## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN,<br>P.O. Box 1174<br>Craig, Alaska 99921 | )<br>)<br>)<br>) |
| KEN DOLE,<br>320 Dock Street<br>Ketchikan, Alaska 99901 | )<br>)<br>)<br>) |
| LARRY MCQUARRIE,<br>P.O. Box 8500<br>Ketchikan, Alaska 99901 | )<br>)<br>)<br>) |
| RICK BIERMAN,<br>P.O. Box 21066<br>Auke Bay, Alaska 99821 | )<br>)<br>)<br>) |
| EDWIN HANEY,<br>8438 N Douglas Highway<br>Juneau, Alaska 99801 | )<br>)<br>) |
| CASE HARRIS,<br>3072 Mountainwood Circle<br>Juneau, Alaska 99801 | )<br>)<br>)<br>) |
| TOM OHAUS<br>4256 Halibut Point Road<br>Sitka, Alaska 99835 | )<br>)<br>)<br>) |
| CARL PORTER,<br>P.O. Box 7844<br>Ketchikan, Alaska 99901 | )<br>)<br>)<br>) |
| PATTY SEAMAN,<br>P.O. Box 8500<br>Ketchikan, Alaska 99901 | )<br>)<br>)<br>) |
| THERESA WEISER<br>P.O. Box 2300, 724 Siginaka Way<br>Sitka, Alaska 99835, and | )<br>)<br>)<br>) |
| DONALD WESTLUND<br>15065 Lizzie Lane<br>Ketchikan, Alaska | )<br>)<br>)<br>) |
|        Plaintiffs,<br><br>    v. | )<br>)<br>)<br>)<br>) |

**COMPLAINT FOR REVIEW OF AGENCY ACTION AND FOR DECLARATORY AND INJUNCTIVE RELIEF**

**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION SOUGHT**

Civil Action No. _____

Carlos M. Gutierrez, in his Official )
Capacity as Secretary of the U.S. )
DEPARTMENT OF COMMERCE, )
Office of the Secretary, Room 5852 )
14th Street and Constitution Ave., NW )
Washington, DC 20230 )
 )
Conrad C. Lautenbacher, Jr., )
in his Official Capacity as )
Administrator of the U.S. )
NATIONAL OCEANIC AND )
ATMOSPHERIC ADMINISTRATION, )
Department of Commerce, Room 5128 )
14th Street and Constitution Ave., NW )
Washington, DC 20230 )
 )
James W. Balsiger, in his Official )
Capacity as Acting Assistant )
Administrator of the U.S. )
NATIONAL MARINE FISHERIES )
SERVICE )
Department of Commerce, Room 14636 )
1315 East-West Highway )
Silver Spring, MD 20910 )
 )
                Defendants. )
 )

## JURISDICTION AND VENUE

1.  This action arises under the Northern Pacific Halibut Act of 1982 (the "Halibut
    Act"), 16 U.S.C. §§ 773-773k, and the Administrative Procedure Act ("APA"), 5
    U.S.C. §§ 701-706.

2.  This court has jurisdiction over this action by virtue of the Halibut Act, which
    provides, "[t]he district courts of the United States shall have exclusive
    jurisdiction over any case or controversy arising under this Act. Any such court
    may, at any time—(1) enter restraining orders or prohibitions; (2) issue warrants,
    process *in rem* or other process; (3) prescribe and accept satisfactory bonds or
    other security; and (4) take such other actions as are in the interest of justice." 16
    U.S.C. § 773i(d).

3.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants the
    district courts "original jurisdiction of all civil actions arising under
    the...laws...of the United States," and 28 U.S.C. § 1361, which grants the district
    courts "original jurisdiction of any action in the nature of mandamus to compel an
    officer or employee of the United States or any agency thereof to perform a duty
    owed to the plaintiff."

4.  Jurisdiction is also found under the APA, 5 U.S.C. § 706, which authorizes a
    court to "set aside agency action, findings, and conclusions found to be ...
    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with
    law," and 5 U.S.C. § 704, which provides a right to judicial review of all "final
    agency action for which there is no other adequate remedy in a court."

5.  Venue is proper in this district court pursuant to 28 U.S.C. § 1391(e).

## NATURE OF THE CASE

6.      This is an action for review of a final rule issued by the Secretary of Commerce through the National Marine Fisheries Service ("NMFS"), a division of the National Oceanic and Atmospheric Administration, Department of Commerce, published in the Federal Register on May 28, 2008. 73 Fed. Reg. 30504. The rule limits the harvest of Pacific halibut to one halibut per calendar day by guided sport charter vessel anglers in Area 2C (Southeast Alaska).

7.      In order to reduce the harvest of halibut by the charter vessel fishery in Southeast Alaska, NMFS initially published a proposed rule on December 31, 2007, setting forth two options. 72 Fed. Reg. 74257 (Dec. 31, 2007). The proposed rule was published by NMFS at the request of the North Pacific Fishery Management Council (the "Council"), a body with statutory authority to recommend, but not to adopt, regulations. The rule was based on an Environmental Assessment, Regulatory Impact Review, and Initial Regulatory Flexibility Analysis (EA/RIR/IFRA) dated November 27, 2007 and available at http://www.fakr.noaa.gov/analyses/halibut/earirirfa_1107.pdf.

8.      The proposed rule did not in any way implicate resource conservation concerns. Both Option A and Option B under the proposed rule dealt only with the issue of allocating the total allowable halibut harvest between the commercial sector and the guided recreational charter sector. NMFS concluded that neither Option A nor Option B would affect the health of the halibut stock or have any adverse impacts on the halibut resource.

9.    Under the first option ("Option A"), NMFS proposed the following rules: (1) a
two-halibut daily bag limit on the charter fishery provided that one of the fish is
not more than 32 inches in length, (2) a prohibition against charter vessel guides,
charter vessel operators, and crews of a charter vessel from catching and retaining
halibut during a charter fishing trip, (3) a limit on the number of lines used to fish
for halibut not to exceed six, or the number of charter vessel anglers onboard the
charter vessel, whichever is less, and (4) a limit on the combined number of
halibut that may be harvested by a charter vessel angler in Area 2C during a
calendar year not to exceed four fish. 72 Fed. Reg. at 74260.

10.    Under the second option ("Option B"), NMFS proposed: (1) a limit of one
halibut per calendar day to be caught and retained by each charter vessel angler in
Area 2C, (2) a prohibition against charter vessel guides, charter vessel operators,
and crews of a charter vessel from catching and retaining halibut during a charter
fishing trip, (3) a limit on the number of lines used to fish for halibut to not
exceed six, or the number of charter vessel anglers onboard the charter vessel,
whichever is less. 72 Fed. Reg. at 74260.

11.    NMFS requested public comment on which option, if any, would best "limit the
catch of the guided sport vessel fishery...while minimizing the adverse impacts
on the charter fishery, its sport fishing clients, the coastal communities that serve
as home ports for this fishery, and on fisheries for other species." 72 Fed. Reg. at
74260.

12.    On January 30, 2008, Plaintiffs Scott Van Valin, Ken Dole, Patty Seaman, Tom
Ohaus, and Rick Bierman, through counsel, filed comments in response to the

proposed rule. The Plaintiffs stated that they all owned and/or managed lodge-based halibut guided charter operations in Area 2C, and they opposed both the four-fish annual limit (Option A) and the one-halibut daily limit (Option B), each of which would have substantial and lasting negative effects on Plaintiffs' businesses, the guided charter fishing industry, and the communities in Southeast Alaska where Plaintiffs' businesses are located.

13.     As lodge-based operators whose business models are built primarily around non-local, multi-day anglers who come to Southeast Alaska for the sole or primary purpose of recreational fishing, Plaintiffs explained that they would suffer the greatest negative impact of any sector of the charter fishery if the Secretary were to adopt either the Option A four-halibut annual limit or the Option B one-halibut daily bag limit.

14.     On May 28, 2008, the Secretary of Commerce, through NMFS, published its final rule in the Federal Register, formally adopting the one-halibut daily limit (Option B). The final rule is effective on June 1, 2008. NMFS stated that a June 1, 2008 effective date "is necessary to effectuate the Council's intent to limit the charter halibut sector's harvest." NMFS provided two justifications for the accelerated effective date: (1) the action needed to be effective at the time of peak harvest (June, July, and August), and (2) a June 1 effective date would avoid industry confusion. Accordingly, NMFS asserted that there was good cause to waive the APA's 30-day delayed effectiveness period under 5 U.S.C. § 553(d).

15.     Because the final rule does not provide a benefit to the commercial sector that justifies the severe damage to the charter sector, the final rule violates Section

5(c) the Halibut Act, which requires that all allocations or assignments of halibut fishing privileges be "fair and equitable to all such fisherman, based on the rights and obligations in existing Federal law [and be] carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of the halibut fishing privileges." 16 U.S.C. §§ 773c(c).

16.    The final rule is arbitrary and capricious because the Secretary failed to make any finding with respect to the statutory mandate that halibut allocation measures be fair and equitable.

17.    The final rule is also contrary to existing NMFS regulations found at 50 C.F.R. § 300.65(c) because it set harvest restrictions based on the Guideline Harvest Level ("GHL") for a future fishing year rather than the GHL for a past fishing year.

18.    Moreover, the final rule is arbitrary and capricious because NMFS failed to address the merits of Plaintiffs' argument that the new regulations are inconsistent with NMFS' existing GHL regulations.

19.    The final rule impermissibly waived the APA's 30-day delayed effectiveness requirement without an adequate showing of good cause by the agency, and is therefore arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

20.    Plaintiffs seek in this action an order declaring the final rule adopted by NMFS to be invalid, vacating it, and preliminarily and permanently enjoining NMFS from acting in further reliance on it.

## THE PARTIES

21.    Plaintiffs each own and/or operate either a combined lodge and charter boat

operation or a charter boat operation that provides guided charter services to

anglers fishing for halibut in Area 2C (Southeast Alaska). Their businesses are

built around multi-day clients who come to Southeast Alaska for the sole or

primary purpose of recreational fishing. Plaintiffs, as well as the communities in

which they conduct their guided charter businesses, have suffered and will

continue to suffer substantial economic harm and other negative effects due to the

final rule adopted by Defendant NMFS.

22.    Plaintiff Scott Van Valin is the owner of El Capitan Lodge, which is located on

Prince of Wales Island.

23.    Plaintiff Ken Dole is a partner in Waterfall Resort, located on the west coast of

Prince of Wales Island.

24.    Plaintiff Larry McQuarrie is owner of the Sportman's Cove Lodge, which is

located on the eastern shore of Price of Wales Island.

25.    Plaintiff Rick Bierman is the owner of The Whale's Eye Lodge, which is located

on Shelter Island near Juneau.

26.    Plaintiff Edwin Haney is owner and operator of Lucky Dog Adventure LLC,

which is located in Juneau, Alaska.

27.    Plaintiff Case Harris is owner and operator of Alaskan Marine Adventures, LLC,

which is located in Juneau, Alaska.

28.    Plaintiff Carl Porter is owner and operator of Chip Porter Charters, which is

located in Ketchikan, Alaska.

29.    Plaintiff Tom Ohaus is owner and operator of Angling Unlimited, which is
       located in Sitka, Alaska.

30.    Plaintiff Patty Seaman is Operations Manager for Sportman's Cove Lodge, which
       is located on the eastern shore of Price of Wales Island.

31.    Plaintiff Theresa Weiser is owner and operator of Alaska Premier Charters and
       Wild Strawberry Lodge, which is located on Baranof Island near Sitka, Alaska.

32.    Plaintiff Donald Westlund is the owner and operator of Silver King Charters,
       which is located in Ketchikan, Alaska.

33.    Defendant Carlos M. Gutierrez is Secretary of the United States Department of
       Commerce.  He is sued in his official capacity as the chief officer of the
       Department charged with managing United States marine fisheries.

34.    Defendant the U.S. Department of Commerce is a federal agency organized and
       existing pursuant to the Department of Commerce and Labor Act, 15 U.S.C. §§
       1501 *et seq.*, and is responsible for, among other things, managing United States
       marine fisheries.

35.    Defendant Conrad C. Lautenbacher, Jr. is the Under Secretary of Commerce for
       Oceans and Atmosphere, and the Administrator of the National Oceanic and
       Atmospheric Administration ("NOAA").  He is sued in his official capacity as
       chief officer of NOAA charged with managing United States marine fisheries.

36.    Defendant NOAA is an agency of the U.S. Department of Commerce with
       supervisory responsibility for the National Marine Fisheries Service ("NMFS").
       The Secretary of Commerce has delegated responsibility to manage fisheries and

ensure compliance with the Halibut Act and the APA to NOAA, which in turn has sub-delegated those responsibilities to NMFS.

37.    Defendant James W. Balsiger is the Acting Assistant Administrator for Fisheries for NOAA and Administrator of NMFS. He is sued in his official capacity as chief officer of NMFS charged with managing United States marine fisheries.

38.    Defendant NMFS is an agency of the United States Department of Commerce that has been delegated the responsibility to manage United States marine fisheries. NMFS is the United States government agency with primary responsibility to manage marine fisheries and enforce the Halibut Act.

## RELEVANT STATUTORY AND REGULATORY PROVISIONS

39.    The Secretary of Commerce and the International Pacific Halibut Commission ("IPHC") manage fishing for Pacific halibut through regulations established under the authority of the Northern Pacific Halibut Act of 1982 (the "Halibut Act"), 16 U.S.C. §§ 773-773k; 50 C.F.R. §§ 300.60-300.66.

40.    The IPHC promulgates regulations governing the halibut fishery under the Convention between the United States and Canada for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea (the "Convention"). The IPHC's regulations are subject to approval by the Secretary of State with concurrence from the Secretary of Commerce. *See* 16 U.S.C. § 773b. After approval by the Secretaries of State and Commerce, the IPHC regulations are published in the Federal Register as annual management measures. *See* 50 C.F.R. § 300.62.

41.    The Halibut Act's general rulemaking authority provides the Secretary of Commerce with broad authority and discretion to "adopt such regulations as may be necessary to carry out the purposes and objectives of the Convention and Act...." 16 U.S.C. §773c(b)(1).  The Halibut Act also provides the North Pacific Fishery Management Council (the "Council") with the authority to recommend regulations to the Secretary of Commerce to allocate harvesting privileges among U.S. fisherman. *See* 16 U.S.C. § 773c(c).  The Secretary has full authority to adopt any regulation or no regulation in his discretion, irrespective of any Council recommendation, and the Secretary may act whether or not the Council makes any recommendation. *Id.*

42.    Section 5(c) of the Halibut Act provides in relevant part: "[i]f it becomes necessary to allocate or assign halibut fishing privileges among various United States fishermen, such allocation shall be fair and equitable to all such fishermen, based upon the rights and obligations in existing Federal law, reasonably calculated to promote conservation, and carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of the halibut fishing privileges." 16 U.S.C. §773c(c).

## FACTS

43.    The harvest of halibut off Alaska generally occurs in four basic fisheries— commercial, guided sport (charter), unguided sport, and subsistence fisheries. *See* 72 Fed. Reg. 74257, 74258.  The final rule adopted by NMFS seeks to reduce the harvest of halibut by the guided sport charter fishery in order to eventually allocate a larger harvest to the commercial fishery.

11

44.    The IPHC annually determines the amount of halibut that may be removed from the resource without causing any conservation problems on an area-by-area basis in all areas of the Convention waters. *See* 72 Fed. Reg. at 74258. The target level of allowable harvest is called the total constant exploitation yield ("CEY"), which represents the target level for total removals in net pounds for that area in the coming year. The IPHC subtracts estimates of all non-commercial removals from the total CEY to determine the target level for commercial fishing, then applies an economic "buffering," algorithm called "slow-up, fast-down" to determine the commercial fishery's catch limit. According to NMFS, the continued growth of the charter fishery in Area 2C has resulted in the charter fishery harvesting an even larger amount of halibut, which reduces the amount available to the commercial fishery. Charter harvests in Area 2C peaked, however, in 2005.

45.    On August 8, 2003, the Secretary published a final rule establishing non-binding harvest target limits for the charter fisheries in Areas 2C and 3A off Alaska. Those target harvest levels were called "guideline harvest levels," or "GHLs." *See* 68 Fed. Reg. 47256 (Aug. 8, 2003); 50 C.F.R. §300.65(c). The GHLs do not limit the charter vessel fisheries, but instead serve as a benchmark for monitoring the charter vessel fishery harvest relative to the commercial fishery harvest. In the 2003 final rule establishing annual GHLs, NMFS described a process in which a change in the CEY for an area could trigger a change in the GHL, but went on to provide that any restrictions associated with a harvest in excess of that revised GHL would be proposed only after the Secretary advised the Council that the GHL for a given year had been exceeded. 68 Fed. Reg. at 47259.

46.    At its annual meeting in January 2007, the IPHC adopted a motion to recommend reducing the daily bag limit for anglers on charter vessels in Areas 2C and 3A from two halibut to one halibut during certain time periods. The IPHC recommended this bag limit reduction to initiate control on the charter harvest.

47.    On March 1, 2007, the Secretaries of State and Commerce rejected the recommended one-halibut daily bag limit in Areas 2C and 3A due to the heavy economic burden it would place on the charter sector, and indicated that the appropriate reduction in the charter vessel harvest would be better achieved by a combination of other regulatory actions.

48.    On June 4, 2007, the Secretary of Commerce published regulations without any recommendation from the Council with the goal of reducing the harvest of halibut in the charter vessel sector in Area 2C to a level comparable to the level that would have been achieved by the IPHC-recommended regulations. *See* 72 Fed. Reg. 30714 (June 4, 2007). The alternative chosen by the Secretary maintained the two-halibut daily bag limit, provided that at least one of the harvested halibut had a head-on length of no more than 32 inches.

49.    In June 2007, the Council considered management alternatives for the charter halibut fishery in Area 2C. The Council adopted an alternative that contained two options, which were designed specifically to restrict the harvest of halibut by anglers fishing from charter vessels to the 2008 GHL, which at that time had not yet been established. These two options formed the basis of NMFS' proposed rule.

50.  On December 31, 2007, the NMFS published a proposed rule, as recommended by the Council in June 2007, proposing two measures to reduce the harvest of halibut by anglers fishing on charter vessels in Area 2C:  (1) Option A, the four-fish annual limit, and (2) Option B, the one-halibut daily bag limit (*see* ¶¶ 8-10, *supra*).  72 Fed. Reg. 74257.

51.  After a public comment period that closed on January 30, 2008, the Secretary of Commerce published the final rule in the Federal Register on May 28, 2008, adopting Option B, the one-halibut daily limit. The Secretary waived the APA's 30-day delayed effectiveness requirement, 5 U.S.C. § 553(d)(3), and therefore the final rule will became effective on June 1, 2008.

### ERRORS IN THE RULE

52.  Section 5(c) of the Halibut Act provides in relevant part: "[i]f it becomes necessary to allocate or assign halibut fishing privileges among various United States fishermen, such allocation shall be fair and equitable to all such fishermen, based upon the rights and obligations in existing Federal law...and carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of the halibut fishing privileges." 16 U.S.C. § 773c(c).

53.  The Secretary in both the proposed rule and the final rule acknowledged that the one-halibut rule would impose a substantial hardship on lodge-based charter businesses, as well as other charter businesses, and that some would be driven out of business 73 Fed. Reg. 30508 (comments 11 and 14).  The Secretary also found that the one-halibut rule would provide no benefit to commercial fishermen in 2008, and virtually none in 2009, EA/RIR/IRFA at 73 (Table 58) and that the

14

Council has proposed replacement management measures that could be in place by 2010. 73 Fed. Reg. 30516 (comment 69)

54.    In the 2003 rule establishing guideline harvest levels or GHLs, the Secretary did not make any determination as to whether the GHLs then set, or the mechanism adopted for adjusting those non-binding GHLs, were "fair and equitable" within the meaning of section 5(c) of the Halibut Act. Similarly, the Secretary in adopting the final rule for which review is sought made no such finding. Instead, the Secretary merely stated that the one-halibut daily bag limit was adopted in order "to reduce the poundage of halibut harvested by the guided sport charter vessel sector in Area 2C to the GHL. . . ." 73 Fed. Reg. 30505. The Secretary has never offered an analysis of whether the one-halibut daily limit or management to the GHL is "fair and equitable" within the meaning of the Halibut Act.

55.    Federal agencies must follow their own rules. *See, e.g., Ballard v. Comm'r of Internal Revenue*, 544 U.S. 40, 59 (2005). If an agency wishes to change its rules, the APA requires that it must do so under a proper notice and comment procedure. *See* 5 U.S.C. § 553.

56.    The Secretary chose to employ the GHL as the benchmark for this regulatory action, and makes constant reference to the GHL as the basis for its action. The final rule clearly states that this rule does not purport to change the existing GHL regulations. 73 Fed. Reg. 30512 (comment 45). When the Secretary adopted the GHL benchmark as a regulation in 2003, however, the rule made it clear that any subsequent management measures that were based on the GHL would be imposed in years that came *after* the completion of a fishing year in which the GHL was

exceeded: "Given the one-year lag between the end of the fishing season and the availability of that year's harvest data, management measures in response to the guided recreational fleet's meeting or exceeding the GHL would take up to two years to become effective." 68 Fed. Reg. 47256, 47257. Here, in contrast, the management measures are designed to reduce harvest to a GHL (2008) for a fishing year that has not yet occurred. As such, the GHL is being used here in a manner that is expressly contrary to the mechanism described in the GHL final rule promulgated in 2003.

57.    Agency action violates the APA whenever the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[1]

58.    In this case, the Secretary "entirely failed to consider an important aspect of the problem." In addition to the fact that the Secretary failed to follow his own regulations regarding the use of the GHL as the basis for management measures, the Secretary failed here even to consider Plaintiffs' argument that the proposed rule made that error. Plaintiffs' conspicuously and in detail made that argument on pages 4-10 of their comments. *See* Exhibit 3 at 4-10. The Secretary expressly acknowledged the comment at 73 Fed. Reg. 30512 (comment 49), but the response did not address the substance of Plaintiffs' argument. Instead, the response was directed at the adequacy of the public notice for the proposed rule,

---

[1] *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983).

something that is entirely different and that Plaintiffs did not contest. The Secretary's response was a *non sequitur*, and his failure to address this central and substantial issue from the most detailed and extensive set of comments filed in the rulemaking is arbitrary and capricious.

59. The APA provides that a substantive rule "shall be made not less than 30 days before its effective date," 5 U.S.C. § 553(d). To waive the 30-day delayed effectiveness period, an agency must provide good cause. *Id.* at 553(d)3). This "good cause" exception "must be narrowly construed and only reluctantly countenanced in order to assure than an agency's decisions will be informed and responsive." *Asiana Airlines v. FAA*, 134 F.3d 393, 396 (D.C. Cir. 1998) (internal citations omitted). If an agency fails to meet this narrow "good cause" exception, it has thus adopted its final rule "without observance of procedure required by law," and a reviewing court must therefore "hold unlawful and set aside" the rule. 5 U.S.C. § 706(2)(D).

60. The Secretary waived the 30-day delayed effective date required under 5 U.S.C. § 553(d) on the grounds that the peak fishing period begins on June 1 and "the intent of the Council will be thwarted" if the rules do not have immediate effect. 73 Fed. Reg. 30523. NMFS also stated that "confusion" would occur if the effective date were delayed. *Id.* The "intent of the Council," unless adopted by the Secretary as his own and adequately explained – which did not occur here – is no reason at all in light of the fact that it is the Secretary, not the Council, that Congress has cloaked with rulemaking authority under the Halibut Act. In any event, the comment period closed nearly four months ago, and the bulk of the

comments received were one or two page statements of a preferred outcome, without analysis. Failure to complete the rulemaking in time to provide the statutorily required notice does not under those circumstances constitute "good cause." With respect to the alleged confusion to be avoided by immediate implementation of the rule, the Secretary provides no explanation of how announcing a rule three days before it is to become effective when anglers have already made plans on the basis of the existing rules will avoid confusion. The proffered explanation is simply words devoid of any meaning.

## FIRST CAUSE OF ACTION

61.    Plaintiffs hereby repeat and reallege and incorporate paragraphs 1 through 60 above.

62.    The final rule adopted by the Secretary is contrary to the clear and unambiguous language of the Halibut Act, 16 U.S.C. §§ 773-773k, which provides that all allocations or assignments of halibut fishing privileges be "fair and equitable," 16 U.S.C. §§ 773c(c). The rule has caused and will continue to cause substantial harm to charter sector operators without any corresponding benefit to commercial sector fisherman and is therefore contrary to the Halibut Act.

## SECOND CAUSE OF ACTION

63.    Plaintiffs hereby repeat and reallege and incorporate paragraphs 1 through 60 above.

64.    The final rule adopted by the Secretary violates the Administrative Procedure Act. The Secretary failed even to consider whether the allocation established by the

final rule was fair and equitable as required by the Halibut Act and thereby failed to consider a central issue mandated by Congress. The final rule is therefore arbitrary and capricious, an abuse of discretion, and contrary to law. 5 U.SC. § 704.

## THIRD CAUSE OF ACTION

65.    Plaintiffs hereby repeat and reallege and incorporate paragraphs 1 through 60 above.

66.    The final rule adopted by the Secretary is inconsistent with the Secretary's existing GHL regulations, which the final rule does not purport to change. Those existing GHL regulations plainly state that GHL-based management measures are to *follow* a fishing year in which that year's GHL was exceeded, and that such management measures are to be designed to bring future harvests in line with the GHL of the year in which the excess harvest occurred. Here, in contrast, the management measures were adopted in response to an overage in 2006, but are set at a level designed to reduce harvest to a lower 2008 GHL. The Secretary could have gone outside of the GHL mechanism in order to adopt management measures that would constrain the charter fleet to a lower 2008 GHL. However, having chosen the GHL mechanism as the sole basis for the rulemaking, the Secretary was obliged to act within his own GHL rules as promulgated in 2003 and not changed here.

## FOURTH CAUSE OF ACTION

67.    Plaintiffs hereby repeat and reallege and incorporate paragraphs 1 through 60 above.

19

68.   It is unnecessary to reach the merits of the Third Cause of Action, because the

       Secretary failed to provide any meaningful response to comments filed by the

       Plaintiff alleging the Secretary's failure to follow his own regulations as

       summarized in the Third Cause of Action.  That failure to address a substantial

       and specific allegation of illegality is arbitrary and capricious and constitutes an

       independent ground for reversal.

## FIFTH CAUSE OF ACTION

69.   Plaintiffs hereby repeat and reallege and incorporate paragraphs 1 through 60

       above.

70.   The final rule adopted by the Secretary is contrary to the clear and unambiguous

       language of the APA, because it impermissibly waived the requirement that a

       substantive rule "shall be made not less than 30 days before its effective date," 5

       U.S.C. § 553(d), without an adequate showing of good cause by the agency, and

       is therefore arbitrary and capricious, an abuse of discretion, and contrary to law.

## RELIEF REQUESTED

WHEREFORE Plaintiffs Pray:

71.   That the Court declare the final rule adopted by the Secretary to be in excess of

       his authority, arbitrary, capricious, an abuse of discretion, in violation of law, and

       vacated.

72.   That the Court issue a temporary restraining order to enjoin the Secretary from

       acting in further reliance upon the final rule and thereafter that the Court issue a

preliminary injunction to prevent the Secretary from acting upon the rule until such time as the Court may rule on the merits.

73.    That the Court grant such other relief as is proper and just.

74.    A separate motion for a temporary restraining order and/or preliminary injunction is filed contemporaneously herewith.

Respectfully submitted this 2nd day of June, 2008.

By: _____

John W. Butler (D.C. Bar No. 437370)
Robert K. Magovern (D.C. Bar No. 497862)
SHER & BLACKWELL LLP
1850 M Street, N.W.
Suite 900
Washington, DC 20036
(202) 463-2500 (Main)
(202) 463-2510 (Direct)
(202) 365-0059 (Cell)

Earl W. Comstock
COMSTOCK CONSULTING LLC
6225 30th Street, N.W.
Washington, DC 20015
(202) 255-0273

*Counsel for Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of June, 2008, a true and correct copy of the foregoing Complaint, Motion for a Temporary Restraining Order and/or a Preliminary Injunction, and Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order and/or a Preliminary Injunction were served on the following individuals by first class mail, and, where indicated, also electronically:

The Hon. Michael B. Mukasey
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001
(202) 514-2001

Ronald J. Tenpas
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Law & Policy Section
P.O. Box 4390
Ben Franklin Square
Washington, DC 20044-4390
(202) 514-2701
(also served electronically)

Seth Barsky
Assistant Chief Wildlife Section
U.S. Department of Justice
Environment and Natural Resources Division
Law & Policy Section
P.O. Box 4390
Ben Franklin Square
Washington, DC 20044-4390
(202) 305-0223
(also served electronically)

Carlos M. Gutierrez,
Secretary
U.S. Department of Commerce
Office of the Secretary, Room 5852
14th Street and Constitution Ave., NW
Washington, DC 20230
(202) 483-2112

David K. Bowsher
Acting General Counsel
U.S. Department of Commerce
Herbert C. Hoover Building
Mail Stope 5875
14th & Constitution Avenue, NW
Washington, DC 20230
(202) 482-4772

Conrad C. Lautenbacher, Jr.,
Administrator
National Oceanic and Atmospheric Administration
Department of Commerce, Room 5128
14th Street and Constitution Ave., NW
Washington, DC 20230
(202) 482-3436

Jane C. Luxton
General Counsel
U.S. Department of Commerce
National Oceanic and Atmospheric Administration
Room 5814
14th & Constitution Avenue, N.W.
Washington, DC 20230
(202) 482-4080
(also served electronically)

Dr. James W. Balsiger
Acting Assistant Administrator
U.S. Department of Commerce
National Marine Fisheries Service
Room 14636
1315 East-West Highway
Silver Spring, MD 20910
(301) 713-2239 ext. 103
(also served electronically)

Joyce M. Baker

**30504**    Federal Register / Vol. 73, No. 103 / Wednesday, May 28, 2008 / Rules and Regulations

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

**50 CFR Part 300**

[Docket No. 080515668–8669–01]

RIN 0648–AW82

**Pacific Halibut Fisheries; Guideline Harvest Levels for the Guided Recreational Halibut Fishery; Correction**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule; correcting amendments.

**SUMMARY:** This action corrects the regulatory text of a final rule published on August 8, 2003 (68 FR 47256), that implemented guideline harvest levels (GHLs) for the guided sport charter vessel fishery in the International Pacific Halibut Commission Regulatory Areas 2C and 3A. The table of GHLs as they relate to the total constant exploitation yield contains errors in the conversions from pounds to metric tons, and rounding errors for some metric equivalents. This action is necessary to correct the errors in the fishery.

**DATES:** Effective May 28, 2008.

**FOR FURTHER INFORMATION CONTACT:** Julie Scheurer, (907) 586–7356.

**SUPPLEMENTARY INFORMATION:** A final rule published August 8, 2003 (68 FR 47256, RIN 0648–AK17), implemented guideline harvest level (GHL) measures for managing the harvest of Pacific halibut (*Hippoglossus stenolepis*) in the charter sport fishery in International Pacific Halibut Commission (IPHC) Regulatory Areas 2C and 3A in and off Alaska. This correcting amendment revises the table at 50 CFR 300.65(c)(1) that lists GHLs corresponding to different levels of the total constant exploitation yield set annually by the IPHC.

### Need for Correction

The table at § 300.65(c)(1) contains three metric conversion errors, several rounding errors, and missing paragraph designations. Paragraphs (c)(1)(i) through (v) refer to different benchmark levels for the total constant exploitation yield for Area 2C. There are no similar paragraph designations for the benchmark levels for Area 3A. Paragraph designations are added for the Area 3A table entries for consistency. This final rule corrects the conversion to metric equivalent errors

and rounding errors, adds new paragraph designations to paragraph (c)(1), and reorganizes the table into two columns instead of four for clarity and ease of reading.

### Classification

Pursuant to 5 U.S.C. 553(b)(B), the Acting Assistant Administrator for Fisheries finds there is good cause to waive prior notice and an opportunity for public comment on this action, as notice and comment would be unnecessary. Notice and comment are unnecessary because this action makes only minor, non-substantive changes to the metric equivalents for the GHLs, and reorganizes the table to make it easier to read and understand. The IPHC conducts its analyses and sets limits using pounds. Likewise, Canadian and U.S. management agencies use pounds to measure and report halibut catch information. These corrections will not affect the results of analyses conducted to support management decisions in the halibut fishery nor change the total catch of halibut in the charter halibut fishery. This rule does not make any substantive change in the rights and obligations of charter vessel anglers managed under the GHL halibut regulations. No aspect of this action is controversial and no change in operating practices in the fishery is required. NMFS therefore determines that APA requirements for public notice and comment are unnecessary for this action and determines that this rule is not subject to the 30-day delay in effectiveness requirement at 5 U.S.C. 553(d).

This final rule complies with the Halibut Act and the North Pacific Fishery Management Council's authority to implement allocation measures for the management of the halibut fishery.

### List of Subjects in 50 CFR Part 300

Fisheries, Fishing, Reporting and recordkeeping requirements, Treaties.

Dated: May 21, 2008.

**Samuel D. Rauch III**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

■ For the reasons set out in the preamble, 50 CFR part 300 is corrected as follows:

## PART 300—INTERNATIONAL FISHERIES REGULATIONS

■ 1. The authority citation for 50 CFR part 300, subpart E, continues to read as follows:

**Authority:** 16 U.S.C. 773–773k.

■ 2. In § 300.65, paragraph (c)(1) is revised to read as follows:

**§ 300.65 Catch sharing plan and domestic management measures in waters in and off Alaska.**

\*    \*    \*    \*    \*

(c) \* \* \*

(1) The annual GHLs for Regulatory Areas 2C and 3A are determined as follows:

| If the Annual Total Constant Exploitation Yield for Halibut is More Than: | Then the GHL will be: |
|---|---|
| (i) Regulatory Area 2C | |
| (A) 9,027,000 lb (4,094.6 mt) | 1,432,000 lb (649.5 mt) |
| (B) 7,965,000 lb (3,612.9 mt) | 1,217,000 lb (552.0 mt) |
| (C) 6,903,000 lb (3,131.1 mt) | 1,074,000 lb (487.2 mt) |
| (D) 5,841,000 lb (2,649.4 mt) | 931,000 lb (422.3 mt) |
| (E) 4,779,000 lb (2,167.7 mt) | 788,000 lb (357.4 mt) |
| (ii) Regulatory Area 3A | |
| (A) 21,581,000 lb (9,789.0 mt) | 3,650,000 lb (1,655.6 mt) |
| (B) 19,042,000 lb (8,637.3 mt) | 3,103,000 lb (1,407.5 mt) |
| (C) 16,504,000 lb (7,486.1 mt) | 2,734,000 lb (1,240.1 mt) |
| (D) 13,964,000 lb (6,334.0 mt) | 2,373,000 lb (1,076.4 mt) |
| (E) 11,425,000 lb (5,182.3 mt) | 2,008,000 lb (910.8 mt) |

\*    \*    \*    \*    \*

[FR Doc. E8–11881 Filed 5–27–08; 8:45 am]

**BILLING CODE 3510-22-S**

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

**15 CFR Part 902**

**50 CFR Part 300**

[Docket No. 071031633–8385–02]

RIN 0648–AW23

**Pacific Halibut Fisheries; Guided Sport Charter Vessel Fishery for Halibut**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

Exhibit 1

**ACTION:** Final rule.

**SUMMARY:** NMFS implements regulations to limit the harvest of Pacific halibut by guided sport charter vessel anglers in International Pacific Halibut Commission Area 2C of Southeast Alaska to the guideline harvest level (GHL) of 931,000 lb (422.3 mt). The intended effect of this action is to reduce the poundage of halibut harvested by the guided sport charter vessel sector in Area 2C to the GHL while minimizing adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and fisheries for other species. This final rule implements three restrictions for the guided sport charter vessel fishery for halibut in Area 2C: a one-fish daily bag limit, no harvest by the charter vessel guide and crew, and a line limit equal to the number of charter vessel anglers onboard, not to exceed six lines.

**DATES:** Effective June 1, 2008.

**ADDRESSES:** Copies of the Environmental Assessment (EA), Regulatory Impact Review (RIR), and Final Regulatory Flexibility Analysis (FRFA) prepared for this action may be obtained from the North Pacific Fishery Management Council (Council) at 605 West 4th, Suite 306, Anchorage, Alaska 99501–2252, 907–271–2809, or the NMFS Alaska Region, P.O. Box 21668, Juneau, Alaska 99802, Attn: Ellen Sebastian, and on the NMFS Alaska Region Web site at *http:// www.noaa.fakr.gov.*

Written comments regarding the burden-hour estimates or other aspects of the collection of information requirements contained in this rule may be submitted to NMFS at the above address, and by e-mail to *David_Rostker@omb.eop.gov* or by fax to 202–395–7285.

**FOR FURTHER INFORMATION CONTACT:** Sue Salveson, 907–586–7228, or Julie Scheurer, 907–586–7356.

**SUPPLEMENTARY INFORMATION:** The International Pacific Halibut Commission (IPHC) and NMFS manage fishing for Pacific halibut (*Hippoglossus stenolepis*) through regulations established under the authority of the Northern Pacific Halibut Act of 1982 (Halibut Act). The IPHC promulgates regulations governing the halibut fishery under the Convention between the United States and Canada for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea (Convention). The IPHC's regulations are subject to approval by the Secretary of State with concurrence by the Secretary of Commerce

(Secretary). After approval by the Secretaries of State and Commerce, the IPHC regulations are published in the **Federal Register** as annual management measures pursuant to 50 CFR 300.62. The annual management measures for 2008 were published on March 7, 2008 (73 FR 12280).

The Halibut Act also provides the Council with authority to recommend regulations to the Secretary to allocate harvesting privileges among U.S. fishermen. This process requires the Council to submit a recommendation to the Secretary as a proposed rule for publication in the **Federal Register** along with supporting analyses as required by other applicable law. The Council is developing a regulatory program to manage the guided sport charter vessel fishery for halibut. This final rule is a step toward the Council's effort to stabilize relative harvest between the Area 2C charter vessel and commercial halibut fisheries while a longer term management program is developed and implemented. The proposed longer term program under development currently includes a proposed limited entry program for charter businesses, a catch sharing plan, and compensated reallocation from the commercial to charter fishing sectors. This final rule is linked to the overall management of the halibut fisheries by the IPHC and a previous regulation approved by the Secretary that establishes a guideline harvest level (GHL) for managing the harvest of halibut by the guided sport charter vessel fishery (August 8, 2003; 68 FR 47256).

### Background and Need for Action

The background and need for this action were described in the preamble of the proposed rule published in the **Federal Register** on December 31, 2007 (72 FR 74257). In summary, this final rule will implement a one-fish daily bag limit for guided sport charter vessel anglers in Area 2C to reduce the poundage of halibut harvested by the guided sport charter vessel sector in Area 2C to the GHL while minimizing adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and fisheries for other species.

### Management of the Halibut Fisheries

A complete description of how the halibut fisheries are managed can be found in the preamble to the proposed rule. In short, the IPHC annually determines the amount of halibut that may be removed from the resource without causing biological or

conservation problems on an area-by-area basis in all areas of Convention waters. The IPHC estimates the exploitable biomass and calculates the target amount of allowable mortality for a given area. This target level is called the total constant exploitation yield (CEY) and it represents the target level for total removals (in net pounds) for that area in the coming year. The IPHC subtracts estimates of all non-commercial removals (sport, subsistence, bycatch, and wastage) from the total CEY. The remaining CEY, after the removals are subtracted, is the maximum catch or AFishery CEY" for an area's directed commercial fixed gear fishery.

### Guideline Harvest Level

A more thorough discussion of the development of the guideline harvest level (GHL) is provided in the preamble to the proposed rule (December 31, 2007; 72 FR 74257) and in the rule that first implemented the GHL (August 8, 2003; 68 FR 47256). The Area 2C GHL is established in regulations at 50 CFR 300.65(c) and is a benchmark for monitoring the charter vessel fishery relative to the commercial fishery and other sources of fishing mortality. The fishery is not closed when the GHL is reached, but it is the Council's policy that the charter vessel fishery should not exceed the GHL.

To accommodate fluctuations in halibut abundance, the Council adjusts the GHL step-wise according to the total CEY determined annually by the IPHC. Specifically, the Council linked a step-wise reduction in the GHL in any one year to the decrease in the total CEY as compared to the 1999–2000 stock abundance. Since 2003 when the GHL became effective, it has never been reduced below its maximum level because declines in the total CEY have not been sufficient to trigger the first step reduction of the GHL. This situation changed in 2008 when the total CEY for Area 2C was markedly reduced, resulting in a GHL of 931,000 lb (422.3 mt). If the CEY were to increase in the future, the GHL could increase up to a maximum of 1.432 million lb (649.5 mt) for Area 2C.

### Recent Harvests of Halibut in Area 2C

The GHL was implemented in 2003, and the charter vessel fishery has exceeded the GHL for Area 2C every year since 2004. In 2006, the charter harvest exceeded its 2006 Area 2C GHL by 380,000 lb (172.4 mt) or 26.5 percent. In 2007, the Secretary of Commerce took regulatory action to reduce sport fish harvest of halibut in Area 2C by amending the two-fish bag limit with

the restriction that at least one of the two halibut retained could be no longer than 32 in (81.3 cm) with its head on. Alaska Department of Fish and Game (ADF&G) preliminary estimates of the Area 2C halibut harvest by the charter vessel fishery in 2007 again indicated that the GHL was exceeded, although by a smaller amount.

The Council recommended this final rule specifically to maintain the charter vessel fishery at its GHL. In June 2007, the Council adopted a preferred alternative that contained two options. The Council recommended that the selection between the options would depend on whether the CEY decreased substantially for 2008. Not knowing in June 2007 how the GHL might be affected by total CEY established by the IPHC in January 2008, the Council recommended a suite of charter vessel fishery restrictions if the GHL were to remain the same in 2008 (proposed rule Option A) and a more restrictive suite of restrictions if the GHL were to decrease in 2008 (proposed rule Option B).

At the IPHC annual meeting in January 2008, the IPHC set the 2008 total CEY for Area 2C was set at 6.5 million lb (2,948.4 mt). This is a 4.3 million lb (1,950.4 mt) reduction from the 2007 total CEY of 10.8 million lb (4,899.0 mt).

## 2008 GHL for Area 2C

NMFS published a notice of the guideline harvest levels for Areas 2C and 3A for 2008 on February 5, 2008 (73 FR 6709). As established by the original rule that implemented the GHL (August 8, 2003; 68 FR 47256), the GHL will step down if the IPHC reduces the CEY below certain benchmarks. The 2008 CEY resulted in a three-step reduction in the GHL for Area 2C. The 2008 GHL for Area 2C is 931,000 lb (422.3 mt).

## The Action

With this final rule, NMFS implements the following management measures to restrict halibut harvest by the charter vessel sector to the GHL for Area 2C:

• The number of halibut caught and retained by each charter vessel angler in Area 2C is limited to no more than one halibut of any size per calendar day;

• A charter vessel guide, a charter vessel operator, and crew of a charter vessel must not catch and retain halibut during a charter vessel fishing trip; and

• The number of lines used to fish for halibut must not exceed six or the number of charter vessel anglers onboard the charter vessel, whichever is less.

No annual limit for individual anglers will be implemented in Area 2C for 2008. NMFS notes that a two-fish daily bag limit for sport fish anglers is established under annual IPHC regulations for all harvest off Alaska. If an angler onboard a charter vessel in Area 2C retains a halibut, then that angler may retain only one additional halibut that day and only if that additional halibut was caught in an IPHC regulatory area other than Area 2C. This is most pertinent to charter vessels that may fish adjacent Areas 2C and 3A in a single day. While charter vessel guides, operators, and crew will be prohibited from catching and retaining halibut, they are not prohibited from demonstrating fishing techniques to their clients.

## Summary of Comments

The proposed rule was published in the Federal Register on December 31, 2007 (72 FR 74257), and invited public comments until January 30, 2008. NMFS received 273 letters, e-mails, and faxes before the deadline containing 107 unique comments on the proposed rule. NMFS received 162 letters in favor, 102 letters in opposition, 8 letters in partial support, and one letter stating an ambiguous position on the proposed rule. Of the letters from which affiliations could be determined, 96 were from the commercial industry, 61 from the charter industry, 14 from local businesses, 2 from fisheries management organizations (IPHC and ADF&G), and 24 letters were received from anglers and members of the general public. Three form letters were received. Ten copies of one letter in support of the one-fish daily bag limit were received. One form letter was received from 51 individuals who opposed the proposed rule because it did not include a sunset provision. The third form letter was from 13 businesses that opposed the proposed rule citing negative economic effects to their communities. Additionally, two letters in favor of the proposed rule were received, one signed by 24 commercial fisherman, and another signed by 15 deckhands. Comments in favor of the rule generally expressed support for limiting the guided sport charter vessel sector harvest to the GHL to ensure conservation of the halibut stock and to avoid further reallocations from the commercial sector. Most comments against the rule cited economic hardship to businesses and communities, inability to retain clients who will choose to fish in other areas with more lenient restrictions, and the need for what was perceived by the commenters as a more equitable

allocation split between the commercial and charter sectors, as reasons for their opposition.

## Comments and Responses

### Allocation Issue

*Comment 1:* NMFS should impose restrictions on the commercial fishing sector, including reducing commercial bycatch and the commercial set-line quota instead of limiting the halibut charter fishery.

*Response:* This rule is not designed to impose further restrictions on commercial fisheries that take halibut. The commercial fishery for halibut as well as the commercial fishery for groundfish that takes halibut as bycatch to the harvest of other species are limited to a specified amount of halibut mortality. Unlike the charter vessel fishery for halibut, these commercial fisheries are closed each year when their limits are reached.

*Comment 2:* All sectors need to stay within their allocations and measures should be implemented to restrict the charter sector to the GHL. Due to a declining estimate in biomass, and charter fishery overages of the GHL, the Area 2C commercial fishery has taken a 42 percent reduction in allowable harvest between 2006 and 2008. Achievement of IPHC's harvest goals and management objectives depends on implementation of the proposed action. To choose an option that won't hold the charter sector at or below the GHL would result in continued reallocation of the halibut resource. Option B in the proposed rule is the only option that will reduce harvest to the 2008 GHL.

*Response:* NMFS is implementing management measures in the final rule that are intended to reduce the Area 2C charter halibut harvest amount to the 2008 GHL.

*Comment 3:* Change how allocations are divided between the charter and commercial sectors.

*Response:* Establishing a new process for allocating Pacific halibut among different sectors is outside the scope of the proposed action; however, the Council is considering options for reallocating halibut between the commercial and charter sectors and received public testimony at its April 2008 meeting. Final action is scheduled for October 2008.

*Comment 4:* The Council has stated that its intent is to manage the charter halibut fishery to the GHL until a long term plan is adopted including a limited entry program for halibut charter businesses and potentially new regulations on the allocation of halibut

between the commercial and charter fisheries.

*Response:* NMFS agrees. See response to Comment 3.

*Comment 5:* The IFQ program has allowed commercial fisherman to fish shallower waters and deplete fish that sport fisherman would otherwise catch.

*Response:* Current data do not clearly indicate whether nearshore depletions are occurring, or what the causes, magnitude, and geographical distribution of nearshore depletions might be. While it is accurate that commercial fishermen may fish in areas that are accessible to sport fishermen, any localized depletions resulting from high halibut catch rates may be offset by egg and larval drift and migrations of juveniles and adults. Information about local biomass, immigration and emigration rates, seasonal changes, and the relationship of these factors with environmental characteristics is not available at a fine enough scale to indicate whether localized depletions are occurring in Area 2C.

This final rule is not expected to significantly impact the sustainability of the halibut stock. As discussed in the EA/RIR/IRFA, the IPHC sets catch limits for the commercial fishery in proportion to the amount of halibut that may be sustainably removed. This strategy protects against overharvest and distributes the fishing effort over the entire geographic range for halibut to prevent regional depletion. The IPHC does not expect small scale local depletion to have a significant biological effect on the resource as a whole.

*Comment 6:* There is no balance between the commercial and sport fisheries. Commercial catch is increasing while the charter industry is being faced with a cut. The proposed rule states that, "from 1997 to 2006, the average annual removal of halibut was about 12.454 million pounds and of this, the commercial fishery harvested 76.7 percent or 9.522 million pounds per year. From 2004 to 2006, the average annual removal of halibut was 14.142 million pounds, and of this the commercial fishery harvested 73.8 percent or 10.437 million pounds per year." While it is true there has been some growth in the charter sector harvest, the commercial harvest did not decrease, but in fact, increased. While sport fish catch is being reduced, the commercial sector will be able to harvest 2.28 million pounds over the IPHC's CEY for Area 2C.

*Response:* The catch limit for the commercial halibut fishery and the guideline harvest level for the sport fishery are derived from the same estimate of total halibut biomass. The

biomass allocation among areas is estimated from the annual setline survey data and estimates of bottom area. The catch limits are biologically based.

NMFS acknowledges that the commercial catch increased from the period 2000–2003 to somewhat higher levels in 2004–2006 (reflecting improved biological factors and technical improvements to the IPHC assessments in those years); however, it is incorrect that the commercial catch is increasing while the charter industry is being faced with a cut. IPHC data show that the commercial catch declined in each year from 2006 to 2008. Between 2007 and 2008, the commercial catch limit in Area 2C was reduced from 8,510,000 pounds in 2007 to 6,210,000 pounds in 2008. This is a reduction of 27 percent and follows a 20 percent reduction in the commercial catch limit in 2007 from the 2006 level.

*Comment 7:* The preliminary 2007 charter harvest estimate is 1.7 million pounds, only 270,000 pounds over the GHL. NMFS is giving poundage back to the commercial fleet and cutting the charter catch.

*Response:* As described in the preamble to this rule, the 2008 GHL was reduced to 931,000 lb. While the preliminary estimate of 2007 charter vessel harvest is 270,000 lb over the 2007 GHL, this level of harvest would exceed the 2008 GHL by about 770,000 lb. The one-fish daily limit implemented under this final rule is the only proposed measure that may adequately reduce harvest to the current GHL.

The commercial Area 2C Fishery CEY is set by the IPHC and includes a buffering provision for large changes in catch limits. The amount of this buffer does not affect the GHL and does not represent pounds of fish given back to the commercial sector at the expense of the charter sector.

The charter vessel GHL is established in regulations at § 300.65(c) and is adjusted in a stepwise manner based on the Total CEY established annually by the IPHC. The GHL table in regulations at § 300.65(c), adjusts the GHL to 931,000 lb when the Total CEY for Area 2C is more than 5.841 million lb, but less than 6.903 million lb. The IPHC set the 2008 Total CEY to 6.50 million lb, which is above 5.841 million lb. In 2007, the GHL was set at 1.432 million lb under § 300.65(c) and the 2007 Total CEY of 11.40 million lb. The difference between the 2008 GHL of 931,000 lb and the 2007 GHL of 1,432,000 lb is about 500,000 lb. This 500,000 is not cut from the 2007 GHL. Rather, the 2008 GHL is reduced consistent with the lower Total

CEY in 2008 and the stepwise manner in which GHL is established under § 300.65(c).

*Community Effects*

*Comment 8:* Tourism benefits more Alaskans than commercial fishing. Tourism supports a wide variety of businesses that will be affected by reduced demand for halibut charter trips. Lodges and charter industry bring jobs and money to local communities and businesses, including Alaska Airlines and the Alaska Marine Highway System. Communities have invested a lot of money to encourage tourism and this rule will undermine those efforts.

*Response:* NMFS agrees that the charter industry is an important industry for many communities, generating jobs and revenue for the communities involved as well as direct employment for the guides and crew. A reduction in the daily bag limit for guided charter clients will affect those communities and their efforts to develop guided charter industries. The analysis indicates that the segment of the charter industry that caters to cruise ship tourists will not be impacted by changes to the daily bag limit to the same extent as the lodge-based guided charter businesses. Moreover, tourists on the four hour charter fishing trips associated with cruise ships often do not have enough time to harvest two halibut. Tourists coming to communities on cruise ships and choosing to take a charter trip for halibut will likely continue to do so and businesses that cater to these tourists will continue to benefit from their visits. NMFS acknowledges that independent or repeat tourists who book day vacations at lodges may consider the reduced halibut bag limit in their decision to book a vacation, along with considerations for alternative fishing or tourist opportunities that may be offered. The potential impact on bookings and demands for tourist activities is discussed in the analysis supporting this final rule, but quantitative estimates of how such impacts will influence demand for these services and commensurate impacts on local communities are unavailable.

*Comment 9:* Tourist hopes and expectations of catching a "barn door" (i.e., a very large halibut) are fading along with their willingness to pay for trips. Sufficient incentive must remain to attract tourists.

*Response:* A tourist's expectation to catch a large halibut still exists if the bag limit is one fish. This expectation and the fishing experience itself often are the key factors in deciding to board

a charter vessel, not the daily bag limit. Furthermore, for much of the charter fishing season, there are opportunities to catch other sport fish species during a trip. This contributes to one of the incentives to hire a charter vessel, which is to optimize the experience of sport fishing in Alaska by fishing for more than one species.

*Comment 10:* Announcing new regulations at the beginning of a season creates confusion and frustration and makes it hard to attract and retain business. The proposed restrictions on the charter fishery will negatively impact the ability of lodge owners to book trips and many lodges have already pre-booked vacations for the 2008 season.

*Response:* NMFS agrees that a change in charter fishing regulations in the months prior to a fishing season will be disruptive and may cause some clients to reconsider bookings. However, information about the potential for this action has been available since mid-2007. In June 2007, the Council announced its intention to adopt a one-fish bag limit if necessary to reduce the charter fishery harvest to the 2008 GHL. The proposed rule for this action was published in the **Federal Register** on December 31, 2007 (72 FR 74257), with a public comment period that closed on January 30, 2008. The results of the IPHC annual meeting were published on January 22, 2008, and included an Area 2C CEY that triggered a reduction in the GHL to 931,000 lb GHL. This reduced GHL prompted selection of the Council's proposed one-fish bag limit as the preferred management option to limit harvest to the GHL. NMFS took action to inform the public and charter industry about the proposed regulation changes as soon as possible through an information bulletin published on its Web site and a press release.

*Comment 11:* The proposed annual limit disproportionately affects multi-day lodge and charter operations while allowing cruise-based day charters, the sector that comprises the main growth of the industry, to continue. Both Options A and B would have profound negative effects on lodge-based charter operations.

*Response:* The EA/RIR/IRFA and the proposed rule acknowledged that the proposed actions may have greater adverse impacts on the lodge-based sector of the guided charter vessel industry than on the day-boat sector (see response to Comment 8).

*Comment 12:* This rule creates a marketing disadvantage for businesses in Area 2C and will discourage clients from coming to Southeast Alaska. Our businesses rely on repeat customers.

Many of these customers will now go to fish in other areas.

*Response:* NMFS believes this comment applies primarily to the lodge-based segment of the guided charter industry. As indicated in the analysis, the cruise-based component relies primarily on people arriving in Alaska for one-time visits who have little opportunity to fish in other areas and are not likely to be repeat customers. NMFS acknowledges that lodge-based guided charter clients have more opportunities to substitute fishing experiences to other regions of Alaska or outside of Alaska. They also may shift to targeting a different species. Models are not available to predict the number of clients that will choose to not take a charter vessel trip in Area 2C as a direct result of this final rule, or to estimate the proportion of clients who would choose to maximize their experience with some other type of fishing experience. Other than acknowledging the potential for lost business, as was done in the EA/RIR/IRFA, NMFS cannot forecast the probability or extent to which this might occur.

*Comment 13:* The bag limit should be the same for the entire British Columbia and Alaska coastline so that no one area is more desirable than another to anglers.

*Response:* NMFS lacks the authority to manage halibut in British Columbia. This action is in response to concerns that are specific to Area 2C.

*Comment 14:* Small charter operations will not be able to survive this restriction.

*Response:* NMFS agrees that this action may have adverse impacts on charter businesses and that some may fail or leave the business. This possibility is mentioned in the analysis. Likewise, some businesses may benefit from reduced competition if other businesses close. NMFS does not agree that all small charter businesses will be forced to leave the business.

*Alternative and Future Management Measures*

*Comment 15:* Allow the proposed limited entry program (moratorium) for guided sport charter vessel businesses to go into place to preserve the current charter vessel fleet. The number of boats should be limited, not the number of fish.

*Response:* The Council adopted a proposal at its April 2007 meeting to limit the number of businesses and vessels permitted to participate in the guided sport charter vessel fishery for halibut. NMFS currently is developing a proposed rule to implement the Council's action. Publication of the

proposed rule is scheduled for Spring 2008. Pending consideration of public comment and approval of the proposed limited entry program by the Secretary of Commerce, fishing under the limited entry program would begin in 2010.

A limited entry program would limit the number of businesses and vessels, but not the amount of halibut harvested. The amount of halibut harvested in this fishery would need to be regulated by other management measures, including GHL restrictions (if the GHL program is not replaced with a different allocation) or an individual fishing quota program designed specifically for the guided sport charter vessel fishery for halibut. Limited entry programs in commercial fisheries only weakly influence the amount of fish harvested because harvesters adapt by changing their fishing effort and methods. Ancillary regulations are needed to control the amount of harvest. If the number of halibut charter vessel businesses was limited, the fishery could still maximize harvest by modifying vessel size, capital inputs, number of trips, length of trips, and the number of people in a fishing party. Thus, harvest restrictions such as those implemented under this final rule are necessary because effort controls alone are not sufficient to reduce harvest.

*Comment 16:* Don't impose an annual catch limit; instead impose a one-fish daily limit and move toward a limited entry program.

*Response:* NMFS agrees that a one-fish daily bag limit is an appropriate management measure to limit the harvest of the guided sport charter vessel for halibut to the reduced GHL established for 2008. Even the most conservative annual catch limit considered by the Council (4 fish a year) would not result in a harvest reduction sufficient to meet the objective of this final rule. Thus, an annual catch limit is not included as a provision of the final rule. NMFS is developing a proposed rule to establish a limited entry program for the halibut guided sport charter vessel businesses and expects a proposed rule to be published in Spring 2008 for public review and comment. Also see response to Comment 15.

*Comment 17:* Under the moratorium [limited entry program], charter operators will have to buy their rights to fish while the original commercial IFQs were given away.

*Response:* The nature and restrictions of the proposed limited entry program for guided sport charter vessel businesses will be best addressed under the proposed rule to implement that program once it is published. However,

charter vessel business owners who initially qualify under the limited entry program for participation in the guided sport charter vessel fishery for halibut would not be required to purchase their privilege for ongoing participation. This is similar to the initial allocation of commercial IFQ.

*Comment 18:* With a new allocation decision and interim management plan due this October from the Council, it seems unnecessary to inflict serious harm on the charter industry in the meantime.

*Response:* NMFS disagrees that it is unnecessary to reduce the guided sport charter vessel fishery harvest of halibut to the GHL. The purpose of this final rule is to reduce harvest to the GHL, and to provide a measure of stability to the halibut industry and coastal communities while the Council develops a long-term plan for the charter sector. The Council has initiated additional analyses of sector allocations and a means for compensated reallocation of halibut from the commercial to the charter vessel halibut fishery that would allow the charter sector to grow. The Council also is exploring options for a share-based program for the charter halibut fishery. Pending timely Council action and Secretarial review and approval, regulations implementing alternative allocations and associated management measures are unlikely to be effective until 2010 or 2011, and would become effective concurrently or after a proposed limited entry program for halibut charter businesses is implemented if approved by the Secretary (see response to Comment 15). To wait several years to reduce the harvest in the halibut charter fishery to the GHL while longer term allocation solutions are developed and implemented would frustrate the IPHC's attempt to manage halibut mortality to the Total CEY based on projected charter fishery harvests at the GHL level, and would continue the ongoing *de facto* reallocation of halibut from the commercial sector to the charter sector.

NMFS acknowledges that a policy decision to maintain the charter fishery harvest at the GHL until such time as a different allocation system is implemented will constrain the growth of charter sector harvest of halibut and impose costs on charter businesses. The EA/RIR/IRFA supporting the final rule addresses these costs, although the assessment of the economic effects is qualitative due to lack of data.

*Comment 19:* Develop a stable, long-term management plan for the halibut charter sector.

*Response:* NMFS agrees that a more stable management program for the halibut charter sector is necessary and is coordinating with the Council and other management agencies to accomplish this through a sequence of proposed management changes. The first step in this sequence is the proposed implementation of a limited entry program for halibut charter sector businesses. Also see response to Comment 18.

*Comment 20:* Develop a catch sharing plan for Area 2C.

*Response:* The Council is considering a catch sharing plan for the halibut charter vessel and commercial fishery sectors. The Council initially reviewed the alternatives for a catch sharing plan at its April 2008 meeting and final action is scheduled for October 2008. Also see responses to Comments 3, 18, and 19.

*Comment 21:* The Council is moving toward long-term solutions. To change management now will disrupt ongoing analyses.

*Response:* The Council and NMFS' management objective for the halibut guided sport charter vessel fishery since 2003 has been to maintain harvest amounts to the GHL. Since 2004, the charter vessel fishery in Area 2C has exceeded GHL by amounts that range between 122 percent and 136 percent. Until 2006, administrative and implementation issues delayed responsive management actions to reduce harvest of halibut in the Area 2C charter vessel fishery. In cooperation with ADF&G, these issues largely have been resolved and NMFS and the Council are moving forward to manage the charter vessel fishery consistent with management objectives set forth since 2003. NMFS disagrees that management of this fishery to reduce harvest to the GHL would disrupt ongoing analyses; this final rule does not change the long-term solutions for the charter vessel fishery under consideration by the Council nor does it prevent future management actions that the Council may wish to consider as new information becomes available. See also response to Comment 18.

*Comment 22:* Restrict the guided sport charter vessel fishery to only allow retention of halibut greater than 32 inches in length like the commercial sector in order to protect recruits of the halibut biomass. Halibut only twenty inches in length and weighing five pounds have been brought back to the dock by charter vessel anglers. Charter vessel anglers should also have a maximum poundage.

*Response:* Restricting the charter vessel fishery to retention of fish over 32

inches without other harvest constraints would not meet the intent of reducing harvest in this fishery to the GHL. Implementing a size limit in addition to the one-fish daily bag limit would be overly restrictive. Other reasons may exist to consider size restrictions in the charter fishery in the future, but not as a provision of this final rule.

NMFS notes that the Council did consider minimum size limits of 45 and 50 inches on a second fish (assuming a two-fish bag limit) as part of the EA/RIR/IRFA supporting this final rule. A key reason why the Council rejected alternatives with minimum size limits was the difficulty in measuring larger fish.

*Comment 23:* Maintain the status quo for the Area 2C charter harvest restrictions.

*Response:* NMFS disagrees. The estimated harvests under status quo (1.333 to 1.448 million lb) substantially exceed the GHL of 0.931 million lb. Thus, the status quo alternative would not achieve the policy objective of the Council, NMFS, and other management agencies to maintain charter sector harvest amounts to the GHL while longer term solutions are developed and implemented for stabilizing the allocation of halibut between the commercial and charter sectors.

*Comment 24:* Implement a compensated reallocation program to use taxpayer money to buy back IFQ for the sport fishery sector. It is only reasonable that the responsible government agencies fund this reallocation because they have been shortsighted and inactive in response to increasing charter demand.

*Response:* The Secretary of Commerce does not have statutory authority to use government funds to purchase halibut quota share (QS) or lease halibut IFQ for use in the charter vessel fishery; this would require congressional action and funding and was outside the scope of the proposed rule. NMFS notes that the Council is considering a provision that would allow charter vessel businesses to lease IFQ from commercial halibut QS holders. The Council is scheduled to take final action on this and other provisions supporting a compensated reallocation program for the charter and commercial fishing sectors at its October 2008 meeting.

*Comment 25:* Implement a charter individual fishing quota program. If charter IFQs had been enacted shortly after they were proposed in 1993, the rapid growth of the charter fleet could have been controlled.

*Response:* The Council did propose an IFQ program for the halibut charter sector in 2001, but NMFS declined to

publish a proposed rule to implement the Council's program for several reasons, including questions about the reliability of data supporting the proposed program. Had an acceptable IFQ program been implemented, NMFS agrees that the current allocation problems between the commercial and charter sectors could have been reduced and easier to address.

*Comment 26:* Consider a slot limit based on size or weight that both commercial and charter boats abide by to protect the long-term recruitment of future halibut stocks. It also would be much easier for the resource agencies to monitor and audit such a rule with at-sea inspections and audits of landed fish at processing facilities.

*Response:* The purpose of the final rule is to reduce the charter vessel fishery harvest to the GHL established for this fishery. Restricting the charter vessel fishery to size or weight limits without other harvest constraints would not meet the intent of reducing harvest to the GHL. The EA/RIR/IRFA developed by the Council did consider halibut slot limits; these were rejected because this approach could potentially result in an increased harvest, contrary to the objective of this final rule. Further, the options that would implement minimum size limits of 45 or 50 inches in length were rejected in large part because of the difficulty in measuring and releasing large fish without injuring them. There are safety concerns for crew and clients when attempting to measure large, heavy, muscular fish. Other reasons may exist to consider size or weight restrictions in the charter fishery in the future, but not as a provision of this final rule.

*Comment 27:* Subsistence issues need to be addressed before this issue. The subsistence limits are too high and the amount of subsistence fish that is sold is not monitored.

*Response:* NMFS acknowledges that the halibut resource is fully utilized in Area 2C and that the three major categories of use are commercial, sport, and subsistence harvest. This final rule addresses an allocation issue between two of the larger users of halibut: the commercial and charter halibut fisheries, which account for 72 percent and 13 percent of total removals in Area 2C, respectively. While subsistence harvest of halibut is a source of mortality, it comprises the smallest use at 4 percent of total removals (See section 1.10.1 of the EA/RIR/IRFA). The Council, through regulations, established an allowed use of the halibut resource by subsistence users. The Council and NMFS disagree that the subsistence use of halibut is too high

and must be further restricted prior to proceeding with this final rule.

NMFS acknowledges that monitoring catch and total mortality (retained and discard) in the subsistence fishery poses unique concerns and challenges and has asked ADF&G for estimates of subsistence removals in subsistence harvests. Subsistence harvest is estimated using specialized survey methods tailored for that sector. ADF&G staff report that the subsistence harvest has remained relatively stable during recent years, which is another reason why NMFS does not believe that subsistence harvest needs to be reduced before taking this action.

*Comment 28:* Female halibut should all be catch and release. Discourage retention of small halibut. A rule should be developed to release sport caught halibut over 200 pounds.

*Response:* The comment presumes that large females contribute disproportionately to reproduction and that harvest of these females will substantially decrease juvenile halibut abundance. In 1999, the IPHC reviewed options for a maximum size limit of 60 inches (150 cm) in the commercial fishery and concluded that, based on the research at the time, it did not add substantial production to the stock. Applying the limit to the sport fishery would have an even smaller benefit because the sport fishery harvest is much smaller than commercial harvest, and also because this action would only apply to Area 2C. The halibut stock is managed as a single population throughout its entire range. See also the response to Comment 26.

*Comment 29:* The one-fish daily bag limit should be imposed on the whole state, not just one area.

*Response:* The harvest of halibut by the charter vessel fishery in Area 2C has exceeded the annual GHL each year since 2004 by significant amounts. Conversely, the charter vessel harvest of halibut in Area 3A has not exceeded the annual GHL and restrictions on this fishery are unwarranted at this time. NMFS recognizes that different restrictions for the charter vessel sector in different IPHC regulatory areas off Alaska may influence where potential clients choose to fish. However, applying different regulations and bag limits to different areas is a common practice in fishery management. Although a one-fish daily bag limit in Area 2C may change the demand for charter trips if anglers are unwilling to substitute other species, many clients associated with cruise vessels likely will continue to fish in Area 2C because their fishing time is limited to half-day

trips, which may not provide enough time to harvest two halibut.

*Comment 30:* Implement the Federal prohibition on skipper and crew harvest of halibut. Making this a Federal regulation will relieve the restriction on skipper and crew harvest of other species. Skipper and crew harvest is abused, sold to restaurants, or used as a guarantee that clients will have fish to take home.

*Response:* NMFS notes the support for the part of the final rule that prohibits the catch and retention of halibut by charter vessel guides, operators, and crew. This action allows ADF&G to remove the emergency order that prevents skippers and crew from retaining any species of fish while on a saltwater charter trip. Thus, this rule could relieve a burden on crew compared to the previous emergency order. This prohibition also will help attain the management objective of limiting the charter vessel harvest of halibut in Area 2C to the GHL while minimizing adverse impacts on the charter fishery, its clients, and its home ports.

*Comment 31:* Modify the skipper and crew provision to allow personal use fishing before May 16 and after August 15, or some other dates outside the tourist season, for halibut. Making a special trip wastes resources. This would minimize the impact of the regulation on skipper and crew by compensating them and allowing them to catch fish for food while working.

*Response:* NMFS acknowledges that the prohibition on retention of halibut by charter vessel guides, operators, and crew could lead to higher operating costs for harvesting halibut for personal use. However, as noted in the response to Comment 30, this final rule will improve the opportunity for charter vessel guides, operators, and crew to retain non-halibut catch while clients are onboard, thus enhancing personal use fishing opportunities for species other than halibut.

*Comment 32:* Remove the prohibition on skipper and crew harvest. No one at ADF&G, the Council, or IPHC can say or prove that skipper and crew harvest was included in the original GHL calculations. Crew harvest records began voluntarily in 1998 with the logbook program. Uncertainty exists whether this harvest was included with "other" sport harvest and whether policy makers considered skipper and crew harvest as part of the GHL when it was established. Thus, it is unethical to continue this prohibition based on the GHL.

*Response:* The Council and NMFS, working with stakeholders, have

approved a prohibition on charter vessel guide, operator, and crew catch and retention of halibut as a preferred first tool for restricting harvest. Notwithstanding whether crew harvest of halibut was voluntarily reported in charter vessel logbooks submitted to ADF&G when the logbook program first was established, the Council and NMFS have specified their intent that this harvest be part of the existing GHL. As noted in Section 2.6.3.2 of the EA/RIR/FRFA supporting this final rule, the ADF&G estimates that the State prohibition on crew-caught halibut reduced harvest in the charter vessel fishery by between 78,000 lb and 84,000 lb in 2006. See also responses to Comments 30 and 31.

*Comment 33:* Maintain the status quo regulations and add a six-fish annual limit.

*Response:* The status quo restrictions on the Area 2C charter vessel fishery with a six-fish annual catch limit would not reduce harvest to the current GHL of 931,000 lb. Instead, this option would result in an estimated harvest of between 1.3 and 1.4 million pounds, an unacceptable overage of the GHL. A one-fish daily bag limit, the primary provision implemented by NMFS in this final rule, is the only management measure that may reduce the harvest to the GHL, as indicated by the analysis.

*Enforcement and Recordkeeping and Reporting Requirements*

*Comment 34:* Better enforcement and better data are needed for existing regulations. Many charter operators are not obeying restrictions because they know there is no enforcement in their area. As a result, harvest estimates are not accurate. Improve funding for better logbook analysis and more active enforcement by the USCG and NMFS. Many charter clients are transporting many more fish than allowed under the existing regulations.

*Response:* Significant effort is being made to improve reporting. ADF&G has made numerous changes to their logbook program in recent years. For example, ADF&G has conducted dockside checks and post season client verifications to validate logbooks. In addition, NMFS has coordinated with ADF&G to establish new logbook requirements that will further validate halibut harvest information recorded in the state's Saltwater Sport Fishing Charter Trip Logbook, including requiring the signatures of anglers to verify that the number of halibut caught and recorded is accurate. ADF&G supports this requirement as it will lead to more reliable logbook data and more accurate estimates of charter halibut

harvest. NMFS believes that enhanced recordkeeping and reporting, together with ongoing cooperative monitoring and enforcement by State and Federal enforcement personnel as time and resources allow will serve as a deterrent to large scale violations of sport fish regulations.

*Comment 35:* There is a lack of monitoring and enforcement of commercial catch. The published commercial catch data are flawed and commercial fisherman are not being held to their targets.

*Response:* NMFS disagrees. Although no fishery is exempt from illegal fishing activity, NMFS believes that current monitoring and enforcement efforts are sufficient to maintain control of the commercial halibut fishery and that reported catch is sufficiently accurate for management of the fishery and the halibut resource. The commercial quota system for halibut is administered, regulated, and enforced by NMFS to insure harvests are within quota limits and to monitor and enforce the amount of quota that each commercial fisherman is allowed to harvest. Enforcement of halibut regulations for Alaska is accomplished through complementary efforts of NMFS Office for Law Enforcement (OLE), Alaska State enforcement agencies, and the U.S. Coast Guard.

Alaska Wildlife Troopers (Alaska Department of Public Safety) also perform inspections, audits, and patrol hours to monitor and enforce Federal commercial halibut fishery regulations under a Joint Enforcement Agreement between NOAA OLE and the Alaska Wildlife Troopers.

*Comment 36:* Many charter operators are illegal and do not comply with Alaska Statute 38.05. If we enforced this statute, there would be less of a problem with the charter harvest levels.

*Response:* The Secretary is not responsible for enforcing State of Alaska statutes. Comments regarding the enforcement of State statutes are more appropriately addressed to the State of Alaska.

*Comment 37:* Enforcement of the regulations is impossible. When considering enforcement of annual limits, charter operators cannot be held responsible for client actions because the operator doesn't know what the client may have previously harvested.

*Response:* NMFS believes that enforcement of this final rule is possible. This final rule does not include provisions for an annual catch limit. Thus, recordkeeping and reporting requirements proposed to monitor and enforce such a limit have been removed from the final rule. All

other proposed federal recordkeeping requirements are retained to increase the accuracy of data collection and recorded information (see response to Comment 34).

*Comment 38:* Keep the angler signature provision. This will lead to more accurate reporting.

*Response:* NMFS agrees and has maintained this requirement (see response to Comment 34).

*Comment 39:* The current carcass retention provisions are unreasonable. On live-aboard charters, it is not reasonable to carry around whole fish for days when they could be processed and vacuum packed onboard. The current requirements create storage issues, reduce meat quality, and create a timing problem after returning to port to process fish and transport clients and their fish to the airport in time. Inspectors should be able to estimate the number of fish from the packages.

*Response:* This final rule does not require the retention of halibut carcasses. When the rule that implemented a 2-fish daily bag limit with one-fish under 32 inches in length went into effect in Area 2C in 2007, the carcass retention requirement was necessary to determine head-on length for enforcement purposes. This final rule will rescind the requirement at § 300.66(m) to retain carcasses onboard. However, IPHC regulations require that for Convention waters off the coast of Alaska no person shall possess onboard a fishing vessel, including charter vessels and pleasure craft, halibut that have been filleted, mutilated, or otherwise disfigured in any manner except that each halibut may be cut into no more than two ventral and two dorsal pieces, and two cheeks, all with skin on (paragraph (28)(2) of the Pacific Halibut Annual Management Measures; March 7, 2008; 73 FR 12280). This change allows enforcement officers to count the number of fish in possession by an angler.

*Comment 40:* NMFS should retain the requirement to bring halibut carcasses to shore for measurement. Accurate creel survey lengths are fundamental to estimating the catch of the charter fleet. Fish that are filleted at sea cannot be measured.

*Response:* NMFS agrees that carcass retention facilitates enforcement and more accurate data collection, but it is unnecessarily burdensome to charter operators given that this final rule does not implement a size limit on retained halibut. Further, charter operators have expressed concerns about disposal of carcasses at ports, time constraints, the diminished meat quality of fish that are not processed immediately, and limited

storage space onboard some vessels. These concerns were especially pronounced for charter operators who run multi-day trips or more than one trip in a day. To respond to these concerns and to address the need for better enforcement, the IPHC adopted a regulation that is described in the response to Comment 39.

*Comment 41:* The proposed paperwork requirement for monitoring the annual catch limit is burdensome and time consuming for operators and anglers. The requirement to print the angler name is redundant. It would be better to collect youth and senior angler information for inclusion in the database when issuing the harvest cards. Furthermore, the proposed requirement for anglers to retain their licenses for three years is unreasonable, the license paper is flimsy and hard to keep track of, and retention is a burden for clients.

*Response:* Under Option A, which would have implemented an annual catch limit for Area 2C, it would have been necessary for anglers to retain their licenses in the event that discrepancies arose in the logbook data. However, because NMFS is implementing Option B, the one-fish daily bag limit, the requirement to retain angler licenses is no longer necessary and has been removed from the final rule. Other requirements for recording the angler name and license number are retained to improve accuracy of recorded information. Also see response to Comment 34.

*Comment 42:* Issue harvest tags with licenses instead of the burdensome recordkeeping and reporting requirements proposed to monitor and enforce an annual catch limit.

*Response:* NMFS is not implementing the proposed annual catch limit because this management tool would not reduce the Area 2C charter vessel harvest to the 2008 GHL. Harvest tags are not required for the monitoring and enforcement of a one-fish daily bag limit.

*Guideline Harvest Level*

*Comment 43:* Rescind the GHL.
*Response:* Rescinding the GHL is outside the scope of this action. See Response to Comment 46.

*Comment 44:* Maintain the GHL and manage halibut charter vessel harvest to that level. The GHL was set at 125 percent of the charter vessel fishery's highest historic harvest to allow for growth in the industry. The GHL was exceeded in 2004–2007 and the charter fleet is still growing with an increased number of clients served, fishing trips, and active vessels.

*Response:* NMFS acknowledges the comment. This final rule does not change the GHL provisions, only the management measures necessary to control harvest to the GHL.

*Comment 45:* If the GHL doesn't increase with the CEY, why should the GHL decrease with the CEY? Commercial IFQ shareholders are afforded a buffering mechanism by the IPHC to soften the economic impacts of a rapidly declining CEY. The guided sport halibut fleet should be afforded similar buffering. Also, the stair step feature of the GHL is not compatible with the slow up/fast down (SUFD) policy of the IPHC.

*Response:* This rule was not designed to change either the 2008 GHL published in the Federal Register (73 FR 6709, February 5, 2008) or the GHL regulations at 50 CFR 300.65. The GHL "stair steps" down only during periods when the CEY established by the IPHC falls below benchmark levels in the GHL regulation. To change the GHL regulations would require separate rulemaking. The Council incorporated an element of buffering into the GHL rule by setting the maximum at 125 percent of the 1995–1999 average harvest to allow for growth in the charter industry. NMFS notes that, should the CEY increase from the 2008 level, the GHL could increase as well to a maximum of 1.432 million lb, consistent with the procedures described in regulations.

The SUFD procedure used by the IPHC is not incompatible with the stair step feature of the GHL. Federal regulations require certain levels for the GHL based on the annual Total CEY, not procedures used by the IPHC to derive that annual Total CEY.

*Comment 46:* The GHL setting process is flawed. The GHL is too low and needs to be changed. The GHL was proposed and implemented with only commercial interests voting on the Council. The GHL has been the same for 14 years and deserves some kind of update or allowance.

*Response:* The Council first began discussing the guided charter fishery for halibut in 1993. After 10 years of debate, the GHLs were established for Areas 2C and 3A (August 8, 2003; 68 FR 47259). This rule set the maximum GHL for Area 2C at 1.432 million lb (649.5 mt), and included a mechanism for reducing the GHL in years of low abundance as determined by the IPHC. Since implementation, the GHL has remained at its maximum level until this year when reduced stock abundance estimates triggered a reduction. Guided sport charter vessel harvest exceeded the maximum GHL in 2004, 2005, and 2006 and is estimated to have again exceeded the GHL in 2007. The

maximum GHL cannot be increased without a change to regulations. Revising the GHL and the halibut sector allocations are beyond the scope of this final rule.

*Comment 47:* The GHL is just a guideline, not a hard cap.

*Response:* NMFS acknowledges that area-specific GHLs were established in 2003 as a guideline that, if exceeded, could prompt responsive management action to reduce charter vessel harvest amounts. The GHL has been exceeded since 2004. Thus, management action to reduce harvest to the GHL is completely within the management objective for the GHL provisions. The fact that a time lag exists between when a GHL overage occurs and responsive management action is implemented through rulemaking also was acknowledged when the GHLs were established.

*Comment 48:* Modify the final rule to accurately reflect the charter GHL that is associated with the IPHC-adopted Total CEY and the effect of Option B compared to that GHL, not the GHL of 1.217 million lb.

*Response:* NMFS agrees and has reported the new GHL of 931,000 lb (422.3 mt) in this final rule and its associated EA/RIR/FRFA. A notice of the 2008 GHLs for Areas 2C and 3A was published in the Federal Register on February 5, 2008 (73 FR 6709). When the proposed rule was written, NMFS anticipated that the IPHC might reduce the CEY, triggering a reduction in the GHL, and wrote the proposed rule in a manner to allow final action notwithstanding the reduction.

*Comment 49:* The proposal to simultaneously reduce the GHL and implement management measures to reduce harvest to the new GHL is contrary to the existing regulations regarding use of GHLs. Option B violates the Administrative Procedures Act (APA), and both options violate the purpose and intent of the charter fishery regulatory regime.

*Response:* NMFS disagrees. The Council recognized that the GHL might be adjusted downward from the maximum GHL that was in place when it recommended the management measures for this final rule in June 2007. Thus, the Council proposed two different sets of management measures; one if the GHL remained unchanged in 2008, and a second more restrictive set of management measures if GHL was reduced. Both sets of management measures were published in the Federal Register for public review and comment. The comment period on the proposed rule extended beyond the IPHC meeting in mid-January, when the new and reduced total halibut CEY of

6,500,000 lb (2,948.4 mt) for Area 2C was established for 2008. This CEY resulted in a reduced GHL based on existing regulations at 50 CFR 300.65(c). NMFS published a notice in the **Federal Register** of this downward adjustment on February 5, 2008 (73 FR 6709). This was a nondiscretionary action given that the regulations at 50 CFR 300.65 clearly established how the GHL steps down when Total CEY is reduced below certain benchmarks. Given that a one-fish bag limit was proposed by the Council if the GHL was reduced, analyzed in the EA/RIR/IRFA supporting this action, and noticed in the proposed rule under APA rulemaking procedures, NMFS believes the public had adequate notice and opportunity for review and comment on the actions implemented under this final rule and that this action is consistent with the APA and the GHL management provisions.

*Applicability of the Rule*

*Comment 50:* The proposed rule discriminates against anglers fishing from charter vessels, especially those who because of age, physical ability, or financial limits cannot operate or buy their own boat. It is not fair to discriminate against charter clients so the status quo should be maintained. Equal access and equal protection rights are being violated.

*Response:* NMFS does not agree that this rule discriminates against charter anglers because age, physical ability, and financial status are not the subject of this regulation. This final rule was designed to reduce the harvest of halibut in the charter vessel fishery to the GHL to address the current allocation problem between the halibut charter fishery and the commercial fishery. Recreational anglers who wish to fish from a charter vessel may still elect to do so. The final rule does not discriminate between U.S. citizens based on age, physical ability, or ownership of a vessel.

*Comment 51:* Support 6-fish annual catch limit for non-resident anglers only.

*Response:* NMFS disagrees. If this rule were applied only to non-resident anglers, then Federal management of this Federal resource would discriminate among U.S. citizens based on their state of residence. This would be contrary to the Halibut Act, contrary to basic rights and obligations in existing Federal law, and could not reasonably be considered necessary to promote conservation. Moreover, this action would not reduce charter harvest to the 2008 GHL and therefore would

not accomplish the objective of this action.

*Comment 52:* Apply restrictions to self-guided anglers as well. The proposed action discriminates between sport fishermen with and without their own boats. Self-directed anglers are only held to the 2-fish daily limit. Include bare boat charters or self-guided trips in restriction. Including self-directed anglers in the 2-fish with size limits regulation would further decrease sport harvest. Self-directed harvest equals about 67 percent of the sport harvest. If all sport anglers in Area 2C were held to the limit, perhaps further restrictions would not be necessary.

*Response:* The Halibut Act under the Convention does not prevent the Secretary from tailoring a management action so that it addresses the concern that prompted action in a reasonable manner. The objective of this final rule is to reduce the harvest of halibut in the Area 2C guided sport charter vessel fishery to the GHL. The reason for this action is clearly indicated in the preambles to the proposed and final rules. The Council did not recommend limiting other recreational harvest, subsistence harvest, or bycatch and wastage in the commercial fishery because harvest data in the EA/RIR/IRFA show that removals from categories other than the guided charter vessel sector have remained relatively stable during the past 5 years and have not grown at the rate of the guided charter vessel fishery. Therefore, self-guided anglers were not considered part of the problem addressed by the Council and this final rule. Guided charter harvests rose each year from about 1.28 million pounds in 2003 to 2.03 million pounds in 2006. It is this information that prompted the Council to propose provisions to limit Area 2C charter vessel angler harvest consistent with the Halibut Act under the Convention.

*Comment 53:* Expand the proposed harvest restriction to all non-resident anglers, guided and unguided.

*Response:* Federal law prohibits applying different regulations to anglers based on state residency. The regulations will apply to all charter vessel anglers, regardless of state of residency. Expanding the restriction beyond the guided charter vessel fishery is beyond the scope of this action. See also responses to Comments 51 and 52.

*Comment 54:* Apply restrictions to all anglers, but only during June, July, and August, with more lenient restrictions during the rest of the season.

*Response:* NMFS interprets the comment as suggesting that the one-fish daily bag limit for charter vessel anglers be applied to both guided and unguided

recreational anglers, and be limited for both to the months of June, July, and August. The application of the rule to the unguided sport fishery would not address the problem identified by the Council, or the objectives defined for this action.

*Comment 55:* The charter industry should not be considered part of the sport fishery. The charter and lodge fishers are, in effect, commercial fishers.

*Response:* Fish caught in commercial fisheries enter commerce, that is, they are sold to consumers, whereas fish caught in recreational fisheries are for personal consumption. This is a fundamental difference between commercial and sport fisheries and the reason why the guided sport charter vessel industry is not considered a commercial fishery.

*Data and Data Quality*

*Comment 56:* ADF&G catch data are flawed, and no scientific basis exists for imposing increased restrictions on the halibut charter fishery.

*Response:* The analysis supporting this final action uses sport fishing data collected by ADF&G through its postal survey, logbook program, and creel survey program. These data comprise the best scientific information available for the EA/RIR/IRFA and are appropriate for use in estimating the impact of the final rule on the charter halibut and commercial sectors. These data collection programs have been reviewed by the Council's Scientific and Statistical Committee and use statistical methods accepted by the scientific community to collect and extrapolate sport fishing information, including the disclosure of known statistical biases and verification of data collection methodology.

*Comment 57:* The Council motion for this action was based on the ADF&G's projection that the 2006 charter harvest was 46 percent over the GHL. ADF&G's final estimate for 2006 charter halibut catch was less than the initial estimate. Update the analysis to recognize that 2006 harvest was substantially lower than initially estimated.

*Response:* NMFS acknowledges that the preliminary estimate of 2006 charter halibut harvest in Area 2C was higher than the final estimate; however, both estimates were above the 1.432 million lb (649.5 mt). The preliminary estimate for 2006 was 2.029 million lb (920.3 mt), 42 percent over the GHL, and the final estimate was 1.804 million lb (818.3 mt), 26 percent over the GHL. This overage indicates the ongoing need for management measures to reduce harvest to the GHL. The EA/RIR/IRFA was updated to reflect the final harvest

estimate for the Area 2C halibut charter fishery (See Table A4–1).

*Comment 58:* The regulation that went into place in 2007 for a two-fish bag limit with one fish under 32 inches in length substantially reduced the guided sport charter vessel harvest of halibut. Data from 2007 are not yet available to evaluate the effectiveness of this regulation or the need for further restriction.

*Response:* The management measures implemented for the halibut charter fishery in 2007 were expected to reduce charter halibut harvest by 518,000 lb (235.0 mt). The preliminary estimate of charter halibut harvest in Area 2C for 2007 is 1.70 million lb (771.1 mt), plus or minus 15 percent (between 1.45 million lb (657.7 mt) and 1.96 million lb (889.0 mt)). Even at the lower end of this range, harvest was still slightly above the 2007 GHL. In 2008 a reduction in the Total CEY set by the IPHC triggered a reduction of the Area 2C GHL to 931,000 lb (422.3 mt). The 2007 rule would not reduce harvest enough to meet the new 2008 GHL. According to the analysis for this action, the one-fish daily bag limit is the only alternative analyzed that may reduce harvest enough to meet the new 2008 GHL.

*Comment 59:* Sport landings of halibut contribute minimally to the overall mortality in the fishery. Projections based on historical data indicate that halibut sport landings are stable and not likely to increase dramatically in the near future. Even the best recreational data collection programs can not accurately estimate harvest. As such, managers need to look at trends and not yearly estimates in setting limits.

*Response:* The guided sport charter vessel sector's contribution to overall mortality is not minimal and has been increasing. It was noted in the analysis that between 2002–2006, guided sport charter vessel harvests accounted for 13 percent of the removals from Area 2C, and were the second largest source of removals after commercial harvest. Table 17 of the analysis provides information on harvests from 1995 to 2006 for the guided and unguided components of the sport fishery. Unguided harvests have fluctuated between 0.723 million lb and 1.187 million lb with no clear increasing or decreasing trend. In contrast, guided sport charter vessel fishery harvests have increased. Between 1999 and 2006 guided harvest amounts rose each year from 0.938 million lb in 1999 to 2.035 million lb in 2006. The Area 2C charter fishery has consistently harvested more than the GHL. By Council policy, this

necessitates corrective action to limit the charter fishery to the GHL.

*Comment 60:* Charter harvest is overestimated. Operators inflate logbook numbers in hopes of receiving extra quota share. Most charter fish are in the 5–10 lb range, much smaller than the 18–20 lb average that is used by ADF&G as an estimator.

*Response:* The analysis supporting this final action uses sport fishing data collected by ADF&G through its postal survey, logbook program, and creel survey program. These data comprise the best scientific information available for the EA/RIR/IRFA and are appropriate for use in estimating the impact of the final rule on the charter halibut and commercial sectors (see Comment 56). The weight estimates for the charter halibut fishery used in the analysis supporting this final rule were obtained from halibut measurements taken by the ADF&G creel survey that are extrapolated using a length-to-weight relationship published by the IPHC. These measurements are taken in port with a creel sampling technician and represent a sample of harvested halibut that have not been mutilated in such a way that they cannot be measured. Length information from all sampled ports is used in determining the average size of halibut for Area 2C. The proportion of harvested fish that are measured by ADF&G varies by port; however, these estimates provide the best available information about the size and weight composition of halibut harvested in the guided sport charter vessel fishery. These data collection programs have been reviewed by the Council's Scientific and Statistical Committee and use statistical methods accepted by the scientific community to collect and extrapolate sport fishing information, including the disclosure of known statistical biases and verification of data collection methodology.

*Comment 61:* Page ix of the Executive Summary of the EA/RIR/IRFA states that the analysis "employs the best information available, in this case, 2006 ADF&G Saltwater Charter Vessel Logbook data." We believe this is erroneous. Most ADF&G data for the charter fishery comes from a combination of the Statewide Harvest Survey and logbook data.

*Response:* The ADF&G released its final estimate of the 2006 charter harvest in September 2007. This final estimate was based on the 2006 Statewide Harvest Survey. This new information became available after the Council's initial review of the analysis when it made its recommendations in June 2007. However, this new information was used to prepare

Appendix IV to the EA/RIR/IRFA that was released in November 2007. This appendix updates the earlier results. The Secretary is considering this new information in making the final decision about this action. The wording in the Executive Summary of the November 2007 EA/RIR/IRFA was not updated to accurately reflect the full range of information being considered by the Secretary and will be corrected.

*Comments Regarding the Economic Analysis*

*Comment 62:* The analysis did not fully consider the economic effects on small businesses and coastal communities. The analysis is not based on the best available data.

*Response:* NMFS used data including the most recent logbook and statewide fishery survey information available from ADF&G, a 2005 study of the charter fishery in Sitka conducted by the McDowell Group, an analysis of charter anglers in South Central Alaska prepared by the University of Alaska, and the key informant interviews that were noted in the EA/RIR/IRFA. This is the best available information. However, the data available for the analysis of this action are limited. The information that would be necessary to provide a complete quantitative analysis of the impacts of this action on the commercial or charter boat sectors, and to estimate the impacts these sectors would have on the regional economy, is not available. This information would include survey-based models of anglers' behavioral responses to the regulation, detailed information on the revenues and costs of commercial and guided charter operations, a model of guided charter responses to changing client behavior, and income and employment impact multipliers for the regional communities in Southeast Alaska.

In the absence of more detailed information, the EA/RIR/FRFA provides a qualitative discussion of the impacts on the charter operations and on the communities dependent on them. Specific community concerns are reflected in the choice of the alternatives. Commenters have noted that the analysis recognizes that the options would have significant negative impacts on the guided charter fishery and might put some operators out of business, and that the notice of proposed rulemaking describes the disproportionate impact on lodge-based charter operations.

*Comment 63:* This final rule will have adverse economic impacts on Juneau area businesses. The guided sport charter vessel industry supports a wide variety of local businesses, including

restaurants, souvenir shops, hotels, fish processors, and outdoor stores.

*Response:* NMFS acknowledges that limitations on the charter vessel harvest of halibut in Area 2C could have an impact on demand for charter services and on local businesses supporting fishing opportunities. The analysis supporting this action assesses these impacts to the extent possible with the information available. See also response to Comment 62.

*Comment 64:* The Council does not understand and is unwilling to examine the true economic value of halibut to the guided sport charter vessel industry. There is no evidence that the charter fishery is growing exponentially. A thorough economic analysis of the guided sport charter vessel industry is needed before making decisions that affect the recreational fishing industry.

*Response:* The analysis does not claim that the guided charter fishery is growing exponentially. However, the charter industry has grown in recent years, in terms of pounds of fish harvested (see response to Comment 59), and in the number of businesses, vessels, and trips (see response to Comment 105). The EA/RIR/FRFA recognizes the value of halibut to the guided sport charter vessel fishery and to local communities dependent on the charter fishery, and acknowledges the potential for losses because of a one-fish bag limit.

*Comment 65:* The Council's intent in its motion was misrepresented in the purpose statement in the EA/RIR/IRFA and proposed rule, which state that the proposed measures to restrict charter halibut harvest if the GHL would be implemented if the GHL is reduced to 1.217 million lb in 2008. The Council motion only states, "if the GHL is reduced," and does not specify the amount of the reduction.

*Response:* NMFS did not intend to misrepresent the Council's intent. At the time of the Council action, IPHC staff indicated that there was the potential for the Total CEY to fall below the point that would trigger a change in the GHL. However, the CEY established by the IPHC after its 2008 annual meeting was 6.5 million lb in Area 2C—a level low enough to trigger a three step drop in the GHL from 1.432 million lb to 0.931 million lb, effectively bypassing the 1.217 million lb level. The Council's intent is clear that it intended Option B to be implemented if the drop in the CEY was large enough to trigger any reduction in the GHL. At the time of the Council's action it was not anticipated that the GHL would stair step down more than one level.

*Comment 66:* A quantitative rather than qualitative analysis of the impacts to the guided sport charter vessel industry is needed. In the absence of a comprehensive economic analysis that accurately assesses the economic impact of all options to both guided recreational and commercial sectors, the Secretary has no meaningful economic data upon which to fairly base his decision. This supports continuation of the status quo until the analysis shortfalls are fully addressed. Although some quantitative estimates are made of the impact to longline fishermen, there is no quantitative discussion of adverse impacts on charter fishermen and there is no quantitative comparison of impacts to the longline and charter sectors.

*Response:* NMFS notes that there are fundamental differences between the longline and charter operations that affect the ability to estimate gross revenues impacts on the two sectors. The output of the commercial longline sector is halibut. The output of the commercial longline sector in Area 2C is small enough compared to overall output on the West Coast that the impact of changes in Area 2C production on Area 2C halibut prices are probably small. Under these conditions, NMFS has been able to estimate the gross revenues of the status quo and other alternatives on the commercial longline sector. However the situation is very different in the charter sector. The output in the charter sector is not halibut, but days of client fishing time. To estimate gross revenue changes in the guided charter fleets, NMFS would have to have separate demand models based on survey research, which would permit the determination of changes in client participation in the lodge-based and cruise ship-based industry segments in response to changes in the bag limit, and the competitive adaptations that the charter operations would make. The information necessary for these estimates for the charter sector is not available. NMFS did make inferences using survey research from South Central Alaska to the extent possible. NMFS notes that the gross revenue estimates provided for the longline sector are an incomplete quantitative analysis of that sector as well since they do not address the issue of the impact of the alternatives on the profitability of these fishing operations.

NMFS must choose a management option to restrict harvest to the GHL. To maintain the status quo would be, in fact, a choice of a particular policy to allow charter harvests to continue to exceed the GHL despite the current

regulations in place. Status quo with respect to the regulations is not status quo in the fishery due to the growth of the guided sport charter vessel industry in Area 2C and the new stock information from the coastwide model.

*Comment 67:* There is no economic analysis of the cost of enforcement of an annual limit.

*Response:* The Regulatory Impact Review contains an economic analysis of the cost of enforcement of the annual limit in section 2.7.4.3. Additionally, this section references a discussion paper that was presented to the Council in October 2006 that contains a more thorough analysis of the cost of implementing and enforcing an annual limit. This discussion paper is available on the North Pacific Fishery Management Council's Web site at *http://www.fakr.noaa.gov/npfmc.* Enforcement issues and costs are discussed, as well as the estimated costs for compliance that would be imposed on the industry. However, because Option B was selected, NMFS is not implementing an annual limit. Therefore the costs associated with enforcing an annual limit will not apply. NMFS believes that sufficient information was provided to permit a decision among the alternatives.

*Comment 68:* The appropriate geographic scope of the analysis should be the coastal home ports for the guided sport charter vessel fleet, not the national economy.

*Response:* NMFS is required to examine net benefits to the Nation under Executive Order 12866. NMFS also examines regional and sector impacts in the analysis. However, in the section of the analysis referred to by this comment, NMFS explicitly examines the effects on net benefits to the Nation and makes the point that from a national perspective, the benefits of an alternative to one sector are likely to be offset by the costs to another. The analysis states that some impacts that adversely affect regional and community interests have distributive elements that prevent them from being considered either benefits or costs at the national level. This is a standard cost-benefit convention, in which the accounting stance affects evaluations of net benefits or costs. It considers the costs to local and regional interests. The choice of the preferred alternative, in fact, depends in part on local impact considerations evaluated in the analysis. For example, the analysis notes that Option 1 of Alternative 2 (one trip per vessel per day) would disproportionately impact small charter operators in major cruise ports and was thus rejected.

*Comment 69:* The cost of this action to the guided sport charter vessel industry is not justified by the benefit to the longline fishery. The rule will provide virtually no benefit to the commercial sector before it is superseded in 2010 by the long-term allocation program currently under development. The negative consequences of the proposed rule on the charter sector far outweigh any potential benefit to the commercial sector.

*Response:* While the Council is considering new management measures to replace those in this action, and while it has stated its intent to implement those measures in 2010, NMFS cannot assume that this will, in fact, take place, or that it will take place by 2010. The Council has not yet agreed on which management measures to implement and it may be several years before a decision is reached. The proposed program then would need to be approved by the Secretary of Commerce. The analysis suggests that the expected burden on the longline fishery and its consumers rises significantly in the years after 2010.

The objective of this action is to limit halibut harvest by the guided sport charter vessel industry to the GHL. Inherently and inevitably, this will constrain overall charter harvests and will have adverse economic impacts on charter fishing operations. NMFS notes that cost-benefit analysis, economic impact analysis, and evaluations of the costs and benefits to different sectors of the industry are only some of the factors that the Council and Secretary are required to take into account when they make policy decisions.

It is not possible to conduct a comprehensive quantitative cost and benefit analysis or compare quantitatively the benefits and costs to the commercial longline or charter industries, or to the regional economy with the information available, and such an analysis is not required before action can be taken.

There is limited information available on the economics of longline halibut fishing, charter operations that cater to cruise ship clients, and lodge-based operations. Similarly, there is limited information on how these types of operations interact with the local community and regional economies to generate secondary or indirect income and jobs in firms supplying the commercial firms or the guided charter operations and their clients. Given that lack of information, NMFS has used the best available scientific information.

*Comment 70:* Tables 56 and 58 in the EA/RIR/IRFA project hypothetical ex-

vessel losses and consumers' surplus losses to the commercial fishery associated with guided sport catches over the period from 2006 to 2015. The following changes and revisions to these tables are necessary: (a) Change the 2006 guided sport catch estimates in Appendix IV to reflect the final 2006 catch estimate; (b) use a more appropriate projection for annual growth in the guided sport charter vessel industry; (c) account for the IPHC's practice of increasing and decreasing commercial harvest limits with a lag to changes in the CEY (the "slow-up/fast-down" or SUFD approach).

*Response:* Revised versions of Tables 56 and 58 have been added to Appendix IV. The revisions include the final 2006 guided sport charter vessel sector harvest, updated charter industry growth rates, the IPHC's 2008 CEY, and the 0.931 million lb GHL that will take effect in 2008 as a result of the lowered CEY. However, the tables were not prepared to provide predictions of actual revenue losses over the time period. The purpose of the original tables in the body of the text, and the revised versions in the appendix was to illustrate the potential magnitudes of the revenue losses that might accrue to the longline sector if a number of factors remain constant. The tables were not meant to provide forecasts. For example, the tables incorporate a number of simplifying factors such as constant values for the Total CEY, ex-vessel prices, commercial underage, and unguided sport fish catch. The tables do not estimate these values or incorporate official estimates from other agencies as these estimates change regularly and materially. As a result NMFS has not made change (c), and has made change (b) only to the extent of updating the growth rate to reflect new information for 2006.

*Comment 71:* The analysis does not address losses to recreational anglers denied access to halibut.

*Response:* It is accurate that the analysis focuses primarily on the impacts of the actions on the longline and charter industries, and the communities dependent on them. The analysis does not estimate the loss in consumers' surplus from the preferred alternative. The information to estimate this does not exist since models of angler behavior in Southeast Alaska are unavailable. The discussion in Section 2.7.5 indicates that recreational anglers can expect a reduction in their benefits from charter fishing from this action. The analysts based their assessments on modeling that had been done in other areas of Alaska. The analysis points out

that clients would no longer be able to take a second fish, and has a long section discussing the impact in terms of the change in anglers' cost per fish, of the potential reduction in angler demand for fishing experiences in Southeast Alaska, and of the potential for anglers to shift to other activities in Southeast Alaska or in other areas.

*Comment 72:* The EA/RIR/IRFA identifies the lack of socioeconomic information on the charter fishery as a source of concern to the Council. If the Council lacks the socioeconomic information to adequately evaluate comparative loss scenarios, it does not have a valid problem statement, by definition. Commercial quota share values have not been reduced, contrary to the problem statement, and there has been no resultant economic hardship to the commercial sector. The analysis fails to use readily available information, including information on quota share prices, to address this issue.

*Response:* Although the Council and Secretary are always striving to obtain more information to assist in determinations, the Council had sufficient information to develop a problem statement. Furthermore, the analysis developed for this action, based on the best available information, provided the Council and Secretary with sufficient information to take action. See response to Comment 73 regarding trends in commercial quota share values.

*Comment 73:* Restrict the charter sector because their overages are reducing the commercial sector's allowance and devaluing purchased IFQs.

*Response:* NMFS examined a time series of the value of transferred quota share units from before the charter fishery began exceeding the GHL to the present and there was no evidence of a cause and effect relationship between harvest overages and the value of quota shares. The only trend these data demonstrated was an overall increase in the value of shares transferred from 2000 through 2007. Many factors contribute to valuation of quota shares at any particular time including cold storage holdings, timing within the fishing season, pre-season market prices, availability of lower interest loans, seller motivation, and whether the IFQ pounds are transferred with the quota share.

*Comment 74:* Commercial fishermen receive more money as supply declines. This is not the case for charter operators.

*Response:* NMFS agrees that market-driven prices paid to commercial halibut fishermen for halibut can

increase when supply becomes limited and market demand is high. This can offset quantity-driven revenue losses. It is unlikely that commercial fishermen will obtain higher prices for halibut as a result of this rule because the Area 2C commercial halibut fishery contributes only modestly to the overall coastwide halibut production.

The guided sport charter vessel industry is selling a fishing experience, one part of which is the possibility of catching halibut. NMFS agrees that a one-fish bag limit that reduces the amount of halibut an angler may catch and retain could reduce the price that charter operators can charge for their service. The actual impact on price is unclear and will depend, for example, on the ways that charter operations modify their services to adapt to the new limit.

*Comment 75:* The analysis incorrectly concludes that "increases in regional expenditures associated with increases in charter-based sport fishing are likely to be offset by decreases in regional expenditures associated with commercial fishing."

*Response:* This commenter refers to a statement in a paragraph in the analysis discussing net national benefits under Alternative 1. The analysis notes that the principal source of benefits from the charter fishery is the benefits to clients, because the competitive nature of the charter fishery is likely to drive profits close to zero. The author notes that it is unlikely that changes in regional expenditures will result in changes in net national benefits, in part because increased charter-based regional expenditures are likely to be offset by decreases in regional expenditures associated with commercial fishing. This is clearly advanced as one reason not to expect increased national benefits, in a cost-benefit analysis sense, from an expanding charter fishery. The author is using "expenditures" here as a proxy for sectoral activity and sectoral profits and rents—which he has already indicated are likely to be small. The author indicates that an offset is likely, not certain. The author clearly did not intend to assert a dollar for dollar offset. The language in the analysis has been modified to insert the words, "at least partially" before the word "offset" to clarify this.

*Comment 76:* Table 56 of the EA/RIR/IRFA assumes an inappropriate constant rate of growth in charter sector harvest when the actual data indicate that charter rates decreased in both 2006 and 2007. The analysis is inadequate, biased, devoid of data, and uses arbitrary assumptions, and speculative data and scenarios. The analysis

depends on interviews with a small number of key informants instead of on a survey of 696 potentially affected charter vessel operators. NMFS has been remiss in not collecting, presenting, and evaluating the best available data.

*Response:* Table 56 has been revised in Appendix IV (Table A4–2) to assume a growth rate for the charter sector harvest of 5.7 percent. This is the growth rate that was observed from 1995 to 2006. The rate was adjusted down from an earlier estimate rate of 6.8 percent to reflect the lower final participation rate estimate for 2006 based on the Statewide Harvest Survey (SWHS).

Limited information was available for the preparation of this analysis. The analysts however, drew on available data and modified the analysis to reflect newer data as it became available (in particular, adding Appendix IV to update the analysis to take account of the SWHS information for 2006 that became available in the fall of 2007). The analysts consistently sought to ground the analysis in concrete numbers and information. As noted in the response to Comment 70, the results in this table are not meant to provide a forecast of future impacts, but to illustrate possible revenue losses under certain assumptions. The analysis is not biased; analysts sought to identify and qualitatively describe the impacts of the actions on all the parties. The key informant information was not used in place of or as a substitute for phone, mail or personal interview surveys. Key informant information was used to provide factual information and to provide context for information obtained from other sources. NMFS has drawn on the best available information to inform this discussion, including the most recent logbook and statewide fishery survey information available from the ADF&G, a 2005 study of the charter fishery in Sitka conducted by the McDowell Group, an analysis of charter anglers in South Central Alaska prepared by the University of Alaska, and the key informant interviews that were noted.

### Conservation

*Comment 77:* Halibut harvest by the guided sport charter vessel fishery should be managed to stay below the GHL because of concerns about depletion of local stocks and the long term effects on local businesses. Overharvest by the charter sector requires subsistence and local sport anglers to travel farther to catch halibut.

*Response:* See response to Comment 15 concerning localized depletion. NMFS does not have data to confirm

that short term localized depletions of halibut are due to focused harvest activity by one or more sectors.

*Comment 78:* There is no evidence that the proposed regulations will have any effect on halibut recovery or that the charter fishery has a negative effect on the fishery. NMFS should use the best available science.

*Response:* Neither the EA/RIR/IRFA nor the proposed rule for this action identify overfished halibut stocks as the problem, or halibut recovery as an objective of this action. The IPHC sets allowable commercial catch limits taking account of the status of the stocks and projections of overall removals by all sectors. The charter fishery is not subject to a harvest quota, but estimated charter harvests are subtracted from the Total CEY to determine the Fishery CEY that forms the basis of the catch limit for the commercial fishery. While the procedures used by the IPHC can lead to harvests in excess of the Total CEY in a year, over time they should constrain harvests to biologically sustainable levels.

*Comment 79:* The IPHC does not view this as a conservation issue. The IPHC would never allow an overharvest of the Total CEY if there was a conservation issue. It should be very clear that due to the conservative nature of IPHC harvest calculations, overharvest of the Area 2 Total CEY by 60 to 85 percent is possible without resulting in a conservation issue. The proposed rule deals with a pure allocation issue and does not present any resource conservation questions.

*Response:* NMFS agrees. The healthy status of the halibut stock is evidence that IPHC policies are conservative and successful.

*Comment 80:* Hunters and fishermen have strong conservation values and are willing to pay for conservation initiatives. Increasing restrictions will discourage people from participating in these activities and will undermine their support for conservation causes.

*Response:* NMFS believes that this comment refers to recreational hunters and fishermen who have been, and continue to be, an important source of funding and support for conservation programs. As user numbers increase, regulatory regimes governing sport, personal use, and subsistence harvests of fish and game have become much more restrictive and complex. Many programs, such as those that issue limited numbers of permits through lotteries, are much more restrictive than this action. However, hunters and fishermen have continued to be supportive of conservation. NMFS does

not believe that this action will appreciably reduce that support.

*Comment 81:* There is a conservation issue. The Area 2C stock is overfished and fishing needs to be limited to an extent that ensures the long term sustainability of the stock.

*Response:* NMFS disagrees. The best available evidence indicates that the Area 2C stock is not overfished and the IPHC has not made that determination. Overages of the GHL are accounted for in the methods the IPHC uses to set the annual commercial catch limit to ensure that the halibut stock is not overfished. NMFS agrees that fishing limits need to be adhered to, in order to maintain the long term health of the halibut stock, and has therefore proposed this rule to reduce the charter fleet harvest to the GHL.

*Comment 82:* Unconstrained growth of the charter industry threatens the health of the fishery. In any one year, CEY may be overharvested if the projected charter harvest is higher than the assumed GHL level. These overages result in adjustments to the CEY and commercial catch limit the following year. Thus the issue poses a potential conservation concern, as well as a reallocation of allowable harvest.

*Response:* NMFS agrees that if the guided charter fishery grows in any single year, halibut removals will exceed planned IPHC removals in the short run and the actual harvest rate may be greater than the rate on which the CEY for a year is based. However, in the medium and long term, the IPHC will adjust its harvest allowances for the commercial setline fishery to take account of changes in guided charter harvests. While this process will take place gradually over time, NMFS does not expect it to seriously affect the health of the halibut stock, unless the guided charter fishery were to grow at an unexpectedly high rate. Halibut are a long-lived species and the health of the stock depends less on removals in any single year (the short run) than it does on removals over a longer multiple-year period. The IPHC has also adopted conservative harvest policies to protect against resource damage. Furthermore, the environmental analysis prepared for this rule did not find that failure to limit the guided sport charter vessel halibut harvest to the GHL would cause significant environmental impacts to the resource.

*Comment 83:* We disagree with the statement in the Executive Summary of the EA/RIR/IRFA that states, "none of the alternatives would affect the health of the halibut stock since the IPHC sets limits on total halibut removals." The IPHC does consider all removals, but if one sector continually over-harvests the amount the IPHC uses for the calculations when setting catch limits, damage to the resource occurs. The charter sector's harvest in excess of the GHL is one of the contributing factors to the biomass decline in Area 2C. The IPHC appropriately uses the associated GHL for the charter sector as determined by the Total CEY.

*Response:* NMFS agrees that the charter fishery has exceeded the GHL for several years and that is one of the primary reasons for taking this action. As stated in the response to Comment 81, the IPHC has not determined that the Area 2C stock is overfished (see also response to Comment 82).

*Comment 84:* Both the commercial and charter sectors are facing large cuts. These are necessary for the long term sustainability of the resource. Both sectors must reduce harvests and share in the conservation of the resource.

*Response:* The reduction in the 2008 Area 2C CEY will be shared by the commercial fishery, through the reduction in the Fishery CEY, and by the guided sport fishery, through the reduction of the GHL from 1.432 million lb to 0.931 million lb and the implementation of a one-fish daily limit. This reduction in the GHL is not a part of this action, but is a consequence of the final rule adopting the stair-stepped GHL that was promulgated on August 8, 2003 (68 FR 47256). Unguided angler harvests and subsistence harvests are not restricted; however, these have been relatively minor components of the overall harvest to date, accounting for an average of 11 percent of the harvest between them. Miscellaneous other uses have accounted for about 6 percent.

### Coastwide Model and IPHC Issues

*Comment 85:* The coastwide model represents the best available scientific information and thus should be used for setting the CEY. It is not appropriate to use the coastwide model in some areas and the closed area model in others.

*Response:* NMFS agrees that the coastwide assessment is considered the best available science to estimate the entire biomass of the stock of Pacific halibut and that using this total biomass to estimate the Total CEY is the best approach available at this time. The IPHC adopted the coastwide assessment in 2008 after rigorous external review to evaluate the technical merit; this approach is used to estimate biomass in all IPHC management areas. The closed area model is no longer used by IPHC.

*Comment 86:* The GHL triggers were based on the 1999–2000 average Total CEY, which was calculated using the Closed Area assessment model. If we continued to use the Closed Area model, the Area 2C Total CEY would be 9.8 million pounds, well above the first stair step for the GHL. Careful review of the 2003 final rule for the GHL shows that there is no mention of which Total CEY the GHL must be based upon. Because both have been published by the IPHC, the Secretary has the discretion to choose which Total CEY to use. The GHL was established using the Closed Area model and should continue to be based on that model.

*Response:* The IPHC adopted the coastwide assessment in 2008 after rigorous external review to evaluate its technical merit. This approach is used to estimate biomass in all IPHC management areas. This assessment was used to make the IPHC's recommendations for the CEY that were approved by the Secretary.

The final rule establishing the GHLs for the halibut charter fishery in 2003 acknowledged that the Total CEY used to stair step the GHLs is "the total target biomass that may be removed each year. The Commission sets the CEY based on the best available information and the professional judgment of the IPHC. As such, it may reflect uncertainty or changes in the stock assessment modeling" (68 FR 47259, August 8, 2003). Thus, the 2003 GHL final rule is correctly silent on setting any requirement for how the CEYs should be determined, other than stating that it is up to the IPHC to use the best available information and its professional judgment.

NMFS continues to support the IPHC's decision to adopt the coastwide assessment as the best available science. Further, the resultant 2008 Total CEY and downward adjustment of GHL in Area 2C is based on the best available science and is consistent with the intent of the Council and NMFS when the GHLs were established in 2003.

### Unintended Effects of the Rule

*Comment 87:* The proposed action will shift charter fishing effort to other groundfish species.

*Response:* NMFS acknowledges that this action may cause some charter businesses to modify their operations to provide alternative or supplementary fishing experiences for their clients. The environmental assessment reviewed the potential impacts on other species, such as salmon or rockfish, and found that they would not have significant impacts on those resources. These stocks are managed by the State of Alaska and NMFS using biological benchmarks that prompt agency response to constrain harvest to maintain sustainable stocks. Thus, an increase in sport harvest of

these species may lead to increased allocation problems between sport and commercial sectors. However, any such allocation problem would occur within the confines of the management measures established by Federal and State governments to maintain sustainable stocks.

*Comment 88:* The proposed limits on the charter fishery will result in increased catch and release or bycatch mortality as charter anglers try to catch the largest fish possible.

*Response:* NMFS acknowledges that this action may cause increased catch and release or bycatch mortality, but NMFS believes that the impact on the resource will not be significant. Appendix II of the EA/RIR/FRFA discusses the choice of a hook and release mortality rate for the Area 2C charter halibut fishery. It concludes that the overall estimate of hooking mortality is 4.8 percent. The environmental assessment took account of release mortality in its analysis of the various alternatives and did find that the preferred alternative (Alternative 2, Option 4) had the highest catch and release mortality of the alternatives. However, the analysis concluded that none of the alternatives would increase release mortality substantially above the status quo and did not find that any of the alternatives would have a significant impact on the halibut resource.

*Comment 89:* A one-fish annual limit will not impede an angler's ability to catch and release fish and will not keep anglers from fishing in Area 2C any more than the status quo. With a one-fish daily limit, anglers can keep fish of any size and will only lose the opportunity to keep a second fish smaller than 32 inches in length or about 11 pounds.

*Response:* NMFS acknowledges the comment.

### Consistency With Other Laws

*Comment 90:* The intent of Executive Order 12962 is to provide guidance to NMFS to improve the potential productivity of aquatic resources for recreational fisheries. The proposed rule improves productivity for commercial fisheries.

*Response:* This rule does not violate Executive Order (E.O.) 12962. To the extent permitted by law, E.O. 12962 directs Federal agencies to improve the quality, function, sustainability, productivity, and distribution of aquatic resources for increased recreational fishing opportunities. This rule is promulgated to meet the management goals set forth in the Halibut Act under the Convention and implemented by the Secretary. These management goals

include setting annual limits on the amount of halibut that may be removed without compromising the long-term sustainability of the halibut stock, including the achievement of maximum sustainable yield for halibut fisheries.

*Comment 91:* This rule does not comply with the Halibut Act which states that allocations shall be fair and equitable to all such fishermen. The fast down portion of the SUFD gives an advantage to the commercial sector that the charter sector does not receive.

*Response:* This final rule was not designed to change either the 2008 GHL published in the **Federal Register** (73 FR 6709, February 5, 2008) or the GHL regulations at 50 CFR 300.65. The GHL steps down only when the CEY established by the IPHC falls below benchmark levels in the GHL regulation. To change the GHL regulations would require separate rulemaking.

The "slow-up/fast-down" (SUFD) component of the IPHC's management regime is not necessarily advantageous to the commercial sector. It is designed to ameliorate the impacts of large changes in biomass. If the CEY is bigger than the previous year's catch limit, then the IPHC staff's recommended catch limit is only allowed to increase by 33 percent of the difference. If the CEY is less than the previous year's catch limit, the recommended catch limit reduction is limited to 50 percent of the difference. The commercial catch limit increases and decreases with changes in biomass, even with a static GHL, whereas changes to the charter sector's GHL occur in a stepwise manner only when specific CEY levels are established by the IPHC (see § 300.65(i)(1)).

NMFS believes the commercial longline fishery and guided sport charter vessel fishery situations are not comparable. The longline fishery is controlled by a hard cap that is extended, through the IFQ system, to individual longline fishermen. The hard cap is modified through time to reflect changes in the fishery biomass and the harvest by other sectors. The hard cap modification takes place gradually over a series of years. The guided sport charter fishery has not been subject to a hard cap, and this action will not impose a hard cap on the output of the guided sport fishery as a whole, or on individual businesses within it.

### Miscellaneous

*Comment 92:* Halibut is a public resource and the public should not be denied the opportunity to fish for it.

*Response:* This final rule does not deny the public the opportunity to harvest halibut. Although this rule is

designed to reduce the poundage of halibut harvested in Area 2C by the guided sport charter vessel fishery, it maintains the opportunity of charter vessel anglers to harvest one halibut per day, and has no effect on recreational anglers not fishing from a charter vessel. In addition, this final rule supports the management goals set forth in the Halibut Act under the Convention and the allocation objectives set forth by the Council and approved by the Secretary of Commerce. The management goals include setting annual limits on the amount of halibut that may be removed without compromising the long-term sustainability of the halibut stock, including the achievement of maximum sustainable yield for all halibut fisheries (commercial, subsistence, and sport). The allocation objectives are intended to limit the harvest of halibut in the charter fishery to the annual GHL.

*Comment 93:* There is no sunset provision for the rule. This goes against the Council motion to restrict charter harvest for 2008 only until the charter moratorium goes into place in 2009. There was a misunderstanding during the Council process that this regulation would continue indefinitely. Additional measures like the "Permanent Solution," "Compensated Reallocation," and "Initial Allocation" will also go into effect before 2009. The rule needs to go through the whole Council process again because of this misunderstanding on the duration of the measures. The public process requires clear and unambiguous language.

*Response:* NMFS disagrees that this final rule was intended by the Council to be effective only for 2008 and that the Council is required to reconsider this action to clarify this point. Although NMFS is developing a proposed rule to implement a limited entry program for charter vessel businesses, fishing under the proposed limited entry program would not occur before 2010 pending the rule's approval by the Secretary of Commerce. While the Council is considering other management programs for the charter vessel fishery for halibut, the schedule for Council action on these programs and the subsequent rulemaking process would not allow their implementation before 2010. NMFS intends to encourage Council consideration of changes to GHL measures in the event the annual GHL is adjusted upward or downward from the 2008 level with changes of Total CEY. Any such changes would require separate Council analysis and consideration, as well as subsequent rulemaking. This was the process intended by the Council when it voted

in June 2007 to adopt the actions implemented under this final rule.

*Comment 94:* Adjacent management areas will have more favorable management regimes in place that will further negatively affect Area 2C charter fisheries and the Council may need to review this in a manner that allows for adjustments in time for the 2009 fishery if biomass abundance supports an increase in the CEY.

*Response:* NMFS agrees. See response to Comment 93.

*Comment 95:* Much of the fish caught by sport anglers is wasted and the focus is on catching trophy fish for bragging rights, not the meat. Many charter clients take the fish home to give away or sell to pay for their trip.

*Response:* The purpose of this final rule is to reduce harvest of halibut in the Area 2C charter vessel fishery to the GHL. It is not intended to manage what anglers choose to do with legally harvested halibut, including choices of keeping or giving away harvested fish. It is illegal to commercially sell recreationally harvested halibut. Violators are subject to civil penalties and prosecution.

*Comment 96:* The six-line limit puts Area 2C at a disadvantage to other areas that can fish more lines. Larger boats that can accommodate more than six lines are safer and more cost effective to operate. These regulations put an undue hardship on Area 2C charter operations.

*Response:* NMFS recognizes that different restrictions for the charter vessel sector in different IPHC regulatory areas may influence where potential clients choose to fish. Line limits have been in place under State regulations since 1997. This regulation puts that line limit in Federal regulations.

*Comment 97:* The Sitka area Local Area Management Plan (LAMP) forces charter operators to fish beyond protected waters so fishing is more weather dependent. A one-fish daily limit combined with weather considerations could limit clients' opportunities to such an extent that a trip to Sitka would not be worthwhile.

*Response:* The EA/RIR/FRFA for this final rule acknowledges the possibility that consumer demand for charter vessel trips in Area 2C to fish for halibut could be impacted by the one-fish daily bag limit (see sections 2.6.3.4 and 2.7.3.4). The analysis also notes that Sitka may be less likely to experience this reduction in demand because it has greater potential for multi-species charter trips compared to Inside Passage communities such as Juneau or Ketchikan.

*Comment 98:* Two very large year classes will recruit into the fishery beginning in 2010, therefore this rule is unnecessary.

*Response:* The current stock assessment does suggest that two extremely large year classes—1999 and 2000—could grow to exploitable size over the next few years. These year classes appear to be larger than those in 1987 and 1988 that supported past higher harvests. It is important to note that size-at-age is smaller than 20 years ago. This has two important ramifications. First it means that the 1999 and 2000 year classes are only just beginning to reach the exploitable size range and therefore their true contribution to the population is still quite uncertain. Second, it means that for a given number of halibut, biomass will be lower than in the past. By assuming the size-at-age relationship remains the same as this year, then the projections for the exploitable biomass and spawning biomass are very optimistic and current declines are apt to reverse. However, the harvest rate should remain around 20 percent of the exploitable biomass so that when the biomass increases, higher Total CEY and commercial catch limits will follow. If the Total CEY is increased, current GHL regulations would allow for an increase of the GHL up to the maximum level of 1.432 million lb.

*Comment 99:* There is a commercial bias in the IPHC and North Pacific Fisheries Management Council. Since the 1980s the IPHC and Council have supported explosive growth in commercial harvest while stifling the charter sector. The charter vessel owners do not have representation in these bodies; therefore all decisions tend to favor the commercial sector.

*Response:* The IPHC and the Council are the bodies established by treaty and Congress and given the authority to make decisions and recommendations about the management of the halibut fisheries. They have made their decisions through transparent and public processes, and in a manner that is consistent with the requirements of the relevant statutes.

This final rule is an outgrowth of the 2003 GHL rule for the charter vessel fishery; annual changes to the GHL are linked directly to the Total CEY amount determined annually by the IPHC. The Council has the authority to consider and recommend management policy to address allocation issues among different domestic sector users of halibut off Alaska, including the commercial and charter vessel fisheries. In 1998 the Council initiated a public process to identify GHL management options and formed a GHL committee comprised of numerous representatives from the charter industry. This committee has evolved over time to develop longer term solutions for Council consideration that provide harvest stability between these two sectors. The Council has used the recommendations from this committee to formulate its GHL management options. Furthermore, the Secretary of Commerce reviews all Council policy recommendations and actions for consistency with the Halibut Act and Convention, as well as with other applicable law. NMFS does not believe that this final rule inappropriately favors the commercial fishing sector.

*Comment 100:* An annual limit is not needed because sport anglers are self-limiting. As fish stocks decline, fewer anglers go fishing and harvest decreases.

*Response:* This final rule does not establish an annual catch limit and instead relies primarily on a one-fish daily bag limit to reduce charter vessel harvest to the GHL. Harvest in the Area 2C charter vessel fishery has exceeded the GHL every year since 2004 and harvest amounts have consistently increased, although the rate of increase has varied from year to year. Given this trend and the current level of harvest, NMFS does not believe the charter vessel harvest of halibut in Area 2C would decrease to the GHL level without the limitations established in this final rule.

*Comment 101:* Clarify the definition of a charter vessel. The definition as written creates a loophole where a hired vessel may have a professional guide onboard who is not the "operator" of the vessel.

*Response:* NMFS agrees that the current definition of "charter vessel" is problematic. NMFS intends to address this problem under separate rulemaking as explained under Changes from the Proposed Rule, below.

*Comment 102:* Commercial setline fishermen provide consumers their only access to halibut unless they can afford an expensive trip to Alaska to catch their own.

*Response:* NMFS acknowledges the comment.

*Comment 103:* Halibut are resilient and survive well when caught and released properly. Support the one-fish bag limit and encourage catch and release fishing. Catch and release policies are in place elsewhere and do not limit tourist demand for fishing.

*Response:* NMFS acknowledges the comment. NMFS notes that Appendix II of the EA/RIR/IRFA reviews the available scientific information on hook and release mortality rates, and

recommended the use of a 5 percent rate for the analysis of regulatory restrictions on the Area 2C charter vessel fishery.

*Comment 104:* Charter operators don't have to pay anything for the fish they harvest whereas the commercial sector must purchase IFQs.

*Response:* NMFS acknowledges the comment.

*Comment 105:* Growth of charter industry is tapering and charter vessel catch is declining.

*Response:* Final harvest information from 2007, a year subject to new management measures, is not yet available. NMFS would expect that the rate of growth in the Area 2C halibut harvest by charter vessels to slow with increased harvest limitations, however, preliminary data suggests that the 2007 harvest still exceeded the 2007 GHL. Given the reduced GHL in 2008, harvest must be further limited by this final rule so that GHL is not again exceeded.

The data in the EA/RIR/FRFA supporting the final rule cover the period through 2006. The data available in the analysis show positive growth in the number of clients in every year but one since 2000, and accelerating growth in the number of clients in every year since 2002. The number of active vessels showed some decline from 2000 to 2002, but has increased in each year since then. The total number of trips by active vessels decreased from 2000 to 2002, but has increased in each year since then. Charter harvests of halibut have shown positive growth in every year from 2000 to 2006. In 2007 there were 403 active licensed guided charter businesses in Area 2C compared to 381 in 2005 and 395 in 2006. Likewise in 2007 there were 724 active vessels in Area 2C compared to 654 in 2005 and 680 in 2006, indicating continued growth in the industry.

*Comment 106:* More regulation of the charter fleet is not going to have an appreciable positive effect on the sport fishing in our area. Commercial fishing is what is hurting the stocks.

*Response:* The halibut stock is conservatively managed under the policies and catch limitations developed annually by the IPHC (see response to Comment 81). The objective of this final rule is to reduce the charter vessel harvest of halibut to the established GHL level while a longer term solution toward sector stability and resource allocation is developed and implemented.

*Comment 107:* An annual limit is draconian and would devastate the industry. If an annual limit is necessary, go with the six-fish limit.

*Response:* The final rule does not implement an annual harvest limit.

NMFS acknowledges that the one-fish daily bag limit implemented under this final rule also will impose costs on the charter vessel sector (see responses to Comments 33, 62, 66, and 69 addressing impacts of the one-fish bag limit). However, these costs are necessary to maintain harvest within the GHL.

**Changes From the Proposed Rule**

The final rule is revised from the proposed rule (72 FR 74257) in that the option that was proposed to address the circumstance of a GHL reduction (Option B) was chosen because the total CEY recommended by the IPHC for Area 2C in 2008 required a reduction in the GHL for Area 2C in 2008. The selection of Option B required revisions to recordkeeping and recording requirements to ensure that sufficient information is collected to manage and enforce harvest limitations in Area 2C.

The following recordkeeping and recording information is required to enforce this final rule: charter vessel business owner license number, charter vessel guide license number, date, regulatory area fished, angler sport fishing license number and printed name, number of halibut retained, charter vessel guide signature, and charter vessel angler signature. Additionally, for charter vessels fishing for halibut in both Areas 2C and 3A in a single trip, separate logbook data sheets must be maintained for each area if halibut are caught and retained.

Three definitions are revised (charter vessel angler, charter vessel fishing trip, and charter vessel guide) and four definitions are added (charter vessel operator, charter vessel services, crew member, and sport fishing guide services) to clarify limitations and recordkeeping and reporting requirements. These revised and added definitions are derived from State of Alaska definitions used to define guided sport fishing activities and are intended to clarify who may and may not catch and retain halibut and who is responsible for recordkeeping and reporting requirements in § 300.65(d).

The definition of charter vessel is not revised by this rule. However, the definition of charter vessel is currently proposed for revision in the proposed rule to revise the subsistence halibut program (April 14, 2008; 73 FR 20008). Currently, the definition of charter vessel is: "Charter vessel means a vessel used for hire in sport fishing for halibut, but not including a vessel without a hired operator." The new definition of charter vessel in the subsistence halibut program proposed rule is: "Charter vessel means a vessel registered as a sport fishing guide vessel with the

Alaska Department of Fish and Game." Due to comments received on the proposed rule to implement GHL management measures in Area 2C , and further consideration of the interactions between charter fishing and subsistence fishing, NMFS believes that the charter vessel definition proposed in the subsistence rule likely will need further refinement, including reference to charter vessel services and the specific regulations to which this definition would apply (*i.e.*, § 300.65(d) and (e)). Persons interested in commenting on the definition of charter vessel are referred to that proposed rule for more details.

The following requirements from the proposed rule for this action to implement GHL management measures in Area 2C were removed because an annual catch limit is not implemented in this final rule and these requirements were determined to be no longer necessary:

*Angler license record and retention.* NMFS has removed from the final rule the proposed requirements that anglers record the number of halibut caught and retained in Area 2C on the back of their licenses, and that they retain their licenses for three years.

*Year-to-date halibut caught.* To enforce an annual catch limit, NMFS proposed requiring that guides record in the logbook the number of halibut caught year-to-date as recorded on the back of the angler's license. This requirement no longer is needed.

*Youth angler information.* NMFS proposed requiring that youth names and birth dates be recorded in the logbook to better track and enforce an annual catch limit. Because no annual catch limit is being implemented, the date of birth for youth anglers will not be required in Federal regulations; however, the State of Alaska will still require that this information be recorded.

In addition, NMFS removes existing requirements for the retention of halibut carcasses. To help enforce the two-fish daily bag limit with size restrictions that went into place in Area 2C in 2007, NMFS prohibited mutilating or otherwise disfiguring a halibut carcass such that the head-on length could not be determined. This requirement to retain carcasses is no longer necessary with a one-fish daily bag limit and is removed from regulations at § 300.66(m). The IPHC adopted new standards in 2008 that were published in the annual management measures on March 7, 2008 (73 FR 12280). The new IPHC requirement for Alaska states that no person shall possess onboard a fishing vessel, including charter vessels

and pleasure craft, halibut that have been filleted, mutilated, or otherwise disfigured in any manner except that each halibut may be cut into no more than two ventral and two dorsal pieces, and two cheeks, all with skin on. This change allows enforcement officers to count the number of fish in possession by an angler.

The organization of § 300.65(d) is changed from the proposed rule to clarify the requirements for Areas 2C and 3A. In addition, numerous technical changes were made to clarify the regulatory intent and to ensure that consistent terminology is used. Finally a new prohibition (p) was added to § 300.66 to ensure that charter vessel operators, guides, anglers, and crew members do not refuse to present any identification card, U.S. Coast Guard operator's license, permit, license, or Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook upon the request of an authorized officer.

## Classification

This final rule has been determined to be not significant for the purposes of Executive Order (E.O.) 12866. This final rule complies with the Halibut Act and the Secretary's authority to implement allocation measures for the management of the halibut fishery.

A Final Regulatory Flexibility Analysis (FRFA) was prepared, as required by section 604 of the Regulatory Flexibility Act. The FRFA describes the impact of this rule on directly regulated small entities and compares that impact to the impacts of other alternatives that were considered. A copy of this analysis is available from NMFS (see **ADDRESSES**). A description of this action, an explanation for why it is being considered, the legal basis for this action, and changes made to the rule in response to public comments are discussed above.

In 2005, 381 charter businesses operated 654 charter vessels in Area 2C; in 2007, 403 businesses operated 724 vessels. All of these operations are assumed to be small entities, with annual gross revenues of less than the limit of $6.5 million dollars for charter vessels. The largest companies involved in the fishery, lodges or resorts that offer accommodations as well as an assortment of visitor activities, may be large entities under the Small Business Administration size standard. Key informant interviews have indicated that the largest of these companies may gross more than $6.5 million per year, but also that it was possible for all the entities involved in the charter vessel halibut of harvest to have grossed less

than this amount. The number of small entities is likely to be overestimated because of the limited information on vessel ownership and operator revenues. However, it is likely that nearly all entities qualify as small businesses.

The proposed regulation was published in the **Federal Register** on December 31, 2007 (72 FR 74257). An Initial Regulatory Flexibility Analysis (IRFA) was prepared, and described in the classifications section of the preamble to the proposed rule. The public comment period ended on January 30, 2008. NMFS received 107 unique comments in 273 letters, faxes, and e-mails on the proposed rule and 21 comments that pertain directly to the IRFA and small entities regulated by this action. Summaries of the comments, and NMFS' responses, may be found in the preamble to this action.

NMFS examined two alternatives for this action: the no-action or status quo alternative, and the action alternative. Alternative 1, the status quo, would retain the two-fish bag limit with one of the two fish less than or equal to 32 inches (83.1 cm) in length, without changes. Alternative 2, the action alternative, had 13 options for different combinations of management measures to restrict the charter halibut harvest to the Area 2C GHL. The options included limiting vessels to one trip per day; restricting harvest by guide and crew while clients are onboard; limiting the number of lines to six per vessel, not to exceed the number of paying clients onboard; daily bag limits of one or two fish (including sub-options for size limit slots and specific months when the bag limit would apply); and annual harvest limits of four, five, or six fish per charter angler.

Two preferred options (Option A and Option B) were selected by considering different combinations of management measures that would minimize the impacts on small entities while still meeting the management objective of restricting the charter vessel harvest of halibut to the GHL. Option A, which would have been implemented if the 2008 GHL had been greater than 1.217 million lb, included the following measures in addition to the existing two halibut daily limit with size restrictions: (1) A prohibition on halibut harvest by charter vessel guides, operators, and crew while clients were onboard; (2) a limit on the number of fishing lines that may be used on a charter vessel of six or the number of charter vessel anglers onboard, whichever is less; and (3) an annual catch limit of four halibut per charter vessel angler. Option B is being implemented because the 2008 GHL fell

below 1.217 million lb. It includes the same prohibition on guide and crew harvest and line limits as Option A. However, Option B includes a one-fish daily bag limit rather than the two-fish daily limit with size restrictions and the proposed four-fish annual harvest limit in Option A.

Other options would have had a smaller impact on the directly regulated guided charter operations because they would have reduced guided charter harvests less and had smaller impacts on demands for guided charter services. However, Option B was the only alternative that would have met the objectives of this action to reduce the guided charter harvest to the guideline harvest level. The guideline harvest level in 2008 is 0.931 million lb. The estimates of possible production under Option B ranged from 82 percent to 117 percent of the GHL. No other alternative or option had a range of estimated harvest levels that included the 2008 GHL.

### Collection of Information

This rule includes a collection of information requirement subject to the Paperwork Reduction Act (PRA) and that has been approved by OMB under Control Number 0648–0575. The public reporting burden for charter vessel guide respondents to fill out and submit logbook data sheets is estimated to average four minutes per response. The public reporting burden for charter vessel anglers to sign the logbook is estimated to be one minute per response. These estimates include the time required for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The total public reporting burden for this collection is estimated at 3,134 hours. Send comments regarding this burden estimate, or any other aspect of this data collection, including suggestions for reducing the burden, to NMFS (see **ADDRESSES**) and by e-mail to *David_Rostker@omb.eop.gov*, or fax to 202–395–7285.

Notwithstanding any other provision of the law, no person is required to respond to, and no person shall be subject to a penalty for failure to comply with, a collection of information subject to the requirements of the PRA, unless that collection of information displays a currently valid OMB Control Number.

### Small Entity Compliance Guide

Section 212 of the Small Business Regulatory Enforcement Fairness Act of 1996 states that, for each rule, or group of related rules for which an agency is

required to prepare a FRFA, the agency shall publish one or more guides to assist small entities in complying with the rule and shall designate such publications as "small entity compliance guides." The agency shall explain the actions a small entity is required to take to comply with a rule or group of rules. As part of this rulemaking process, NMFS Alaska Region has developed an Internet site that provides easy access to details of this final rule, including links to the final rule, and frequently asked questions regarding Program. The Small Entity Compliance Guide for the Program is available on the Internet at *http://www.fakr.noaa.gov*. Copies of this final rule are available upon request from the NMFS, Alaska Regional Office (see **ADDRESSES**).

*Executive Order 12962*

This action is consistent with E.O. 12962 which directs Federal agencies to improve the quantity, function, sustainable productivity, and distribution of aquatic resources for increased recreational fishing opportunities "to the extent permitted by law and where practicable." This E.O. does not diminish NMFS' responsibility to address allocation issues, nor does it require NMFS or the Council to limit their ability to manage recreational fisheries. E.O. 12962 provides guidance to NMFS to improve the potential productivity of aquatic resources for recreational fisheries. This rule does not diminish that productivity or countermand the intent of E.O. 12962.

*Administrative Procedure Act*

A June 1, 2008 effective date for this action is necessary to effectuate the Council's intent to limit the charter halibut sector's harvest to the federally mandated GHL, found at 50 CFR 300.65(c). If this action is not in place by the beginning of the peak season for the charter halibut sector (June, July, and August), the intent of the Council will be thwarted as this is time of peak harvest and when the harvest limitations would have its greatest impact. During the "shoulder seasons," i.e., before and after June, July, and August, charter halibut fishing is occurring, but to a lesser extent, and hence the harvest limitations would have a smaller impact. Also, having the harvest limitations effective as of June 1, 2008, would avoid the confusion that could occur to the charter halibut industry and its clients if the rule became effective after the peak season had begun. It is for these reasons that NMFS finds that there is good cause to

waive the 30-day delayed effectiveness period under 5 U.S.C. 553(d)(3) to the extent that it would allow for a June 1, 2008, effective date.

List of Subjects

*15 CFR Part 902*

Reporting and recordkeeping requirements.

*50 CFR Part 300*

Fisheries, Fishing, Reporting and recordkeeping requirements, Treaties.

Dated: May 21, 2008.

**Samuel D. Rauch III,**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

■ For the reasons set out in the preamble, NMFS amends 15 CFR chapter IX, and 50 CFR chapter III as follows:

**15 CFR Chapter IX**

**PART 902—NOAA INFORMATION COLLECTION REQUIREMENTS UNDER THE PAPERWORK REDUCTION ACT: OMB CONTROL NUMBERS**

■ 1. The authority citation for part 902 continues to read as follows:

**Authority:** 44 U.S.C. 3501 *et seq.*

■ 2. In § 902.1, in the table in paragraph (b) under the entry "*50 CFR*", add an entry for "300.65(d)" in alphanumeric order to read as follows:

**§ 902.1   OMB control numbers assigned pursuant to the Paperwork Reduction Act.**

\*   \*   \*   \*   \*

(b) \* \* \*

| CFR part or section where the information collection requirement is located | Current OMB control number (all numbers begin with 0648–) |
| --- | --- |
| \*   \*   \*   \*   \* | |
| *50 CFR* ....................... | |
| \*   \*   \*   \*   \* | |
| 300.65(d) .................... | –0575 |
| \*   \*   \*   \*   \* | |

**50 CFR Chapter III**

**PART 300—INTERNATIONAL FISHERIES REGULATIONS**

■ 3. The authority citation for 50 CFR part 300, subpart E, continues to read as follows:

**Authority:** 16 U.S.C. 773–773k.

■ 4. In § 300.61, add definitions for "Area 3A", "Charter vessel angler", "Charter vessel fishing trip", "Charter vessel guide", "Charter vessel operator",

"Charter vessel services", "Crew member", and "Sport fishing guide services" in alphabetical order to read as follows:

**§ 300.61   Definitions.**

\*   \*   \*   \*   \*

*Area 3A* means all waters between Area 2C and a line extending from the most northerly point on Cape Aklek (57°41′15″ N. latitude, 155°35′00″ W. longitude) to Cape Ikolik (57°17′17″ N. latitude, 154°47′18″ W. longitude), then along the Kodiak Island coastline to Cape Trinity (56°44′50″ N. latitude, 154°08′44″ W. longitude), then 140° true.

\*   \*   \*   \*   \*

*Charter vessel angler*, for purposes of § 300.65(d), means a person, paying or nonpaying, using the services of a charter vessel guide.

*Charter vessel fishing trip*, for purposes of § 300.65(d), means the time period between the first deployment of fishing gear into the water from a charter vessel after any charter vessel angler in onboard and the offloading of one or more charter vessel anglers or any halibut from the charter vessel.

*Charter vessel guide*, for purposes of § 300.65(d), means a person who is required to have an annual sport guide license issued by the Alaska Department of Fish and Game, or a person who provides sport fishing guide services.

*Charter vessel operator*, for purposes of § 300.65(d), means the person in control of the vessel during a Charter vessel fishing trip.

*Charter vessel services*, for purposes of § 300.65(d), means the use of a vessel by a charter vessel guide to provide assistance for compensation to a person who is sport fishing from that vessel.

\*   \*   \*   \*   \*

*Crew member*, for purposes of § 300.65(d), means an assistant, deckhand, or similar person who works directly under the supervision of and on the same vessel as a charter vessel guide.

\*   \*   \*   \*   \*

*Sport fishing guide services*, for purposes of § 300.65(d), means assistance, for compensation, to a person who is sport fishing, to take or attempt to take fish by accompanying or directing such person who is sport fishing during any part of a charter vessel fishing trip. Sport fishing guide services does not include services provided by a crew member.

\*   \*   \*   \*   \*

■ 5. In " 300.65, revise paragraph (d) to read as follows:

**§ 300.65  Catch sharing plan and domestic management measures in waters in and off Alaska.**

\*    \*    \*    \*    \*

(d) *Charter vessels in Area 2C and Area 3A*—(1) *General requirements*—(i) *Logbook submission.* Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook data sheets must be submitted to the appropriate Alaska Department of Fish and Game office according to the time schedule printed in the instructions at the beginning of the logbook.

(ii) The charter vessel guide is responsible for complying with the reporting requirements of this paragraph (d). The employer of the charter vessel guide is responsible for ensuring that the charter vessel guide complies with the reporting requirements of this paragraph (d).

(2) *Charter vessels in Area 2C*—(i) *Daily bag limit.* The number of halibut caught and retained by each charter vessel angler in Area 2C is limited to no more than one halibut per calendar day.

(ii) *Charter vessel guide and crew restriction.* A charter vessel guide, a charter vessel operator, and any crew member of a charter vessel must not catch and retain halibut during a charter fishing trip.

(iii) *Line limit.* The number of lines used to fish for halibut must not exceed six or the number of charter vessel anglers onboard the charter vessel, whichever is less.

(iv) *Recordkeeping and reporting requirements in Area 2C.* Each charter vessel angler and charter vessel guide onboard a charter vessel in Area 2C must comply with the following recordkeeping and reporting requirements (see paragraphs (d)(2)(iv)(A) and (B) of this section):

(A) *Charter vessel angler signature requirement.* At the end of a charter vessel fishing trip, each charter vessel angler who retains halibut caught in Area 2C must acknowledge that his or her information and the number of halibut retained (kept) are recorded correctly by signing the back of the Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook data sheet on the line number that corresponds to the angler's information on the front of the logbook data sheet.

(B) *Charter vessel guide requirements.* For each charter vessel fishing trip in Area 2C, the charter vessel guide onboard the charter vessel is required to record the following information (see paragraphs (d)(2)(iv)(B)(*1*) through (*8*) of this section) in the Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook:

(1) *Business owner license number.* The sport fishing operator business license number issued by the Alaska Department of Fish and Game to the charter vessel guide or the charter vessel guide's employer.

(2) *Guide license number.* The Alaska Department of Fish and Game sport fishing guide license number held by charter vessel guide who certified the logbook data sheet.

(3) *Date.* Month and day for each charter vessel fishing trip taken. A separate logbook data sheet is required for each charter vessel fishing trip if two or more trips were taken on the same day. A separate logbook data sheet is required for each calendar day that halibut are caught and retained during a multi-day trip.

(4) *Regulatory area fished.* Circle the regulatory area (Area 2C or Area 3A) where halibut were caught and retained during each charter vessel fishing trip. If halibut were caught and retained in Area 2C and Area 3A during the same charter vessel fishing trip, then a separate logbook data sheet must be used to record halibut caught and retained for each regulatory area.

(5) *Angler sport fishing license number and printed name.* Before a charter vessel fishing trip begins, record for each charter vessel angler the Alaska Sport Fishing License number for the current year, resident permanent license number, or disabled veteran license number, and print the name of each paying and nonpaying charter vessel angler onboard that will fish for halibut. Record the name of each youth angler under 16 years of age.

(6) *Number of halibut retained.* For each charter vessel angler, record the number of halibut caught and retained during the charter vessel fishing trip.

(7) *Signature.* At the end of a charter vessel fishing trip, acknowledge that the recorded information is correct by signing the logbook data sheet.

(8) *Angler signature.* The charter vessel guide is responsible for ensuring that anglers comply with the signature requirements at paragraph (d)(2)(iv)(A) of this section.

(3) *Charter vessels in Area 3A.* For each charter vessel fishing trip in Area 3A, the charter vessel guide onboard the charter vessel is required to record the regulatory area (Area 2C or Area 3A) where halibut were caught and kept by circling the appropriate area in the Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook. If halibut were caught and retained in Area 2C and Area 3A during the same charter vessel fishing trip, then a separate logbook data sheet must be

used to record halibut caught and retained for each regulatory area.

\*    \*    \*    \*    \*

■ 6. In § 300.66, revise paragraph (m) and add paragraphs (n), (o), and (p) to read as follows:

**§ 300.66  Prohibitions.**

\*    \*    \*    \*    \*

(m) Exceed any of the harvest or gear limitations specified in § 300.65(d).

(n) Fail to comply with the requirements at § 300.65(d).

(o) Fail to submit or submit inaccurate information on any report, license, catch card, application or statement required under § 300.65.

(p) Refuse to present any identification card, U.S. Coast Guard operator's license, permit, license, or Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip logbook upon the request of an authorized officer.

[FR Doc. 08–1301 Filed 5–22–08; 2:39 pm]

**BILLING CODE 3510–22–P**

---

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 679**

**[Docket No. 071106673–8011–02]**

**RIN 0648–XI14**

**Fisheries of the Exclusive Economic Zone Off Alaska; Yellowfin Sole by Vessels Participating in the Amendment 80 Limited Access Fishery in Bycatch Limitation Zone 1 of the Bering Sea and Aleutian Islands Management Area**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Temporary rule; closure.

**SUMMARY:** NMFS is prohibiting directed fishing for yellowfin sole by vessels participating in the Amendment 80 limited access fishery in Bycatch Limitation Zone 1 (Zone 1) of the Bering Sea and Aleutian Islands management area (BSAI). This action is necessary to prevent exceeding the 2008 bycatch allowance of red king crab in Zone 1 specified for the trawl yellowfin sole fishery category by vessels participating in the Amendment 80 limited access fishery in the BSAI.

**DATES:** Effective 1200 hrs, Alaska local time (A.l.t.), May 22, 2008, through 2400 hrs, A.l.t., December 31, 2008.

regarding full and open competition, the option must have been evaluated as part of the initial competition and be exercisable at an amount specified in or reasonably determinable from the terms of the basic contract, e.g.—

(i) A specific dollar amount;

(ii) An amount to be determined by applying provisions (or a formula) provided in the basic contract, but not including renegotiation of the price for work in a fixed-price type contract;

(iii) In the case of a cost-type contract, if—

(A) The option contains a fixed or maximum fee; or

(B) The fixed or maximum fee amount is determinable by applying a formula contained in the basic contract (but see 16.102(c));

(iv) A specific price that is subject to an economic price adjustment provision; or

(v) A specific price that is subject to change as the result of changes to prevailing labor rates provided by the Secretary of Labor.

(2) See 32.1108(b)(2) for restrictions on the use of the Governmentwide commercial purchase card as a method of payment when the Central Contractor Registration (CCR) shows a delinquent debt flag.

\*    \*    \*    \*    \*

**PART 32—CONTRACT FINANCING**

7. Amend section 32.1108 by revising paragraph (b) to read as follows:

**32.1108  Payment by Governmentwide commercial purchase card.**

\*    \*    \*    \*    \*

(b)(1) Written contracts to be paid by purchase card should include the clause at 52.232–36, Payment by Third Party, as prescribed by 32.1110(d). However, payment by a purchase card also may be made under a contract that does not contain the clause to the extent the contractor agrees to accept that method of payment.

(2)(i) Contracting officers are required to verify (by looking in CCR) whether the contractor has any delinquent debt subject to collection under the Treasury Offset Program (TOP) program at contract award, order placement, and prior to any option exercise. Information on TOP is available at *http:// fms.treas.gov/debt/index.html.*

(ii) The contracting officer shall not authorize the Governmentwide commercial purchase card as a method of payment when the Central Contractor Registration (CCR) indicates that the contractor has delinquent debt subject to collection under the TOP. In such cases, the contracting officer shall

provide alternative payment instructions to the contractor. Contracting officers shall not use the presence of the delinquent debt indicator to exclude a contractor from receipt of the contract, order, or exercised option.

(iii) If a contractor alerts the contracting officer that the CCR debt flag indicator has been changed to no longer show a delinquent debt, the contracting officer may take steps to authorize payment by Governmentwide commercial purchase card.

\*    \*    \*    \*    \*

**PART 52—SOLICITATION PROVISIONS AND CONTRACT CLAUSES**

8. Amend section 52.232–36 by revising the date of the clause and paragraphs (a) and (b) to read as follows:

**52.232–36  Payment by Third Party.**

\*    \*    \*    \*    \*

PAYMENT BY THIRD PARTY (DATE)

(a) *General.* (1) Except as provided in paragraph (a)(2) of this clause, the Contractor agrees to accept payments due under this contract, through payment by a third party in lieu of payment directly from the Government, in accordance with the terms of this clause. The third party and, if applicable, the particular Governmentwide commercial purchase card to be used are identified elsewhere in this contract.

(2) The Governmentwide commercial purchase card is not authorized as a method of payment when the Central Contractor Registration (CCR) indicates that the Contractor has delinquent debt that is subject to collection under the Treasury Offset Program (TOP). Information on TOP is available at *http://fms.treas.gov/debt/ index.html.* If the CCR subsequently indicates that the Contractor no longer has delinquent debt, the Contractor may request the Contracting Officer to authorize payment by Governmentwide commercial purchase card.

(b) *Contractor payment request.* (1) Except as provided in paragraph (b)(2) of this clause, the Contractor shall make payment requests through a charge to the Government account with the third party, at the time and for the amount due in accordance with those clauses of this contract that authorize the Contractor to submit invoices, contract financing requests, other payment requests, or as provided in other clauses providing for payment to the Contractor.

(2) When the Contracting Officer has notified the Contractor that the Governmentwide commercial purchase card is no longer an authorized method of payment, the Contractor shall make such payment requests in accordance with instructions provided by the Contracting Officer during the period when the purchase card is not authorized.

\*    \*    \*    \*    \*

[FR Doc. E7–25424 Filed 12–28–07; 8:45 am]

**BILLING CODE 6820–EP–S**

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 300**

[Docket No. 071031633–7834–01]

**RIN 0648–AW23**

**Pacific Halibut Fisheries; Guided Sport Charter Vessel Fishery for Halibut**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Proposed rule; request for comments.

**SUMMARY:** NMFS proposes regulations that would limit the harvest of Pacific halibut by guided sport charter vessel anglers in International Pacific Halibut Commission (IPHC) Area 2C of Southeast Alaska to the guideline harvest level (GHL) for that area under two different scenarios. First, if the GHL remains unchanged in 2008, a suite of three management measures are proposed to be added to an existing two-halibut daily catch and size limit. These management measures include a prohibition on the harvest of halibut by charter vessel guides, operators, and crew; a limit on the number of fishing lines that may be used on a charter vessel of six or the number of charter vessel anglers onboard, whichever is less; and an annual catch limit of four halibut per charter vessel angler. Second, if the GHL decreases in 2008, then a one-halibut daily catch limit is proposed to be substituted for the existing two-halibut daily catch limit. The prohibition of halibut harvest by charter vessel guides, operators, and crew, and the 6-line limit also are proposed under the second scenario. This proposed regulatory change is necessary to reduce the halibut harvest in the charter vessel sector to the GHL for Area 2C. The intended effect of this action is a reduction in the poundage of halibut harvested by the guided sport charter vessel sector in Area 2C to the GHL while minimizing adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and on fisheries for other species.

**DATES:** Comments must be received no later than January 30, 2008.

**ADDRESSES:** Send comments to Sue Salveson, Assistant Regional Administrator, Sustainable Fisheries Division, Alaska Region, NMFS, Attn: Ellen Sebastian. You may submit comments, identified by "RIN 0648–

Exhibit 2

AW23'' by any one of the following methods:
• *Electronic Submissions*: Submit all electronic public comments via the Federal eRulemaking Portal Web site at *http://www.regulations.gov.*
• *Mail*: P. O. Box 21668, Juneau, AK 99802.
• *Fax*: (907) 586–7557.
• *Hand delivery to the Federal Building*: 709 West 9th Street, Room 420A, Juneau, AK.

All comments received are a part of the public record and will be posted to *http://www.regulations.gov* without change. All Personal Identifying Information (e.g., name, address) voluntarily submitted by the commenter may be publicly accessible. Do not submit Confidential Business Information or otherwise sensitive or protected information.

NMFS will accept anonymous comments. Attachments to electronic comments must be in Microsoft Word, Excel, WordPerfect, or Adobe portable document file (pdf) formats to be accepted.

Copies of the Environmental Assessment (EA), Regulatory Impact Review (RIR), and Initial Regulatory Flexibility Analysis (IRFA) prepared for this action may be obtained from the North Pacific Fishery Management Council (Council) at 605 West 4th, Suite 306, Anchorage, Alaska 99501–2252, 907–271–2809, or the NMFS Alaska Region, P.O. Box 21668, Juneau, Alaska 99802, Attn: Ellen Sebastian, and on the NMFS Alaska Region Web site at *http://www.noaa.fakr.gov.*

Written comments regarding the burden-hour estimates or other aspects of the collection-of-information requirements contained in this rule may be submitted to NMFS at the above address, and by e-mail to *David_Rostker@omb.eop.gov* or by fax to 202–395–7285.

**FOR FURTHER INFORMATION CONTACT:** Jay Ginter, 907–586–7228, *jay.ginter@noaa.gov*, or Julie Scheurer, 907–586–7356, *julie.scheurer@noaa.gov.*

**SUPPLEMENTARY INFORMATION:** The International Pacific Halibut Commission (IPHC) and NMFS manage fishing for Pacific halibut (*Hippoglossus stenolepis*) through regulations established under the authority of the Northern Pacific Halibut Act of 1982 (Halibut Act). The IPHC promulgates regulations governing the halibut fishery under the Convention between the United States and Canada for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea (Convention). The IPHC's regulations are subject to approval by the Secretary of State with concurrence from the Secretary of Commerce (Secretary). After approval by the Secretaries of State and Commerce, the IPHC regulations are published in the **Federal Register** as annual management measures pursuant to 50 CFR 300.62 (March 14, 2007; 72 FR 11792).

The Halibut Act also provides the Council with authority to recommend regulations to the Secretary to allocate harvesting privileges among U.S. fishermen. This process requires the Council to submit a recommendation to the Secretary as a proposed rule for publication in the **Federal Register** along with supporting analyses as required by other applicable law. The Council has exercised this authority, most notably in the development of its Individual Fishing Quota (IFQ) Program, codified at 50 CFR part 679, and subsistence halibut fishery management measures, codified at 50 CFR 300.65. The Council also has been developing a regulatory program to manage the guided sport charter vessel fishery for halibut. The regulatory program proposed by this action is linked to the overall management of the halibut fisheries by the IPHC and a previous action by the Council and NMFS to establish a guideline harvest level (GHL) for managing the harvest of halibut by the guided sport charter vessel fishery (August 8, 2003; 68 FR 47256).

**Management of the Halibut Fisheries**

The harvest of halibut occurs in three basic fisheries—the commercial, sport, and subsistence fisheries. Additional fishing mortality occurs as bycatch or incidental catch while targeting other species and wastage of halibut that are caught but cannot be used for human food.

The IPHC annually determines the amount of halibut that may be removed from the resource without causing biological conservation problems on an area-by-area basis in all areas of Convention waters. It imposes catch limits, however, on only the commercial sector in areas in and off of Alaska. The IPHC estimates the exploitable biomass of halibut using a combination of harvest data from the commercial, recreational, subsistence fisheries, and information collected during scientific surveys and sampling of bycatch in other fisheries. The target amount of allowable harvest for a given area is calculated by multiplying a fixed harvest rate by the estimate of exploitable biomass. This target level is called the total constant exploitation yield (CEY) as it represents the target level for total removals (in net pounds) for that area in the coming year. The IPHC subtracts estimates of all non-commercial removals (sport, subsistence, bycatch, and wastage) from the total CEY. The remaining CEY, after the removals are subtracted, is the maximum catch or "fishery CEY" for an area's directed commercial fixed gear fishery.

This method of determining the commercial fishery's catch limit in an area results in a decrease in the commercial fishery's use of the resource as other non-commercial uses increase their proportion of the total CEY. As conservation of the halibut resource is the overarching goal of the IPHC, it attempts to include all sources of fishing mortality of halibut within the total CEY. This method for determining the limit for the commercial use of halibut has worked well for many years to conserve the halibut resource, provided that the other non-commercial uses of the resource have remained relatively stable and small. Although most of the non-commercial uses of halibut have been relatively stable, growth in the guided sport charter vessel fishery in recent years, particularly in Area 2C, has resulted in the guided sport charter vessel fishery harvesting a larger amount of halibut, thereby reducing the amount available to the commercial fishery.

**Guideline Harvest Level (GHL)**

Currently, the Council's only approved management policy in effect for the charter vessel fisheries is to have separate GHLs for Area 2C and Area 3A (50 CFR 300.65(c)). The GHLs serve as benchmarks for monitoring the charter vessel fishery relative to the commercial fishery and other sources of fishing mortality. The GHLs do not limit the charter vessel fisheries. Although it is the Council's policy that the charter vessel fisheries should not exceed the GHLs, no constraints have been imposed on the charter vessel fisheries for GHLs that have been exceeded in the past.

The Council has discussed the expansion of the charter vessel fishery for halibut since 1993. The GHLs were initially adopted by the Council in 1997 without implementing regulations. The Council stated its intent to maintain a stable charter vessel fishing season without a mid-season closure. If a GHL were exceeded, other management measures would be triggered to take effect in years following attainment of the GHL. The Council envisioned "framework" regulations of increasing restrictiveness depending on the extent to which a GHL was exceeded. Proposed framework regulations were published in 2002 (January 28, 2002; 67 FR 3867);

however, NMFS informed the Council later that year that its framework regulations could not be implemented as envisioned. Hence, a final rule establishing the GHLs was published without any restrictive regulations (August 8, 2003; 68 FR 47256).

The GHLs represent a pre-season specification of acceptable annual halibut harvests in the charter vessel fisheries in Areas 2C and 3A. To accommodate some growth in the charter vessel sector while approximating historical harvest levels, the Council recommended GHLs based on 125 percent of the average 1995 through 1999 charter vessel harvest. For Area 2C the GHL was set at 1,432,000 lb (649.5 mt) net weight, and in Area 3A the GHL was set at 3,650,000 lb (1,655.6 mt) net weight. When the Council recommended these GHLs, halibut stocks were considered to be near record high levels of abundance. To accommodate decreases and subsequent increases in abundance, the Council recommended a system of step-wise adjustments in each GHL based on a predetermined uniform measure of stock abundance. The measure used was the CEY determined annually by the IPHC. Specifically, the Council linked a step-wise reduction in the GHL in any one year to the decrease in the CEY as compared to the 1999 through 2000 average CEY. For example, if the halibut stock in Area 2C were to fall from 15 to 24 percent below its 1999 through 2000 average CEY, then the GHL for Area 2C would be reduced by 15 percent. Conversely, as the CEY increased from low levels, the GHL also would increase in the same step-wise manner. However, regardless of how high the CEY may rise above its 1999 through 2000 average, the GHLs were not designed to increase above their maximum amounts. Since 2003 when the GHLs became effective, they have never been reduced below their maximum level because declines in the total CEY have not been sufficient to trigger the first step reduction of the GHLs.

**Recent Harvests of Halibut in Area 2C**

In Area 2C, the commercial, sport and subsistence harvest of halibut over the past 10 years (1997 through 2006) has been estimated by the IPHC to average about 12.454 million lb (5,649.0 mt) per year. Of this annual average total removal from the halibut resource, the commercial fishery accounts for about 76.7 percent, the sport fishery (guided and unguided combined) account for about 19.1 percent, and the remaining 4.2 percent may be attributed to subsistence, bycatch, and wastage combined. Estimates of the subsistence

harvest of halibut were made based on surveys conducted by the Alaska Department of Fish and Game (ADF&G) during the past three years and average about 600,000 lb (272.2 mt) per year.

In the most recent three years (2004 through 2006), the annual average of total halibut removals in Area 2C is 14.142 million lb (6,414.7 mt) of which the commercial fishery has taken about 73.8 percent, the sport fishery has taken about 20.7 percent, the subsistence fishery has taken about 4.3 percent, and about 1.2 percent is attributed to bycatch and wastage. The commercial fishery is the primary user of the halibut resource in Area 2C followed by the sport fishery, which together account for almost 95 percent of the total removals from the halibut resource.

In Area 2C, the sport fishery is comprised of guided fishing on charter vessels and unguided angling. Residents of Southeast Alaska and their family and friends are the primary unguided anglers, while non-resident tourists are the main clients for guided fishing on charter vessels. The linkage between guided sport fishing and tourism is apparent from data collected by ADF&G and compiled by IPHC staff. Over the past 10 years (1997 through 2006), the average guided sport harvest of halibut has been 1.431 million lb (649.1 mt) per year and the unguided sport harvest of halibut has amounted to 0.951 million lb (431.4 mt) per year. Proportionately, the guided charter vessel harvest to unguided sport harvest has been a ratio of about 60 to 40. The guided sport harvest has increased in more recent years. Over the past five years (2002 through 2006), the annual guided sport charter vessel harvest amounted to an average 63.9 percent of the total sport harvest of halibut in Area 2C, and in 2005 reached a record 69.8 percent of the total sport harvest. In response, the Council is considering a management program to restrict the charter vessel harvest of halibut.

Since their implementation in 2003, the GHLs for Areas 3A and 2C have been exceeded by the charter vessel halibut harvest in 2004, 2005, and 2006. In Area 2C, based on ADF&G sport fishing survey data, the charter vessel harvest in 2003 was one percent under the GHL, but in 2004 and 2005, it was 22 percent and 36 percent over the GHL, respectively.

The total Area 2C harvest of halibut by the sport fishery in 2006 was 2.537 million lb (1,150.8 mt), based on final ADF&G sport harvest estimates reported in October 2007. Of this amount, the charter fishery harvested 1.812 million lb (821.9 mt) or 71.4 percent and the unguided harvest was 0.725 million lb

(328.8 mt) or 28.6 percent. Hence, the charter harvest exceeded its 2006 Area 2C GHL by 380,000 lb (172.4 mt) or 26.5 percent. This overage is substantially less than ADF&G's preliminary projection of 2006 charter harvests made in October 2006. At that time, ADF&G had preliminary projections indicating that the 2006 charter harvest of halibut could be as much as 2.113 million pounds (958.4 mt) or 47 percent above the Area 2C GHL. The ADF&G preliminary projections of the overage of the GHL in 2006 produced responses in 2007 from the Council and the three management agencies involved: IPHC, NMFS, and ADF&G.

**Management Agencies' Response in 2007**

At its annual meeting in January 2007, the IPHC adopted a motion to recommend reducing the daily bag limit for anglers on charter vessels in Areas 2C and 3A from two halibut to one halibut during certain time periods. Specifically, for Area 2C, the IPHC recommended that the one-fish daily bag limit should apply to guided anglers from June 15 through July 30. The IPHC recommended this temporary bag limit reduction because it believed its management goals were at risk by the magnitude of the charter halibut harvest in excess of the GHL, especially in Area 2C. This action was not explicitly designed to manage the charter fishery to the Council's GHLs but rather to initiate some control on what appeared to be a constantly increasing charter vessel harvest. The IPHC took this action reluctantly. It stated that its preference was for the Council to resolve the allocation issue between the sport charter and commercial sectors. Moreover, it delayed the effective date of the reduced bag limit to June 15 to afford the Secretary time to resolve the issue under U.S. domestic law with regulations that would achieve "comparable reductions" in halibut harvest by the charter vessel fishery.

In a letter to the IPHC on March 1, 2007, the Secretary of State, with concurrence from the Secretary, rejected the recommended one-fish daily bag limit in Areas 2C and 3A, and indicated that appropriate reduction in the charter vessel harvest in these areas would be achieved by a combination of ADF&G and NMFS regulatory actions. For Area 2C, the State of Alaska Commissioner of Fish and Game (hereafter, State Commissioner) issued an emergency order to prohibit retention of fish by charter vessel guides and crew members (No. 1–R–02–07). This emergency order was similar to one issued for 2006. This action was intended, in conjunction

with other measures, to reduce the 2007 charter vessel harvest of halibut to levels comparable to the IPHC-recommended bag limit reduction which was estimated to range from 397,000 (180.1 mt) pounds to 432,000 pounds (195.9 mt).

Regulatory action to remedy this problem by June 2007 required the Secretary, through NMFS, to develop regulations independent of the Council process. The analysis of alternative restrictions had an explicit goal of finding the best alternative that would reduce sport fishing mortality of halibut in the charter vessel sector in Area 2C to a level comparable to the level that would have been achieved by the IPHC-recommended regulations and in a manner that would minimize adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and on fisheries for other species. The preferred alternative selected by NMFS maintained the traditional two-fish daily bag limit provided that at least one of the harvested halibut has a head-on length of no more than 32 inches (81.3 cm). If a charter vessel angler retains only one halibut in a calendar year, that fish may be of any length. Regulations implementing this partial maximum size limit were published on June 4, 2007 (72 FR 30714).

The Council also was considering management alternatives for the charter vessel halibut fishery in Area 2C during the first half of 2007. Unlike the IPHC, ADF&G, and NMFS actions, however, the Council's alternatives were designed specifically to maintain the charter vessel fishery to its GHL. In June 2007, the Council adopted a preferred alternative that contained two options. The Council recommended that the selection between the options depend on whether the CEY decreases substantially for 2008. As explained above, the GHLs for Area 2C and 3A are linked to the CEY determined annually by the IPHC as a basis for setting the commercial fishery catch limits in these areas. A substantial decrease in the CEY could cause the GHL for Area 2C to decrease from its current 1.432 million lb (649.5 mt) to 1.217 million lb (552.0 mt). Not knowing in June 2007 how the GHL may be affected by IPHC action in January 2008, the Council recommended a suite of charter vessel fishery restrictions if the GHL remains the same in 2008 (Option A) and a different, more restrictive, suite of restrictions if the GHL decreases in 2008 (Option B). This Council recommendation is the basis for this proposed regulatory action.

## The Proposed Action

As recommended by the Council in June 2007, this action proposes management measures to reduce the charter vessel fishery harvest of halibut in Area 2C to the GHL under two scenarios—Option A if the GHL for this area remains the same in 2008, and Option B if the GHL decreases in 2008. NMFS encourages public comment on all regulatory options to maximize the ability of NMFS to achieve the intent of the Council to limit the catch of the guided sport charter vessel fishery in Area 2C to the GHL while minimizing the adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and on fisheries for other species. In brief, the specific options recommended by the Council are as follows:

*Option A    management measures for the charter vessel halibut fishery in Area 2C.*

- Two fish daily bag limit provided that one fish is no more than 32 inches (81.3 cm) in length (existing regulation at 50 CFR 300.65(d));
- A charter vessel guide, a charter vessel operator, and crew of a charter vessel must not catch and retain halibut during a charter fishing trip;
- The number of lines used to fish for halibut must not exceed six or the number of charter vessel anglers onboard the charter vessel, whichever is less; and
- The combined number of halibut that may be harvested by a charter vessel angler in Area 2C during a calendar year must not exceed four fish.

*Option B    management measures for the charter vessel halibut fishery in Area 2C.*

- The number of halibut caught and retained by each charter vessel angler in Area 2C is limited to no more than one halibut per calendar day;
- A charter vessel guide, a charter vessel operator, and crew of a charter vessel must not catch and retain halibut during a charter fishing trip; and
- The number of lines used to fish for halibut must not exceed six or the number of charter vessel anglers onboard the charter vessel, whichever is less.

*Option A Management Measures*

The following management measures were recommended by the Council if the GHL remains unchanged in 2008. If implemented, the proposed regulations would remain in effect until changed by a new Federal regulatory action.

*Daily bag and maximum size limit.* The existing regulation (at 50 CFR 300.65(d)) in effect since June 1, 2007 (72 FR 30714, June 4, 2007), reads as follows:

In Commission Regulatory Area 2C, halibut harvest on a charter vessel is limited to no more than two halibut per person per calendar day provided that at least one of the harvested halibut has a head-on length of no more than 32 inches (81.3 cm). If a person sport fishing on a charter vessel in Area 2C retains only one halibut in a calendar day, that halibut may be of any length.

Before June 1, 2007, the daily catch limit applicable to charter vessel anglers was the same as that which applies to all sport fishing for halibut in Alaska, which is two halibut of any size per person. This two-fish daily bag limit for sport fishermen is an IPHC regulation (section 25(2)(b) at 72 FR 11801; March 14, 2007) first imposed in 1975. The NMFS regulation in June 2007 simply supplemented the traditional two-fish bag limit with the additional requirement that one of the two fish must be no more than 32 inches (81.3 cm) in length. If only one halibut is retained, it may be of any length.

No substantive change in this requirement is proposed by Option A. Minor changes in the text are proposed, however, due to other changes proposed in this action. Specifically, § 300.65(d) would have a new heading that would move the text currently at § 300.65(d) to § 300.65(d)(1), and that would have a new heading specifying "daily bag limit in Area 2C." As a result, the existing introductory phrase, "In Commission Regulatory Area 2C" would be removed as redundant. In addition, the second sentence of the paragraph would be changed by substituting the phrase, "If a charter vessel angler" for the existing phrase "If a person sport fishing on a charter vessel in Area 2C." This change is proposed because a new definition of "charter vessel angler" is proposed and reiterating "in Area 2C" is unnecessary due to the new paragraph heading that already makes clear the geographic application of the regulation.

*No harvest by skipper and crew.* A new Federal restriction is proposed prohibiting the harvest of halibut by the charter vessel guide, the charter vessel operator, and the charter vessel crew during a charter vessel fishing trip. The language of the Council's motion adopting this recommendation reads, "no harvest by skipper and crew when clients are on board the charter vessel." Although a sport fishing guide on a charter vessel in Area 2C is likely to be the same person as the "skipper," captain, or operator of the vessel, in some cases the skipper and guide could be different persons. Hence, this proposed rule makes clear the Council's

intent of applying this restriction to all persons-guide, skipper or operator, and crew-involved with the delivery of onboard services to the charter vessel angler.

The proposed regulation deviates from the Council's adopted motion language also in that the phrase "when clients are on board" is not used in the proposed regulation. Instead, the proposed regulation would limit the skipper and crew harvesting prohibition to a charter vessel fishing trip. A new definition is proposed in this action for "charter vessel fishing trip" which describes the period from the first deployment of fishing gear from a charter vessel until the offloading of any charter vessel angler or halibut. Also, an existing definition of "charter vessel" (at § 300.61) describes such a vessel as one "used for hire in sport fishing for halibut, but not including a vessel without a hired operator." Hence, the effect of the proposed regulation would be the same as that intended by the Council, which is to prohibit retention of halibut caught by the guide, skipper, and crew on a charter vessel, but not to impose this restriction when no clients or charter vessel anglers are onboard. A vessel without clients or paying anglers onboard is, by definition, not a charter vessel. Therefore, guides, skippers, and crew would not be prevented from sport fishing for halibut for themselves when they are not on a charter vessel fishing trip.

The Council recommended this restriction to make it more specific to halibut harvest on charter vessels in Area 2C. As discussed above, the State Commissioner's emergency order prohibiting the retention of all fish by the skipper and crew of a charter vessel in Area 2C was implemented in 2007. The State Commissioner could not make his emergency order apply only to halibut because he has no authority under the Halibut Act to directly regulate halibut fishing. A comprehensive application of the emergency order to all fish effectively prevented charter vessel skippers and crews from harvest of salmon, rockfish, lingcod, and other species. Charter vessel operators requested relief from this comprehensive prohibition on skipper and crew harvests by having a Federal prohibition on skipper and crew harvest apply only to halibut. Assuming that the State Commissioner does not reissue his earlier emergency order for other reasons, this action would relieve charter vessel skippers and crew from the more comprehensive prohibition against retention of all fish on charter vessels but would impose this prohibition on the retention of halibut.

The Council's original analysis of alternatives, prepared for its meeting in June 2007, indicated that the daily bag/maximum size limit and prohibition on skipper/crew harvest of halibut together would reduce the charter vessel harvest in Area 2C to 115 percent to 106 percent of the GHL (Table 15 in EA/RIR/IRFA, see **ADDRESSES**). The fact that these management measures would fall short of achieving the GHL is not surprising as they were designed by NMFS and ADF&G and implemented in 2007 for a different purpose-not to achieve the GHL, but instead to reduce charter vessel halibut harvests to a comparable extent to what would have been realized under the IPHC recommendation.

In October 2007, ADF&G published its final estimate of charter vessel harvests in Area 2C. This final estimate indicated fewer halibut were being harvested by the charter vessel sector in 2006 than had been preliminarily estimated by ADF&G a year earlier. In fact, the revised ADF&G estimate for 2006 showed the first decrease in the growth of halibut pounds harvested by charter vessels since 1999. The agency's preliminary estimate of the 2006 charter vessel halibut harvest in Area 2C in October 2006 of 2.113 million lb (958.4 mt) was reduced in its final estimate in October 2007 to 1.812 million lb (821.9 mt). The Council staff subsequently reviewed its analysis in light of these new harvest data for 2006 and submitted a supplement to the EA/RIR/IRFA (Appendix IV to the EA/RIR/IRFA, see **ADDRESSES**). The supplement revises Table 15 (Table A4–1 in Appendix IV). This table estimates the impact of each management option under the action alternative on the total amount of halibut harvested by the sport charter vessel fishery in 2006 relative to the current GHL if that management option had been in place in 2006. The revised analysis indicates that the daily bag/maximum size limit and prohibition on skipper/crew harvest of halibut together would reduce the charter vessel harvest in Area 2C to a range of 101 percent to 93 percent of the GHL. By weight, this expected harvest would be in the range of 1.448 million lb (656.8 mt) to 1.333 million lb (604.6 mt). This range would bracket the current GHL in Area 2C which is 1.432 million lb (649.5 mt). It is important to note that although the daily bag/maximum size limit and prohibition on skipper/crew harvest of halibut together would appear from the analysis to achieve the GHL, the analysis does not account for possible changes in fishing effort between 2006 and 2008.

When ADF&G presented its final estimate of the 2006 charter vessel harvest to the Council in October 2007, the Council decided not to reconsider its June 2007 recommendation which this action proposes to implement with Federal regulations. However, NMFS is particularly interested in public comment on these proposed regulations in light of the new final estimate of 2006 harvests of halibut by the charter vessel sector and the revised analysis of the potential effect of the proposed management measures, as indicated in the above paragraph. The intent of particularly soliciting public comment on this and other specific issues in this action is to maximize the ability of NMFS to achieve the intent of the Council to limit the catch of the guided sport charter vessel fishery in Area 2C to the GHL while minimizing the adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and on fisheries for other species. Based on public comment, and to achieve the intent of the Council and minimize adverse impacts, NMFS may implement either Option A or Option B in their entirety, or some portion of either option.

*Line limits.* A new Federal restriction is proposed that would limit the number of lines that could be fished from a charter vessel to six or the number of charter vessel anglers onboard the charter vessel, whichever is less. The existing IPHC gear limitation for a person sport fishing for halibut is a single line with no more than two hooks attached, or a spear (section 25(1) at 72 FR 11801). Hence, this restriction would prevent more than six charter vessel anglers on a vessel from fishing at the same time. This restriction is not viewed as onerous, however, because the charter vessels and charter vessel skippers in Southeast Alaska (Area 2C) typically are licensed by the U.S. Coast Guard to carry no more than six passengers. In addition, existing State of Alaska regulations (at 5 AAC 47.030(b)) limit the number of lines fished from a charter vessel generally to the number of clients onboard the vessel. A six-line limit has been in Alaska regulations since 1983, and limiting the number of lines fished to the number of clients onboard has been a requirement since 1997. The proposed line limits would reflect the existing Alaska regulations in Federal regulations specifically for halibut fishing.

*Annual catch limit.* The proposed annual catch limit of four halibut would impose a new restriction on each charter vessel angler in Area 2C to two daily bag limits of halibut per year. A sport fishing guide or charter vessel operator also would be responsible to know how

many halibut each of his clients had previously harvested on a charter vessel that year and limit a charter vessel angler's harvest if necessary. For example, if a charter vessel angler arrives for a charter vessel fishing trip, the charter vessel guide would be required, before the trip begins, to record the number of halibut caught and retained year-to-date by each angler on the charter vessel (see discussion of recordkeeping and reporting below). A charter vessel angler who begins the trip with three halibut already harvested that year would be limited to only one additional halibut regardless of the two halibut daily bag limit.

No exceptions are proposed for this annual catch limit. This restriction would apply equally to youth anglers under 16 years of age who are not required to have an Alaska sport fishing license, anglers who are over 60 years of age, and anglers who are disabled veterans, both of which may have special Alaska sport fishing licenses. The proposed annual catch limit, however, would apply only to charter vessel anglers. Halibut harvested by non-guided sport fishermen would not count toward the proposed four-fish annual catch limit. Likewise, a charter vessel angler who has harvested her annual catch limit would be allowed to continue sport fishing for halibut as a non-guided angler subject to the existing two-halibut per day catch limit.

The analysis indicates that the proposed annual catch limit would reduce the charter vessel harvest by an estimated 0.335 million lb (151.9 mt). In conjunction with the other management measures under Option A, the anticipated effect of this restriction would be a reduction in total charter vessel harvests in Area 2C to a range of 84 percent to 78 percent of the current GHL (Table A4–1 of Appendix IV of the EA/RIR/IRFA). In terms of weight, the supplement to the analysis predicts (based on 2006 data) a charter vessel halibut harvest in Area 2C of between

1.208 million lb (547.9 mt) and 1.111 million lb (503.9 mt). Harvests in this range would be less than the current GHL in Area 2C, which is 1.432 million lb (649.5 mt).

The Council considered but did not recommend more liberal annual catch limits of five halibut and six halibut which would allow a total charter vessel harvest in Area 2C closer to the GHL. According to the supplement of the analysis, the predicted harvest under the Option A management measures using a six-halibut annual catch limit instead of a four-halibut annual catch limit would range from 1.386 million lb (628.7 mt) to 1.276 million lb (578.8 mt), and using a five-halibut annual catch limit instead of a four-halibut annual catch limit would range from 1.313 million lb (595.6 mt) to 1.209 million lb (548.4 mt). NMFS is particularly interested in public comment on these annual catch limits (6, 5, and 4 halibut) given the new final estimate of 2006 charter vessel harvest. The intent of particularly soliciting public comment on this and other specific issues in this action is to maximize the ability of NMFS to achieve the intent of the Council to limit the catch of the guided sport charter vessel fishery in Area 2C to the GHL while minimizing the adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and on fisheries for other species. Based on public comment, and to achieve the intent of the Council and minimize adverse impacts, NMFS may implement an annual catch limit of 6, 5, or 4 halibut, or no annual limit.

*Recordkeeping and reporting.* The Area 2C annual catch limit for charter vessel anglers proposed under Option A would require new recordkeeping and reporting requirements for charter vessel anglers and guides. This information collection is necessary to monitor and enforce the area specific annual catch limit. Charter vessel guides and anglers

are individually and collectively responsible for the accuracy and completeness of recorded information on halibut caught and retained. The Council, NMFS, and ADF&G stressed the importance of minimizing reporting burden on the charter vessel industry and developed a proposed information collection program that allows for the recording of necessary information in the existing ADF&G Saltwater Sport Fishing Charter Trip Logbook and on existing State of Alaska sport fishing licenses or catch cards.

Each charter vessel angler would be required to record on the back of his or her State of Alaska Sport Fishing License or catch card the date and number of halibut caught and retained in Area 2C. This information is necessary to monitor retained catch relative to the annual catch limit and to provide information to a charter vessel guide on the number of halibut retained to date during a calendar year so that the angler's annual catch limit is not exceeded during a charter vessel fishing trip. Each angler who retains halibut catch from Area 2C would be required to retain his or her license or catch card for a period of three years from the date of the latest Area 2C halibut entry. Maintenance of these records is necessary in the event that NMFS Enforcement needs to verify the number of retained halibut catch recorded by the angler or compare an angler's record of retained halibut with the number of retained halibut in Area 2C as recorded by charter vessel guides for that angler in the ADF&G Saltwater Sport Fishing Charter Trip Logbook.

Information recorded in the ADF&G Saltwater Sport Fishing Charter Trip Logbook on the number of halibut caught and retained in Area 2C by each charter vessel angler would be used by NMFS to monitor and enforce the annual catch limit. Specific logbook information requirements are summarized below for charter vessel guides and anglers.

INFORMATION RECORDED IN THE ADF&G SALTWATER SPORT FISHING CHARTER TRIP LOGBOOK

| Who records the information? | What information is recorded? | Purpose of information collection |
|---|---|---|
| Charter vessel guide. | Sport fish charter business license number issued by ADF&G to a person that owns or employs the charter vessel. The charter vessel guide license number issued by ADF&G to the guide that led the fishing trip. | To provide the identity of the charter vessel business owner and guide who are mutually and severally responsible for accurate recordkeeping and reporting of charter vessel angler harvest of halibut in Area 2C. |
| | IPHC regulatory area fished—circle either regulatory area 2C or 3A where halibut were caught and retained. Separate logbook sheets must be completed if both areas were fished during the same charter vessel fishing trip. | To verify that charter vessel fishing did or did not occur in Area 2C where an annual catch applies. The catch and retention of halibut in Area 2C triggers additional recordkeeping and reporting requirements. |
| | Angler sport fishing license number and printed name; the printed name and date of birth is recorded for each youth angler under 16 years of age. | To record the identity of charter vessel anglers subject to the annual catch limit. |

INFORMATION RECORDED IN THE ADF&G SALTWATER SPORT FISHING CHARTER TRIP LOGBOOK—Continued

| Who records the information? | What information is recorded? | Purpose of information collection |
|---|---|---|
| | From each angler's ADF&G sport fishing license or catch card, the total number of halibut caught and retained in the current year-to-date aboard a charter vessel in Area 2C. | To provide the charter vessel guide information on the number of halibut each angler is allowed to retain during the fishing trip so that halibut are not retained in excess of each angler's annual catch limit. |
| | The total number of halibut caught and retained in Area 2C aboard a charter vessel during the current year-to-date from each charter vessel angler's sport fishing license or catch card. | This information currently is required by ADF&G to estimate sport fish harvest of halibut and the proposed Federal requirement will be used to monitor angler-specific compliance with the annual catch limit. |
| | Signature of the charter vessel guide ...................................... | Guide's acknowledgement that the recorded information is correct. |
| Charter vessel angler. | Signature of the charter vessel angler ...................................... | Angler's acknowledgement that his or her Area 2C halibut retention information is correctly recorded. |

The ADF&G Saltwater Sport Fishing Charter Trip Logbook data sheets would be required to be submitted to the appropriate ADF&G office and according to the time schedule described in the instructions at the beginning of the logbook.

*Option B Management Measures*

The following management measures were recommended by the Council if the GHL decreases in Area 2C in 2008 to 1.217 million lb (552.0 mt). If implemented, the proposed regulations would remain in effect until changed by a new Federal regulatory action.

*One-fish daily bag limit.* This restriction would substitute a daily catch limit for a charter vessel angler of one halibut per day of any size for the existing daily catch limit of two halibut per day providing one of the two fish is no longer than 32 inches (81.3 cm). This restriction would be more onerous than the management measures described above under Option A. The Council reasoned that this more restrictive action would be necessary if the GHL in Area 2C were to decrease in 2008 to 1.217 million lb (552.0 mt). In conjunction with the proposed restrictions on harvest by skipper and crew and line limits, the Option B management measures are estimated to reduce the charter vessel harvest to a range of 76 percent to 53 percent of the current Area 2C GHL, or to a range of 63 to 89 percent of the reduced GHL. By weight, the estimated effect of the Option B management measures would be to allow a charter vessel harvest of from 1.089 million lb (494.0 mt) to 0.762 million lb (345.6 mt).

*No harvest by skipper and crew.* This restriction would be the same as that described above under Option A.

*Line limits.* This restriction would be the same as that described above under Option A.

Classification

An Initial Regulatory Flexibility Analysis (IRFA) was prepared, as required by section 603 of the Regulatory Flexibility Act. The IRFA describes the economic impact that this proposed rule, if adopted, would have on directly regulated small entities. A copy of this analysis and its updated supplement are available from NMFS (see **ADDRESSES**). A description of this action, why it is being considered, and the legal basis for this action are discussed above. The proposed action would implement one of two management options—Option A or Option B, or portions thereof, as described above—for the charter vessel halibut fishery in Area 2C. A summary of the analysis follows.

In 2006, 696 vessels operated as charter vessels in Area 2C. All of these operations are believed to be small entities, with annual gross revenues of less than the limit of $6.5 million dollars for charter vessels. The largest companies involved in the fishery, lodges or resorts that offer accommodations as well as an assortment of visitor activities, may be large entities under the Small Business Administration size standard. Key informant interviews have indicated that the absolute largest of these companies may gross more than $6.5 million per year, but that it was also possible for all of the entities involved in the charter vessel halibut of harvest to have grossed less than this amount. The number of small entities is likely to be overestimated because of the limited information on vessel ownership and operator revenues. However, it is likely that nearly all entities qualify as small businesses.

The demand for sport fishing on charter vessels depends on a number of factors including the number of halibut a charter vessel angler may catch and retain in a year or in a day. The

proposed annual catch limit on charter vessel anglers under Option A may reduce demand for trips that target halibut. An annual catch limit may reduce the demand for multi-day trips and affect remote fishing lodges more than day-trip operators. Other species of bottom fish and salmon also are targeted by charter vessels. Some charter vessel operators also may have non-fishing business taking passengers for whale watching, bird watching or general sightseeing trips. A larger effect on the demand for charter vessel fishing trips may be experienced under reduced GHL, which would impose a one-halibut daily catch limit under Option B. The current daily catch limit is two halibut per day providing one of the fish is no more than 32 inches (81.3 cm) in length.

Prohibiting the harvest of halibut by charter vessel guides and crew may reduce the their overall compensation because the ability to harvest fish while working is sometimes considered part of their compensation. As discussed above, the State Commissioner has issued an emergency order in recent years to prohibit retention of fish by charter vessel guides and crew members (No. 1–R–02–07). This emergency order was comprehensive in that all fish were covered by the emergency order, and not just halibut. A Federal prohibition on charter vessel guide and crew harvest of halibut in Area 2C would be specific to halibut and therefore would be less restrictive and have less of an economic impact than has been experienced under the current State of Alaska emergency order.

Little information is available on charter vessel operations or on how charter vessel anglers and operators may respond to proposed changes. It is not possible to predict quantitatively the impact on gross or net revenues, or on entry or exit from the industry. This proposed action is expected to reduce the amount of halibut harvested by

charter vessels relative to what they have harvested in recent years. The regulatory burden is expected to be highest for the smallest firms, those involved in multiple trips per day, those who offer multiday packages, and those who are unable to target species other than halibut. These operators may face reduced profits or losses. Key informant interviews indicated that profit margins in the industry are small for some operators and that the proposed management options could reduce or eliminate those margins and force some operators out of business.

NMFS has examined two alternatives to this action: the no-action or status quo alternative, and the action alternative. Alternative 1, the status quo, would retain the two-fish bag limit with one of the two fish less than or equal to 32 inches (83.1 cm) in length, without changes. Alternative 2, the action alternative, considered 13 options for different combinations of management measures to restrict the charter halibut harvest to the Area 2C GHL. The options included limiting vessels to one trip per day; restricting harvest by guide and crew while clients are onboard; limiting the number of lines to six per vessel, not to exceed the number of paying clients onboard; daily bag limits of one or two fish (including sub-options for size limit slots and specific months when the bag limit would apply); and annual harvest limits of four, five, or six fish per charter angler. Two preferred options (Option A and Option B) were selected by considering different combinations of management measures that would minimize the impacts on small entities while still meeting the management objective of restricting the charter vessel harvest of halibut to the GHL.

This proposed rule has been determined to be not significant for the purposes of Executive Order (E.O.) 12866.

This proposed rule complies with the Halibut Act and the Secretary's authority to implement allocation measures for the management of the halibut fishery.

This proposed rule contains a collection-of-information requirement subject to review and approval by OMB under the Paperwork Reduction Act (PRA). This requirement has been submitted to OMB for approval. The public reporting burden for charter vessel guide respondents to fill out and submit logbook data sheets is estimated to average five minutes per response. The public reporting burden for charter vessel anglers to sign the logbook, record the number of halibut caught and retained in Area 2C on an Alaska Sport Fishing License or catch card, and retain

that document is estimated to average 2 minutes per response. These estimates include the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection-of-information.

Public comment is sought regarding whether this proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; the accuracy of the burden estimate; ways to enhance the quality, utility, and clarity of the information to be collected; and ways to minimize the burden of the collection of information, including through the use of automated collection techniques or other forms of information technology. Send comments on these or any other aspects of the collection of information to NMFS Alaska Region (see **ADDRESSES**) and by e-mail to *David_Rostker@omb.eop.gov* or fax to (202) 395–7285.

Notwithstanding any other provision of the law, no person is required to respond to, and no person shall be subject to penalty for failure to comply with, a collection-of-information subject to the requirements of the PRA, unless that collection of information displays a currently valid OMB control number.

This proposed action is consistent with E.O. 12962 which directs Federal agencies to improve the quantity, function, sustainable productivity, and distribution of aquatic resources for increased recreational fishing opportunities "to the extent permitted by law and where practicable." This E.O. does not diminish NMFS's responsibility to address allocation issues, nor does it require NMFS or the Council to limit their ability to manage recreational fisheries. E.O. 12962 provides guidance to NMFS to improve the potential productivity of aquatic resources for recreational fisheries. This proposed rule does not diminish that productivity or countermand the intent of E.O. 12962.

## List of Subjects in 50 CFR Part 300

Fisheries, Fishing, Reporting and recordkeeping requirements, Treaties.

Dated: December 21, 2007.

**Samuel D. Rauch III,**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

For the reasons set out in the preamble, NMFS proposes to amend 50 CFR part 300 as follows:

## PART 300—INTERNATIONAL FISHERIES REGULATIONS

1. The authority citation for 50 CFR part 300, subpart E, continues to read as follows:

Authority: 16 U.S.C. 773–773k.

## Subpart E—[Amended]

2. In § 300.61, add definitions for "Area 3A", "Charter vessel angler", "Charter vessel fishing trip", and "Charter vessel guide" in alphabetical order to read as follows:

### § 300.61  Definitions.

\*    \*    \*    \*    \*

*Area 3A* means all waters between Area 2C and a line extending from the most northerly point on Cape Aklok (57°41′15″ N. latitude, 155°35′00″ W. longitude) to Cape Ikolik (57°17′17″ N. latitude, 154°47′18″ W. longitude), then along the Kodiak Island coastline to Cape Trinity (56°44′50″ N. latitude, 154°08′44″ W. longitude), then 140° true.

\*    \*    \*    \*    \*

*Charter vessel angler* means a person, paying or nonpaying, using the services of a charter vessel guide.

*Charter vessel fishing trip* means the time period between the first deployment of fishing gear into the water from a charter vessel and offloading one or more charter vessel anglers or any halibut from the charter vessel.

*Charter vessel guide* means a person who has been issued an annual guide license by the Alaska Department of Fish and Game.

\*    \*    \*    \*    \*

3. In § 300.65, revise paragraph (d) to read as follows:

### § 300.65  Catch sharing plan and domestic management measures in waters in and off Alaska.

## OPTION A

\*    \*    \*    \*    \*

(d) *Guideline harvest level management measures*—(1) *Daily bag limit in Area 2C.* Halibut harvest on a charter vessel is limited to no more than two halibut per person per calendar day provided that at least one of the harvested halibut has a head-on length of no more than 32 inches (81.3 cm). If a charter vessel angler retains only one halibut in a calendar day, that halibut may be of any length.

(2) *Charter vessel guide and crew restriction in Area 2C.* A charter vessel guide, a charter vessel operator, and crew of a charter vessel must not catch and retain halibut during a charter vessel fishing trip.

(3) *Line limit in Area 2C.* The number of lines used to fish for halibut must not exceed six or the number of charter vessel anglers onboard the charter vessel, whichever is less.

(4) *Annual limit in Area 2C.* The combined number of halibut that may be harvested by a charter vessel angler in Area 2C during a calendar year must not exceed four fish.

(5) *Recordkeeping and reporting requirements in Area 2C.* The following information must be recorded by charter vessel anglers and charter vessel guides for each charter vessel fishing trip in Area 2C:

(i) *Charter vessel angler requirements*—(A) *State of Alaska Sport Fishing License.* Each charter vessel angler, including a youth angler under 16 years of age and an angler over 60 years of age, who retains halibut caught in Area 2C must record on the back of his or her State of Alaska Sport Fishing License or catch card the date and number of halibut caught and retained in Area 2C.

(B) *Retention requirements.* A State of Alaska Sport Fishing License or catch card with a record of halibut caught and retained in Area 2C must be retained by the individual named on the license or catch card for a period of three years from the date of the latest Area 2C halibut entry.

(C) *Angler signature.* At the end of a charter fishing trip, each charter vessel angler who retains halibut caught in Area 2C must acknowledge that his or her information and the number of halibut kept are recorded correctly by signing the back of the Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook data sheet on the line number that corresponds to the angler's information on the front of the logbook data sheet.

(ii) *Charter vessel guide requirements.* For each charter vessel fishing trip in Area 2C, the charter vessel guide leading the charter vessel fishing trip is required to record the following information in the Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook:

(A) *Business owner license number.* The sport fish charter business license number issued by the Alaska Department of Fish and Game to a

person who owns or employs the charter vessel.

(B) *Guide license number.* The charter vessel guide license number issued by the Alaska Department of Fish and Game to the charter vessel guide that led the fishing trip and certified the logbook data sheet.

(C) *Date.* Month and day for each charter vessel fishing trip taken. A separate logbook data sheet is required for each charter vessel fishing trip if two or more trips were taken on the same day. A separate logbook data sheet is required for each calendar day that halibut are caught and kept during a multi-day trip.

(D) *Regulatory area fished.* Circle the regulatory area (Area 2C or Area 3A) where halibut were caught and kept during each charter vessel fishing trip. If halibut were caught and retained in Area 2C and Area 3A during the same charter vessel fishing trip, then a separate logbook data sheet must be used to record halibut caught and retained for each regulatory area.

(E) *Angler sport fishing license number and printed name.* Before a charter vessel fishing trip begins, record for each charter vessel angler the Alaska Sport Fishing License number for the current year, resident permanent license number, or disabled veteran license number; and print the name of each paying and nonpaying charter vessel angler onboard that will fish for halibut. Record the name and date of birth of each youth angler under 16 years of age.

(F) *Year-to-date halibut caught.* Before a charter vessel fishing trip begins, record the total number of halibut caught and retained in the current year to date aboard a charter vessel in Area 2C for each charter vessel angler from his or her sport fishing license or catch card.

(G) *Number of halibut retained.* For each charter vessel angler, record the number of halibut caught and retained during the charter vessel fishing trip.

(H) *Signature.* At the end of a charter vessel fishing trip, acknowledge that the recorded information is correct by signing the logbook data sheet.

(I) *Angler signature.* Charter vessel guide is responsible for ensuring that anglers comply with the signature requirements at § 300.65(d)(5)(i)(C).

(6) *Recordkeeping and reporting requirements in Area 3A.* For each charter vessel fishing trip in Area 3A, the charter vessel guide leading the charter vessel fishing trip is required to record the regulatory area (Area 2C or Area 3A) where halibut were caught and kept by circling the appropriate area in the Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook. If halibut were caught and retained in Area 2C and Area 3A during the same charter vessel fishing trip, then a separate logbook data sheet must be used to record halibut caught and retained for each regulatory area.

(7) *Logbook submission.* Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook data sheets must be submitted to the appropriate Alaska Department of Fish and Game office according to the time schedule printed in the instructions at the beginning of the logbook.

\* \* \* \* \*

**OPTION B**

\* \* \* \* \*

(d) *Charter vessels in Area 2C*—(1) *Daily bag limit.* The number of halibut caught and retained by each charter vessel angler in Area 2C is limited to no more than one halibut per calendar day.

(2) *Charter vessel guide and crew restriction.* A charter vessel guide, a charter vessel operator, and crew of a charter vessel must not catch and retain halibut during a charter fishing trip.

(3) *Line limit.* The number of lines used to fish for halibut must not exceed six or the number of charter vessel anglers onboard the charter vessel, whichever is less.

\* \* \* \* \*

4. In § 300.66, add paragraphs (n), (o), and (p) to read as follows:

**§ 300.66 Prohibitions.**

\* \* \* \* \*

(n) Exceed any of the harvest or gear limitations specified in § 300.65(d).

(o) Fail to comply with the requirements of § 300.65(d).

(p) Fail to submit or submit inaccurate information on any report, license, catch card, application or statement required under § 300.65.

[FR Doc. E7–25407 Filed 12–28–07; 8:45 am]
**BILLING CODE 3510-22-P**

**BEFORE THE**

**DEPARTMENT OF COMMERCE**

National Oceanic and Atmospheric Administration

National Marine Fisheries Service

Pacific Halibut Fisheries; Guided Sport Charter Vessel Fishery for Halibut

Docket No. 071031633-7834-01

RIN 0648-AW23

**Comments of**
**Scott Van Valin, Ken Dole, Patty Seaman, Tom Ohaus, and Rick Bierman**

Submitted by:

John W. Butler
Sher & Blackwell LLP
1850 M Street, N.W., Suite 900
Washington, D.C.  20036
Tel:  (202) 463-2510

Earl W. Comstock
Comstock Consulting LLC
6225 30th Street, N.W.
Washington, DC 20015
Tel:  (202) 255-0273

Exhibit 3

# TABLE OF CONTENTS

Page

A.    The Proposed Rule Deals With a Pure Allocation Issue; The NPRM
      Does Not Present Any Resource Conservation Questions. ....................................2

B.    Both Option A (Four-Fish Annual Limit) And Option B (One-Fish
      Bag Limit) Would Have Profound Negative Effects On Lodge-Based
      Charter Operations. ............................................................................................3

C.    The Proposal To Simultaneously Reduce The GHL and Implement
      Management Measures To Reduce Harvest To The New GHL Is
      Contrary To The Existing Regulations Regarding Use of GHLs. ........................4

      1.    The Council's Option B Proposal Violates the APA and
            Supreme Court Precedent. ....................................................................4

      2.    Both Option A and Option B Violate the Purpose and
            Intent of the Charter Fishery Regulatory Regime. ................................8

D.    The Economic Analysis Set Forth In The EA/RIR/IRFA Is
      Incomplete And Inaccurate. .............................................................................10

      1.    NMFS Has Already Found that the Proposed Measures
            Would Have A Substantial Negative Impact on the Charter Sector. ....11

      2.    The EA/RIR/IRFA Makes No Attempt to Quantify the
            Damage to the Charter Sector; the Damage Would Be
            Severe. ...............................................................................................11

      3.    The Proposed Regulations Would Not Provide a Benefit to
            the Commercial Sector that Would Justify the Severe
            Damage to the Charter Sector. ...........................................................13

            a.    There are long-term solutions under development that
                  make the rules proposed here unnecessary and
                  potentially damaging to the development of those more
                  comprehensive measures. ........................................................14

            b.    The negative impact of the proposed rules on the
                  charter sector would be swift and lasting. ...............................14

i

**TABLE OF CONTENTS (continued)**

Page

c.    The rules would provide virtually no benefit to the
commercial sector before being superseded by the
long-term allocation currently under development. ...................................14

d.    The negative consequences of the proposed rules on
the charter sector far outweigh any potential benefits
to the commercial sector. ........................................................................15

4.    The EA/RIR/IRFA Fails to Address the Impact on Coastal
Communities and the Regional Economy. ..........................................................17

E.    Conclusion. ....................................................................................................................18

**Exhibits**

Exhibit 1 - Affidavit of Scott Van Valin, El Capitan Lodge

Exhibit 2 - Affidavit of Ken Dole, Waterfall Resort

Exhibit 3 - Affidavit of Patty Seaman, Sportsman's Cove Lodge

Exhibit 4 - Affidavit of Tom Ohaus, Angling Unlimited

Exhibit 5 - Letter of Rick Bierman, The Whale's Eye Lodge

January 30, 2008

Ms. Sue Salveson
Assistant Regional Administrator
Sustainable Fisheries Division, Alaska Region
National Marine Fisheries Service
709 West 9th Street, Room 420A
Juneau, AK 99802
Attn: Ms. Ellen Sebastian

    **Re:   Pacific Halibut Fisheries; Guided Sport Charter Vessel Fishery for
        Halibut; Docket No. 071031633-7834-01; RIN 0648-AW23**

Dear Ms. Salveson:

    Scott Van Valin, Ken Dole, Patty Seaman, Tom Ohaus, and Rick Bierman
(together the "commenters"), through their undersigned counsel, file these comments in
response to the Notice of Proposed Rulemaking ("NPRM") published by the Secretary in
the December 31, 2007, Federal Register, 72 Fed. Reg. 74257.

    The commenters all own and/or manage lodge-based halibut guided charter
operations in Area 2C. Scott Van Valin is the owner of El Capitan Lodge on Prince of
Wales Island. Ken Dole is a partner in Waterfall Resort, located on the west coast of
Prince of Wales Island. Patty Seaman is Operations Manager for Sportsman's Cove
Lodge on the eastern shore of Prince of Wales Island. Tom Ohaus is the owner of
Angling Unlimited, a lodge and charter fishing operation in Sitka. Rick Bierman is the
owner of The Whale's Eye Lodge on Shelter Island near Juneau. Affidavits (or a letter)
from each of the commenters describing their operations, the economics of the guided
fishery, and the anticipated impacts of the Council's proposals are attached to these
comments as Exhibits 1-5.

    As the Environmental Assessment/Regulatory Impact Review/Initial Regulatory
Flexibility Analysis ("EA/RIR/IRFA") found, approximately 96% of Area 2C
recreational charter halibut anglers are residents of states other than Alaska. The
economic contributions of these anglers to the state – with associated air and ground
transportation, meals, lodging, and other services – greatly exceeds the amount paid
directly to charter guides and associated lodges. Accordingly, these comments reflect the
interests of the communities in which the commenters conduct business as well as the
interests of the commenters themselves.

    For the reasons set forth in more detail below, the commenters oppose the one-
fish bag limit (Option B) proposal and the four-fish annual limit (Option A) proposal,
both of which would have substantial negative effects on the guided charter fishery.
Instead, the commenters support adoption of federal regulations that: (1) prohibit the
catch and retention of halibut in Area 2C by charter vessel guides, operators, and crew;

(2) restrict the number of lines used to the lesser of six or the number of charter vessel anglers aboard, and (3) continue the second-fish minimum size requirement adopted by NMFS in June 2007. In the event that the Secretary determines that further harvest restrictions are necessary at this time, the commenters urge that any annual limit be set at no fewer than six fish.

A.    **The Proposed Rule Deals With a Pure Allocation Issue; The NPRM Does Not Present Any Resource Conservation Questions.**

At the outset, the commenters wish to emphasize that the NPRM deals solely with an allocation issue. The NPRM does not in any way implicate resource conservation concerns. NMFS has stated, for example that:

- "The environmental analysis (EA) concluded that none of the alternatives would affect the health of the halibut stock since the IPHC sets limits on total halibut removals. Regardless of the amount of halibut biomass taken by a sector, no adverse impacts on the halibut resource would be expected because the IPHC factors in most resource removals in the halibut stock assessment when setting annual catch limits." (EA/RIR/IRFA at page xi.)

- "The proposed alternatives will not have any effect on the halibut resource." (EA/RIR/IRFA at page xii.)

- "The exploitable biomass for the coastwise projection and Area 2C projection is expected to increase during the next ten years." (EA/RIR/IRFA at 14.)

- "The proposed alternatives address resource allocation issues. They would affect harvest levels and fishing practices of individuals participating in the charter halibut fishery, but not the health of the halibut stock." (EA/RIR/IRFA at 20.)

In addition to these agency statements, we note that the International Pacific Halibut Commission ("IPHC") – in contrast to its statement of concern regarding Area 2C charter harvest levels in its January 2007 annual meeting press release – did not in its January 18, 2008, annual meeting press release express any concern regarding charter harvest levels in Area 2C, and did not suggest or request additional measures to further constrain those harvests.

Because the NPRM addresses only an allocation issue, not a resource conservation issue, the applicable legal standard comes solely from section 5(c) of the Northern Pacific Halibut Act of 1982, 16 U.S.C. § 773c(c). That section provides in relevant part that:

If it becomes necessary to allocate or assign halibut fishing privileges among various United States fishermen, such allocation shall be fair and equitable to all such fishermen, based on the rights and obligations in existing Federal law, reasonably calculated to promote conservation, and carried out in such manner

that no particular individual, corporation, or other entity acquires an excessive
share of the halibut fishing privileges. . . .

As discussed in the sections that follow, the "rights and obligations in existing federal
law" applicable to this rulemaking include procedural rights and obligations under the
Administrative Procedure Act ("APA") that constrain the ability of the Secretary to
undermine the reasonable expectations of stability established by existing regulations that
the proposed rules do not purport to amend.[1]  Applicable law also requires that the
economic impacts of the proposed actions be given more than the cursory review
provided in the EA/RIR/IRFA.  The economic analysis is especially important in light of
the fact that this action concerns only issues of allocation, not issues of resource
conservation.

**B.**  **Both Option A (Four-Fish Annual Limit) And Option B (One-Fish Bag
Limit) Would Have Profound Negative Effects On Lodge-Based Charter
Operations.**

As lodge-based operators whose business models are built around multi-day
anglers who come to Southeast Alaska for the sole or primary purpose of fishing, these
commenters would suffer the greatest negative impacts of any sector of the charter
fishery if the Secretary were to adopt either the Option A four-fish annual limit or the
Option B one-fish bag limit.  Although Option B, the one-fish bag limit, is estimated to
have the most dramatic impact on the number of pounds of fish harvested by the guided
fishery, the fact is that Option A, the four-fish annual limit, would likely have an almost
equally negative effect on the fishery, even though the poundage reduction under that
option is less than under Option B.  The reason that both measures have the potential to
do real harm has to do with the nature of recreational fishing.

The point of recreational fishing, in contrast to commercial fishing, is not to catch
the greatest number of pounds of fish possible.[2]  Instead, as the EA/RIR/IRFA correctly
states: "Fishing is not catching.  The value is in the 'possibility' of catching a fish.  The
fishing experience is diminished by eliminating the possibility."  EA/RIR/IRFA at 47
n.22.  It is the possibility of catching a fish that leads clients to book far in advance and to
commit to the substantial expense of traveling to Alaska and procuring lodging and
guided charter services.  Because of that expense, and because of the time that it takes to
travel to Alaska in order to fish, many charter clients plan multiple-day trips.  These are
the clients served by the operators filing these comments.  A four-fish annual limit raises
the possibility of an angler being foreclosed from fishing for some or all of that part of a
trip that exceeds two days in length.  That limitation, in turn, is likely to dissuade people
from booking three, four, or five day packages, thereby eliminating the core offering of

---

[1] *See* 72 Fed. Reg. 30714, 30723 (June 4, 2007) ("To change the GHL regulations would require separate
rulemaking.").

[2] In fact, NMFS has stated that: "For Area 2C overall, however, halibut under 32 inches comprised nearly
half of the charter harvest in 2006." 72 Fed. Reg. 30720.  32 inches is the minimum size fish that can be
retained in the commercial halibut fisheries, so nearly half of the fish being caught in the charter fishery in
Area 2C could not be retained or sold by the commercial fleet because they are too small.

3

lodge-based charter operators. *See* affidavits of Scott Van Valin at ¶ 3; Ken Dole at ¶¶ 4, 11; Patty Seaman at ¶¶ 8-11; and Tom Ohaus at ¶¶ 5-8; letter of Rick Bierman at p.2.

The NPRM correctly acknowledges that lodge-based operations would be more affected than other types of operators if the Council's proposals were adopted. At page 74263 of the NPRM, for example, the agency states that "[a]n annual catch limit may reduce the demand for multi-day trips and affect remote fishing lodges more than day-trip operators." NMFS goes on to state that "[t]he regulatory burden is expected to be highest for the smallest firms, those involved in multiple trips per day, *those who offer multiday packages,* and those who are unable to target species other than halibut." NPRM, 72 Fed. Reg. at 74264 (emphasis added).

For all of these reasons, both the one-fish bag limit proposal and the four-fish annual limit proposal represent substantial threats to the viability of the lodge-based charter industry, which is also the industry sector that makes the greatest monetary contribution to the regional economy and the local economies where the lodges are located. Accordingly, both Option A and Option B should be evaluated with these serious adverse economic impacts in mind.

**C.**     **The Proposal To Simultaneously Reduce The GHL And Implement Management Measures To Reduce Harvest To The New GHL Is Contrary To The Existing Regulations Regarding Use Of GHLs.**

> **1.**     The Council's Option B Proposal Violates the APA and Supreme Court Precedent.

Option B of the proposed regulations would use the 2008 constant exploitation yield ("CEY") adopted by the IPHC on January 18, 2008, as the basis for reducing the GHL. The Council's Option B proposal would then impose harvest restrictions in 2008 based on that lowered 2008 GHL. Thus, the new CEY, the new GHL, and the associated management measures would all be adopted and implemented in the same year.

It is axiomatic that agencies must follow their own rules. *See Ballard v. Comm'r of Internal Revenue,* 544 U.S. 40, 59 (2005). Compressing into a single year a regulatory process that all parties understood would take at least two years – and more likely three years – changes the rules without the notice and comment procedure required under the Administrative Procedure Act. *See* 5 U.S.C. § 553.

The process described in Option B of the proposed rule, in which a harvest in excess of the GHL in one year is addressed by adopting both a reduced GHL and harvest restrictions based on that new GHL in a subsequent year, is contrary to the GHL process that the Secretary created in the final rule published on August 8, 2003. 68 Fed. Reg. 47256; 50 C.F.R. § 300.65(c). In that 2003 final rule, the Secretary described a process in which a change in the CEY could trigger a change in the GHL, but went on to provide that any restrictions associated with a harvest in excess of that revised GHL would be

proposed *after* the Secretary advised the Council that the GHL for a given year had been exceeded. Such notification of harvest in excess of the GHL was expected to occur approximately eight months after the end of the season in question. Under that procedure, the effective date of harvest restrictions would lag the year in which the GHL was exceeded by at least two, and more likely three, years. The Secretary explained the process this way:

> Once the Commission determines the stock abundance for the year during its January meeting, NMFS will review the Commission's CEY relative to the baseline 1999-2000 average CEY and announce the GHL for the year in the Federal Register by notice before the beginning of the guided fishery. If the GHL is exceeded in any year, then NMFS will notify the Council in writing that the GHL has been exceeded as soon as that information is available. Currently, the only source of information on guided recreational harvests comes from the Harvest Survey. The final results of the Harvest Survey are typically available by August of the year following the survey. Under this data collection system, NMFS would not have data that the GHL was exceeded until eight months after the end of the prior guided recreational season.

68 Fed. Reg. 47256, 47259 (August 8, 2003); *see also* 50 C.F.R. § 30.65(c)(2) and (3).

In the present case, the NPRM makes clear that it was a *projection* of a guided harvest in excess of the GHL *in 2006* that triggered the Option A and Option B proposals from the Council. *See, e.g.*, 72 Fed. Reg. at 74259 ("The ADF&G preliminary projections of the overage of the GHL in 2006 produced responses in 2007 from the Council and the three management agencies involved: IPHC, NMFS, and ADF&G."). It is equally clear[3] that the "response[] in 2007 from the Council" was the Option A and Option B proposals set forth in the December 31, 2007, NPRM. Despite the fact that the actual 2006 harvest was lower than the projected 2006 harvest upon which the Council proposed the management measures here at issue, the Council did not amend its recommendations to the Secretary. Nor has the Council made any change to its recommendations reflecting the fact that the 2007 harvest appears to be lower than the 2006 actual harvest.

The disconnect between the way that the GHL process as explained and codified in 2003 is supposed to work and the process contemplated by the Council's current proposal is obvious. Any overage with respect to the GHL in effect in 2006 (the stated trigger for the action proposed here) is properly reflected in management measures that are designed to bring the future guided charter harvest in line with the *2006 GHL*. Instead, the Council's Option B proposal would implement harvest restrictions in 2008 based on a revised *2008 GHL*. Such an action, which would eliminate any lag between the GHL overage and the associated management measures, is plainly contrary to the GHL regulations adopted in 2003. In addition to eliminating any time lag, the options proposed by the Council would reduce harvests to well below even the (impermissibly)

---

[3] See EA/RIR/IRFA at Appendix IV, Table 4A-1.

5

reduced GHL levels proposed by the Council. *See* EA/RIR/IRFA at Appendix IV, Table 4A-1. As such, adoption of such measures would be unlawful under the Administrative Procedure Act and applicable Supreme Court precedent. *See Ballard*, 544 U.S. at 59.

In contrast, the adoption of measures designed to bring the 2008 guided recreational harvest within the *2006 GHL* would be consistent with the existing regulations (which the Secretary does not propose to change), and would therefore be lawful. Specifically, adoption of the ban on guide and crew fishing and retention and adoption of the line limit, in conjunction with the June 2007 second-fish size limit codified at 50 C.F.R. § 300.65(d), would bracket the 2006 GHL of 1.434 mlb, with the statistical probability favoring a 2008 catch below the GHL (the range is 1.448 – 1.333 mlb per EA/RIR/IRFA App. IV, Table 4A-1). Those measures and their associated reporting requirements, therefore, are appropriate and lawful,[4] and should be adopted.

The differences between the regulatory process as contemplated and codified in the 2003 GHL regulations adopted by the Secretary and the regulatory process as proposed by the Council in the current rulemaking are summarized in the chart below. The side-by-side comparison of the two regulatory processes highlights the fact that the current NPRM is impermissibly based on the 2008 GHL rather than the 2006 GHL, and further emphasizes the compressed timeline of the current proposal. As discussed further in subsection C.2 of these comments, below, that compression of the rulemaking process is inconsistent with the need for stability and advance notice that both the Council and the Secretary have acknowledged, as well as being inconsistent with the agency's regulations. *See, e.g.*, 68 Fed. Reg. 47256, 47262 (2003) ("The intent is not to close the fishery, but additional management measures may be triggered in years following attainment of the GHL. The overall intent was to maintain a stable guided recreational fishing season of historic length, using area-specific measures.").

---

[4] The Secretary has full authority to adopt any regulation or no regulation in his discretion, irrespective of the Council's recommendation. The Secretary's discretion under the Halibut Act is much broader than under the Magnuson-Stevens Act. The latter contains a provision at 16 U.S.C. § 1854(a)(3) relating to fishery management plans that essentially limits the Secretary's ability to disapprove a plan to those situations in which the plan proposed by a Council is contrary to law. The Halibut Act does not include fishery management plan authority or the Magnuson-Stevens Act limitation on the Secretary's authority. The general rulemaking authority at 18 U.S.C §773c(b)(1) provides the Secretary with broad authority and discretion to "adopt such regulations as may be necessary to carry out the purposes and objectives of the Convention and this subchapter. . . ." *See also* 72 Fed. Reg. at 30717 (June 2007) ("As discussed in the preamble to this action, the Secretary has the general authority and responsibility to carry out the Convention and Halibut Act. This includes the authority to promulgate regulations without Council consultation.").

| GHL Procedure as Described in the 2003 Regulations | GHL/Management Procedure Proposed by the Council |
|---|---|
| **Year 1** | **Year 1** |
| • GHL for Year 1 is set | • GHL for Year 1 is set |
| • Year 1 fishery occurs | • Year 1 fishery occurs |
| **Year 2** | **Year 2** |
| • Year 1 harvest is determined and reported to Council in August/September of Year 2 | • Council proposes future management measures based on Year 1 projected (unconfirmed) harvest and possible future GHL based on possible change in CEY |
| • If Year 1 GHL is exceeded, Council considers and proposes measures to support historical charter fishery at sustainable levels with Year 1 GHL as target | • Actual Year 1 harvest survey shows lower than expected harvest; Year 2 harvest is less than Year 1 harvest |
| | • Council does not revise recommendations in response to lower harvest numbers |
| **Year 3** | **Year 3** |
| • Secretary publishes proposed harvest restrictions and seeks public comment on notice of proposed rulemaking | • IPHC sets Year 3 CEY |
| | • GHL for Year 3 is adjusted per CEY change |
| • Secretary publishes final rule establishing regulations effective in Year 4 | • Secretary publishes NPRM with Council proposals for harvest restrictions designed to meet changed Year 3 GHL |
| | • Secretary issues final rule implementing Year 3 harvest restrictions designed to meet Year 3 GHL |
| **Year 4** | |
| • New harvest regulations become effective | |

7

In the NPRM, the Secretary implicitly, if not explicitly, acknowledges that the measuring GHL for 2008 management measures is the 2006 GHL, *not* the 2008 GHL as amended by the new 2008 CEY. For example, at page 74261, the NPRM states: "However, NMFS is particularly interested in public comment on these proposed regulations in light of the new final estimate of 2006 harvests of halibut by the charter vessel sector and the revised analysis of the potential effect of the proposed management measures, as indicated in the above paragraph." The NPRM recognizes 2006 as the appropriate GHL measuring year again on page 74262, where it states that "NMFS is particularly interested in public comment on these annual catch limits (6, 5, and 4 halibut) given the new final estimate of 2006 charter vessel harvest." This repeated recognition that the 2006 (*not* 2008) GHL is the appropriate benchmark for 2008 regulatory actions underscores the point that the Council's Option B proposal (one-fish limit), which is predicated on a reduced 2008 GHL, is inconsistent with the existing NMFS regulations and would therefore be unlawful if adopted by the Secretary.

2.     Both Option A and Option B Violate the Purpose and Intent of the Charter
       Fishery Regulatory Regime.

In addition to being unlawful as flatly inconsistent with the process adopted in the Secretary's 2003 GHL rules, the compressed relationships among GHL overages, GHL adjustments, and changes in management measures as proposed by the Council would also violate the spirit of those rules. Specifically, a core objective of the GHL regime is to provide substantial advance notice to both anglers and charter operators of what future rules will be. By proposing the adoption of substantial new harvest restrictions just before the opening of the fishing season, both Option A and Option B threaten to upset existing plans of anglers and investment-backed expectations of the charter operators with whom those anglers have booked.[5]

In the preamble to the Notice of Proposed Rulemaking that led to the 2003 GHL rules, the Secretary explained that "[t]he reason for the delay in implementing the harvest reduction measures is not to over-react to an overharvest until such time that NMFS has all data verifying the extent of overharvest, and that so, if necessary either NMFS can institute greater or lesser reduction measures or the Council can recommend that measures currently in place be removed." 67 Fed. Reg. at 3870 (January 28, 2002). Avoiding precipitous action as described by the Secretary is not merely an end in its own right; it also has a practical basis that is directly tied to the economic impact of any regulations that might be adopted. Specifically, harvest rules that are adopted to apply in a season that is already largely booked may have especially serious economic impacts. Only eight months ago, in the preamble to its June 4, 2007, announcement of the second-

---

[5] As the commenters note in their attached affidavits, the 2008 season is virtually 100% booked. *See, e.g.*, Affidavit of Scott Van Valin at ¶ 4 ("For each of the last five years we have been 85% booked by September and 100% booked by December for the following summer season."); Affidavit of Patty Seaman at ¶ 4 ("As of January 22, 2008, we are booked to 83% capacity."); Affidavit of Tom Ohaus at ¶ 2 ("We are currently over 80% full for the coming 2008 season.").

fish minimum size rule, the Secretary credited testimony before the IPHC that stated that same-year rule changes could have serious impacts on the guided fishery:

> Comments from charter vessel guides before, during, and after the IPHC meeting in January 2007 indicated that changing the bag limit for anglers on charter vessels from two fish to one fish per day for the six-week period in Area 2C would have an adverse impact on charter vessel bookings that had been or were in the process of being made for the 2007 charter fishing season.

72 Fed. Reg. at 30715 (June 4, 2007). Charter clients learning of a substantial change in the rules may cancel, require refunds, or perceive that they have been sold a service that the guides are unable to deliver. In addition to causing disruptions in current-year plans that no party understood to be susceptible to such sudden changes under the process set forth in the agency's regulations, the sort of compression of the regulatory process proposed here by the Council may exacerbate the negative economic effect on the guided charter fishery by discouraging bookings in future years, because clients will have no confidence in the predictability of the regulatory system.

On the issue of the temporal relationship between a harvest that exceeds the relevant target and the imposition of management measures that would address that overage, the Council has also recognized that there must be at least one year's notice before new harvest restrictions go into effect. Specifically, in its corrected statement of December 2007 Council Action regarding initial and future allocations between the charter and commercial sectors for Areas 2C and 3A,[6] the Council stated the following "Management Objectives":

> These new measures for the sport charter sector are designed to address the specific needs of the sport charter sector for advance notice and predictability with respect to the management tools and length of season that will be used to achieve the allocation allotted to that sector under the plan. In order to achieve the allocation, *it is the Council's intent that management tools and season length would be established during the year prior to the year in which they would take effect*, and that the tools selected and season length would not be changed in season.

> The Council will evaluate its success in achieving the sport charter sector allocation, and specific needs for predictability, advance notice, and season length each year, and will adjust its management tools as needed. In designing this regime for the sport charter sector the *Council realizes that providing advance notice and predictability may result in a charter harvest that does not precisely meet the sector allocation for that particular year*. Therefore, the Council intends to adjust its management measures as needed to ensure that the sport charter sector is held at or below its allocation on average over a rolling five-year period. (emphasis added)

---

[6] Available at http://www.fakr.noaa.gov/npfmc/current_issues/halibut_issues/halibut.htm under the heading "Charter Halibut interim measures motion (revised); 12/07."

These statements from the Council concerning its current efforts to craft a long-term allocation between the charter and commercial sectors are in sharp contrast to the proposed rules that it has forwarded to the Secretary for implementation in the 2008 fishing year. At the same time that the rule proposed by the Council and published by the Secretary in the pending NPRM would base 2008 management measures on the 2008 CEY and 2008 revised GHL, the Council's proposals for a long term allocation and interim management program make clear that management measures must *follow* previous years' harvests, not seek to predict those harvests for future years and manage to those predictions. The two approaches are fundamentally at odds with one another, and the Council in forwarding its proposal for the current NPRM to the Secretary has provided absolutely no explanation of how the proposed restrictions can be squared with the management objectives of predictability and stability that the Council has properly recognized in its December 2007 document as being essential to the ability of the guided charter sector to function. Inasmuch as the NPRM likewise provides no explanation of how a compressed regulatory process such as the one proposed under the Council's proposal can be reconciled with the recognized management objectives for the fishery, adoption of either of the Council's proposed options would be arbitrary and capricious, quite apart from their inconsistency with the agency's existing GHL regulations.

## D.    The Economic Analysis Set Forth In The EA/RIR/IRFA Is Incomplete And Inaccurate.

The Secretary is required by Executive Order 12866 to conduct a Regulatory Impact Review (RIR), the primary purpose of which is to analyze the costs and benefits of the proposed action. In addition, the Regulatory Flexibility Act, 5 U.S.C. §§ 601 et seq., requires that the agency conduct an analysis to insure that the proposed regulations do not unduly inhibit the ability of small entities to compete. Finally, an economic analysis is inherent in the allocation process under the Halibut Act. Although the economic analysis is not the only factor that the Halibut Act requires the Secretary to consider in making allocation decisions, it is clearly central to this rulemaking, especially since there are no resource conservation issues presented.

The economic analysis is all the more central to the decision here in light of the objectives of both the Council and the Secretary in maintaining a sustainable and stable guided sport fishery. The economic analysis is also important in light of the fact that NMFS will soon issue limited entry rules for the charter fleet and the Council expects in 2008 to propose an actual quota allocation and interim management regime for the charter sector that would replace the GHL starting in 2010. If participation by historical operators is severely disrupted in 2008 and 2009 by the adoption of the precipitous harvest restrictions proposed by the Council, that disruption will undermine the analytical basis for all of the background work that has already been done in preparation for the limited entry and allocation rules that are currently in process.

1. <u>NMFS Has Already Found that the Proposed Measures Would Have A Substantial Negative Impact on the Charter Sector.</u>

The draft EA/RIR/IRFA was released by NMFS staff on November 27, 2007. The EA/RIR/IRFA recognizes in several places that the one-fish bag limit and four-fish annual limit options would have significant negative impacts on the guided charter fishery, and that adoption of such restrictive measures could put some operators out of business. That document states, for example, that:

- "Thus, it isn't clear from the available research that the industry can service the same number of clients on fewer fish." (EA/RIR/IRFA at 74.)

- "Key informant interviews indicated that margins in the industry are already slim for some operators and that the new management options could eliminate those margins and force operators out of business." (EA/RIR/IRFA at 80.)

Those findings echo the Secretary's conclusions in June of 2007 that "a reduced bag limit would impose a considerable economic burden on the charter sector that could be mitigated by maintaining the traditional two-fish bag limit." 72 Fed. Reg. at 30721. There is nothing in the NPRM or the EA/RIR/IRFA that indicates any change in that analysis, and for the purposes of the allocation decisions posed by the NPRM, the Secretary's final decision must take that fact as true. It is against this harsh impact that any benefits of the proposed regulations must be weighed.

2. <u>The EA/RIR/IRFA Makes No Attempt to Quantify the Damage to the Charter Sector; the Damage Would Be Severe.</u>

Although the EA/RIR/IRFA acknowledges as a qualitative matter that the Council's proposed harvest restrictions would have substantial negative impacts on the charter fishery, the EA/RIR/IRFA makes no attempt to quantify that effect. It is not feasible for charter operators to commission a full economic study[7] in the 30 days provided for comment, but the raw information regarding the economic activity associated with the fishing lodges described in the attached affidavits should help the Secretary put into perspective the relative economic impacts of this allocation decision on the charter sector and the commercial sector. Operators in the business are already feeling the economic impacts merely from the Option A and Option B rules having been proposed. As set forth in the attached affidavits, the reality of the business is that sport anglers have booked for the 2008 year with the expectation of being able to retain two

---

[7] The Sitka Charter Boat Operators Association did commission the McDowell Group, Inc. to conduct a survey of Alaska fishing visitors. In response to a question about whether lower fish retention limits would affect the traveler's likelihood of returning to Sitka to fish, a total of 43% said that such a reduction would make them either much less likely to return or somewhat less likely to return. McDowell Group, Inc., *Sitka Charter Fishing Visitor Profile and Impact Analysis* (January 2005), at pp. 7-8. As discussed below, given the high overhead costs and low margins of the lodge operations that would be affected by the proposed rules, if even half of the 24% of anglers who indicated that they would be much less likely to return in fact stayed away, that could be the difference being these lodges staying in business or going out of business.

fish daily and of being able to fish on multiple days. If that expectation changes, there is a very real chance that many of those anglers will cancel this year's reservation or will not return in subsequent years as a result of the limitation – a limitation that does not apply in the adjacent halibut management areas in which competing charter services operate.

The fact is that, despite the relatively high cost to the angler (and thus the large monetary contribution to the local economies supporting charter fishing), charter fishing operations are relatively low margin businesses. In addition to having low margins, these businesses tend to have high percentages of fixed overhead. That is, many of the operators' costs, such as boat loans, lodge mortgages, lodge fuel for heating and lighting, and vessel fuel costs, do not vary directly with the number of anglers served. That means that when revenues go down, costs remain high. Under that combination of factors, a loss of 10 or 20 percent of annual revenues does not translate into a 10 or 20 percent loss of annual profit. Instead, that percentage change in revenue can mean the difference between staying in business (and contributing directly and indirectly to the local and regional economy) and going out of business. Nor is going out of business likely to be temporary. Because many operators have outstanding loans on their boats and, where applicable, lodges, it is not possible to "ride-out" a bad year or two and then return to the fishery. Loss of adequate revenue means foreclosure on vessel and lodge loans and therefore loss of the means to continue in or return to the business. Even if operators are not immediately driven out of business, these lodges and guides rely heavily on repeat customers. Clients lost to operations in other regulatory areas are not likely to be easily recovered.

As Scott Van Valin of El Capitan Lodge states at paragraphs 5 and 8 of his affidavit (Exhibit 1):

> 5.    With the extremely high overhead required for operating a remote lodge our profit margin is a very low percentage of our gross sales, usually about 15%. So simply put, our entire profit is the revenue created by approximately 80 customers of the 620 customers we accommodate every year. Every two weeks we accommodate 80 customers, so if we were to lose just half of our June customers due to these limits we would be at a break even scenario, and realistically we will lose most, if not all of our June customers with the one fish limit in place. Implementing a less than six fish limit essentially expects the customer to spend thousands to make the trip up to Alaska, stay at our lodge for three days, catch one halibut and one king salmon daily (June and part of July) due to bag limits and after all is done only take six fish back home to their family.

* * *

> 8.    When customers book these trips over a year in advance they are under the assumption that they will be coming to Alaska to catch and retain the same amount of fish as they have in previous years. We have already had approximately $100,000 in cancellations from some of our most dedicated

12

customers just based on the possibility of a one fish daily limit. When canceling, these customers state that they just can't justify the time and costs associated with a remote Alaskan fishing trip anymore if they only have the ability to land three king salmon and three halibut during their entire three-day stay.

Ken Dole of Waterfall Resort explains the same economic reality this way at Paragraph 7 of his affidavit (attached as Exhibit 2):

> 7.      Waterfall Resorts is a remote lodge that has high fixed costs that are not reduced with fewer clients. We have been in business for 26 years and are operating at or near capacity. If Waterfall were to lose 30% of its clientele in any given year, an amount that NMFS says in the EA/RIR/IRFA is possible based on the proposed one fish daily limit (and is also therefore possible for Waterfall Resorts under a four fish annual limit given our standard four day fishing packages), we would certainly lose money in that year and it would be extremely unlikely that we could regain profitability soon enough to escape bankruptcy.

The economic impact of the proposed restrictions would, in short, not be in the nature of having a "bad year." The very survival of many of these small businesses will very likely depend on the decision that the Secretary makes in this allocation rulemaking. The Halibut Act requires that such decisions be "fair and equitable. . . ." 18 U.S.C. § 773c(c). As NMFS put it in the EA/RIR/IRFA, "the full season one-fish bag limit . . . would reduce harvest too much under the current GHL and has a high potential for significant economic effects on the charter industry." EA/RIR/IFRA at page xvi.

Both fairness and equity require that the Secretary consider whether the measures proposed are so imperative from an allocation perspective as to justify the high probability that a substantial number of historical participants who have spent large sums of money and years of their lives building their businesses should be forced to go out of business and lose their investments. In light of the fact that the 2006 GHL is the only lawful benchmark in the current rulemaking proceeding, the allocation question becomes one of whether it is "fair and equitable" to threaten the existence of numerous small businesses by imposing a one-fish bag limit or a four-fish annual limit when both of those options would reduce yields to well *below* the 2006 GHL. As discussed further below, the record here provides no justification for such a draconian result.

3.      <u>The Proposed Regulations Would Not Provide a Benefit to the Commercial Sector that Would Justify the Severe Damage to the Charter Sector.</u>

Because the only issue pending is one of allocation between two sectors of the fishery, answering the question of what is fair and equitable becomes an exercise in balancing the relative harms and benefits to the affected parties. The severe impacts on the charter sector are discussed above. In this section, we examine what, if any, benefit the commercial sector would receive if the Option A or Option B measures were adopted.

a.     *There are long-term solutions under development that make the rules proposed here unnecessary and potentially damaging to the development of those more comprehensive measures.*

In considering the economic effects on the commercial sector, it is important to keep in mind the larger regulatory context in which this analysis takes place. Specifically, there is a strong likelihood that whatever rules result from this proceeding will only be in place for 2008 and 2009. The reason for this, as discussed above in the context of the Council's management objectives for a long-term allocation between the charter and commercial sectors, is that it is the Council's objective that such a quota allocation be in place to govern the 2010 fishing season. Therefore, anything adopted here is by definition likely to be a short-term measure, and the economic impacts with respect to all affected parties must be viewed with that reality in mind. In other words, the Secretary must ask whether there is a need for more restrictive measures in the next two years that would justify putting numerous historical operators with large investments out of business. The answer to that question must also be informed by the fact that charter harvests declined in both 2006 and 2007. There is no upward harvest trend that requires immediate action.

b.     *The negative impact of the proposed rules on the charter sector would be swift and lasting.*

The fact that the rules contemplated here may be in effect for only two years does not mitigate the negative impacts on the charter sector, because the more draconian proposals (one-fish bag limit/four fish annual limit) are likely to have immediate and long term negative consequences. Even if such rules did not result in operators falling below the break-even point and/or going out of business in 2008, the negative effects would almost certainly reach their full – and in many cases irreversible – impacts in 2009. Moreover, given the charter sector's reliance on repeat customers, the damage done in 2008 and 2009 would likely continue in later years for those operators that were able to survive the impacts in the first two years. In other words, the fact that the proposed measures would likely only be in effect for two years does not mitigate the harm that such rules would cause to the charter sector.

c.     *The rules would provide virtually no benefit to the commercial sector before being superseded by the long-term allocation currently under development.*

The commercial sector, on the other hand, presents a very different picture. Although it is clear that historical participants in the charter sector would be immediately and irreparably harmed by the Option A and Option B proposals, nothing in the record indicates that the commercial sector would realize any corresponding benefit in 2008 or 2009 that would justify imposing the substantial negative consequences that all parties agree would fall upon the charter sector. To the contrary, what information there is in the EA/RIR/IRFA confirms that there would be no meaningful positive effect in 2008 or

2009 for the commercial sector as a result of the rules as proposed by the Council and set forth in the NPRM.

The EA/RIR/IRFA's discussion of the possible "Lost Consumer Surplus" (as a measure of negative impact on the commercial sector) under the status quo and the preferred alternative indicates on its face that there is no short-term allocation gain for the commercial sector in 2008-2009 of a magnitude that would justify the devastating effect of the rules on the charter sector in those two years. Even under the status quo, EA/RIR/IRFA Table 58 (page 73) predicts zero negative impact on the commercial sector for 2008, and only a very minimal impact for 2009. The zero-effect prediction for 2008 is obviously correct, because the IPHC has already set the fishery catch limit for this year, and nothing in this rulemaking will affect that catch limit. It is only in 2010, the year the long-term allocation measures that are to replace the GHL are intended to take effect, that any measurable impact is predicted in the EA/RIR/IRFA. As discussed above, however, the strong likelihood is that any rules proposed in this NPRM, if adopted, will not apply in 2010, so any analysis of that year and following years is irrelevant in the context of the pending proposal. And according to Table 58, if the status quo restrictions remain in place until 2012, the cumulative lost consumer surplus would still total less than $1 million dollars – far less than the regional impact that would occur over the same period if just one of the lodge operations described in the attached affidavits were to go out of business in 2009.

In addition, the Table 58 figures, unlike Appendix IV, are not corrected to recognize the fact that the harvest in 2006 was substantially less than predicted. As the Secretary suggests in the NPRM (72 Fed. Reg. at 74261-62), that 2006 harvest decline as measured against the original higher estimate has a substantial effect on the assumptions underlying the Council's proposals. One of the obvious results is that the economic analysis must be adjusted to reflect the reduced harvest. Specifically, Table 58 assumes a continuous increase in the charter harvest, but the facts now clearly say otherwise. Moreover, even ignoring the 2006 discrepancy, the EA/RIR/IRFA itself acknowledges at footnote 32 on page 73 that the model used for Table 58 "may overestimate real world losses."

     d.     *The negative consequences of the proposed rules on the charter sector far outweigh any potential benefits to the commercial sector.*

The other table in the EA/RIR/IRFA that seeks to address the relative economic impacts of the various alternatives on the commercial and charter sectors, Table 56 (page 59), similarly demonstrates that there is no need to impose additional restrictions beyond the NMFS second-fish rules adopted in June of 2007 and the crew retention and maximum line rules previously adopted by ADF&G and proposed for Federal adoption in this rulemaking. The two columns at the far right edge of Table 56 list, respectively, the projected "GHL Overage" and resulting "Ex-Vessel Losses." The projected losses of $1.141 million in 2008 and $1.588 million in 2009 (which would be spread across the *entire* 600-plus-vessel Area 2C commercial fishery) are roughly equal to the annual

15

economic impact of *one* lodge-based charter operation being driven out of business. *See* Affidavit of Scott Van Valin:

> 10.    Many people don't realize how the charter and lodge businesses coincide with other businesses in the local areas. Just our lodge operation alone infuses over one million dollars into the local economy of Ketchikan and Craig. Our vendors include: Alaska Airlines (600 round trips from Seattle to Ketchikan), Narrows Inn Hotel in Ketchikan (620 room nights), restaurants, ground transportation services in Ketchikan, seaplane transportation to the lodge (175 round trip aircraft charters), beverage and food suppliers in Ketchikan, Petro Marine (45,000 gallons of fuel each year), maintenance supplies purchased from local vendors, approximately 150,000 – 200,000 pounds of freight on Alaska Marine Lines or Northland services, 680 Alaska fishing licenses, and we employ, feed, and house 22 staff members. All of that goes away if my lodge goes out of business.

Exhibit 1 at ¶ 10. *See also* the affidavits of Ken Dole at ¶ 8 (over $5 million in annual payroll and operating expenses); Patty Seaman at ¶ 5 ($1.5 – $1.75 million annual contribution to local economy); Tom Ohaus at ¶ 4 (approximately 1 million in annual expenses paid to local suppliers).

The economic activity described by Mr. Van Valin and the other commenters does not, of course, reflect the additional capital investments in their individual lodges and fleets of charter vessels. The point here, obviously, is one of relative costs and benefits. Given that a generous estimate of the economic benefits to the commercial sector indicates that the benefit to the entire Area 2C commercial fleet is less than the corresponding cost to a single lodge operation and its surrounding community, it is plain that the "fair and equitable" standard for halibut allocations in the Halibut Act would require the Secretary to identify some substantial as-yet unnamed benefit to the commercial sector if he were to decide to adopt the Council's recommendations. Indeed, notwithstanding that the halibut resource itself does not constitute private property with constitutional protection from uncompensated governmental takings, in this context of a regulation aimed solely at allocation, the arbitrary assignment of that resource to one class of fishermen over another raises a question of regulatory taking that the agency may best avoid by taking a more measured approach.

Beyond the fact that Table 56 on its face demonstrates that fairness and equity argue against the proposed Option A and Option B harvest restrictions, the Table 56 loss numbers are inflated in two ways. First, they assume a constant rate of growth in the charter sector harvest, when the actual data indicate that charter harvest rates decreased in both 2006 and 2007. Second, and of equal importance for 2008 and 2009, the loss figures are overstated by a factor of at least two. The loss figures are derived by multiplying the wholesale price of halibut by the GHL overage. That one-to-one relationship does not in fact exist, however, because of the effect of the "slow up/fast down" methodology that the IPHC applies to the calculation of the fishery catch limit. Under that formula, the correlation between a GHL overage and the fishery catch limit is

not one-to-one. Instead, in a declining CEY year, the commercial fishery only foregoes half a pound for every pound of overage in the charter sector.

For both of these reasons, whose effect is additive rather than overlapping, these loss numbers are inflated by at least a factor of two, and probably more. Even at full value, they do not support the proposals made by the Council. Reduced to a more realistic number, the lack of justification becomes even more clear. If the Secretary chooses to move forward with the options proposed by the Council despite the legal and economic infirmities of those proposals, then in order to avoid having that action found arbitrary and capricious, the Secretary would have to undertake a new economic analysis to replace the facially inadequate analysis provided by the EA/RIR/IRFA. That replacement analysis would then be subject to notice and public comment as a material change that is central to the statutorily mandated criteria for allocation decisions.

4.    The EA/RIR/IRFA Fails to Address the Impact on Coastal Communities and the Regional Economy.

In addition to the fact that the Halibut Act requires a fair and equitable allocation among fishermen, the Secretary in the NPRM has properly recognized that the analysis must also consider ways of "minimizing the adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and on fisheries for other species." 72 Fed. Reg. at 74260. The impacts on the charter fishery and its sport fishing clients are addressed above. Just as the EA/RIR/IRFA fails to attempt any meaningful quantitative assessment of the impact on those participants in the fishery, that document also fails to address the impacts on coastal communities. As such, there is nothing in the record upon which the Secretary could make the findings necessary to support adoption of the Option A and B proposals.

Returning to the analysis accompanying Table 58 in the context of the effect of the proposed regulations on coastal communities, the EA/RIR/IRFA applies the wrong test and reaches the wrong conclusion on page 74 when it dismisses the regional economic value of the guided sport fishery by stating that "it is unlikely that the changes in regional expenditures will result in changes in net national benefits. Anglers that are unable to find the angling experience they want in Alaska may be able to find it somewhere else." As the Secretary correctly points out in the NPRM, the proper geographic scope of the economic analysis is "the coastal communities that serve as home ports for this fishery," 72 Fed. Reg. at 74260, not the national economy.

In addition to substituting national economic benefits for regional economic benefits as the measuring stick, the EA/RIR/IRFA incorrectly concludes that "increases in regional expenditures associated with increases in charter-based sport fishing are likely to be offset by decreases in regional expenditures associated with commercial fishing." EA/RIR/IRFA at 74. This conclusion assumes, without analysis, that the harvest of one fish of a given size by the charter industry has the same economic impact as the harvest of that same fish by the commercial sector. There is no evidence in this rulemaking

17

record to support that conclusion, and common sense and the affidavits attached to these comments refute it. *See, e.g.,* Affidavit of Patty Seaman of Sportsman's Cove Lodge on Prince of Wales Island, paragraph 5 ("Each year our operation contributes approximately 1.5 to 1.75 million dollars to the local Ketchikan economy."); Affidavit of Scott Van Valin at paragraph 10 (set forth in full above); Affidavit of Ken Dole ($5 million in payments to local and regional suppliers).

As the EA/RIR/IRFA states at page 45, "ADF&G reports that 96 percent of anglers in Southeast Alaska are from out of state, which means that in addition to the cost of the trip itself, anglers are also paying for rooms, meals, and transportation costs." Recognizing that commercial fishing operations also create local demand for goods and services to support fishing vessels and their crews, it is nevertheless apparent that the regional economic activity associated with the harvest of a fish by the charter sector substantially exceeds the economic activity associated with the harvest of that same fish by the commercial sector. If in fact the per-fish costs associated with the commercial harvest equaled those of the per-fish costs associated with the guided harvest, the retail price of halibut would be in the many hundreds of dollars. It is not. Clearly the analysis is flawed in assuming the economic impact of a pound of harvested fish is the same regardless of who catches the fish.

## E.    Conclusion.

The Council's proposals are directed solely at allocation of the harvest between the commercial and charter sectors; there are no conservation issues or adverse impacts on the halibut resource at issue in this proceeding. The issue of allocation beyond 2009 will quite likely be dealt with through a separate regulatory process that is already underway. In that separate proceeding, the Council has made clear that substantial advance notice of harvest restrictions is essential to the stability of the charter sector. That approach, and only that approach, is legally consistent with the agency's existing GHL regulations, which this rulemaking does not propose to amend. Given that charter harvests were well below predictions in 2006 and fell further in 2007, there is no rationale under which it makes sense to drastically reduce charter harvests in 2008 and 2009, the likely applicable years for the proposed rules.

NMFS and the Council have recognized that changes to harvest rules within a fishing year would have serious adverse economic consequences for the fishery. NMFS has made a specific finding in this proceeding that imposing a one-fish bag limit for 2008 would have a severe economic impact on the charter fishery. The Secretary made precisely the same finding in June of 2007. 72 Fed. Reg. at 30721 ("a reduced bag limit would impose a considerable economic burden on the charter sector that could be mitigated by maintaining the traditional two-fish bag limit"). Nothing has changed between June of 2007 and now except that it has been confirmed that the 2006 guided harvest was substantially lower than had been projected, and information to date demonstrates a further harvest reduction in 2007. Charter operators have expressed the view that the economic results under a four-fish annual limit would be very similar to those under the one-fish bag limit. Against the backdrop of those findings, neither the

EA/RIR/IRFA nor the NPRM provides any basis to conclude that further allocation measures (beyond those imposed in mid-2007 and Federal adoption of the ADF&G skipper/crew and line limits measures) would provide a benefit in 2008-2009 to the commercial sector that would offset even a fraction of the economic harm caused to the charter sector.

In light of these facts, there is an insufficient basis on this record to indicate that any additional measures beyond Federal adoption of the skipper/crew and line limit measures are required at this time. Given that (1) the resource is in no danger of overfishing, (2) the Council is on track to recommend a permanent allocation between the commercial and charter sectors to be implemented in 2010, (3) NMFS is expected soon to release Council recommended rules to limit entry in the charter sector that will take effect in 2010, and (4) charter harvest rates have slowed in recent years, the more prudent and appropriate course would be to evaluate the trends after the 2007 harvest survey is complete, and then determine whether any additional harvest restrictions are in order for the 2009 season, or whether the current restrictions (including federal adoption of existing ADF&G restrictions) should be maintained until the anticipated 2010 quota allocations and limited entry regime come into force. That more moderate course, especially in the wake of the mid-season disruption caused by the June 2007 regulations, would be most in keeping with the regulatory policies of stability and advance notice enunciated by both the Council and the Secretary. That course would also be the most consistent with the Halibut Act and the Secretary's existing regulations.

Respectfully submitted,

Earl Comstock
Comstock Consulting LLC
6225 30th Street, N.W.
Washington, D.C. 20015
Tel: (202) 255-0273

John W. Butler
Sher & Blackwell LLP
1850 M Street, N.W., Suite 900
Washington, D.C. 20036
Tel: (202) 463-2510

19

## AFFIDAVIT

In the City of Kailua Kona, State of Hawaii, Scott Van Valin, having been duly sworn under oath, deposes and says as follows:

1.  I am Scott Van Valin, owner of El Capitan Lodge on Prince of Wales Island (area 2C) and I would like to express my great concern in regards to the one fish daily halibut limit and four fish annual halibut limit proposed for area 2C and its effect on our business as well as the local economy.

2.  I am an Alaskan born, Alaskan resident and a second generation lodge owner that has invested my entire life and millions of my own dollars creating my lodge business over the last twenty years. This business supports my family, our employees (many which have been with us for over 15 years), and many local venders. I can honestly testify that without the ability to offer my customers the opportunity to retain two halibut per day during their stay with us I will lose a substantial amount of customers and be forced to shut down my operation, ending any possibilities of making this business a three generation Alaskan lodge business with my children at the helm someday.

3.  The impact of a one fish daily limit or four fish annual limit will have a drastic impact on our business. A one fish daily bag limit or any annual limit that doesn't allow a customer to retain 6 halibut during their stay with us will essentially end our operation. Typically our customers stay at the lodge for three days. Our lodge is their only destination in Alaska, meaning this is their sole reason to travel to Alaska, unlike cruise ship customers who are visiting Alaska for a diverse range of activities, fishing being just one of the many activities available to them during their trip.

4.  In my lodge business and many other lodge businesses in Alaska we only have approximately 100 days to operate our business because of the seasonal fisheries as well as weather. For each of the last five years we have been 85% booked by September and 100% booked by December for the following summer season. 85-90 % of our guests are return customers. We are booking people a year in advance and it is their expectation when booking that they are booking a trip that will allow them the opportunity to retain the same amount of fish as they have in the past. By changing the limits after we book our customers it essentially creates a situation where we are selling a higher value product than we are actually able to provide.

5.  With the extremely high overhead required for operating a remote lodge our profit margin is a very low percentage of our gross sales, usually about 15%. So simply put, our entire profit is the revenue created by approximately 80 customers of the 620 customers we accommodate every year. Every two weeks we accommodate 80 customers, so if we were to lose just half of our June customers due to these limits we would be at a break even scenario, and realistically we will lose most, if not all of our June customers with the one fish limit in place. Implementing a less than six fish limit

EXHIBIT 1

essentially expects the customer to spend thousands to make the trip up to Alaska, stay at our lodge for three days, catch one halibut & one king salmon daily (June and part of July) due to bag limits and after all is done only take six fish back home to their family.

6. Some argue that our customers can make up the difference with ling cod or yellow eye but unfortunately we already have stringent restrictions on catching these fish as well, and let's face it, people really don't travel thousands of miles to Alaska and spend thousands of dollars to catch ling cod or rock fish. Halibut and salmon are still the real draw to anglers who choose Alaska. With such an extremely low limit on halibut and king salmon it won't take long for our customers to realize that at a rate of approximately $1000 a day this trip is no longer justifiable to them. This limit will ultimately force even our most dedicated customers out of our lodge and on to other lodges in areas with higher halibut limits, more specifically areas 3A or 2B.

7. It literally took me fifteen years of breaking even or operating at a loss without a family to support to establish a successful customer base and lodge facility that could support my family. If my business fails at this point in time I could never start the long process and undertake the years of financial hardship required to rebuild a customer base while at the same time supporting my family.

8. When customers book these trips over a year in advance they are under the assumption that they will be coming to Alaska to catch and retain the same amount of fish as they have in previous years. We have already had approximately $100,000 in cancellations from some of our most dedicated customers just based on the possibility of a one fish daily limit. When canceling, these customers state they just can't justify the time and costs associated with a remote Alaskan fishing trip anymore if they only have the ability to land three king salmon and three halibut during their entire three-day stay. When asking these customers what their future fishing plans are most say they intend to find lodges in Homer (3A) or British Columbia (2B) where the limits are justifiable for the cost; others say they will fish in other states for other species.

9. In our business stability equals survival; we need a minimum amount of fish to survive. Unlike the commercial IFQ fleet, in years of abundance we have no ability to use an increase in fish because we can fish only so many customers on the boats we have. In the near future, after the halibut charter boat moratorium is in effect, our industry will have a set number of boats needing a set number of halibut. In contrast to the commercial fleet if our industry has a year of low limits our customers are gone for years; in the commercial industry their customers will be with them throughout the low and high abundance years. Even if we were able to survive these severe limits until a point in time where the limits are raised, we will still have lost such an enormous number of our customers that it will essentially mean starting over.

10. Many people don't realize how the charter and lodge businesses coincide with other businesses in the local areas. Just our lodge operation alone infuses over one million dollars into the local economy of Ketchikan and Craig. Our venders include: Alaska

Airlines (600 round trips from Seattle to Ketchikan), Narrows Inn Hotel in Ketchikan (620 room nights), restaurants, ground transportation services in Ketchikan, seaplane transportation to the lodge (175 round trip aircraft charters), beverage and food suppliers in Ketchikan, Petro Marine (45,000 gallons of fuel each year), maintenance supplies purchased from local venders, approximately 150,000 – 200,000 pounds of freight on Alaska Marine Lines or Northland Services, 680 Alaska fishing licenses, and we employ, feed and house 22 staff members. All of that goes away if my lodge goes out of business.

11. According to the most recent information presented to the North Pacific Fishery Management Council the difference between a one fish daily limit and a six fish annual limit is roughly 500,000 pounds. The difference between a four fish annual limit and a six fish annual limit is roughly 150,000 pounds. The commercial market value of the additional 500,000 pounds of halibut needed to preserve the lodge and charter industry in southeast Alaska is far less valuable to the state's economy than if it were used as charter halibut.

12. It is clear this is not a conservation issue. After attending the IPHC meeting this year in Portland and witnessing the "gift," for a lack of a better term, of one million additional pounds of halibut to Canada (area 2B), which exceeds the IPHC staff recommendations by one million pounds, I find it very hard to comprehend why the lodge and charter industry in area 2C is quite possibly facing extinction over such a small amount of halibut.

13. I urge you to seriously consider the economic devastation a one fish daily or four fish annual halibut limit will bring to our industry as well as the effect it will have on the local economy of Southeast Alaska. Simple math shows that it will certainly force us to close our doors; ending business which has been in operation for 20 years and thus also ending my family's multi generation fishing lodge business which started in the 1960's with my mother and father in southwest Alaska.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

Dated this _____24_____ day of ____January____, 2008.

FURTHER AFFIANT SAYETH NAUGHT.

(SEAL)

OWNER
(Title)

3

I, _Jay C. Wiese_____, a Notary Public of the City and State aforesaid, hereby certify that _Scott Van Valin_____ personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the ___21^st___ day of __January, 2008__.

(SEAL)

_____ Jay C. Wiese

Notary Public

My Commission expires:

_June / 6 / 2008_ .

JAY C. WIESE
NOTARY
PUBLIC
STATE OF HAWAII

4

**AFFIDAVIT**

In the City of Bainbridge Island, State of Washington, Ken Dole, having been duly sworn under oath, deposes and says as follows:

1.  My partners and I own Waterfall Resort located on the west coast of Prince of Wales Island in Southeast Alaska. We have been in business for 26 years, operate 27 guided charter boats, accommodate up to 92 guests per day and employ over 100 people during the summer season. Our average guest spends four days and approximately $3,500 at our resort, and each summer we typically have 2300 guests.

2.  The Secretary of Commerce is taking public comment on a proposed rule by the National Marine Fisheries Service (NMFS) to impose further restrictions on the catching of halibut by anglers on charter vessels in Area 2C. The two "preferred alternatives" indentified in the proposed rule would seriously hurt the viability of our continued operation.

3.  The two "preferred alternatives" further limit the charter angler catch by imposing either a four halibut annual limit or a one halibut daily limit. Both of these preferred alternatives were recommended to the Secretary by the North Pacific Fishery Management Council, which also recommended that the one fish daily bag limit be imposed if the International Pacific Halibut Commission (IPHC) reduced their estimate of the total amount of halibut available in Area 2C enough to trigger a step down in the Guideline Harvest Level for Area 2C. The IPHC has now done that, so the "preferred alternative" under the proposed rule is the one fish daily bag limit on halibut.

4.  For Waterfall Resort, the impact of a one fish daily limit or a four fish annual limit is effectively the same thing. Given that last year's regulations have only been in place for one season and we don't yet know the full effect, it seems appropriate that the Secretary should consider leaving those unchanged until a more permanent solution is adopted by NPFMC. Leaving those regulations in effect would also provide time to do a proper economic analysis of any further changes. In the event maintaining the current regulations is not possible, we support instead as the only survivable alternative continuing the current regulations with the addition of a six halibut annual limit. It might not sound like much of a difference but having the opportunity to harvest that second fish on half of the days that charter anglers are at our resort will likely mean the difference between many guests returning in 2009 or choosing another location for the future. Over the last 15 years, Waterfall Resort has average a 90% repeat/referral rate for its guests. Due to the competition that exists within Alaska, from British Columbia, Mexico and the world, it is critical that we maintain these high repeat/referral rates. On any given year, our marketing expenditures will actually exceed the gross revenue from new business! In other

**EXHIBIT 2**

words, we can't afford to replace too many guests per year or we won't be able to remain profitable.

5.   The Secretary has the discretion to adopt the current regulations, or the current regulations with a six fish annual limit, under the range of options included in the proposed rule. If the Secretary were to adopt the six fish annual limit, NMFS estimates that option would still result in a reduction of the Area 2C charter harvest of halibut to a level 300,000 to 400,000 pounds below the 2007 catch, which is estimated to have been 1.7 million pounds (i.e., an 18% to 25% reduction from the 2007 catch). While this reduction will almost certainly adversely impact Waterfall Resort, I believe the impact will be significantly less than under a one fish daily or four fish annual rule because our guests will still have the opportunity to attempt to catch a second fish during half of their stay.

6.   Another way of illustrating the difference in impact of a one fish daily bag limit is to look at what it would mean in terms of the number of fish available for anglers. According to information in Appendix IV of the EA/RIR accompanying the rule, a one fish daily bag limit would translate into between 45,000 and 64,000 halibut at the same average weight as was reported in 2007. The EA/RIR also shows there were over 92,000 anglers who fished in Southeast in 2006 (the last year for which numbers are available). At that number of anglers, a one fish daily bag limit results in only one half to two thirds of a halibut per angler on average – which means one third to one half of the anglers will catch nothing – which is not good for staying in business. A four fish annual limit results in between 65,000 and 71,000 fish at the 2007 weight. In contrast, a six fish annual limit would translate into 75,000 to 82,000 halibut at the 2007 weight; still less than one fish per angler and still 18,000 to 25,000 less halibut than we caught in 2007, but probably survivable given the skill of our guides.

7.   Waterfall Resorts is a remote lodge that has high fixed costs that are not reduced with fewer clients. We have been in business for 26 years and are operating at or near capacity. If Waterfall were to lose 30% of its clientele in any given year, an amount that NMFS says in the EA/RIR is possible based on the proposed one fish daily limit (and is also therefore possible for Waterfall Resorts under a four fish annual limit given our standard four day fishing packages), we would certainly lose money in that year and it would be extremely unlikely that we could regain profitability soon enough to escape bankruptcy.

8.   Waterfall Resorts spends in excess of $5 million annually on payroll and operating expenses, most of which goes to local suppliers. If our lodge were to go out of business due to adoption of a one fish daily or four fish annual limit it would mean not only the loss of the millions of dollars we pay directly to the local economy, but also a significant adverse impact on the local transportation infrastructure as well. We have over two thousand guests staying at our lodge each year, each of whom flies in and out of Ketchikan on Alaska Air and then takes a local charter flight to

2

Waterfall Resort. Many of those guests also stay overnight in Ketchikan, further increasing their economic contribution to the economy.

9.   Having just attended the International Pacific Halibut Commission's 2008 Annual Meeting in Portland, Oregon, I can attest that this is not a conservation issue. At that meeting the IPHC allocated 6.21 million pounds of halibut to the Area 2C commercial IFQ fleet, and said the halibut stocks in Area 2C are "well above a level of concern" and give them no cause for "undue alarm." In Area 2C alone, the IPHC chose to give the commercial IFQ fishermen an extra 2.29 million pounds to buffer the adverse effects from the new IPHC biomass model, but provided no buffer for the charter halibut fleet in Area 2C. The reallocation of halibut under the new model is the entire cause of the reduction in Area 2C's CEY, not the health of the biomass. IPHC biologists admitted at the meeting that the new allocation of the exploitable biomass is a "policy" decision, and is not based on biological requirements. The IPHC at the same 2008 meeting also gave a million extra pounds of halibut to British Columbia, just south of Area 2C. If a one fish daily or four fish annual limit is adopted for Area 2C, you can bet many of the people that would otherwise have returned to Area 2C to fish will choose instead to go to British Columbia, where the additional million pounds the IPHC gave them will mean no such onerous restrictions.

10.  The bottom line is that the amount of fish at issue is very small – basically 500,000 pounds of halibut – which translates into just $2.5 million for the commercial IFQ fleet at $5 a pound for halibut. However, that 500,000 pounds is the tipping point between life and death for lodges like Waterfall Resorts in Southeast Alaska. Many lodges, possibly including my resort, will go out of business in 2009 with a one fish daily or four fish annual bag limit for halibut. Clients simply won't come in June when all they can catch is one halibut and one king salmon per day due to bag limits, and may not come in other months when they can fish elsewhere for more halibut.

11.  I am also concerned about how the one fish daily or four fish annual proposed alternatives could adversely impact businesses like mine that qualify under the charter halibut moratorium approved by the North Pacific Fishery Management Council and for which we expect to see proposed regulations soon. Both the one fish daily and four fish annual limits affect multi-day remote lodge operators more than single day charters, many of which have come into business or expanded since the control date for the moratorium. If the one fish daily/four fish annual limits are imposed and multi-day remote lodge operators who are qualified under the proposed moratorium are forced out of business, they will have been unfairly denied the very benefits that the proposed moratorium was supposed to provide. The current proposed regulations seem out of step with both the moratorium process and the interim allocation process that is presently under consideration by the North Pacific Fishery Management Council. The Secretary should consider the negative impacts that imposing a one fish daily or four fish annual limit on the Area

3

2C charter industry for the next two or more years will have on those actions as well.

12. Our business and the other charter operators in Southeast Alaska need the Secretary to consider the devastating impacts of choosing either of the preferred alternatives. Instead, please support the charter industry in Southeast Alaska and choose the current two fish daily bag limit with at least a six halibut annual limit. Imposition of no less than a six halibut annual limit will still result in Area 2C charter anglers seeing a significant reduction in their charter harvest for 2008 and beyond, but not at the uneconomic levels that would be imposed under the proposed preferred alternatives.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

Dated this _____25th_____ day of _____January_____, 2008.

FURTHER AFFIANT SAYETH NAUGHT.

(SEAL )

_____
(Title)

I, Shana W Ramirez , a Notary Public of the City and State aforesaid, hereby certify that Ken Dole personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the 25th day of January, 2008 .

> **Notary Public**
> **State of Washington**
> **SHANA W RAMIREZ**
> MY COMMISSION EXPIRES
> October 26, 2011

(SEAL)

_____
Notary Public

My Commission expires:

10 / 26 / 2011 .

4

## AFFIDAVIT

In the City of **Ketchikan**, State of **Alaska**,
**Patty Seaman**, having been duly sworn under oath,
deposes and says as follows:

1.    Sportsman's Cove Lodge is located in Saltery Cove, in Skowl Arm on the south side of Kasaan Bay, which is located on the eastern shore of Prince of Wales Island approximately 28 miles due west of Ketchikan. We operate in Clarence Strait ranging from the southern tip of Prince of Wales Island (Cape Chacon) in the south, to Union Bay to the north.

2.    We have been in the charter sport fishing business since 1972, starting in Washington State at Westport, Washington. In 1983 we left Westport to come to Alaska. We operated out of Wrangell for the 1984-85 seasons then moved to a lodge south of Ketchikan for four years.  In 1989 we acquired our present property and developed Sportsman's Cove Lodge.  We have been doing business as Sportsman's Cove Lodge in the same location for 18 years.

3.    We operate a fleet of seven 37' six-pack vessels, five primary vessels and two back-up vessels. We fish 30 guests per day for approximately 100 days each season for a total capacity of approximately 3,000 angler/days. The average length of stay is 3.5 days. Approximately 800 individual guests pass through our operation in a little over three months each season. Up to 50 additional staff individuals pass through the lodge each season.

4.    We operate very close to maximum capacity every season, out of necessity.  That's what it takes to remain viable in this short window. Our goal is to be entirely sold out by June 1st, but subsequent last minute cancellations occur which are difficult to backfill on short notice, so our realized occupancy each year runs around 95%. As of January 22, 2008, we are booked to 83% capacity.

5.    Each year our operation contributes approximately 1.5 to 1.75 million dollars to the local Ketchikan economy. This level has been maintained for the past decade. Prior contributions were smaller, but still substantial during the formative years of the company.  Our entire operation is located in Southeast Alaska, including all sport fishing operations and all administrative, marketing, and maintenance functions.

6.    Our lodge is remotely located on Prince of Wales Island, 28 air miles from Ketchikan.  There are no roads in or out. Guests arrive in Ketchikan primarily via Alaska Air.  Very rarely do guests arrive on cruise ships or by Alaska Marine Highway ferries. All guests are transferred to/from Ketchikan and the Lodge via local air taxi floatplanes. All of our supplies and materials that are not bought locally are brought from Seattle via barge lines each week.

**EXHIBIT 3**

7.    In order to maximize time on the water on the last fishing day of each package, our guest itinerary is such that the departing day from the Lodge necessitates an overnight stay in Ketchikan. Guests typically take dinner that evening in Ketchikan, stay overnight, have breakfast and depart the following morning. Many guests remain in Ketchikan to partake in local tours prior to, or after their fishing packages at the Lodge.

8.    It is safe to say that the greatest impact that a 1-fish limit would have on our business would be the loss of the early part of the season before the strong runs of Pinks and Coho show up. It is unrealistic to think that guests would pay the $1,000/day fee required to remain a viable entity, to catch only one King Salmon and one halibut during this period. This would result in the loss of all of June and the first week of July, about 20 days or 20% of our historical inventory.

9.    We have had potential guests ask about the proposed new regulation, but, so far, nobody has out right cancelled because we tell them we are hopeful the Secretary will not impose a one fish limit or four fish annual limit. Our guests do have substantial deposits down on their 2008 trip. The folks that are from the west coast and the folks who are actual sportsmen and keep up on outdoor sporting news have called to inquire about how this may affect us and in turn them. They are taking a "wait and see" attitude. We may not know the impact of the proposed 1 fish limit or four fish annual limit until the booking for 2009.

10.    A nice halibut is tough enough to get a guest on to. If the chance is lessoned at all to take a decent quantity of halibut home, which is what a June guest is paying for, the potential for all June halibut fishing trips could realistically go away. If adopted a one fish bag limit or four fish annual limit could shorten our season an additional 2 weeks and reduce our income another $275,000.00. That is a substantial amount of income to lose in a season! Not to mention the guests who come up at other times during the summer months with the hopes of catching halibut when they reach their limit on kings. Because of the limited amount of kings a guest can keep, and before the quantities of chums and pink show up in July and the Coho in August, we need to be able to offer a better-rounded trip to stay in business and make the time worthwhile to the guest.

11.    Our trips are all multi-day packages. Each week is divided into a 3-day and a 4-day package. A 4-fish annual bag limit would devalue our packages significantly and it would reduce the Marketable Client Expectations below the tipping point. A 6-fish annual bag limit would salvage our 3-day packages and impact the 4-day packages somewhat. A side effect of a four or six fish annual limit would be that many of our guests who fish with us more than once a season, or fish with us and other operators within the same season, would not be able to do so. Annual limits would wipe out any repeats in the same year throughout Southeast Alaska. In our case, 85% of our guests have been to the Lodge before or have been referred by someone who has.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

Dated this ___28th___ day of __January__ 2008.

FURTHER AFFIANT SAYETH NAUGHT.

(SEAL)

*Patty Seaman*

___authorized representative___
(Title)

I, _Teri A. Holderman_, a Notary Public of the City and State aforesaid, hereby certify that _Patricia Louise Seaman_ personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the _28th_ day of _January_ _2008_.

**STATE OF ALASKA**
(SEAL)  **NOTARY PUBLIC**
**TERI A. HOLDERMAN**
**My Commission Expires January 11, 2011**

*Teri A Holderman*
Notary Public

My Commission expires:

_01_ / _11_ / _11_

**AFFIDAVIT**

In the City of _Dartmouth_, State of _MASSACHUSETTS_, Thomas Ohaus, having been duly sworn under oath, deposes and says as follows:

1.  My name is Tom Ohaus and I'm the owner of Angling Unlimited, a lodge and charter fishing business in Sitka, Alaska. My wife and I came to Sitka in 1993. We began as a small subcontractor to a local lodge and gradually grew our business to an 8 boat operation with two lodge buildings.

2.  Our business is successful and profitable only when we are booked in excess of 85% of capacity. Alaska is an expensive place to operate and our season – roughly mid-May until Labor Day – is short. Angling Unlimited enjoys an excellent reputation and very high rate of rebooking. We are currently over 80% full for the coming 2008 season. In order to book in advance, our clients must be confident that fishing opportunities are predictable and not volatile.

3.  The roughly 1000 customers we attract to Sitka fly in directly on Alaska Airlines from Seattle and beyond. Our business model doesn't include serving dinner and most of our guests spend each night of their stay in the town of Sitka supporting local restaurants. They spend the last night of their fishing trip in a local hotel in order to make room at our lodge for the new incoming groups.

4.  In 2007, Angling Unlimited paid roughly $130,000 to the Borough of Sitka in bed tax, sales tax, and the new fish box tax. Our customers paid $59,000 in fishing license and salmon stamp fees to the State of Alaska. We spend nearly $1 million per year for food, fuel, payroll, insurance, repairs, maintenance, supplies, and the countless other expenses our business incurs in the course of a season.

5.  This money won't come to the State of Alaska if our customers don't perceive value. Bag limits are important in their perception of value. We've had a two per day halibut bag limit for decades. To the minds of our customers, it's a constant. Cutting the bag limit in half to one halibut per day, after the majority of our guests are booked, will decrease the perception of value and kill the confidence to make advance bookings.

6.  I've testified multiple times to the North Pacific Fishery Management Council that our business run on very thin margins and make substantial contributions to local economies. A regulation that is poorly received, especially when it comes as a surprise, takes many years for our business to recover from. Angling Unlimited's guests book their trips as much as a year in advance. They buy nonrefundable airplane tickets. They carve vacation time out of busy schedules. They will not do this in the face of regulatory volatility. We compete in the global market of destination fishing resorts. Our customers have countless options.

7.  A sustained loss of 10 to 20% of our customers, a realistic result of halving the halibut bag limit to one, would make Angling Unlimited no long viable. Our business has a tipping

1

EXHIBIT 4

point, below which we cease to make money. Like any other business, we can survive below that point for brief periods of time, but, unfortunately, the effect of surprise regulatory changes outlives the regulation by many years. In June of 2000, we experienced a sudden change to one king salmon per day with a Wednesday closure. This regulation lasted two weeks that June before being changed. As I look at our 2008, 8 years later, the first two weeks of June remain our toughest dates to book. Once burned, customers tend not to return.

8. All of our groups fish for at least three days, thus the four halibut annual limit translates to a de facto one halibut per day bag limit. The multi-day lodges in Southeast Alaska are unfairly affected by such a small annual limit and subject to a competitive disadvantage over single day charters or multi-day lodges in British Columbia and the rest of Alaska.

9. If we were looking at a conservation crisis with halibut in Area 2C, the charter industry would take this bitter medicine for the sake of the resource. However, I just attended the IPHC meetings and it was clearly stated that we don't have a resource crisis with halibut in Area 2C. The commercial fleet was granted over 2 million pounds above the fishery constant exploitable yield to buffer the economic impacts of a rapidly falling catch limit. We ask for similar considerations to maintain our businesses and preserve our contributions to the economies of communities throughout Southeast Alaska.

Dated this _30th_ day of _January_, 2008.

FURTHER AFFIANT SAYETH NAUGHT.

(SEAL)

_Thomas Ohaus_
_President, Angling Unlimited_
(Title)

I, _Scott E. Sylvia_, a Notary Public of the City and State aforesaid, hereby certify that _Thomas Ohaus_ personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn, deposes and says that the facts set forth in the above affidavit are true and correct. _Showed Alaska Drivers license_

Witness my hand and official seal this the _30th_ day of _January, 2008_

(SEAL)

_Notary Public_

My Commission expires: _/ / _

2



**The Whale's Eye Lodge**

PO Box 210166
Auke Bay, Alaska
99821
(907) 723-2920
E-mail whaleseye@starband.net
www.JuneauAlaskaFishing.com

Sue Salveson
Assistant Regional Administrator
Sustainable Fisheries Division
Alaska Region
National Marine Fisheries Service
P.O. Box 21668
Juneau, Alaska 99801-1668
Attention: Ellen Sebastian
Re: RIN 0648-AW23
Proposed Charter Halibut Regulation; one fish daily bag limit, 4 fish annual limit.

1/22/2008

Dear Ms. Salverson,

My family and I operate a small, 4-guest fishing lodge on Shelter Island near Juneau. Our lodge is our home. My wife and I and my son and his family derive our entire income from our lodge operation. We built our business from dirt and sweat beginning in 1986, opening for business in 1995. We have harvested from 150 to 250 halibut per year through the entire life of our business. Our business plan is to operate 50 to 70 days per summer grossing about $100,000.00. In a nutshell, we operate 200 to 280 angler days harvesting 150 to 250 halibut generating $100,000.00 which we spill back into our local economy plus probably another $100,000.00 in spin off for hotels, processing, sales and bed taxes, t-shirts and gifts, taxis and airline fairs. We feel our business plan is ecologically sustainable and lies within the historical halibut sport fishery.

Our client base is, intentionally, working people. We work for our living and we enjoy the company of others who do the same. Our guests are primarily husband-wife and father-son groups. They seem to align into two categories. One is our return clients while the other is people visiting Alaska as a once in a lifetime dream. All of our guests must book a hotel in town to transition at least one way. Many of our guests spend several days in Juneau to take in the sights. We send all of our guest's fish for processing through Jerry's Meats, a local sport fish processor.



Where fishing is a way of life

EXHIBIT 5

All of our clients have expectations that include the following:

1. Our guests visit to enjoy the Alaskan marine environment.
2. They come for the opportunity to catch salmon *and halibut.*
3. They come for the opportunity to take their catch home to share it with family and friends around the dinner table.

Removing just one of these components reduces the value of my product below what I can market.

As high energy costs diminish disposable income in America, potential clients are shopping for the best value. Over the course of the last two years we have experienced a marked reduction in business. We fulfilled our business plan in 2006 with 50 Lodge operating days grossing $100,000.00. We were even able to schedule two five day brakes that summer. In 2007 with the one fish under 32 inches rule in place our lodge business dropped 30%. Most of the loss was from the once in a lifetime category. I say this because most of our core of return clients returned. Now with the threat of further reductions in the halibut bag limit to either one fish a day or a 4 fish annual limit, our core of returning guests is diminishing. My bookings for 2008 are down so low I may not be able to meet fixed costs next year which means I could be writing refunds and attempting to sell my boat in 2008. As I said, my clients are shopping. Newspapers and magazines have published the one fish a day and four fish annual limit already and my people are asking about it—every call!

As a small operation that markets to independent travelers I am in harms way of these bag limit reductions. I have gone from thriving to what could be inoperable in two years. Fuel costs are driving my prices up and Federal regulations will have reduced my product by half if this regulation is imposed. To make matters worse airfare to Anchorage and area 3A, where the bag limit has not been reduced, is by far less expensive. These factors leave me no tools to fight with.

My clients, without exception want to bring home both salmon and halibut. A one fish bag limit makes it cost prohibitive for them and for me. A four fish annual limit allows them to finish up in two days. Most of my core return clients book for three to five days. They want the opportunity to catch a fish the entire time. **If I had two fish a day and a six fish annual limit to work with I might be able to persuade most of my regulars to return.** Much damage has already been done. The fishing public has been made aware of the new regulations by the IPHC and the NPFMC and it is having a major impact on my business.

Folks like me will be the first to fall. Make no mistake, many recently healthy businesses like mine will fall in 2008 if these regulations are imposed. Even without bag limit reductions the lodge industry in Southeast Alaska is facing hard times in 2008 with the economy falling into recession and fuel prices skyrocketing. Add to this a one fish a day bag limit or four fish annual limit and the lodge and multi-day guided sport fishing industry as it has existed for decades will begin to collapse throughout area 2-C.

The only segment of our industry that can do well under this regulation is cruse ship based. These operators who are responsible for the lion's share of the unacceptable growth will still do well. They will be able to combine salmon with halibut if the one fish limit is imposed and an annual limit has no effect on people who jump ship for a day of halibut fishing. This fact is so obvious from my prospective that I have to wonder if the 4 fish limit was engineered to shift the charter catch from independent travelers to cruse visitors.

My wife and I have invested our entire life's energy and savings into our small fishing lodge. When we began building 22 years ago it was not possible to foresee this happening. Commercial halibut was regulated by derby style openings. The cruse industry was still in its infancy. Now these are the big businesses and small long established operators like us are being pushed out. What shall we do? These regulations not only steal our ability to make a living, they render our lifetime investment worthless. We can only hope to part out our lives, sell our boat and lodge for pennies on the dollar and move out. Those of us who are leveraged will be bankrupt. Surely, destroying small operators like me and my family is not the only way preserve and apportion halibut stocks. Give us two fish a day, six fish annual and let us fight to stay in business. Give us some tools to work with. Let us sell fishing trips not boats and used lodges.

Sincerely,

Rick Bierman

3

D
08-941
JDB

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS
Scott Van Valin
**(See attached for additional Plaintiffs)**
**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 88888
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
John Butler. Sher & Blackwell LLP
1850 M Street, NW, Suite 900
Washington, DC 20036.    (202) 463-2510

## DEFENDANTS  Carlos M. Gutierrez, Secretary
of U.S. Dept. of Commerce (see attached for
additional Defendants)
COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT 11001
(IN U.S. PLAINTIFF CASES ONLY)

Case: 1:08-cv-00941
Assigned To : Bates, John D.
Assign. Date : 6/2/2008
Description: TRO/PI

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ☐ A. Antitrust
☐ 410 Antitrust

### ☐ B. Personal Injury/ Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ☐ C. Administrative Agency Review
☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ☒ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ **G.** *Habeas Corpus/ 2255*<br><br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ **H.** *Employment Discrimination*<br><br>☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **I.** *FOIA/PRIVACY ACT*<br><br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **J.** *Student Loan*<br><br>☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ☐ **K.** *Labor/ERISA (non-employment)*<br><br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ **L.** *Other Civil Rights (non-employment)*<br><br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ **M.** *Contract*<br><br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ **N.** *Three-Judge Court*<br><br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ Multi district Litigation ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Northern Pacific Halibut Act of 1982, 16 U.S.C. § 773i(d) – Action for review of administrative agnecy final rule. TRO sought.

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | **DEMAND $** | Check YES only if demanded in complaint<br>**JURY DEMAND:** ☐ YES ☒ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY** (See instruction) ☐ YES ☒ NO   If yes, please complete related case form.

DATE **06/02/08**    SIGNATURE OF ATTORNEY OF RECORD    *John W. B...*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.