IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SCOTT VAN VALIN, et al. | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | |
| | ) | |
| Carlos M. Gutierrez, in his Official | ) | |
| Capacity as Secretary of the U.S. | ) | |
| DEPARTMENT OF COMMERCE, | ) | |
| Office of the Secretary | ) | |
| Room 5852 | ) | |
| 14th Street and Constitution Ave., NW | ) | |
| Washington, DC 20230 | ) | |
| | ) | Civil Action No. _____ |
| Conrad C. Lautenbacher, Jr., | ) | |
| in his Official Capacity as | ) | |
| Administrator of the U.S. | ) | |
| NATIONAL OCEANIC AND | ) | **PLAINTIFFS' MOTION FOR A** |
| ATMOSPHERIC ADMINISTRATION, | ) | **TEMPORARY RESTRAINING** |
| Department of Commerce | ) | **ORDER AND/OR PRELIMINARY** |
| Room 5128 | ) | **INJUNCTION** |
| 14th Street and Constitution Ave., NW | ) | |
| Washington, DC 20230 | ) | |
| | ) | |
| James W. Balsiger, in his Official | ) | |
| Capacity as Acting Assistant | ) | |
| Administrator of the U.S. | ) | |
| NATIONAL MARINE FISHERIES | ) | |
| SERVICE | ) | |
| Department of Commerce | ) | |
| Room 14636 | ) | |
| 1315 East-West Highway | ) | |
| Silver Spring, MD 20910 | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

Pursuant to Fed. R. Civ. P. 65, Plaintiffs respectfully move for entry of a temporary restraining order and/or a preliminary injunction to enjoin the effectiveness of a final rule promulgated by Defendant Secretary of Commerce through the National Marine Fisheries Service ("NMFS"), which was published in the Federal Register on May 28, 2008, and effective on June 1, 2008. *See* 73 Fed. Red. 30504 (2008) (Docket No. 071031633-7834-01). This final rule limits the harvest of Pacific halibut by guided sport charter vessel anglers in Southeast Alaska by imposing a one-fish daily bag limit on the guided sport charter vessel fishery. Absent emergency relief from this Court, the final rule adopted by Defendant NMFS will irreparably harm Plaintiffs, who all own and/or manage halibut guided charter operations in Southeast Alaska. Plaintiffs' businesses are built around repeat, multi-day clients who come to Southeast Alaska annually for the sole or primary purpose of fishing. The one-fish daily bag limit represents an immediate and substantial threat to the viability of the halibut charter industry in Southeast Alaska, and threatens the ability of Plaintiffs to remain in business. Plaintiffs have already lost bookings for the 2008 and 2009 seasons, and they have no action at law under which they can recover damages from the Secretary of Commerce.

In support of this motion, Plaintiffs rely on the following documents: (1) the Complaint, (2) the Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order and/or a Preliminary Injunction, (3) the Declaration of Scott Van Valin, (4) the Declaration of Larry McQuarrie, (5) the Declaration of Carl Porter, (6) the Declaration of Edwin Haney, (7) the Declaration of Donald Westlund, (8) the Declaration of Case Harris, (9) the Declaration of Rex Murphy, (10) the Declaration of Donna Bondioli, and (11) the Declaration of Theresa Weiser.

Pursuant to Fed. R. Civ. P. 65 and Local Rule 65.1(d), Plaintiffs respectfully request that the Court schedule a hearing on this motion at the Court's earliest convenience. The Department of Justice has asked to be heard.

Respectfully submitted,

John W. Butler (D.C. Bar No. 437370)
Robert K. Magovern (D.C. Bar No. 497862)
SHER & BLACKWELL LLP
1850 M Street, N.W.
Suite 900
Washington, DC 20036
(202) 463-2500 (Main)
(202) 463-2510 (Direct)
(202) 365-0059 (Cell)

Earl W. Comstock
COMSTOCK CONSULTING LLC
6225 30th Street, N.W.
Washington, DC 20015
(202) 255-0273

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, et al. ) | |
| ) | |
| **Plaintiffs,** ) | |
| v. ) | |
| ) | |
| Carlos M. Gutierrez, in his Official ) | **MEMORANDUM IN SUPPORT** |
| Capacity as Secretary of the U.S. ) | **OF PLAINTIFFS' MOTION FOR A** |
| DEPARTMENT OF COMMERCE, ) | **TEMPORARY RESTRAINING ORDER** |
| Office of the Secretary ) | **AND/OR A PRELIMINARY** |
| Room 5852 ) | **INJUNCTION** |
| 14th Street and Constitution Ave., NW ) | |
| Washington, DC 20230 ) | |
| ) | **Civil Action No. _____** |
| Conrad C. Lautenbacher, Jr., ) | |
| in his Official Capacity as ) | |
| Administrator of the U.S. ) | |
| NATIONAL OCEANIC AND ) | |
| ATMOSPHERIC ADMINISTRATION, ) | |
| Department of Commerce ) | |
| Room 5128 ) | |
| 14th Street and Constitution Ave., NW ) | |
| Washington, DC 20230 ) | |
| ) | |
| James W. Balsiger, in his Official ) | |
| Capacity as Acting Assistant ) | |
| Administrator of the U.S. ) | |
| NATIONAL MARINE FISHERIES ) | |
| SERVICE ) | |
| Department of Commerce ) | |
| Room 14636 ) | |
| 1315 East-West Highway ) | |
| Silver Spring, MD 20910 ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 2

THE COURT HAS JURISDICTION TO GRANT THE REQUESTED RELIEF ........................ 4

PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER AND/OR A
PRELIMINARY INJUNCTION ................................................................................... 5

A.    Plaintiffs Will Be Irreparably Injured in the Absence of Injunctive Relief. ........................ 5

B.    If Injunctive Relief is Granted, Others' Interests Will Not Be Substantially Burdened... 11

C.    The Public Interest Favors Injunctive Relief. ................................................. 12

D.    Plaintiffs are Likely to Succeed on the Merits. ................................................. 13

      1.    The Final Rule Does Not Create a "Fair and Equitable" Allocation as Required
            by the Halibut Act. ............................................................................... 13

            i.     The Final Rule Deals Solely With the Allocation of Fish Between Groups
                   of Fishermen; It Is Not a Conservation Regulation ........................................ 13

            ii.    The Secretary Made No Finding that the Allocation Set Forth in the  Final
                   Rule was Fair and Equitable, Nor Could He Have  Done so on the Record
                   Below. ................................................................................... 14

      2.    The Final Rule Violates the Administrative Procedure Act. .................................. 16

            i.     The Rule is Contrary to Existing NMFS Regulations. ................................... 16

            ii.    The Secretary Failed to Address Plaintiffs' Arguments in the Final Rule. .... 20

            iii.   The Secretary Does Not Provide Adequate Good Cause to Waive the
                   30-Day Delayed Effectiveness Requirement. ................................................. 21

CONCLUSION.................................................................................................... 22

APPENDIX

TABLE OF AUTHORITIES

Page

**Cases**
*Am. Fed. Of Gov't Employees v. Block*, 655 F.2d 1153 (D.C. Cir. 1981) ................................... 21
*Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987)............................................ 12
*Asiana Airlines v. FAA*, 134 F.3d 393 (D.C. Cir. 1998) ............................................................. 21
*Ballard v. Comm'r of Internal Revenue*, 544 U.S. 40 (2005)................................................. 12, 16
*Bracco Diagnostics v. Shalala*, 963 F. Supp. 20 (D.D.C. 1997) ................................................. 9
*Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533 (D.C. Cir. 1986) ................................... 17
*City Fed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995)...................... 5
*Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56 (D.D.C. 2004) ................ 12
*Council of Southern Mountains, Inc. v. Donovan*, 653 F.2d 573 (D.C. Cir. 1981) .................... 22
*Cuomo v. U.S. NRC*, 772 F.2d 972 (D.C. Cir. 1985)................................................................. 5
*DSE, Inc. v. United States*, 3 F. Supp. 2d 1464 (D.D.C. 1998) .................................................. 11
*Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30 (D.D.C. 2006)............................ 5
*Hoffman Laroche Inc. v. Califano*, 453 F. Supp. 900 (D.D.C. 1978)........................................... 9
*International Long Term Care v. Shalala*, 947 F. Supp. 15 (D.D.C. 1996) ................................ 11
*Jacksonville Port Authority v. Adams*, 556 F.2d 52 (D.C. Cir. 1977) ........................................ 12
*Local Lodge No. 1266, Int'l Ass'n of Machinists and Aerospace Workers v. Panoramic Corp.*,
    668 F.2d 276 (7th Cir. 1981) ........................................................................................... 6
*Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558 (6th Cir. 1982)....................................... 5
*Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29
    (1983)............................................................................................................................. 20
*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998)........................................ 5, 13
*Nat'l Treasury Employees Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631 (D.D.C. 1993)... 11
*Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82 (5th Cir. 1992)............................................. 13
*Omnipoint Corp. v. FCC*, 78 F.3d 620 (D.C. Cir. 1996) ........................................................... 21
*Reuters Ltd. v. FCC*, 781 F.2d 946 (D.C. Cir. 1986).................................................................. 17
*United States v. BNS, Inc.*, 858 F.2d 456 (9th Cir. 1988) ........................................................... 5
*World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61 (D.D.C. 2000) .......................... 9

**Statutes**
16 U.S.C. § 773c(c)............................................................................................................. 3, 13
16 U.S.C. § 773i(d) ................................................................................................................ 4
5 U.S.C. § 553.............................................................................................................. 2, 17, 21

**Other Authorities**
50 C.F.R. § 300.65(c)............................................................................................................ 3, 17
68 Fed. Reg. 47256 (Aug. 8, 2003)........................................................... 3, 11, 16, 17, 20, 21, 22
72 Fed. Reg. 30714-15 (June 4, 2007)........................................................................... 15, 19, 22
73 Fed. Reg. 12280 (March 7, 2008) ....................................................................................... 11
73 Fed. Reg. 30504 (May 28, 2008) ...................................... 5, 9, 10, 12, 14, 15, 16, 17, 18, 20, 22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, et al. | )<br>)<br>) |
| **Plaintiffs,** | )<br>) |
| v. | )<br>) |
| Carlos M. Gutierrez, in his Official<br>Capacity as Secretary of the U.S.<br>DEPARTMENT OF COMMERCE,<br>Office of the Secretary<br>Room 5852<br>14th Street and Constitution Ave., NW<br>Washington, DC 20230 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Conrad C. Lautenbacher, Jr.,<br>in his Official Capacity as<br>Administrator of the U.S.<br>NATIONAL OCEANIC AND<br>ATMOSPHERIC ADMINISTRATION,<br>Department of Commerce<br>Room 5128<br>14th Street and Constitution Ave., NW<br>Washington, DC 20230 | )    Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| James W. Balsiger, in his Official<br>Capacity as Acting Assistant<br>Administrator of the U.S.<br>NATIONAL MARINE FISHERIES<br>SERVICE<br>Department of Commerce<br>Room 14636<br>1315 East-West Highway<br>Silver Spring, MD 20910 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| **Defendants.** | )<br>) |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
## A TEMPORARY RESTRAINING ORDER AND/OR A PRELIMINARY INJUNCTION

Plaintiffs Scott Van Valin, Ken Dole, Larry McQuarrie, Rick Bierman, Edwin Haney,

Case Harris, Tom Ohaus, Carl "Chip" Porter, Patty Seaman, Theresa Weiser, and Donald

Westlund, through counsel, respectfully submit this memorandum of points and authorities in support of their Motion for a Temporary Restraining Order and/or a Preliminary Injunction.

## INTRODUCTION

This is an action for review of a final rule issued by the Secretary of Commerce through the National Marine Fisheries Service ("NMFS"), a division of the National Oceanic and Atmospheric Administration ("NOAA"), Department of Commerce ("Commerce"), published in the Federal Register on May 28, 2008. 73 Fed. Reg. 30504 (May 28, 2008). The final rule limits the harvest of Pacific halibut to one halibut per calendar day by guided sport charter vessel anglers in Area 2C (Southeast Alaska). The Secretary invoked the "good cause" exception in 5 U.S.C. § 553(d) to waive the 30-day period between publication and the effective date of the rule. The final rule became effective on Sunday, June 1, 2008, the fourth day after it was published in the Federal Register.

The Secretary of Commerce issued the final rule under the Northern Pacific Halibut Act of 1982 ("Halibut Act"), 16 U.S.C. §§ 773-773k. The halibut fishery is regulated by the International Pacific Halibut Commission ("IPHC"), a body established under the Convention between the United States and Canada for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea (the "Convention") which is responsible for the overall conservation of halibut stocks in the Pacific Ocean off the US and Canada, and by the Secretary of Commerce, who is responsible under the Halibut Act for allocation and management decisions affecting U.S. halibut fishermen. The Halibut Act is the U.S. domestic implementing legislation for the Convention. In addition to the authority granted the Secretary, the Halibut Act also provides that the North Pacific Fishery Management Council (the "Council") may recommend

allocation and management regulations for consideration by the Secretary of Commerce, but the Secretary is not required to pursue such recommendations, and any regulations recommended by the Council may be adopted only after approval by the Secretary. The final rule under review here was recommended by the Council.

The final rule does not address a resource conservation issue. All parties agree that halibut stocks are healthy, and the final rule expressly states that there are no conservation issues present. Instead, the sole issue addressed in the final rule is the allocation of fish between the charter sector and the commercial sector.

The stated purpose of the final rule "is to reduce the poundage of halibut harvested by the guided sport charter vessel sector in Area 2C to the GHL. . . ." 73 Fed. Reg. at 30505. The "GHL" referenced in the final rule is the Guideline Harvest Level, a target figure that was first adopted in 2003. *See* 68 Fed. Reg. 47256 (Aug. 8, 2003); 50 C.F.R. § 300.65(c). The GHL is not in itself a limitation on the amount of halibut the charter sector may harvest. The preamble to the 2003 GHL final rule stated, for example, that "[t]his final rule imposes no restrictions on the guided recreational fishery. . . ." 68 Fed. Reg. at 47259. Instead, the GHL was adopted as a historical benchmark against which the charter sector harvest could be monitored.

The 2003 GHL regulations did not make any finding, either in the regulatory language or in the preambles to either the proposed rule or the final rule, that the GHL or any future regulations limiting the charter sector harvest to the GHL would be "fair and equitable" under section 5(c) of the Halibut Act, 16 U.S.C. § 773c(c). The GHL regulations include a mechanism by which the GHL level may be adjusted downward if the IPHC reduces the constant exploitation yield ("CEY"), which is the total amount of halibut that may be harvested by all sectors of the fishery (commercial, charter, unguided sport, and subsistence) in a given

3

regulatory area in a given year. The GHL regulations do not, however, provide for the automatic implementation of management measures in the event of a change to the GHL. Any management measures, such as those challenged here, must be adopted separately.

The final rule is unlawful for several independent reasons, which are discussed in more detail in the merits section that begins on page 13. First, the Secretary failed to make a finding that the allocation of fish under the final rule is "fair and equitable" as is required by section 5 of the Halibut Act, and he could not have made such a finding on the record here. Second, the Secretary failed to follow the procedural rules set forth in the existing GHL regulations by setting harvest measures based on a future year GHL rather than on the GHL for a completed fishing year. In addition, the Secretary failed to address substantial and specific comments filed by Plaintiffs raising that issue. Finally, the Secretary unlawfully shortened the statutory 30-day notice period between the publication date and the effective date of the final rule to only four days.

## THE COURT HAS JURISDICTION TO GRANT THE REQUESTED RELIEF

This court has jurisdiction over this action under section 11 of the Halibut Act, which provides that "[t]he district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under this Act. Any such court may, at any time—(1) enter restraining orders or prohibitions; (2) issue warrants, process *in rem* or other process; (3) prescribe and accept satisfactory bonds or other security; and (4) take such other actions as are in the interest of justice." 16 U.S.C. § 773i(d). The final rule was published in the Federal Register on May 28, 2008, with an effective date of June 1, 2008. Plaintiffs' request for a temporary restraining order and/or preliminary injunction is therefore ripe for judicial review.

4

## PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER AND/OR A PRELIMINARY INJUNCTION

In determining whether to grant a temporary restraining order and/or a preliminary injunction, the Court must assess (1) the likelihood of success on the merits; (2) any irreparable injury to the plaintiff if preliminary relief is not granted; (3) any burden on others' interests from an injunction; and (4) the public interest in granting or denying relief. *See Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 35–36 (D.D.C. 2006) (citing *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)). Under a traditional equitable analysis, these factors interrelate on a sliding scale, and relief may be afforded "where there is a particularly strong likelihood of success of the merits even if there is a relatively slight showing of irreparable injury." *City Fed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see also Cuomo v. U.S. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985) (justifying injunction with "either a high probability of success and some injury, or *vice versa*.").

Because the irreparable harm, burden on the interests of others, and public interest factors are closely related, we address them first, followed by an analysis of the merits. Each of these factors weighs in Plaintiffs' favor.

### A.    Plaintiffs Will Be Irreparably Injured in the Absence of Injunctive Relief.

Courts have recognized that the requisite injury is present, and preliminary injunctive relief is appropriate, in cases where "time is of the essence." *See, e.g., United States v. BNS, Inc.*, 858 F.2d 456, 465 (9th Cir. 1988); *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982). Such is the case here. The Secretary published the final rule in the Federal Register on May 28, 2008, and it became effective just four days later on June 1, 2008. Because of the rule's immediate effectiveness, Plaintiffs will be irreparably harmed unless the Court acts

5

now, "when it [is] still possible to grant effective relief," and before "all opportunity to grant the requested relief [is] foreclosed." *Local Lodge No. 1266, Int'l Ass'n of Machinists and Aerospace Workers v. Panoramic Corp.*, 668 F.2d 276, 290 (7th Cir. 1981).

Plaintiffs all own and/or operate charter operations in Area 2C. All of the Plaintiffs rely on repeat customers, and several are lodge-based operators whose business models are built around multi-day anglers who come to Southeast Alaska for the sole or primary purpose of fishing. Plaintiffs have already suffered, and will continue to suffer, negative impacts now that the Secretary has adopted its one-fish daily limit for halibut in the final rule. As set forth in the affidavits attached to Plaintiff's comments to the agency (Exhibit 3 to the Complaint), the reality of the business is that sport anglers have booked for the 2008 year with the expectation of being able to retain two fish daily. As the affidavits attached as Exhibits 1-9 to this memorandum demonstrate, customers are already cancelling 2008 halibut bookings in Area 2C and moving their 2009 plans elsewhere for the sole reason that the rule restricts their daily catch to one fish. Those anglers are instead choosing to fish in other regulatory areas (which retain a two-fish daily limit for halibut), especially the adjacent Area 3A.

The evidence of serious and ongoing harm to Area 2C charter operators is irrefutable. Larry McQuarrie, an Area 2C lodge operator, states in his affidavit that 26 regular clients have already cancelled existing reservations for the 2008 season because of the one-fish limit, and that 10 additional clients chose not to book with his establishment for the same reason. The 26 cancellations alone represent a loss of $98,970.00 in gross revenues. *See* Exhibit 1. Scott Van Valin, also an Area 2C lodge operator, has already lost even more. Mr. Van Valin has had 40 regular clients cancel their 2008 reservations because of the one-fish rule. He has refunded $147,800.00 to those clients. Thirty-two additional regular clients have also declined to book

6

with Mr. Van Valin's lodge because of the one-fish rule. Mr. Van Valin states in his affidavit that he may have to close the family business that he has built over the last 21 years as a result of the Secretary's action. *See* Exhibit 2. Edwin Haney and Theresa Weiser, operating lodge and charter operations in Juneau and Sitka, had two and three clients cancel, for a loss of $7,100 and $8,257, respectively. *See* Exhibits 3 and 4.

The experiences of other Plaintiffs who just operate charter boats have been similar. Case Harris, an Area 2C charter boat operator, has had nine people cancel halibut trips for 2008 because of the final rule. He has refunded $7,500.00 in deposits to those clients. Eleven additional regular clients declined to book in the first place because of the final rule. Those clients told Mr. Case that they would fish instead in Area 3A, where they would be allowed to retain two halibut per day. *See* Exhibit 5. Donald Westlund's experience has been the same. He has had four clients cancel to date, and an additional twenty clients decline to book because of the one-fish rule. *See* Exhibit 6. Chip Porter has had eight clients cancel for 2008, with a resulting loss of $10,400. Mr. Porter has also had an additional four regular clients advise that they would not book with him this year because of the one-fish rule. Those lost bookings represent a loss of $5,200. *See* Exhibit 7.

The experiences of these Area 2C charter operators are corroborated by the affidavits of their colleagues and competitors in Area 3A, who have received bookings from clients lost by Area 2C operators. Rex Murphy states that he has booked three clients for this year who have told him that they have moved from Mr. McQuarrie's Area 2C Sportsman's Cove Lodge because of the one-fish rule. *See* Exhibit 8. Finally, Donna Bondioli has had three groups of fishermen book with her Area 3A business for the first time. Those new clients stated that they had moved from Area 2C to Area 3A because of the one halibut limit. Ms. Bondioli has also received a

7

2009 booking from a group that told her that they had regularly booked at Mr. Van Valin's El Capitan Lodge in Area 2C in the past, but had switched because of the one-fish limit. *See* Exhibit 9.

The losses already suffered by Plaintiffs, described above and in their respective affidavits, are more than adequate to demonstrate substantial and irreparable harm. It is nevertheless important to note that the harm is not limited to what is described above. In addition to the high likelihood of more cancellations as word of the final rule spreads, the losses to date have a greater ultimate impact than their (already high) dollar values would suggest. Specifically, despite the relatively high cost to the angler (and thus the large monetary contribution to the local economies supporting charter fishing), charter fishing operations are relatively low margin businesses. *See* Affidavits of Scott Van Valin and Ken Dole, attached as Exhibits 1 and 2 to the comments attached the Complaint. In addition to having low margins, these businesses tend to have high percentages of fixed overhead. That is, many of the operators' costs, such as boat loans, lodge mortgages, lodge fuel for heating and lighting, and vessel fuel costs, do not vary directly with the number of anglers served. That means that when revenues go down, costs remain high. In addition, because many operators have outstanding loans on their boats and, where applicable, lodges, it is not possible to "ride-out" a bad year or two and then return to the fishery. Loss of adequate revenue means foreclosure on vessel and lodge loans and therefore loss of the means to continue in or return to the business. Even if operators are not immediately driven out of business, these charter lodges and charter boat operators rely heavily on repeat customers. Clients lost to operations in other regulatory areas are not likely to be easily recovered. Under this combination of factors, a loss, for example, of 20 or 30 percent of annual revenues does not translate merely into a 20 or 30 percent loss of

annual profit. Instead, that percentage change in revenue can mean the difference between staying in business (and contributing directly and indirectly to the local and regional economy) and going out of business.

Finally, and equally significant, it is possible that the reductions in business for these charter operators in 2008 and later years will jeopardize their ability to continue in operation when a charter limited entry program is implemented (anticipated for 2010, *see* 73 Fed. Reg. 30508). Specifically, although the proposed rule for the charter halibut limited entry recommended by the Council will not be published by the Secretary until later this year, the plan as recommended by the Council would exclude charter operators from participating in the fishery in the future if they did not have a minimum number of successful halibut trips in a specified measuring period. Therefore, a loss of customers, and thus qualifying trips, in 2008 may translate into being excluded from the charter fishery in future years under the limited access regime recommended by the Council. *See* Exhibits 1-7 hereto. That potential harm grows with each day under the one-fish rule.

This Court has held that "economic loss may constitute irreparable harm where the loss threatens the very existence of the movant's business," *World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 67 (D.D.C. 2000), or "where plaintiff has made a showing that the economic loss would significantly damage its business above and beyond a simple diminution in profits." *Id.* This Court has also recognized that "admittedly economic" injury to a plaintiff amounts to irreparable harm if "no adequate compensatory or other corrective relief" could be provided at a later date. *Bracco Diagnostics v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997). *See also Hoffman Laroche Inc. v. Califano*, 453 F. Supp. 900, 903 (D.D.C. 1978) (where no other corrective relief is available, "it is not one of the 'mere' economic injuries which…are

insufficient to warrant a stay.") Here, Plaintiffs do not have a viable action at law against the Secretary for damages, because fishing limits are not property protected by the Fifth Amendment to the U.S. Constitution. Moreover, the harm threatens the very existence of their businesses, not just their profits.

Throughout the final rule, the Secretary has conceded the immediate and substantial harm that Plaintiffs will suffer, including the possibility that some charter operators will go out of business. For example, in response to a comment that the final rule "disproportionately affects multi-day lodge and charter operators while allowing [other operations] to continue," the Secretary agreed that the rule "may have greater adverse impacts on the lodge based sector." 73 Fed. Reg. at 30508. The final rule also states that "NMFS agrees that this action may have adverse impacts on charter businesses and that some may fail or leave the business." 73 Fed. Reg. at 30508. The Secretary also "acknowledges that independent or repeat tourists who book day vacations at lodges may consider the reduced halibut bag limit in their decision to book a vacation, along with considerations for alternative fishing or tourist opportunities that may be offered." 73 Fed. Reg. at 30507. Nevertheless, the Secretary concedes, "[o]ther than acknowledging the potential for lost business, as was done in the EA/RIR/IRFA, NMFS cannot forecast the probability or extent to which this might occur." 73 Fed. Reg. at 30508. As the attached affidavits describe in detail, there is no question that this harm has already occurred, and unless the court enjoins the final rule, Plaintiffs' harm will only get worse. If the Plaintiffs are to receive any meaningful relief in this action, the final rule must be enjoined now.

**B.    If Injunctive Relief is Granted, Others' Interests Will Not Be Substantially Burdened.**

In contrast to the serious, immediate, and irreparable harm to Plaintiffs' interests that will result if the final rule is not enjoined, the Secretary of Commerce certainly will not suffer any substantial injury if the final rule is preliminarily enjoined. The Secretary cannot be said to be "burdened" by a requirement that it comply with the law. The immediate relief Plaintiffs seek will require nothing more of the Secretary than what the law already requires. There is no harm, other than delay, that Defendants will suffer if the final rule is enjoined, and the Secretary is in no position to complain of delay. The proposed rule was released on December 31, 2007, and the public comment period closed on January 30, 2008. The Secretary did not release the final rule until almost four months later, on May 28, 2008, with an effective date four days later. In any event, the issue has been percolating for fifteen years (*see* 68 Fed. Reg. 47257). A temporary delay to give the Court sufficient time to review the merits of this case will not harm the Defendants. Case law in this Court has held that issuing an injunction is appropriate where the only injury to the defendant federal agency is delay. *See, e.g., International Long Term Care v. Shalala*, 947 F. Supp. 15, 20 (D.D.C. 1996) (delay in administrative process was inadequate basis for denying preliminary injunction); *DSE, Inc. v. United States*, 3 F. Supp. 2d 1464, 1472 (D.D.C. 1998); *Nat'l Treasury Employees Union v. U.S. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993).

Nor will the entry of preliminary injunctive relief harm any person involved in the commercial halibut fisheries. The total allowable catch for the commercial sector has already been fixed by the IPHC and the Secretary for the 2008 commercial season. *See* 73 Fed. Reg. 12280 (Mar. 7, 2008). Any change to this rule (and certainly only a temporary delay in its effectiveness) would have absolutely no affect on the allowable harvest for the commercial

sector in 2008, and, according to the EA/RIR/IRFA accompanying this rule, virtually none in 2009. *See* EA/RIR/IFRA at 73 (table 58).[1]

Finally, injunctive relief would not burden or harm any members of the general public. Although the Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied" and thus, "the balance of harms will usually favor the issuance of an injunction" to protect against such harm, *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987), the Secretary has expressly conceded that the final rule does not in any way implicate resource conservation concerns. The Secretary concluded that the final rule would not affect the health of the halibut stock or have any adverse impacts on the halibut resource. Instead, the final rule deals only with an allocation issue. *See* 73 Fed. Reg. at 30517-30518. As such, temporary injunctive relief will not result in any environmental injury.

### C.    The Public Interest Favors Injunctive Relief.

The public interest criterion for the issuance of a preliminary injunction is satisfied in this case. The D.C. Circuit has long recognized that "there is an overriding public interest…in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Authority v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977). Such adherence is all that Plaintiffs seek here. Likewise, it is axiomatic that an agency is required to follow Congressional mandates and its own regulations. *See Ballard v. Comm'r of Internal Revenue*, 544 U.S. 40, 59 (2005). Consequently, it is in the public interest that an agency be enjoined from acting unlawfully. *See, e.g., Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 66 (D.D.C. 2004) (noting a "substantial public interest" in ensuring that a federal agency "acts within the limits of

---

[1] The text of the EA/RIR/IRFA is available at http://www.noaa.fakr.gov/analyses/halibut/earirifra_1107.pdf

its authority"); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (1998) (affirming

preliminary injunction based in part on the public interest in the faithful execution of the laws);

*Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93 (5th Cir. 1992).

Finally, as noted above, to the extent that there is any concern that the final rule is

necessary to protect the halibut resource, the Secretary has conceded that the final rule deals only

with an allocation issue.  The final rule does not in any way implicate resource conservation

concerns.  The issuance of preliminary injunctive relief will not affect the health of the halibut

stock or have any adverse impacts on the halibut resource.  Thus, there are no environmental or

conservation issues in the public interest that are relevant in this case. *See supra* at p. 14.

Moreover, because the 2008 commercial allocation has already been set, the relief requested here

will not affect consumers' ability to purchase halibut.

    **D.**      **Plaintiffs are Likely to Succeed on the Merits.**

        **1.**      **The Final Rule Does Not Create a "Fair and Equitable" Allocation as Required by the Halibut Act.**

            **i.**   **The Final Rule Deals Solely With the Allocation of Fish Between Groups of Fishermen; It Is Not a Conservation Regulation.**

Section 5(c) of the Halibut Act provides in relevant part that: "[i]f it becomes necessary

to allocate or assign halibut fishing privileges among various United States fishermen, such

allocation shall be fair and equitable to all such fishermen, based upon the rights and obligations

in existing Federal law...and carried out in such manner that no particular individual,

corporation, or other entity acquires an excessive share of the halibut fishing privileges." 16

U.S.C. § 773c(c).  The final rule is purely an allocation measure; there are no resource

conservation issues involved.  Accordingly, the section 5(c) "fair and equitable" test is the only

relevant statutory standard.

The final rule relies upon the Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis[2] ("EA/RIR/IRFA") prepared by the Council for the proposition that "[t]his final rule is not expected to significantly impact the sustainability of the halibut stock." 73 Fed. Reg. at 30507. The EA/RIR/FRFA is most clear on that point, stating:

- "The environmental analysis (EA) concluded that none of the alternatives would affect the health of the halibut stock since the IPHC sets limits on total halibut removals. Regardless of the amount of halibut biomass taken by a sector, no adverse impacts on the halibut resource would be expected because the IPHC factors in most resource removals in the halibut stock assessment when setting annual catch limits." (EA/RIR/IRFA at page xi.)

- "The proposed alternatives will not have any effect on the halibut resource." (EA/RIR/IRFA at page xii.)

- "The exploitable biomass for the coastwise projection and Area 2C projection is expected to increase during the next ten years." (EA/RIR/IRFA at 14.)

- "The proposed alternatives address resource allocation issues. They would affect harvest levels and fishing practices of individuals participating in the charter halibut fishery, but not the health of the halibut stock." (EA/RIR/IRFA at 20.)

In addition, in response to Comment 81, which states: "There is a conservation issue," the Secretary responded: "NMFS disagrees." 73 Fed. Reg. at 30518.

### ii. The Secretary Made No Finding that the Allocation Set Forth in the Final Rule was Fair and Equitable, Nor Could He Have Done so on the Record Below.

Because the final rule deals only with the issue of the allocation of fish between the commercial sector and the charter sector, the Halibut Act's section 5(c) "fair and equitable" standard is the sole statutory touchstone for this final rule. There is no need to factor in resource conservation factors that might in a different case make the analysis more complex.

---

[2] *See* footnote 1 for cite to EA/RIR/IRFA.

14

Notwithstanding the fact that this is a one-issue rulemaking, the Secretary never made any finding with respect to the "fair and equitable" statutory allocation standard. Moreover, as noted above, the Secretary made no such finding when it adopted its GHL rules in 2003. That the Secretary did not make a "fair and equitable" allocation finding in 2003 is entirely understandable, because the 2003 GHL rules did not by themselves impose any harvest restrictions and therefore did not make any allocation of fish. That the Secretary did not make such a finding with respect to the final rule published five days ago, however, is incomprehensible, and is reversible error, because the *only* thing that final rule does is allocate halibut among classes of fishermen.

If the Secretary had performed an allocation analysis, he would have had to conclude that the allocation made by the final rule is not fair and equitable. By the agency's own determination, the rule "will be disruptive and may cause some clients to reconsider bookings," "may have greater adverse impacts on the lodge-based sector of the guided charter vessel sector," and "may have adverse impacts on charter businesses and that some may fail or leave the business." 73 Fed. Reg. at 30508. In this regard it is worth noting that the Secretary in June of 2007 expressly rejected an IPHC request for a two-month-long one-halibut daily limit because that measure would have imposed an unwarranted hardship on the charter industry. *See* 72 Fed. Reg. 30714-15 (June 4, 2007).

Plaintiffs do not argue that an allocation decision cannot impose hardship, and even crippling hardship, on one sector if the circumstances so require. Before such actions can be taken, however, if the statutory standard is to have any meaning, there must be a balancing of the relative harms and benefits to the classes of fishermen affected. Here, despite Plaintiffs' pointed written comments on this issue, the Secretary never even pretended to weigh the relative benefits

15

and burdens of the rule. The lack of that analysis is all the more troubling because the Council's

EA/RIR/IRFA (upon which the Secretary relies without independent analysis or comment)

demonstrates that maintenance of the status quo ante would have caused no adverse impact

whatsoever on the commercial halibut fleet or any other class of halibut fishermen in 2008, and

virtually none in 2009. *See* EA/RIR/IRFA at 73 (table 58). Only in 2010, the year in which the

current regulations are expected to be replaced with a more permanent allocation regime (*see* 73

Fed. Reg. at 30506, 30508-09; *but see* 73 Fed. Reg. at 30516), does the Council's analysis show

any negative impact from maintenance of the status quo on the commercial halibut sector. In

sum, then, the rule that the Secretary implicitly (by adopting it) offers as fair and equitable is one

that imposes potentially catastrophic economic impacts charter operators but that offers no

corresponding benefit to the commercial sector. The Secretary does not even attempt to address

these facts in the context of the statutory standard. Instead, it claims that it has done all of the

analysis that it could in light of a lack of economic data. 73 Fed. Reg. at 30516. That argument

is thin in 2008 given that the Council has been studying the issue of allocation between the

charter and commercial sectors since 1993. *See* 68 Fed. Reg. 47256, 47257 ("The Council has

discussed the expansion of the guided recreational halibut fishery since 1993".).

     Whatever the outer limits of what can be considered "fair and equitable" might be, the

final rule falls well outside that boundary, and is therefore contrary to the requirements of the

Halibut Act.

     2.     **The Final Rule Violates the Administrative Procedure Act.**

     i.  **The Rule is Contrary to Existing NMFS Regulations.**

     It is axiomatic that federal agencies must follow their own rules. *See, e.g., Ballard v.*

*Comm'r of Internal Revenue*, 544 U.S. 40, 59 (2005). Further, if an agency wishes to change its

rules, the APA requires that it must do so under a proper notice and comment procedure. *See* 5

U.S.C. § 553. As the D.C. Circuit has held,

> [I]t is elementary that an agency must adhere to its own rules and regulations. *Ad hoc* departures from those rules, even to achieve laudable aims, cannot be sanctioned, for therein lies the seeds of destruction of the orderliness and predictability which are the hallmarks of lawful administrative action. Simply stated, rules are rules, and fidelity to the rules which have been properly promulgated, consistent with applicable statutory requirements, is required of those to whom Congress has entrusted the regulatory missions of modern life.

*Reuters Ltd. v. FCC*, 781 F.2d 946, 950-51 (D.C. Cir. 1986) (citation omitted). *See also*

*Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986) (Scalia, J.)

("It is axiomatic that an agency must adhere to its own regulations . . .").

Quite apart from its failure (discussed above) to analyze whether the final rule is fair and

equitable as required by the Halibut Act, the rule is materially inconsistent with NMFS' own

regulations governing GHL-based management measures. *See* 50 C.F.R. § 300.65(c). In

adopting the final rule, the Secretary expressly relied upon its GHL regulations as the basis for

the rule, stating that "[t]he intended effect of this action is to reduce the poundage of halibut

harvested by the guided sport charter vessel sector in Area 2C to the GHL . . . ." 73 Fed. Reg. at

30505. The Secretary then goes on to provide a detailed discussion of the GHL mechanism, 73

Fed. Reg. at 30505-06, after stating (73 Fed. Reg. at 30505) that "[t]his final rule is linked to the

overall management of the halibut fisheries by the IPHC and a previous regulation approved by

the Secretary that establishes a guideline harvest level (GHL) for managing the guided sport

charter vessel fishery (August 8, 2003; 68 Fed. Reg. 47256)." The final rule is "linked" to IPHC

management only in that the GHL is tied to the IPHC's CEY calculation. The Secretary is

entirely correct, however, that the final rule is based on the existing GHL regulations. Having

chosen the GHL regulations as the basis for the regulations under review here, the Secretary

must follow those regulations.[3]  He has not, and the final rule is unlawful as a result of the agency's failure to follow its own regulations.

The nature of the agency's violation of its own regulations is straightforward.  The GHL regulations adopted in 2003 made it plain that any harvest restrictions that might be adopted with relation to the GHL would be adopted in the years *following* the year in which the GHL was exceeded, and that such harvest restrictions would be designed to prevent future harvests in excess of the GHL for the year that had been exceeded.  The GHL regulation as originally proposed by the Council would have set forth automatic harvest restrictions that would go into effect if triggered by a reduction in the GHL.  The Secretary advised the Council that that approach was not available under the APA, and described an alternative approach, which the Council in turn endorsed and the Secretary adopted as the GHL regulation in 2003.  The description of that deliberative process from the preamble to the 2003 final rule is instructive:

> The September 6, 2002, letter noted that the proposed rule could be approved only if it were changed to explicitly provide for an opportunity for public comment before implementing any harvest restrictions. *This change would increase the amount of time between when the GHL is exceeded and implementing any harvest restrictions*, because the APA rulemaking process would require an analysis of alternatives to the proposed harvest restrictions recommended by the Council under the requirements of . . . applicable laws.

68 Fed. Reg. at 47258 (emphasis added).

Earlier in the same preamble, the Secretary noted that: "Given the one-year lag between the end of the fishing season and availability of that year's harvest data, management measures in response to the guided recreational fleet's meeting or exceeding the GHL would take up to two years to become effective." *Id*. at 47257.  As these explanations demonstrate, the GHL

---

[3] The final rule does not change the GHL regulations.  As the agency states: "This rule was not designed to change either the 2008 GHL published in the Federal Register (73 FR 6709, February 5, 2008) or the GHL regulations at 50 C.F.R. 300.65. . . .  To change the GHL regulations would require separate rulemaking." 73 Fed. Reg. at 30512.

regulations are structured so that management measures may be implemented after the fact to address future harvests once it has become clear that a given year's GHL has been exceeded, and those measures are to be designed to match harvest to the GHL of the year in which the overage occurred. Thus, for example, in the proposed rule, NMFS noted (72 Fed. Reg. at 74259) that the Council's recommendation that became the final rule was based on "preliminary projections indicating that the 2006 charter harvest of halibut could be as much as 2.113 million pounds (958.4 mt) or 47 percent above the Area 2C GHL."[4]

Leaving aside whether proceeding on the basis of a projected harvest when the GHL regulations contemplate consideration of management measures only after the actual harvest numbers have been compiled, the Secretary's primary error here was to regulate to the 2008 GHL in order to address a 2006 overage. As discussed above, the GHL regulations are clear that management measures are to follow and address past GHL overages, not anticipate them. Accordingly, the acceleration of the process here to simultaneously lower the GHL (for 2008), anticipate an overage in that future fishing season, and set management measures for that season to meet the lowered GHL is materially different from the process set by the GHL regulations, under which management measures follow and react to – rather than anticipate – harvest levels and changes to the GHL.

Plaintiffs emphasize that they *do not* argue that the Secretary is without *statutory* authority to take forward-looking regulatory measures in anticipation of future conditions. To the contrary, the delegation of authority to the Secretary in the Halibut Act is broad, and there can be no doubt that, for example, the Secretary could act very quickly, arguably without notice,

---

[4] The actual 2006 harvest ended up being 1.804 million pounds, or 14.6 percent, less than the projection, and the harvest went down in 2007 as well. *See* EA/RIR/IRFA at Appendix IV at pp. 98, 100.

if there were a sudden or severe resource conservation issue. Plaintiffs' argument here is a much

narrower one. Having chosen the GHL regulations as the basis for the management measures in

the final rule, the Secretary must live within the system that those rules created.[5] That he has not

done, and that failure requires that the rule be set aside.

### ii. The Secretary Failed to Address Plaintiffs' Arguments in the Final Rule.

Agency action violates the APA whenever the agency "relied on factors which Congress

has not intended it to consider, entirely failed to consider an important aspect of the problem,

offered an explanation for its decision that runs counter to the evidence before the agency, or is

so implausible that it could not be ascribed to a difference in view or the product of agency

expertise."[6] In this case, NMFS "entirely failed to consider an important aspect of the problem,"

because NMFS failed to address Plaintiffs' argument that the final rule conflicts with the existing

GHL rules upon which it was based.

Plaintiffs' conspicuously and in detail made that argument on pages 4-10 of their

comments. *See* Exhibit 3 to the Complaint at 4-10. The Secretary expressly acknowledged the

comment at 73 Fed. Reg. at 30512 (Comment 49), but that response did not address the

substance of Plaintiffs' argument. Instead, the response was directed at adequacy of the public

---

[5] The fact that Plaintiffs do not argue that the Secretary is precluded from taking action outside of the GHL framework does not mean that the error alleged in the text is a minor or technical one. As discussed in the context of the Halibut Act's "fair and equitable" test for allocation regulations, the Secretary here appears to have tried to use the GHL numbers as a proxy for a fair and equitable determination. As discussed above, that attempt was legally insufficient, because the Secretary did not conduct a "fair and equitable" analysis when the 2003 GHL rule was adopted. Should the Secretary seek to re-impose the management measures set forth in the final rule after remand, he will be required to make that finding under any regulatory mechanism he might choose to employ.

[6] *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983).

notice for the proposed rule, something that is entirely different and that Plaintiffs did not

contest. The Secretary's response was a *non sequitur*, and his failure to address this central and

substantial issue from the most detailed and extensive set of comments filed in the rulemaking is

arbitrary and capricious. In light of the fact that the agency has not yet provided its substantive

view on this central issue, the Court may remand on that ground alone, and need not at this stage

address the merits of the argument that the final rule contravenes the GHL regulations.

### iii. The Secretary Does Not Provide Adequate Good Cause to Waive the 30-Day Delayed Effectiveness Requirement.

The APA provides that a substantive rule "shall be made not less than 30 days before its

effective date," 5 U.S.C. § 553(d). To waive the 30-day delayed effectiveness period, an agency

must show "good cause." *Id.* at 553(d)(3). The D.C. Circuit has held that "exceptions to § 553

must be narrowly construed and only reluctantly countenanced in order to assure that an

agency's decisions will be informed and responsive." *Asiana Airlines v. FAA*, 134 F.3d 393, 396

(D.C. Cir. 1998) (internal citations omitted). In determining whether good cause exists to waive

the 30-day delayed effectiveness rule, an agency should "balance the necessity for immediate

implementation against principles of fundamental fairness which require that all affected persons

be afforded a reasonable amount of time to prepare for the effective date of its ruling."

*Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996). This Circuit has admonished that

the good cause exception for the 30-day delayed effectiveness rule "should be limited to

emergency situations," and is "not [an] escape clause that may be arbitrarily utilized at the

agency's whim." *Am. Fed. Of Gov't Employees v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981).

Rather, its use is limited to "rare" circumstances, and "will be accepted only after the court has

'examine[d] closely proffered rationales justifying the elimination of public procedures.'"

21

*Council of Southern Mountains, Inc. v. Donovan,* 653 F.2d 573, 580 (D.C. Cir. 1981) (per curiam*)* (quoting *Block,* 655 F.2d at 1157 n.6).

NMFS provided two purported "good cause" justifications for waiving the 30-day delayed effectiveness rule under the APA: (1) the "intent of the Council would be thwarted" if the rule was not effective at the time of peak harvest (June, July, and August); and (2) a June 1 effective date would avoid industry confusion. *See* 73 Fed. Reg. at 30523. The "intent of the Council," unless adopted by the Secretary as his own and adequately explained – which did not occur here – is no reason at all to waive the 30-day delayed effectiveness rule in light of the fact that it is the Secretary, not the Council, that Congress has cloaked with rulemaking authority under the Halibut Act. In any event, the comment period closed nearly four months ago, and the bulk of the comments received were one or two page statements of a preferred outcome, without analysis. Failure to complete the rulemaking in time to provide the statutorily required notice does not under those circumstances constitute "good cause." With respect to the alleged confusion to be avoided by immediate implementation of the rule, the Secretary provides no explanation of how announcing a rule four days before it is to become effective will avoid confusion when anglers have booked fishing trips months or a year in advance on the basis of the existing rules. The proffered explanations are words devoid of any meaning.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order and/or a preliminary injunction should be granted.

Respectfully submitted,

John W. Butler (D.C. Bar No. 437370)
Robert K. Magovern (D.C. Bar No. 497862)
SHER & BLACKWELL LLP
1850 M Street, N.W.
Suite 900
Washington, DC 20036
(202) 463-2500 (Main)
(202) 463-2510 (Direct)
(202) 365-0059 (Cell)

Earl W. Comstock
COMSTOCK CONSULTING LLC
6225 30th Street, N.W.
Washington, DC 20015
(202) 255-0273

*Counsel for Plaintiffs*

23

# Northern Pacific Halibut Act of 1982

## Section 5(c); 16 U.S.C. § 773c. General responsibility

### (a) Secretary of Commerce

The Secretary shall have general responsibility to carry out the Convention and this subchapter.

### (b) Adoption of regulations; cooperation with Canadian officials

In fulfilling this responsibility, the Secretary—

**(1)** shall, in consultation with the Secretary of the department in which the Coast Guard is operating, adopt such regulations as may be necessary to carry out the purposes and objectives of the Convention and this subchapter; and

**(2)** may, with the concurrence of the Secretary of State, cooperate with the duly authorized officials of the Government of Canada.

### (c) Regional Fishery Management Council involvement

The Regional Fishery Management Council having authority for the geographic area concerned may develop regulations governing the United States portion of Convention waters, including limited access regulations, applicable to nationals or vessels of the United States, or both, which are in addition to, and not in conflict with regulations adopted by the Commission. Such regulations shall only be implemented with the approval of the Secretary, shall not discriminate between residents of different States, and shall be consistent with the limited entry criteria set forth in section 1853 (b)(6) of this title. If it becomes necessary to allocate or assign halibut fishing privileges among various United States fishermen, such allocation shall be fair and equitable to all such fishermen, based upon the rights and obligations in existing Federal law, reasonably calculated to promote conservation, and carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of the halibut fishing privileges: Provided, That the Regional Council may provide for the rural coastal villages of Alaska the opportunity to establish a commercial halibut fishery in areas in the Bering Sea to the north of 56 degrees north latitude during a 3 year development period.


APPENDIX

**AFFIDAVIT**

In the City of Ketchikan, State of Alaska, Larry Gardner McQuarrie, having been duly sworn under oath, deposes and says as follows:

1. My name is Larry Gardner McQuarrie and I am the owner and operator of Southeast Alaska Sportfishing Adventures, Inc, dba Sportsman's Cove Lodge, a charter fishing lodge with eight six-passenger boats located on Prince of Wales Island, Alaska. My mailing address is P.O. Box 8500, Ketchikan, AK 99901.

2. My business depends on taking recreational anglers fishing in Area 2C, as designated by the International Pacific Halibut Commission. I have been engaged in the charter fishing business in Area 2C for 25 years.

3. I have had at least 26 regular clients cancel charter fishing trips they had already booked with me for this year because of the one fish rule. This represented $98,970.00 in gross income to my business. I have had to refund $4,244.00 in deposits that these groups had already sent to me.

4. I have also had 10 regular clients decline to book with me for this year out of concern over the one fish rule. These clients told me that they were going to fish instead in other regulatory areas where the limit is still two halibut a day.

5. These regular clients represent a significant portion of my annual business. In addition to the harm caused to me from the loss of revenue, not having these clients could put me in jeopardy of some of my vessels not making enough halibut fishing trips this year to qualify for the charter fishing vessel moratorium that the National Marine Fisheries Service is expected to publish as a final rule by the end of this year.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

Dated this ___28th___ day of ___May___, 2008.

FURTHER AFFIANT SAYETH NAUGHT.

(SEAL)

> Notary Public
> **J. YOUNG**
> State of Alaska
> My Commission Expires 4/13/2010

_OWNER - CEO_
(Title)

I, _Jeanne Young_, a Notary Public of the City and State aforesaid, hereby certify that _Larry Gardner McQuarrie_ personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Exhibit 1

Witness my hand and official seal this the 28th day of May , 2008 .

(SEAL)

Notary Public
J. YOUNG
State of Alaska
My Commission Expires 4/13/2010

_____
Notary Public

My Commission expires:

4 / 13 / 10 .

## AFFIDAVIT

In the City of Craig, State of Alaska, Scott E. Van Valin, having been duly sworn under oath, deposes and says as follows:

1. My name is Scott E. Van Valin and I am the owner and operator of **El Capitan Lodge, LLC**, a charter fishing lodge with 6 boats located on Prince of Wales Island, Alaska. My address is **P.O. Box 1174, Craig, AK, 99921**.

2. My business depends on taking recreational anglers fishing in Area 2C, as designated by the International Pacific Halibut Commission. I have been engaged in the charter fishing business in Area 2C for 21 years.

3. I have 40 regular clients cancel charter fishing trips they had already booked with me for this year because of the one fish rule. I had to refund $147,800.00 these groups had already sent to me.

4. I have also had 32 regular clients decline to book with me for this year out of concern over the one fish rule. These clients told me that they were going to fish instead in other regulatory areas where the limit is still two halibut a day.

5. These regular clients represent a significant portion of my annual business. The harm caused to me from this loss of revenue has the potential to force us to end our family business of 21 years.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

Dated this ___28___ day of ___MAY___, 2008.

FURTHER AFFIANT SAYETH NAUGHT.

(SEAL )

_Owner - El Capitan Lodge, LLC_
(Title)

I, _Angelique M Collins_, a Notary Public of the City and State aforesaid, hereby certify that _Scott E Vanvalin_ personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Exhibit 2

Witness my hand and official seal this the ___28^th___ day of _May_, _2008_.

(SEAL)

_____
Notary Public

My Commission expires:

7 / 4 / 2009.

## AFFIDAVIT

In the City of Juneau, State of Alaska, Edwin Richard Haney, having been duly sworn under oath, deposes and says as follows:

1. My name is Edwin Richard Haney and I am the owner and operator of Lucky Dog Adventure LLC, A Bed & Breakfast and Charter Fishing & Sightseeing business in Juneau, Alaska.  My mailing address is 8438 N Douglas Hwy Juneau, AK  99801.

2. My business depends on taking recreational anglers fishing in Area 2C, as designated by the International Pacific Halibut Commission.  I have been engaged in the charter fishing business in Area 2C for 3 years.

3. I have had at least 2 clients cancel charter fishing trips they had already booked with me for this year because of the one fish rule. This represented $7100.00 in gross income to my business.

4.  I have also had 5 clients decline to book with me for this year out of concern over the one fish rule.  These clients told me that they were going to fish instead in other regulatory areas where the limit is still two halibut a day.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

Dated this ___29th___ day of ___MAY___, 2008.


FURTHER AFFIANT SAYETH NAUGHT.

(SEAL )

_Edwin Richard Haney_
_OWNER / PRINCIPAL_
(Title)


I, ___CELIA F. LUMBAB___, a Notary Public of the City and State aforesaid, hereby certify that ___EDWIN RICHARD HANEY___ personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the ___29th___ day of ___MAY___, ___2008___.


(SEAL)

_Celia F. Lumbab_
Notary Public


My Commission expires:

_04_
_05 / 25 / 2011_ .

STATE OF ALASKA
OFFICIAL SEAL
Celia F. Lumbab
NOTARY PUBLIC
My Commission Expires _04·25·2011_

Exhibit 3

## AFFIDAVIT

In the City and Borough of Sitka, State of Alaska, **Theresa Weiser**, having been duly sworn under oath, deposes and says as follows:

1. My name is Theresa Weiser and I am the owner and operator of **Alaska Premier Charters, Inc. / Wild Strawberry Lodge**, a charter fishing lodge operating six boats located on Baranof Island, in SE Alaska. My address is **P.O. Box 2300 / 724 Siginaka Way, Sitka, Alaska 99835.**

2. My business depends on taking recreational anglers fishing in Area 2C, as designated by the International Pacific Halibut Commission. I have been engaged in the halibut charter fishing business in Area 2C for 19 years.

3. I have three regular clients cancel charter fishing trips they had already booked with me for this year because of the one fish rule. I had to refund their deposit of $2,700 this group had already sent to me. A group of three canceling represents a total of **$8,257.50 in lost revenues**, which I was depending on.

4. I have also had 6 regular clients decline to book with me for this year out of concern over the one fish rule, and another group of four new clients deciding to go to Area 3A rather than book with us because of the one fish rule. They were all looking at a 3 Day/4 Night fishing lodging package in July or August 2008. All of these clients told me that they were going to fish instead in other regulatory areas where the limit is still two halibut a day. (See attached 2008 Rate Sheet for the value of lost revenues represented by clients declining to book with us and are going elsewhere because of the one fish rule.)

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

Dated this ____28th____ day of ____may____, 2008.

FURTHER AFFIANT SAYETH NAUGHT.

(SEAL )

_Theresa Weiser_
_owner / President_
(Title)

I, _Sara L. Russell_, a Notary Public of the City and State aforesaid, hereby certify that _Theresa Weiser_ personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the _28_ day of _May_, _2008_.

(SEAL)

_Sara L Russell_
Notary Public

My Commission expires _4 / 15 / 2011_

Exhibit 4



### Alaska Premier Charters, Inc.

**Wild Strawberry Lodge**

## 2008 FISHING PACKAGE RATES*

| 2 days / 3 nights | $1,435 |
| 3 days / 4 nights | $2,035 |
| 4 days / 5 nights | $2,625 |
| 5 days / 6 nights | $3,205 |
| 6 days / 7 nights | $3,775 |
| 7 days / 8 nights | $4,335 |

*There is a special meals and lodging rate of $135 per night, per person for Non-Fishing Guests traveling with a Fishing Guest. Special requests for alternative lodging can be arranged for an additional fee.*

## "BUDDY SPECIAL" SAVINGS

For certain times of the season, you and your Buddies will save 10% to 15%!

**10% Buddy Special savings** for fishing between June 1st–July 8th and Aug 24th–Aug 31st, 2008

**15% Buddy Special savings** for fishing all of May and September, 2008

BUDDY SPECIAL RATES

| | 10% Buddy Special | 15% Buddy Special |
|---|---|---|
| 2 days / 3 nights | $1,291 | $1,220 |
| 3 days / 4 nights | $1,831 | $1,730 |
| 4 days / 5 nights | $2,362 | $2,231 |
| 5 days / 6 nights | $2,884 | $2,724 |
| 6 days / 7 nights | $3,397 | $3,208 |
| 7 days / 8 nights | $3,901 | $3,685 |

**1-800-770-2628 • www.alaskapremier.net**



*Come Enjoy World Class Fishing and Genuine Alaskan Hospitality!*

## 2008 Fishing Packages Include:

- Courtesy transportation to and from the airport
- Fishing with an experienced USCG licensed Captain and crew
- All quality fishing equipment, tackle and bait
- Full rain gear and boots
- Fishing license
- Hot breakfasts, lunches and hearty evening meals featuring fresh seafood
- Clean and comfortable lodging accommodations with private baths
- Fish cleaning, vacuum packing, freezing and boxing of all your catch
- Seafood recipe booklet
- Wireless Internet access for your laptop computer
- Guest computers with Internet / Email access
- Courtesy laundry facility
- Genuine Alaskan Hospitality
- An Enjoyable and Memorable Alaskan Experience

*\* All rates are per person based on a minimum double occupancy. Package price does not include airfare, king salmon stamp, gratuities, dinner on arrival night, or applicable taxes. There is a 6% city sales tax of $60.00 maximum per person, or maximum per family.*

*(Prices and taxes subject to change without notice.)*

## BOOKING A RESERVATION:

A 50% deposit per person is required within 14 days of booking your reservation. Your final balance is due 30 days prior to your arrival. (Visa, MC, Discover, Amex accepted)

### ALASKA PREMIER CHARTERS, INC.
**Wild Strawberry Lodge**

Mail to:    P.O. Box 2300, Sitka, AK 99835
Ship to:    724 Siginaka Way, Sitka, AK 99835

Toll Free:    1-800-770-2628
Office:    (907) 747-3232
Fax:    (907) 747-3646

Email:    apcinc@ptialaska.net
Website:    alaskapremier.net
Website:    wildstrawberrylodge.com

**AFFIDAVIT**

In the City of Juneau, State of Alaska, **Case E. Harris**, having been duly sworn under oath, deposes and says as follows:

1. My name is Case Harris and I am the **owner and operator** of **Alaskan Marine Adventures, LLC**. Alaskan Marine Adventures is a charter sightseeing and sport fishing business operating one boat located in Juneau, Alaska. My address is **3072 Mountainwood Circle, Juneau, AK 99801**.

2. My business depends on taking recreational anglers fishing in Area 2C, as designated by the International Pacific Halibut Commission. I have been engaged in the charter fishing business in Area 2C for 5 years.

3. I have had 2 different groups of regular clients, totaling 9 people, cancel charter fishing trips they had already booked with me for this year because of the one fish rule. I had to refund the $7,500 these groups had already sent to me as a deposit.

4. I have also had 3 groups of regular clients, totaling 11 people, decline to book with me for this year out of concern over the one fish rule. These clients told me that they were going to fish instead Homer and Ninilchik, which are located in Area 3A, where the limit is still two halibut a day.

5. These regular clients represent a significant portion of my annual business. In addition to the harm caused to me from the loss of revenue, not having these clients could put me in jeopardy of not making enough halibut fishing trips this year to qualify for the charter fishing vessel moratorium that the National Marine Fisheries Service is expected to publish as a final rule by the end of this year.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

Dated this twenty-seventh day of May, 2008.

FURTHER AFFIANT SAYETH NAUGHT.

(SEAL )

Case E. Harris,
Owner, Alaskan Marine Adventures, LLC

I, ___James H. Herron___, a Notary Public of the City and State aforesaid, hereby certify that ___Case E. Harris___ personally known to me to be the affiant in the

Exhibit 5

foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the __27ᵗʰ__ day of __MAY__, __2008__.

(SEAL)

```
Notary Public
State of Washington
JAMES H HERRON
My Appointment Expires Aug 14, 2010
```

_____
Notary Public

My Commission expires:

__08__ / __14__ / __2010__.

## AFFIDAVIT

In the City of Ketchikan, State of Alaska, **Donald Edwin Westlund**, having been duly sworn under oath, deposes and says as follows:

1. My name is Donald Edwin Westlund and I am the owner and operator of **Silver King Charthers**, a charter fishing boat that operates out of Ketchikan, Alaska. My address is **15065 Lizzie Lane Ketchikan Alaska**.

2. My business depends on taking recreational anglers fishing in Area 2C, as designated by the International Pacific Halibut Commission. I have been engaged in the charter fishing business in Area 2C for 22 years since 1986.

3. I have had One group of four regular clients cancel a four day charter fishing trip they had already booked with me for this year because of the one fish rule.

4. I have had Five groups of four regular clients that have fish four days, decline to book with me for this year out of concern over the one fish rule. Some of these clients told me that they were going to fish instead in Homer Alaska where the limit is still two halibut a day. Last year I had Two groups go to Homer out of concerns of a one fish limit

5. These regular clients represent a significant portion of my annual business. In addition to the harm caused to me from the loss of revenue, not having these clients could put me in jeopardy of not making enough halibut fishing trips this year to qualify for the charter fishing vessel moratorium that the National Marine Fisheries Service is expected to publish as a final rule by the end of this year.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

Dated this ____28 TH____ day of ____MAY____, 2008.

FURTHER AFFIANT SAYETH NAUGHT.

(SEAL )

_Donald Edwin Westlund_

_____
(Title)

I, _LISA V. LORENZO_, a Notary Public of the City and State aforesaid, hereby certify that _Donald Edwin Westlund_ personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having

Exhibit 6

been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the _____28th_____ day of _____May_____, _____2008_____.

OFFICIAL S E A L
LISA V. LORENZO
(SEAL)C, STATE OF ALASKA
MISSION EXPIRES 3/9/2010

_____Lisa V. Lorenzo_____
Notary Public

My Commission expires:

_3_ / _9_ / _2010_.

## AFFIDAVIT

In the City of Ketchikan, State of Alaska, Carl Hyres Porter, having been duly sworn under oath, deposes and says as follows:

1. My name is "Chip" Porter and I am the owner and operator of Chip Porter Charters, a charter fishing operation with one six-passenger boat located in Ketchikan, Alaska. My mailing address is P.O. Box 7844, Ketchikan, AK 99901.

2. My business depends on taking recreational anglers fishing in Area 2C, as designated by the International Pacific Halibut Commission. I have been engaged in the charter fishing business in Area 2C for 20 years.

3. I have had 8 regular clients cancel charter fishing trips they had already booked with me for this year because of the one fish rule. These clients represented income to my business of approximately $10,400.

4. I have also had 4 regular clients decline to book with me for this year out of concern over the one fish rule, representing a loss in gross revenue of $5,200. These clients told me that they were going to fish instead in other regulatory areas where the limit is still two halibut a day.

5. These regular clients represent a significant portion of my annual business. In addition to the harm caused to me from the loss of revenue, not having these clients could put me in jeopardy of some of my vessels not making enough halibut fishing trips this year to qualify for the charter fishing vessel moratorium that the National Marine Fisheries Service is expected to publish as a final rule by the end of this year.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

Dated this _28th_ day of _May_, 2008.

FURTHER AFFIANT SAYETH NAUGHT.

(SEAL)
```
Notary Public
J. YOUNG
State of Alaska
My Commission Expires 4/13/2010
```

_____
OWNER / OPERATOR
(Title)

I, _Jeanne Young_, a Notary Public of the City and State aforesaid, hereby certify that _Chip Porter_ personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Exhibit 7

Witness my hand and official seal this the $\underline{28th}$ day of $\underline{May}$, $\underline{2008}$.

(SEAL)

Notary Public
J. YOUNG
State of Alaska
My Commission Expires 4/13/2010

_____
Notary Public

My Commission expires:

$\underline{04}$ / $\underline{13}$ / $\underline{10}$.

**AFFIDAVIT**

In the City of Homer, State of Alaska, Rex Byrd Murphy having been duly sworn under oath, deposes and says as follows:

1. My name is Rex Byrd Murphy and I am the owner and operator of Winter King Charters, a charter fishing business located in Homer, Alaska. My address is P.O. Box 3309, Homer, AK 99603.

2. My business depends on taking recreational anglers fishing in Area 3A, as designated by the International Pacific Halibut Commission. I have been engaged in the charter fishing business in Area 3A for 6 years.

3. I have had three people who told me they regularly fish for halibut in Area 2C book fishing trips with me this summer in Area 3A. These people have told me the reason they have switched from Area 2C to Area 3A is because of concern over the one fish rule.

4. The booking these people made with me totals 12 angler days. The location where these people told me they regularly booked in Area 2C is Sportsman's Cove Lodge in Ketchikan, Alaska.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

Dated this ____27th____ day of ____May____, 2008.


FURTHER AFFIANT SAYETH NAUGHT.                     _____Rex B Murphy_____

(SEAL )                                            _____Owner_____
                                                           (Title)


I, ____Lucinda M Eckert____, a Notary Public of the City and State aforesaid, hereby certify that ____Rex B. Murphy____ personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the ____27th____ day of ____May____, 2008 .

```
OFFICIAL SEAL
STATE OF ALASKA
LUCINDA M. ECKERT
(SEAL)  NOTARY PUBLIC
My Comm. Exp.:
```
                                                   _____
                                                        Notary Public

My Commission expires:

___3_/_29_/_2010___ .

Exhibit 8

**AFFIDAVIT**

In the City of Homer, State of Alaska, Donna Clancy Bondioli having been duly sworn under oath, deposes and says as follows:

1. My name is Donna Bondioli and I am a Partner of Captain B's Alaskan C's Adventures, a charter fishing company, located in Homer, Alaska. My address is 260 Whispering Meadows, PO Box 66, Homer, Alaska 99603.

2. My business depends on recreational anglers who fish in Area 3A, as designated by the International Pacific Halibut Commission. I have been engaged in the charter fishing business in Area 3A for twelve years.

3. I had 3 groups of fishermen call me to book 2008 fishing trips in Area 3A, coming to 3A for the first time. They told me they have fished regularly for years for halibut in Area 2C., but have switched to Area 3A is because of concern over the one fish rule.

4. One group of Fishermen booked with me for July, 2009. The location where these people told me they regularly booked in Area 2C is El Capitan Lodge on Prince of Wales Island, Alaska. They have chosen to come to 3A to fish next year instead of 2C because of their concern over the one fish rule.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

Dated this _May 27_ day of _May_, 2008.

FURTHER AFFIANT SAYETH NAUGHT.

(SEAL )

_Donna Clancy Bondioli_
_Partner_
(Title)

I, _Zetta Koontz_, a Notary Public of the City and State aforesaid, hereby certify that _Donna Clancy Bondioli_ personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says that the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the _27th_ day of _May_, _2008_.

(SEAL)



_Zetta Koontz_
Notary Public

My Commission expires:

_11 / 11 / 2011_.

Exhibit 9

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, et al.<br><br>      **Plaintiffs,**<br>   v.<br><br>Carlos M. Gutierrez, in his Official<br>Capacity as Secretary of the U.S.<br>DEPARTMENT OF COMMERCE,<br>Office of the Secretary<br>Room 5852<br>14th Street and Constitution Ave., NW<br>Washington, DC 20230<br><br>Conrad C. Lautenbacher, Jr.,<br>in his Official Capacity as<br>Administrator of the U.S.<br>NATIONAL OCEANIC AND<br>ATMOSPHERIC ADMINISTRATION,<br>Department of Commerce<br>Room 5128<br>14th Street and Constitution Ave., NW<br>Washington, DC 20230<br><br>James W. Balsiger, in his Official<br>Capacity as Acting Assistant<br>Administrator of the U.S.<br>NATIONAL MARINE FISHERIES<br>SERVICE<br>Department of Commerce<br>Room 14636<br>1315 East-West Highway<br>Silver Spring, MD 20910<br><br>      **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. _____ |

## ORDER

The Court, having considered Plaintiffs' Motion for a Temporary Restraining Order

and/or a Preliminary Injunction, concludes that Plaintiffs have demonstrated a likelihood of

success on the merits of their claims that the final rule adopted by NMFS is in violation of the

24

Halibut Act and the Administrative Procedure Act. The Court also finds that Plaintiffs have demonstrated that the balance of harms tips in favor of a stay because Plaintiffs would suffer irreparable harm if the rule is implemented, while neither commercial halibut fishermen, the public, nor Defendants would suffer harm from a delay in the implementation of the rule pending consideration of Plaintiffs' claims.

Accordingly, Plaintiffs' Motion should be and hereby is **GRANTED.** It is further **ORDERED** that, pending a hearing on whether a preliminary injunction should issue, Defendants, and their officers, agents, employees, and attorneys, are hereby **ENJOINED AND RESTRAINED** from giving any effect to or otherwise taking any action to implement the Final Rule adopted by the Secretary of Commerce through the National Marine Fisheries Service entitled "Pacific Halibut Fisheries; Guided Sport Charter Vessel Fishery for Halibut" that was published at 73Fed. Reg. 30504 (May 28, 2008).

The hearing on Plaintiffs' Motion for a Preliminary Injunction will be held on

_____, 2008, at _____.

SO **ORDERED**.

Entered this _____ day of _____, 2008.


_____

UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of June, 2008, a true and correct copy of the foregoing Complaint, Motion for a Temporary Restraining Order and/or a Preliminary Injunction, and Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order and/or a Preliminary Injunction were served on the following individuals by first class mail, and, where indicated, also electronically:

The Hon. Michael B. Mukasey
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001
(202) 514-2001

Ronald J. Tenpas
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Law & Policy Section
P.O. Box 4390
Ben Franklin Square
Washington, DC 20044-4390
(202) 514-2701
(also served electronically)

Seth Barsky
Assistant Chief Wildlife Section
U.S. Department of Justice
Environment and Natural Resources Division
Law & Policy Section
P.O. Box 4390
Ben Franklin Square
Washington, DC 20044-4390
(202) 305-0223
(also served electronically)

Carlos M. Gutierrez,
Secretary
U.S. Department of Commerce
Office of the Secretary, Room 5852
14th Street and Constitution Ave., NW
Washington, DC 20230
(202) 483-2112

David K. Bowsher
Acting General Counsel
U.S. Department of Commerce
Herbert C. Hoover Building
Mail Stope 5875
14th & Constitution Avenue, NW
Washington, DC 20230
(202) 482-4772

Conrad C. Lautenbacher, Jr.,
Administrator
National Oceanic and Atmospheric Administration
Department of Commerce, Room 5128
14th Street and Constitution Ave., NW
Washington, DC 20230
(202) 482-3436

Jane C. Luxton
General Counsel
U.S. Department of Commerce
National Oceanic and Atmospheric Administration
Room 5814
14th & Constitution Avenue, N.W.
Washington, DC 20230
(202) 482-4080
(also served electronically)

Dr. James W. Balsiger
Acting Assistant Administrator
U.S. Department of Commerce
National Marine Fisheries Service
Room 14636
1315 East-West Highway
Silver Spring, MD 20910
(301) 713-2239 ext. 103
(also served electronically)

Joyce M. Baker

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTT VAN VALIN, et al.**<br><br>     **Plaintiffs,**<br>   **v.**<br><br>**Carlos M. Gutierrez, in his Official**<br>**Capacity as Secretary of the U.S.**<br>**DEPARTMENT OF COMMERCE,**<br>**Office of the Secretary**<br>**Room 5852**<br>**14th Street and Constitution Ave., NW**<br>**Washington, DC 20230**<br><br>**Conrad C. Lautenbacher, Jr.,**<br>**in his Official Capacity as**<br>**Administrator of the U.S.**<br>**NATIONAL OCEANIC AND**<br>**ATMOSPHERIC ADMINISTRATION,**<br>**Department of Commerce**<br>**Room 5128**<br>**14th Street and Constitution Ave., NW**<br>**Washington, DC 20230**<br><br>**James W. Balsiger, in his Official**<br>**Capacity as Acting Assistant**<br>**Administrator of the U.S.**<br>**NATIONAL MARINE FISHERIES**<br>**SERVICE**<br>**Department of Commerce**<br>**Room 14636**<br>**1315 East-West Highway**<br>**Silver Spring, MD 20910**<br><br>     **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. _____<br>)<br>)<br>)   **PLAINTIFFS' LOCAL RULE 65.1**<br>)   **CERTIFICATE OF COUNSEL**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' LOCAL RULE 65.1 CERTIFICATE OF COUNSEL

Pursuant to Local Rule 65.1, Plaintiffs hereby certify that, as set forth in the

accompanying Motion for a Temporary Restraining Order and/or a Preliminary Injunction,

Plaintiffs' undersigned counsel has by telephone provided advance notice of Plaintiffs' intention to file this motion to: (1) the office of Assistant Attorney General Ronald J. Tenpas, who is in charge of the Environment and Natural Resources Division at the U.S. Department of Justice (spoke with Seth Barsky), (2) Jane C. Luxton, General Counsel for the National Oceanic and Atmospheric Administration ("NOAA"), and (3) Dr. James W. Balsiger, Acting Assistant Administrator for NOAA and the Administrator of the National Marine Fisheries Service. Plaintiffs' counsel furnished these individuals with an electronic copy of the Complaint, this motion, and all supporting papers on June 2, 2008, and indicated that all subsequent pleadings will be furnished to these individuals as soon as they are filed with the Court, either through the Court's electronic filing system (if Defendants have entered a formal appearance), or through other expeditious means.

Respectfully submitted,

John W. Butler (D.C. Bar No. 437370)
Robert K. Magovern (D.C. Bar No. 497862)
SHER & BLACKWELL LLP
1850 M Street, N.W.
Suite 900
Washington, DC 20036
(202) 463-2500 (Main)
(202) 463-2510 (Direct)
(202) 365-0059 (Cell)

Earl W. Comstock
COMSTOCK CONSULTING LLC
6225 30th Street, N.W.
Washington, DC 20015
(202) 255-0273

*Counsel for Plaintiffs*

2