UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SCOTT VAN VALIN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>THE HONORABLE CARLOS GUTIERREZ, in his official capacity as the Secretary of Commerce, et al.,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 08-cv-00941<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FEDERAL DEFENDANTS' SUPPLEMENTAL BRIEF
IN SUPPORT OF ITS OPPOSITION TO PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

As requested by the Court at oral argument on June 4, 2008, Defendants Carlos Gutierrez, in his official capacity as the U.S. Secretary of Commerce, Conrad C. Lautenbacher, Jr., in his official capacity as Administrator of the U.S. National Oceanic and Atmospheric Administration, and James W. Balsinger, in his official capacity as the Acting Assistant Administrator of the U.S. National Oceanic and Atmospheric Administration (collectively referred to as "Federal Defendants"), hereby submit the following supplemental brief in support of their opposition to Plaintiffs' Motion for a Temporary Restraining Order.

**I. INTRODUCTION**

As explained more fully below, Plaintiffs are patently wrong to assert that the National Marine Fisheries Service ("NMFS") acted unlawfully in implementing management measures to reduce the harvest of Pacific halibut by the charter fishing sector to the 2008 guideline harvest

level ("GHL").  As such, Plaintiffs have failed to meet their heavy burden of showing a likelihood of success on the merits of their case necessary to warrant the extraordinary remedy of a temporary restraining order.  Plaintiff's motion therefore should be denied.

## II. ARGUMENT: Plaintiffs Are Not Likely to Succeed on the Merits of Their Claims.

### A. NMFS Acted in Full Compliance with its Regulations.

As explained in Federal Defendants' opposition to Plaintiffs' motion for a temporary restraining order (Fed. Defs' Br. at 18), the regulation that determines how the annual GHL is determined (the "GHL Policy") is found at 50 C.F.R. § 300.65.  The final rule promulgating the GHL Policy was published in 2003 and was "necessary to allow NMFS to manage more comprehensively the Pacific halibut stocks in waters off Alaska."  68 Fed. Reg. 47256 (Aug. 8, 2003).  In particular, harvests by the guided recreational fishery historically had been "unrestricted" within the constant exploitation yield ("CEY").  *Id*. at 47257.  This unrestricted harvest equated to "an open-ended allocation to the guided recreational fishery from quota available to the commercial halibut fishery."  *Id*.[1]  When NMFS published the proposed rule for the GHL Policy, it received 228 letters in support and 12 in opposition.  *Id*. at 47260.  The preamble to the final rule explains that "[t]he principal reasons given for supporting the proposed rule in these letters were that it would: (1) *Establish an equitable allocation between sport and commercial harvests*; (2) Provide additional security for commercial fishermen who have invested in the IFQ Program and believe that they should be provided a stable percentage of the

---

[1] As Federal Defendants explained in their opposition (Fed. Defs' Br. at 6-7), the maximum catch, or "fishery CEY," for a management area's directed commercial fixed gear fishery is established by the International Pacific Halibut Commisssion ("IPHC") by subtracting estimates of all non-commercial removals (sport, subsistence, bycatch, and wastage) from the total CEY. Thus, as non-commercial uses increase their proportion of the total CEY, the commercial fishery's use of the resource decreases.

total halibut resource; and (3) Provide a control on guided recreational fishery harvests in nearshore waters that are used by smaller commercial vessels." *Id*. (emphasis added). The GHL Policy does not establish specific harvest restriction measures, but rather is a tool that is used to provide an annual benchmark for monitoring the charter vessel fishery relative to the commercial fishery and other sources of fishing mortality. The GHL Policy has only three "regulatory effects," which are to: (1) establish how the GHL is determined; (2) require the publication of the GHL on an annual basis; and (3) require NMFS to notify the Council if the GHL is exceeded. 50 C.F.R. § 300.65(c)(1)-(3). Management measures – such as the regulations at issue in this case – are implemented by NMFS pursuant to the Halibut Act after undergoing notice and comment rulemaking. 68 Fed. Reg. at 47257. The authority to issue management measures in no way originated with or is restricted by the GHL Policy.

In this case, NMFS clearly complied with its regulations, the Halibut Act, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Based on the 2008 CEY, NMFS determined the GHL for 2008 and published it in the Federal Register. *See* 73 Fed. Reg. 6709 (Feb. 5, 2008) (notice of determination of 2008 GHLs). Because there was a 4.3 million pound reduction from the 2007 total CEY in 2008, it triggered a three-step reduction in the GHL for Area 2C, to 931,000 pounds. *Id*. With the commercial sector having had its amount of halibut reduced in 2008, it was incumbent upon NMFS to respond to the Council's request to hold the guided recreational fishery to its established GHL for 2008. Indeed, it would hardly be considered fair and equitable to the commercial sector to have its share of the halibut harvest reduced while the guided recreational sector was allowed to harvest the same amount as previous

years, or even more.[2]  Therefore, pursuant to NMFS' authority under the Halibut Act, the agency underwent an open and transparent rulemaking process to develop regulations that would limit the harvest of Pacific halibut by guided sport charter vessel anglers to the 2008 GHL, publishing a proposed rule on December 31, 2007 (72 Fed. Reg. 74257), and after accepting public comment, a final rule on May 28, 2008 (73 Fed. Reg. 30504).

      The Court specifically has asked, whether if NMFS decided to use a GHL as a management target, it must necessarily use only past GHLs as management targets instead of the current, 2008, GHL.  Plaintiffs argue that because the 2003 rule does not establish the GHL as a target, but instead as a notice tool, that NMFS either cannot manage to the GHL or that it can only manage to past GHLs after data has indicated that such a past GHL was exceeded.  Plaintiffs argument is faulty on several fronts.  First, there is nothing in the actual text of the GHL Regulation, as set forth in 50 C.F.R. § 300.65, that constrains NMFS' ability to implement any restrictions on the allowable harvest of halibut from any sector.  The GHL regulation simply sets forth NMFS' duties to publish a notice establishing the GHL for Area 2C within 30 days of receiving the Commission's CEY.  *Id*. at § 300.65(i)(2).  Additionally, the GHL regulation provides that NMFS shall notify the Council if a GHL has been exceeded within thirty days of receiving such information.  *Id*. at § 300.65(i)(3).

---

[2] It is worth noting that the halibut regulations at issue allow recreational fishermen to retain one fish of any size.  In 2007, NMFS allowed a limit of two fish; one could be of any size, but the second fish had to be 32 inches or less in length.  As such, the only difference in the current regulations from 2007's 2-fish bag limit is that recreational fishermen may not keep a second small fish (*i.e.*, 32 inches or less).  Furthermore, the 2008 regulations speak only to what a fisherman can keep – there is no limit on how many halibut a fisherman may catch.  As such, the recreational fishermen's opportunity to fish is not being compromised, only what they may keep.

Notably, the regulation omits any discussion of the implementation of any management measures, including when or how NMFS may use the GHL as a tool or target for management. Ignoring that the 2003 GHL Policy serves only to establish the GHL and to provide notification procedures between NMFS and the Council, Plaintiffs argue that language in the preamble constrains NMFS' ability to use the GHL as a management tool. Plaintiffs cite irrelevant language in the preamble in an attempt to create a regulatory prohibition where no such prohibition exists. The Court should decline to read this illusory restriction into the 2003 regulation.

Indeed, Plaintiffs are patently wrong to assert that NMFS violated, or acted inconsistently with any rule or regulation by implementing management measures with a proactive goal of meeting and not exceeding the 2008 GHL. Pls' Br. at 16-21. Plaintiffs are wrong for several reasons. First, Plaintiffs' assertion has no support in any statutory or regulatory text. There is nothing in the Halibut Act or in agency rules or regulations that prohibit NMFS from taking steps to minimize the harvest of halibut by any sector of the fishery. Indeed, the Secretary has broad authority under the Halibut Act to "adopt such regulations as may be necessary to carry out the purposes and objectives of the Convention and this subchapter."[3] 16 U.S.C. § 773c(b)(2). Plaintiffs do not dispute the existence of this broad statutory authority. Pls' Br. at 20. For example, if there was a sudden crash in the halibut population, NMFS would be empowered to impose necessary management measures to protect the halibut resource.

In implementing the GHL Policy, the Secretary did not constrain its authority under the

---

[3] In fact, had the 2008 CEY triggered an increase in the GHL for 2008, it is doubtful that Plaintiffs would contend that the agency is precluded from managing the charter sector to that higher GHL.

Halibut Act. Plaintiffs argue to the contrary by relying exclusively on a selective and constrained reading of the preamble to the GHL Policy in the Federal Register. *See* Pls' Br. at 18 (citing 68 Fed. Reg. at 47257-58). As an initial matter, reliance on the preamble in the Federal Register rather than regulations that are codified in the Code of Federal Regulations is in error. A preamble is nonbinding, explanatory material with no independent legal effect. In any event, Plaintiffs' assertion (Pls' Br. at 19) that NMFS is precluded from managing to the 2008 GHL seriously misrepresents what is explained in the preamble.

The preamble clearly explains that the GHL Policy was not intended to prevent the Council from recommending management measures before the guided recreational fishery exceeds a GHL:

> This final rule establishes a GHL policy which specifies a level of harvest for the guided recreational fishery. If the GHL is exceeded, then NMFS will notify the Council within 30 days of receiving information that the GHL has been exceeded. At that time the Council may initiate analysis of possible harvest restrictions and NMFS may initiate subsequent rulemaking to reduce guided recreational harvests. This final rule does not establish specific harvest restrictions for the guided recreational fishery. *This final rule does not prevent the Council from recommending management measures before the guided recreational fishery exceeds a GHL*, nor does it obligate the Council to take specific action if the GHL is exceeded. Under this GHL policy, NMFS would notify the Council if a GHL for the guided recreational harvests has been met or exceeded.

68 Fed. Reg. at 47257 (emphasis added).

It certainly was contemplated that an exceedance of the GHL could be grounds for subsequent regulatory or management measures. *See* 68 Fed. Reg. 47258 ("In other words, this final rule would establish the GHL policy and require NMFS to notify the Council when a GHL is exceeded, which could serve as a trigger for subsequent rulemaking"). Nonetheless, the decision to manage to a target other than a past GHL, including a target that happens to be the current GHL, is not foreclosed by this, or any other, language in the preamble or text of the

5

proposed rule.

Plaintiffs' sole support for their assertion is selective citations to the preamble, which confuse and misconstrue the GHL Policy. Plaintiffs cite the language in the preamble to the GHL Policy that discusses the "delay" period between when the GHL is exceeded and implementing any harvesting restrictions. Pls' Br. at 18 (citing 68 Fed. Reg. at 47258). The text cited by Plaintiffs from the preamble explains that *using notice and comment rulemaking* would increase the time it takes to get a management measure in place, *not* because – as Plaintiffs assert – there is any statutory or regulatory requirement that the Council and NMFS must await harvest numbers for past GHL overages:

> The September 6, 2002, letter noted that the proposed rule could be approved *only if it were changed to explicitly provide for an opportunity for public comment* before implementing any harvest restrictions. This change would increase the amount of time between when the GHL is exceeded and implementing any harvest restrictions, *because the APA rulemaking process would require an analysis of alternatives to the proposed harvest restrictions recommended by the Council under the requirements of the Regulatory Flexibility Act, the National Environmental Policy Act, Executive Order (E.O.) 12866 (which requires a Regulatory Impact Review), and other applicable laws.*

68 Fed. Reg. at 47258 (emphasis added).

This language, however, is not at all related to the situation we find in this case. That discussion was a specific comment regarding why NMFS decided to discard the automatic management measures from the proposed rule in passing the final rule.[4] In that discussion, NMFS explained that management measures could not automatically be triggered when a GHL was exceeded because to do so would not comport with the APA's rulemaking principles. This

---

[4] The preamble to the 2003 GHL Policy devotes significant text to explaining the agency's departure from the proposed rule. The final rule declined to adopt automatic management measures that the Council had proposed initially.

6

discussion of delay, does not, as Plaintiffs argue, mean that every management measure must based on a past GHL.  Rather, it simply observes that any management measure based on a past GHL would likely be delayed because of required APA notice and comment rulemaking.  Again, this language says nothing regarding a situation where NMFS might decide the appropriate management scheme is to manage in a proactive manner to meet the current year's GHL.  Plaintiffs therefore clearly are wrong to argue that the passage above from the preamble to the GHL Policy – or the GHL Policy itself, for that matter – prohibits NMFS and the Council from taking action to regulate the guided recreational fishery to its 2008 GHL. The only effect of this language is to explain why the automatic management measures were not adopted.  This language does not, as Plaintiffs argue, bind NMFS to manage harvest levels using only past GHLs.  This language in no way curtails NMFS' discretion to manage to the 2008 GHL or, for that matter, any other harvest level supported by the record.

In sum, NMFS lawfully followed its rules found at 50 C.F.R. § 300.65 and acted consistently with the explanation of the GHL Policy found in its preamble.  NMFS determined the GHL for 2008 and published it in the Federal Register.  *See* 73 Fed. Reg. 6709.  There is no dispute that NMFS has notified the Council each time the charter fishery has exceeded the GHL since 2003.  These are the only requirements of the regulations.  Pursuant to NMFS' authority under the Halibut Act, the agency conducted formal rulemaking in accordance with the requirements of the APA to limit the harvest of Pacific halibut by the charter sector in 2008 to the 2008 GHL.  There is nothing in NMFS' rules that require the agency to make a determination that the guided recreational fishery exceeded their 2008 GHL before NMFS can regulate it to the 2008 GHL.  What the agency rules and federal law require is that NMFS use notice and comment rulemaking to implement management measures, which it did in this case.  For these

reasons, Plaintiffs have no likelihood of prevailing on the merits of their case, and as such they have failed to carry their heavy burden of demonstrating that the drastic remedy of a temporary restraining order is warranted.

### B.    NMFS Did Not Fail to Address An Important Aspect of the Problem

Plaintiffs also argue in their motion for a temporary restraining order (Pls' Br. at 20-21) that the halibut regulations at issue should be overturned because NMFS' response to comments failed to respond adequately to Plaintiffs' comment that NMFS is precluded from managing to the 2008 GHL.  As explained above, there is no merit to Plaintiffs' comment, and likewise there is no merit to Plaintiffs' argument to the Court.

Plaintiffs correctly point out (Pls' Br. at 20) that the Supreme Court has explained that "an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  However, Plaintiffs erroneously assume that their comment constituted an "important aspect of the problem."  As explained above, Plaintiffs are wrong to assert that NMFS is precluded from managing to the 2008 GHL and as such, Plaintiffs' comment to that effect cannot constitute a "important aspect of the problem."  Therefore, whatever the agency's response to the comment, it cannot render the regulation arbitrary and capricious.  An agency has a responsibility to carefully consider public comments on its proposed rules, but it is not the agency's responsibility to refute every argument that is presented by public comment, particularly if it is frivolous.  *See, e.g. Interstate Natural Gas Ass'n of America v. F.E.R.C.*, 494

8

F.3d 1092, 1096 (D.C. Cir. 2007) ("'[C]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern'") (citation omitted); *Natural Res. Def. Council v. USEPA*, 859 F.2d 156, 188 (D.C. Cir. 1988) ("'[t]he APA requirement of agency responsiveness to comments is subject to the common-sense rule that a response be necessary'").

In any event, NMFS did respond to Plaintiffs' comment. *See* 73 Fed. Reg. at 30512-13. NMFS' response was appropriate, explaining that, contrary to the comment, the agency fully complied with its rules:

> Comment 49: The proposal to simultaneously reduce the GHL and implement management measures to reduce harvest to the new GHL is contrary to the existing regulations regarding use of GHLs. Option B violates the Administrative Procedures Act (APA), and both options violate the purpose and intent of the charter fishery regulatory regime.
>
> Response: NMFS disagrees. The Council recognized that the GHL might be adjusted downward from the maximum GHL that was in place when it recommended the management measures for this final rule in June 2007. Thus, the Council proposed two different sets of management measures; one if the GHL remained unchanged in 2008, and a second more restrictive set of management measures if GHL was reduced. Both sets of management measures were published in the Federal Register for public review and comment. The comment period on the proposed rule extended beyond the IPHC meeting in mid-January, when the new and reduced total halibut CEY of 6,500,000 lb (2,948.4 mt) for Area 2C was established for 2008. This CEY resulted in a reduced GHL based on existing regulations at 50 CFR 300.65(c). NMFS published a notice in the Federal Register of this downward adjustment on February 5, 2008 (73 FR 6709). This was a nondiscretionary action given that the regulations at 50 CFR 300.65 clearly established how the GHL steps down when Total CEY is reduced below certain benchmarks. Given that a one-fish bag limit was proposed by the Council if the GHL was reduced, analyzed in the EA/RIR/IRFA supporting this action, and noticed in the proposed rule under APA rulemaking procedures, NMFS believes the public had adequate notice and opportunity for review and comment on the actions implemented under this final rule and that this action is consistent with the APA and the GHL management provisions.

*Id*.

NMFS' response to Plaintiffs' comment was anything but a "non sequitur." Pls' Br. at 21. Plaintiffs' comment argued that NMFS was acting unlawfully in managing to the 2008 GHL because such action was forbidden by its regulations. NMFS' response explained that, contrary to Plaintiffs' argument, the GHL Policy, 50 C.F.R. § 300.65, determines how the GHL steps down when the total CEY is reduced. NMFS' response further explains that the Council acted lawfully under the Halibut Act to develop regulations to allocate the halibut resource, providing those regulations to the Secretary for approval, as provided by the Halibut Act. NMFS then approved and promulgated the regulations by notice and comment rulemaking under the APA.

In sum, as explained above, there is no support in any regulatory text for Plaintiffs' contention that NMFS cannot manage to the 2008 GHL, and in fact Plaintiffs' contention is directly refuted by the explanation of the GHL Policy found in its preamble. Plaintiffs' comment therefore does not constitute an "important aspect of the problem" warranting a response, but in any event, NMFS provided an adequate response to Plaintiffs' comment. As such, Plaintiffs have failed to show that NMFS "entirely" failed to consider an important aspect of the problem and Plaintiffs have failed to demonstrate a likelihood of success on the merits of their claim necessary for the issuance of a temporary restraining order.

      C.    **Good Cause Existed to Forego the APA's 30-Day Delayed Effectiveness Provision.**

The APA provides that a rule may become effective less than 30 days from its issuance where an agency finds "good cause" exists for so doing. 5 U.S.C. § 553(d)(3). "The existence of the good cause exception is proof that Congress intended to let agencies depart from normal APA procedures where compliance would jeopardize their assigned missions." *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1484 (9th Cir. 1992). As NMFS explained in the Federal

Register notice accompanying the final rule for the halibut regulations, good cause existed in this case for making the regulations effective as of June 1, 2008. *See* 73 Fed. Reg. at 30523. In particular, NMFS explained that it was imperative that the regulations take effect on June 1 to effectuate the Council's intent to limit the charter halibut sector's harvest to the federally mandated GHL. *Id*. This was because the peak season for the charter halibut sector is the summer months of June, July, and August. *Id*. As NMFS explained, if the harvest restrictions were not in place by the beginning of this peak season, "the intent of the Council will be thwarted as this is time of peak harvest and when the harvest limitations would have its greatest impact." *Id*. In addition, it was important that the harvest limitations be effective as of June 1, 2008 to avoid the confusion that could occur to the charter halibut industry and its clients if the rule became effective after the peak season had begun. *Id*. As such, NMFS had good cause to waive the 30-day delayed effectiveness period under to allow for a June 1, 2008, effective date.

      Plaintiffs fail to demonstrate that the waiver of the delayed effectiveness period was arbitrary and capricious. First, Plaintiffs do not dispute the fact that, unless the regulations went into effect on June 1, the necessary reductions in harvest would not be achieved to manage to the GHL. As the Ninth Circuit noted in *Riverbend Farms*, part of the rationale for the delayed effectiveness rule is that a "window of time usually causes no harm." 958 F.2d at 1485. As explained above, that is not the case here; a delay would have thwarted the Council's intent. Furthermore, "the 30-day waiting period is intended to give affected parties time to adjust their behavior before the final rule takes effect." *Id*. Plaintiffs have failed to demonstrate that waiver of the delayed effectiveness in any way deprived them of an opportunity to adjust their behavior. Plaintiffs assert that the bulk of their customers book fishing trips "months or a year in advance." Pls. Br. at 22. If, as Plaintiffs assert, customers are canceling fishing trips "for the sole reason

11

that the rule restricts their daily catch to one fish" (Pls' Br. at 6), that would be true whether the halibut regulations became effective on June 1 or July 1. In other words, the effective date of the regulation is not the cause of Plaintiffs' alleged injury.

Indeed, Plaintiffs' affidavits do not even contend that the regulations at issue here came as any surprise to them. As explained above, the proposed rule for the halibut regulations at issue here was published on December 31, 2007. 72 Fed. Reg. 74257. The proposed rule made it very clear that, if the GHL were to decrease in 2008, "[t]he number of halibut caught and retained by each charter vessel angler in Area 2C is limited to no more than one halibut per calendar day." *Id*. at 74260. The 2008 GHL was published on February 5, 2008, which represented a three-step reduction in the GHL for Area 2C due to the reduced CEY for 2008. 73 Fed. Reg. 6709. As such, Plaintiffs were on notice as early as February 5, 2008 that it was very likely that NMFS would issue a one-fish bag limit for 2008. NMFS worked diligently from the close of the public comment period on January 30, 2008 to promulgate the final rule, reviewing and responding to 273 letters, emails, and faxes commenting on the proposed rule. Salveson Decl. ¶¶ 5-6. The agency's best efforts produced a final rule for publication on May 28, 2008. *Id*. ¶ 5.[5]

In sum, NMFS had good cause to waive the 30-day delayed effectiveness period under the APA, 5 U.S.C. § 553(d)(3). Plaintiffs have failed to demonstrate that this decision warrants overturning the halibut regulations at issue, and as such have not demonstrated a likelihood of

---

[5] At oral argument, the Court inquired as to whether issuance of the regulations at issue was influenced by a recent memorandum regarding agencies' issuance of new regulations. Federal Defendants have provided the memorandum as an exhibit to this brief. The memorandum explains that it applies only to the issue of new proposed rules, not to new final rules. As such, the memorandum is not applicable in this case.

success on the merits necessary to warrant issuance of a temporary restraining order.

### III.  CONCLUSION

    For the foregoing reasons, and for the reasons set forth in Federal Defendants' opposition brief (Dckt. No. 3), Plaintiffs' motion for a temporary restraining order and/or preliminary injunction should be denied.

Respectfully submitted this 6th of June, 2008.

    RONALD J. TENPAS
    Assistant Attorney General

    JEAN E. WILLIAMS
    Chief, Wildlife & Marine Resources Section

    s/ *Robert P. Williams*
    ROBERT P. WILLIAMS, Trial Attorney
    U.S. Department of Justice
    Wildlife & Marine Resources Section
    Benjamin Franklin Station, P.O. Box 7369
    Washington, DC 20044-7369
    (202) 305-0210 (ph)
    (202) 305-0275 (fx)
    robert.p.williams@usdoj.gov

    *Attorneys for Federal Defendants*

Declaration of Susan J. Salveson

1. I am Susan J. Salveson, Assistant Alaska Regional Administrator for Sustainable Fisheries for the National Marine Fisheries Service (NMFS). One of my duties is to supervise the development of notice and comment rulemaking dealing with fishery management issues, including management measures for Pacific halibut.

2. On Monday, December 31, 2007, NMFS published a proposed rule (72 FR 74257) to limit the harvest of Pacific halibut by guided sport charter vessel anglers in International Pacific Halibut Commission (IPHC) Area 2C to the guideline harvest level (GHL) established under 50 CFR sec. 300.65.

3. When the proposed rule was published, NMFS did not have the information necessary to determine the specific level of the GHL, which depends on the specification of the total constant exploitation yield (CEY) by the IPHC. Therefore, NMFS proposed two scenarios in the proposed rule, one scenario if the GHL remained the same, and one scenario if the GHL was reduced based on a reduction of the total CEY.

4. During its annual meeting in January 2008, the IPHC set the total CEY for IPHC Area 2C at 6.5 million pounds. This specification by the IPHC required the NMFS to publish a notice of the GHL for IPHC Area 2C. This notice was published on February 5, 2008, and indicated the GHL for IPHC Area 2C had been reduced from 1.432 million pounds to 931,000 pounds.

5. The comment period for proposed rule ended January 30, 2008. NMFS received 273 letters, e-mails, and faxes on the proposed rule containing 107 unique comments. Given the number and complexity of the comments, I and my staff spent significant time compiling, organizing, and responding to the comments. Our best efforts produced a final rule that was ready for publication by May 28, 2008. This final rule implemented scenario 2 because the GHL was reduced, as was indicated in the proposed rule.

6. In order to effectuate the intent of the action to limit the harvest of Pacific halibut by guided sport charter vessel anglers in IPHC Area 2C to the GHL, it was determined by the agency that the delayed effectiveness period required by the Administrative Procedure Act should be waived. The waiver allowed the final rule to be effective as of June 1, 2008. The agency determined it was necessary to have this rule effective during the peak of the season in order to keep guided sport charter vessel anglers in IPHC Area 2C to the GHL.

The foregoing declaration is true and complete to the best of my knowledge, information, and belief.

Signed: *Susan J. Salveson*  6-6-08
Susan J. Salveson                DATE

THE WHITE HOUSE

WASHINGTON

May 9, 2008

MEMORANDUM FOR    THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES
THE ADMINISTRATOR OF THE OFFICE OF INFORMATION AND REGULATORY AFFAIRS

FROM:    JOSHUA B. BOLTEN
CHIEF OF STAFF

SUBJECT:    Issuance of Agency Regulations at the End of the Administration

Over the last seven years, our Administration has worked to achieve through regulation important public benefits while minimizing regulatory costs on the American people. The President has emphasized that the American people deserve a regulatory system that protects and improves their health, safety and environment, secures their rights, and ensures a fair and competitive economic system, while respecting their prerogative to make their own decisions and not imposing unnecessary costs. We need to continue this principled approach to regulation as we sprint to the finish, and resist the historical tendency of administrations to increase regulatory activity in their final months. We must recognize that the burden imposed by new regulations is cumulative and has a significant effect on all Americans.

Every regulatory agency and department has a responsibility for continuing to ensure regulations issued in this final year are in the best interests of the American public. To the extent permitted by law, the heads of executive departments and agencies should continue to minimize costs and maximize benefits for each of their upcoming regulations, and should avoid issuing regulations that are unnecessary. Except in extraordinary circumstances, regulations to be finalized in this Administration should be proposed no later than June 1, 2008, and final regulations should be issued no later than November 1, 2008.

To ensure we continue to serve the American people through carefully-designed regulations, the Administrator of the Office of Information and Regulatory Affairs (OIRA) of the Office of Management and Budget (OMB) will coordinate an effort to complete Administration priorities in this final year while providing for an appropriately open and transparent process and controlling regulatory costs. In this effort, OIRA will work closely with the heads of the President's policy councils, and rely on its centralized review authority under Executive Order 12866.

Pursuant to Executive Order 12866, agencies shall continue to assess the need for regulation, examine alternatives, design regulations in the most cost-effective manner to achieve regulatory objectives, and assess both the costs and benefits of intended regulations. Circular A-4 provides guidance to agencies for analyzing the effects of regulation. Agencies should view each regulation as part of a broader regulatory framework and, in cooperation with OIRA, make careful and coordinated policy choices that do not impose undue regulatory burdens on the American people.

Agencies should examine the regulations they intend to promulgate before the end of this Administration for compliance with this memorandum and provide all information and assistance requested by the Administrator of OIRA in this important endeavor. In identifying priorities and establishing schedules, agencies should provide adequate time for necessary analysis, interagency consultation, robust public comment, and a careful evaluation of and response to those comments. However, I also want to emphasize that nothing in this memorandum alters or impedes the ability of the executive departments and agencies to perform their responsibilities under existing law.

Finally, the OIRA Administrator will report on a regular basis regarding agency compliance with this memorandum.

cc:

Chairman of the Council on Environmental Quality
Chairman of the Council of Economic Advisors
Director, Office of Science and Technology Policy
Assistants to The President