UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>THE HONORABLE CARLOS GUTIERREZ, in his official capacity as the Secretary of Commerce, et al.,<br><br>   Defendants. | Civil Action No. 08-cv-00941 |

**FEDERAL DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO CONTINUE PRELIMINARY INJUNCTION HEARING[1/]**

Defendants Carlos Gutierrez, in his official capacity as the U.S. Secretary of Commerce, Conrad C. Lautenbacher, Jr., in his official capacity as Administrator of the U.S. National Oceanic and Atmospheric Administration, and James W. Balsinger, in his official capacity as the Acting Assistant Administrator of the U.S. National Oceanic and Atmospheric Administration (collectively referred to as "Federal Defendants"), hereby submit the following opposition to Plaintiffs' Motion for a Preliminary Injunction.

**I. INTRODUCTION**

On June 10, 2008, the Court found that Plaintiffs had demonstrated a likelihood of

---

[1/] As indicated in Federal Defendants' motion to continue preliminary injunction, Federal Defendants have requested additional time to prepare a full and proper response to Plaintiffs' motion for a preliminary injunction, and have consented to extending the temporary restraining order an additional ten days, to June 30, 2008. If granted the opportunity, Federal Defendants would further develop the arguments set forth in this supplemental brief.

success on the merits of their claims that the final rule adopted by the National Marine Fisheries Service ("NMFS"), 73 Fed. Reg. 30504 (May 28, 2008), is in violation of the Administrative Procedure Act, 5 U.S.C. § 706, and that Plaintiffs had met the remaining factors[2/] favoring an injunction.  With respect to Plaintiffs' likelihood of success on the merits, the Court agreed with Federal Defendants that NMFS possesses broad authority to manage the halibut resource under the Northern Pacific Halibut Act of 1982 (the "Halibut Act"), 16 U.S.C. §§ 773 *et seq.*, however the Court accepted Plaintiffs' argument that the preamble to NMFS' 2008 final rule indicated that it was "based on" (Pls' Supp. Br. at 3), a "policy" embodied in a 2003 preamble found at 68 Fed. Reg. 47256 (Aug. 8, 2003).  According to Plaintiffs' argument, by indicating a intention to base its 2008 final rule on the 2003 guideline harvest level "policy," NMFS eliminated its discretion under the Halibut Act to manage the halibut resource proactively (*i.e.* to impose management measures to limit the charter sector to the 2008 guideline harvest level ("GHL")). Plaintiffs contended that, under the 2003 GHL "policy," management action is authorized only to address a past overage of a GHL, and not to proactively manage to the 2008 GHL.  Thus, Plaintiffs' contended that, by proactively managing to the 2008 GHL, NMFS' 2008 final rule ran afoul of the APA.

---

[2/] To prevail on a motion for temporary restraining order or preliminary injunction, plaintiffs must satisfy a four-part test: (1) there must be a substantial likelihood of success on the merits; (2) there must be a showing of irreparable injury if an injunction is not granted; (3) an injunction must not substantially injure other parties; and (4) the public interest must be furthered by the proposed injunction.  *See e.g.*, *Cityfed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).  In deciding to issue the Temporary Restraining Order in this case, the Court noted that it was influenced by the fact that the regulations at issue did not implicate conservation issues, and that there would be limited injury to other parties or to the public interest by temporarily enjoining the one-halibut daily bag limit for recreational anglers.  Given the time constraints, Federal Defendants will focus this brief on Plaintiffs' likelihood of success on the merits.  If granted additional time, Federal Defendants will present further information regarding the public interest factor.

Federal Defendants respectfully submit that a closer examination of Plaintiffs' claim reveals that it lacks merit. First, neither the preamble to the 2003 rule nor the preamble to the 2008 rule imposed binding commitments upon NMFS under D.C. Circuit authority. Second, even assuming for the sake of argument that the preamble to the 2003 GHL rule can create a regulatory "policy" that binds NMFS, and also assuming for the sake of argument that the preamble to the 2003 GHL rule precludes NMFS from managing the halibut resource prospectively, the fact of the matter is that the halibut regulations at issue in this case were not promulgated under the authority of the 2003 GHL preamble or the regulations 2003 regulations codified in the Code of Federal Regulations. In fact, the regulations at issue here were not intended to address a past exceedance of a GHL. Rather, the administrative record demonstrates that the agency determined that the charter sector's harvest needed to be limited to the 2008 GHL and the agency acted pursuant to its authority under the Halibut Act to promulgate management measures necessary to accomplish this goal. Thus, the regulations at issue in this case constituted an entirely separate APA rule making outside any process that may have been established by the 2003 GHL rule. This critical distinction goes to the heart of the Court's finding that Plaintiffs had demonstrated a likelihood of success on the merits.

## II. ARGUMENT

### A. Neither the 2003 Preamble Nor the 2008 Preamble Imposed Legally Binding Commitments the Precluded the Management Measures At Issue.

As the D.C. Circuit has noted, "[i]t is axiomatic that an agency must adhere to its own regulations . . . and that it need not adhere to mere "general statement[s] of policy." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 539 (D.C. Cir. 1986) (citations omitted). The *Brock* decision presented a situation analogous to the instant case, and the D.C. Circuit's analysis

in that case is instructive. At issue in *Brock* was a citation by the Secretary of Labor for a safety standard violation committed by an independent contractor of a mine operator. In challenging the citation, the mine operator did not dispute that, under the governing statute, it could have been cited for independent contractor violations, but the operator "argued that the citation was impermissible under the 'Enforcement Policy and Guidelines for Independent Contractors' published by the Secretary of Labor in the Federal Register." *Id*. at 535. Analogously, in this case Plaintiffs do not dispute that NMFS possesses broad authority under the Halibut Act to impose the management measures at issue, but rather Plaintiffs argue that promulgation of those management measures was impermissible under the preamble to the 2008 rule published in the Federal Register. Thus, in *Brock*, and analogously to this case, "[t]he principal question presented by the Secretary's petition for review is whether the published enforcement policy was legally binding." *Id*. The D.C. Circuit concluded that the policy was not legally binding, reversing the contrary determination of the Federal Mine Safety and Health Review Commission.

  The D.C. Circuit explained in *Brock* that "[a]n agency pronouncement is not deemed a binding regulation merely because it may have "some substantive impact," as long as it "leave[s] the administrator free to exercise his informed discretion." *Id*. (citation omitted). "The real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents 'having general applicability and *legal effect*,' 44 U.S.C. § 1510 (1982) (emphasis added), and which the governing regulations provide shall contain only 'each Federal *regulation* of general applicability and current or future effect,' 1 C.F.R. § 8.1 (1986) (emphasis added).'" *Brock* at 539. The D.C. Circuit subsequently has reaffirmed the dividing line explained in *Brock*, noting

that "[p]ublication in the Code is not just a matter of agency convention. The regulations governing the Code provide that it shall contain 'each Federal regulation of general applicability and legal effect.' 1 C.F.R. § 8.1(a) (1996)." *American Portland Cement Alliance v. EPA*, 101 F.3d 772, 776 (D.C. Cir. 1996) (citing *Brock*, 796 F.2d at 539).

In this case, neither the 2003 preamble nor the 2008 preamble were published in the Code of Federal Regulations. As the D.C. Circuit noted in *Brock*, the fact that the policy at issue was published in the Federal Register did not cast any doubt on its decision. *Id*. at 538. As the Court explained:

> Failure to publish in the Federal Register is indication that the statement in question was not meant to be a regulation . . . since the Administrative Procedure Act requires regulations to be so published . . . . The converse, however, is not true: *Publication in the Federal Register does not suggest that the matter published was meant to be a regulation*, since the APA requires general statements of policy to be published as well. See 5 U.S.C. § 552(a)(1)(D).

*Brock* at 538-39 (internal citations omitted) (emphasis added).

As in *Brock*, in this case the preambles to the final rules "merely provide general guidance and do not constitute rigid requirements which necessarily bind the Secretary and restrict his statutorily-granted enforcement discretion." *Brock* at 537. Indeed, Plaintiffs' argument hangs on the statement in the Federal Register that the 2008 final rule is "linked to the overall management of the halibut fisheries by the IPHC and a previous regulation approved by the Secretary that establishes a guideline harvest level (GHL) for managing the harvest of halibut by the guided sport charter vessel fishery (August 8, 2003; 68 FR 47256)." 73 Fed. Reg. 30504. This statement is vague at best, and thus does not evidence a definite commitment on the part of the agency to bind itself to any "policy" or procedures found associated with any prior rules. *See Center for Auto Safety v. Federal Highway Admin.*, 956 F.2d 309, 313 (D.C. Cir. 1992) (where

the text of a preamble is too vague it is not reviewable). To the contrary, as explained more fully below, the agency's intention was not to limit its authority under the Halibut Act. Balsiger Decl. ¶ 10; Salveson Decl. ¶ 2.

> B.  **NMFS Acted Pursuant to its Authority Under the Halibut Act, Not the 2003 GHL Rule.**

Plaintiffs' contention that NMFS acted unlawfully in managing the charter sector to the 2008 GHL is premised entirely on the erroneous notion that "the final rule is based on the existing GHL regulations." Pls' Opening Br. at 17. The administrative record demonstrates that, contrary to Plaintiffs' contention, the North Pacific Fishery Management Council (the "Council") and NMFS took action under their authority in the Halibut Act in an APA rulemaking. The preambles to the proposed and final rule make it clear that the agency's intent was to manage to the 2008 GHL, as opposed to addressing a past overage of a GHL:

> The intended effect of this action is a reduction in the poundage of halibut harvested by the guided sport charter vessel sector in Area 2C to the GHL while minimizing adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and on fisheries for other species.

72 Fed. Reg. 74257 (Dec. 31, 2007) (proposed rule).

> The intended effect of this action is to reduce the poundage of halibut harvested by the guided sport charter vessel sector in Area 2C to the GHL while minimizing adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and fisheries for other species.

73 Fed. Reg. 30504, 30505 (May 28, 2008) (final rule).

Indeed, the Declaration of Acting Assistant Administrator Dr. James W. Balsiger submitted herewith explains that "[t]he final rule was not intended to put management measures in place to address the charter sector in a previous year exceeding the GHL. It was intended to

keep the catch of the charter sector as close to the current GHL as possible." Balsiger Decl. ¶ 8. As Dr. Balsiger's Declaration further explains, the analysis of the rule found in the 2008 EA/RIR/FRFA[3/] (at xiii) states that the management measures at issue here were adopted as the only way to reduce the charter sector's harvest to below the 2008 GHL. Balsiger Decl. ¶ 9. The EA/RIR/FRFA was clear on the intent of the agency action:

> The goal of any restrictive measures would be to reduce sport fishing mortality of halibut in the charter fishery sector in Area 2C to its GHL in a manner that minimizes adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home port for this fishery, and on fisheries for other species. In addition to the No Action Alternative, the Council is considering 12 options to reduce halibut harvests to the GHL of 1.432 Mlb in Area 2C. At the request of the Council, the analysis also compares these options relative to a reduced Area 2C GHL, which may be triggered in 2008 as a result of a potentially reduced constant exploitation yield (CEY). At final action in June 2007, the Council selected a preferred alternative to achieve a harvest up to the current GHL and a different preferred alternative under a reduced GHL. The proposed rule would notify the public of these two GHL scenarios. The final rule would implement the measures associated with the Area 2C GHL, which will be set by NMFS, as set forth in the regulations, after the IPHC's Annual Meeting in January 2008.

EA/RIR/FRFA at ix.

Significantly, there is no mention in the passage above that the management measures were intended to address a past GHL overage. That the Council and NMFS' intent was to manage to the GHL is further supported by the Declaration of Susan J. Salveson, Assistant Administrator for Sustainable Fisheries for the Alaska Region. Ms. Salveson served as the NMFS designee on the Council during its June 2007 meeting. Salveson Decl. ¶ 2. Ms. Salveson explains that:

> At no time did the Council nor NMFS assume that the 2008 GHL must be

---

[3/] A copy of the EA/RIR/FRFA was provided as an attachment to Federal Defendants' opening brief.

>exceeded before management measures proposed by the Council for the 2008 season and beyond could be put in place to reduce charter vessel harvest to the GHL level. Rather, the intent of the Council was to limit 2008 harvest by the Area 2C charter vessel fishery to the 2008 GHL while minimizing adverse impacts on the charter fishery, its sport fishing clients and the coastal communities that serve as home ports for the charter fishery.

Salveson Decl. ¶ 2.

Thus, it was not NMFS' intention to limit its authority under U.S. Treaties ("The Protocol), U.S. Statutes (Northern Pacific Halibut Act of 1982 and the Administrative Procedure Act), and U.S. Regulations (50 CFR 300.65(c)) when NMFS stated in the preamble to the final rule that "[t]his final rule is linked to the overall management of the halibut fisheries by the IPHC and a previous regulation approved by the Secretary that establishes a guideline harvest level (GHL) for managing the harvest of halibut by the guided sport charter vessel fishery (August 8, 2003; 68 FR 47256)." Balsiger Decl. ¶ 10; 73 Fed. Reg. 30504. Stating that the rule was "linked to" previous rules was intended to provide background on the action, not to bind the agency to any policy or process for determining the circumstances under which management measures may be implemented. Indeed, as explained above, the proposed rule (December 31, 2007) and final rule (May 28, 2008) clearly outlined the action and rationale for the action. It is an unsupportable stretch for Plaintiffs to use this statement or other isolated statements in the preamble to the May 28 final rule to argue that NMFS somehow incorporated by reference or invoked a regulatory "process" found in a preamble to an entirely different rule from five years prior. Nor is there anything in the 2003 GHL rule limiting the agency to any process established therein or constraining the agency's authority and discretion to implement management measures under the broad authority of the Halibut Act. To the contrary, the agency invoked this broad authority to impose the only management measures that would limit the charter sector to the

GHL.  The agency expressed no desire or intention to address a past overage of a GHL, nor did the agency express any intent to limit its authority to be proactive and manage to the present year's GHL.  When the Council and NMFS' action is viewed in the proper perspective, it is clear that there is no merit to Plaintiffs' contention that NMFS was not entitled to manage to the 2008 GHL.

Plaintiffs likely will argue that the Declarations discussed above are extra-record and post-decisional, however the Supreme Court has recognized an exception allowing agencies to supplement the administrative record to provide "such additional explanations of the reasons for the agency decision as may prove necessary.'" *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973).  The D.C. Circuit recognizes eight exceptions to the presumption against extra-record review, including "when agency action is not adequately explained in the record before the court" and "in cases where relief is at issue, especially at the preliminary injunction stage." *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197-98 (D.D.C. 2005) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)).  In *Midwater Trawlers Coop. v. Dept. of Commerce*, 393 F.3d 994 (9th Cir. 2004), the Ninth Circuit upheld NMFS' supplementation of the administrative record with declarations "to further explain how its current allocation conformed to the requirements of the Magnuson-Stevens Act and the Treaty of Neah Bay." *Id*. at 1008.  As in *Midwater Trawlers*, supplementation of the administrative record is appropriate in this case where the Court has indicated that the existing record is insufficient to explain the agency's decision.  Indeed, NMFS' statement in the preamble to the final rule that "[t]his final rule is linked to the overall management of the halibut fisheries by the IPHC and a previous regulation approved by the Secretary that establishes a guideline harvest level (GHL) for managing the harvest of halibut by the guided sport charter vessel fishery (August 8, 2003; 68 FR 47256)," has

caused considerable confusion, and the agency therefore is entitled to supplement the administrative record to further explain the meaning of this statement and the critical distinction between the 2003 GHL rule and the management actions taken in 2008 to limit the charter sector's harvest to the 2008 GHL.  73 Fed. Reg. 30504.  The agency is not providing an entirely new rationale after the fact where none existed before.  Rather, it is offering additional explanation of the existing administrative record to eliminate any confusion as to the meaning of the statement that the final rule was "linked to the overall management of the halibut fisheries by the IPHC and a previous regulation approved by the Secretary that establishes a guideline harvest level (GHL) for managing the harvest of halibut by the guided sport charter vessel fishery."  Allowing such additional explanation is in keeping with APA record review principles, where the appropriate relief typically is to remand the action to the agency for further explanation.  *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (where a court finds that an agency decision is contrary to law, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation").  This is particularly appropriate here where the agency retained the authority to promulgate these measures under the Halibut Act itself, rather than under any process established by the 2003 GHL rule.  To be sure, the explanation in the existing record is less than crystal clear.  In that case, the Court should permit and credit the agency's additional explanation regarding its actual intent with respect to the 2008 GHL rule.

### III.  CONCLUSION

In sum, Plaintiffs erroneously rely on an analysis for a previous agency action that was not the basis for the present action.  Indeed, the administrative record for the regulations at issue in this case makes clear that the Council and the Secretary were not acting to address an overage

of a past GHL under the 2003 GHL rule, but rather that the Council and Secretary were acting pursuant to their broad authority under the Halibut Act to limit the charter sector's harvest to this year's GHL.  As such, whatever limitations may apply when NMFS is acting pursuant to its regulatory authority under the 2003 GHL rule, those limitations do not apply in this case.  The Council and NMFS acted in full compliance with the substantive and procedural requirements of the Halibut Act and the APA.  Plaintiffs therefore should not prevail on the merits of their case, and they thus have not made the requisite "clear showing" necessary to warrant the "extraordinary and drastic remedy" of a preliminary injunction.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  Plaintiffs' motion for a preliminary injunction should be denied.

Respectfully submitted this 18th of June, 2008.

>RONALD J. TENPAS
>Assistant Attorney General
>
>JEAN E. WILLIAMS
>Chief, Wildlife & Marine Resources Section
>
>s/ *Robert P. Williams*
>ROBERT P. WILLIAMS, Trial Attorney
>U.S. Department of Justice
>Wildlife & Marine Resources Section
>Benjamin Franklin Station, P.O. Box 7369
>Washington, DC 20044-7369
>(202) 305-0210 (ph)
>(202) 305-0275 (fx)
>robert.p.williams@usdoj.gov
>
>*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE HONORABLE CARLOS GUTIERREZ, in his official capacity as Secretary of Commerce, et al.,<br><br>Defendants. | Civil Action No. 08-cv-00941 |

## DECLARATION OF DR. JAMES W. BALSIGER

I, DR. JAMES W. BALSIGER, declare:

1.  I am the Acting Assistant Administrator of the National Marine Fisheries Service ("NMFS"), National Oceanic and Atmospheric Administration ("NOAA"), of the United States Department of Commerce and a U.S. Commissioner to the International Pacific Halibut Commission ("IPHC"), the international organization established by the Protocol amending the Convention between Canada and the United States of America for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea ("The Protocol").

2.  As part of my official duties, I am responsible for coordinating all aspects of NMFS's scientific and policy programs to ensure their effectiveness for the scientific study, management, and conservation of the living marine resources in the exclusive

1

economic zone of the U.S., including fish populations in waters off Alaska, marine mammal populations, and the impacts of the groundfish fisheries managed in accordance with the Fishery Management Plans ("FMPs") for the Bering Sea and Aleutian Islands ("BSAI") and the Gulf of Alaska ("GOA") and Pacific halibut in accordance with the Northern Pacific Halibut Act of 1982. In my capacity as a U.S. Commissioner to the IPHC, I work with other two U.S. Commissioners and three Canada Commissioners to ensure conservation of the halibut resource. In performance of that duty, we recommend catch limits for U.S. and Canada fisheries. Once those recommendations are established by domestic law, the parties (U.S. and Canada), can allocate those catch limits among domestic halibut fisheries. In the U.S., these fisheries include the subsistence, recreational, and commercial sectors.

3. During its annual meeting, January 15 – 18, 2008, the IPHC set the total constant exploitation yield (CEY) of halibut in IPHC Area 2C at 6,500,000 lbs. The catch limit derived from this total CEY was formally approved by the U.S. Secretary of State on March 7, 2008 (73 FR 12280).

4. Regulations found at 50 CFR sec. 300.65(c)(2) require NMFS to publish a notice in the Federal Register each year establishing the Guideline Harvest Level ("GHL") within 30 days of receiving information from the IPHC that establishes the total CEY. The GHL is based on the total CEY established by the IPHC and is determined by the table found at 50 CFR sec. 300.65(c)(1).

5. On February 5, 2008, NMFS published a notice (73 FR 6710) establishing the IPHC Area 2C GHL at 931,000 lbs. as required by 50 CFR 300.65(c) and based on the total CEY set by the IPHC during its 2008 annual meeting. The notice stated that the

2

GHL was "intended to provide a benchmark harvest level for participants in the charter fishery."

6. On December 31, 2007, NMFS published a proposed rule that included two different scenarios under which NMFS could limit the harvest of Pacific halibut by guided sport charter vessel anglers in International Pacific Halibut Commission (IPHC) Area 2C of Southeast Alaska to the guideline harvest level (GHL) for that area. Under the first proposed scenario, if the GHL remained unchanged in 2008, NMFS could add a suite of three management measures to an existing two halibut daily catch and size limit. Under the second proposed scenario, if the GHL decreased in 2008, then NMFS would substitute a one-halibut daily catch limit for the existing two-halibut daily catch limit. The intended effect of the proposed rule was to obtain public comment on the proposed management scenarios to reduce the poundage of halibut harvested by the guided sport charter vessel sector in Area 2C to the GHL while minimizing adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and on fisheries for other species.

7. Based on the February 5, 2008 notice of a reduced GHL (931,000 lbs. in 2008, as compared to 1,432,000 lbs. in 2007), and the stated intent in the proposed rule published on December 31, 2007, a final rule was published on May 28, 2008 (73 FR 30504), establishing a one-halibut daily bag limit.

8. The intent of the proposed rule published on December 31, 2007, and the final rule published on May 28, 2008 were the same, "to reduce the poundage of halibut harvested by the guided sport charter vessel sector in Area 2C to the GHL while minimizing adverse impacts on the charter fishery, its sport fishing clients, the coastal

communities that serve as home ports for this fishery, and fisheries for other species." (73 FR 30504, 30505). The final rule was not intended to put management measures in place to address an exceedance of the GHL by the charter sector in a previous year. Rather, it was intended to keep the catch of the charter sector as close to the current GHL as possible.

9.   The Environmental Assessment/Regulatory Impact Review/Final Regulatory Flexibility Analysis (2008 EA/RIR/FRFA) prepared for the final rule states:

"The preferred alternative contains two components based on which GHL is in effect. If the current GHL is in effect, then the preferred alternative is to implement a two-fish bag limit, with one of the two fish less than or equal to 32 inches; no harvest by skipper and crew when clients are onboard the charter vessel; line limits of six per vessel, not to exceed the number of paying clients onboard; and an annual limit of four fish per charter angler. The Council selected this preferred alternative as the only combination of options that would reduce harvest below the GHL and allow for some growth in client trips over the next several years while simultaneously avoiding the complications of measuring large fish in the water, limiting a potential increase in release mortality, and reinforcing the State ban on skipper and crew harvest. The analysis estimates that the preferred alternative would result in harvest levels between 89.2 percent and 99.4 percent of the GHL under 2006 harvest levels. These levels are well below the actual 2006 harvest of 142.1 percent of the GHL and below the estimated harvest level of the status quo. If the IPHC lowers total CEY enough to trigger the GHL step-down function, the Council selected a preferred alternative of a one-fish daily bag limit for the entire season; no harvest by skipper and crew when clients are onboard the charter vessel; and line

limits of six per vessel, not to exceed the number of paying clients onboard. The Council selected this alternative because it is the only option that would reduce harvest to below the 1.217 Mlb GHL." (2008 EA/RIR/FRFA pg. xiii).

10. As indicated by the quote in paragraph 9 above, the intent of the Council and the Secretary was to prospectively limit harvest to a level at or below the current GHL. To that end, it was not NMFS' intention to limit its authority under U.S. Treaties (The Protocol), U.S. Statutes (Northern Pacific Halibut Act of 1982 and the Administrative Procedure Act), and U.S. Regulations (50 CFR 300.65(c)) when it stated that the final rule was "linked" to the 2003 regulation that established how the GHL is determined each year. This process (*i.e.*, how the GHL is determined each year), and the rationale supporting that action, is not a prohibition on the Council and Secretary from exercising their legal authority cited above.

_____
DR. JAMES W. BALSIGER
Acting Assistant Administrator
National Marine Fisheries Service

6/19/08
DATE

5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, et al., )<br>)<br>)<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>THE HONORABLE CARLOS )<br>GUTIERREZ, in his official capacity as )<br>Secretary of Commerce, et al., )<br>)<br>Defendants. )<br>) | Civil Action No. 08-cv-00941 |

## DECLARATION OF SUSAN J. SALVESON

I, SUSAN J. SALVESON, declare:

1. I am Susan J. Salveson, Assistant Administrator for Sustainable Fisheries, Alaska Region, National Marine Fisheries Service (NMFS). My duties include serving as the NMFS representative on the North Pacific Fishery Management Council (Council) when necessary as the designee of the NMFS Regional Administrator. I also supervise the development of notice and comment rulemaking addressing fishery management issues, including those that implement proposed Council policy recommendations for the management of the Pacific halibut commercial and charter vessel fisheries.

2. I served as the NMFS designee on the Council during its June 2007 meeting. At this meeting, he Council recommended a two-pronged approach to limit the harvest of Pacific halibut by guided sport charter vessel anglers to the guideline

1

harvest level (GHL), starting with the 2008 GHL that would be determined by the schedule in existing regulations at 50 CFR 300.65(c). The Council recognized that the 2008 GHL would not be determined until after the International Pacific Halibut Commission established the annual total constant exploitation yield (Total CEY) for halibut in Area 2C at its January 2008 meeting. Thus, one suite of proposed management measures was recommended if the GHL remained unchanged, and a second suite of proposed management measures also was recommended in the event the GHL was reduced. At no time did the Council nor NMFS assume that the 2008 GHL must be exceeded before management measures proposed by the Council for the 2008 season and beyond could be put in place to reduce charter vessel harvest to the GHL level. Rather, the intent of the Council was to limit 2008 harvest by the Area 2C charter vessel fishery to the 2008 GHL while minimizing adverse impacts on the charter fishery, its sport fishing clients and the coastal communities that serve as home ports for the charter fishery.

3. On December 31, 2007, NMFS published a proposed rule (72 FR 74257) to limit the harvest of Pacific halibut by the Area 2C charter vessel fishery to the GHL established under § 300.65 (c). Because NMFS did not have the information necessary to determine the specific level of the 2008 GHL, which depended on the specification of the Total CEY by the IPHC at its January 2008 meeting, NMFS proposed the two scenarios recommended by the Council. The first if the GHL remained the same and the second if the GHL was reduced based on a reduction of Total CEY.

4. During its January 15-18, 2008 meeting, the IPHC set the 2008 Total CEY for Area 2C at 6.5 million lbs. Under the schedule established at § 300.65 (c), this level of CEY resulted in a 2008 GHL of 931,000 lbs, a reduction from the 2007 GHL of 1.41 million lbs. NMFS published a notice informing the public of the 2008 GHL on February 5, 2008 (73 FR 6710).

5. Based on the 2008 GHL and Council intent as stated in the proposed rule published on December 31, 2007, a final rule was published on May 28, 2008 (73 FR 30504) that established a one-halibut daily bag limit. This management measure was necessary to limit the Area 2C charter vessel fishery to the existing GHL level, as intended by the Council and as articulated by NMFS in the proposed and final rules. The May 28, 2008, final rule establishing the one-fish daily bag limit referenced the 2003 rulemaking that established the GHL as a benchmark for managing the charter vessel harvest. This benchmark was exceeded each year since 2004. The GHL benchmark was reduced in 2008 to reflect the reduced abundance of halibut in Area 2C, consistent with regulations at § 300.65 (c). No information suggests that the reduced GHL established for 2008 would not also be exceeded unless management measures were put in place to limit harvest to the GHL as intended. The policy recommendations by the Council, the rulemaking leading up to the establishment of the one-fish daily bag limit, and the management intent underlying both the Council and NMFS decisions do not support an assertion that the reduced 2008 GHL must be

exceeded before NMFS could implement management measures to limit the charter vessel fishery to this level of harvest.

*[signature]*

SUSAN J. SALVESON
Assistant Administrator for Sustainable Fisheries
Alaska Region
National Marine Fisheries Service

6-17-08
DATE