# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SCOTT VAN VALIN, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| Carlos M. Gutierrez, in his Official | ) | |
| Capacity as Secretary of the U.S. | ) | |
| DEPARTMENT OF COMMERCE, | ) | |
| | ) | |
| | ) | **Civil Action No. 1:08-cv-941** |
| Conrad C. Lautenbacher, Jr., | ) | |
| in his Official Capacity as | ) | |
| Administrator of the U.S. | ) | |
| NATIONAL OCEANIC AND | ) | |
| ATMOSPHERIC ADMINISTRATION, | ) | |
| | ) | |
| James W. Balsiger, in his Official | ) | |
| Capacity as Acting Assistant | ) | |
| Administrator of the U.S. | ) | |
| NATIONAL MARINE FISHERIES | ) | |
| SERVICE, | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' OPPOSITION TO MOTION TO INTERVENE AS DEFENDANTS

Plaintiffs Scott Van Valin, Ken Dole, Larry McQuarrie, Rick Bierman, Edwin Haney, Case Harris, Tom Ohaus, Carl "Chip" Porter, Patty Seaman, Theresa Weiser, and Donald Westlund, through counsel, respectfully submit this brief in opposition to the Motion for Leave to Intervene as Defendants filed on June 18, 2008, by Linda Behnken, Christopher Knight, William Thomas, Jr., Steve Box, David Gibson, Sherri and Kurt Wohlhueter, Annah Taft Perry, North Pacific Seafoods, Inc., Erik Bahnsen, Wayne Brown, Sandy Craig, Luke Wiedel, Carolyn

Heuer, Jerrod Galanin, Seafood Producers Cooperative, Ryan Nichols, the City of Pelican, and the City of Alexander ("the Commercial Sector").[1]

The framework for considering a motion to intervene under Rule 24 of the Federal Rules of Civil Procedure is well-established. Intervention is permitted as a matter of right under Rule 24(a) when the applicant (1) makes a timely motion; (2) has an interest relating to the property or transaction which is the subject of the action; (3) is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) where the applicant's interests are not adequately represented by the existing parties. *See* Fed. R. Civ. P. Rule 24(a); *Sierra Club v. Van Antwerp*, 523 F. Supp. 2d. 5, 6 (D.D.C. 2007). Intervention may also be permitted in the court's discretion under Rule 24(b) where an applicant (1) makes a timely motion; (2) has a claim or defense; and (3) that claim or defense shares with the main action a common question of law or fact. *See* Fed. R. Civ. P. Rule 24(b); *EEOC v. National Children's Ctr.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998).

At the outset, Plaintiffs do not object to the Commercial Sector's intervention for the purposes of addressing the merits. However, Plaintiffs strenuously oppose intervention for the purpose of attempting to prevent the conversion of the temporary restraining order that was granted to Plaintiffs by the Court in its Order dated June 10, 2008, to a preliminary injunction. For that purpose, the prospective intervenors do not meet the requirements of either Rule 24(a) or (b) because: (1) the motion for intervention is not timely, and (2) with respect to the narrow issue

---

[1] The bulk of intervenors' brief focuses on issues that are relevant to the merits of the Secretary's final rule. Plaintiffs will address those arguments at the appropriate time should the Court choose to grant the motion for intervention. In this opposition, however, Plaintiffs only respond to the points and authorities raised in intervenors' motion that are relevant to the entry of a preliminary injunction.

of intervention for the purposes of preventing the entry of a preliminary injunction, the commercial sector does not have a sufficient interest or claim warranting protection.

## I.    **The Intervention Motion is Not Timely.**

Under both Rule 24(a) and (b), an intervention motion must be timely. The Supreme Court has said that "timeliness is to be determined from all the circumstances. And it is to be determined by the court in the exercise of its sound discretion." *NAACP v. New York*, 413 U.S. 345, 366 (1973) (footnote omitted). "Timeliness is measured from when the prospective intervener knew or should have known that any of its rights would be directly affected by the litigation." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003), *cert. denied*, 542 U.S. 915 (2004). A motion for "intervention after judgment will usually be denied where a clear opportunity for pre-judgment intervention was not taken." *Dimond v. District of Columbia*, 792 F.2d 179, 193 (D.C. Cir. 1986); *see also Massachusetts School of Law v. United States*, 118 F.3d 776, 783, n.5 (D.C. Cir. 1997). The motion for intervention here is unquestionably untimely because intervenors have known of Plaintiffs' challenge to the final rule since it was filed on June 2, 2008, but nonetheless waited to seek intervention until after the Court issued its Order granting injunctive relief to Plaintiffs. Because the motion is untimely, there is no need for the Court to consider any other factor from the four-part intervention test. *See Associated Builders and Contractors, Inc. v. Herman,* 166 F.3d 1248, 1257 (D.C. Cir. 1999) ("If the motion [is] not timely, there is no need for the court to address the other factors that enter into an intervention analysis.").

Plaintiffs filed their Complaint for review and motion for injunctive relief with this Court on June 2, 2008. Plaintiffs believe that the prospective intervenors knew of the action the same day, but there can be no question that they knew of it two days later, when Paul Knight, counsel

for the prospective intervenors, was present at the June 4, 2008, hearing on Plaintiffs Motion for a Temporary Restraining Order and/or a Preliminary Injunction.  Mr. Knight was also present at the June 10, 2008, hearing, but did not seek to be heard at either hearing.  Indeed, after the June 4 hearing, counsel for Plaintiffs stated to counsel representing the prospective intervenors that Plaintiffs would have no objection to intervention so long as such intervention did not delay the proceedings.  Nevertheless, intervenors chose to wait until after the June 4 hearing, after an additional round of supplemental briefing by the parties requested by the Court, after the second hearing on June 10, 2008, and after the Court issued its ruling on Plaintiffs' motion granting a temporary restraining order.   Intervenors have now finally decided to file their motion less than 48 hours prior to the preliminary injunction hearing that was announced by the Court eight days ago.  There was a clear opportunity for intervention well before the Court was poised to rule on the preliminary injunction motion, but intervenors chose not to take it.

Intervenors all but concede that their motion is untimely, but suggest (at 29-30) that the Court should excuse their delay in light of the fact that the "bringing of this motion was necessitated by obtaining necessary declarations filed herewith—a process made difficult and time consuming by the fact that the proposed intervenors are primarily fisherman whose fishing season has begun...." This is nonsense.  After the Secretary released the final rule under review on May 28, 2008, Plaintiffs (who were also at the start of a fishing season) were able to prepare their motion for injunctive relief along with nine declarations in five days.  Intervenors have offered no reasonable explanation why they could not have filed a more abbreviated motion setting forth the appropriate factual and legal points weeks ago.

Additionally, intervenors cite *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998), and suggest that it would be improper for the Court to deny their motion

for lack of timeliness. *See* Int. Motion at 30. In *Mova*, the intervenor filed its motion directly before a preliminary injunction was issued by the Court. The district court chose not to rule on the motion for intervention until after it granted the preliminary injunction, at which time it denied the motion because it found that intervenor did not have sufficient interest in the proceeding. On appeal, the D.C. Circuit held that intervenor had sufficient interest, and the district court should have allowed intervention <u>after</u> the entry of the preliminary injunction. *See* 140 F.3d at 1074. Plaintiffs submit that what happened in *Mova* is exactly what the Court should do here—rule on the preliminary injunction first, and then rule on intervenors' motion for purposes of allowing them to address the merits of the case.

Intervenors also assert (at 30) that they "found no case where a motion to intervene, filed prior to a hearing on a preliminary injunction, was denied on the basis of timeliness." Plaintiffs, however, are aware of some. *See, e.g., Doe v. Duncanville Ind. School District,* 994 F.2d 160, 167 (5th Cir. 1993) (upholding district court denial of intervention motion on the basis of timeliness "citing the fact that Rutherford moved to intervene just two days before the hearing on the preliminary injunction."); *South Dakota v. U.S. Army Corp. of Engineers,* 330 F.3d 1014, 1021 (8th Cir. 2003) (denying motion for intervention after a TRO was issued, but before preliminary injunction hearing due to lack of timeliness).

Finally, it is clear intervenors hope to carry the day by citing isolated pronouncements from various cases in this Circuit (and others), none of which has much relevance here. For example, Intervenors' reliance (at 30) on *Geiger v. Foley Hoag LLP Retirement Plan,* 521 F.3d 60 (1st Cir. 2008) is strange. This case did not involve a request for intervention before the entry of a preliminary injunction, and the issue there was not a review of an agency final rule under the APA. That case instead dealt with the distribution of marital property following divorce. Thus,

the fact that intervention was permitted in that case because it had not yet reached the discovery stage bears no relevance here. Intervenors have cited virtually nothing authoritative on the substantive issues and the factual particulars germane to this case, and have given the Court no explanation as to why it took them so long to file their motion. Under the clear precedent in this Court, the motion for intervention is untimely and therefore must be denied.

## II.    The Prospective Intervenors Do Not Have an Interest or Claim in Whether this Court Grants Injunctive Relief.

Although there is no need for the Court to address the other intervention factors since the motion is untimely, the prospective intervenors nonetheless fail to meet their burden of showing a sufficient interest or claim that needs protection with respect to the narrow issue of whether this Court grants Plaintiffs' motion for a preliminary injunction. In order to satisfy this requirement, the prospective intervenor must show it has an interest that is "direct, substantial, and legally protectable." *Stuart v. Rubin,* 948 F. Supp. 1077, 1105 (D.D.C. 1996). Prospective intervenors have not satisfied this requirement.

Intervenors' primary argument appears to be that their interest is derived from "conservation issues" present in this proceeding. *See* Int. motion at 4-13. What Intervenors do not address, and what they have no answer for, is the fact that the Secretary has made it quite clear that there are no conservation issues present in the final rule. In response to Comment 79, which states "[t]he proposed rule deals with a pure allocation issue and does not present any resource conservation questions," the Secretary replied: "NMFS agrees. The healthy status of halibut stocks is evidence that IPHC policies are conservative and successful." 73 Fed. Reg. at 30517. Additionally, in response to Comment 81, which states: "There is a conservation issue," the Secretary responded: "NMFS disagrees." 73 Fed. Reg. at 30518. In summary, the Secretary

concluded that the final rule would not affect the health of the halibut stock or have any adverse

impacts on the halibut resource. *See* 73 Fed. Reg. at 30517-30518. The government conceded

this point at oral argument, *see* June 10, 2008, Transcript at 28 (attached as Exhibit 1 hereto), and

the Court accepted and relied upon the fact that no conversation issues were present as part of the

basis for issuing the Temporary Restraining Order. Thus, Intervenors' primary argument that

they have a direct and protectable interest in the protection of the halibut resource is flatly

contradicted by the Secretary's own statements in the final rule, and directly contrary to the

Court's findings in this case.

Proposed Intervenors' only other arguments (at 31-32) are that preliminary injunctive

relief will "prevent proposed Intervenor-Defendants from fishing or severely restrict such

fishing" and that "it would alter existing fishery management programs to the consequent

economic disadvantage of proposed Intervenor-Defendant." As Plaintiffs demonstrated in their

Memorandum in Support of Injunctive Relief (at 11-12), temporary injunctive relief will have

absolutely no effect on commercial fisherman in 2008. The total allowable catch for the

commercial sector has already been fixed by the IPHC and the Secretary for the 2008

commercial season. *See* 73 Fed. Reg. 12280 (Mar. 7, 2008). A temporary delay in the

effectiveness of the rule under review here would have zero impact on the allowable harvest for

the commercial sector in 2008. *See* 73 Fed. Reg. at 12280 (May 7, 2008). *See also* Pl. Motion

for TRO at 11-12; EA/RIR/FRFA at 78.

Further, with respect to any claim that their individual fishing quotas will be devalued by

a preliminary injunction, NMFS said in response to Comment 73: "there was no evidence of a

cause and effect relationship between harvest overages and the value of quota shares." 73 Fed.

Reg. at 30516.

For all of these reasons, in addition to its motion being untimely, prospective intervenors have not demonstrated that they have a direct interest that needs protection with respect to whether this Court enters preliminary injunctive relief.

### Conclusion

Plaintiffs have no objection to intervention for the purposes of addressing the merits. However, for the reasons stated herein, for purposes of intervention to prevent the conversion of the TRO to a preliminary injunction, Plaintiffs respectfully request that this Court deny the Motion to Intervene as Defendants, or defer ruling until after entry of a preliminary injunction.

Respectfully submitted,

John W. Butler (D.C. Bar No. 437370)
Robert K. Magovern (D.C. Bar No. 497862)
SHER & BLACKWELL LLP
1850 M Street, N.W.
Suite 900
Washington, DC 20036
(202) 463-2500 (Main)
(202) 463-2510 (Direct)
(202) 365-0059 (Cell)

Earl W. Comstock
COMSTOCK CONSULTING LLC
6225 30th Street, N.W.
Washington, DC 20015
(202) 255-0273
(Admitted in Alaska)

*Counsel for Plaintiffs*

June 19, 2008

## CERTIFICATE OF SERVICE

Plaintiffs hereby certify that, in addition to service to the Defendants via the Court's ECF system, the following Opposition to Motion to Intervene as Defendants was also served on the individuals listed below via email and first class mail. Plaintiffs also separately informed these individuals by email that the Court's hearing is scheduled for 10:00 am on Friday, June 20, 2008.

Christopher T. Koegel
Manatt, Phelps & Phillips, LLP
700 12th Street, NW
Suite 1100
Washington, DC 20005
CKoegel@manatt.com

George J. Mannina, Jr.
Paul L. Knight
O'Connor & Hannan, L.L.P.
1666 K Street, N.W.
Suite 500
Washington, DC 20006-2803
gmannina@oconnorhannan.com
pknight@oconnorhannan.com

Robert K. Magovern

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN,                    :
                                    :
              Plaintiff,            :
       vs.                          :      Docket No. CA 08-941
                                    :
CARLOS M. GUTIERREZ,                :      Washington, D.C.
                                    :      Tuesday, June 10, 2008
              Defendant.    :             11:25 a.m.
---------------------------x


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ROSEMARY M. COLLYER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          JOHN W. BUTLER, Esquire
                            EARL COMSTOCK, Esquire
                            Sher Blackwell
                            1850 M Street, NW
                            Suite 900
                            Washington, DC  20036


For the Defendant:          ROBERT WILLIAMS, Esquire
                            LISA LYNNE RUSSELL, Esquire
                            U.S. Department of Justice
                            601 D Street, NW Third Floor
                            Washington, DC  20004


Court Reporter:             Crystal M. Pilgrim, RPR
                            United States District Court
                            District of Columbia
                            333 Constitution Avenue, NW
                            Room 4704
                            Washington, DC  20001

Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

COPY

1    THE DEPUTY CLERK:  Civil Action 08-941 Scott Valin

2 versus Carlos Gutierrez.  John Butler and Earl Comstock for the

3 plaintiff.  Robert Williams and Lisa Russell for the defense.

4    THE COURT:  Good morning everyone, I'm sorry we're

5 running late.  I hope you were entertained.  I was entertained.

6 I was incredulous, excuse me.  I should be more careful right.

7 Does anybody else want to be held in contempt, I'm on a roll.

8    All right, thank you.

9   I have received your subsequent briefs from which I

10 thank you very much for all of the hard work that somebody put

11 in.  Luckily it was too hot to go outside anyway.  And I did

12 have some questions for each side.  This is still a motion on

13 behalf of Mr. Van Valin.

14    MR. BUTLER:  Van Valin.

15    THE COURT:  Van Valin, so the plaintiff still bears

16 the burden so perhaps the plaintiff should speak first.  Will

17 Mr. Butler or Mr. Comstock be speaking?

18    MR. BUTLER:  I will Your Honor.

19    THE COURT:  So my question is, is Mr. Butler or

20 Mr. Comstock?

21    MR. BUTLER:  John Butler for the plaintiffs.

22    THE COURT:  Good morning.

23    MR. BUTLER:  Good morning, Your Honor.

24    THE COURT:  It's not that I haven't seen you before

25 Mr. Butler, but that was days ago and I've had exciting things

1    happening clearly.

2              MR. BUTLER:  Whatever happens here today we're going

3    appeal to the Court of Appeals, no.

4              THE COURT:  Be my guest.  You won't be the only ones.

5              MR. BUTLER:  We're hoping that's not necessary, Your

6    Honor.

7         Your Honor, as you say you have the briefs so I'd like

8    to answer your questions.

9              THE COURT:  Well my question really is because your

10   arguments are very interesting legal, very nice legal point.

11   And you agree that if the Department had moved forward straight

12   up saying we're adopting regulations under our authority under

13   the Halibut Act, we could do that.  But the issue here is that

14   they purported to be relying on the 2003 GHL regulations and

15   then misapplying them.

16             MR. BUTLER:  That's mostly correct, Your Honor.

17   There are two issues here.

18             THE COURT:  Okay.

19             MR. BUTLER:  The second one you properly identified

20   which is the, whether or not the Secretary complied with his

21   own 2003 GHL regulations.

22             THE COURT:  Right.

23             MR. BUTLER:  The other issue arises from the

24   statutory standard.

25             THE COURT:  This is your fair --

1        MR. BUTLER:  This is a fair and equitable argument.

2        THE COURT:  Right.

3        MR. BUTLER:  I just don't want to lose sight of the

4  fact that that is a separate argument and in that argument

5  there's a substantive component.  Which is that on this record

6  not only did the Secretary not make a finding that this

7  allocation was fair and equitable.  But on this record, the

8  Secretary could not have made a finding that this allocation is

9  fair and equitable.

10       THE COURT:  Okay, well I --

11       MR. BUTLER:  And it ties back into the GHL.

12       THE COURT:  Yeah, it ties back into the GHL.  And it

13  really ties into this rule which ties into the GHL which says

14  that if the GHL does down then we'll do X and if the GHL

15  doesn't go down we'll do Y.  But I think your fair and

16  equitable argument and I recognize that it's there and I don't

17  mean to overlook it, but I think that even if it were to be a

18  standard, I'm not sure that the Secretary has to articulate an

19  analysis in all instances that says okay, we've considered this

20  and we think this is fair and equitable.  That's contrary to

21  your argument so let me just put that aside.  I'm not as

22  persuaded by that point.

23       But I am still troubled by the 2003 GHL regulations.  I

24  know that the government says look, we have the authority to do

25  this.  And since we have the authority to do this, whether we

1    do it explicitly under the Halibut Act or we do it in blinking

2    it which is the term used to the GHL regulations we have the

3    authority to do it.  It was straight up making in we have that

4    authority.  Your argument is more fine than that.

5         MR. BUTLER:  Well, every day, virtually every

6    executive agency in the United States that has any rule making

7    power has quite broad authority to do all sorts of things.  But

8    every day courts overturn rule making by agencies because they

9    fail to follow their own procedures.  That's fundamental.

10       It's not that there aren't all sorts of things that they

11   could do if they did them correctly.  That's a very general

12   statement.  That really has nothing much to do with this case.

13        Our point as you summarize it is correct and that is

14   that they did not follow their own procedures.  And it's

15   axiomatic that an agency is bound to follow its own

16   regulations.

17       So the only real dispute that we have here is whether, and

18   frankly the government still hasn't answered this.  Is whether

19   the GHL regulations and their accompanying documents, the

20   preambles to the notice of proposed rule making and the final

21   rule and this environmental assessment from 2003 that we filed

22   with our papers yesterday.  Whether those placed procedural

23   constraints on the Secretary in the situation where the sole

24   basis and the sole purpose, the sole stated purpose of the

25   current rule is to regulate to the GHL.

1     The Secretary did not issue a rule describing the entire

2  circumstances and saying we're considering a number of

3  different levels of allocation and we just happen to come out

4  of the GHL.  No, the Secretary started with the premise that

5  the GHL was the right number.  And there's absolutely no

6  analysis in the current rule making, Your Honor, explaining why

7  the GHL is the right number, accept to say that that's what the

8  counsel wants us to do.  This is where it ties back into the

9  fair and equitable standard in the statute.

10     Essentially they're relying on the GHL as being fair and

11  equitable.  They've been very upfront about that in their

12  supplemental brief as we pointed out in our papers.  So you've

13  got a bit of a shell game going on here.

14     There's no determination now in the current rule or even

15  consideration of whether an allocation based on the GHL is fair

16  and equitable.  If you look back to 2003 they specifically say

17  we're not allocating anything, so we don't have to make that

18  determination.  We don't have to balance the cost of benefits

19  to the various sectors, expressly say that on Section 201 of

20  the EA.

21     Their main argument now is the GHL doesn't mean anything

22  except when it does.

23          THE COURT:  Yes, except when it does.

24          MR. BUTLER:  What they're saying is it means

25  something.  Their argument is that the GHL matters when our

1    purpose in adopting a regulation is to meet the GHL.  But

2    notwithstanding the fact that we've adopted the GHL as being

3    inherently fair and reasonable notwithstanding the lack of any

4    analysis of that paint, we're not bound by it.  In other words,

5    we can pick and choose.  We can take the number.  But all those

6    hundreds of pages of description of how the GHL is intended to

7    match up with future management measures, pay no attention to

8    that.

9              THE COURT:  Okay, thank you.  Mr. Williams.

10             MR. WILLIAMS:  Thank you, Your Honor.

11             THE COURT:  Thank you for your brief.

12             MR. WILLIAMS:  I have some prepared remarks or would

13    you prefer to start with questions.

14             THE COURT:  You can do it whichever way you want, go

15    right ahead.

16             MR. WILLIAMS:  Okay, I think I would like to start by

17    addressing the points that Mr. Butler just raised.  I think

18    Your Honor has it exactly right, that you know to use sort of a

19    absurd example, that counsel in this can manage to a ham

20    sandwich.  The statute gives them broad authority.  So if

21    there's a management, if it's supported by the administrative

22    record they can manage to any given level aside from the GHL.

23        So what plaintiffs are falling back on, there's nothing

24    in the statute that says you can't manage to a current GHL.

25    There's nothing in the statute, I'm sorry in the regulations

1   that say that.  As we set out in our brief the regulations only

2   have three requirements.  It's sort of a formula for

3   determining the GHL based on the CEY that's handed down from

4   the international body.  There's a requirement that it be

5   published in the Federal Register.  And there's a requirement

6   that NMFS notify the counsel if there's been an overage.  So

7   there's simply no support for Mr. Butler's argument that the

8   agency hasn't followed its own procedures as he was referring.

9   Those are the procedures that are set forth in the GHL policy.

10         THE COURT:  But what about all of the discussion in

11   the preamble and otherwise that talks about how this GHL is to

12   be used for management purposes; that is, that will, we won't

13   have information until the end of a season and so it'll be the

14   next season or even three seasons or five seasons later before

15   we'll get the adjustments that we're talking about.

16         Now, I don't know why it was in 2003 they didn't have

17   data quickly enough and in 2007 they had already data on 2006.

18   Anyway they did.  But anyway, so why should I ignore all of

19   that?  Why should I ignore the fact that people in Alaska, the

20   people affected by this relied on that?  Sensibly relied on it;

21   that the government said we're not going to pull the rug out

22   from anybody's feet.  We're going to manage to the GHL but

23   we're going to do it in a careful husbandly way.  We don't

24   destroy businesses, we'll give you advance notice.  You have to

25   say that there was no advance notice on this one.

1      MR. WILLIAMS:  Your Honor, I would disagree that

2 there was no advance notice.  I think as we set forth in our

3 papers this was coming down the pike and I think all of the

4 parties were aware that it was very likely possibility that

5 this one fish bag limit would go into effect.

6      THE COURT:  Okay, so you now sit on May 28th and it

7 went into effect on June 1st?

8      MR. WILLIAMS:  Yes, Your Honor.

9      THE COURT:  And that was an order not to disrupt the

10 industry?  I mean you have to admit that the Secretary's

11 rationale for that is highly questionable.  If not patently

12 ridiculous.

13      Now the fact that you wanted it to go into effect for

14 the high season of the halibut, I understand that, that makes

15 sense.  That I understand that.  I'll sign off on that one.

16 But it makes no sense to say oh, we have to do it quickly so we

17 don't disrupt the industry.  Come on, you've totally disrupted

18 things, but I'm taking you off your main point, I'm sorry.

19      Let me go back to your main point which is how can I

20 ignore all of that stuff?  You say I should ignore it.  I

21 should ignore pages and pages of discussion because it doesn't

22 matter.  It doesn't bind the agency.

23      MR. WILLIAMS:  Yes, Your Honor.  I think there are

24 several answers to your question.  The first is that a preamble

25 as Your Honor just said is not regulation.

1    Plaintiff's want to talk about this broad GHL framework

2  that we're operating under that sort of takes it out of the

3  authority under the statute. Now we're in this other world

4  where the agency has tied its hands.

5    So I think it's pretty clear that this preamble is just

6  explanatory, it's not binding.  It's not published in the Code

7  of Federal Regulations.  It's in the Federal Register.  So I

8  think as an initial matter regardless of what it says in the

9  preamble, if there was inarticulate drafting there.

10    THE COURT:  We're not talking about inarticulate

11  drafting.  We're talking about clear drafting that you don't

12  want me to pay any attention to. So it's not a question of

13  being inarticulate it's a question of the agency changed its

14  position since 2003 as to how it wants to manage the GHL.

15    MR. WILLIAMS:  No, I would disagree, with that Your

16  honor.  If Your Honor is inclined to look to the preamble for

17  guidance, I would refer the Court to 68 Federal Register at

18  47-257.  And this is quoted in our supplemental brief.  I'd

19  like to point it out to the Court.  It clearly states this

20  final rule does not prevent the counsel from recommending

21  management measures before the guided recreational fishery

22  exceeds a GHL.

23    Your Honor, that statement is the exact opposite of what

24  the plaintiffs are arguing here.  It explains that NMFS did not

25  intend to tie its hand to constrain its authority to act unless

1    there's been an overage of the GHL.

2         So clearly under the language in the preamble the agency

3    could act prospectively as it did in this case to manage to the

4    2008 GHL.   I think it's quite telling that we set this out very

5    clearly in our supplemental brief and in response plaintiffs

6    had nothing to say about it.   They don't even try to address

7    it.   I submit that's because they can't, the language is clear.

8         And the other language that talks about delay, Your

9    Honor, as we set forth in our papers is talking about the fact

10   that there would need to be notice and comment to impose

11   management measures in the event that the agency was to try and

12   regulate to the GHL.   That's not to say that the agency wanted

13   to preclude itself from being able to manage prospectively.   I

14   think plaintiffs have it exactly backwards because what the

15   counsel wanted to do with the proposed rule for the GHL policy

16   is they wanted to sort of say here's the GHL and then if

17   there's an overage, there will be an automatic trigger that

18   will trigger management restrictions.

19              THE COURT:  Right, right.

20              MR. WILLIAMS:  The idea there is because you want to

21   minimize the amount of time between the overage and between the

22   management response.   And as they propose doing it through a

23   framework would sort of be less cumbersome.   It wouldn't have

24   to go through notice and comment, it could be done rather

25   quickly.   But the agency had to tell the counsel, no, those are

1   actually regulations that you can't bypass notice and comment.

2   So therefore, if you want to do this you have to go through

3   formal rule making under the APA which will increase the amount

4   of delay between the actual overage and the management

5   response.

6        So I think if you think about it in the broader context,

7   what the plaintiffs are saying doesn't make any sense that the

8   agency would somehow say well, we'll never be able to regulate

9   to the current year GHL.  We have to wait for past overage and

10  then we have to manage that past overage regardless of what the

11  current situations are now; it just doesn't make any sense.

12       THE COURT:  Well, the question isn't exactly that.

13  The question is that the Secretary has as you cite, broad

14  authority to engage in rule making under the Halibut Act.   If

15  the Secretary had said, I am engaging in rule making, pursuant

16  to my broad authority under the Halibut Act and this is what

17  we're doing with my broad authority under the Halibut Act you

18  would be in a different case.

19       What the plaintiffs are saying is that that's not what the

20  Secretary said.  The Secretary said, I am engaging in rule

21  making pursuant to and in furtherance of the rules that I

22  adopted in 2003, the GHL rule making.  And so, in furtherance

23  of those rules, I'm adopting this rule.  And the plaintiffs say

24  when you rely, when the Secretary relied and said I'm

25  furthering my GHL rule making from 2003, then the secretary was

1   bound to follow the procedures that were laid out in 2003.

2        So it's not --

3        MR. WILLIAMS:  I agree, Your Honor.

4        THE COURT:  Let me ask you this specifically.

5   Because in your supplemental brief, you cite the Halibut Act, I

6   don't know maybe 10 times, but I went looked in the new rule

7   and it only cites the Halibut Act twice.

8        Once it talks about the past and then once it talks about

9   the authority to adopt regulations in this, in the CFR are tied

10  to the Halibut Act.  But it never says we're adopting this new

11  rule on one fish limit, pursuant to my authority under the

12  Halibut Act.  It never even says that.

13        MR. WILLIAMS:  Well, Your Honor, I would say that

14  that cuts both ways.  It shows the broad authority that the

15  agency has under the act.  Unless the agency specifically binds

16  itself that it can't take a certain action, it's entitled as I

17  said to manage to a ham sandwich.

18        THE COURT:  Yeah, and the plaintiff's argument is

19  that the Secretary did find itself or prior secretary at a

20  prior time, I assume.  I don't even know, is it the same

21  Secretary, was Mr. Gutierrez the Secretary in 2003?

22        MR. BUTLER:  It was Mr. Evans.

23        THE COURT:  Mr. Evans, thank you.  So it's a prior

24  Secretary.  So the current Secretary doesn't even know about

25  this I'm sure.  But in any event, the question is whether the

1    Secretary bound himself in the past that if he's going to

2    engage in rule making under the GHL 2003 rules, he's going to

3    do it a certain way.

4            MR. WILLIAMS:    Two points Your Honor.    First, I don't

5    think there's any statement in the preamble that says that the

6    agency is intending to bind itself by this preamble.    But even

7    if you accept for the sake of argument that the agency did

8    intend to bind itself, the passage that I read to the Court

9    says the exact opposite of what plaintiffs are arguing here.

10   It says we can act prospectively even if there's no overage of

11   a GHL, we can still impose management measures.    Our idea is

12   not to bind ourselves to a past overage.

13           THE COURT:    And it's a good point you're making, but

14   it sidesteps just a little bit.    Yes, indeed, the counsel

15   without reference to the GHL could recommend management

16   measures.    And yes, indeed, the Secretary with all of the rule

17   making authority he has under the Halibut Act could respond to

18   that recommendation from the counsel without reference to the

19   GHL.

20       The argument is that when you do reference and you do rely

21   on and not you personally of course, that when one does

22   reference and rely on and assert the authority for the current

23   action, is the GHL regulation then you have to follow what the

24   GHL regulation says.

25       So it's not, I mean it's not that they have to tie

1    themselves to the GHL regulation, but when the Secretary says

2    what I'm doing is under the GHL regulation then he has to

3    follow that regulation.  That's the nature, that's why it's

4    such a lawyer's argument with respect.

5        Most of the fisherman in Alaska would think it's kind of

6    dancing on the head of a pin.  But it's not actually dancing on

7    the head of a pin because it really is a question of whether

8    the Secretary has authority to say he's relying on the

9    regulations over here, but not do it the way those regulations

10   would suggest he intended to do it, and the way he advised the

11   world he was going to do it.

12       MR. WILLIAMS:  Well, Your Honor, I would disagree

13   with what Your Honor's characterizing the regulations to say.

14   As, you know, tried to argue that --

15       THE COURT:  Well okay, let's go there then and talk

16   for a minute.  The regulations say so and so is going to notify

17   so and so of this and somebody is going to notify somebody else

18   of the same fact.  So now we'll all know the same fact and then

19   the Council can do whatever it wants with that fact.

20       But that would ignore all of the other writings about

21   why this regulation isn't actually an allocation in and of

22   itself.  It's not really an allocation, it's just a management

23   measure.  And so don't worry about it because when we get

24   notice of an overage, it's going to take us time, we're going

25   to be able to give everybody prior notice, et cetera and you

1   want me to say, none of that matters.

2           MR. WILLIAMS:  Well, I hate to keep harping on the

3   same point.  But the language that I quoted it says that, in

4   that same preamble that the plaintiffs are referring to it says

5   that there doesn't need to be an overage to act.  In this case

6   there has been an overage.  In '06 we know that they went over.

7           THE COURT:  I'm sorry, we're missing each other.

8   Let's try one more time.

9           I agree and I think the plaintiffs would agree that

10  under the GHL regulations the Council can make management

11  recommendations without reference to the GHL.  Whether it's

12  over, under, wildly surpassed we have more fish than we know

13  what to do with.  That is irrelevant.

14          The Council retains the ability to make recommendations

15  regardless of the GHL, put that to aside.  Because that's not

16  what the Secretary did here.  The Secretary did not adopt and

17  the Council did not recommend that the Secretary adopt this

18  particular regulation without regard to the GHL at all.  This

19  is specifically with regard to the GHL, right?

20          MR. WILLIAMS:  Yes, Your Honor.

21          THE COURT:  Okay, no wait, wait you got to follow

22  along.  Now you get your chance to tell me where I'm turning

23  backwards.

24          They don't have to regulate to the GHL.  True.  This

25  time they specifically regulated to the GHL, true.  When you're

 1   specifically regulating to the GHL, do you have to follow the

 2   procedures that are suggested, laid out, whatever you want you

 3   to say in the preamble and the accompanying documentation that

 4   the supported the GHL regulation?

 5        MR. WILLIAMS:  I would submit in this case that the

 6   agency did follow those regulations.

 7        Okay, we have to manage to the GHL.  The question is

 8   which GHL?  I defy plaintiff's to point anywhere to point where

 9   it says it must be the past GHL.

10        THE COURT:  Well, the whole concept in the discussion

11   of the GHL is that we will use this to manage the, I'll say bio

12   mass of fish, halibut and we will always be doing it with the

13   best information available which is the amount of the catch at

14   the end of the season which we won't know until the next

15   season.  So we'll be managing it somewhat with our eyes looking

16   backwards and it's the only way it can be done.  That's

17   essentially what the preamble says.

18        MR. WILLIAMS:  In this case, Your Honor, there's no

19   dispute that ever since the GHL policy went into effect in '03

20   the recreational sector has gone over it.

21        THE COURT:  But there's also no doubt that if the GHL

22   had not gone down in 2008, the recommendation of the Council

23   was that the two fish limit recognizing one of them small, that

24   the two fish limit from last year could stay in effect.

25        So it's not that the overage in any of those prior years

1    prompted the adoption of a single fish regulation in 2008, it

2    didn't.   The Council was very clear about that.   The overage in

3    prior years isn't so great that we need to change it.   It's

4    because this year the GHL went down.

5                MR. WILLIAMS:   Yes, Your Honor, and I think if you

6    think about it the GHL in the previous years was higher than it

7    is this year.   So we had the recreational sector going over by

8    significant margins, I think, twenty-five percent.   Then when

9    the GHL comes down, it's a virtual certainty that they'll go

10   over again in 2008.   And I think when you think about the

11   commercial sector --

12               THE COURT:   I think it's absolutely correct.   That

13   there's a virtual certainty if the fishing in charter industry

14   continues as it was last year they'll go over.   I don't know

15   that that's terribly relevant to whether or not -- it's just

16   such a fine point to try to discuss it, because the question is

17   the Secretary ties its regulations to the GHL, but then ignores

18   all the stuff about how the Secretary is going to use the GHL

19   to actually manage.   So that's where we are.   Can the Secretary

20   -- does the Secretary's authority -- it's very confusing to me.

21   Because on the one hand here's the GHL, it says this is how

22   we're going to use this tool.   This management measure, we're

23   going to use it in the following way. And Over here it says I

24   have all of the authority in the world to manage to a ham

25   sandwich.   Forgetting the ham sandwich the Secretary says I'm

1  doing this.  I'm managing under these regulations, but then

2  doesn't.  So now what do I do with that.  Do I say, well, it

3  doesn't really matter because you have all of the authority in

4  the world and you didn't have to manage to this and you could

5  have managed over there so forget it?

6          MR. WILLIAMS:  Well, Your Honor, I would come back to

7  the point that what is in the Code of Federal Regulations is

8  very limited.  It has three requirements and the agency

9  complied with those three requirements.  The plaintiff's

10  argument is built entirely on the preamble which --

11          THE COURT:  Well, and the EA the other documentation

12  that surrounded the proposal and the final and all of that.

13          MR. WILLIAMS:  Yes, Your Honor.

14          THE COURT:  And the whole administrative record, you

15  know, there's a whole lot of discussion about this, it's not --

16          MR. WILLIAMS:  Yes, and while that is the rationale

17  supporting a lot of the action here.  When we're talking about

18  what is required by law, absent a specific statement by the

19  agency that intended to bind itself by the explanatory material

20  in the preamble, it's simply just not a legal requirement.

21  It's not a regulation.

22          THE COURT:  Okay.  Is that the way it should work for

23  government agencies, putting aside whether it does in fact,

24  that they can put out a regulation with a lot of palliative

25  assurances to the population that now this might look a little

1  severe, but it's not severe because we're only going do it in

2  certain ways.  This is how we're going to follow up and we're

3  going to be very attentive, and we're going to watch out for

4  your interests and then later on they can say, well we didn't

5  actually mean that.  We don't have to pay attention to anything

6  we said in the preamble because it's just, just what somebody

7  wrote down one day in the Federal Register.

8          MR. WILLIAMS:  Well, Your Honor, I think on the facts

9  of this case as, you know, we've sort of explained in our

10 papers this is something that's been the subject of debate for

11 15 years.  I don't think that this was any sort of surprise to

12 anyone that this very measure that was implemented this year

13 was contemplated last year.  And in the proposed rule, the

14 agency made it very clear that if the CEY goes down, this is

15 going to be the management measure.  You know, when the CEY was

16 published in the Federal Register in February, everyone new

17 that the proposed rule, you know, made it a very likely

18 possibility that that was in fact what was going to be the

19 management response.

20         So I don't think that the plaintiffs have said anywhere

21 in their papers that it came as a complete surprise, it came

22 out of left field.  I think this was something that everyone

23 was aware that was coming down the pike.  And in terms of

24 fairness and equity, you have to keep in mind that the

25 commercial sector has had its quota reduced.  And you know it

1   was sort of incumbent on the agency to then reduce the

2   recreational quota as well.  It very well might be the

3   commercial sector sitting where Mr. Butler is if the agency had

4   allowed the reactional sector to keep the same quota or even

5   increase its quota while the commercial sector was being

6   decreased.

7          THE COURT:  Okay, let me ask you one other set of

8   questions and this goes to -- wait, I just had it in my mind

9   and now its fled.

10          MR. WILLIAMS:  I know how Your Honor feels.

11          THE COURT:  It's very embarrassing when that happens

12  in open court, bad enough when it happens in my chambers.  But

13  why don't you sit down and let Mr. Butler speak and if I get a

14  brilliant flash I'll let you speak.

15          MR. WILLIAMS:  Thank you, Your Honor.

16          THE COURT:  I understand the argument, don't I Mr.

17  Butler?

18          MR. BUTLER:  You do, Your Honor.  The only thing that

19  I would suggest that perhaps I think we're making this too

20  hard.  Because I don't think -- while I appreciate the left

21  handed compliment about a lawyer's argument, I don't think it

22  is.

23      I think this is right in the main stream of administrative

24  law. The fundamental premise of our administrative system is

25  that the Congress may delegate power to these agencies, but

1    when the agencies use that power they have to say what they've

2    done and why.  And they have to follow whatever constraints

3    they may have placed on themselves.

4        In this case, we have a failure in both respects.  They

5    have not followed the constraints they placed on themselves and

6    as a result in addition to that being a procedural problem,

7    they have a substantive problem at the beginning of the final

8    rule. They say that the purpose of this rule is to limit the

9    harvest to the GHL.  Quote, "While minimizing adverse impacts

10   on the charter fishery", close quote.

11       The whole purpose of the exercise of the 2003 GHL EA,

12   the notice of proposed rule making, the final rule, the

13   June 2007 rule animating all of that activity was the idea that

14   however we manage this fishery, we are going to do it in such a

15   way that we do not disrupt year old bookings.

16       So for the government to come in and say we can do

17   anything we want ham sandwich, that's one thing.  But it's not

18   a technical argument for us to say they didn't follow their

19   regulations.   There are consequences and the consequences that

20   have approved are precisely the consequences that the Secretary

21   stated over and over he wished to avoid by adopting a certain

22   procedural framework for regulating to the GHL if indeed he

23   chose at some point to regulate the GHL.

24       Going to something much more narrow -- Mr. Williams

25   primary argument, I don't want to belabor this because I think

1   the Court does understand this.  His primary argument is the

2   italicized language on page five with the supplemental brief.

3   He did state that we had not responded to that.  We do respond

4   to that in footnote four on page eight in our response to the

5   supplemental brief along with the text there.

6       Your Honor has it precisely correct.  It's not that they

7   don't have the ham sandwich authority.  It's just that when

8   they've said they're not going to use it, unless they issue

9   something saying we've changed our mind and here's why, then

10  they're stuck with what they said before.  And they go out of

11  their way in this rule making to say we are not changing our

12  GHL regulations.  They go out of their way over and over to say

13  we are regulating to the GHL.  That's our purpose.  There's no

14  analysis of whether GHL is the right number.  There was no

15  analysis in 2003 of whether or not in fact the GHL was the

16  right number.  Indeed, nobody could have even challenged the

17  2003 GHL regulation because nobody could have showed harm.

18      So now we're faced with the situation where they tried

19  out something from five years ago and say this is the reason

20  for our rule making.  We didn't give you any reasons then why

21  it was fair and equitable.  We're not giving you any reasons

22  now why it's fair and equitable, but you have to live by it.

23      On this point about preambles, I'm a little perplexed

24  because first of all in the government's supplemental brief it

25  cites to preamble as authority.  On the first full page of the

1    May 28th, final rule which is the second page of that rule but

2    the first substantive page which is 73 Federal Register 30505

3    they cite not once, not twice, but three times to prior

4    preambles as being the basis for and the background of this

5    action.

6        So not only have they conclusively tied this back to the

7    GHL regulations, but they themselves have relied upon their own

8    preambles as their explanatory statements. So if these

9    preambles mean nothing and they are nothing, then it follows

10   without fail that there is no explanation for this rule.

11       So either way the Secretary wants it, he loses. What I

12   mean by that is this: If said on the one hand either the GHL

13   is the basis for the rule and somehow that's permissible and it

14   fulfills the standard of fair and equitable. And along with

15   that they're bound by the GHL rules promulgated in 2003 and

16   everything they said about them. Or the GHL means nothing and

17   all of that stuff before means nothing and you have a rule

18   before you in which there has been no explanation of whether

19   this is a fair and equitable allocation.

20       And I would cautiously agree up to a point that I think

21   the case law, this goes to the fair and equitable point. I

22   think it's correct that the case law doesn't require the

23   Secretary to come out and in magic words say this allocation is

24   fair and equitable because. I mean the cases say if you can

25   reasonably discern the agency's decision making, but here you

1   don't even have that.  And you don't even have an attempt at

2   that.

3       The whole thing about something being fair and equitable

4   in the context of deciding between two groups; who gets the

5   fish?  It's inherently a balancing question.  We've raised this

6   at length in our comments before the agency and we said you're

7   --

8       THE COURT:  That was my brilliant idea.  Sorry, that

9   was the point I wanted to ask Mr. Williams about.

10      MR. BUTLER:  Okay.  We raised this separately.  We

11  said you haven't done the analysis.  You can't possibly -- it's

12  not, we're not arguing, Your Honor, that it's impossible for

13  the Secretary to come up with a rationale that this Court would

14  accept for why this number is fair and equitable.  We don't

15  think.  We think they'd have a tough time, but that's not our

16  argument.  Our argument is it's not before you.  You can't even

17  analyze it.  You don't know why they came up with this number

18  except that they say, oh, it's the GHL.  But there's nothing

19  magic about the GHL because when they formulated the GHL in

20  2003 and the system for adjusting it, they never made a finding

21  that management to that GHL was fair and equitable.  So it's

22  all smoke.  They can't point to anything to where they've made

23  that determination or even done the analysis.  And it's no

24  excuse to say, gee whiz, we don't have the information.

25  They've known since 1993 they needed more information.  At some

1    point it's incumbent upon the agency to get it.

2              THE COURT:   Okay.

3              MR. BUTLER:   That's all I have.

4              THE COURT:   Thank you, sir.  Mr. Williams, I did have

5    a question for you.  And I also wanted to raise, ask you a

6    question about the rule making response.

7        But this is from page five of your brief and it's exactly

8    where you quoted the Federal Register where it said the final

9    rule doesn't prevent the Council from recommending management

10   measures.

11       Then you quote further down towards the bottom of the

12   page you quote from the Federal Register.  "In other words this

13   final rule would establish the GHL policy and require NMFS to

14   notify the Council when a GHL has exceeded which could serve as

15   a trigger for subsequent rule making".

16       Doesn't that suggest that the exceeding the GHL comes

17   first and the rule making comes second?

18             MR. WILLIAMS:   In this case there has been an

19   accedence of the GHL, Your Honor, every year since it went into

20   effect.

21             THE COURT:   The problem with that argument is that

22   all of that exceeding, according to the Council, doesn't need a

23   change in the fish levels this year.  If the GHL had stayed

24   exactly where it was last year, the recommendation was let

25   people fish the way they fished last year.

1        The recommendation to lower the fish limit is based on

2   the 2008 GHL not any prior GHL.  No notice from the Secretary

3   that the GHL has been exceeded.  There has been no notice from

4   the Secretary in 2008 for obvious reasons.

5        And so doesn't that statement alone indicate how the

6   agency plans to use this management tool?  And what the agency

7   has done here is different from that.

8            MR. WILLIAMS:  I think it's fair to say, Your Honor,

9   the idea was we were going to have this GHL as a target, as

10  benchmark as long as the agency, the recreational sector stayed

11  under that GHL we wouldn't need to do anything, that might be

12  okay.  Then the idea is once they go over it then we need to,

13  you know, implement management measures and they've gone over

14  it every year since 2003.

15       I don't think the framework contemplated was that when

16  they go over then our hands are tied to actually manage them to

17  the current GHL and you have to go back to the last year of the

18  overage.

19           THE COURT:  I absolutely agree with you.  I don't

20  think your hands are tied.  The problem isn't whether you could

21  or couldn't or might or mightn't.  The problem is that the

22  Council said if it doesn't change, if the GHL isn't any

23  different in 2008 then it was in 2007, even though the

24  industry, the charter industry went over the GHL in all of

25  those years, they can still fish one large, one small.  The

1  taking the second fish from a large one to a small one is
2  enough of a management measure, and so that can continue.

3      So we know what the answer is.  It's not that the
4  Council is not attempting to manage to the over average in
5  prior years. If that's what they were trying to do they
6  wouldn't have changed it.  They're managing to a projected
7  underage or whatever you want to call it, a change in 2008.
8  But the Secretary said, we'll notify the Council when a GHL is
9  exceeded which could serve as a trigger for subsequent rule
10  making.

11      MR. WILLIAMS:  And it doesn't say what that rule
12  making must be.

13      THE COURT:  But it says subsequent.  And we don't
14  have a notice from the Secretary that we've exceeded GHL in
15  2008.  And you've thrown an entire part of the industry into
16  some sort of chaos.  Now I know -- we're not saving the fish.
17  This is not a saving the fish move.  It might have a saving the
18  fish intent over a long period of time.  But this regulation in
19  and of itself going from one fish to two fish or two fish to
20  one fish, excuse me, wasn't to save the fish, right?

21      MR. WILLIAMS:  It is for stability in the fishery and
22  there are some issues, I think, with localized depletion
23  issues.  But I think the agency has said that generally
24  speaking this is not necessarily a conservation measure.

25      THE COURT:  Right.

1          MR. WILLIAMS:  But Your Honor with respect to the
2    fair and equitable argument, I would just like to point out
3    that I think Your Honor is exactly right, that there is no
4    requirement in the statute that the Secretary make a finding as
5    such that this is a fair and equitable allocation.  It's just a
6    requirement in the statute that the allocation be fair and
7    equitable.  I think, you know, when we're thinking about the
8    context in which we find ourselves which is in the context of a
9    motion for temporary restraining order, the burden is entirely
10   on the plaintiffs.  The plaintiffs want to sort of shift the
11   burden to the agency and say justify your rule.  That's not the
12   standard.

13       The standard is that the agency's action is  presumed
14   valid and is entitled to deference unless the plaintiffs can
15   demonstrate that it's arbitrary and capricious.  And in this
16   case they're just sort of saying, well, you should have done
17   more.  But I think they need to go a step further and actually
18   show this is what you should have done and your failure to do
19   this is actually arbitrary and capricious and they haven't done
20   that in this case.

21          THE COURT:  Well, their argument is that your failure
22   to engage in, what the terminology from the Federal Register
23   is, subsequent rule making instead of prospective rule making
24   is contrary to what you, how you said you were going to use GHL
25   measurements.  And once you told us that you were going to use

1   GHL measurements for subsequent rule making, that's what you

2   have to do.  And you can't use it for prospective rule making

3   because that throws our business into a tizzy and you said you

4   were only going to use it for subsequent rule making so that we

5   could preserve the stability of our charter operations absent

6   some emergency.

7        I mean clearly if there were, you know, a red sea or

8   whatever, I don't know what I'm -- you know, some sort of

9   biological impact on the fish that were severely reducing the

10  number of available fish, well then the Secretary could clearly

11  step in.  But that's on an entirely different basis, that's to

12  save the fish, which is not what we're doing here.

13            MR. WILLIAMS:  I would ask Your Honor where does that

14  authority, where is that --

15            THE COURT:  That authority comes from the Halibut

16  Act.  You see then we go back again, if the Secretary said I'm

17  relying on the Halibut Act, I have a right to make regulations

18  and I'm making this regulation under Halibut Act, we'd be in

19  one place.  What the Secretary said is, I'm following the GHL

20  policy, but he didn't.  That's the problem, he didn't.  He

21  didn't engage in subsequent rule making, he engaged in

22  prospective rule making.

23            MR. WILLIAMS:  Well, I guess I would take issue with

24  that characterization, Your Honor, that this is subsequent to

25  an overage.  And the preamble says that it can be proactive.

1    It doesn't say what overage you have to --

2         THE COURT:  But unfortunately the Secretary says, oh,

3    and we have to implement this immediately because that fulfills

4    the intent of the Council.  It's very clear that the Secretary

5    is doing what the Council recommended.  And the independent

6    analysis within the agency was not as -- I don't know what it

7    was.  I can't say.  I have no idea.  But clearly the Secretary

8    just adopted what the Council recommended, put it into effect

9    the way the Council wanted it to be put into effect.

10        And the Council said and if it doesn't change, you don't

11   have to do anything.  You can follow last year's rule.  Well,

12   the Secretary can't take the Council for one and not for the

13   other.

14        So we know that if it hadn't changed we'd still be fishing

15   for two fish; one big, one small. So it's prospective only.

16   Prospective only.  And yet the Secretary said we're only going

17   to use this for subsequent rule making.

18        MR. WILLIAMS:  Well, Your Honor, I would just fall

19   back on the language in the preamble which, you know, where the

20   agency made clear that it intended to maintain the discretion

21   to prospectively manage in the absence of an accedence of the

22   GHL.  And I think any inconsistency in the preamble has to go

23   in favor of the agency.

24        I think that the agency is entitled to deference on it's

25   interpretation of it's regulations where there's any ambiguity

```
 1   in the preamble.

 2            THE COURT:  Well, I think that the agency made it

 3   clear in 2003 that the GHL policy would be implemented in

 4   specific ways.  And that that policy would allow the Council

 5   and the NMFS to use the GHL to manage the resource.  They

 6   clearly have and have reserved to themselves other ways to

 7   manage the resource without reference to the GHL and without

 8   the need for the GHL to be exceeded for the Council to consider

 9   and make recommendations from management of the halibut.

10            In this instance, the Secretary wanted two ways; the

11   Secretary wants to be able to say well, I'm implementing, I'm

12   relying on the GHL policy which I adopted in 2003, but I'm not

13   following the assurances that I gave the people of Alaska as to

14   how I was going to implement that policy; that is, because of

15   the impact on fisherman that an overage would serve, could

16   serve, didn't have to, there's a lot of discretion retained in

17   this, but it could serve as a trigger for subsequent rule

18   making.

19            I think that that isn't what happened here.  The

20   Secretary has engaged in prospective rule making.  The

21   subsequent rule making was the alternative, alternative A which

22   would have allowed the continued fishing for one large and one

23   small halibut.

24            And I think that the speed with which the regulation was

25   adopted or implemented.  I mean I agree with you that the rule
```

1   making process itself went through the normal process, but the

2   short notice as well as the prospective nature of the new rule,

3   rather then the subsequent nature of it, when it's totally

4   relying on the GHL from 2003 and not relying on the Secretary's

5   independent authority, certainly raises serious questions about

6   whether or not the rule was adopted properly or perhaps given

7   its connection of things that don't actually go together, that

8   it would really constitute arbitrary and capricious rule

9   making.  And that the plaintiffs have shown more than the

10  50 percent likelihood of success on their challenge to the rule

11  as not having been properly adopted.

12       And they've also shown harm to the charter industry

13  which is irrevocable in the sense that there's no way that

14  those money losses could ever been be repaid by the Secretary

15  or the businesses that might be lost or severely injured could

16  be recovered.  So the Court finds that there is also

17  irreparable harm to these plaintiffs.

18       The public interest goes two ways.  The Secretary has

19  serious responsibilities here to protect the halibut over the

20  long term.  I certainly would be very concerned if this rule

21  were a total environmental protection rule; that is, to

22  preserve the species, luckily it's not that.  And also if the

23  diminution projected for this year were so severe that it could

24  turn into that. But I know from the Council's recommendation

25  that without a reduction in the GHL, it would have allowed last

1   year's fishing levels to continue.

2       So I think the public policy is really represented by

3   the Secretary's own hesitations in 2003 to up and settled

4   expectations without sufficient advance notice. And that that

5   public policy which was what the Secretary had intended

6   apparently in 2003 to use as a guide for its GHL policy has

7   been ignored in this particular instance. And, therefore, the

8   public interest, while it's a close balance, would favor an

9   injunction.

10      Harm to the Secretary is the other consideration that I

11  must identify. And I think that everybody has acted in good

12  faith here. I don't think there's been anything but a sincere

13  and strong effort to do what's necessary to keep stability in

14  the resource.

15      But a short TRO I would make this a TRO not a PI, does

16  everybody agree with that? That's what you were seeking in the

17  first instance right?

18      MR. BUTLER: Your Honor, we pled it in the

19  alternative so that if we wanted to have something immediate

20  and then to be followed by a preliminary injunction if Your

21  Honor found that the factors were met and the standards are

22  part of the same. I guess it's really a question of schedule

23  going forward.

24      THE COURT: Well, the real question is whether or not

25  the Secretary would have additional evidence or argument that

1   you would want to present to if I issued a temporary

2   restraining order within the next 10 days so that it could be,

3   there could be additional facts or something.  I don't know

4   what it would be because we're basically working with an

5   administrative record.  You might want to consult.

6          MR. WILLIAMS:  Yes, Your Honor.

7          (Pause.)

8          MR. BUTLER:  Your Honor, if I may speak.

9          THE COURT:  No, don't speak while he's consulting,

10  that's not fair.

11         MR. BUTLER:  Oh, I'm sorry.

12         MR. WILLIAMS:  Your Honor, I think we'd like to have

13  some time to confer with our program folks in Alaska to see

14  what impact a temporary restraining order might have on the

15  operation on the ground before we really speak to schedule.

16         THE COURT:  Okay, what we're talking about is whether

17  I should issue a TRO or a PI.  Did you want to speak?

18         MS. RUSSELL:  Thank you, Your Honor.  Lisa Russell

19  also with the Environment Division.

20         THE COURT:  Yes.

21         MS. RUSSELL:  What I would suggest is we need to talk

22  in terms of record and figuring out whether there would be many

23  more record materials that we would file to make this helpful

24  as a preliminary injunction.

25         What I would suggest is that if the Court is going to

1  issue a TRO, that's a strong likelihood that we would agree

2  also of converting the TRO into a preliminary injunction and we

3  could notify the Court properly within a day or so.

4        THE COURT:  That would be fine.  Why don't you do

5  that then.  I'll issue a TRO.  And then if you have additional

6  things that you want to bring to my attention we'll set another

7  hearing and we'll do that.  If not, if you're satisfied with

8  the state of the record and you just want to take me up, you

9  can do that too.

10        MS. RUSSELL:  Thank you, Your Honor.

11        THE COURT:  We'll make it a PI and you can take me

12  up.

13        MS. RUSSELL:  Thank you, Your Honor.

14        THE COURT:  How's that?

15        MS. RUSSELL:  That sounds wonderful.

16        THE COURT:  I fully understand that you have your

17  jobs to do and we're all just doing the best we can.  Although

18  I will say Mr. Williams has done a fine job.

19        MS. RUSSELL:  Thank you, Your Honor.

20        THE COURT:  You're welcome, you should go back and

21  tell that. Don't you think so Mr. Butler?

22        MR. BUTLER:  Absolutely.

23        THE COURT:  I do have a couple of things that I

24  wanted to add to my conclusion here.

25     Mr. Butler had something else he wanted to say.  Before I

1  get that far, I do want to say I was into the balancing of

2  harms.  And I think that the harm to the Secretary is harm to

3  the policy the Secretary is seeking to further, but it's very

4  much more attenuated than the harm to the real people that the

5  plaintiffs are representing.

6         And I also wanted to respond to my comment to Mr. Butler

7  that this was a very fine lawyer's argument.  I do agree with

8  him that it's more substantive than just dancing on the head of

9  a pin.  And that the legitimate expectations of the people in

10 Alaska which were based on how the Secretary said in 2003 he

11 was going use the GHL to manage this resource, has been really

12 completely upended by the way the Secretary has done it in this

13 instance because of the prospective nature of the rule making

14 that the Secretary adopted.  So I just wanted the record to be

15 clear that I think it is more, it's a more substantive issue

16 than my question suggested.

17        Mr. Butler, did you want to add anything?  I need an

18 order.  I don't know if you submitted one to me.

19        MR. BUTLER:  We did, Your Honor, with the original

20 pleadings.  I was just going to speak to scheduling.  If I

21 understand what Your Honor said, I think my question has been

22 taken into account. If I stand that the defendants will provide

23 something to the Court this week as to whether.

24        THE COURT:  As to whether they're willing to turn it

25 into a PI or not.  Any time within the next 10 days.

1        MS. RUSSELL:  Yes, Your Honor.

2        THE COURT:  The TRO can only last 10 days.  We need

3   to set a hearing for 10 days out which I need to do because if

4   you don't agree, I need to have a hearing in 10 days out,

5   within 10 days.  But you can take your time and consider it

6   within the department and with your, both departments and reach

7   a conclusion as to how you want to proceed.

8        MR. BUTLER:  That's why the 10 days Your Honor why I

9   wanted to address the Court.  There are other people in my

10  office that can pick this up, but my last day in the office is

11  a week from Friday and then I'm out for about 13, 14 days.

12        THE COURT:  Well, we'll do it before a week from

13  Friday.

14        MR. BUTLER:  That's fine.

15        THE COURT:  But I don't know quite when, hold on.

16        MS. RUSSELL:  Your Honor, we'd be a happy to submit a

17  supplemental status on Friday of this week.

18        THE COURT:  Oh.

19        MS. RUSSELL:  So that we have sufficient time.

20        THE COURT:  That's great.

21        MR. BUTLER:  That's fine.

22        THE COURT:  All right, can we do something before a

23  week from Friday?

24        We could do it on the 20th which is the Friday.  What

25  time, or we could do it on Thursday.  We could do it Friday

1   morning.

2            THE COURT:  Four o'clock, it will have to be four

3   o'clock on Friday, okay, the 20th.  Sorry, I'm going to make

4   you work until the very last end Mr. Butler.

5            MR. BUTLER:  No problem Judge.

6            THE COURT:  Has the government reviewed the order

7   that the plaintiff submitted?

8            MR. WILLIAMS:  Yes, Your Honor, although it's not

9   exactly fresh in my mind.

10           THE COURT:  No, it isn't fresh in my mind either.

11  Why don't you take a look at it, talk to Mr. Butler.  If

12  everybody agrees that I can sign that order let me know.  I

13  mean, you can talk to each other right now, let Kristen know,

14  okay.

15           MS. RUSSELL:  Thank you, Your Honor.

16           THE COURT:  If you wanted to make changes in it for

17  any reason tell her what you want to do with it, okay?

18           MR. WILLIAMS:  Yes, Your Honor.

19           THE COURT:  Thank you everybody.  Ms. Russell, tell

20  your colleagues that Mr. Williams did a great job.

21           MS. RUSSELL:  I well.  Thank you, Your Honor.

22           THE COURT:  And Mr. Butler thinks so too.  Thank you.

23           MR. BUTLER:  Thank you, Your Honor.

24                          -oOo-

25

CERTIFICATE

1

2          I certify that the foregoing is a true and correct

3   transcript, to the best of my ability, of the above pages, of

4   the stenographic notes provided to me by the United States

5   District Court, of the proceedings taken on the date and time

6   previously stated in the above matter.

7          I further certify that I am neither counsel for,

8   related to, nor employed by any of the parties to the action in

9   which this hearing was taken, and further that I am not

10  financially nor otherwise interested in the outcome of the

11  action.

12

13  _____          6/18/08
    Crystal M. Pilgrim, RPR                _____
                                              Date
14

15

16

17

18

19

20

21

22

23

24

25