**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| SCOTT VAN VALIN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Carlos M. Gutierrez, in his Official | ) | |
| Capacity as Secretary of the U.S. | ) | |
| DEPARTMENT OF COMMERCE, | ) | |
| | ) | Civil Action No. 1:08-cv-00941-RMC |
| Conrad C. Lautenbacher, Jr., | ) | |
| in his Official Capacity as | ) | |
| Administrator of the U.S. | ) | |
| NATIONAL OCEANIC AND | ) | |
| ATMOSPHERIC ADMINISTRATION, | ) | |
| | ) | |
| James W. Balsiger, in his Official | ) | |
| Capacity as Acting Assistant | ) | |
| Administrator of the U.S. | ) | |
| NATIONAL MARINE FISHERIES | ) | |
| SERVICE | ) | |
| | ) | |
| Defendants. | ) | |

_____

## MOTION OF THE INTERNATIONAL PACIFIC HALIBUT COMMISSION FOR LEAVE TO APPEAR AS _AMICUS CURIAE_

### I. RELIEF REQUESTED

The International Pacific Halibut Commission ("IPHC") respectfully moves the Court for

leave to file the Declaration of Bruce M. Leaman, Ph.D. attached as Exhibit A hereto as _amicus_

_curiae_ in this case.[1]

---

[1] Pursuant to LCvR 7(m), on June 17 and 18, 2008 counsel for _amicus curiae_ contacted counsel for Defendants and Plaintiffs, respectively, regarding the filing of this motion.  Defendants' counsel did not express any objection but Plaintiffs' counsel indicated that he would likely oppose the motion.

## II. ARGUMENT

The decision whether to allow a non-party to participate as *amicus curiae* is within the broad discretion of this Court. *Ellsworth Assocs. v. United States*, 917 F. Supp. 841, 846 (D.D.C. 1996) (internal citations omitted). In general, the Court will "grant leave to appear as an *amicus* if the information offered is timely and useful." *Id.* If *amicus curiae* has a "special interest" in the pending litigation and a "familiarity and knowledge of the issues" that may aid the Court in resolving a case, the Court will grant the non-party movant's motion to participate as *amicus curiae*. *Id.* The IPHC has both a "special interest" and particular "familiarity and knowledge of the issues" in this litigation and therefore this motion should be granted.

The IPHC is mandated by the Convention for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and the Bering Sea to research and manage the Pacific halibut stock within the waters of the United States and Canada with the objective of long term preservation of the halibut resource. It promulgated the commercial catch limits for the IPHC regulatory areas, which were adopted by the United States, and which are the subject of the regulations at issue in this case.

The IPHC catch limits explicitly presumed effective management of charter vessel fisheries to levels specified in United States fishery regulations. If the charter vessel fisheries are not held to the levels upon which IPHC catch regulations are based, the 2008 conservation targets accepted by Canada and the United States will not be realized. The IPHC, accordingly, has a direct interest in the matter before the Court, and seeks to provide the Court with its perspective on the significant consequences of the charter vessel fisheries' non-compliance with the IPHC's recommended catch limits.

The *amicus curiae* Declaration of Bruce M. Leaman, Ph.D. is useful to the disposition of this case because it addresses the conservation concerns for the halibut resource and the implications of not adhering to the IPHC's management targets.

### III. CONCLUSION

For the foregoing reasons, this Court should grant the IPHC leave to file the declaration attached as Exhibit A as an *amicus curiae* brief.


Dated:  June 18, 2008                          Respectfully submitted,


                          By  ___/s/ Christopher T. Koegel_____
                               Christopher Koegel (D.C. Bar No. 473478)
                               MANATT, PHELPS & PHILLIPS, LLP
                               700 12th Street, N.W., Suite 1100
                               Washington, DC  20005-4075
                               Telephone: (202) 585-6563
                               Facsimile: (202)-585-6600
                               ckoegel@manatt.com


                               Charles Jordan
                               Michelle Buhler
                               Danielson Harrigan Leyh & Tollefson, LLP
                               999 Third Avenue, Suite 4400
                               Seattle, WA  98104
                               Telephone: (206) 623-1700
                               Facsimile: (206)623-8717
                               (Admitted in Washington and Alaska)

                               *Attorneys for International Pacific Halibut
                               Commission*

CERTIFICATE OF SERVICE

I, Christopher T. Koegel, hereby certify that on June 18, 2008, a copy of the Motion of the International Pacific Halibut Commission for Leave to Appear as *Amicus Curiae* dated June 18, 2008, attached Declaration of Bruce M. Leaman, Ph.D., and a proposed Order was served by electronic transmission to counsel for the parties as listed below, and sent to the Court's Generic Email Box to be filed with the Court.

Dated:  June 18, 2008                              _____/s/ Christopher T. Koegel_____

John W. Butler
Sher & Blackwell LLP
1850 M Street, NW, Suite 900
Washington, DC  20036
JBUTLER@sherblackwell.com

*Attorneys for Plaintiffs*

Robert P. Williams
U.S. Department of Justice
Wildlife & Marine Resources Section
Benjamin Franklin Station, P. O. Box 7369
Washington, DC  20044-7369
Robert.p.williams@usdoj.gov

*Attorneys for Federal Defendants*

30209844.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SCOTT VAN VALIN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Carlos M. Gutierrez, in his Official | ) | |
| Capacity as Secretary of the U.S. | ) | |
| DEPARTMENT OF COMMERCE, | ) | |
| | ) | Civil Action No. 1:08-cv-00941-RMC |
| Conrad C. Lautenbacher, Jr., | ) | |
| in his Official Capacity as | ) | |
| Administrator of the U.S. | ) | |
| NATIONAL OCEANIC AND | ) | |
| ATMOSPHERIC ADMINISTRATION, | ) | |
| | ) | |
| James W. Balsiger, in his Official | ) | |
| Capacity as Acting Assistant | ) | |
| Administrator of the U.S. | ) | |
| NATIONAL MARINE FISHERIES | ) | |
| SERVICE | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF BRUCE M. LEAMAN, PH.D. AS *AMICUS CURIAE* ON BEHALF OF DEFENDANTS

I, Bruce M. Leaman, Ph.D., declare as follows:

1.      I am the Executive Director of the International Pacific Halibut Commission ("IPHC" or "the Commission") and make this Declaration as an *amicus curiae* on behalf of the Defendants concerning recent changes in the stock of Pacific halibut, with particular reference to IPHC Regulatory Area 2C and IPHC's decisions concerning conservation of the halibut stock resource.

2.      The IPHC, originally called the International Fisheries Commission, was established in 1923 by a Convention between the governments of Canada and the United States of America. *The Convention for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea, March 2, 1953* ("The Halibut Convention"), 5 USTS; TIAS 2900; 16 U.S.C. § 773k. Its mandate is research and management of the stocks of Pacific halibut within the Convention waters of both nations. The Commission's actions are directed at the long-term conservation of the halibut resource. The IPHC consists of three government-appointed commissioners for each country who serve their terms at the pleasure of the President of the United States and the Canadian government respectively.

3.      The IPHC, an International Fisheries Organization, receives monies from both the United States and Canadian governments to support a Director and staff. Annually, the IPHC meets to conduct the business of the Commission. At this annual meeting the budgets, research plans, biomass estimates, catch recommendations, as well as regulatory proposals are discussed and approved then forwarded to the respective governments for implementation. In the U.S., the Commission's actions are implemented through provisions of the Northern Pacific Halibut Act of 1982. The Commission approves regulations at its annual meeting, which include catch limits for the commercial fisheries, and these recommended regulations are forwarded to the U.S. government (Departments of State and Commerce) for acceptance. Following acceptance by the U.S. government, the IPHC regulations are read into the Federal Register and become U.S. regulations.

4.      The Commission has historically been able to rely fully on the capability of the U.S. government to implement effective regulations to satisfy its Convention-based commitments to halibut management. This includes adherence to both catch limits specified by

2

the Commission and those of any more restrictive nature developed by the United States for domestic purposes. In particular, since the 1995 implementation of Individual Fishing Quotas for commercial harvesters in Alaska, the U.S. government has consistently met the Commission's annual conservation targets, specified in the accepted Commission regulations. The Commission places a similar reliance on the U.S. government's capability to implement regulations for other directed and non-directed fisheries. For example, bycatch mortality of halibut in non-directed fisheries is subject to effective monitoring and control, to the benefit of available yield in the halibut fisheries.

     5.      At its January 2008 meeting, the IPHC recommended catch limits for the commercial fisheries throughout the range of Pacific halibut, by IPHC regulatory area. The IPHC received notification of acceptance of its recommended regulations from the U.S. government (letter from the Department of State) on February 28, 2008.

     6.      The 2008 IPHC regulations incorporated acceptance by the Commission of the staff recommendations for lower catch limits throughout the central and eastern portions of the stock range (IPHC Regulatory Areas 2A-3A) in recognition of lower stock biomass estimates in these areas. The Commission further recognized and accepted the staff assessment that exploitation rates in Area 2 have been higher than the Commission's accepted harvest policy targets for the past several years. Recognition of these non-sustainable exploitation rates resulted from Commission stock assessments that incorporated research results from stock-wide tag recovery programs initiated in 2003. The Commission's target harvest policy for these areas is 20% of the exploitable biomass. Exploitation rates in Area 2 have exceeded 30% in recent years and the Commission adopted catch limits that would reduce these exploitation rates.

3

7.      The 2008 catch limits recommended by the Commission and accepted by the U.S.

government were based on an understanding that the U.S. government would be enacting

regulations for 2008 to limit the charter vessel harvest of halibut to the Guideline Harvest Levels

(GHL), as approved by the North Pacific Fishery Management Council and developed by the

National Marine Fisheries Service for incorporation into U.S. federal regulations. Attached

hereto as Exhibit 1 is a true and correct copy of the recommended Yield Table presented to the

Commission by International Pacific Halibut Commission staff. Those regulations specify the

magnitude of the GHL in relation to the Commission's determination of the Constant

Exploitation Yield (CEY), which is derived from the stock abundance estimates. For 2008, the

CEY determined and accepted by the U.S. government resulted in a GHL for Area 2C of 0.931

Mlb. The North Pacific Fishery Management Council had previously approved a motion to

restrict the charter halibut fishery to this GHL level for 2008 through a combination of regulatory

actions and the National Marine Fisheries Service implemented a regulatory package designed to

achieve this 0.931 Mlb GHL objective. Attached hereto as Exhibit 2 is a true and correct copy of

the Federal Registry, *e.g.*, 73 Fed. Reg. 30504 (May 28, 2008).

8.      In the period 2006-2007, the charter fishery in Area 2C exceeded GHL targets

that were higher than the 2008 GHL by significant amounts. Attached hereto as Exhibit 3 are the

estimated removals from halibut stock 2006-2007 generated by International Pacific Halibut

Commission staff. The Commission, the North Pacific Fishery Management Council, and the

National Marine Fisheries Service recognized that additional regulatory actions would be

required to reduce the charter fishery removals since the regulations for 2006 and 2007 had been

demonstrated to result in removals well above those required to achieve the conservation and

management targets of the Commission. These additional regulatory actions were contained in

4

the package scheduled for implementation in June 2008 and provided measures that could be

reasonably calculated to promote conservation, as required by the Convention and the Halibut

Act. Absent the implementation of these new regulations on the charter fishery, the removals by

this fishery are reasonably expected to exceed the 0.931 Mlb GHL, as has been amply

demonstrated over previous years when existing regulations were in effect.

9.     Exceeding the GHL specified for 2008 in Area 2C will mean that the combined

removals by all sectors in 2008 will exceed the Commission's conservation targets, which have

been accepted by the U.S. government, to the detriment of the halibut stock in this area. The

regulatory framework scheduled for implementation on June 1, 2008 was an important

component of the U.S. government's compliance with the Commission's management program,

and guided the Commission's decisions on appropriate removals for 2008.

I declare under penalty of perjury and under the laws of the State of Washington that the

foregoing is true and correct.

Executed this 17th day of June, 2008, at Seattle, Washington.

By _____

Bruce M. Leaman, Ph.D.
Executive Director
International Pacific Halibut Commission
P. O. Box 95009
Seattle, WA  98145-2009
(206) 634-1838, Ext. 203

5

# EXHIBIT 1

Attachment 1

**Table 1. Staff recommended catch limits for 2008 by IPHC regulatory area (million lbs, net weight). Recommendations based on coastwide assessment of exploitable biomass with survey apportionment to Regulatory Area exploitable biomass. Removal data are preliminary. Also shown are the 2007 catch limits for comparison.**

| Reg Area | Exploitable biomass | Harvest Rate | Total CEY | 2007 Other Removals | 2007 Catch Limit | 2008 Fishery CEY | 2008 Catch Limit Recommendation | |
|---|---|---|---|---|---|---|---|---|
| 2A | 4.70 | 20.0% | 0.94 | 0.29 | 1.34 | 0.65 | 1.00 | 1,4 |
| 2B | 25.60 | 20.0% | 5.12 | 0.47 | 11.47 | 4.65 | 8.06 | 2,4 |
| 2C | 32.50 | 20.0% | 6.50 | 2.59 | 8.51 | 3.92 | 6.21 | 4 |
| 3A | 144.80 | 20.0% | 28.96 | 6.71 | 26.20 | 22.25 | 24.22 | 4 |
| 3B | 74.00 | 20.0% | 14.80 | 0.53 | 9.22 | 14.27 | 10.90 | 3 |
| 4A | 21.30 | 20.0% | 4.26 | 0.75 | 2.89 | 3.51 | 3.10 | 3 |
| 4B | 20.20 | 15.0% | 3.03 | 0.33 | 1.44 | 2.70 | 1.86 | 3 |
| 4CDE | 37.90 | 15.0% | 5.69 | 2.01 | 4.10 | 3.68 | 3.89 | 4 |
| Total | 361.00 | 19.2% | 69.30 | 13.68 | 65.17 | 55.62 | 59.24 | |

Note: Exploitable biomass is coastwide assessment, survey partitioning; amended 2C sport

[1] Catch limits and Fishery CEY for 2A includes commercial, sport, and treaty subsistence catches

[2] Catch limits and Fishery CEY for 2B includes commercial and sport catch

[3] Calculated as 2007 catch limit plus 1/3 of the difference between
     2008 Fishery CEY and 2007 Catch Limit

[4] Calculated as 2007 Catch Limit minus 1/2 of the difference between
     2008 Fishery CEY and 2007 Catch Limit

**Assumes GHL of 0.931 Mlb in Area 2C, 3.65 Mlb in Area 3A under Other Removals; reduced GHL in Area 2C, based on NMFS-regulated GHL reduction associated with reduced Total CEY.**

Source: IPHC Staff Regulatory Proposals: 2008 Bruce M. Leaman and Heather L. Gilroy
International Pacific Halibut Commission 2008 Annual Meeting Blue Book.
http://www.iphc.washington.edu/halcom/pubs/annmeet/2008/bluebook/bluebook08.pdf

EXHIBIT __1__

# <u>EXHIBIT 2</u>

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**50 CFR Part 300**

[Docket No. 080515668–8669–01]

RIN 0648–AW82

**Pacific Halibut Fisheries; Guideline Harvest Levels for the Guided Recreational Halibut Fishery; Correction**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Final rule; correcting amendments.

**SUMMARY:** This action corrects the regulatory text of a final rule published on August 8, 2003 (68 FR 47256), that implemented guideline harvest levels (GHLs) for the guided sport charter vessel fishery in the International Pacific Halibut Commission Regulatory Areas 2C and 3A. The table of GHLs as they relate to the total constant exploitation yield contains errors in the conversions from pounds to metric tons, and rounding errors for some metric equivalents. This action is necessary to correct the errors in that table.

**DATES:** Effective May 28, 2008.

**FOR FURTHER INFORMATION CONTACT:** Julie Scheurer, (907) 586–7356.

**SUPPLEMENTARY INFORMATION:** A final rule published August 8, 2003 (68 FR 47256, RIN 0648–AK17), implemented guideline harvest level (GHL) measures for managing the harvest of Pacific halibut (*Hippoglossus stenolepis*) in the charter sport fishery in International Pacific Halibut Commission (IPHC) Regulatory Areas 2C and 3A in and off Alaska. This correcting amendment revises the table at 50 CFR 300.65(c)(1) that lists GHLs corresponding to different levels of the total constant exploitation yield set annually by the IPHC.

**Need for Correction**

The table at § 300.65(c)(1) contains three metric conversion errors, several rounding errors, and missing paragraph designations. Paragraphs (c)(1)(i) through (v) refer to different benchmark levels for the total constant exploitation yield for Area 2C. There are no similar paragraph designations for the benchmark levels for Area 3A. Paragraph designations are added for the Area 3A table entries for consistency. This final rule corrects the conversion to metric equivalent errors

and rounding errors, adds new paragraph designations to paragraph (c)(1), and reorganizes the table into two columns instead of four for clarity and ease of reading.

**Classification**

Pursuant to 5 U.S.C. 553(b)(B), the Acting Assistant Administrator for Fisheries finds there is good cause to waive prior notice and an opportunity for public comment on this action, as notice and comment would be unnecessary. Notice and comment are unnecessary because this action makes only minor, non-substantive changes to the metric equivalents for the GHLs, and reorganizes the table to make it easier to read and understand. The IPHC conducts its analyses and sets limits using pounds. Likewise, Canadian and U.S. management agencies use pounds to measure and report halibut catch information. These corrections will not affect the results of analyses conducted to support management decisions in the halibut fishery nor change the total catch of halibut in the charter halibut fishery. This rule does not make any substantive change in the rights and obligations of charter vessel anglers managed under the GHL halibut regulations. No aspect of this action is controversial and no change in operating practices in the fishery is required. NMFS therefore determines that APA requirements for public notice and comment are unnecessary for this action and determines that this rule is not subject to the 30-day delay in effectiveness requirement at 5 U.S.C. 553(d).

This final rule complies with the Halibut Act and the North Pacific Fishery Management Council's authority to implement allocation measures for the management of the halibut fishery.

**List of Subjects in 50 CFR Part 300**

Fisheries, Fishing, Reporting and recordkeeping requirements, Treaties.

Dated: May 21, 2008.

**Samuel D. Rauch III**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

■ For the reasons set out in the preamble, 50 CFR part 300 is corrected as follows:

**PART 300—INTERNATIONAL FISHERIES REGULATIONS**

■ 1. The authority citation for 50 CFR part 300, subpart E, continues to read as follows:

**Authority:** 16 U.S.C. 773–773k.

■ 2. In § 300.65, paragraph (c)(1) is revised to read as follows:

**§ 300.65  Catch sharing plan and domestic management measures in waters in and off Alaska.**

\*    \*    \*    \*    \*

(c) \* \* \*

(1) The annual GHLs for Regulatory Areas 2C and 3A are determined as follows:

| If the Annual Total Constant Exploitation Yield for Halibut is More Than: | Then the GHL will be: |
|---|---|
| (i) Regulatory Area 2C | |
| (A) 9,027,000 lb (4,094.6 mt) | 1,432,000 lb (649.5 mt) |
| (B) 7,965,000 lb (3,612.9 mt) | 1,217,000 lb (552.0 mt) |
| (C) 6,903,000 lb (3,131.1 mt) | 1,074,000 lb (487.2 mt) |
| (D) 5,841,000 lb (2,649.4 mt) | 931,000 lb (422.3 mt) |
| (E) 4,779,000 lb (2,167.7 mt) | 788,000 lb (357.4 mt) |
| (ii) Regulatory Area 3A | |
| (A) 21,581,000 lb (9,789.0 mt) | 3,650,000 lb (1,655.6 mt) |
| (B) 19,042,000 lb (8,637.3 mt) | 3,103,000 lb (1,407.5 mt) |
| (C) 16,504,000 lb (7,486.1 mt) | 2,734,000 lb (1,240.1 mt) |
| (D) 13,964,000 lb (6,334.0 mt) | 2,373,000 lb (1,076.4 mt) |
| (E) 11,425,000 lb (5,182.3 mt) | 2,008,000 lb (910.8 mt) |

\*    \*    \*    \*    \*

[FR Doc. E8–11881 Filed 5–27–08; 8:45 am]

BILLING CODE 3510–22–S

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**15 CFR Part 902**

**50 CFR Part 300**

[Docket No. 071031633–8385–02]

RIN 0648–AW23

**Pacific Halibut Fisheries; Guided Sport Charter Vessel Fishery for Halibut**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

EXHIBIT ___2___

**ACTION:** Final rule.

**SUMMARY:** NMFS implements regulations to limit the harvest of Pacific halibut by guided sport charter vessel anglers in International Pacific Halibut Commission Area 2C of Southeast Alaska to the guideline harvest level (GHL) of 931,000 lb (422.3 mt). The intended effect of this action is to reduce the poundage of halibut harvested by the guided sport charter vessel sector in Area 2C to the GHL while minimizing adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and fisheries for other species. This final rule implements three restrictions for the guided sport charter vessel fishery for halibut in Area 2C: a one-fish daily bag limit, no harvest by the charter vessel guide and crew, and a line limit equal to the number of charter vessel anglers onboard, not to exceed six lines.

**DATES:** Effective June 1, 2008.

**ADDRESSES:** Copies of the Environmental Assessment (EA), Regulatory Impact Review (RIR), and Final Regulatory Flexibility Analysis (FRFA) prepared for this action may be obtained from the North Pacific Fishery Management Council (Council) at 605 West 4th, Suite 306, Anchorage, Alaska 99501–2252, 907–271–2809, or the NMFS Alaska Region, P.O. Box 21668, Juneau, Alaska 99802, Attn: Ellen Sebastian, and on the NMFS Alaska Region Web site at *http:// www.noaa.fakr.gov.*

Written comments regarding the burden-hour estimates or other aspects of the collection of information requirements contained in this rule may be submitted to NMFS at the above address, and by e-mail to *David_Rostker@omb.eop.gov* or by fax to 202–395–7285.

**FOR FURTHER INFORMATION CONTACT:** Sue Salveson, 907–586–7228, or Julie Scheurer, 907–586–7356.

**SUPPLEMENTARY INFORMATION:** The International Pacific Halibut Commission (IPHC) and NMFS manage fishing for Pacific halibut (*Hippoglossus stenolepis*) through regulations established under the authority of the Northern Pacific Halibut Act of 1982 (Halibut Act). The IPHC promulgates regulations governing the halibut fishery under the Convention between the United States and Canada for the Preservation of the Halibut Fishery of the Northern Pacific Ocean and Bering Sea (Convention). The IPHC's regulations are subject to approval by the Secretary of State with concurrence by the Secretary of Commerce

(Secretary). After approval by the Secretaries of State and Commerce, the IPHC regulations are published in the **Federal Register** as annual management measures pursuant to 50 CFR 300.62. The annual management measures for 2008 were published on March 7, 2008 (73 FR 12280).

The Halibut Act also provides the Council with authority to recommend regulations to the Secretary to allocate harvesting privileges among U.S. fishermen. This process requires the Council to submit a recommendation to the Secretary as a proposed rule for publication in the **Federal Register** along with supporting analyses as required by other applicable law. The Council is developing a regulatory program to manage the guided sport charter vessel fishery for halibut. This final rule is a step toward the Council's effort to stabilize relative harvest between the Area 2C charter vessel and commercial halibut fisheries while a longer term management program is developed and implemented. The proposed longer term program under development currently includes a proposed limited entry program for charter businesses, a catch sharing plan, and compensated reallocation from the commercial to charter fishing sectors. This final rule is linked to the overall management of the halibut fisheries by the IPHC and a previous regulation approved by the Secretary that establishes a guideline harvest level (GHL) for managing the harvest of halibut by the guided sport charter vessel fishery (August 8, 2003; 68 FR 47256).

**Background and Need for Action**

The background and need for this action were described in the preamble of the proposed rule published in the **Federal Register** on December 31, 2007 (72 FR 74257). In summary, this final rule will implement a one-fish daily bag limit for guided sport charter vessel anglers in Area 2C to reduce the poundage of halibut harvested by the guided sport charter vessel sector in Area 2C to the GHL while minimizing adverse impacts on the charter fishery, its sport fishing clients, the coastal communities that serve as home ports for this fishery, and fisheries for other species.

**Management of the Halibut Fisheries**

A complete description of how the halibut fisheries are managed can be found in the preamble to the proposed rule. In short, the IPHC annually determines the amount of halibut that may be removed from the resource without causing biological or

conservation problems on an area-by-area basis in all areas of Convention waters. The IPHC estimates the exploitable biomass and calculates the target amount of allowable mortality for a given area. This target level is called the total constant exploitation yield (CEY) and it represents the target level for total removals (in net pounds) for that area in the coming year. The IPHC subtracts estimates of all non-commercial removals (sport, subsistence, bycatch, and wastage) from the Total CEY. The remaining CEY, after the removals are subtracted, is the maximum catch or AFishery CEY'' for an area's directed commercial fixed gear fishery.

**Guideline Harvest Level**

A more thorough discussion of the development of the guideline harvest level (GHL) is provided in the preamble to the proposed rule (December 31, 2007; 72 FR 74257) and in the rule that first implemented the GHL (August 8, 2003; 68 FR 47256). The Area 2C GHL is established in regulations at 50 CFR 300.65(c) and is a benchmark for monitoring the charter vessel fishery relative to the commercial fishery and other sources of fishing mortality. The fishery is not closed when the GHL is reached, but it is the Council's policy that the charter vessel fishery should not exceed the GHL.

To accommodate fluctuations in halibut abundance, the Council adjusts the GHL step-wise according to the total CEY determined annually by the IPHC. Specifically, the Council linked a step-wise reduction in the GHL in any one year to the decrease in the total CEY as compared to the 1999–2000 stock abundance. Since 2003 when the GHL became effective, it has never been reduced below its maximum level because declines in the total CEY have not been sufficient to trigger the first step reduction of the GHL. This situation changed in 2008 when the total CEY for Area 2C was markedly reduced, resulting in a GHL of 931,000 lb (422.3 mt). If the CEY were to increase in the future, the GHL could increase up to a maximum of 1.432 million lb (649.5 mt) for Area 2C.

**Recent Harvests of Halibut in Area 2C**

The GHL was implemented in 2003, and the charter vessel fishery has exceeded the GHL for Area 2C every year since 2004. In 2006, the charter harvest exceeded its 2006 Area 2C GHL by 380,000 lb (172.4 mt) or 26.5 percent. In 2007, the Secretary of Commerce took regulatory action to reduce sport fish harvest of halibut in Area 2C by amending the two-fish bag limit with

the restriction that at least one of the two halibut retained be no longer than 32 in (81.3 cm) with its head on. Alaska Department of Fish and Game (ADF&G) preliminary estimates of the Area 2C halibut harvest by the charter vessel fishery in 2007 again indicated that the GHL was exceeded, although by a smaller amount.

The Council recommended this final rule specifically to maintain the charter vessel fishery at its GHL. In June 2007, the Council adopted a preferred alternative that contained two options. The Council recommended that the selection between the options would depend on whether the CEY decreased substantially for 2008. Not knowing in June 2007 how the GHL might be affected by total CEY established by the IPHC in January 2008, the Council recommended a suite of charter vessel fishery restrictions if the GHL were to remain the same in 2008 (proposed rule Option A) and a more restrictive suite of restrictions if the GHL were to decrease in 2008 (proposed rule Option B).

At the IPHC annual meeting in January 2008, the IPHC set the 2008 total CEY for Area 2C was set at 6.5 million lb (2,948.4 mt). This is a 4.3 million lb (1,950.4 mt) reduction from the 2007 total CEY of 10.8 million lb (4,899.0 mt).

## 2008 GHL for Area 2C

NMFS published a notice of the guideline harvest levels for Areas 2C and 3A for 2008 on February 5, 2008 (73 FR 6709). As established by the original rule that implemented the GHL (August 8, 2003; 68 FR 47256), the GHL will step down if the IPHC reduces the CEY below certain benchmarks. The 2008 CEY resulted in a three-step reduction in the GHL for Area 2C. The 2008 GHL for Area 2C is 931,000 lb (422.3 mt).

## The Action

With this final rule, NMFS implements the following management measures to restrict halibut harvest by the charter vessel sector to the GHL for Area 2C:

• The number of halibut caught and retained by each charter vessel angler in Area 2C is limited to no more than one halibut of any size per calendar day;

• A charter vessel guide, a charter vessel operator, and crew of a charter vessel must not catch and retain halibut during a charter vessel fishing trip; and

• The number of lines used to fish for halibut must not exceed six or the number of charter vessel anglers onboard the charter vessel, whichever is less.

No annual limit for individual anglers will be implemented in Area 2C for 2008. NMFS notes that a two-fish daily bag limit for sport fish anglers is established under annual IPHC regulations for all waters off Alaska. If an angler onboard a charter vessel in Area 2C retains a halibut, then that angler may retain only one additional halibut that day and only if that additional halibut was caught in an IPHC regulatory area other than Area 2C. This is most pertinent to charter vessels that may fish adjacent Areas 2C and 3A in a single day. While charter vessel guides, operators, and crew will be prohibited from catching and retaining halibut, they are not prohibited from demonstrating fishing techniques to their clients.

## Summary of Comments

The proposed rule was published in the **Federal Register** on December 31, 2007 (72 FR 74257), and invited public comments until January 30, 2008. NMFS received 273 letters, e-mails, and faxes before the deadline containing 107 unique comments on the proposed rule. NMFS received 162 letters in favor, 102 letters in opposition, 8 letters in partial support, and one letter stating an ambiguous position on the proposed rule. Of the letters from which affiliations could be determined, 96 were from the commercial industry, 61 from the charter industry, 14 from local businesses, 2 from fisheries management organizations (IPHC and ADF&G), and 24 letters were received from anglers and members of the general public. Three form letters were received. Ten copies of one letter in support of the one-fish daily bag limit were received. One form letter was received from 51 individuals who opposed the proposed rule because it did not include a sunset provision. The third form letter was from 13 businesses that opposed the proposed rule citing negative economic effects to their communities. Additionally, two letters in favor of the proposed rule were received, one signed by 24 commercial fisherman, and another signed by 15 deckhands. Comments in favor of the rule generally expressed support for limiting the guided sport charter vessel sector harvest to the GHL to ensure conservation of the halibut stock and to avoid further reallocations from the commercial sector. Most comments against the rule cited economic hardship to businesses and communities, inability to retain clients who will choose to fish in other areas with more lenient restrictions, and the need for what was perceived by the commenters as a more equitable

allocation split between the commercial and charter sectors, as reasons for their opposition.

## Comments and Responses

*Allocation Issue*

*Comment 1:* NMFS should impose restrictions on the commercial fishing sector, including reducing commercial bycatch levels and the commercial setline quota instead of limiting the halibut charter fishery.

*Response:* This rule is not designed to impose further restrictions on commercial fisheries that take halibut. The commercial fishery for halibut as well as the commercial fishery for groundfish that takes halibut as bycatch to the harvest of other species are limited to a specified amount of halibut mortality. Unlike the charter vessel fishery for halibut, these commercial fisheries are closed each year when their limits are reached.

*Comment 2:* All sectors need to stay within their allocations and measures should be implemented to restrict the charter sector to the GHL. Due to a declining estimate in biomass, and charter fishery overages of the GHL, the Area 2C commercial fishery has taken a 42 percent reduction in allowable harvest between 2006 and 2008. Achievement of IPHC's harvest goals and management objectives depends on implementation of the proposed action. To choose an option that won't hold the charter sector at or below the GHL would result in continued reallocation of the halibut resource. Option B in the proposed rule is the only option that will reduce harvest to the 2008 GHL.

*Response:* NMFS is implementing management measures in the final rule that are intended to reduce the Area 2C charter halibut harvest amount to the 2008 GHL.

*Comment 3:* Change how allocations are divided between the charter and commercial sectors.

*Response:* Establishing a new process for allocating Pacific halibut among different sectors is outside the scope of the proposed action; however, the Council is considering options for reallocating halibut between the commercial and charter sectors and received public testimony at its April 2008 meeting. Final action is scheduled for October 2008.

*Comment 4:* The Council has stated that its intent is to manage the charter halibut fishery to the GHL until a long term plan is adopted including a limited entry program for halibut charter businesses and potentially new regulations on the allocation of halibut

between the commercial and charter fisheries.

*Response:* NMFS agrees. See response to Comment 3.

*Comment 5:* The IFQ program has allowed commercial fisherman to fish shallower waters and deplete fish that sport fisherman would otherwise catch.

*Response:* Current data do not clearly indicate whether nearshore depletions are occurring, or what the causes, magnitude, and geographical distribution of nearshore depletions might be. While it is accurate that commercial fishermen may fish in areas that are accessible to sport fishermen, any localized depletions resulting from high halibut catch rates may be offset by egg and larval drift and migrations of juveniles and adults. Information about local biomass, immigration and emigration rates, seasonal changes, and the relationship of these factors with environmental characteristics is not available at a fine enough scale to indicate whether localized depletions are occurring in Area 2C.

This final rule is not expected to significantly impact the sustainability of the halibut stock. As discussed in the EA/RIR/IRFA, the IPHC sets catch limits for the commercial fishery in proportion to the amount of halibut that may be sustainably removed. This strategy protects against overharvest and distributes the fishing effort over the entire geographic range for halibut to prevent regional depletion. The IPHC does not expect small scale local depletion to have a significant biological effect on the resource as a whole.

*Comment 6:* There is no balance between the commercial and sport fisheries. Commercial catch is increasing while the charter industry is being faced with a cut. The proposed rule states that, "from 1997 to 2006, the average annual removal of halibut was about 12.454 million pounds and of this, the commercial fishery harvested 76.7 percent or 9.522 million pounds per year. From 2004 to 2006, the average annual removal of halibut was 14.142 million pounds, and of this the commercial fishery harvested 73.8 percent or 10.437 million pounds per year." While it is true there has been some growth in the charter sector harvest, the commercial harvest did not decrease, but in fact, increased. While sport fish catch is being reduced, the commercial sector will be able to harvest 2.28 million pounds over the IPHC's CEY for 2008.

*Response:* The catch limit for the commercial halibut fishery and the guideline harvest level for the sport fishery are derived from the same estimate of total halibut biomass. The

biomass allocation among areas is estimated from the annual setline survey data and estimates of bottom area. The catch limits are biologically based.

NMFS acknowledges that the commercial catch increased from the period 2000–2003 to somewhat higher levels in 2004–2006 (reflecting improved biological factors and technical improvements to the IPHC assessments in those years); however, it is incorrect that the commercial catch is increasing while the charter industry is being faced with a cut. IPHC data show that the commercial catch declined in each year from 2006 to 2008. Between 2007 and 2008, the commercial catch limit in Area 2C was reduced from 8,510,000 pounds in 2007 to 6,210,000 pounds in 2008. This is a reduction of 27 percent and follows a 20 percent reduction in the commercial catch limit in 2007 from the 2006 level.

*Comment 7:* The preliminary 2007 charter harvest estimate is 1.7 million pounds, only 270,000 pounds over the GHL. NMFS is giving poundage back to the commercial fleet and cutting the charter catch.

*Response:* As described in the preamble to this rule, the 2008 GHL was reduced to 931,000 lb. While the preliminary estimate of 2007 charter vessel harvest was 270,000 lb over the 2007 GHL, this level of harvest would exceed the 2008 GHL by about 770,000 lb. The one-fish daily limit implemented under this final rule is the only proposed measure that may adequately reduce harvest to the current GHL.

The commercial Area 2C Fishery CEY is set by the IPHC and includes a buffering provision for large changes in catch limits. The amount of this buffer does not affect the GHL and does not represent pounds of fish given back to the charter sector at the expense of the charter sector.

The charter vessel GHL is established in regulations at § 300.65(c) and is adjusted in a stepwise manner based on the Total CEY established annually by the IPHC. The GHL table in regulations at § 300.65(c), adjusts the GHL to 931,000 lb when the Total CEY for Area 2C is more than 5.841 million lb, but less than 6.903 million lb. The IPHC set the 2008 Total CEY to 6.50 million lb, which is above 5.841 million lb. In 2007, the GHL was set at 1.432 million lb under § 300.65(c) and the 2007 Total CEY of 11.40 million lb. The difference between the 2008 GHL of 931,000 lb and the 2007 GHL of 1,432,000 lb is about 500,000 lb. This 500,000 is not cut from the 2007 GHL. Rather, the 2008 GHL is reduced consistent with the lower Total

CEY in 2008 and the stepwise manner in which GHL is established under § 300.65(c).

*Community Effects*

*Comment 8:* Tourism benefits more Alaskans than commercial fishing. Tourism supports a wide variety of businesses that will be affected by reduced demand for halibut charter trips. Lodges and charter industry bring jobs and money to local communities and businesses, including Alaska Airlines and the Alaska Marine Highway System. Communities have invested a lot of money to encourage tourism and this rule will undermine those efforts.

*Response:* NMFS agrees that the charter industry is an important industry for many communities, generating jobs and revenue for the communities involved as well as direct employment for the guides and crew. A reduction in the daily bag limit for guided charter clients will affect those communities and their efforts to develop guided charter industries. The analysis indicates that the segment of the charter industry that caters to cruise ship tourists will not be impacted by changes to the daily bag limit to the same extent as the lodge-based guided charter businesses. Moreover, tourists on the four hour charter fishing trips associated with cruise ships often do not have enough time to harvest two halibut. Tourists coming to communities on cruise ships and choosing to take a charter trip for halibut will likely continue to do so and businesses that cater to these tourists will continue to benefit from their visits. NMFS acknowledges that independent or repeat tourists who book day vacations at lodges may consider the reduced halibut bag limit in their decision to book a vacation, along with considerations for alternative fishing or tourist opportunities that may be offered. The potential impact on bookings and demands for tourist activities is discussed in the analysis supporting this final rule, but quantitative estimates of how such impacts will influence demand for these services and commensurate impacts on local communities are unavailable.

*Comment 9:* Tourist hopes and expectations of catching a "barn door" (i.e., a very large halibut) are fading along with their willingness to pay for trips. Sufficient incentive must remain to attract visitors.

*Response:* A tourist's expectation to catch a large halibut still exists if the bag limit is one fish. This expectation and the fishing experience itself often are the key factors in deciding to board

a charter vessel, not the daily bag limit. Furthermore, for much of the charter fishing season, there are opportunities to catch other sport fish species during a trip. This contributes to one of the incentives to hire a charter vessel, which is to optimize the experience of sport fishing in Alaska by fishing for more than one species.

*Comment 10:* Announcing new regulations at the beginning of a season creates confusion and frustration and makes it hard to attract and retain business. The proposed restrictions on the charter fishery will negatively impact the ability of lodge owners to book trips and many lodges have already pre-booked vacations for the 2008 season.

*Response:* NMFS agrees that a change in charter fishing regulations in the months prior to a fishing season will be disruptive and may cause some clients to reconsider bookings. However, information about the potential for this action has been available since mid-2007. In June 2007, the Council announced its intention to adopt a one-fish bag limit if necessary to reduce the charter fishery harvest to the 2008 GHL. The proposed rule for this action was published in the **Federal Register** on December 31, 2007 (72 FR 74257), with a public comment period that closed on January 30, 2008. The results of the IPHC annual meeting were published on January 22, 2008, and included an Area 2C CEY that triggered a reduction in the GHL to 931,000 lb GHL. This reduced GHL prompted selection of the Council's proposed one-fish bag limit as the preferred management option to limit harvest to the GHL. NMFS took action to inform the public and charter industry about the proposed regulation changes as soon as possible through an information bulletin published on its Web site and a press release.

*Comment 11:* The proposed annual limit disproportionately affects multi-day lodge and charter operations while allowing cruise-based day charters, the sector that comprises the main growth of the industry, to continue. Both Options A and B would have profound negative effects on lodge-based charter operations.

*Response:* The EA/RIR/IRFA and the proposed rule acknowledged that the proposed actions may have greater adverse impacts on the lodge-based sector of the guided charter vessel industry than on the day-boat sector (see response to Comment 8).

*Comment 12:* This rule creates a marketing disadvantage for businesses in Area 2C and will discourage clients from coming to Southeast Alaska. Our businesses rely on repeat customers.

Many of these customers will now go to fish in other areas.

*Response:* NMFS believes this comment applies primarily to the lodge-based segment of the guided charter industry. As indicated in the analysis, the cruise-based component relies primarily on people arriving in Alaska for one-time visits who have little opportunity to fish in other areas and are not likely to be repeat customers. NMFS acknowledges that lodge-based guided charter clients have more opportunities to substitute fishing experiences to other regions of Alaska or outside of Alaska. They also may shift to targeting a different species. Models are not available to predict the number of clients that will choose to not take a charter vessel trip in Area 2C as a direct result of this final rule, or to estimate the proportion of clients who would choose to maximize their experience with some other type of fishing experience. Other than acknowledging the potential for lost business, as was done in the EA/RIR/IRFA, NMFS cannot forecast the probability or extent to which this might occur.

*Comment 13:* The bag limit should be the same for the entire British Columbia and Alaska coastline so that no one area is more desirable than another to anglers.

*Response:* NMFS lacks the authority to manage halibut in British Columbia. This action is in response to concerns that are specific to Area 2C.

*Comment 14:* Small charter operations will not be able to survive this restriction.

*Response:* NMFS agrees that this action may have adverse impacts on charter businesses and that some may fail or leave the business. This possibility is mentioned in the analysis. Likewise, some businesses may benefit from reduced competition if other businesses close. NMFS does not agree that all small charter businesses will be forced to leave the business.

### Alternative and Future Management Measures

*Comment 15:* Allow the proposed limited entry program (moratorium) for guided sport charter vessel businesses to go into place to preserve the current charter vessel fleet. The number of boats should be limited, not the number of fish.

*Response:* The Council adopted a proposal at its April 2007 meeting to limit the number of businesses and vessels permitted to participate in the guided sport charter vessel fishery for halibut. NMFS currently is developing a proposed rule to implement the Council's action. Publication of the

proposed rule is scheduled for Spring 2008. Pending consideration of public comment and approval of the proposed limited entry program by the Secretary of Commerce, fishing under the limited entry program would begin in 2010.

A limited entry program would limit the number of businesses and vessels, but not the amount of halibut harvested. The amount of halibut harvested in this fishery would need to be regulated by other management measures, including GHL restrictions (if the GHL program is not replaced with a different allocation) or an individual fishing quota program designed specifically for the guided sport charter vessel fishery for halibut. Limited entry programs in commercial fisheries only weakly influence the amount of fish harvested because harvesters adapt by changing their fishing effort and methods. Ancillary regulations are needed to control the amount of harvest. If the number of halibut charter vessel businesses was limited, the fishery could still maximize harvest by modifying vessel size, capital inputs, number of trips, length of trips, and the number of people in a fishing party. Thus, harvest restrictions such as those implemented under this final rule are necessary because effort controls alone are not sufficient to reduce harvest.

*Comment 16:* Don't impose an annual catch limit; instead impose a one-fish daily limit and move toward a limited entry program.

*Response:* NMFS agrees that a one-fish daily bag limit is an appropriate management measure to limit the harvest of the guided sport charter vessel for halibut to the reduced GHL established for 2008. Even the most conservative annual catch limit considered by the Council (4 fish a year) would not result in a harvest reduction sufficient to meet the objective of this final rule. Thus, an annual catch limit is not included as a provision of the final rule. NMFS is developing a proposed rule to establish a limited entry program for the halibut guided sport charter vessel businesses and expects a proposed rule to be published in Spring 2008 for public review and comment. Also see response to Comment 15.

*Comment 17:* Under the moratorium (limited entry program), charter operators will have to buy their rights to fish while the original commercial IFQs were given away.

*Response:* The nature and restrictions of the proposed limited entry program for guided sport charter vessel businesses will be best addressed under the proposed rule to implement that program once it is published. However,

charter vessel business owners who initially qualify under the limited entry program for participation in the guided sport charter vessel fishery for halibut would not be required to purchase their privilege for ongoing participation. This is similar to the initial allocation of commercial IFQ.

*Comment 18:* With a new allocation decision and interim management plan due this October from the Council, it seems unnecessary to inflict serious harm on the charter industry in the meantime.

*Response:* NMFS disagrees that it is unnecessary to reduce the guided sport charter vessel fishery harvest of halibut to the GHL. The purpose of this final rule is to reduce harvest to the GHL, and to provide a measure of stability to the halibut industry and coastal communities while the Council develops a long-term plan for the charter sector. The Council has initiated additional analyses of sector allocations and a means for compensated reallocation of halibut from the commercial to the charter vessel halibut fishery that would allow the charter sector to grow. The Council also is exploring options for a share-based program for the charter halibut fishery. Pending timely Council action and Secretarial review and approval, regulations implementing alternative allocations and associated management measures are unlikely to be effective until 2010 or 2011, and would become effective concurrently or after a proposed limited entry program for halibut charter businesses is implemented if approved by the Secretary (see response to Comment 15). To wait several years to reduce the harvest in the halibut charter fishery to the GHL while longer term allocation solutions are developed and implemented would frustrate the IPHC's attempt to manage halibut mortality to the Total CEY based on projected charter fishery harvests at the GHL level, and would continue the ongoing *de facto* reallocation of halibut from the commercial sector to the charter sector.

NMFS acknowledges that a policy decision to maintain the charter fishery harvest at the GHL until such time a different allocation system is implemented will constrain the growth of charter sector harvest of halibut and impose costs on charter businesses. The EA/RIR/IRFA supporting the final rule addresses these costs, although the assessment of the economic effects is qualitative due to lack of data.

*Comment 19:* Develop a stable, long-term management plan for the halibut charter sector.

*Response:* NMFS agrees that a more stable management program for the halibut charter sector is necessary and is coordinating with the Council and other management agencies to accomplish this through a sequence of proposed management changes. The first step in this sequence is the proposed implementation of a limited entry program for halibut charter sector businesses. Also see response to Comment 18.

*Comment 20:* Develop a catch sharing plan for Area 2C.

*Response:* The Council is considering a catch sharing plan for the halibut charter vessel and commercial fishery sectors. The Council initially reviewed the alternatives for a catch sharing plan at its April 2008 meeting and final action is scheduled for October 2008. Also see responses to Comments 3, 18, and 19.

*Comment 21:* The Council is moving toward long-term solutions. To change management now will disrupt ongoing analyses.

*Response:* The Council and NMFS' management objective for the halibut guided sport charter vessel fishery since 2003 has been to maintain harvest amounts to the GHL. Since 2004, the charter vessel fishery in Area 2C has exceeded GHL by amounts that range between 122 percent and 136 percent. Until 2006, administrative and implementation issues delayed responsive management actions to reduce harvest of halibut in the Area 2C charter vessel fishery. In cooperation with ADF&G, these issues largely have been resolved and NMFS and the Council are moving forward to manage the charter vessel fishery consistent with management objectives set forth since 2003. NMFS disagrees that management of this fishery to reduce harvest to the GHL would disrupt ongoing analyses; this final rule does not change the long-term solutions for the charter vessel fishery under consideration by the Council nor does it prevent future management actions that the Council may wish to consider as new information becomes available. See also response to Comment 18.

*Comment 22:* Restrict the guided sport charter vessel fishery to only allow retention of halibut greater than 32 inches in length like the commercial sector in order to protect recruits of the halibut biomass. Halibut only twenty inches in length and weighing five pounds have been brought back to the dock by charter vessel anglers. Charter vessel anglers should also have a maximum poundage.

*Response:* Restricting the charter vessel fishery to retention of fish over 32 inches without other harvest constraints would not meet the intent of reducing harvest in this fishery to the GHL. Implementing a size limit in addition to the one-fish daily bag limit would be overly restrictive. Other reasons may exist to consider size restrictions in the charter fishery in the future, but not as a provision of this final rule.

NMFS notes that the Council did consider minimum size limits of 45 and 50 inches on a second fish (assuming a two-fish bag limit) as part of the EA/RIR/IRFA supporting this final rule. A key reason why the Council rejected alternatives with minimum size limits was the difficulty in measuring larger fish.

*Comment 23:* Maintain the status quo for the Area 2C charter harvest restrictions.

*Response:* NMFS disagrees. The estimated harvests under status quo (1.333 to 1.448 million lb) substantially exceed the GHL of 0.931 million lb. Thus, the status quo alternative would not achieve the policy objective of the Council, NMFS, and other management agencies to maintain charter sector harvest amounts to the GHL while longer term solutions are developed and implemented for stabilizing the allocation of halibut between the commercial and charter sectors.

*Comment 24:* Implement a compensated reallocation program to use taxpayer money to buy back IFQ for the sport fishery sector. It is only reasonable that the responsible government agencies fund this reallocation because they have been shortsighted and inactive in response to increasing charter demand.

*Response:* The Secretary of Commerce does not have statutory authority to use government funds to purchase halibut quota share (QS) or lease halibut IFQ for use in the charter vessel fishery; this would require congressional action and funding and was outside the scope of the proposed rule. NMFS notes that the Council is considering a provision that would allow charter vessel businesses to lease IFQ from commercial halibut QS holders. The Council is scheduled to take final action on this and other provisions supporting a compensated reallocation program for the charter and commercial fishing sectors at its October 2008 meeting.

*Comment 25:* Implement a charter individual fishing quota program. If charter IFQs had been enacted shortly after they were proposed in 1993, the rapid growth of the charter fleet could have been controlled.

*Response:* The Council did propose an IFQ program for the halibut charter sector in 2001, but NMFS declined to

publish a proposed rule to implement the Council's program for several reasons, including questions about the reliability of data supporting the proposed program. Had an acceptable IFQ program been implemented, NMFS agrees that the current allocation problems between the commercial and charter sectors could have been reduced and easier to address.

*Comment 26:* Consider a slot limit based on size or weight that both commercial and charter boats abide by to protect the long-term recruitment of future halibut stocks. It also would be much easier for the resource agencies to monitor and audit such a rule with at-sea inspections and audits of landed fish at processing facilities.

*Response:* The purpose of the final rule is to reduce the charter vessel fishery harvest to the GHL established for this fishery. Restricting the charter vessel fishery to size or weight limits without other harvest constraints would not meet the intent of reducing harvest to the GHL. The EA/RIR/IRFA developed by the Council did consider halibut slot limits; these were rejected because this approach could potentially result in an increased harvest, contrary to the objective of this final rule. Further, the options that would implement minimum size limits of 45 or 50 inches in length were rejected in large part because of the difficulty in measuring and releasing large fish without injuring them. There are safety concerns for crew and clients when attempting to measure large, heavy, muscular fish. Other reasons may exist to consider size or weight restrictions in the charter fishery in the future, but not as a provision of this final rule

*Comment 27:* Subsistence issues need to be addressed before this issue. The subsistence limits are too high and the amount of subsistence fish that is sold is not monitored.

*Response:* NMFS acknowledges that the halibut resource is fully utilized in Area 2C and that the three major categories of use are commercial, sport, and subsistence harvest. This final rule addresses an allocation issue between two of the larger users of halibut: the commercial and charter halibut fisheries, which account for 72 percent and 13 percent of total removals in Area 2C, respectively. While subsistence harvest of halibut is a source of mortality, it comprises the smallest use at 4 percent of total removals (See section 1.10.1 of the EA/RIR/IRFA). The Council, through regulations, established an allowed use of the halibut resource by subsistence users. The Council and NMFS disagree that the subsistence use of halibut is too high

and must be further restricted prior to proceeding with this final rule.

NMFS acknowledges that monitoring catch and total mortality (retained and discard) in the subsistence fishery poses unique concerns and challenges and has asked ADF&G for estimates of subsistence removals to evaluate trends in subsistence harvests. Subsistence harvest is estimated using specialized survey methods tailored for that sector. ADF&G staff report that the subsistence harvest has remained relatively stable during recent years, which is another reason why NMFS does not believe that subsistence harvest needs to be reduced before taking this action.

*Comment 28:* Female halibut should all be catch and release. Discourage retention of small halibut. A rule should be developed to release sport caught halibut over 200 pounds.

*Response:* The comment presumes that large females contribute disproportionately to reproduction and that harvest of these females will substantially decrease juvenile halibut abundance. In 1999, the IPHC reviewed options for a maximum size limit of 60 inches (150 cm) in the commercial fishery and concluded that, based on the research at the time, it did not add substantial production to the stock. Applying the limit to the sport fishery would have an even smaller benefit because the sport fishery harvest is much smaller than commercial harvest, and also because this action would only apply to Area 2C. The halibut stock is managed as a single population throughout its entire range. See also the response to Comment 26.

*Comment 29:* The one-fish daily bag limit should be imposed on the whole state, not just one area.

*Response:* The harvest of halibut by the charter vessel fishery in Area 2C has exceeded the annual GHL each year since 2004 by significant amounts. Conversely, the charter vessel harvest of halibut in Area 3A has not exceeded the annual GHL and restrictions on this fishery are unwarranted at this time. NMFS recognizes that different restrictions for the charter vessel sector in different IPHC regulatory areas off Alaska may influence where potential clients choose to fish. However, applying different regulations and bag limits to different areas is a common practice in fishery management. Although a one-fish daily bag limit in Area 2C may change the demand for charter trips if anglers are unwilling to substitute other species, many clients associated with cruise vessels likely will continue to fish in Area 2C because their fishing time is limited to half-day

trips, which may not provide enough time to harvest two halibut.

*Comment 30:* Implement the Federal prohibition on skipper and crew harvest of halibut. Making this a Federal regulation will relieve the restriction on skipper and crew harvest of other species. Skipper and crew harvest is abused, sold to restaurants, or used as a guarantee that clients will have fish to take home.

*Response:* NMFS notes the support for the part of the final rule that prohibits the catch and retention of halibut by charter vessel guides, operators, and crew. This action allows ADF&G to remove the emergency order that prevents skippers and crew from retaining any species of fish while on a saltwater charter trip. Thus, this rule could relieve a burden on crew compared to the previous emergency order. This prohibition also will help attain the management objective of limiting the charter vessel harvest of halibut in Area 2C to the GHL while minimizing adverse impacts on the charter fishery, its clients, and its home ports.

*Comment 31:* Modify the skipper and crew provision to allow personal use fishing before May 16 and after August 15, or some other dates outside the tourist season, for halibut. Making a special trip wastes resources. This would minimize the impact of the regulation on skipper and crew by compensating them and allowing them to catch fish for food while working.

*Response:* NMFS acknowledges that the prohibition on retention of halibut by charter vessel guides, operators, and crew could lead to higher operating costs for harvesting halibut for personal use. However, as noted in the response to Comment 30, this final rule will improve the opportunity for charter vessel guides, operators, and crew to retain non-halibut catch while clients are onboard, thus enhancing personal use fishing opportunities for species other than halibut.

*Comment 32:* Remove the prohibition on skipper and crew harvest. No one at ADF&G, the Council, or IPHC can say or prove that skipper and crew harvest was included in the original GHL calculations. Crew harvest records began voluntarily in 1998 with the logbook program. Uncertainty exists whether this harvest was included with "other" sport harvest and whether policy makers considered skipper and crew harvest as part of the GHL when it was established. Thus, it is unethical to continue this prohibition based on the GHL.

*Response:* The Council and NMFS, working with stakeholders, have

approved a prohibition on charter vessel guide, operator, and crew catch and retention of halibut as a preferred first tool for restricting harvest. Notwithstanding whether crew harvest of halibut was voluntarily reported in charter vessel logbooks submitted to ADF&G when the logbook program first was established, the Council and NMFS have specified their intent that this harvest be part of the existing GHL. As noted in Section 2.6.3.2 of the EA/RIR/FRFA supporting this final rule, the ADF&G estimates that the State prohibition on crew-caught halibut reduced harvest in the charter vessel fishery by between 78,000 lb and 84,000 lb in 2006. See also responses to Comments 30 and 31.

*Comment 33:* Maintain the status quo regulations and add a six-fish annual limit.

*Response:* The status quo restrictions on the Area 2C charter vessel fishery with a six-fish annual catch limit would not reduce harvest to the current GHL of 931,000 lb. Instead, this option would result in an estimated harvest of between 1.3 and 1.4 million pounds, an unacceptable overage of the GHL. A one-fish daily bag limit, the primary provision implemented by NMFS in this final rule, is the only management measure that may reduce the harvest to the GHL, as indicated by the analysis.

*Enforcement and Recordkeeping and Reporting Requirements*

*Comment 34:* Better enforcement and better data are needed for existing regulations. Many charter operators are not obeying restrictions because they know there is no enforcement in their area. As a result, harvest estimates are not accurate. Improve funding for better logbook analysis and more active enforcement by the USCG and NMFS. Many charter clients are transporting many more fish than allowed under the existing regulations.

*Response:* Significant effort is being made to improve reporting. ADF&G has made numerous changes to their logbook program in recent years. For example, ADF&G has conducted dockside checks and post season client verifications to validate logbooks. In addition, NMFS has coordinated with ADF&G to establish new logbook requirements that will further validate halibut harvest information recorded in the state's Saltwater Sport Fishing Charter Trip Logbook, including requiring the signatures of anglers to verify that the number of halibut caught and recorded is accurate. ADF&G supports this requirement as it will lead to more reliable logbook data and more accurate estimates of charter halibut

harvest. NMFS believes that enhanced recordkeeping and reporting, together with ongoing cooperative monitoring and enforcement by State and Federal enforcement personnel as time and resources allow will serve as a deterrent to large scale violations of sport fish regulations.

*Comment 35:* There is a lack of monitoring and enforcement of commercial catch. The published commercial catch data are flawed and commercial fisherman are not being held to their targets.

*Response:* NMFS disagrees. Although no fishery is exempt from illegal fishing activity, NMFS believes that current monitoring and enforcement efforts are sufficient to maintain control of the commercial halibut fishery and that reported catch is sufficiently accurate for management of the fishery and the halibut resource. The commercial quota system for halibut is administered, regulated, and enforced by NMFS to insure harvests are within quota limits and to monitor and enforce the amount of quota that each commercial fisherman is allowed to harvest. Enforcement of halibut regulations for Alaska is accomplished through complementary efforts of NMFS Office for Law Enforcement (OLE), Alaska State enforcement agencies, and the U.S. Coast Guard.

Alaska Wildlife Troopers (Alaska Department of Public Safety) also perform inspections, audits, and patrol hours to monitor and enforce Federal commercial halibut fishery regulations under a Joint Enforcement Agreement between NOAA OLE and the Alaska Wildlife Troopers.

*Comment 36:* Many charter operators are illegal and do not comply with Alaska Statute 38.05. If we enforced this statute, there would be less of a problem with the charter harvest levels.

*Response:* The Secretary is not responsible for enforcing State of Alaska statutes. Comments regarding the enforcement of State statutes are more appropriately addressed to the State of Alaska.

*Comment 37:* Enforcement of the regulations is impossible. When considering enforcement of annual limits, charter operators cannot be held responsible for client actions because the operator doesn't know what the client may have previously harvested.

*Response:* NMFS believes that enforcement of this final rule is possible. This final rule does not include provisions for an annual catch limit. Thus, recordkeeping and reporting requirements proposed to monitor and enforce such a limit have been removed from the final rule. All

other proposed federal recordkeeping requirements are retained to increase the accuracy of data collection and recorded information (see response to Comment 34).

*Comment 38:* Keep the angler signature provision. This will lead to more accurate reporting.

*Response:* NMFS agrees and has maintained this requirement (see response to Comment 34).

*Comment 39:* The current carcass retention provisions are unreasonable. On live-aboard charters, it is not reasonable to carry around whole fish for days when they could be processed and vacuum packed onboard. The current requirements create storage issues, reduce meat quality, and create a timing problem after returning to port to process fish and transport clients and their fish to the airport in time. Inspectors should be able to estimate the number of fish from the packages.

*Response:* This final rule does not require the retention of halibut carcasses. When the rule that implemented a 2-fish daily bag limit with one-fish under 32 inches in length went into effect in Area 2C in 2007, the carcass retention requirement was necessary to determine head-on length for enforcement purposes. This final rule will rescind the requirement at § 300.66(m) to retain carcasses onboard. However, IPHC regulations require that for Convention waters off the coast of Alaska no person shall possess onboard a fishing vessel, including charter vessels and pleasure craft, halibut that have been filleted, mutilated, or otherwise disfigured in any manner except that each halibut may be cut into no more than two ventral and two dorsal pieces, and two cheeks, all with skin on (paragraph (28)(2) of the Pacific Halibut Annual Management Measures; March 7, 2008; 73 FR 12280). This change allows enforcement officers to count the number of fish in possession by an angler.

*Comment 40:* NMFS should retain the requirement to bring halibut carcasses to shore for measurement. Accurate creel survey lengths are fundamental to estimating the catch of the charter fleet. Fish that are filleted at sea cannot be measured.

*Response:* NMFS agrees that carcass retention facilitates enforcement and more accurate data collection, but it is unnecessarily burdensome to charter operators given that this final rule does not implement a size limit on retained halibut. Further, charter operators have expressed concerns about disposal of carcasses at ports, time constraints, the diminished meat quality of fish that are not processed immediately, and limited

storage space onboard some vessels. These concerns are especially pronounced for charter operators who run multi-day trips or more than one trip in a day. To respond to these concerns and to address the need for better enforcement, the IPHC adopted a regulation that is described in the response to Comment 39.

*Comment 41:* The proposed paperwork requirement for monitoring the annual catch limit is burdensome and time consuming for operators and anglers. The requirement to print the angler name is redundant. It would be better to collect youth and senior angler information for inclusion in the database when issuing the harvest cards. Furthermore, the proposed requirement for anglers to retain their licenses for three years is unreasonable, the license paper is flimsy and hard to keep track of, and retention is a burden for clients.

*Response:* Under Option A, which would have implemented an annual catch limit for Area 2C, it would have been necessary for anglers to retain their licenses in the event that discrepancies arose in the logbook data. However, because NMFS is implementing Option B, the one-fish daily bag limit, the requirement to retain angler licenses is no longer necessary and has been removed from the final rule. Other requirements for recording the angler name and license number are retained to improve accuracy of recorded information. Also see response to Comment 34.

*Comment 42:* Issue harvest tags with licenses instead of the burdensome recordkeeping and reporting requirements proposed to monitor and enforce an annual catch limit.

*Response:* NMFS is not implementing the proposed annual catch limit because this management tool would not reduce the Area 2C charter vessel harvest to the 2008 GHL. Harvest tags are not required for the monitoring and enforcement of a one-fish daily bag limit.

*Guideline Harvest Level*

*Comment 43:* Rescind the GHL.
*Response:* Rescinding the GHL is outside the scope of this action. See Response to Comment 46.

*Comment 44:* Maintain the GHL and manage halibut charter vessel harvest to that level. The GHL was set at 125 percent of the charter vessel fishery's highest historic harvest to allow for growth in the industry. The GHL was exceeded in 2004–2007 and the charter fleet is still growing with an increased number of clients served, fishing trips, and active vessels.

*Response:* NMFS acknowledges the comment. This final rule does not

change the GHL provisions, only the management measures necessary to control harvest to the GHL.

*Comment 45:* If the GHL doesn't increase with the CEY, why should the GHL decrease with the CEY? Commercial IFQ shareholders are afforded a buffering mechanism by the IPHC to soften the economic impacts of a rapidly declining CEY. The guided sport halibut fleet should be afforded similar buffering. Also, the stair step feature of the GHL is not compatible with the slow up/fast down (SUFD) policy of the IPHC.

*Response:* This rule was not designed to change either the 2008 GHL published in the **Federal Register** (73 FR 6709, February 5, 2008) or the GHL regulations at 50 CFR 300.65. The GHL "stair steps" down only during periods when the CEY established by the IPHC falls below benchmark levels in the GHL regulation. To change the GHL regulations would require separate rulemaking. The Council incorporated an element of buffering into the GHL rule by setting the maximum at 125 percent of the 1995–1999 average harvest to allow for growth in the charter industry. NMFS notes that, should the CEY increase from the 2008 level, the GHL could increase as well to a maximum of 1.432 million lb, consistent with the procedures described in regulations.

The SUFD procedure used by the IPHC is not incompatible with the stair step feature of the GHL. Federal regulations require certain levels for the GHL based on the annual Total CEY, not procedures used by the IPHC to derive that annual Total CEY.

*Comment 46:* The GHL setting process is flawed. The GHL is too low and needs to be changed. The GHL was proposed and implemented with only commercial interests voting on the Council. The GHL has been the same for 14 years and deserves some kind of update or allowance.

*Response:* The Council first began discussing the guided charter fishery for halibut in 1993. After 10 years of debate, the GHLs were established for Areas 2C and 3A (August 8, 2003; 68 FR 47259). This rule set the maximum GHL for Area 2C at 1.432 million lb (649.5 mt), and included a mechanism for reducing the GHL in years of low abundance as determined by the IPHC. Since implementation, the GHL has remained at its maximum level until this year when reduced stock abundance estimates triggered a reduction. Guided sport charter vessel harvest exceeded the maximum GHL in 2004, 2005, and 2006 and is estimated to have again exceeded the GHL in 2007. The

maximum GHL cannot be increased without a change to regulations. Revising the GHL and the halibut sector allocations are beyond the scope of this final rule.

*Comment 47:* The GHL is just a guideline, not a hard cap.
*Response:* NMFS acknowledges that area-specific GHLs were established in 2003 as a guideline that, if exceeded, could prompt responsive management action to reduce charter vessel harvest amounts. The GHL has been exceeded since 2004. Thus, management action to reduce harvest to the GHL is completely within the management objective for the GHL provisions. The fact that a time lag exists between when a GHL overage occurs and responsive management action is implemented through rulemaking also was acknowledged when the GHLs were established.

*Comment 48:* Modify the final rule to accurately reflect the charter GHL that is associated with the IPHC-adopted Total CEY and the effect of Option B compared to that GHL, not the GHL of 1.217 million lb.

*Response:* NMFS agrees and has reported the new GHL of 931,000 lb (422.3 mt) in this final rule and its associated EA/RIR/FRFA. A notice of the 2008 GHLs for Areas 2C and 3A was published in the **Federal Register** on February 5, 2008 (73 FR 6709). When the proposed rule was written, NMFS anticipated that the IPHC might reduce the CEY, triggering a reduction in the GHL, and wrote the proposed rule in a manner to allow final action notwithstanding the reduction.

*Comment 49:* The proposal to simultaneously reduce the GHL and implement management measures to reduce harvest to the new GHL is contrary to the existing regulations regarding use of GHLs. Option B violates the Administrative Procedures Act (APA), and both options violate the purpose and intent of the charter fishery regulatory regime.

*Response:* NMFS disagrees. The Council recognized that the GHL might be adjusted downward from the maximum GHL that was in place when it recommended the management measures for this final rule in June 2007. Thus, the Council proposed two different sets of management measures; one if the GHL remained unchanged in 2008, and a second more restrictive set of management measures if GHL was reduced. Both sets of management measures were published in the **Federal Register** for public review and comment. The comment period on the proposed rule extended beyond the IPHC meeting in mid-January, when the new and reduced total halibut CEY of

6,500,000 lb (2,948.4 mt) for Area 2C was established for 2008. This CEY resulted in a reduced GHL based on existing regulations at 50 CFR 300.65(c). NMFS published a notice in the **Federal Register** of this downward adjustment on February 5, 2008 (73 FR 6709). This was a nondiscretionary action given that the regulations at 50 CFR 300.65 clearly established how the GHL steps down when Total CEY is reduced below certain benchmarks. Given that a one-fish bag limit was proposed by the Council if the GHL was reduced, analyzed in the EA/RIR/IRFA supporting this action, and noticed in the proposed rule under APA rulemaking procedures, NMFS believes the public had adequate notice and opportunity for review and comment on the actions implemented under this final rule and that this action is consistent with the APA and the GHL management provisions.

*Applicability of the Rule*

*Comment 50:* The proposed rule discriminates against anglers fishing from charter vessels, especially those who because of age, physical ability, or financial limits cannot operate or buy their own boat. It is not fair to discriminate against charter clients so the status quo should be maintained. Equal access and equal protection rights are being violated.

*Response:* NMFS does not agree that this rule discriminates against charter anglers because age, physical ability, and financial status are not the subject of this regulation. This final rule was designed to reduce the harvest of halibut in the charter vessel fishery to the GHL to address the current allocation problem between the halibut charter fishery and the commercial fishery. Recreational anglers who wish to fish from a charter vessel may still elect to do so. The final rule does not discriminate between U.S. citizens based on age, physical ability, or ownership of a vessel.

*Comment 51:* Support 6-fish annual catch limit for non-resident anglers only.

*Response:* NMFS disagrees. If this rule were applied only to non-resident anglers, then Federal management of this Federal resource would discriminate among U.S. citizens based on their state of residence. This would be contrary to the Halibut Act, contrary to basic rights and obligations in existing Federal law, and could not reasonably be considered necessary to promote conservation. Moreover, this action would not reduce charter harvest to the 2008 GHL and therefore would

not accomplish the objective of this action.

*Comment 52:* Apply restrictions to self-guided anglers as well. The proposed action discriminates between sport fishermen with and without their own boats. Self-directed anglers are only held to the 2-fish daily limit. Include bare boat charters or self-guided trips in restriction. Including self-directed anglers in the 2-fish with size limits regulation would further decrease sport harvest. Self-directed harvest equals about 67 percent of the guided harvest. If all sport anglers in Area 2C were held to the limit, perhaps further restrictions would not be necessary.

*Response:* The Halibut Act under the Convention does not prevent the Secretary from tailoring a management action so that it addresses the concern that prompted action in a reasonable manner. The objective of this final rule is to reduce the harvest of halibut in the Area 2C guided sport charter vessel fishery to the GHL. The reason for this action is clearly indicated in the preambles to the proposed and final rules. The Council did not recommend limiting other recreational harvest, subsistence harvest, or bycatch and wastage in the commercial fishery because harvest data in the EA/RIR/IRFA show that removals from categories other than the guided charter vessel sector have remained relatively stable during the past 5 years and have not grown at the rate of the guided charter vessel fishery. Therefore, self-guided anglers were not considered part of the problem addressed by the Council and this final rule. Guided charter harvests rose each year from about 1.28 million pounds in 2003 to 2.03 million pounds in 2006. It is this information that prompted the Council to propose provisions to limit Area 2C charter vessel angler harvest consistent with the Halibut Act under the Convention.

*Comment 53:* Expand the proposed harvest restriction to all non-resident anglers, guided and unguided.

*Response:* Federal law prohibits applying different regulations to anglers based on state residency. The regulations will apply to all charter vessel anglers, regardless of state of residency. Expanding the restriction beyond the guided charter vessel fishery is beyond the scope of this action. See also responses to Comments 51 and 52.

*Comment 54:* Apply restrictions to all anglers, but only during June, July, and August, with more lenient restrictions during the rest of the season.

*Response:* NMFS interprets the comment as suggesting that the one-fish daily bag limit for charter vessel anglers be applied to both guided and unguided

recreational anglers, and be limited for both to the months of June, July, and August. The application of the rule to the unguided sport fishery would not address the problem identified by the Council, or the objectives defined for this action.

*Comment 55:* The charter industry should not be considered part of the sport fishery. The charter and lodge fishers are, in effect, commercial fishers.

*Response:* Fish caught in commercial fisheries enter commerce, that is, they are sold to consumers, whereas fish caught in recreational fisheries are for personal consumption. This is a fundamental difference between commercial and sport fisheries and the reason why the guided sport charter vessel industry is not considered a commercial fishery.

*Data and Data Quality*

*Comment 56:* ADF&G catch data are flawed, and no scientific basis exists for imposing increased restrictions on the halibut charter fishery.

*Response:* The analysis supporting this final action uses sport fishing data collected by ADF&G through its postal survey, logbook program, and creel survey program. These data comprise the best scientific information available for the EA/RIR/IRFA and are appropriate for use in estimating the impact of the final rule on the charter halibut and commercial sectors. These data collection programs have been reviewed by the Council's Scientific and Statistical Committee and use statistical methods accepted by the scientific community to collect and extrapolate sport fishing information, including the disclosure of known statistical biases and verification of data collection methodology.

*Comment 57:* The Council motion for this action was based on the ADF&G's projection that the 2006 charter harvest was 46 percent over the GHL. ADF&G's final estimate for 2006 charter halibut catch was less than the initial estimate. Update the analysis to recognize that 2006 harvest was substantially lower than initially estimated.

*Response:* NMFS acknowledges that the preliminary estimate of 2006 charter halibut harvest in Area 2C was higher than the final estimate; however, both estimates were above the GHL of 1.432 million lb (649.5 mt). The preliminary estimate for 2006 was 2.029 million lb (920.3 mt), 42 percent over the GHL, and the final estimate was 1.804 million lb (818.3 mt), 26 percent over the GHL. This overage indicates the ongoing need for management measures to reduce harvest to the GHL. The EA/RIR/IRFA was updated to reflect the final harvest

estimate for the Area 2C halibut charter fishery (See Table A4–1).

*Comment 58:* The regulation that went into place in 2007 for a two-fish bag limit with one fish under 32 inches in length substantially reduced the guided sport charter vessel harvest of halibut. Data from 2007 are not yet available to evaluate the effectiveness of this regulation or the need for further restriction.

*Response:* The management measures implemented for the halibut charter fishery in 2007 were expected to reduce charter halibut harvest by 518,000 lb (235.0 mt). The preliminary estimate of charter halibut harvest in Area 2C for 2007 is 1.70 million lb (771.1 mt), plus or minus 15 percent (between 1.45 million lb (657.7 mt) and 1.96 million lb (889.0 mt)). Even at the lower end of this range, harvest was still slightly above the 2007 GHL. In 2008 a reduction in the Total CEY set by the IPHC triggered a reduction of the Area 2C GHL to 931,000 lb (422.3 mt). The 2007 rule would not reduce harvest enough to meet the new 2008 GHL. According to the analysis for this action, the one-fish daily bag limit is the only alternative analyzed that may reduce harvest enough to meet the new 2008 GHL.

*Comment 59:* Sport landings of halibut contribute minimally to the overall mortality in the fishery. Projections based on historical data indicate that halibut sport landings are stable and not likely to increase dramatically in the near future. Even the best recreational data collection programs can not accurately estimate harvest. As such, managers need to look at trends and not yearly estimates in setting limits.

*Response:* The guided sport charter vessel sector's contribution to overall mortality is not minimal and has been increasing. It was noted in the analysis that between 2002–2006, guided sport charter vessel harvests accounted for 13 percent of the removals from Area 2C, and were the second largest source of removals after commercial harvest. Table 17 of the analysis provides information on harvests from 1995 to 2006 for the guided and unguided components of the sport fishery. Unguided harvests have fluctuated between 0.723 million lb and 1.187 million lb with no clear increasing or decreasing trend. In contrast, guided sport charter vessel fishery harvests have increased. Between 1999 and 2006 guided harvest amounts rose each year from 0.938 million lb in 1999 to 2.035 million lb in 2006. The Area 2C charter fishery has consistently harvested more than the GHL. By Council policy, this

necessitates corrective action to limit the charter fishery to the GHL.

*Comment 60:* Charter harvest is overestimated. Operators inflate logbook numbers in hopes of receiving extra quota share. Most charter fish are in the 5–10 lb range, much smaller than the 18–20 lb average that is used by ADF&G as an estimator.

*Response:* The analysis supporting this final action uses sport fishing data collected by ADF&G through its postal survey, logbook program, and creel survey program. These data comprise the best scientific information available for the EA/RIR/IRFA and are appropriate for use in estimating the impact of the final rule on the charter halibut and commercial sectors (see Comment 56). The weight estimates for the charter halibut fishery used in the analysis supporting this final rule were obtained from halibut measurements taken by the ADF&G creel survey that are extrapolated using a length-to-weight relationship published by the IPHC. These measurements are taken in port with a creel sampling technician and represent a sample of harvested halibut that have not been mutilated in such a way that they cannot be measured. Length information from all sampled ports is used in determining the average size of halibut for Area 2C. The proportion of harvested fish that are measured by ADF&G varies by port; however, these estimates provide the best available information about the size and weight composition of halibut harvested in the guided sport charter vessel fishery. These data collection programs have been reviewed by the Council's Scientific and Statistical Committee and use statistical methods accepted by the scientific community to collect and extrapolate sport fishing information, including the disclosure of known statistical biases and verification of data collection methodology.

*Comment 61:* Page ix of the Executive Summary of the EA/RIR/IRFA states that the analysis "employs the best information available, in this case, 2006 ADF&G Saltwater Charter Vessel Logbook data." We believe this is erroneous. Most ADF&G data for the charter fishery comes from a combination of the Statewide Harvest Survey and logbook data.

*Response:* The ADF&G released its final estimate of the 2006 charter harvest in September 2007. This final estimate was based on the 2006 Statewide Harvest Survey. This new information became available after the Council's initial review of the analysis when it made its recommendations in June 2007. However, this new information was used to prepare

Appendix IV to the EA/RIR/IRFA that was released in November 2007. This appendix updates the earlier results. The Secretary is considering this new information in making the final decision about this action. The wording in the Executive Summary of the November 2007 EA/RIR/IRFA was not updated to accurately reflect the full range of information being considered by the Secretary and will be corrected.

*Comments Regarding the Economic Analysis*

*Comment 62:* The analysis did not fully consider the economic effects on small businesses and coastal communities. The analysis is not based on the best available data.

*Response:* NMFS used data including the most recent logbook and statewide fishery survey information available from ADF&G, a 2005 study of the charter fishery in Sitka conducted by the McDowell Group, an analysis of charter anglers in South Central Alaska prepared by the University of Alaska, and the key informant interviews that were noted in the EA/RIR/IRFA. This is the best available information. However, the data available for the analysis of this action are limited. The information that would be necessary to provide a complete quantitative analysis of the impacts of this action on the commercial or charter boat sectors, and to estimate the impacts these sectors would have on the regional economy, is not available. This information would include survey-based models of anglers' behavioral responses to the regulation, detailed information on the revenues and costs of commercial and guided charter operations, a model of guided charter responses to changing client behavior, and income and employment impact multipliers for the regional communities in Southeast Alaska.

In the absence of these detailed information, the EA/RIR/FRFA provides a qualitative discussion of the impacts on the charter operations and on the communities dependent on them. Specific community concerns are reflected in the choice of the alternatives. Commenters have noted that the analysis recognizes that the options would have significant negative impacts on the guided charter fishery and might put some operators out of business, and that the notice of proposed rulemaking describes the disproportionate impact on lodge-based charter operations.

*Comment 63:* This final rule will have adverse economic impacts on Juneau area businesses. The guided sport charter vessel industry supports a wide variety of local businesses, including

restaurants, souvenir shops, hotels, fish processors, and outdoor stores.

*Response:* NMFS acknowledges that limitations on the charter vessel harvest of halibut in Area 2C could have an impact on demand for charter services and on local businesses supporting fishing opportunities. The analysis supporting this action assesses these impacts to the extent possible with the information available. See also response to Comment 62.

*Comment 64:* The Council does not understand and is unwilling to examine the true economic value of halibut to the guided sport charter vessel industry. There is no evidence that the charter fishery is growing exponentially. A thorough economic analysis of the guided sport charter vessel industry is needed before making decisions that affect the recreational fishing industry.

*Response:* The analysis does not claim that the guided charter fishery is growing exponentially. However, the charter industry has grown in recent years, in terms of pounds of fish harvested (see response to Comment 59), and in the number of businesses, vessels, and trips (see response to Comment 105). The EA/RIR/FRFA recognizes the value of halibut to the guided sport charter vessel fishery and to local communities dependent on the charter fishery, and acknowledges the potential for losses because of a one-fish bag limit.

*Comment 65:* The Council's intent in its motion was misrepresented in the purpose statement in the EA/RIR/IRFA and proposed rule, which state that the proposed measures to restrict charter halibut harvest if the GHL would be implemented if the GHL is reduced to 1.217 million lb in 2008. The Council motion only states, "if the GHL is reduced," and does not specify the amount of the reduction.

*Response:* NMFS did not intend to misrepresent the Council's intent. At the time of the Council action, IPHC staff indicated that there was the potential for the Total CEY to fall below the point that would trigger a change in the GHL. However, the CEY established by the IPHC after its 2008 annual meeting was 6.5 million lb in Area 2C—a level low enough to trigger a three step drop in the GHL from 1.432 million lb to 0.931 million lb, effectively bypassing the 1.217 million lb level. The Council's intent is clear that it intended Option B to be implemented if the drop in the CEY was large enough to trigger any reduction in the GHL. At the time of the Council's action it was not anticipated that the GHL would stair step down more than one level.

*Comment 66:* A quantitative rather than qualitative analysis of the impacts to the guided sport charter vessel industry is needed. In the absence of a comprehensive economic analysis that accurately assesses the economic impact of all options to both guided recreational and commercial sectors, the Secretary has no meaningful economic data upon which to fairly base his decision. This supports continuation of the status quo until the analysis shortfalls are fully addressed. Although some quantitative estimates are made of the impact to longline fishermen, there is no quantitative discussion of adverse impacts on charter fishermen and there is no quantitative comparison of impacts to the longline and charter sectors.

*Response:* NMFS notes that there are fundamental differences between the longline and charter operations that affect the ability to estimate gross revenues impacts on the two sectors. The output of the commercial longline sector is halibut. The output of the commercial longline sector in Area 2C is small enough compared to overall output on the West Coast that the impact of changes in Area 2C production on Area 2C halibut prices are probably small. Under these conditions, NMFS has been able to estimate the gross revenues of the status quo and other alternatives on the commercial longline sector. However the situation is very different in the charter sector. The output in the charter sector is not halibut, but days of client fishing time. To estimate gross revenue changes in the guided charter fleets, NMFS would have to have separate demand models based on survey research, which would permit the determination of changes in client participation in the lodge-based and cruise ship-based industry segments in response to changes in the bag limit, and the competitive adaptations that the charter operations would make. The information necessary for these estimates for the charter sector is not available. NMFS did make inferences using survey research from South Central Alaska to the extent possible. NMFS notes that the gross revenue estimates provided for the longline sector are an incomplete quantitative analysis of that sector as well since they do not address the issue of the impact of the alternatives on the profitability of these fishing operations.

NMFS must choose a management option to restrict harvest to the GHL. To maintain the status quo would be, in fact, a choice of a particular policy to allow charter harvests to continue to exceed the GHL despite the current

regulations in place. Status quo with respect to the regulations is not status quo in the fishery due to the growth of the guided sport charter vessel industry in Area 2C and the new stock information from the coastwide model.

*Comment 67:* There is no economic analysis of the cost of enforcement of an annual limit.

*Response:* The Regulatory Impact Review contains an economic analysis of the cost of enforcement of the annual limit in section 2.7.4.3. Additionally, this section references a discussion paper that was presented to the Council in October 2006 that contains a more thorough analysis of the cost of implementing and enforcing an annual limit. This discussion paper is available on the North Pacific Fishery Management Council's Web site at *http://www.fakr.noaa.gov/npfmc*. Enforcement issues and costs are discussed, as well as the estimated costs for compliance that would be imposed on the industry. However, because Option B was selected, NMFS is not implementing an annual limit. Therefore the costs associated with enforcing an annual limit will not apply. NMFS believes that sufficient information was provided to permit a decision among the alternatives.

*Comment 68:* The appropriate geographic scope of the analysis should be the coastal home ports for the guided sport charter vessel fleet, not the national economy.

*Response:* NMFS is required to examine net benefits to the Nation under Executive Order 12866. NMFS also examines regional and sector impacts in the analysis. However, in the section of the analysis referred to by this comment, NMFS explicitly examines the effects on net benefits to the Nation and makes the point that from a national perspective, the benefits of an alternative to one sector are likely to be offset by the costs to another. The analysis states that some impacts that adversely affect regional and community interests have distributive elements that prevent them from being considered either benefits or costs at the national level. This is a standard cost-benefit convention, in which the accounting stance affects evaluations of net benefits or costs. It considers the costs to local and regional interests. The choice of the preferred alternative, in fact, depends in part on local impact considerations evaluated in the analysis. For example, the analysis notes that Option 1 of Alternative 2 (one trip per vessel per day) would disproportionately impact small charter operators in major cruise ports and was thus rejected.

*Comment 69:* The cost of this action to the guided sport charter vessel industry is not justified by the benefit to the longline fishery. The rule will provide virtually no benefit to the commercial sector before it is superseded in 2010 by the long-term allocation program currently under development. The negative consequences of the proposed rule on the charter sector far outweigh any potential benefit to the commercial sector.

*Response:* While the Council is considering new management measures to replace those in this action, and while it has stated its intent to implement those measures in 2010, NMFS cannot assume that this will, in fact, take place, or that it will take place by 2010. The Council has not yet agreed on which management measures to implement and it may be several years before a decision is reached. The proposed program then would need to be approved by the Secretary of Commerce. The analysis suggests that the expected burden on the longline fishery and its consumers rises significantly in the years after 2010.

The objective of this action is to limit halibut harvest by the guided sport charter vessel industry to the GHL. Inherently and inevitably, this will constrain overall charter harvests and will have adverse economic impacts on charter fishing operations. NMFS notes that cost-benefit analysis, economic impact analysis, and evaluations of the costs and benefits to different sectors of the industry are only some of the factors that the Council and Secretary are required to take into account when they make policy decisions.

It is not possible to conduct a comprehensive quantitative cost and benefit analysis or compare quantitatively the benefits and costs to the commercial longline or charter industries, or to the regional economy with the information available, and such an analysis is not required before action can be taken.

There is limited information available on the economics of longline halibut fishing, charter operations that cater to cruise ship clients, and lodge-based operations. Similarly, there is limited information on how these types of operations interact with the local community and regional economies to generate secondary or indirect income and jobs in firms supplying the commercial firms or the guided charter operations and their clients. Given that lack of information, NMFS has used the best available scientific information.

*Comment 70:* Tables 56 and 58 in the EA/RIR/IRFA project hypothetical ex-

vessel losses and consumers' surplus losses to the commercial fishery associated with guided sport catches over the period from 2006 to 2015. The following changes and revisions to these tables are necessary: (a) Change the 2006 guided sport catch estimates in Appendix IV to reflect the final 2006 catch estimate; (b) use a more appropriate projection for annual growth in the guided sport charter vessel industry; (c) account for the IPHC's practice of increasing and decreasing commercial harvest limits with a lag to changes in the CEY (the "slow-up/fast-down" or SUFD approach).

*Response:* Revised versions of Tables 56 and 58 have been added to Appendix IV. The revisions include the final 2006 guided sport charter vessel sector harvest, updated charter industry growth rates, the IPHC's 2008 CEY, and the 0.931 million lb GHL that will take effect in 2008 as a result of the lowered CEY. However, the tables were not prepared to provide predictions of actual revenue losses over the time period. The purpose of the original tables in the body of the text, and the revised versions in the appendix was to illustrate the potential magnitudes of the revenue losses that might accrue to the longline sector if a number of factors remain constant. The tables were not meant to provide forecasts. For example, the tables incorporate a number of simplifying factors such as constant values for the Total CEY, ex-vessel prices, commercial underage, and unguided sport fish catch. The tables do not estimate these values or incorporate official estimates from other agencies as these estimates change regularly and materially. As a result NMFS has not made change (c), and has made change (b) only to the extent of updating the growth rate to reflect new information for 2006.

*Comment 71:* The analysis does not address losses to recreational anglers denied access to halibut.

*Response:* It is accurate that the analysis focuses primarily on the impacts of the actions on the longline and charter industries, and the communities dependent on them. The analysis does not estimate the loss in consumers' surplus from the preferred alternative. The information to estimate this does not exist since models of angler behavior in Southeast Alaska are unavailable. The discussion in Section 2.7.5 indicates that recreational anglers can expect a reduction in their benefits from charter fishing from this action. The analysts based their assessments on modeling that had been done in other areas of Alaska. The analysis points out

that clients would no longer be able to take a second fish, and has a long section discussing the impact in terms of the change in anglers' cost per fish, of the potential reduction in angler demand for fishing experiences in Southeast Alaska, and of the potential for anglers to shift to other activities in Southeast Alaska or in other areas.

*Comment 72:* The EA/RIR/IRFA identifies the lack of socioeconomic information on the charter fishery as a source of concern to the Council. If the Council lacks the socioeconomic information to adequately evaluate comparative loss scenarios, it does not have a valid problem statement, by definition. Commercial quota share values have not been reduced, contrary to the problem statement, and there has been no resultant economic hardship to the commercial sector. The analysis fails to use readily available information, including information on quota share prices, to address this issue.

*Response:* Although the Council and Secretary are always striving to obtain more information to assist in determinations, the Council had sufficient information to develop a problem statement. Furthermore, the analysis developed for this action, based on the best available information, provided the Council and Secretary with sufficient information to take action. See response to Comment 73 regarding trends in commercial quota share values.

*Comment 73:* Restrict the charter sector because their overages are reducing the commercial sector's allowance and devaluing purchased IFQs.

*Response:* NMFS examined a time series of the value of transferred quota share units from before the charter fishery began exceeding the GHL to the present and there was no evidence of a cause and effect relationship between harvest overages and the value of quota shares. The only trend these data demonstrated was an overall increase in the value of shares transferred from 2000 through 2007. Many factors contribute to valuation of quota shares at any particular time including cold storage holdings, timing within the fishing season, pre-season market prices, availability of lower interest loans, seller motivation, and whether the IFQ pounds are transferred with the quota share.

*Comment 74:* Commercial fishermen receive more money as supply declines. This is not the case for charter operators.

*Response:* NMFS agrees that market-driven prices paid to commercial halibut fishermen for halibut can

increase when supply becomes limited and market demand is high. This can offset quantity-driven revenue losses. It is unlikely that commercial fishermen will obtain higher prices for halibut as a result of this rule because the Area 2C commercial halibut fishery contributes only modestly to the overall coastwide halibut production.

The guided sport charter vessel industry is selling a fishing experience, one part of which is the possibility of catching halibut. NMFS agrees that a one-fish bag limit that reduces the amount of halibut an angler may catch and retain could reduce the price that charter operators can charge for their service. The actual impact on price is unclear and will depend, for example, on the ways that charter operations modify their services to adapt to the new limit.

*Comment 75:* The analysis incorrectly concludes that "increases in regional expenditures associated with increases in charter-based sport fishing are likely to be offset by decreases in regional expenditures associated with commercial fishing."

*Response:* This commenter refers to a statement in a paragraph in the analysis discussing net national benefits under Alternative 1. The analysis notes that the principal source of benefits from the charter fishery is the benefits to clients, because the competitive nature of the charter fishery is likely to drive profits close to zero. The author notes that it is unlikely that changes in regional expenditures will result in changes in net national benefits, in part because increased charter-based regional expenditures are likely to be offset by decreases in regional expenditures associated with commercial fishing. This is clearly advanced as one reason not to expect increased national benefits, in a cost-benefit analysis sense, from an expanding charter fishery. The author is using "expenditures" here as a proxy for sectoral activity and sectoral profits and rents—which he has already indicated are likely to be small. The author indicates that an offset is likely, not certain. The author clearly did not intend to assert a dollar for dollar offset. The language in the analysis has been modified to insert the words, "at least partially" before the word "offset" to clarify this.

*Comment 76:* Table 56 of the EA/RIR/IRFA assumes an inappropriate constant rate of growth in charter sector harvest when the actual data indicate that charter rates decreased in both 2006 and 2007. The analysis is inadequate, biased, devoid of data, and uses arbitrary assumptions, and speculative data and scenarios. The analysis

depends on interviews with a small number of key informants instead of on a survey of 696 potentially affected charter vessel operators. NMFS has been remiss in not collecting, presenting, and evaluating the best available data.

*Response:* Table 56 has been revised in Appendix IV (Table A4–2) to assume a growth rate for the charter sector harvest of 5.7 percent. This is the growth rate that was observed from 1995 to 2006. The rate was adjusted down from an earlier estimate rate of 6.8 percent to reflect the lower final participation rate estimate for 2006 based on the Statewide Harvest Survey (SWHS).

Limited information was available for the preparation of this analysis. The analysts however, drew on available data and modified the analysis to reflect newer data as it became available (in particular, adding Appendix IV to update the analysis to take account of the SWHS information for 2006 that became available in the fall of 2007). The analysts consistently sought to ground the analysis in concrete numbers and information. As noted in the response to Comment 70, the results in this table are not meant to provide a forecast of future impacts, but to illustrate possible revenue losses under certain assumptions. The analysis is not biased; analysts sought to identify and qualitatively describe the impacts of the actions on all the parties. The key informant information was not used in place of or as a substitute for phone, mail or personal interview surveys. Key informant information was used to provide factual information and to provide context for information obtained from other sources. NMFS has drawn on the best available information to inform this discussion, including the most recent logbook and statewide fishery survey information available from the ADF&G, a 2005 study of the charter fishery in Sitka conducted by the McDowell Group, an analysis of charter anglers in South Central Alaska prepared by the University of Alaska, and the key informant interviews that were noted.

### Conservation

*Comment 77:* Halibut harvest by the guided sport charter vessel fishery should be managed to stay below the GHL because of concerns about depletion of local stocks and the long term effects on local businesses. Overharvest by the charter sector requires subsistence and local sport anglers to travel farther to catch halibut.

*Response:* See response to Comment 15 concerning localized depletion. NMFS does not have data to confirm

that short term localized depletions of halibut are due to focused harvest activity by one or more sectors.

*Comment 78:* There is no evidence that the proposed regulations will have any effect on halibut recovery or that the charter fishery has a negative effect on the fishery. NMFS should use the best available science.

*Response:* Neither the EA/RIR/IRFA nor the proposed rule for this action identify overfished halibut stocks as the problem, or halibut recovery as an objective of this action. The IPHC sets allowable commercial catch limits taking account of the status of the stocks and projections of overall removals by all sectors. The charter fishery is not subject to a harvest quota, but estimated charter harvests are subtracted from the Total CEY to determine the Fishery CEY that forms the basis of the catch limit for the commercial fishery. While the procedures used by the IPHC can lead to harvests in excess of the Total CEY in a year, over time they should constrain harvests to biologically sustainable levels.

*Comment 79:* The IPHC does not view this as a conservation issue. The IPHC would never allow an overharvest of the Total CEY if there was a conservation issue. It should be very clear that due to the conservative nature of IPHC harvest calculations, overharvest of the Area 2 Total CEY by 60 to 85 percent is possible without resulting in a conservation issue. The proposed rule deals with a pure allocation issue and does not present any resource conservation questions.

*Response:* NMFS agrees. The healthy status of the halibut stock is evidence that IPHC policies are conservative and successful.

*Comment 80:* Hunters and fishermen have strong conservation values and are willing to pay for conservation initiatives. Increasing restrictions will discourage people from participating in these activities and will undermine their support for conservation causes.

*Response:* NMFS believes that this comment refers to recreational hunters and fishermen who have been, and continue to be, an important source of funding and support for conservation programs. As user numbers increase, regulatory regimes governing sport, personal use, and subsistence harvests of fish and game have become much more restrictive and complex. Many programs, such as those that issue limited numbers of permits through lotteries, are much more restrictive than this action. However, hunters and fishermen have continued to be supportive of conservation. NMFS does

not believe that this action will appreciably reduce that support.

*Comment 81:* There is a conservation issue. The Area 2C stock is overfished and fishing needs to be limited to an extent that ensures the long term sustainability of the stock.

*Response:* NMFS disagrees. The best available evidence indicates that the Area 2C stock is not overfished and the IPHC has not made that determination. Overages of the GHL are accounted for in the methods the IPHC uses to set the annual commercial catch limit to ensure that the halibut stock is not overfished. NMFS agrees that fishing limits need to be adhered to, in order to maintain the long term health of the halibut stock, and has therefore proposed this rule to reduce the charter fleet harvest to the GHL.

*Comment 82:* Unconstrained growth of the charter industry threatens the health of the fishery. In any one year, CEY may be overharvested if the projected charter harvest is higher than the assumed GHL level. These overages result in adjustments to the CEY and commercial catch limit the following year. Thus the issue poses a potential conservation concern, as well as a reallocation of allowable harvest.

*Response:* NMFS agrees that if the guided charter fishery grows in any single year, halibut removals will exceed planned IPHC removals in the short run and the actual harvest rate may be greater than the rate on which the CEY for a year is based. However, in the medium and long term, the IPHC will adjust its harvest allowances for the commercial setline fishery to take account of changes in guided charter harvests. While this process will take place gradually over time, NMFS does not expect it to seriously affect the health of the halibut stock, unless the guided charter fishery were to grow at an unexpectedly high rate. Halibut are a long-lived species and the health of the stock depends less on removals in any single year (the short run) than it does on removals over a longer multiple-year period. The IPHC has also adopted conservative harvest policies to protect against resource damage. Furthermore, the environmental analysis prepared for this rule did not find that failure to limit the guided sport charter vessel halibut harvest to the GHL would cause significant environmental impacts on the resource.

*Comment 83:* We disagree with the statement in the Executive Summary of the EA/RIR/IRFA that states, "none of the alternatives would affect the health of the halibut stock since the IPHC sets limits on total halibut removals." The IPHC does consider all removals, but if

one sector continually over-harvests the amount the IPHC uses for the calculations when setting catch limits, damage to the resource occurs. The charter sector's harvest in excess of the GHL is one of the contributing factors to the biomass decline in Area 2C. The IPHC appropriately uses the associated GHL for the charter sector as determined by the Total CEY.

*Response:* NMFS agrees that the charter fishery has exceeded the GHL for several years and that is one of the primary reasons for taking this action. As stated in the response to Comment 81, the IPHC has not determined that the Area 2C stock is overfished (see also response to Comment 82).

*Comment 84:* Both the commercial and charter sectors are facing large cuts. These are necessary for the long term sustainability of the resource. Both sectors must reduce harvests and share in the conservation of the resource.

*Response:* The reduction in the 2008 Area 2C CEY will be shared by the commercial fishery, through the reduction in the Fishery CEY, and by the guided sport fishery, through the reduction of the GHL from 1.432 million lb to 0.931 million lb and the implementation of a one-fish daily limit. This reduction in the GHL is not a part of this action, but is a consequence of the final rule adopting the stair-stepped GHL that was promulgated on August 8, 2003 (68 FR 47256). Unguided angler harvests and subsistence harvests are not restricted; however, these have been relatively minor components of the overall harvest to date, accounting for an average of 11 percent of the harvest between them. Miscellaneous other uses have accounted for about 6 percent.

### Coastwide Model and IPHC Issues

*Comment 85:* The coastwide model represents the best available scientific information and thus should be used for setting the CEY. It is not appropriate to use the coastwide model in some areas and the closed area model in others.

*Response:* NMFS agrees that the coastwide assessment is considered the best available science to estimate the entire biomass of the stock of Pacific halibut and that using this total biomass to estimate the Total CEY is the best approach available at this time. The IPHC adopted the coastwide assessment in 2008 after rigorous external review to evaluate the technical merit; this approach is used to estimate biomass in all IPHC management areas. The closed area model is no longer used by IPHC.

*Comment 86:* The GHL triggers were based on the 1999–2000 average Total CEY, which was calculated using the Closed Area assessment model. If we

continued to use the Closed Area model, the Area 2C Total CEY would be 9.8 million pounds, well above the first stair step for the GHL. Careful review of the 2003 final rule for the GHL shows that there is no mention of which Total CEY the GHL must be based upon. Because both have been published by the IPHC, the Secretary has the discretion to choose which Total CEY to use. The GHL was established using the Closed Area model and should continue to be based on that model.

*Response:* The IPHC adopted the coastwide assessment in 2008 after rigorous external review to evaluate its technical merit. This approach is used to estimate biomass in all IPHC management areas. This assessment was used to make the IPHC's recommendations for the CEY that were approved by the Secretary.

The final rule establishing the GHLs for the halibut charter fishery in 2003 acknowledged that the Total CEY used to stair step the GHLs is "the total target biomass that may be removed each year. The Commission sets the CEY based on the best available information and the professional judgment of the IPHC. As such, it may reflect uncertainty or changes in the stock assessment modeling" (68 FR 47259, August 8, 2003). Thus, the 2003 GHL final rule is correctly silent on setting any requirement for how the CEYs should be determined, other than stating that it is up to the IPHC to use the best available information and its professional judgment.

NMFS continues to support the IPHC's decision to adopt the coastwide assessment as the best available science. Further, the resultant 2008 Total CEY and downward adjustment of GHL in Area 2C is based on the best available science and is consistent with the intent of the Council and NMFS when the GHLs were established in 2003.

### Unintended Effects of the Rule

*Comment 87:* The proposed action will shift charter fishing effort to other groundfish species.

*Response:* NMFS acknowledges that this action may cause some charter businesses to modify their operations to provide alternative or supplementary fishing experiences for their clients. The environmental assessment reviewed the potential impacts on other species, such as salmon or rockfish, and found that they would not have significant impacts on those resources. These stocks are managed by the State of Alaska and NMFS using biological benchmarks that prompt agency response to constrain harvest to maintain sustainable stocks. Thus, an increase in sport harvest of

these species may lead to increased allocation problems between sport and commercial sectors. However, any such allocation problem would occur within the confines of the management measures established by Federal and State governments to maintain sustainable stocks.

*Comment 88:* The proposed limits on the charter fishery will result in increased catch and release or bycatch mortality as charter anglers try to catch the largest fish possible.

*Response:* NMFS acknowledges that this action may cause increased catch and release or bycatch mortality, but NMFS believes that the impact on the resource will not be significant. Appendix II of the EA/RIR/RFA discusses the choice of a hook and release mortality rate for the Area 2C charter halibut fishery. It concludes that the overall estimate of hooking mortality is 4.8 percent. The environmental assessment took account of release mortality in its analysis of the various alternatives and did find that the preferred alternative (Alternative 1, Option 4) had the highest catch and release mortality of the alternatives. However, the analysis concluded that none of the alternatives would increase release mortality substantially above the status quo and did not find that any of the alternatives would have a significant impact on the halibut resource.

*Comment 89:* A one-fish annual limit will not impede an angler's ability to catch and release fish and will not keep anglers from fishing in Area 2C any more than the status quo. With a one-fish daily limit, anglers can keep fish of any size and will only lose the opportunity to keep a second fish smaller than 32 inches in length or about 11 pounds.

*Response:* NMFS acknowledges the comment.

### Consistency With Other Laws

*Comment 90:* The intent of Executive Order 12962 is to provide guidance to NMFS to improve the potential productivity of aquatic resources for recreational fisheries. The proposed rule improves productivity for commercial fisheries.

*Response:* This rule does not violate Executive Order (E.O.) 12962. To the extent permitted by law, E.O. 12962 directs Federal agencies to improve the quality, function, sustainability, productivity, and distribution of aquatic resources for increased recreational fishing opportunities. This rule is promulgated to meet the management goals set forth in the Halibut Act under the Convention and implemented by the Secretary. These management goals

include setting annual limits on the amount of halibut that may be removed without compromising the long-term sustainability of the halibut stock, including the achievement of maximum sustainable yield for halibut fisheries.

*Comment 91:* This rule does not comply with the Halibut Act which states that allocations shall be fair and equitable to all such fishermen. The fast down portion of the SUFD gives an advantage to the commercial sector that the charter sector does not receive.

*Response:* This final rule was not designed to change either the 2008 GHL published in the **Federal Register** (73 FR 6709, February 5, 2008) or the GHL regulations at 50 CFR 300.65. The GHL steps down only when the CEY established by the IPHC falls below benchmark levels in the GHL regulation. To change the GHL regulations would require separate rulemaking.

The "slow-up/fast-down" (SUFD) component of the IPHC's management regime is not necessarily advantageous to the commercial sector. It is designed to ameliorate the impacts of large changes in biomass. If the CEY is bigger than the previous year's catch limit, then the IPHC staff's recommended catch limit is only allowed to increase by 33 percent of the difference. If the CEY is less than the previous year's catch limit, the recommended catch limit reduction is limited to 50 percent of the difference. The commercial catch limit increases and decreases with changes in biomass, even with a static GHL, whereas changes to the charter sector's GHL occur in a stepwise manner only when specific CEY levels are established by the IPHC (see § 300.65(i)(1)).

NMFS believes the commercial longline fishery and guided sport charter vessel fishery situations are not comparable. The longline fishery is controlled by a hard cap that is extended, through the IFQ system, to individual longline fishermen. The hard cap is modified through time to reflect changes in the fishery biomass and the harvest by other sectors. The hard cap modification takes place gradually over a series of years. The guided sport charter fishery has not been subject to a hard cap, and this action will not impose a hard cap on the output of the guided sport fishery as a whole, or on individual businesses within it.

### Miscellaneous

*Comment 92:* Halibut is a public resource and the public should not be denied the opportunity to fish for it.

*Response:* This final rule does not deny the public the opportunity to harvest halibut. Although this rule is

designed to reduce the poundage of halibut harvested in Area 2C by the guided sport charter vessel fishery, it maintains the opportunity of charter vessel anglers to harvest one halibut per day, and has no effect on recreational anglers not fishing from a charter vessel. In addition, this final rule supports the management goals set forth in the Halibut Act under the Convention and the allocation objectives set forth by the Council and approved by the Secretary of Commerce. The management goals include setting annual limits on the amount of halibut that may be removed without compromising the long-term sustainability of the halibut stock, including the achievement of maximum sustainable yield for all halibut fisheries (commercial, subsistence, and sport). The allocation objectives are intended to limit the harvest of halibut in the charter fishery to the annual GHL.

*Comment 93:* There is no sunset provision for the rule. This goes against the Council motion to restrict charter harvest for 2008 only until the charter moratorium goes into place in 2009. There was a misunderstanding during the Council process that this regulation would continue indefinitely. Additional measures like the "Permanent Solution," "Compensated Reallocation," and "Initial Allocation" will also go into effect before 2009. The rule needs to go through the whole Council process again because of this misunderstanding on the duration of the measures. The public process requires clear and unambiguous language.

*Response:* NMFS disagrees that this final rule was intended by the Council to be effective only for 2008 and that the Council is required to reconsider this action to clarify this point. Although NMFS is developing a proposed rule to implement a limited entry program for charter vessel businesses, fishing under the proposed limited entry program would not occur before 2010 pending the rule's approval by the Secretary of Commerce. While the Council is considering other management programs for the charter vessel fishery for halibut, the schedule for Council action on these programs and the subsequent rulemaking process would not allow their implementation before 2010. NMFS intends to encourage Council consideration of changes to GHL measures in the event the annual GHL is adjusted upward or downward from the 2008 level with changes of Total CEY. Any such changes would require separate Council analysis and consideration, as well as subsequent rulemaking. This was the process intended by the Council when it voted

in June 2007 to adopt the actions implemented under this final rule.

*Comment 94:* Adjacent management areas will have more favorable management regimes in place that will further negatively affect Area 2C charter fisheries and the Council may need to review this issue in a manner that allows for adjustments in time for the 2009 fishery if biomass abundance supports an increase in the CEY.

*Response:* NMFS agrees. See response to Comment 93.

*Comment 95:* Much of the fish caught by sport anglers is wasted and the focus is on catching trophy fish for bragging rights, not the meat. Many charter clients take the fish home to give away or sell to pay for their trip.

*Response:* The purpose of this final rule is to reduce harvest of halibut in the Area 2C charter vessel fishery to the GHL. It is not intended to manage what anglers choose to do with legally harvested halibut; including choices of keeping or giving away harvested fish. It is illegal to commercially sell recreationally harvested halibut. Violators are subject to civil penalties and prosecution.

*Comment 96:* The six-line limit puts Area 2C at a disadvantage to other areas that can fish more lines. Larger boats that can accommodate more than six lines are safer and more cost effective to operate. These regulations put an undue hardship on Area 2C charter operations.

*Response:* NMFS recognizes that different restrictions for the charter vessel sector in different IPHC regulatory areas may influence where potential clients choose to fish. Line limits have been in place under State regulations since 1997. This regulation puts that line limit in Federal regulations.

*Comment 97:* The Sitka area Local Area Management Plan (LAMP) forces charter operators to fish beyond protected waters so fishing is more weather dependent. A one-fish daily limit combined with weather considerations could limit clients' opportunities to such an extent that a trip to Sitka would not be worthwhile.

*Response:* The EA/RIR/FRFA for this final rule acknowledges the possibility that consumer demand for charter vessel trips in Area 2C to fish for halibut could be impacted by the one-fish daily bag limit (see sections 2.6.3.4 and 2.7.3.4). The analysis also notes that Sitka may be less likely to experience this reduction in demand because it has greater potential for multi-species charter trips compared to Inside Passage communities such as Juneau or Ketchikan.

*Comment 98:* Two very large year classes will recruit into the fishery beginning in 2010, therefore this rule is unnecessary.

*Response:* The current stock assessment does suggest that two extremely large year classes—1999 and 2000—could grow to exploitable size over the next few years. These year classes appear to be larger than those in 1987 and 1988 that supported past higher harvests. It is important to note that size-at-age is smaller than 20 years ago. This has two important ramifications. First it means that the 1999 and 2000 year classes are only just beginning to reach the exploitable size range and therefore their true contribution to the population is still quite uncertain. Second, it means that for a given number of halibut, biomass will be lower than in the past. By assuming the size-at-age relationship remains the same as this year, then the projections for the exploitable biomass and spawning biomass are very optimistic and current declines are apt to reverse. However, the harvest rate should remain around 20 percent of the exploitable biomass so that when the biomass increases, higher Total CEY and commercial catch limits will follow. If the Total CEY is increased, current GHL regulations would allow for an increase of the GHL up to the maximum level of 1.432 million lb.

*Comment 99:* There is a commercial bias in the IPHC and North Pacific Fisheries Management Council. Since the 1980s the IPHC and Council have supported explosive growth in commercial harvest while stifling the charter sector. The charter vessel owners do not have representation in these bodies, therefore all decisions tend to favor the commercial sector.

*Response:* The IPHC and the Council are the bodies established by treaty and Congress and given the authority to make decisions and recommendations about the management of the halibut fisheries. They have made their decisions through transparent and public processes, and in a manner that is consistent with the requirements of the relevant statutes.

This final rule is an outgrowth of the 2003 GHL rule for the charter vessel fishery; annual changes to the GHL are linked directly to the Total CEY amount determined annually by the IPHC. The Council has the authority to consider and recommend management policy to address allocation issues among different domestic sector users of halibut off Alaska, including the commercial and charter vessel fisheries. In 1998 the Council initiated a public process to identify GHL management options and formed a GHL committee comprised of numerous representatives from the charter industry. This committee has evolved over time to develop longer term solutions for Council consideration that provide harvest stability between these two sectors. The Council has used the recommendations from this committee to formulate its GHL management options. Furthermore, the Secretary of Commerce reviews all Council policy recommendations and actions for consistency with the Halibut Act and Convention, as well as with other applicable law. NMFS does not believe that this final rule inappropriately favors the commercial fishing sector.

*Comment 100:* An annual limit is not needed because sport anglers are self-limiting. As fish stocks decline, fewer anglers go fishing and harvest decreases.

*Response:* This final rule does not establish an annual catch limit and instead relies primarily on a one-fish daily bag limit to reduce charter vessel harvest to the GHL. Harvest in the Area 2C charter vessel fishery has exceeded the GHL every year since 2004 and harvest amounts have consistently increased, although the rate of increase has varied from year to year. Given this trend and the current level of harvest, NMFS does not believe the charter vessel harvest of halibut in Area 2C would decrease to the GHL level without the limitations established in this final rule.

*Comment 101:* Clarify the definition of a charter vessel. The definition as written creates a loophole where a hired vessel may have a professional guide onboard who is not the "operator" of the vessel.

*Response:* NMFS agrees that the current definition of "charter vessel" is problematic. NMFS intends to address this problem under separate rulemaking as explained under Changes from the Proposed Rule, below.

*Comment 102:* Commercial setline fishermen provide consumers their only access to halibut unless they can afford an expensive trip to Alaska to catch their own.

*Response:* NMFS acknowledges the comment.

*Comment 103:* Halibut are resilient and survive well when caught and released properly. Support the one-fish bag limit and encourage catch and release fishing. Catch and release policies are in place elsewhere and do not limit tourist demand for fishing.

*Response:* NMFS acknowledges the comment. NMFS notes that Appendix II of the EA/RIR/IRFA reviews the available scientific information on hook and release mortality rates, and

recommended the use of a 5 percent rate for the analysis of regulatory restrictions on the Area 2C charter vessel fishery.

*Comment 104:* Charter operators don't have to pay anything for the fish they harvest whereas the commercial sector must purchase IFQs.

*Response:* NMFS acknowledges the comment.

*Comment 105:* Growth of charter industry is tapering and charter vessel catch is declining.

*Response:* Final harvest information from 2007, a year subject to new management measures, is not yet available. NMFS would expect that the rate of growth in the Area 2C halibut harvest by charter vessels to slow with increased harvest limitations, however, preliminary data suggests that the 2007 harvest still exceeded the 2007 GHL. Given the reduced GHL in 2008, harvest must be further limited by this final rule so that GHL is not again exceeded.

The data in the EA/RIR/FRFA supporting the final rule cover the period through 2006. The data available in the analysis show positive growth in the number of clients in every year but one since 2000, and accelerating growth in the number of clients in every year since 2002. The number of active vessels showed some decline from 2000 to 2002, but has increased in each year since then. The total number of trips by active vessels decreased from 2000 to 2002, but has increased in each year since then. Charter harvests of halibut have shown positive growth in every year from 2000 to 2006. In 2007 there were 403 active licensed guided charter businesses in Area 2C compared to 381 in 2005 and 395 in 2006. Likewise in 2007 there were 724 active vessels in Area 2C compared to 654 in 2005 and 680 in 2006, indicating continued growth in the industry.

*Comment 106:* More regulation of the charter fleet is not going to have an appreciable positive effect on the sport fishing in our area. Commercial fishing is what is hurting the stocks.

*Response:* The halibut stock is conservatively managed under the policies and catch limitations developed annually by the IPHC (see response to Comment 81). The objective of this final rule is to reduce the charter vessel harvest of halibut to the established GHL level while a longer term solution toward sector stability and resource allocation is developed and implemented.

*Comment 107:* An annual limit is draconian and would devastate the industry. If an annual limit is necessary, go with the six-fish limit.

*Response:* The final rule does not implement an annual harvest limit.

NMFS acknowledges that the one-fish daily bag limit implemented under this final rule also will impose costs on the charter vessel sector (see responses to Comments 33, 62, 66, and 69 addressing impacts of the one-fish bag limit). However, these costs are necessary to maintain harvest within the GHL.

**Changes From the Proposed Rule**

The final rule is revised from the proposed rule (72 FR 74257) in that the option that was proposed to address the circumstance of a GHL reduction (Option B) was chosen because the total CEY recommended by the IPHC for Area 2C in 2008 required a reduction in the GHL for Area 2C in 2008. The selection of Option B required revisions to recordkeeping and recording requirements to ensure that sufficient information is collected to manage and enforce harvest limitations in Area 2C.

The following recordkeeping and recording information is required to enforce this final rule: charter vessel business owner license number, charter vessel guide license number, date, regulatory area fished, angler sport fishing license number and printed name, number of halibut retained, charter vessel guide signature, and charter vessel angler signature. Additionally, for charter vessels fishing for halibut in both Areas 2C and 3A in a single trip, separate logbook data sheets must be maintained for each area if halibut are caught and retained.

Three definitions are revised (charter vessel angler, charter vessel fishing trip, and charter vessel guide) and four definitions are added (charter vessel operator, charter vessel services, crew member, and sport fishing guide services) to clarify limitations and recordkeeping and reporting requirements. These revised and added definitions are derived from State of Alaska definitions used to define guided sport fishing activities and are intended to clarify who may and may not catch and retain halibut and who is responsible for recordkeeping and reporting requirements in § 300.65(d).

The definition of charter vessel is not revised by this rule. However, the definition of charter vessel is currently proposed for revision in the proposed rule to revise the subsistence halibut program (April 14, 2008; 73 FR 20008). Currently, the definition of charter vessel is: "Charter vessel means a vessel used for hire in sport fishing for halibut, but not including a vessel without a hired operator." The new definition of charter vessel in the subsistence halibut program proposed rule is: "Charter vessel means a vessel registered as a sport fishing guide vessel with the

Alaska Department of Fish and Game." Due to comments received on the proposed rule to implement GHL management measures in Area 2C , and further consideration of the interactions between charter fishing and subsistence fishing, NMFS believes that the charter vessel definition proposed in the subsistence rule likely will need further refinement, including reference to charter vessel services and the specific regulations to which this definition would apply (*i.e.,* § 300.65(d) and (e)). Persons interested in commenting on the definition of charter vessel are referred to that proposed rule for more details.

The following requirements from the proposed rule for this action to implement GHL management measures in Area 2C were removed because an annual catch limit is not implemented in this final rule and these requirements were determined to be no longer necessary:

*Angler license record and retention.* NMFS has removed from the final rule the proposed requirements that anglers record the number of halibut caught and retained in Area 2C on the back of their licenses, and that they retain their licenses for three years.

*Year-to-date halibut caught.* To enforce an annual catch limit, NMFS proposed requiring that guides record in the logbook the number of halibut caught year-to-date as recorded on the back of the angler's license. This requirement no longer is needed.

*Youth angler information.* NMFS proposed requiring that youth names and birth dates be recorded in the logbook to better track and enforce an annual catch limit. Because no annual catch limit is being implemented, the date of birth for youth anglers will not be required in Federal regulations; however, the State of Alaska will still require that this information be recorded.

In addition, NMFS removes existing requirements for the retention of halibut carcasses. To help enforce the two-fish daily bag limit with size restrictions that went into place in Area 2C in 2007, NMFS prohibited mutilating or otherwise disfiguring a halibut carcass such that the head-on length could not be determined. This requirement to retain carcasses is no longer necessary with a one-fish daily bag limit and is removed from regulations at § 300.66(m). The IPHC adopted new standards in 2008 that were published in the annual management measures on March 7, 2008 (73 FR 12280). The new IPHC requirement for Alaska states that no person shall possess onboard a fishing vessel, including charter vessels

and pleasure craft, halibut that have been filleted, mutilated, or otherwise disfigured in any manner except that each halibut may be cut into no more than two ventral and two dorsal pieces, and two cheeks, all with skin on. This change allows enforcement officers to count the number of fish in possession by an angler.

The organization of § 300.65(d) is changed from the proposed rule to clarify the requirements for Areas 2C and 3A. In addition, numerous technical changes were made to clarify the regulatory intent and to ensure that consistent terminology is used. Finally a new prohibition (p) was added to § 300.66 to ensure that charter vessel operators, guides, anglers, and crew members do not refuse to present any identification card, U.S. Coast Guard operator's license, permit, license, or Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook upon the request of an authorized officer.

**Classification**

This final rule has been determined to be not significant for the purposes of Executive Order (E.O.) 12866. This final rule complies with the Halibut Act and the Secretary's authority to implement allocation measures for the management of the halibut fishery.

A Final Regulatory Flexibility Analysis (FRFA) was prepared, as required by section 604 of the Regulatory Flexibility Act. The FRFA describes the impact of this rule on directly regulated small entities and compares that impact to the impacts of other alternatives that were considered. A copy of this analysis is available from NMFS (see **ADDRESSES**). A description of this action, an explanation for why it is being considered, the legal basis for this action, and changes made to the rule in response to public comments are discussed above.

In 2005, 381 charter businesses operated 654 charter vessels in Area 2C; in 2007, 403 businesses operated 724 vessels. All of these operations are assumed to be small entities, with annual gross revenues of less than the limit of $6.5 million dollars for charter vessels. The largest companies involved in the fishery, lodges or resorts that offer accommodations as well as an assortment of visitor activities, may be large entities under the Small Business Administration size standard. Key informant interviews have indicated that the largest of these companies may gross more than $6.5 million per year, but also that it was possible for all the entities involved in the charter vessel halibut of harvest to have grossed less

than this amount. The number of small entities is likely to be overestimated because of the limited information on vessel ownership and operator revenues. However, it is likely that nearly all entities qualify as small businesses.

The proposed regulation was published in the **Federal Register** on December 31, 2007 (72 FR 74257). An Initial Regulatory Flexibility Analysis (IRFA) was prepared, and described in the classifications section of the preamble to the proposed rule. The public comment period ended on January 30, 2008. NMFS received 107 unique comments in 273 letters, faxes, and e-mails on the proposed rule and 21 comments that pertain directly to the IRFA and small entities regulated by this action. Summaries of the comments, and NMFS' responses, may be found in the preamble to this action.

NMFS examined two alternatives for this action: the no-action or status quo alternative, and the action alternative. Alternative 1, the status quo, would retain the two-fish bag limit with one of the two fish less than or equal to 32 inches (83.1 cm) in length, without changes. Alternative 2, the action alternative, had 13 options for different combinations of management measures to restrict the charter halibut harvest to the Area 2C GHL. The options included limiting vessels to one trip per day; restricting harvest by guide and crew while clients are onboard; limiting the number of lines to six per vessel, not to exceed the number of paying clients onboard; daily bag limits of one or two fish (including sub-options for size limit slots and specific months when the bag limit would apply); and annual harvest limits of four, five, or six fish per charter angler.

Two preferred options (Option A and Option B) were selected by considering different combinations of management measures that would minimize the impacts on small entities while still meeting the management objective of restricting the charter harvest of halibut to the GHL. Option A, which would have been implemented if the 2008 GHL had been greater than 1.217 million lb, included the following measures in addition to the existing two halibut daily limit with size restrictions: (1) A prohibition on halibut harvest by charter vessel guides, operators, and crew while clients were onboard; (2) a limit on the number of fishing lines that may be used on a charter vessel of six or the number of charter vessel anglers onboard, whichever is less; and (3) an annual catch limit of four halibut per charter vessel angler. Option B is being implemented because the 2008 GHL fell

below 1.217 million lb. It includes the same prohibition on guide and crew harvest and line limits as Option A. However, Option B includes a one-fish daily bag limit rather than the two-fish daily limit with size restrictions and the proposed four-fish annual harvest limit in Option A.

Other options would have had a smaller impact on the directly regulated guided charter operations because they would have reduced guided charter harvests less and had smaller impacts on demands for guided charter services. However, Option B was the only alternative that would have met the objectives of this action to reduce the guided charter harvest to the guideline harvest level. The guideline harvest level in 2008 is 0.931 million lb. The estimates of possible production under Option B ranged from 82 percent to 117 percent of the GHL. No other alternative or option had a range of estimated harvest levels that included the 2008 GHL.

*Collection of Information*

This rule includes a collection of information requirement subject to the Paperwork Reduction Act (PRA) and that has been approved by OMB under Control Number 0648–0575. The public reporting burden for charter vessel guide respondents to fill out and submit logbook data sheets is estimated to average four minutes per response. The public reporting burden for charter vessel anglers to sign the logbook is estimated to be one minute per response. These estimates include the time required for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The total public reporting burden for this collection is estimated at 3,134 hours. Send comments regarding this burden estimate, or any other aspect of this data collection, including suggestions for reducing the burden, to NMFS (see **ADDRESSES**) and by e-mail to *David_Rostker@omb.eop.gov*, or fax to 202–395–7285.

Notwithstanding any other provision of the law, no person is required to respond to, and no person shall be subject to a penalty for failure to comply with, a collection of information subject to the requirements of the PRA, unless that collection of information displays a currently valid OMB Control Number.

*Small Entity Compliance Guide*

Section 212 of the Small Business Regulatory Enforcement Fairness Act of 1996 states that, for each rule, or group of related rules for which an agency is

required to prepare a FRFA, the agency shall publish one or more guides to assist small entities in complying with the rule and shall designate such publications as "small entity compliance guides." The agency shall explain the actions a small entity is required to take to comply with a rule or group of rules. As part of this rulemaking process, NMFS Alaska Region has developed an Internet site that provides easy access to details of this final rule, including links to the final rule, and frequently asked questions regarding Program. The Small Entity Compliance Guide for the Program is available on the Internet at *http://www.fakr.noaa.gov.* Copies of this final rule are available upon request from the NMFS, Alaska Regional Office (see **ADDRESSES**).

*Executive Order 12962*

This action is consistent with E.O. 12962 which directs Federal agencies to improve the quantity, function, sustainable productivity, and distribution of aquatic resources for increased recreational fishing opportunities "to the extent permitted by law and where practicable." This E.O. does not diminish NMFS' responsibility to address allocation issues, nor does it require NMFS or the Council to limit their ability to manage recreational fisheries. E.O. 12962 provides guidance to NMFS to improve the potential productivity of aquatic resources for recreational fisheries. This rule does not diminish that productivity or countermand the intent of E.O. 12962.

*Administrative Procedure Act*

A June 1, 2008 effective date for this action is necessary to effectuate the Council's intent to limit the charter halibut sector's harvest to the federally mandated GHL, found at 50 CFR 300.65(c). If this action is not in place by the beginning of the peak season for the charter halibut sector (June, July, and August), the intent of the Council will be thwarted as this is time of peak harvest and when the harvest limitations would have its greatest impact. During the "shoulder seasons," i.e., before and after June, July, and August, charter halibut fishing is occurring, but to a lesser extent, and hence the harvest limitations would have a smaller impact. Also, having the harvest limitations effective as of June 1, 2008, would avoid the confusion that could occur to the charter halibut industry and its clients if the rule became effective after the peak season had begun. It is for these reasons that NMFS finds that there is good cause to

waive the 30-day delayed effectiveness period under 5 U.S.C. 553(d)(3) to the extent that it would allow for a June 1, 2008, effective date.

**List of Subjects**

*15 CFR Part 902*

Reporting and recordkeeping requirements.

*50 CFR Part 300*

Fisheries, Fishing, Reporting and recordkeeping requirements, Treaties.

Dated: May 21, 2008.

**Samuel D. Rauch III,**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

■ For the reasons set out in the preamble, NMFS amends 15 CFR chapter IX, and 50 CFR chapter III as follows:

**15 CFR Chapter IX**

**PART 902—NOAA INFORMATION COLLECTION REQUIREMENTS UNDER THE PAPERWORK REDUCTION ACT: OMB CONTROL NUMBERS**

■ 1. The authority citation for part 902 continues to read as follows:

**Authority:** 44 U.S.C. 3501 *et seq.*

■ 2. In § 902.1, in the table in paragraph (b) under the entry "*50 CFR*", add an entry for "300.65(d)" in alphanumeric order to read as follows:

**§ 902.1  OMB control numbers assigned pursuant to the Paperwork Reduction Act.**

\*     \*     \*     \*     \*

(b) \* \* \*

| CFR part or section where the information collection requirement is located | Current OMB control number (all numbers begin with 0648–) |
| --- | --- |
| \*          \*          \*          \*          \* | |
| *50 CFR* ...................... | |
| \*          \*          \*          \*          \* | |
| 300.65(d) ................... | –0575 |

**50 CFR Chapter III**

**PART 300—INTERNATIONAL FISHERIES REGULATIONS**

■ 3. The authority citation for 50 CFR part 300, subpart E, continues to read as follows:

**Authority:** 16 U.S.C. 773–773k.

■ 4. In § 300.61, add definitions for "Area 3A", "Charter vessel angler", "Charter vessel fishing trip", "Charter vessel guide", "Charter vessel operator",

"Charter vessel services", "Crew member", and "Sport fishing guide services" in alphabetical order to read as follows:

**§ 300.61  Definitions.**

\*     \*     \*     \*     \*

*Area 3A* means all waters between Area 2C and a line extending from the most northerly point on Cape Aklek (57°41'15" N. latitude, 155°35'00" W. longitude) to Cape Ikolik (57°17'17" N. latitude, 154°47'18" W. longitude), then along the Kodiak Island coastline to Cape Trinity (56°44'50" N. latitude, 154°08'44" W. longitude), then 140° true.

\*     \*     \*     \*     \*

*Charter vessel angler*, for purposes of § 300.65(d), means a person, paying or nonpaying, using the services of a charter vessel guide.

*Charter vessel fishing trip*, for purposes of § 300.65(d), means the time period between the first deployment of fishing gear into the water from a charter vessel after any charter vessel angler in onboard and the offloading of one or more charter vessel anglers or any halibut from the charter vessel.

*Charter vessel guide*, for purposes of § 300.65(d), means a person who is required to have an annual sport guide license issued by the Alaska Department of Fish and Game, or a person who provides sport fishing guide services.

*Charter vessel operator*, for purposes of § 300.65(d), means the person in control of the vessel during a Charter vessel fishing trip.

*Charter vessel services*, for purposes of § 300.65(d), means the use of a vessel by a charter vessel guide to provide assistance for compensation to a person who is sport fishing from that vessel.

\*     \*     \*     \*     \*

*Crew member*, for purposes of § 300.65(d), means an assistant, deckhand, or similar person who works directly under the supervision of and on the same vessel as a charter vessel guide.

\*     \*     \*     \*     \*

*Sport fishing guide services*, for purposes of § 300.65(d), means assistance, for compensation, to a person who is sport fishing, to take or attempt to take fish by accompanying or directing such person who is sport fishing during any part of a charter vessel fishing trip. Sport fishing guide services does not include services provided by a crew member.

\*     \*     \*     \*     \*

■ 5. In " 300.65, revise paragraph (d) to read as follows:

**§ 300.65  Catch sharing plan and domestic management measures in waters in and off Alaska.**

\*    \*    \*    \*    \*

(d) *Charter vessels in Area 2C and Area 3A*—(1) *General requirements*—(i) *Logbook submission.* Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook data sheets must be submitted to the appropriate Alaska Department of Fish and Game office according to the time schedule printed in the instructions at the beginning of the logbook.

(ii) The charter vessel guide is responsible for complying with the reporting requirements of this paragraph (d). The employer of the charter vessel guide is responsible for ensuring that the charter vessel guide complies with the reporting requirements of this paragraph (d).

(2) *Charter vessels in Area 2C*—(i) *Daily bag limit.* The number of halibut caught and retained by each charter vessel angler in Area 2C is limited to no more than one halibut per calendar day.

(ii) *Charter vessel guide and crew restriction.* A charter vessel guide, a charter vessel operator, and any crew member of a charter vessel must not catch and retain halibut during a charter fishing trip.

(iii) *Line limit.* The number of lines used to fish for halibut must not exceed six or the number of charter vessel anglers onboard the charter vessel, whichever is less.

(iv) *Recordkeeping and reporting requirements in Area 2C.* Each charter vessel angler and charter vessel guide onboard a charter vessel in Area 2C must comply with the following recordkeeping and reporting requirements (see paragraphs (d)(2)(iv)(A) and (B) of this section):

(A) *Charter vessel angler signature requirement.* At the end of a charter vessel fishing trip, each charter vessel angler who retains halibut caught in Area 2C must acknowledge that his or her information and the number of halibut retained (kept) are recorded correctly by signing the back of the Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook data sheet on the line number that corresponds to the angler's information on the front of the logbook data sheet.

(B) *Charter vessel guide requirements.* For each charter vessel fishing trip in Area 2C, the charter vessel guide onboard the charter vessel is required to record the following information (see paragraphs (d)(2)(iv)(B)(*1*) through (*8*) of this section) in the Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook:

(1) *Business owner license number.* The sport fishing operator business license number issued by the Alaska Department of Fish and Game to the charter vessel guide or the charter vessel guide's employer.

(2) *Guide license number.* The Alaska Department of Fish and Game sport fishing guide license number held by charter vessel guide who certified the logbook data sheet.

(3) *Date.* Month and day for each charter vessel fishing trip taken. A separate logbook data sheet is required for each charter vessel fishing trip if two or more trips were taken on the same day. A separate logbook data sheet is required for each calendar day that halibut are caught and retained during a multi-day trip.

(4) *Regulatory area fished.* Circle the regulatory area (Area 2C or Area 3A) where halibut were caught and retained during each charter vessel fishing trip. If halibut were caught and retained in Area 2C and Area 3A during the same charter vessel fishing trip, then a separate logbook data sheet must be used to record halibut caught and retained for each regulatory area.

(5) *Angler sport fishing license number and printed name.* Before a charter vessel fishing trip begins, record for each charter vessel angler the Alaska Sport Fishing License number for the current year, resident permanent license number, or disabled veteran license number, and print the name of each paying and nonpaying charter vessel angler onboard that will fish for halibut. Record the name of each youth angler under 16 years of age.

(6) *Number of halibut retained.* For each charter vessel angler, record the number of halibut caught and retained during the charter vessel fishing trip.

(7) *Signature.* At the end of a charter vessel fishing trip, acknowledge that the recorded information is correct by signing the logbook data sheet.

(8) *Angler signature.* The charter vessel guide is responsible for ensuring that anglers comply with the signature requirements at paragraph (d)(2)(iv)(A) of this section.

(3) *Charter vessels in Area 3A.* For each charter vessel fishing trip in Area 3A, the charter vessel guide onboard the charter vessel is required to record the regulatory area (Area 2C or Area 3A) where halibut were caught and kept by circling the appropriate area in the Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip Logbook. If halibut were caught and retained in Area 2C and Area 3A during the same charter vessel fishing trip, then a separate logbook data sheet must be

used to record halibut caught and retained for each regulatory area.

\*    \*    \*    \*    \*

■ 6. In § 300.66, revise paragraph (m) and add paragraphs (n), (o), and (p) to read as follows:

**§ 300.66  Prohibitions.**

\*    \*    \*    \*    \*

(m) Exceed any of the harvest or gear limitations specified at § 300.65(d).

(n) Fail to comply with the requirements at § 300.65(d).

(o) Fail to submit or submit inaccurate information on any report, license, catch card, application or statement required under § 300.65.

(p) Refuse to present any identification card, U.S. Coast Guard operator's license, permit, license, or Alaska Department of Fish and Game Saltwater Sport Fishing Charter Trip logbook upon the request of an authorized officer.

[FR Doc. 08–1301 Filed 5–22–08; 2:39 pm]

**BILLING CODE 3510–22–P**

---

## DEPARTMENT OF COMMERCE

**National Oceanic and Atmospheric Administration**

**50 CFR Part 679**

[Docket No. 071106673–8011–02]

RIN 0648–XI14

**Fisheries of the Exclusive Economic Zone Off Alaska; Yellowfin Sole by Vessels Participating in the Amendment 80 Limited Access Fishery in Bycatch Limitation Zone 1 of the Bering Sea and Aleutian Islands Management Area**

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Temporary rule; closure.

**SUMMARY:** NMFS is prohibiting directed fishing for yellowfin sole by vessels participating in the Amendment 80 limited access fishery in Bycatch Limitation Zone 1 (Zone 1) of the Bering Sea and Aleutian Islands management area (BSAI). This action is necessary to prevent exceeding the 2008 bycatch allowance of red king crab in Zone 1 specified for the trawl yellowfin sole fishery category by vessels participating in the Amendment 80 limited access fishery in the BSAI.

**DATES:** Effective 1200 hrs, Alaska local time (A.l.t.), May 22, 2008, through 2400 hrs, A.l.t., December 31, 2008.

# **EXHIBIT 3**

Attachment 3

Table 1. 2006 Total CEY and harvest figures (millions of pounds, net wt.).

| | Area 2C | Area 3A |
|---|---|---|
| **Total CEY** | 13.73 | 32.18 |
| **Removals** | | |
| Commercial fishery | 10.35 | 24.87 |
| Sport | 3.03 | 6.09 |
| Personal Use | 0.60 | 0.43 |
| Bycatch - Legal-sized | 0.14 | 1.32 |
| Wastage - Legal-sized | 0.02 | 0.05 |
| Total | 14.14 | 32.75 |
| **Overage:** | | |
| M lbs | 0.41 | 0.57 |
| | | |
| **GHL/Sport allocation (M lbs) (A):** | 1.432 | 3.650 |
| Guided Harvest (M lbs) | 2.03 | 3.97 |
| Private Harvest (M lbs) | 1.00 | 2.12 |
| Combined | 3.03 | 6.09 |
| **Guided Harvest vs. GHL/Allocation (A)** | | |
| Overage in M lbs | 0.60 | 0.32 |
| Overage as pct of (A) | 41.8% | 8.7% |

Data are preliminary.

Table 2. 2007 Total CEY and harvest figures (millions of pounds, net wt.).

| | Area 2C | Area 3A |
|---|---|---|
| **Total CEY** | 10.80 | 35.78 |
| **Removals** | | |
| Commercial fishery | 8.34 | 25.96 |
| Sport | 2.55 | 5.05 |
| Personal Use | 0.58 | 0.38 |
| Bycatch - Legal-sized | 0.21 | 0.99 |
| Wastage - Legal-sized | 0.05 | 0.02 |
| Total | 11.73 | 32.39 |
| **Overage:** | | |
| M lbs | 0.93 | -3.39 |
| | | |
| **GHL/Sport allocation (M lbs) (A):** | 1.432 | 3.650 |
| Guided Harvest (M lbs) | 1.70 | 3.40 |
| Private Harvest (M lbs) | 0.84 | 1.64 |
| Combined | 2.55 | 5.05 |
| **Guided Harvest vs. GHL/Allocation (A)** | | |
| Overage in M lbs | 0.27 | -0.25 |
| Overage as pct of (A) | 18.8% | -6.7% |

Data are preliminary.

EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| SCOTT VAN VALIN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Carlos M. Gutierrez, in his Official | ) |
| Capacity as Secretary of the U.S. | ) |
| DEPARTMENT OF COMMERCE, | ) |
| | )   <u>Civil Action No. 1:08-cv-00941-RMC</u> |
| Conrad C. Lautenbacher, Jr., | ) |
| in his Official Capacity as | ) |
| Administrator of the U.S. | ) |
| NATIONAL OCEANIC AND | ) |
| ATMOSPHERIC ADMINISTRATION, | ) |
| | ) |
| James W. Balsiger, in his Official | ) |
| Capacity as Acting Assistant | ) |
| Administrator of the U.S. | ) |
| NATIONAL MARINE FISHERIES | ) |
| SERVICE | ) |
| | ) |
| Defendants. | ) |

_____

## [PROPOSED] ORDER GRANTING MOTION OF THE INTERNATIONAL PACIFIC HALIBUT COMMISSION FOR LEAVE TO APPEAR AS *AMICUS CURIAE*

This matter came before the Court on the International Pacific Halibut Commission's

Motion for Leave to Appear as *Amicus Curiae*.  The Court has considered the pleadings filed in

support and against the motion and therefore deems itself fully advised.  Based on the pleadings

submitted,

**IT IS ORDERED** that the International Pacific Halibut Commission's Motion to Appear as *Amicus Curiae* is **GRANTED** and that the Declaration of Bruce M. Leaman, Ph.D. may be filed on behalf of the defendants.


Dated: _____        _____
                               Judge Rosemary M. Collyer
                               United States District Court


Copies to:  All counsel of record via ECF


30209845.1