## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.,*

        **Plaintiffs,**

**v.**

        Civil Action No. 08-0941 (RMC)
        Category D

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.,*

        **Defendants.**

## MOTION TO INTERVENE AS DEFENDANTS

Pursuant to Fed. R. Civ. P. 24 and for the reasons set forth in their accompanying Memorandum of Points and Authorities, attached hereto, Linda Behnken, Christopher Knight, William Thomas, Jr., Steve Box, David Gibson, Sherri Wohlhueter and Kurt Wohlhueter, Annah Taft Perry, North Pacific Seafoods, Inc., Erik Bahnsen , Wayne Brown , Sandy Craig , Luke Wiedel, Carolyn Heuer, Jerrod Galanin, Seafood Producers Cooperative, Ryan Nichols, the City of Pelican, and the City of Port Alexander respectfully move to intervene as defendants in the case as of right pursuant to Fed. R. Civ. P. 24(a)(2) or, in the alternative, permissively under Fed. R. Civ. P. 24(b). The Proposed Answer is attached hereto as Exhibit 1.

Counsel for Proposed Intervenor-Defendants has conferred with counsel for Plaintiffs and Defendants in this action. Defendants have represented that they have no position regarding the Motion to Intervene. Plaintiffs have represented that they have no opposition to this Motion as it relates to the merits of the case but oppose the Motion to Intervene as it relates to the immediately pending issue of a Preliminary Injunction. In light of the immediacy of the pending

issue of a Preliminary Injunction, proposed Intervenor-Defendants respectfully request expedited

consideration of this Motion to Intervene.

Dated:  June 18, 2008                             Respectfully submitted,


George J. Mannina, Jr. (D.C. Bar No. 316943)
Paul L. Knight (D.C. Bar No. 911594)
O'Connor & Hannan, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C.  20006-2803
Telephone:      (202) 887-1400
Facsimile:      (202) 466-3215
*Counsel for Proposed Intervenor-Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, *et al.*, | |
| **Plaintiffs**, | |
| v. | Civil Action No. 08-0941 (RMC) Category D |
| THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*, | |
| **Defendants**. | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
INTERVENE AS DEFENDANTS SUBMITTED BY LINDA BEHNKEN,
CHRISTOPHER KNIGHT, WILLIAM THOMAS, JR., STEVE BOX, DAVID GIBSON,
SHERRI WOHLHUETER AND KURT WOHLHUETER, ANNAH TAFT PERRY,
NORTH PACIFIC SEAFOODS, INC., ERIK BAHNSEN , WAYNE BROWN ,
SANDY CRAIG , LUKE WIEDEL, CAROLYN HEUER, JERROD GALANIN,
SEAFOOD PRODUCERS COOPERATIVE, RYAN NICHOLS, THE CITY OF
PELICAN, AND THE CITY OF PORT ALEXANDER

## I.    INTRODUCTION

Plaintiffs, the charter halibut fishing industry operating in International Pacific Halibut

Commission ("IPHC") Area 2C seek to overturn a final rule issued under the Northern Pacific

Halibut Act ("Halibut Act") – a rule specifically designed to prevent continued overfishing by

Plaintiffs in Area 2C.  The proposed Intervenor-Defendants, described in more detail below, will

be substantially affected should this final rule be struck down by the Court.

Proposed Intervenor-Defendants have three specific interests they wish to present to the

Court.  First, they have a strong interest in the conservation of the halibut stocks.  Allowing

charter fishermen to continue to overfish their quota in Area 2C, as they have every year since

2003, will significantly affect halibut fishing in future years.  Intervenors do not view halibut

fishing one year at a time, as Plaintiffs do, but view halibut as a resource that must be protected for generations to come.

Second, proposed Intervenor-Defendants have an interest in a clear and precise regulation of the industry. They too have huge investments in halibut fishing and need to know whether their IPHC designated quota of fish will be available to them. Overfishing of halibut stocks by the charter industry affects Intervenors' share of future harvests.

Lastly, proposed Intervenor-Defendants wish to correct factual inaccuracies and omissions presented to the Court by the charter industry. The Court should make its final decision on accurate and complete facts.

It is very significant that the charter industry has never claimed that its allotment of halibut in Area 2C under the CEY is unfair or incorrect. They do not deny that the harvest amount they are allocated, called the Guideline Harvest Level ("GHL"), is a conservation-based determination. What Plaintiffs are seeking in this action is to prevent the National Marine Fisheries Service ("NMFS") from implementing the conservation-based harvest levels set for the charter industry.

Exceeding the GHL is first and foremost a conservation issue. It is not a simple allocation issue as Plaintiffs repeatedly claim. Plaintiffs have been allocated 931,000 pounds of halibut, but they do not want to be held to that level. In fact, as discussed below, the TRO allows the guided sport industry to fish at a rate which will allow a catch almost double the conservation-based GHL provided for in the existing regulation.

The proposed Intervenor-Defendants include individual fishermen and family members, college students, and small boat owners who depend on the halibut resource for their income. Proposed Intervenor-Defendants include subsistence fishermen and Native Alaskans who depend

on halibut subsistence fishing to feed their families. Proposed Intervenor-Defendants include local governments whose communities and citizens rely on the halibut resource. In the case of one community, about 25% of the residents live below the poverty level. Proposed Intervenor-Defendants include charter boat captains and owners who view the issues from a long-term conservation perspective, not the Plaintiffs' short-term "this year's catch" view. Proposed Intervenor-Defendants include a member of the North Pacific Fishery Management Council ("Council") who actually participated in the Council's decision making process on these conservation issues. Proposed Intervenor-Defendants include people who sit on the two IPHC advisory boards.

As shown below, and based on the decision of this Circuit in *Fund for Animals, Inc. v. Norton,* 322 F.3d 728 (D.C. Cir. 2003), these proposed Intervenor-Defendants are entitled to intervene as a matter of right pursuant to Fed. R. Civ. P. 24(a)(2). Alternatively, proposed Intervenor-Defendants respectfully request that they be permitted to intervene pursuant to Fed. R. Civ. P. 24(b).

## II.     STATEMENT OF FACTS

Plaintiffs challenge a rule issued pursuant to authority granted under the Northern Pacific Halibut Act of 1982, 16 U.S.C. § 773-773k. *See* 73 Fed. Reg. 30504, 30523 (May 28, 2008) (the "Rule") ("The authority citation for 50 C.F.R. Part 300, Subpart E continues to read as follows: Authority: 16 U.S.C. 773-773k.") The Rule limits the 2008 commercial guided sport halibut harvest to the 931,000 pound conservation limit set forth at 50 C.F.R. 300.65(c).

Part II of this Memorandum overviews the facts relevant to the interests of proposed Intervenor-Defendants and the harm to them that will occur if Plaintiffs prevail. Before doing so, it may be helpful to place the Rule in its regulatory context.

The existing regulations specifying the appropriate GHL for the halibut guided sport industry are found at 50 C.F.R. 300.65.  The regulations provide that if the IPHC determines the biologically acceptable harvest of halibut is "x" then the allowable harvest by the guided sport industry, the GHL, will be "y."  There are five different GHLs based on five different halibut population sizes.  50 C.F.R. 300.65(c).  No one, including Plaintiffs, has ever argued the GHL limits are not the correct harvest levels based on the health of the halibut resource.  The regulations also provide a procedure for dealing with circumstances in which the guided sport industry exceeds the appropriate GHL in a given year.  *Id.*

Plaintiffs argue that even though the halibut population has declined such that the appropriate GHL is now set at 931,000 pounds in accordance with 50 C.F.R. 300.65(c), NMFS cannot require the guided sport industry to adhere to that GHL, even though there is no dispute that this is the correct, conservation-based GHL.  Allowing the resource to be overfished by allowing the guided sport industry to exceed the conservation-based GHL harms the resource and causes direct, immediate, and irreparable harm to proposed Intervenor-Defendants.

A.    Conservation Issues

1.    The Halibut Resource Is Declining

The Pacific halibut fishery is cyclical and is currently experiencing a decline in abundance.  Indeed, the exploitable biomass in IPHC Area 2C has declined 55%.  IPHC Eighty-fourth Annual Meeting Handout, Jan. 2008 at 83-84, which can be found at http://www.iphc.washington.edu/HALCOM/pubs/annmeet/2008/bluebook/bluebook08.pdf; Affidavit of Seafood Producers Cooperative ("Seafood Cooperative Aff.") attached as Exhibit 2, ¶ 7 ("In written materials provided at the annual meeting, IPHC staff stated the halibut resource is at the lowest level in a decade"); Affidavit of Linda Behnken ("Behnken Aff."), attached as

Exhibit 3, ¶ 10. When a resource is in decline, it is especially important to prevent overfishing. Commercial setline halibut fishermen such as proposed Intervenor-Defendants who have permitted halibut harvesting rights[1] have a direct and tangible interest in conserving the resource and preventing its overharvest, as do halibut processors. Individuals such as proposed Intervenor-Defendants who depend on the resource for their subsistence needs have the same interest. Similarly, local governments that depend on revenue generated from the commercial setline halibut fishery have a significant interest in preserving and protecting the halibut resource.

2.      Allowable Catch Limits Are Being Exceeded

The IPHC sets fishing harvest levels to protect the resource from overfishing. These harvest levels, called the Constant Exploitation Yield ("CEY"), are established by IPHC management area. There are ten IPHC areas, including Area 2C in southeast Alaska. 72 Fed. Reg. 74257, 74258 (Dec. 31, 2007). Since 1995, when the IFQ Program was established, commercial setline fishermen have never exceeded their portion of the CEY. Ex. 2, Seafood Cooperative Aff., ¶ 10; Federal Defendants' Opposition to Motion for Temporary Restraining Order, Exhibit 1, Environmental Assessment/Regulatory Impact Review/Final Regulatory Flexibility Analysis dated April 20, 2008, at p. 18, Table 19; IPHC Eighty-third Annual Meeting Handout, at 93, found at http://www.iphc.washington.edu/halcom/pubs/annmeet/2007/bluebook/iphcbb07.pdf.

---

[1] In 1995, an Individual Fishermen's Quota ("IFQ") permit program was initiated for the commercial setline halibut fleet. Fishermen were allocated Quota Shares ("QS") based on their past level of fishing. QS is translated annually into pounds of halibut, the amount fluctuating directly with the total setline catch limit for a management area. Without a QS setline, halibut fishing is prohibited. QS were issued for IPHC management areas. Thus, commercial fishermen with QS for management Area 2C (southeast Alaska) cannot fish in management Area 3A (central Gulf of Alaska) without a QS for that area. Fishermen can buy and sell QS. Ex. 3, Behnken Aff., ¶ 3.

In contrast, the commercial guided sport industry in Area 2C has exceeded its portion of the CEY, the GHL, every year since the GHL was established. The commercial guided sport industry exceeded its GHL by 22% in 2004, 36% in 2005, and 26.5% in 2006. 72 Fed. Reg. 74257, 74259 (Dec. 31, 2007). In 2007, the GHL was overharvested by 20%. IPHC Eighty-fourth Annual Meeting Handout, Jan. 2008, at 11, found at http://www.iphc.washington.edu/HALCOM/pubs/annmeet/2008/bluebook/bluebook08.pdf.

Proposed Intervenor-Defendants whose professional, subsistence, and other interests depend on the continued viability of the halibut resource have a significant interest in preventing that resource from being overfished.

3.    The Exceedance Of Allowable Catch Limits Is Causing Overfishing Of Allowable Harvest Levels And Is A Threat To The Resource

Common sense tells you that there is a conservation problem when fishing limits are set and then regularly exceeded. More importantly, the IPHC, the entity charged with managing and conserving the halibut resource, has stated that fishing above the CEY level poses serious conservation problems. As NMFS stated in the preamble to the proposed Rule:

> The IPHC annually determines the amount of halibut that may be removed from the resource without causing biological conservation problems on an area-by-area basis....

72 Fed. Reg. 74257, 74258 (Dec. 31, 2007). Thus, the CEY represents the harvest level that can occur in an IPHC management area "without causing conservation problems." Fishing beyond the CEY presents conservation problems.

The IPHC has expressed continuing concerns about the conservation threat posed by the commercial guided sport industry exceeding its allocation of the CEY, particularly in Area 2C. As early as December 1, 2006, the IPHC wrote the Council, the entity established pursuant to the

Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801, to manage

domestic fisheries, stating:

> The recent publication of the recreational harvests of halibut in
> IPHC Regulatory Areas 2C and 3A in 2006 by the Alaska
> Department of Fish and Game has, with other removals, indicated
> that the [CEY] established by the Commission for these areas has
> been exceeded... The achievement of the Commission's
> conservation mandate is dependent on adherence to catch limits
> and total yield.

*See* Ex. 3, Behnken Aff., Appendix A, Letter from Bruce Leaman, Executive Director, IPHC, to

Stephanie Madsen, Chair, North Pacific Fishery Management Council, December 1, 2006.  As

noted above, only the guided sport sector is exceeding its harvest allocation.

On January 23, 2007, the IPHC wrote the U.S. Secretary of Commerce again protesting

the conservation threat caused by overfishing by the commercial guided sport industry.  That

letter stated:

> The Commission noted that the [GHL] approved by the [Council]
> for the charter/guided recreational halibut fishery in Areas 2C
> (southeast Alaska) and 3A (central Gulf of Alaska) were exceeded
> in recent years, substantially so in Area 2C (over 40% higher than
> the GHL in 2006)....  The Commission, with the support of its
> advisory bodies, therefore recommends establishment of more
> restrictive daily bag limits for the charter/guided halibut fishery in
> Areas 2C and 3A during 2007, in order to constrain catch within
> the [Council's] GHL levels....  The Commission ... believes the
> action to be necessary given the magnitude by which the
> charter/guided catches exceeded the GHL limits and the belief that
> such overharvesting puts at risk the achievement of IPHC
> management goals for the halibut stock.

*See* Ex. 3, Behnken Aff., Appendix B, Letter from Jim Balsiger, Chairman, IPHC, to Secretary

Gutierrez, January 23, 2007.

On January 30, 2008, the IPHC wrote NMFS, again expressing its concerns about the

conservation threat caused by overfishing by the commercial guided sport industry.

> The Council has previously stated its intent to manage the sport
> charter fishery to the GHL, and has proposed management options
> if the GHL was reduced for 2008. The Commission took this into
> account when setting the 2008 commercial fishery catch limit.
> Achievement of the Commission's harvest goals and management
> objectives is thus dependent on the proposed action.

*See* Ex. 3, Behnken Aff., Appendix C, Letter from Bruce Leaman, Executive Director, IPHC, to

Sue Salveson, January 30, 2008.

In sum, the agency charged with responsibility for conserving the halibut resource and

protecting it for present and future generations identifies overfishing by the commercial guided

sport industry as a threat to the conservation of the resource. As NMFS stated in the preamble to

the proposed Rule, "conservation of the halibut resource is the overarching goal of the IPHC...."

72 Fed. Reg. 74257, 74258 (Dec. 31, 2007). NMFS has acknowledged this concern about the

effects of charter boat overfishing stating:

> The IPHC recommended [limits on the guided sport halibut catch]
> because it believed its management goals were at risk by the
> magnitude of the charter halibut harvest in excess of the GHL,
> especially in Area 2C.

72 Fed. Reg. 74257, 74259 (Dec. 31, 2007).

In other words, and as confirmed by the January 30, 2008 IPHC letter cited in this

section, statements that there is no conservation issue are based on the assumption that all

sectors live within their allocation and the CEY is not exceeded in Area 2C or elsewhere.

The facts are that the IPHC establishes its halibut conservation program area by area and the

IPHC is concerned about the conservation of halibut in Area 2C, the area governed by the

regulations at issue. In fact, the IPHC stated in their 2008 annual report that "it has become

paramount that harvest rates be brought down to the target harvest rate in Area 2." IPHC,

Eighty-fourth Annual Meeting Handout, Jan. 2008, at 84, found at

http://www.iphc.washington.edu/HALCOM/pubs/annmeet/2008/bluebook/bluebook08.pdf.

Proposed Intervenor-Defendants, whose subsistence needs, livelihood, and other interests

depend on a healthy halibut resource, have a direct and substantial interest in the conservation of

that resource. Proposed Intervenor-Defendants, charter boat operators, setline fishermen, halibut

processors, subsistence users, and community governments are directly and immediately harmed

by any conservation threat to the halibut resource.

> 4. <u>Overfishing By The Commercial Guided Sport<br>Industry Is Causing Localized Depletion</u>

Commercial setline fishermen are distributed through Area 2C. Ex. 3, Behnken Aff.,

¶ 15. The guided sport charter fleet fishing is concentrated near coastal communities. *Id.*

Alaska Department of Fish and Game ("ADFG") data shows that the charter halibut catch per

rod hour has declined in many areas and by more than 50% around Sitka, Alaska, where

approximately 40% of the Area 2C charter halibut harvest occurs. *Id.* at ¶¶ 15, 16; Ex. 2,

Seafood Cooperative Aff., ¶ 3. Declines in catch per unit of effort are a classic sign of

diminished resource abundance and localized depletion. The fact that the charter fleet now

travels farther to catch the same fish also indicates localized depletion. *Id.* at ¶ 16.

As NMFS has stated:

> The Council has discussed the expansion of the halibut guided
> recreational fleet since 1993, when the rapid increase in guided
> recreational vessel effort in some small Alaskan communities, such
> as Sitka, gave rise to concerns about localized depletion of the
> halibut resource....

67 Fed. Reg. 3867 (Jan. 28, 2002).

Indeed, as early as 1995, the Council recognized this issue finding:

> Pressure by charter operations may be contributing to localized
> depletion in several areas.

*Id.*

Subsistence fishermen are inshore fishermen and proposed Intervenor-Defendants who depend on the halibut resource for their subsistence needs are immediately impacted by localized depletion.

B.    Allocation Impact On Proposed Intervenor-Defendants Caused By Overfishing By The Commercial Guided Sport Industry

1.    Overfishing By The Commercial Guided Sport Industry Results In A Direct Reduction Of The Allocation To The Commercial Setline Sector

In addition to the impact on proposed Intervenor-Defendants caused by conservation threats to the resource, overfishing by the guided sport industry has a second direct adverse impact on proposed Intervenor-Defendants. Each year, the IPHC determines "the amount of halibut that may be removed from the resource without causing biological conservation problems on an area-by-area basis...." 72 Fed. Reg. 74257, 74258 (Dec. 31, 2007). The IPHC then estimates the catch by the guided sport sector and other users, <u>not including</u> commercial setline fishermen. That total is subtracted from the CEY for each area and the remaining amount of fish is the catch quota for the commercial setline fleet for that area. 68 Fed. Reg. 47256, 47257 (Aug. 8, 2003). As the guided sport fishery increases its catch, the setline harvest is reduced. As NMFS has stated:

> This represents an open-ended allocation to the guided recreational
> fishery from the quota available to the commercial halibut fishery.
> Hence, as the guided recreational fishery expands, its harvests
> reduce the pounds available to be fished in the commercial halibut
> fishery and, subsequently, the value of quota shares (QS) in the
> IFQ Program.

*Id.*

Exacerbating the impact of this system on the setline fleet is the fact that the IPHC has deducted from the setline quota the amount of over harvest by the commercial guided sport fishery in the previous year. 72 Fed. Reg. 74257, 74258 (Dec. 31, 2008); 73 Fed. Reg. 30504, 30505 (May 28, 2008).

This open-ended reallocation of fish from commercial setline fishermen to the commercial guided sport sector causes severe economic harm to individual setline fishermen, forcing many to consider leaving the halibut fishery and forcing many to confront the loss of their homes and vessels pledged as collateral for loans to purchase QS. This is a direct, immediate, and irreparable injury to proposed Intervenor-Defendants.

2.    It Is Neither Fair Nor Equitable For Setline Fishermen To Bear All Of The Quota Reduction Needed For Conservation

Because GHL exceedances are deducted from the setline quota, and because of overfishing by the commercial guided sport industry, the setline quota was reduced by 20% in 2007 and another 27% in 2008. 73 Fed. Reg. 30504, 30507 (Response to comment 6)(May 28, 2008). The GHL for the guided sport sector was never reduced until this year. 72 Fed. Reg. 74257, 74259 (Dec. 31, 2007). The purpose of the Rule is to implement a regulatory program that will keep the guided sport harvest in Area 2C within its GHL established at 50 C.F.R. 300.65(c). 72 Fed. Reg. 74257 (Dec. 31, 2007). This will prevent overfishing of the resource by this sector. Plaintiffs filed this action to overturn the Rule so they will not be compelled to stay within their GHL and may continue overfishing.

It is neither fair nor equitable for one group of fishermen to have their quota reduced for conservation purposes and for another group to say they should not have their quota reduced, particularly when the second group is overfishing and creating a conservation problem. Proposed Intervenor-Defendants will be directly, immediately, and irreparably harmed if

Plaintiffs prevail in overturning the Rule because proposed Intervenor-Defendants will bear all of

the conservation and allocation burdens.

      3.      <u>Overharvests By The Guided Sport Industry Threatens Subsistence Fishermen And Local Communities</u>

Halibut is one of Alaska's most important subsistence fish species. Environmental

Assessment and Regulatory Impact Review for a Regulatory Amendment to Define a Halibut

Subsistence Fishery Category in Convention Waters, NMFS, 2003, at 100, found at

http://www.fakr.noaa.gov/analyses/subsistence/halibut0403.pdf. Subsistence fishing occurs in

near shore areas which are readily accessible to subsistence users. *Id.* at 99-100. The

commercial guided sport fishery operates in near shore areas, competing with local anglers and

subsistence users. Localized depletion caused by the guided sport industry poses an immediate,

direct, and irreparable threat to subsistence fishermen, and coastal communities. As a proposed

Intervenor-Defendant explains:

> The charter industry operates near towns, allowing its non-resident
> clients to over harvest the same areas rural native subsistence
> fishermen have depended on for thousands of years. Halibut is a
> traditional food for all Native people, having important cultural
> and nutritional significance. Rural Alaska people, who live far
> from roads and urban grocery stores, depend on local subsistence
> resources to feed their families.... Depleting subsistence resources
> has harmed the subsistence lifestyle of native and non-native
> residents from the rural coastal Alaska communities....

Affidavit of William Thomas, Jr. ("Thomas Aff."), attached as Exhibit 4, ¶ 2. Indeed, the Alaska

Department of Fish and Game has found that subsistence harvests have declined in Area 2C and

in other areas where the guided sport industry operates inshore in waters on which subsistence

fishermen depend. Hall, J.A., Koster, D., and Turek, M., Subsistence Harvests of Pacific Halibut

in Alaska, 2006, Alaska Dept. of Fish and Game, Division of Subsistence, Dec. 2007, at 17-18,

found at http://www.subsistence.adfg.state.ak.us/TechPap/TP333.pdf.

Charter boat harvests in near shore areas have also caused localized depletion of other important subsistence resources such as rockfish. Ex. 4, Thomas Aff., ¶ 3; Ex. 3, Behnken Aff., ¶ 17.

    C.    <u>The Legal and Regulatory Regime</u>

        1.    <u>The GHL Is A Defined And Fixed Allocation</u>

The GHL is the halibut quota established for the commercial guided sport fishery. As NMFS has stated: "The GHLs are established as a total maximum poundage." 68 Fed. Reg. 47257, 47258 (Aug. 8, 2003). "[T]he GHL was to provide a limit on the total amount of harvests in the guided fishery...." 68 Fed. Reg. 47259. The preamble to the Rule recognizes "it is the Council's policy that the charter vessel fishery should not exceed the GHL." 73 Fed. Reg. 30504, 30505 (May 28, 2008). This was clearly the intent of the Council members who debated and voted for this policy. Ex. 3, Behnken Aff., ¶¶ 19, 20, 22.

Proposed Intervenor-Defendants have a direct and immediate interest in assuring that this policy is followed, an interest directly opposed and prevented by the relief sought by Plaintiffs.

        2.    <u>The Area 2C GHL Was Reduced In 2008 In Accordance With 50 C.F.R. 300.65(c)</u>

When the GHLs were established, they were linked to the overall CEY for each IPHC management area. Thus, 50 C.F.R. 300.65(c) provides that if the Area 2C CEY is more than 9,027,000 pounds, the GHL will be 1,432,000 pounds. The regulations then provide four more GHL categories or levels, each expressed such that if the CEY is reduced to "X" pounds, then the GHL shall be "Y" pounds. The Category D level is that if the Area 2C CEY is 5,841,000 pounds or more, then the GHL shall be 931,000 pounds. 50 C.F.R. 300.65(c).

Since the GHLs were first established, the CEY has been reduced. However, it has never been reduced in an amount sufficient to trigger a step down reduction in GHL from the highest

GHL level of 1,432,000 pounds, identified as Category A in the regulations. 2008 is the first

year the Area 2C CEY has been decreased sufficiently to trigger a GHL reduction from Category

A. The 2008 Area 2C CEY reduction was of such a magnitude that the Area 2C GHL was

dropped from the maximum Category A level to the fourth of the five possible levels. As the

preamble to the Rule states:

> Since 2003, when the GHLs became effective, they have never
> been reduced below their maximum level because declines in the
> total CEY have not been sufficient to trigger the first step
> reduction in GHLs.

72 Fed. Reg. 74257, 74259 (Dec. 31, 2007).

No one has ever challenged as improper the regulation providing a step down decrease in

Area 2C GHLs based on Area 2C CEY levels. There is also no dispute that the Area 2C CEY

has now been reduced such that the 2008 Area 2C GHL is 931,000 pounds. For both

conservation and allocation reasons, proposed Intervenor-Defendants have a direct interest in

effectuating the existing regulation and implementing the GHL appropriate to the CEY for the

resource, an interest opposed by Plaintiffs.

> D.    The Purpose Of The Rule

In describing the purpose of the Rule, NMFS stated:

> NMFS proposes regulations that would limit the harvest of Pacific
> halibut by guided sport charter vessel anglers in [IPHC] Area 2C
> of Southeast Alaska to the [GHL] for that area....

72 Fed. Reg. 74257 (Dec. 31, 2007). NMFS continued:

> This proposed regulatory change is necessary to reduce the halibut
> harvest in the charter vessel sector to the GHL for Area 2C.

*Id.*

The final Rule reflects that intent. The preamble to the Rule states its purpose is to restrict the guided sport halibut fishery in Area 2C "to the [GHL] of 931,000 lb (422.3 mt)." 73 Fed. Reg. 30504, 30505 (May 28, 2008). *See also id.* at 30506 (Response to Comment 2) (the Rule is "intended to reduce the Area 2C charter halibut harvest amount to the 2008 GHL."); and at 30509 (Response to Comment 23).

Thus, the Rule is not intended to retrospectively deal with an overage in a prior year's GHL. Its purpose is to implement 50 C.F.R. 300.65(c) which provides for a lower GHL when the CEY is reduced. The issue is not addressing a GHL exceedance in the circumstance when the base GHL remained unchanged. The issue is implementing a conservation program based on the fact that the CEY and, therefore, the GHL has changed. This dichotomy, regulation to address GHL exceedances versus regulations to address a lower GHL based on a lower CEY, was reflected in the Council debate. As NMFS explained in the preamble to the proposed Rule:

> The Council also was considering management alternatives for the charter vessel halibut fishery in Area 2C during the first half of 2007.... Not knowing in June 2007 how the GHL may be affected by IPHC action in January 2008, the Council recommended a suite of charter vessel fishing restrictions if the GHL remains the same in 2008 (Option A) and a different, more restrictive, suite of restrictions if the GHL decreases in 2008 (Option B).

72 Fed. Reg. 74257, 74260 (Dec. 31, 2007). The Council was dealing with two possible circumstances: (1) a lower GHL based on reduced halibut abundance, or (2) an overage of the 2007 GHL, assuming no change in the CEY and, therefore, the base GHL. Once the IPHC determined in January 2008 that the Area 2C CEY needed to be reduced for conservation reasons, the issue became how to manage to the GHL required by the lower CEY. As NMFS noted:

> This Council recommendation is the basis for this proposed regulatory action.

*Id.*

In short, there are two stages of GHL management: management to achieve the GHL based on the CEY level and then management of any exceedances of that GHL. Ample quotations can be found to show that for GHL exceedances, the existing policy is to not disrupt charter fishing by making in-season adjustments, a policy reflected in the procedure for dealing with GHL exceedances retrospectively. However, in 2008, because of the reduced CEY, the issue was implementing 50 C.F.R. 300.65(c) which pegs the Area 2C GHL to changes in the Area 2C CEY. As noted above, Plaintiffs do not challenge that this is the correct conservation-based GHL. The Rule implements this GHL under the Halibut Act.

In sum, the Rule was adopted under the Halibut Act, *infra.* at p.3, to achieve the conservation goals of the IPHC when the Area 2C CEY was reduced, this triggering the lower GHL already established in regulation – a regulation and GHL never challenged by Plaintiffs. Proposed Intervenor-Defendants have a direct and immediate interest in NMFS implementing the regulations setting lower GHLs when CEY is reduced. Plaintiffs seek to prevent the lower, conservation based GHLs from being implemented.

It should be noted that NMFS estimates that even with implementation of the Rule, the guided sport fishery could exceed the 2008 GHL by up to 58,000 pounds. 72 Fed. Reg. 74257, 74263 (Dec. 31, 2007). If that occurs, then the regulatory processes set forth in 50 C.F.R. 300.65(c) for addressing GHL exceedances will be triggered.

E.    Conclusion

As discussed in more detail below, there can be no question that (1) the interests of proposed Intervenor-Defendants are directly and immediately implicated by the subject of this action, *i.e.,* the Rule and its halibut management program, (2) those interests could be seriously

and adversely affected by the disposition of this action, and (3) the interests and perspectives of the proposed Intervenor-Defendants are different from those of the government.

## III.    PROPOSED INTERVENOR-DEFENDANTS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT

Qualification for intervention as of right pursuant to Fed. R. Civ. P. 24(a)(2), depends on the following four factors:

> (1) the timeliness of the motion; (2) whether the applicant "claims an interest relating to the property or transaction which is the subject of the action"; (3) whether "the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest"; and (4) whether "the applicant's interest is adequately represented by existing parties."

*Fund for Animals, Inc.*, 322 F.3d at 731; *Nuesse v. Camp*, 385 F.2d 694, 699 (D.C. Cir. 1967). These standards must be interpreted flexibly. *Nuesse*, 385 F.2d at 700. The requirements of Rule 24(a) are to be broadly construed in favor of applicants for intervention. 7C  C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure*, §§ 1904 (2d ed. 1986); *See also Nuesse v. Camp*, 385 F.2d at 700; *States Marine Intern., Inc. v. Peterson*, 518 F.2d 1070, 1080 n.25 (D.C. Cir. 1975), *cert. denied*, 424 U.S. 912 (1976); *South Dakota ex rel. Barnett v. U.S. Dept. of Interior,* 317 F.3d 783 (8th Cir. 2003); *Lipsett v. United States,* 37 F.R.D. 549 (S.D.N.Y. 1965), *appeal dismissed*, 359 F.2d 956 (2d Cir. 1966); *United States v. Oregon,* 913 F.2d 576, 587 (9th Cir. 1990), *cert. denied*, 501 U.S. 1250 (1991); *United States v. Stringfellow*, 783 F.2d 821, 826 (9th Cir. 1986), *cert. dismissed*, 478 U.S. 1030 (1986); *Westlands Water Dist. v. United States*, 700 F.2d 561, 563 (9th Cir. 1983); *Washington State Bldg. & Constr. Trades Council v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982), *cert. denied*, 461 U.S. 913 (1983).

In addition to the qualifications for intervention under Rule 24(a)(2), a party seeking to intervene as of right in this Circuit must demonstrate that it has standing under Article III of the

Constitution. *Fund for Animals*, 322 F.3d at 731. As shown below, proposed Intervenor-Defendants satisfy all of the requirements for intervention as a matter of right.

A.     Proposed Intervenor-Defendants Would Have Standing To Challenge the Rule

Standing, being jurisdictional, must be addressed prior to determining whether the four factors under Rule 24(a)(2) are met. *Id.* at 732.

1.     Proposed Intervenor-Defendants Have Constitutional Standing

Constitutional standing derives from the requirement that federal courts can act only upon a justiciable case or controversy. U.S. Const. Art. III. If a party lacks Article III standing, the court lacks subject matter jurisdiction to hear the case. To satisfy the case or controversy requirement of Article III, a plaintiff must, generally speaking, demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision. *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997); *Fund for Animals*, 322 F.3d at 732-733.

Both the United States Court of Appeals for the District of Columbia Circuit and the United States Court of Appeals for the Eleventh Circuit have specifically found that harm to economic interests constitutes injury-in-fact sufficient to confer Article III standing. *Fund for Animals*, 322 F.3d at 733; *Alabama-Tombigbee Rivers Coalition v. Norton*, 338 F.3d 1244, 1252 (11th Cir. 2003), *citing Bennett v. Spear*, 520 U.S. at 167-68. Indeed, in a case in which the issue was regulations affecting the amount of fish which could be harvested, this Court held:

> Economic harm of this sort is a canonical example of injury in fact sufficient to establish standing. *E.g., National Wildlife Fed'n v. Hodel*, 839 F. 2d 695, 704 (D.C. Cir. 1988)(recogtnizing that injury to "traditional economic interests [ ] will support standing."

*North Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F.Supp.2d 62, 82 (D.D.C. 2007).

In *North Carolina Fisheries Ass'n*, the issue was implementation of a fishery management plan setting management restrictions to meet target harvest levels. *Id.* at 69-70. The Court found that by affecting the amount of fish that could be caught, the agency had created a situation in which some fishermen would suffer economic harm satisfying the requirements for standing. *Id.* at 83. That is precisely the circumstance confronted by proposed Intervenor-Defendants. Plaintiffs want to implement a fisheries management program allowing them to overfish their halibut allocation. Such a management program affects proposed Intervenor-Defendants by reducing the availability of fish because of conservation and allocation reasons.

*Fund for Animals* involved an attempt by the Natural Resources Department of the government of Mongolia, referred to as the "NRD," to intervene in a case brought by a wildlife conservation organization challenging the Department of the Interior's decision to list the argali sheep as threatened, instead of endangered, under the Endangered Species Act within certain countries including Mongolia. The Court found that the NRD had Article III standing with respect to any decision to list the argali sheep under the ESA. It found that the placement of the argali sheep on the endangered list would result in the cancellation of import permits for American hunters to bring trophies home, thereby causing a loss of tourist dollars, some of which were spent on conservation programs for the argali. This was found to be a concrete and imminent injury fairly traceable to the regulatory action that the Plaintiffs sought in the lawsuit.

> Mongolia's sheep are the subject of the disputed regulations, the country benefits from the [Department's] current regulations, and Mongolia would suffer concrete injury if the court were to grant the relief the plaintiffs seek.

*Fund for Animals,* 322 F.3d at 733.

When, as here, the proposed Intervenor is "an object of the action (or forgone action) at issue," there can be "little question that the action or inaction has caused him injury, and that a

judgment preventing or requiring the action will redress it." *Fund for Animals*, 322 F.3d at 734,

quoting *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002); *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 561-62 (1992). In such cases, it is not even required that parties file evidentiary

submissions to support standing – to the contrary, in many, if not most, cases the petitioner's

standing is self-evident. *Fund for Animals*, 322 F.3d at 733.

> In this case, while the NRD is not itself the object of the
> challenged agency action, sheep that Mongolia regards as its
> national property and natural resource plainly are its subject. And
> for the purpose of determining whether standing is self-evident, we
> see no meaningful distinction between a regulation that directly
> regulates a party and one that directly regulates the disposition of a
> party's property.

*Id.* at 734.

Similarly, in *Alabama-Tombigbee Rivers Coalition, supra*, businesses that operate under

federal permits have standing to challenge federal action that may affect their rights pursuant to

those permits. In addition, permits have been held to convey property rights traditionally

protected by law, and, therefore, are sufficient to confer standing under these circumstances.

*Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810, 818-819 (9th Cir. 2001); *Sierra*

*Club v. U.S. EPA*, 995 F.2d 1478, 1482 (9th Cir. 1993); *Foss v. National Marine Fisheries*

*Service*, 161 F.3d 584, 586, 588 (9th Cir. 1998).

In *Fund for Animals*, as in the instant case, the plaintiffs' own complaint, in and of itself,

established the proposed Intervenor's standing.

> But even if we were to harbor any doubts about the NRD's
> standing, they would be dissipated by evidence in the district court
> record. First, there are the [plaintiff's] own pleadings, which are
> admissible as evidence in support of its opponent's cause.

*Fund for Animals*, 322 F.3d at 734. Based on the plaintiffs' complaint, the Court in *Fund for*

*Animals* found that Mongolia was itself "an object of the action . . . at issue." Likewise, based on

the allegations of the Complaint in the instant case, commercial setline fishermen are an object of the action at issue. *See* Complaint at ¶¶ 8, 43, 44, 53, and 62.

Here, individual commercial setline halibut fishermen have permits issued under the IFQ Program to fish for halibut. Ex. 3, Behnken Aff., ¶ 3. Their economic livelihood depends on their ability to fish for halibut. Plaintiffs' objective is to reduce the amount of halibut available for harvest by fishermen who are not part of the guided sport industry. Plaintiffs' Complaint makes that clear.

Factually, the potential injury in the instant case is even more apparent and immediate than that in *Alabama-Tombigbee Rivers Coalition, supra.* In that case, the Eleventh Circuit found that harm to economic interests caused by the mere listing of a species as either threatened or endangered under the ESA constituted injury-in-fact sufficient to confer Article III standing. *Alabama-Tombigbee Rivers Coalition*, 338 F.3d at 1252-1254.

*Alabama-Tombigbee Rivers Coalition* involved a challenge by a non-profit coalition of entities that used Alabama waterways in their businesses to the listing of the Alabama sturgeon as endangered. The Court found the coalition had Article III standing to challenge the listing of the sturgeon under the ESA:

> . . . the Coalition is operating against the backdrop of a continuing policy that was triggered by the listing and is effectuated by the machinery of the ESA. . . the listing has injured the Coalition's members and will continue to do so.

*Alabama-Tombigbee Rivers Coalition*, 338 F.3d at 1253.

In *Alabama-Tombigbee Rivers Coalition*, the threat to the coalition's members was from the proposed listing of the sturgeon under ESA. In the instant case, the relief sought is to allow charter boat fishermen to increase their harvest and force consequent reductions in commercial

and other harvests. Proposed Intervenor-Defendants are the object of the fishery management program Plaintiffs seek to impose.

In a context similar to the instant situation, the United States Court of Appeals for the First Circuit explained:

> . . . [T]he adverse effect is certain. The fishing groups seeking intervention are the real targets of the suit and are the subjects of the regulatory plan. Changes in the rules will affect the proposed intervenors' business, both immediately and in the future.

*Conservation Law Foundation v. Mosbacher*, 966 F.2d 39, 43 (1st Cir. 1992). Even associations of commercial fishermen and those representing them have been held to have Article III standing with respect to regulations implementing fishery conservation and management measures. *Parravano v. Babbitt*, 861 F. Supp. 914, 928 (N.D. Cal. 1994), *aff'd.,* 70 F.3d 539 (9th Cir. 1995), *cert. denied*, 518 U.S. 1016 (1996).

The threat of more severe reductions in the commercial halibut harvest constitutes injury sufficient to confer Article III standing. Given the facts of this case, it is not possible to argue that the concrete injuries proposed Intervenor-Defendants will suffer would not be traceable to the instant case and to the relief sought by Plaintiffs.

Those harms fall into five categories. First, those proposed Intervenor-Defendants who have permits to fish under IFQ Program will suffer direct harm if the guided sport industry exceeds its GHL and the amount of fish available for harvest by setline fishermen is reduced because of conservation or allocation reasons. As noted above, increases in charter boat harvests above the GHL result in a direct deduction from the quota available to setline fishermen.

As one proposed Intervenor-Defendant setline fisherman stated: "My livelihood depends on sustainable harvest levels of halibut, and the over-harvesting by charter operators threatens the resource and my business." Affidavit of Steve Box ("Box Aff."), attached as Exhibit 5, ¶ 5.

Still another proposed Intervenor-Defendant setline fisherman stated: "I am entirely dependent on commercial fishing for my livelihood.... If the halibut quota is cut any further, *i.e.,* due to charter overages, I may lose my quota share, boat, and salmon permit; in other words, I would lose my whole commercial fishing business." Affidavit of David Gibson ("Gibson Aff."), attached as Exhibit 6, ¶ 6. In the words of another proposed Intervenor-Defendant, "continued over-harvesting by the charter sector will force the IPHC and the North Pacific Fishery Management Council to reduce my access in order to maintain the sustainability of the halibut stock." Affidavit of Christopher Knight ("Knight Aff."), attached as Exhibit 7, ¶ 9. Ryan Nichols, a college student who borrowed money to purchase halibut QS and is using the money earned from fishing halibut to repay his loan and to pay for college is finding it very hard to meet his financial obligations because of reduction in his QS. Affidavit of Ryan Nichols ("Nichols Aff."), attached as Exhibit 8, ¶¶ 3, 4. Similarly, Sherri and Kurt Wohlhueter, commercial setline fishermen, have seen their halibut allocations cut and fear that they will not be able to hire and pay for crew "if quota reductions continue." Affidavit of Sherri Wohlhueter and Kurt Wohlhueter ("Wohlhueter Aff."), attached as Exhibit 9, ¶ 5. There is also the plight of Taft Perry, a setline fishermen who states that "further reduction in our catch necessitated by charter overages will leave us unable to make our annual payments." Affidavit of Annah Taft Perry ("Perry Aff."), attached as Exhibit 10, ¶ 3. Finally, Linda Behnken, who has served as a member of the Council and was a Council member when the GHL program was developed by the Council, is also a setline fisherman who depends on healthy halibut resource. Equally important, if the guided sport industry exceeds the GHL, it could reduce her QS causing a "devastating" economic impact. Ex. 3, Behnken Aff., ¶¶ 1, 5, 6, 9, 12. All of these fishermen hold Area 2C halibut QS.

Each of these individual setline fishermen depends on the halibut fishery for their livelihood. Each has borrowed money to purchase the rights to fish for halibut -- and each faces the reality of economic loss if the setline quota is cut further to make up for overfishing by the guided sport industry. Many have pledged their vessels, homes, or other fishing permits as collateral and could see these forfeited. *See* Ex. 5, Box Aff., ¶¶ 3, 5; Ex. 6, Gibson Aff., ¶¶ 2-6; Ex. 7, Knight Aff., ¶¶ 3, 4, 8, 10; Ex. 10, Perry Aff., ¶¶ 2-4; Ex. 9, Wohlhueter Aff., ¶¶ 3, 5, 6. As Taft Perry explains, she has already "suffered catastrophic losses" because of halibut harvest reductions and further reductions because overfishing by charter boat operators will be devastating. Ex. 10, Perry Aff., ¶ 4.

These commercial setline fishermen are not large corporations but are small family businesses. The average Area 2C commercial setline fisherman holds less than 5,000 pounds of halibut QS which results in an annual gross of $12,000-$40,000. Ex. 3., Behnken Aff., ¶ 9; Ex. 2, Seafood Cooperative Aff., ¶ 9.[2] Indeed, 79% of the Area 2C setline fishermen own 10,000 pounds or less of halibut IFQ and 57% hold less than 3,000 pounds. Ex. 3, Behnken Aff., ¶ 4. They are concerned about their ability to stay in business and to continue as commercial fishermen. *Id.,* ¶ 14. Sixty-seven percent have purchased all or a portion of their halibut QS. *Id.,* ¶ 9; Ex. 3, Behnken Aff., ¶ 4. As noted above, many have borrowed to do so and they face the prospect of lenders calling loans, threatening pledged collateral such as homes and vessels. At the April 2008 Council meeting, three of the principal lending institutions expressed disquiet about the stability of the commercial setline sector and stated that lending standards may be altered. Ex. 2, Seafood Cooperative Aff., ¶ 14.

---

[2] By way of contrast, one of the Plaintiffs testified to the Council that the annual gross income for his charter boat lodge was approximately $12 million while another Plaintiff testified to gross income in his charter boat lodge at $7-8 million. Ex. 3, Behnken Aff., ¶ 9.

Reductions in the halibut harvest by setline fishermen are also felt very directly by halibut processors. Proposed Intervenor-Defendant North Pacific Seafoods, Inc., employs 800 workers and halibut is a primary resource for its processing plants. This processor has seen halibut production in its Area 2C plants drop 25% since 2004 when the charter boat fleet began exceeding its GHL. North Pacific Seafoods, Inc. expects to suffer a 25% loss of revenue if the Rule is overturned and to lay off 10% of its workers. Affidavit of North Pacific Seafoods, Inc. ("North Pacific Seafoods Aff."), attached as Exhibit 11, ¶¶ 1, 2, 5, 6. Similarly, the Seafood Producers Cooperative expects to see its revenues cut by $2 million because of the recent reduction in Area 2C setline quotas. That will reduce the earnings of its 140 plant workers. Ex. 2, Seafood Cooperative Aff., ¶ 2. The Seafood Cooperative, the largest fishermen owned cooperative in the United States, was created in 1944 and 25% of its revenue is derived from the halibut fishery. Id., ¶¶ 1, 2. The Cooperative has participated as a member of both of the IPHC advisory boards and has participated before the Council throughout the 15-year period the Council has wrestled with the charter halibut issue. Id., ¶ 5. The Cooperative depends on the setline commercial harvest, and overfishing by the guided sport industry directly affects the Cooperative's fishermen members and its employees.

In the same way, proposed Intervenor-Defendants who are charter boat operators see their livelihood threatened because they depend on a healthy, viable halibut resource and continued overfishing of the GHL is a threat to that resource. *See* Affidavit of Erik Bahnsen ("Bahnsen Aff.,), attached as Exhibit 12, ¶¶ 3, 4; Affidavit of Wayne Brown ("Brown Aff."), attached as Exhibit 13; Affidavit of Sandy Craig ("Craig Aff.,), attached as Exhibit 14, ¶¶ 4, 5 (Sandy Craig is also a setline fisherman confronting the same economic hardships discussed

above, *see* Craig Aff., ¶¶ 8-9); Affidavit of Luke Wiedel ("Wiedel Aff."), attached as Exhibit 15 ¶¶ 2, 3.

Similarly, proposed Intervenor-Defendants who are subsistence fishermen and Native Alaskans see their access to the resource and their ability to feed their families, significantly and adversely affected by overharvesting by the guided sport industry, particularly as it depletes fish stocks in inshore areas. *See* Ex. 4, Thomas Aff., ¶¶ 2, 3 (Mr. Thomas is also a commercial setline fishermen suffering the same harm discussed earlier in this section. *Id.,* ¶¶ 5-8); Affidavit of Carolyn Heuer ("Heuer Aff."), attached as Exhibit 16, ¶ 1 ("We are dependent on halibut and my ability to feed my family is threatened."); Affidavit of Jerrod Galanin ("Galanin Aff."), attached as Exhibit 17, ¶¶ 1, 4, 5.

Proposed Intervenor-Defendant City of Pelican, an isolated fishing community in Area 2C without road connections to any other town, whose population is 30% Alaska Native or American Indian, is harmed directly by GHL exceedances because it depends on revenue from commercial fish taxes to provide essential services for city resident, because its residents who are setline fishermen are seriously impacted by GHL overages, and because its citizens who are subsistence users are threatened by reductions in the halibut resource. Affidavit of the City of Pelican ("City of Pelican Aff."), attached as Exhibit 18, ¶¶ 2-8. *See also* Ex. 4, Thomas Aff., ¶ 4; Ex. 2, Seafood Cooperative Aff., ¶ 12. Similarly, the City of Port Alexander states that threats to the viability of the halibut resource and reduction in the setline quota caused by quota reallocations are of grave concern "since the economic survival of the community depends on the commercial halibut and salmon fleet." Affidavit of the City of Port Alexander ("Port Alexander Aff."), attached as Exhibit 19, ¶¶ 2, 5. The dependence of members of this community on the

halibut resource is particularly acute since 23% of the community's residents live below the poverty line. Ex. 3, Behnken Aff., ¶ 15.

Proposed Intervenor-Defendants have suffered, are suffering, and will suffer a variety of direct and adverse effects caused by overfishing by the guided sport industry – harms the Rule, addresses – and harms Plaintiffs seek to perpetuate by overturning the Rule. Proposed Intervenor-Defendants satisfy the case or controversy for constitutional standing.

### 2.    Proposed Intervenor-Defendants Have Prudential Standing

Prudential standing refers to judicially self-imposed limits on the exercise of federal jurisdiction. Generally, prudential standing requires that the plaintiff's grievance fall within the zone of interests protected or regulated by the statutory provision invoked in the suit. *Bennett v. Spear,* 520 U.S. at 162.

In an analogous case, the United States Court of Appeals for the District of Columbia Circuit held that a trade association representing industry members had standing to challenge federal actions which affected their economic interests and fell within the "zone of interests" contemplated by the controlling law. *National Coal Ass'n v. Hodel,* 825 F.2d 523, 526-27 (D.C. Cir. 1987) (trade association of coal producers had standing under a Mineral Leasing Act to challenge a decision by the Secretary of the Interior when the association alleged competitive injury and fell within the Act's "zone of interests").

Even if it were not clear that proposed Intervenor-Defendants meet the test of prudential standing under the Halibut Act, a decision of the D.C. Circuit has held that a proposed intervenor need not show they have a cause of action in order to intervene:

> The parties argue that Nina's standing to intervene turns on
> whether she may bring a cause of action, a question they agree
> depends on whether Virginia or Maryland law applies to this case.
> . . . We believe that the parties are looking at this question through

the wrong analytical lens. In a motion to intervene under Rule 24(a)(2), the question is not whether the applicable law assigns the prospective intervenor a cause of action. Rather, the question is whether the individual may intervene in an already pending cause of action. *See Smuck v. Hobson*, 408 F.2d 175, 179 (D.C. Cir. 1969) (*en banc*) ("[I]n the context of intervention the question is not whether a lawsuit should be begun, but whether already initiated litigation should be extended to include additional parties."). As the Rule's plain text indicates, intervenors of right need only an "interest" in the litigation--not a "cause of action" or "permission to sue." *See* Fed. R. Civ. P. 24(a)(2). In *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 92 S. Ct. 630, 30 L.Ed.2d 686 (1972), the Supreme Court concluded that the lack of a cause of action does not, in and of itself, bar a party from intervening. *Id.* at 537, 92 S. Ct. at 635-36.

*Jones v. Prince George's County, Maryland*, 348 F.3d 1014, 1017-1018 (D.C. Cir. 2003).

In the instant case, proposed Intervenor-Defendants clearly fall within the zone of interests regulated by the Halibut Act. Pursuant to that statute, the amount of fish available for use by proposed Intervenor-Defendants for subsistence or for economic benefit is regulated by the Halibut Act. 16 U.S.C. §§ 773b, 773c, 773e. Further, allocations between sectors are regulated under Halibut Act. 16 U.S.C. § 773c.

B.    Proposed Intervenor-Defendants' Motion Is Timely

Under Fed. R. Civ. P. 24, any claim for intervention must be timely filed. Evaluation of the timeliness of a motion to intervene lies within the sound discretion of the District Court. *Mass. Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997). It is well settled in this Circuit particularly where intervention is sought as of right that the amount of time which has elapsed since the litigation began is not in itself the determinative test of timeliness. *Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C. Cir. 1972).

Whether a motion to intervene is timely "is to be determined from all the circumstances" of the case.

28

> (T)he amount of time which has elapsed since the litigation began
> is not in itself the determinative test of timeliness. Rather, the
> court should also look to the related circumstances, including the
> purpose for which intervention is sought . . . and the improbability
> of prejudice to those already in the case.

*Natural Resources Defense Council v. Costle*, 561 F.2d 904, 907, (D.C. Cir. 1977), *quoting*

*Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C. Cir. 1972) and *NAACP*

*v. New York*, 413 U.S. 345, 366 (1973). A court should be more reluctant to deny an intervention

motion on grounds of timeliness if it is intervention as of right than if it is permissive

intervention. *U.S. v. American Tel. and Tel. Co.,* 642 F.2d 1285, 1294-1295(D.C. Cir. 1980).

In *NAACP, supra*, it was found that the District Court abused the "sound discretion" it is

accorded to assess timeliness when it relied solely upon the age of the case and its closeness to

settlement in denying a motion to intervene, while failing to take into account the purpose for

which intervention was sought. In *Hodgson, supra*, looking at the purpose for which the

intervention was sought, the court allowed an application for intervention seven years after the

case was filed.

Even if there was a delay in seeking intervention, a determination of timeliness would

also have to weigh, as *Hodgson* instructs, on whether that delay would unfairly disadvantage the

original parties. *Natural Resources Defense Council v. Costle,* 561 F.2d 904, 907-908 (D.C. Cir.

1977).

Plaintiffs filed their Complaint on June 2, 2008. Proposed Intervenor-Defendants have

acted diligently in bringing this motion to intervene. The less than three week interval between

the filing of the Complaint and the bringing of this motion was necessitated by obtaining the

necessary declarations filed herewith – a process made difficult and time consuming by the fact

that the proposed intervenors are primarily fishermen whose fishing season has begun and who

are therefore not readily accessible. The motion to intervene is being filed before Defendants'
answer is filed. A temporary restraining order was entered on June 11, 2008, and a hearing on
Plaintiffs' Motion for Preliminary Injunction is set for June 20, 2008. The motion to intervene is
being filed at a time when no dispositive motion has been filed. Intervention will not prejudice
any party or delay the proper resolution of this action. No separate briefing has been scheduled
on the requested preliminary injunction. The parties can certainly prepare for oral argument
based on issues raised by intervenors, and if they do need more time, this Court can extend the
temporary restraining order currently in place for an additional 10 days. Fed. R. Civ. P. 65(b).

We have found no case where a motion to intervene, filed prior to a hearing on a
preliminary injunction, was denied on the basis of timeliness. In *Mova Pharmaceutical Corp. v.
Shalala,* 140 F.3d 1060, 1076 (D.C. Cir. 1998), the Court of Appeals for this Circuit stated:

> As to timeliness, Upjohn sought to intervene a few weeks after
> Mova initiated its action, and before the district court ruled on the
> preliminary injunction; this cannot be regarded as untimely.

Other circuits are in accord. In *Geiger v. Foley Hoag LLP Retirement Plan,* 521 F.3d 60
(1st Cir. 2008), the court granted a motion to intervene filed nine months after the intervenor
became aware of the lawsuit, where the court found the case had not progressed beyond the
initial stages when the motion was filed, no action beyond the filing of the Amended Complaint
had occurred, and the only pending item was a scheduled hearing in which the court would
consider the two competing injunction proposals.

> In the absence of any discovery or substantive legal progress, we
> cannot say the litigation was in any way at an "advanced stage."

*Geiger,* 521 F.3d at 65. *See also Association of Connecticut Lobbyists LLC v. Garfield,* 241
F.R.D. 100, 102 -103 (D. Conn. 2007)(motion to intervene filed just after a motion for
preliminary injunction was filed and before the filing of any significant substantive motions was

timely); *Jones v. Blinziner*, 536 F. Supp. 1181, 1188-1189 (N.D. Ind. 1982)(amended motion to intervene, which raises an issue not raised in the complaint, granted although filed after hearing on preliminary injunction where it would not unduly delay or prejudice original parties).

      C.    <u>Proposed Intervenor-Defendants Assert An Interest Relating To The Subject Of The Action</u>

In the intervention area, the "interest" test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process. *Nuesse v. Camp*, 385 F.2d at 700. A greater impetus to intervention inheres in administrative cases. *States Marine Intern., Inc. v. Peterson*, 518 F.2d 1070, 1080 n.25 (D.C. Cir. 1975), *cert. denied*, 424 U.S. 912 (1976).

In *Fund for Animals*, the Court held that once it is established the proposed intervenor has constitutional standing – that alone is sufficient to establish it has an interest relating to the property or transaction which is the subject of the action. *Fund for Animals*, 322 F.3d at 735. *See also Yniguez v. Arizona*, 939 F.2d 727, 735 (9th Cir. 1991) (because Article III standing requirements are more stringent than those for intervention, a determination that a party would have standing under Article III compels the conclusion that it has an adequate interest under Rule 24(a)(2)); *Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Department of the Interior*, 100 F.3d 837, 842 (10th Cir. 1996).

Proposed Intervenor-Defendants, therefore, need show nothing further than they already have by demonstrating Article III standing. Nevertheless, proposed Intervenor-Defendants independently meet the interest requirements of intervention. As shown above, proposed Intervenor-Defendants have a direct and substantial economic and subsistence interest in the challenge lodged by Plaintiffs. Plaintiffs' direct objective is to prevent proposed Intervenor-Defendants from fishing or to severely restrict such fishing. The challenge brought by Plaintiffs

seeks to alter existing fishery management programs to the consequent economic disadvantage of proposed Intervenor-Defendants. Plaintiffs' action also will diminish the availability of halibut for people who depend on the resource, including subsistence users. Proposed Intervenor-Defendants have a direct, clear, and identifiable interest in this action.

In *Coalition of Arizona/New Mexico Counties*, the United States Court of Appeals for the Tenth Circuit, citing the D.C. Circuit decision in *Nuesse*, found that a wildlife photographer had the requisite interest to intervene in a case challenging the listing of the spotted owl as endangered under the ESA. After stating that a person with an economic interest in the species at issue would clearly have the requisite interest to intervene, the court went on to say that mere "involvement with the Owl in the wild" and a "persistent record of advocacy for its protection" amounted to "a direct and substantial interest in the listing of the Owl for the purpose of intervention as of right" even though the proposed intervenor had "little economic interest in the Owl itself." *Coalition of Arizona/New Mexico Counties*, 100 F.3d at 841.

In cases challenging administrative regulations, the interest of those who are governed by the regulations are sufficient to support intervention. 7C  C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 1921 at 492 (2d ed. 1986). Indeed, ownership of a permit the use of which is at issue in a case, such as the fishing rights held by proposed Intervenor-Defendants represents a protectable interest. *See Sierra Club v. United States Env. Protection Agency*, 995 F.2d 1478, 1485 (9th Cir. 1993) (finding a sufficient interest relating to the subject matter by "permit-holding property owners . . . where the statute directly regulates their conduct").

No doubt can exist that Plaintiffs' motive in this action is to force Defendants to allow Plaintiffs to proceed in a way that significantly restricts proposed Intervenor-Defendants' access

to the resource. When the "relief sought by plaintiffs will have direct, immediate, and harmful effects upon a third party's legally protectable interests, that party satisfies the 'interest' test of [Rule] 24(a)(2) . . . ." *Forest Conservation Council v. U.S. Forest Service*, 66 F.3d 1489, 1494 (9th Cir. 1995) (permitting community organizations deriving an economic return from logging activities to intervene as of right in an environmental organization's suit to limit and enjoin these logging activities); *see also Nuesse v. Camp*, 385 F.2d at 699. Nor is there any reasonable doubt that the relief sought by Plaintiffs will have a dramatic negative economic effect on proposed Intervenor-Defendants.

Interests identical to those of proposed Intervenor-Defendants were found to be sufficient to support intervention when fishermen and processors were permitted to intervene in a challenge to an amendment to the Management Plan for the groundfish fishery of the Gulf of Alaska. *Alaska Factory Trawler Association v. Baldridge*, 831 F.2d 1456 (9th Cir. 1987). Other similarly situated parties have also been held to meet the requirements for intervention. In *Center for Marine Conservation v. Brown*, 917 F. Supp. 1128 (S.D. Tex. 1996), groups representing the shrimping industry were allowed to intervene in a challenge to Defendants' management of the Gulf of Mexico commercial shrimp fishery. There, an environmental group asserted that additional fishery management measures were needed.

Similarly, in *Conservation Law Foundation v. Mosbacher*, the Court allowed industry trade associations and industry participants to intervene. There, a conservation group sought to compel the Secretary of Commerce to develop fishery management measures that it claimed were necessary to prevent overfishing. The Court allowed fishing groups participating in the fishery to intervene. The Court found that "[c]hanges in the rules will affect the proposed intervenors' business, both immediately and in the future." 966 F.2d at 43. The Court noted that

33

the plaintiff was seeking "more extensive regulation by a federal agency" of these industries'

productive use of natural resources.  *Id.* at 40; *see also Kleissler v. United States Forest Service*,

157 F.3d 964 (3rd Cir. 1998) (permitting industry and community groups with a financial stake in

logging operations in national forests to intervene as of right in a suit by an environmental group

to enjoin logging activity pending compliance with the National Environmental Policy Act);

*Sierra Club v. Glickman*, 82 F.3d 106 (5th Cir. 1996) (permitting a trade association representing

farmers to intervene as of right in a suit to restrict pumping of water from an aquifer for, among

other things, these farmers' use); *Sierra Club v. Espy*, 18 F.3d 1202 (5th Cir. 1994) (permitting

timber purchasers to intervene in an action challenging U.S. Forest Service logging regulations).

 Guidance can also be gleaned from other judicial precedent.  In *Cascade Natural Gas

Corp. v. El Paso Natural Gas Co.,* 386 U.S. 129, 135-36 (1967), the economic and social

interests of those involved in an industry that would be altered by implementation of a judicial

decree were sufficient to meet the standards for intervention as a matter of right.  Interests

similar to or even less compelling than proposed Intervenor-Defendants' direct economic,

subsistence, and ecological interests have been held sufficient to justify intervention.  *See, e.g.,

Community Nutrition Institute v. Bergland,* 32 Fed. R. Serv. 2d (Callaghan) 910 (D.D.C. 1981)

(association of dairy farmers had a sufficient stake to intervene in an action to invalidate milk

marketing regulations); *United States v. Oregon*, 839 F.2d 635 (9th Cir. 1988) (residents of state

mental institution had a sufficient interest in litigation concerning their living conditions); *United

States v. Oregon*, 745 F.2d 550 (9th Cir. 1984) (Idaho's interest in its fish resources was

sufficient to support intervention in litigation concerning whether other states' fishing

regulations were consistent with Indian treaty rights); *New York Public Interest Research Group,

Inc. v. Regents of University of State of New York*, 516 F.2d 350, 352 (2d Cir. 1975)

(pharmacists' interests in their profession and the impact of regulations justified intervention in a case evaluating regulations of the pharmacy profession); *Louisiana v. Department of Energy*, 507 F. Supp. 1365 (W.D. La. 1981), *aff'd.* 690 F.2d 180 (Temp. Emer. Ct. App. 1982), *cert. denied*, 460 U.S. 1069 (1983) (a company with a royalty interest in oil producing properties had a sufficient interest to intervene in a suit involving the interpretation of oil pricing regulations); *United States v. Niagara Falls*, 103 F.R.D. 164 (W.D. N.Y. 1984) (association of businesses delivering waste to a treatment plant had a sufficient interest to intervene in an action against the treatment plant under the Clean Water Act); *New England Petroleum Corp. v. Federal Energy Administration*, 71 F.R.D. 454 (S.D. N.Y. 1976) (competitor of an oil company had a sufficient interest to intervene in an action brought by the oil company to compel its participation in government programs); *General Motors Corp. v. Burns*, 50 F.R.D. 401 (D. Hawaii 1970) (association of automobile dealers had a sufficient interest to intervene in an action to invalidate motor vehicle licensing regulations).

Although it is not required for this prong of the intervention standards to demonstrate that the harm to proposed Intervenor-Defendants is irreparable, the facts are that it is. As shown above, overfishing by the guided sport industry threatens the continued viability of the resource in Area 2C and leads to a direct allocation of fish away from commercial setline fishermen. Each day the guided sport industry fishes at a rate that will exceed its GHL guarantees the CEY will be exceeded and guarantees a reduction in the setline quota. As the City of Port Alexander stated:

> If the one halibut daily limit is not implemented in June, the
> halibut chart [fleet] will once again exceed its GHL and will likely
> cause a CEY overage.

Ex. 19, Port Alexander Aff., ¶ 5. Commercial setline fishermen, processors, and coastal communities suffer. That the actual quota reductions will occur next year in the case of the setline commercial sector is irrelevant because the cause of those reductions, overfishing by the guided sport industry, is occurring at this very moment. And there is no question that GHL exceedances by the guided sport industry in 2008 will be deducted from the setline quota next year. Ex. 3, Behnken Aff., ¶ 14. Similarly, each day the guided sport industry fishes at a rate that will exceed its GHL constitutes an overharvest of the CEY and contributes to localized depletion, threatening the viability of the resource and threatening subsistence users who depend on halibut to feed their families. Overfishing by the guided sport industry is a direct and immediate threat to subsistence users. Ex. 3, Behnken Aff., ¶ 15.

The threat to the resource and to proposed Intervenor-Defendants is occurring at this very moment because of fishing practices and patterns employed right now by the guided sport industry. In fact, given the TRO that allows the guided sport industry to fish under the 2007 regulations, that industry is fishing right now at a rate that allows a catch almost double the conservation-based GHL established in the Rule for 2008. Ex. 3, Behnken Aff., ¶ 11. The 2008 GHL is 931,000 pounds. Under the 2007 regulations, the regulations in place under the TRO, the guided sport industry harvested 1.7 million pounds of halibut. *Id.* This cannot be good for a resource at a historic low in population size. *Id.* at ¶¶ 10, 11, 12.

> D.    Proposed Intervenor-Defendants' Ability To Protect Their Interests May Be Impaired Or Impeded If The Motion To Intervene Is Denied

As noted above, Plaintiffs are, in reality, contending that management of the halibut fishery must be such as to allow them to increase their halibut harvest at the expense of others and of the resource. If the relief sought by Plaintiffs is granted, the livelihood of proposed Intervenor-Defendants and the other interests of proposed Intervenor-Defendants will be greatly

affected. Denial of the motion to intervene will seriously impair the interests of proposed Intervenor-Defendants.

In *Georgia v. United States Army Corps of Engineers*, 302 F.3d 1242 (11th Cir. 2002), the United States Court of Appeals for the Eleventh Circuit found that the State of Florida was entitled to intervene as of right in a suit by the State of Georgia to compel the Army Corps of Engineers to increase the water supply available to the City of Atlanta from a source under the control of the Corps. Florida argued that Georgia was seeking a de facto partial apportionment of the water in the basin at issue, in violation of a compact between the states. The Court found that Florida's interest could be impaired by the disposition of the suit, even though Georgia did not seek to enjoin or interfere with the prior compact process, and even though Florida might be able to file a separate action with respect to its rights. *Georgia v. United States Army Corps of Engineers*, 302 F.3d at 1253-55. In the instant case, Plaintiffs are specifically seeking to overturn management measure to protect the resource on which proposed Intervenor-Defendants depend and use. Any judgment in this case will be binding on NMFS, and no independent action by proposed Intervenor-Defendants could alter that result.

> Where a party seeking to intervene in an action claims an interest in the very property and very transaction that is the subject of the main action, the potential *stare decisis* effect may supply that practical disadvantage which warrants intervention as of right.

*Chiles v. Thornburgh*, 865 F.2d 1197, 1214 (11th Cir. 1989).

E.    Proposed Intervenor-Defendants' Interests Are Not Adequately Represented By Any Other Party

To satisfy this requirement, an applicant for intervention need only show "that representation of [its] interest [by existing parties] 'may be' inadequate; and the burden of

making that showing should be treated as minimal." *Trbovich v. The United Mine Workers*, 404

U.S. 528, 538 n.10 (1972), *Appleton v. F.D.A.,* 310 F. Supp. 2d 194, 197 (D.D.C. 2004).

While proposed Intervenor-Defendants oppose Plaintiffs' challenge, as do the

Defendants, proposed Intervenor-Defendants have direct economic, subsistence, and

management interests which the government lacks.  Where a private party may make a more

vigorous presentation of the arguments than a government party, its representation by the

government may be inadequate.  *United States v. American Tel. & Tel. Co.*, 642 F.2d. 1285,

1293 (D.C. Cir. 1980); *National Farm Lines v. Interstate Commerce Comm'n*, 564 F.2d. 381,

383 (10th Cir. 1977); *Natural Resources Defense Council v. Costle*, 561 F.2d. 904 (D.C. Cir.

1977).  Moreover, at least one court has held that "[t]he burden of persuasion that representation

is adequate appears to rest on the party *opposing* intervention." *Caterino v. Barry*, 922 F.2d 37,

42 n.4 (1st Cir. 1990) (emphasis in original).

In *Coalition of Arizona/New Mexico Counties for Stable Economic Growth v.*

*Department of the Interior*, the United States Court of Appeals for the Tenth Circuit reversed the

District Court and allowed intervention as of right by a wildlife photographer in a case

challenging a decision to list the spotted owl as endangered under the ESA.  The court found that

the minimal burden of showing that representation by existing parties may be inadequate was

satisfied, even though the proposed intervenor and the government would both be attempting to

defend the decision to list the owl:

> We have here . . . the familiar situation in which the governmental
> agency is seeking to protect not only the interest of the public but
> also the private interest of the petitioners in intervention, a task
> which is on its face impossible.  The cases correctly hold that this
> kind of a conflict satisfies the minimal burden of showing
> inadequacy of representation.

*Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Department of the Interior*, 100 F.3d 837, 845 (10th Cir. 1996), *quoting National Farm Lines v. Interstate Commerce Comm'n*, 564 F.2d 381, 384 (10th Cir. 1977).

Where a proposed intervenor is a private party that seeks to advance its own interests, whereas a public defendant is required to balance a range of interests likely to diverge from those of intervenors, there can be no adequate representation of the intervenor's interest by that public body. *Meek v. Metropolitan Dade County, Florida*, 985 F.2d 1471, 1478 (11th Cir. 1993). Where a government agency seeks to protect its decision making process, as opposed to a proposed intervenor which seeks to protect the economic and statutory interests of its members, there is no adequate representation by the government agency of the proposed intervenor's interest. *Georgia v. United States Army Corps of Engineers*, 302 F.3d at 1259. A federal defendant, with a primary interest in the management of a resource, does not have interests identical to those of an entity with economic interests in the use of that resource. *Id.* Not only does do proposed Intervenor-Defendants have direct economic, subsistence, and management interests which the government lacks, but proposed Intervenor-Defendants and the government may have divergent views on the conservation status of the halibut resource and on the impact of the Rule on proposed Intervenor-Defendants. Thus, proposed Intervenor-Defendants may make arguments the government will not make.

Proposed Intervenor-Defendants satisfy the minimal burden of showing that representation by the government may be inadequate. The interests of the government and proposed Intervenor-Defendants are not the same. The government is interested in establishing and implementing a regulatory system. Proposed Intervenor-Defendants are interested in their

livelihood and the long-term viability of the resource.  In addition, proposed Intervenor-Defendants may have a different view as to some of the issues included in this case.

## IV.    PERMISSIVE INTERVENTION IS APPROPRIATE

Anyone may be permitted to intervene in an action, upon timely motion, when that intervenor's "claim or defense that shares with the main action a common question of law or fact" and the intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b); *Acree v. Republic of Iraq*, 370 F.3d 41, 49 (D.C. Cir. 2004), *cert. denied,* 544 U.S. 1010 (2005).

Proposed Intervenor-Defendants seek to oppose Plaintiffs' efforts to restrict the halibut fishery.  Proposed Intervenor-Defendants' defenses involve questions of fact and law that are in common with the government's defenses.  Moreover, this Motion is timely and intervention will not delay or prejudice adjudication of the rights of the original parties.  Accordingly, proposed Intervenor-Defendants should be permitted to intervene as a defendant.

## V.    CONCLUSION

For the reasons stated above, proposed Intervenor-Defendants  respectfully requests that the Court grant their motion to intervene in this case and to file their Answer.

Dated:  June 18, 2008

Respectfully submitted,

George J. Mannina, Jr. (D.C. Bar No. 316943)
Paul L. Knight (D.C. Bar No. 911594)
O'Connor & Hannan, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C.  20006-2803
Telephone:    (202) 887-1400
Facsimile:    (202) 466-3215
*Counsel for Proposed Intervenor-Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2008, a copy of the foregoing *Motion to Intervene,*

*Memorandum of Points and Authorities* in support thereof, and *Proposed Order* were served via

email and first class mail, postage prepaid, upon the following counsel of record:

John Winston Butler, Esq.
SHER & BLACKWELL
1850 M Street, NW, Suite 900
Washington, DC 20036
Email: jbutler@sherblackwell.com

Robert Pendleton Williams, Esq.
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
601 D Street, NW
3rd Floor - Room 3033
Washington, DC 20530
Email: robert.p.williams@usdoj.gov

George J. Mannina, Jr.

**EXHIBIT 1**

**<u>ANSWER OF INTERVENOR-DEFENDANTS</u>**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

      Plaintiffs,

v.

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

      Defendants.

Civil Action No. 08-0941 (RMC)
Category D

## ANSWER OF INTERVENOR-DEFENDANTS

Intervenor-Defendants, Linda Behnken, Christopher Knight, William Thomas, Jr.,

Steve Box, David Gibson, Sherri Wohlhueter and Kurt Wohlhueter, Annah Taft Perry, North

Pacific Seafoods, Inc., Erik Bahnsen , Wayne Brown , Sandy Craig , Luke Wiedel,

Carolyn Heuer, Jerrod Galanin, Seafood Producers Cooperative, Ryan Nichols, the City of

Pelican, and the City of Port Alexander ("Intervenor-Defendants"), by and through counsel,

answer the Complaint ("Complaint") filed by Plaintiffs as follows:

    1.     Paragraph 1 sets forth legal conclusions to which no response is required.

    2.     Paragraph 2 sets forth legal conclusions to which no response is required.

    3.     Paragraph 3 sets forth legal conclusions to which no response is required.

    4.     Paragraph 4 sets forth legal conclusions to which no response is required.

    5.     Paragraph 5 sets forth legal conclusions to which no response is required.

    6.     In response to the allegations contained in Paragraph 6 of the Complaint,

Intervenor-Defendants admit that the Plaintiffs challenge a final rule issued by the Secretary of

Commerce.  In response to the remaining allegations of Paragraph 6, the document referred to best speaks for itself.

7.  In response to the allegations contained in the first sentence of Paragraph 7, Intervenor-Defendants state that the document referred to best speaks for itself.  The allegations of the second sentence of Paragraph 7 set forth legal conclusions to which no response is required.  Intervenor-Defendants deny the allegation contained in the third sentence of Paragraph 7 because the rule at issue was based on far more than the document referenced.

8.  Intervenor-Defendants deny the allegations contained in Paragraph 8.

9.  In response to the allegations contained in Paragraph 9, Intervenor-Defendants state that the referenced document best speaks for itself.

10.  In response to the allegations contained in Paragraph 10, Intervenor-Defendants state that the referenced document best speaks for itself.

11.  In response to the allegations contained in Paragraph 11, Intervenor-Defendants state that the referenced document best speaks for itself.

12.  In response to the allegations contained in Paragraph 12, Intervenor-Defendants state that the referenced document best speaks for itself.

13.  In response to the allegations contained in Paragraph 13, Intervenor-Defendants state that the referenced document best speaks for itself.

14.  In response to the allegations contained in Paragraph 14, Intervenor-Defendants state that the referenced document best speaks for itself.

15.  Intervenor-Defendants deny the allegations contained in Paragraph 15, except that the references to statutory provisions set forth legal conclusions to which no response is required.

16.  Intervenor-Defendants deny the allegations contained in Paragraph 16.

17.     Intervenor-Defendants deny the allegations contained in Paragraph 17.

18.     Intervenor-Defendants deny the allegations contained in Paragraph 18.

19.     Intervenor-Defendants deny the allegations contained in Paragraph 19.

20.     In response to the allegations contained in Paragraph 20, Intervenor-Defendants state that the referenced document best speaks for itself.

21.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 21.

22.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 22.

23.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 23.

24.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 24.

25.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 25.

26.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 26.

27.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 27.

28.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 28.

29.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 29.

30.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 30.

31.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 31.

32.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 32.

33.     Intervenor-Defendants admit the allegations contained in Paragraph 33.

34.     Intervenor-Defendants admit the allegations contained in Paragraph 34.

35.     Intervenor-Defendants admit the allegations contained in Paragraph 35.

36.     Intervenor-Defendants admit the allegations contained in Paragraph 36.

37.     Intervenor-Defendants admit the allegations contained in Paragraph 37.

38.     Intervenor-Defendants admit the allegations contained in Paragraph 38.

39.     Paragraph 39 contains legal conclusions to which no response is required.

40.     Paragraph 40 contains legal conclusions to which no response is required

41.     Paragraph 41 contains legal conclusions to which no response is required

42.     Paragraph 42 contains legal conclusions to which no response is required

43.     Intervenor-Defendants deny the allegations contained in Paragraph 43.

44.     In response to the allegations contained in Paragraph 44, Intervenor-Defendants state that the document referred to best speaks for itself, that the International Pacific Halibut Commission has established a procedure for determining the Constant Exploitation Yield from a fishery, and deny the remaining allegations.

45.    In response to the allegations contained in Paragraph 45, Intervenor-Defendants state that the documents referred to best speak for themselves and deny the remaining allegations contained in Paragraph 45.

46.    Intervenor-Defendants admit the allegations contained in first sentence of Paragraph 46 and deny the allegation contained in the second sentence of Paragraph 46 as an incomplete statement.

47.    In response to the allegations contained in Paragraph 47, Intervenor-Defendants state that the document referred to best speaks for itself.

48.    In response to the allegations contained in Paragraph 48, Intervenor-Defendants state that the document referred to best speaks for itself.

49.    Intervenor-Defendants admit the allegations contained in the first and third sentences of Paragraph 49 and deny the allegations contained in the second sentence in that the formula for establishing a GHL had already been established.

50.    In response to the allegations contained in Paragraph 50, Intervenor-Defendants state that the document referred to best speaks for itself.

51.    Intervenor-Defendants admit the allegations contained in Paragraph 51.

52.    Paragraph 52 sets forth legal conclusions to which no response is required.

53.    In response to the allegations contained in Paragraph 53, Intervenor-Defendants state that the document referred to best speaks for itself.

54.    In response to the allegations contained in Paragraph 54, Intervenor-Defendants state that the document referred to best speaks for itself and deny the remaining allegations in Paragraph 54.

55.    Paragraph 55 sets forth legal conclusions to which no response is required.

56.     In response to the allegations contained in Paragraph 56, Intervenor-Defendants state that the document referred to best speaks for itself and deny the remaining allegations in Paragraph 56.

57.     Paragraph 57 sets forth legal conclusions to which no response is required.

58.     Intervenor-Defendants deny the allegations contained in Paragraph 58.

59.     Paragraph 59 sets forth legal conclusions to which no response is required.

60.     In response to the allegations contained in Paragraph 60, Intervenor-Defendants state that the document referred to best speaks for itself and deny the remaining allegations in Paragraph 60.

61.     In response to the allegations contained in Paragraph 61, Intervenor-Defendants reallege and incorporate by reference their response to the referenced paragraphs.

62.     Intervenor-Defendants deny the allegations contained in Paragraph 62.

63.     In response to the allegations contained in Paragraph 63, Intervenor-Defendants reallege and incorporate by reference their response to the referenced paragraphs.

64.     Intervenor-Defendants deny the allegations contained in Paragraph 64.

65.     In response to the allegations contained in Paragraph 65, Intervenor-Defendants reallege and incorporate by reference their response to the referenced paragraphs.

66.     Intervenor-Defendants deny the allegations contained in Paragraph 66.

67.     In response to the allegations contained in Paragraph 67, Intervenor-Defendants reallege and incorporate by reference their response to the referenced paragraphs.

68.     Intervenor-Defendants deny the allegations contained in Paragraph 68.

69.     In response to the allegations contained in Paragraph 69, Intervenor-Defendants reallege and incorporate by reference their response to the referenced paragraphs.

70.    Intervenor-Defendants deny the allegations contained in Paragraph 70.

<u>**Affirmative Defenses**</u>

1.    Plaintiffs' Complaint fails to state a claim upon which relief may be granted.

2.    Plaintiffs' claims are barred because Defendants acted lawfully and properly at all times relevant to the Complaint.

WHEREFORE, Intervenor-Defendants respectfully request that this Court dismiss Plaintiffs' Complaint with prejudice and grant such other relief as the Court deems proper and just.

Dated:  June 18, 2008                     Respectfully submitted,

George J. Mannina, Jr. (D.C. Bar No. 316943)
Paul L. Knight (D.C. Bar No. 911594)
O'Connor & Hannan, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C.  20006-2803
Telephone:     (202) 887-1400
Facsimile:     (202) 466-3215
*Counsel for Proposed Intervenor-Defendant*

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTT VAN VALIN**, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 08-00941 |
| **THE HONORABLE CARLOS M. GUTIERREZ**, in his official capacity as Secretary of Commerce, *et al.*, | |
| Defendants. | |

## AFFIDAVIT OF THE
## SEAFOOD PRODUCERS COOPERATIVE

1. I, Thomas McLaughlin am submitting this affidavit as President and CEO and on behalf of Seafood Producers Cooperative. Seafood Producers Cooperative (SPC) is the largest fishermen owned cooperative in the United States. SPC was incorporated in 1944 as Halibut Producers Cooperative. In 1982, the name of the company was changed to Seafood Producers Cooperative, upon completion of our production facility in Sitka, Alaska. Sitka is in Southeast Alaska, area 2C, the International Pacific Halibut Commission (IPHC) regulatory management area affected by the temporary restraining order.

2. SPC has been involved in the halibut fishery since 1944. Currently, 25% of our revenue is derived from the halibut fishery. The commercial quota has been reduced 43% over the last two years. The latest reduction will reduce our revenues by $2 million and production throughout by 15%, increasing costs and reducing incomes for our 140

plant employees.  Since incorporation, SPC has supported the IPHC management and conservation measures.  SPC recognizes that even when the conservation management regime will have a negative impact upon the business, a healthy sustainable resource will provide the best long-term potential for all stakeholders in the halibut fishery.

3. The Southeast charter fleet has exceeded the sector's Guideline Harvest Level (GHL) for four consecutive years, causing an overage of the area's biological limit in 2007 and, if plaintiff's were to prevail, almost certainly again in 2008.  The half decade of charter over harvest has taken a toll on the resource, particularly in the Sitka area where 40% of the Southeast charter halibut harvest occurs and our Sitka SPC plan is located.  Allowing the charter GHL overages to continue will have the immediate effect of reducing fishing success and efficiency for SPC owner/members and further undermining resource health during a time when stock declines demand conservation.

4. The SPC business model is the same model as the major agricultural cooperatives.  Each of our 512 owner/members has a capital investment in Seafood Producers Cooperative. Two hundred seventy-five of our owner/members hold longline individual fishing quota privileges.  (Halibut may only be harvested commercially in Alaska by persons holding halibut fishing quota privileges.)  The vast majority of this quota is for area 2C.  All of our owner/members holding area 2C quota have seen their quota decline by 43% over the last two years. SPC and its owners have long supported the halibut conservation measures of the IPHC and North Pacific Fishery Management Council (NPFMC).

5. SPC is very pro- active in regulatory issues that affect our owner/members. We participate at the NPFMC, the Alaska Board of Fisheries on salmon and groundfish issues, and IPHC. We are a member of United Fishermen of Alaska (UFA) the statewide umbrella organization and have had our representatives many times hold officer positions within this organization.   We have participated in the public process of the NPFMC throughout the 15 year history since 1993 on the halibut charter issue.  SPC provided written testimony and had representatives testify at the June 2007 NPFMC meeting when final action was taken on 2C GHL Management Measures and also provided written comments on this issue in support of a one fish bag limit during the proposed rule public comment period.  SPC has representatives on both advisory boards at IPHC; these consist of the Processor Advisory Group (PAG) and the Conference Board (CB). The CB is a panel representing Canadian and American commercial and sport halibut fishers.  Created in 1931 by the Commission, the CB gives the IPHC the fishers' perspective on Commission proposals presented at annual meetings.  The  PAG, as the name suggests, represents halibut processors and was formed in 1996.  Like the CB, PAG lends its opinion regarding Commission proposals and offers recommendations at IPHC Annual Meetings.

6. At the 2008 annual IPHC meeting, the IPHC Commissioners adopted a staff recommendation to change the model used to determine the halibut exploitable biomass. This model change was recommended because of new information on halibut migration patterns.  The new modeling method is called the "coast-wide" assessment model. The

coast-wide assessment model was first recommended by IPHC staff at the 2007 annual meeting. At that time, the CB, PAG and the IPHC Commissioners all agreed that more time was needed to test model assumptions. Between the 2007 and 2008 annual meetings,, the model was scientifically peer reviewed, a workshop was held to explain and discuss the new model and all questions asked of the IPHC staff were answered. In 2008, all CB representatives, including the charter associations represented, unanimously supported the coast-wide model. The science supporting the model, as presented in published IPHC documents, indicates that previous models have likely overestimated halibut abundance in the Southeast area and that: "exploitation rates were well above the target level in Area 2 and a disproportionate share of the catches have been taken from there." (Clark and O'Hare, 2007). To prevent continued over exploitation, the 2008 Southeast setline quota was reduced by 27% and the charter GHL reduced by 35%.

7. In written materials provided at the annual meeting, IPHC staff stated that the halibut resource is at the lowest level in a decade. IPHC data indicate that the decline in Southeast Alaska is serious and driven by many factors, including the continual charter GHL overages. The charter fleet exceeded its GHL by 22% in 2004; 36% in 2005; 26% in 2006; and an estimated 20% in 2007. In August of 2008 the GHL was defined in the Federal Register as: "a level of allowable halibut harvest by the charter vessel fishery." Clearly halibut charter management restrictions have failed to achieve stated GHL objectives.

8. Since implementation of the Individual Fishing Quota (IFQ) system in 1995, only persons holding halibut Quota Share (QS) may commercially harvest halibut in Alaska.  QS is issued in number of units, assigned by IPHC area, and establish the QS holder's annual portion of the area catch limit. Individual Fishing Quota (IFQ) is the yearly amount you are allowed to harvest and are expressed in pounds.  At the inception of the program participants were issued initial QS based on their historic portion of the catch during an established base period.  For most participants, the original issuance was approximately 80% of the recipients catch levels prior to implementation of the program.

9.  Thirty-three percent (33%) of the participants in the 2C halibut setline fishery have purchased all the quota they currently hold, 67% of the participants have purchased all or a portion of their quota share, and 73% of the quota share has changed hands at least once.  Fifty-seven percent (57%) of commercial setline fishermen in Southeast holds less than 3,000 pounds of halibut QS, which results in an annual gross of $12,000-15,000 at current prices.  Two years with 43% more quota these fishermen's poundage would have been as high as 4,300 pounds an annual gross of $15,000-17,000   Up until the last couple of years, the halibut IFQ fishery appeared to be stable, a safe investment and viewed as one of the most sustainable fisheries in the world.

10.  Through improved resource management, investment in processing equipment, investment in marketing development and value added product focus and investment in quality improvements, halibut has gained excellent acceptance by American consumers.  Reduction of catch due to continued disregard by the charter

sector for management measures will reduce the viability of any commercial fishing. The commercial sector has not exceeded its harvest level since implementation of the individual fishing quota system in 1995.

11. The Marine Stewardship Council (MSC) evaluates fisheries against strict criteria for sustainable management. The Alaska commercial halibut setline fishery received certification in 2006. The inability to constrain charter harvest to the sector's GHL causes over fishing of the halibut resource and jeopardizes the important MSC certification. Sustainability has become a very important marketing tool in the seafood industry and the MSC label is one that is sought by consumers.

12. SPC and its owner/members are responsible for payment of the fishery business tax (FBT) also known as the "raw fish" tax. This is the oldest tax in the State of Alaska and is paid on the ex-vessel value of fish processed in the state. SPC is a shore-based facility and therefore pays 3% of the ex-vessel value of products that are purchased for processing. The fishery business tax is paid into the general fund and 50% is annually appropriated by the Alaska State Legislature to the municipality where the processing took place. Many of the small rural communities heavily rely on the fishery business tax for essential local services. In Sitka, where the SPC shore-side processing plant is located, the Municipality received $808,257 of the fiscal year 2007 (ends June 30th) fishery business tax from all seafood plants located in Sitka and for all species. There is no equivalent tax paid by the charter fleet for the actual cost of the sport fishing charter experience.

13. The commercial setline sector pays the Federal Government through the National Marine Fisheries Service (NMFS) a yearly cost recovery fee. This fee covers the cost of the administration, management and enforcement of the Alaska Halibut and Sablefish Individual Fishing Quota Program. The Magnuson-Stevens Fishery Management and Conservation Act provides for a maximum of 3% of the ex-vessel value of fish harvested under an IFQ program. NMFS annually sets a fee percentage for the sablefish and halibut IFQ program in Alaska based on the actual annual costs and the standard ex-vessel value of the harvest. For 2007, the cost recovery fee was set at 1.2% covering actual costs of $2,739,602. The charter industry does not pay any equivalent fee for the use of, or the costs associated with managing and enforcing the halibut charter fishery. SPC is very concerned that agencies charged with management and conservation of the halibut resource will find management conservation efforts negated by a harvesting sector that has exceeded GHLs for four consecutive years, demonstrated disdain for conservation measures, and relied on the commercial sector to cover management costs.

14. Many of our members are extremely concerned by the instability the halibut charter issue has created. These concerns include: the ability to stay in business under existing QS purchase debt loads, the ability to have future as a commercial fishermen, the ability to depend upon the public process and the regulatory schemes that are implemented, the ability to sell quota share when the owner/members are ready to retire, and the ability to maintain a lending program for willing quota share purchasers. At the April 2008 NPFMC meeting, the Commercial Fishing and Agriculture Bank and signed

by two other commercial lending institutions provided written testimony stating that the
lending institutions are concerned about the stability and the future of the Alaska QS and
rationalization programs and that further concern will limit lending opportunities for both
sectors. For some Southeast halibut fishermen, future QS decreases will create the
untenable position of owing more on QS loans then the underlying value of the QS, yet
unable to generate sufficient income from fishing the shares to cover expenses and meet
loan payments. With Southeast king salmon stocks also on the decline, even diversified
fishing operations will find it economically impossible to subsidize their halibut QS
fishery. These fishermen will be forced to make tough choices, with all choices causing
harm to the QS holder and in turn imposing economic harm on SPC.

15. The charter industry has cited the lack of advance notice in this process as one
of their complaints. SPC member/owners maintain that the charter sector had plenty of
time to change their business model and educate their customers. This action was first
proposed in October of 2005 when the NPFMC was notified that the 2004 GHL was
exceeded. In response to the notice, the NPFMC developed an analysis for implementing
management measures to reduce harvests below the GHL. The Council picked a five-fish
annual limit as the preferred alternative in April of 2006. Upon request by NMFS, the
Council rescinded its preferred alternative in December of 2006, due to the high
implementation costs and enforcement issues. At the same meeting, NMFS advised the
NPFMC that the 2005 charter harvest had exceeded the GHL and that the 2006
preliminary estimates indicated that the GHL had been exceeded. The NPFMC requested
a revised analysis and in a public process in April of 2007 added additional alternatives

and in June, 2007 took final action. A smart business owner would have understood with the first motion in October, 2005 that the charter fleet was facing management restrictions and would have started educating clients that in a fully utilized resource each sector has to face harvest restrictions or risk depleting the resource. Finally, the IPHC recommendations in January 2007 for the one halibut daily limit should have served notice to all charter businesses. The resource is limited and all harvesters need to learn to live within those limits.

16. In personal communications, the IPHC has stated that in the absence of effective GHL management restrictions actual estimated charter halibut harvest, including GHL overages, will be deducted as the best estimate of actual harvest before the commercial setline limit is established. This will cause a very direct effect and relationship between the charter exceedance of the GHL and reduced commercial setline harvest limits. This is the very essence of the NPFMC problem statement to "address the open-ended reallocation of halibut from the commercial to the guided sport sector." Suspension of the one halibut daily limit will directly harm the resource in 2008 and directly harm all QS holders in 2009 and subsequent years.

17. SPC has always supported the principles of resource protection, even when it has hurt our business, above individual company gain. The decision to submit this affidavit is based on concern that the charter sector's over harvest and disregard for effective resource management will jeopardize the future of the halibut resource and the fishing businesses of our owner/members.

I hereby declare and certify, under penalty of perjury under laws of the United States of America, that the foregoing is true and correct. It is based upon my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as this Affidavit.

Dated: June 17, 2008

Thomas McLaughlin

President/CEO

Seafood Producers Cooperative

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

        Plaintiffs,

v.

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

        Defendants.

Civil Action No. 08-0941 (RMC)
Category D

## <u>AFFIDAVIT OF LINDA BEHNKEN</u>

1.      I, Linda Behnken, of 123 Riggs Road, Sitka, Alaska 99835, have a long-term interest in effective management of the Alaska halibut resource. I am a commercial setline fisherman, conservationist, and fishery consultant. I hold a master's degree in Environmental Science from the Yale School of Forestry and Environmental Science, and am the director of the Alaska Longline Fishermen's Association (ALFA), a Sitka-based non-profit. I had the privilege of serving on the North Pacific Fishery Management Council (Council) from 1992-2001, which were the years when the halibut charter Guideline Harvest Level (GHL) was developed and adopted by the Council. I depend on, and have worked to protect the halibut resource throughout the 15 year process of developing the halibut charter management plan and the eight year process to develop the charter harvest restrictions currently challenged by the plaintiffs.

2.      I have commercially setlined for halibut since 1982, as a deckhand and, since 1991, as the owner/operator of the 32 foot hook and line fishing vessel MORGAN. Because my participation in the halibut fishery during the qualifying years for the halibut Individual Fishing Quota (IFQ) program was as a deckhand and Quota Share (QS) was only issued to vessel owners

or holders of a qualified vessel leases, I did not receive an initial allocation of halibut QS when

the IFQ program was implemented in 1995. After the IFQ program was implemented, I married

a fisherman, Kent Barkhau, who had received a small initial QS allocation in Southeast, or

management Area 2C, that translated to approximately 2,500 pounds of IFQ in the year of initial

issuance.

      3.      The IFQ program provides setline fishermen with a federal fisheries permit to

fish. The initial issuance of QS was issued based on historic participation in the halibut fishery

during an established base period and is specified in units; pounds of IFQ are annually issued to

QS holders and directly fluctuate as the total setline halibut catch limit in an area fluctuates. To

commercially harvest halibut in Alaska a person must hold halibut IFQ specified for the area of

harvest.

      4.      I have purchased all the halibut QS I hold, as have 33% of the halibut QS holders

in Southeast Alaska.[1] Sixty-seven percent of the Southeast QS (which includes the 33%

referenced above) is held by persons who purchased some or all of their QS. In 2008, I have

approximately 5,000 pounds of Southeast halibut IFQ, and 324 pounds of South central

(management Area 3A) IFQ, making me an average Southeast halibut QS holder where, in 2008,

79% of the 1,339 QS holders own 10,000 pounds or less of Southeast halibut IFQ and 57% hold

less than 3,000 pounds of Southeast halibut IFQ.[2] My husband has also purchased additional

halibut QS, equaling 3,600 pounds of Southeast IFQs in 2008 and 7,300 pounds of South central

(3A) IFQ in 2008. All the halibut we harvest is delivered to Southeast communities, as is 90% of

the entire Southeast harvest. Ninety-three percent of the Southeast halibut QS holders have QS

---

[1] McDowell Group, April 2007, Economic impact of the commercial halibut fisheries in Areas 2C and 3A. 33% of 2C (Southeast) QS holders are new entrants, having purchased or received by gift all the QS they hold.
[2] NMFS/RAM Division data base.

designated for vessels less than 60 feet, which characterize the Southeast fleet.[3]  I am also

representative of the Southeast fleet in that I live in a southeast Alaska coastal community (74%

of the Southeast QS is held by residents of Alaska's coastal communities and 83% is held by

Alaskans) and fish halibut with my family.  Each of my boys, now ages 6 and 4, first

"deckhanded" on MORGAN at six months of age.

     5.     Approximately fifty percent of my family's income is earned halibut fishing.

Both my husband and I deckhand on setline line boats as well as fish MORGAN, and have used

our earnings from deckhand work to purchase QS.  We live in a log home my husband built and

have stayed generally free of debt by working hard, saving what we earn and living simply.  Our

investment in halibut QS is the largest single investment my husband and I have made, either

singly or as a couple.  The 43% quota reduction over the past two years has caused substantial

economic harm to our family.  If stock conditions do not change next year and if the charter

catch is similar to last year the 2009 setline quota will be reduced 20 percent next year.  We

remind each other that we are doing our part to ensure our boys have access to the same

abundant halibut resource that has sustained us, and economize where we can.  Deductions

necessitated by Charter GHL overages impose a more harmful burden, particularly when we

have taken great care to remain below our personal quotas.  Every dollar counts in the economy

of our family; what counts even more is a measure of confidence that the regulatory process will

function as it is intended to and that all commercial harvesters, charter or setline, large operations

or small family businesses such as ours, will share in conserving the resource.  If the charter

sector exceeds the GHL similar to last year's estimate (769,000 pounds) they will be taking

nearly twice as much fish as they have been allocated, directly taking another 2% of my quota

share on top of the 18.6% possible at current stock conditions.  This is a devastating short term

---

[3] http://www.fakr.noaa.gov/ram/ifqreports.htm.

loss and translates into a further loss given the conservation impacts to the stocks from these persistent charter overages.

6.      Other coastal fishing families have made comparable investments in halibut QS, believing as I did that they were investing in a healthy, well managed resource. I have committed my time to the North Pacific Fishery Management Council process, both as a Council member and as a fishery spokesperson, and have the highest regard for the science that informs management of North Pacific fisheries. For years I have encouraged coastal fishermen to invest the time and funds to travel from remote communities to participate in the Council process, assuring them public testimony did make a difference. For the past 15 years, hundreds of fishermen have made those investments and forfeited fishing time to attend Council meetings to testify on the halibut charter issue. For thirteen years, fishing families have invested in QS and as a fleet have restrained harvest to the setline fishery catch limit (i.e., the Southeast setline quota has not been exceeded since implementation of the IFQ program)—and waited for the federal government to impose effective harvest restrictions on the rapidly growing halibut charter sector. The legal challenge that has suspended implementation of effective harvest controls has severely undermined the public's confidence in the Council process and the federal system. It has also undermined the confidence of commercial QS lenders, who have raised the possibility of loans being called if reallocation is allowed to erode the IFQ program.

7.      Commercial fishing is one of few sources of employment in rural Alaska communities, supporting a uniquely independent way of life. The economic insecurity inflicted by the combination of reduced quotas, reduced access to subsistence resources due to charter driven local depletion, and the federal government's stalled effort to restrict charter harvest to established catch limits, after 13 years of policy reversals and ineffective actions, has intensified

conflicts in small coastal communities. These tensions are manifesting as stress, hostility, and other socially destructive responses. There has been immediate and growing harm from suspension of the one halibut daily limit in Southeast communities.

8.    There is a misperception regarding the scale and impact of guided recreational fisheries that has allowed this over harvest to occur Nation-wide and in Alaska. To quote statements describing the results of a National Research Council study on the impact of recreational fishing:

> "In some ways, recreational fishing is where commercial fishing was 20 years ago with very weak controls and rapidly increasing numbers of fishermen," says Federal Ocean Commissioner Andrew Rosenberg, of the University of New Hampshire and former Deputy Director of NMFS.[4]

The NRC "review of Recreational Fisheries Survey Methods" concludes:

> "...the for-hire sector of marine recreational fisheries should be considered a commercial sector, and survey methods and reporting requirements for that sector therefore should be different from those of private anglers."[5]

In Southeast Alaska, the "very weak controls" have allowed a 70% increase in Southeast halibut charter harvest between 2002 and 2006, despite the halibut resource being fully utilized.[6] Southeast charter fishing lodges operate a fleet of high powered, highly efficient boats serving non-resident anglers and have resource impacts that remain underestimated. To illustrate: a 2008

---

[4] (Study in Science Reveals Recreational Fishing Takes Big Bite of Ocean Catch. *ScienceDaily*, August 2004).
[5] Review of Recreational Fisheries Survey Methods, 2006, Committee on the Review of Recreational Fisheries Survey Methods, Ocean Studies Board, National Research Council of the National Academies.
[6] NPFMC, 2007, Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis for a Regulatory Amendment to Implement Guideline Harvest Level Measures in the Halibut Charter Fisheries.

report prepared by the Alaska Department of Fish and Game states that existing catch accounting

systems for halibut charter harvest in Southeast may under-estimate that harvest by 20%.[7]

9.    During development of the Southeast halibut GHL, and while I was a member of

the Council, one of the current plaintiffs provided harvest data during public testimony indicating

that clients operating from his lodge harvested approximately 80,000 pounds of Southeast halibut

per year.  During the April, 2008 Council meeting, the same plaintiff testified that the annual

gross income of his lodge is approximately $12 million; another plaintiff claimed his lodge

grosses $7-8 million annually (Council record).  Contrast this to the average community based

family fishing businesses of the Southeast setline halibut fleet, whose estimated annual gross

earnings from halibut fishing, using the 2008 figures quoted above and 2008 halibut prices of $4

per pound, ranges from $12-40,000.  Most Southeast commercial fishing families have

diversified their fishing businesses and depend on income from salmon, but incomes are modest

in comparison. Certainly not all charter boat operators have either the substantial income or

resource effect of the current plaintiffs; however, the cumulative effect is significant,

insufficiently monitored or measured, and contributing to resource decline.

10.    The Southeast halibut exploitable biomass has declined by 55% over the past two

years and is near historical low levels.[8]  Halibut catch rates in all sectors have declined, including

the catch rates of charter halibut clients (see attached Appendix 1).  While the halibut stock

overall may be healthy, the IPHC believes that assessment models used prior to 2008

overestimated abundance in IPHC Area 2, which includes Southeast, and that a "disproportionate

---

[7] Meyers, et al., March 24, 2008, Evaluation of the 2006 ADF&G Charter Logbook Scott Meyer, Alaska Department of Fish and Game, Division of Sport Fish, Anchorage, AK.
[8] IPHC Eighty-Fourth Annual Meeting, Jan. 2008. p.65.

share of the catches have been taken from there."[9]  Other resource considerations, including

slowed growth rates, also indicate the need for caution, conservative management, and reduced

harvest.  To accomplish the necessary reduction in harvest, Southeast setline IFQs and the annual

poundage specified for the charter GHL have been reduced over the past two years by 43% and

35%, respectively.  The biomass increases projected for 2011 and beyond will only be realized if

catch limits are not exceed and the overall harvest is reduced.

    11.    The plaintiffs assert that the one halibut daily limit is an allocation, not a

conservation measure.  That assertion is based on the assumption that:  "the IPHC sets limits on

halibut removals" and that those limits will be adhered to.[10]  Conservation concerns are

indisputable given that the choice is between a management measure that can be reasonably

expected to constrain charter harvest to the sector's annual catch limit and management measures

that will allow charter halibut harvest to nearly double the Southeast GHL (preliminary numbers

indicate that under the 2007 two halibut limit with one fish required to be less than 32 inches the

Southeast halibut charter harvest was 1.7 million pounds, close to double the .931 million pound

2008 GHL).  This would mark the fifth consecutive year in which Southeast halibut charter

harvest exceeded the conservation target established for the sector by the IPHC.  The IPHC has

an international responsibility to maintain the health and abundance of North Pacific halibut

stocks to ensure optimal yield, and depends the United States and Canada to restrict catch to

conservation targets.  There are conservation concerns, as well as both domestic and

international implications associated with the long-standing failure of the United States

government to control charter harvest.  Additionally, because the IPHC set 2008 catch limits

---

[9] Clark, W.G. and Hare, S.R., Summary of the 2007 Pacific halibut stock assessment.  Excerpted from International Pacific Halibut Commission Eighty-fourth Annual Meeting, Portland, OR, January 2008. p 65.
[10] Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis. April 20, 2008, p. xi.

based on the assumption that charter halibut harvests would be held to the GHL, suspension of the one halibut daily limit will result in a significant overage of the Southeast Constant Exploitation Yield, defined by the IPHC as the biological target level for total removals from each regulatory area. While past GHL overages were a detriment to the resource, a 2008 overage is unacceptable. As described above, the resource is close to historic low levels, questions regarding declining growth rates remain unanswered, and future projections indicate additional decline even in the absence of charter over fishing. Plaintiffs allege that the Southeast stock will rebound in the next few years; clearly that recovery depends reducing harvest and remaining within conservation limits.

12.     Effects of the rapidly increasing halibut charter harvest in Southeast were first brought to the Council attention in 1993 by the Alaska Longline Fishermen's Association (ALFA). Again, I was a member of the Council at that time, and helped to frame the problem statement as it was expressed in public testimony. These concerns included: local depletion, declining harvests for historic sport and subsistence fishermen, an open-ended reallocation from the commercial fishery to the charter industry, tensions between sectors and impacts on communities, and the need for more reliable data on charter harvest. Despite a tremendous amount of time and effort by the Council and the public, little tangible success in addressing these problems has been achieved. All has led to the management measure implemented on June 1, 2008, and later suspended by the court, to restrict charter halibut harvest to the sector's GHL. Every day that harvest is allowed in the absence of the one halibut limit exacerbates the problems that have now been festering for 15 years. Each day with the one halibut limit suspended worsens local depletion in important subsistence areas; each day charter harvests accrue toward

an overage that will harm the resource and result in a reallocation of QS from coastal fishing families who simply can not afford to lose another pound.

13.     Attached to this affidavit is an abbreviated timeline of the halibut charter management actions stretching from 1993 to the present (Appendix 2). The timeline bears evidence of the Council's efforts to accommodate the perspectives of charter boat and lodge owners through multiple task forces and committees; it also gives evidence of the multiple failed attempts by the Council to create an effective halibut charter management plan. These problems have only intensified with time, government inaction and, particularly, with charter GHL overages.

14.     Until 2007, increased charter harvest resulted in a direct reallocation of halibut from the setline to the charter sector. This occurred as a result of the IPHC quota setting process, which subtracts from the total area CEY the estimated sport, subsistence, charter, bycatch and wastage removals of halibut, then establishes the remainder as the fishery CEY, or setline catch limit. Because harvest control measures were not in place in 2005 and 2006 the IPHC used projected catch, instead of the GHL, to estimate harvest, hence charter GHL overages were deducted from the setline quota in an effort to constrain total harvest to the area CEY. In other words, the charter sector's overages were directly deducted from the IFQs of setline fishermen, most of whom have purchased at great cost some or all of the QS they currently hold. When the Southeast charter harvest exceeded even the IPHC's harvest projections in 2006 and caused the area CEY to be exceeded, the IPHC recommended corrective action to control charter harvest to the GHL and, assuming effective harvest controls would be implemented, did not subtract charter halibut overages from the setline catch limit for 2007. In 2008 the IPHC again assumed the one halibut daily bag limit would be in place to prevent GHL overages, and established the

setline catch limit accordingly. For this reason, suspension of the one halibut bag limit will result in a Southeast CEY overage in 2008, over harvesting the halibut resource. In the absence of charter harvest control measures, the IPHC will revert to deducting charter GHL overages from the setline IFQ fleet, which has remained below catch limits for over a decade. (see attached IPHC letters; Appendix 3).

15.    Localized depletion has been highlighted by the Council in response to public testimony for decades. Local depletion was also the theme of charter operators testifying before the Council in March 2007 on the halibut charter moratorium with operators describing the ever increasing distances they were forced to travel in order to access productive halibut fishing grounds. While commercial setline fishermen fish throughout Area 2C, the guided sport fleet is concentrated near coastal communities. Effort data from the Alaska Department and Game indicate that charter halibut catch per rod hour has declined near two Southeast communities, Sitka by approximately 50%, and Craig by 58%. *See* Alaska Department of Fish and Game Summary Data from the Sport Fishery For Pacific Halibut in the IPHC Area 2C Portion of Southeast Alaska, 2007. This is a clear indication of localized depletion. Local sport fishermen and subsistence users have seen increasing fishing grounds preemption from charter vessels and have suffered declining catch as well. Many coastal Southeast residents depend on subsistence to meet cultural and nutritional needs. In the Southeast coastal community of Port Alexander, for example, 23% of residents live below the poverty level.[11] Subsistence harvest ensures that there will be enough food for the long Alaska winter. The critical importance of locally abundant and accessible subsistence foods is currently heightened by rapidly rising fuel costs, which have hit isolated communities with high transportation costs particularly hard. Because

---

[11] Effort data from the Alaska Department and Game indicate that charter halibut catch per rod hour has declined near two Southeast communities, Sitka by approximately 50%, and Craig by 58%.

charter harvest is concentrated in near town areas to accommodate day clients, allowing charter harvest that is disproportionate to halibut abundance is directly and immediately causing irreparable harm to subsistence residents of rural communities throughout Southeast.

16.     Approximately 40% of the Southeast halibut charter harvest is taken in the Sitka area. Although sport and commercial management and reporting areas do not match exactly, the closest comparison of catch rates in the Sitka Management Area indicates that between 1995 (the year the halibut IFQ program was implemented) and 2006 setline halibut harvest **decreased** by 42% and charter halibut harvest **increased** by 55%.[12]  As is the case many Southeast towns, local depletion has been driven by charter harvest and is extending from towns in an ever increasing radius as charter businesses upgrade to larger and faster boats to access more remote and still productive fishing areas. Setline fishermen have been forced to run further, increasing overhead costs, to find healthy concentrations of halibut, and the harm to subsistence and personal use fishermen will be dramatic and irreparable if the Southeast charter fleet is again allowed to over harvest local halibut resources in 2008.

17.     Over harvest of demersal shelf rockfish (DSR), taken as bycatch in the halibut fisheries, both setline and charter, also pose a conservation concern. DSR are long-lived (80 years) and slow to reproduce. Mortality of DSR brought to the surface is assumed to be at or very close to 100%. DSR exhibit high site fidelity, hence are vulnerable to both over fishing and local depletion. DSR bycatch in the halibut setline fishery is limited to 10% measured against halibut catch on board; in addition, all DSR harvested by the setline halibut fleet must be retained, delivered and weighed to ensure adequate accounting. Charter and sport DSR harvest in the Southeast area are managed under one allocation, and harvest has increased with increased charter halibut harvest. The 2006 Southeast sport fishery allocation of DSR was exceeded by at

---

[12] http://www.iphc.washington.edu/HALCOM/commerc/tables/1998nation&stat.html.

least 10% with at least 50% of the catch coming from the Sitka area (Mike Jaenicke, ADF&G 1/26/2007).

18.    That localized depletion is a serious conservation problem is documented in Heino and Godo (2002), who conclude that recreational angling may have great potential to alter evolutionary trajectories of fish populations because the fisheries are usually concentrated more on coastal and smaller, more insular defined regions.[13]  Charter catch accounts for more than 85% of total recreational halibut taken in Southeast Alaska.

19.    Plaintiffs have not contested the .931 million pound Southeast GHL; instead they have argued that management measures may not be implemented until charter harvest exceeds this year's GHL.  This is a deliberate misinterpretation of Council intent, as expressed and published in the Federal Register, relative to GHL management.

20.    In 2003, on the third attempt, the Council's GHL policy was published in the Federal Register providing the following definitions:

"...the GHLs are established as a maximum poundage....to be harvested by the guided sport fishery" Fed. Reg. 47258 (April 3, 2008)

"...it is the [North Pacific] Council's policy that the charter vessel fisheries should not exceed the GHLs..." Id.

The GHL was published in the Federal Register as a formula, tied to abundance in stair steps, with the clear intent of the Council, of which I was a then a member, that the GHL was defined by that formula, not by any one particular number. From the Council minutes:

Dave Benton moved the following amendment for Issue 1–Basis for the GHL: To establish a proportional GHL consisting of a set of stair step guideline harvest levels

---

[13] Heino, M. and O.R. Godo, 2002.  Fisheries-induced selection pressures in the context of sustainable fisheries. Bull of Mar Sci. 70:639-656.

based on pounds. The GHL would be reduced proportional to the reduction in abundance for halibut. (Council minutes, February 2000)

In 2004 the GHL formula resulted in a 1.4 million pound limit; in 2008 the GHL formula factored in exploitable biomass declines and established a .931 million pound limit – all stair steps and limits that were published in the Federal Register on August 8, 2003 page 47264. The 2008 limit of .931 million pounds is not a "new" GHL any more than the annual individual poundage limit issued to a setline halibut quota share holder represents a "new" QS. IFQs are the annual expression of the QS just as 1.4 and .931 are the annual expression of the GHL formula. This interpretation is consistent with Council intent as I understood that intent when I voted on the motion.

21.    The Southeast halibut charter GHL was implemented in 2004 and has been exceeded every year since. In 2006, Southeast charter GHL overages were sufficient to cause exceedance of the Southeast Constant Exploitation Yield (CEY), defined by the IPHC as "the amount of halibut that may be removed from the resource without causing biological conservation problems." 72 Fed. Reg. at 74258 (Dec. 31, 2007). The problem before the Council already included issues of local depletion of halibut and rockfish, inability to account for halibut charter harvest on a timely or accurate basis, and inability to prevent sector over harvest; the 2006 CEY overages triggered corrective action from the IPHC to "undertake conservation actions to restrain the total removals within this total CEY. The achievement of this conservation mandate is dependent on adherence to catch limits and total yield." (Letter from IPHC to Chair Stephanie Madsen, Council, Dec. 1, 2006). Again, corrective action is demanded; chronic over harvest of sector catch limits by the Southeast charter sector has compromised IPHC conservation mandates.

22.     Both the IPHC and the Council struggled to identify effective management measures that would be deemed enforceable and affordable by NMFS while meeting the charter sector's repeatedly stated request for a continuous season of historic length.  As the attached timeline illustrates, the Council recommended various management tools from the toolbox specified and re-specified by multiple halibut charter committees, including prohibitions on halibut retention by charter skippers and crew, two attempts at annual limits and, reaching back to 2001, halibut charter IFQs.  The Council could have effectively controlled charter harvest by requiring the fleet to comply with and help pay for in-season catch accounting, as the setline industry does, then prohibiting retention of halibut once the GHL was reached.  Instead, the Council, and the IPHC in 2007, sought to accommodate the charter fleet's protests that accurate in-season catch accounting would be too onerous, that in-season closures would be too economically burdensome, and instead recommended a one halibut daily retention limit for charter clients, announced pre-season to manage charter halibut harvest to the "level of allowable halibut harvest by the charter vessel fishery."  50 C.F.R. 300.61 GHL Definitions.  Council intent, as reflected in the GHL final rule regulations, is for management measures to be noticed pre-season and implemented to restrain charter harvest to that year's charter limit, as dictated by IPHC CEY calculations, with overages addressed after the season and prior to establishing the following year's management measures.  Plaintiffs have deliberately misconstrued the intent of both the Council and the Secretary by asserting that the 2008 GHL is "new" and that the Council can not impose management measures to restrict harvest that annual limit until it has been exceeded.

23.     Plaintiffs also incorrectly allege in paragraph 43 of the Complaint that "the harvest of halibut off Alaska generally occurs in **four basic fisheries** – commercial, guided sport

(charter), unguided sport, and subsistence fisheries." In truth, in 72 Fed. Reg. 74258 the Federal

Register actually states:

> *"The harvest of halibut occurs in **three basic fisheries** – the commercial, sport, and*
> *subsistence fisheries. Additional fishing mortality occurs as bycatch or incidental catch*
> *while targeting other species and wastage of halibut that are caught but cannot be used*
> *for human food." (Emphasis added)*

In Southeast Alaska, there is only one commercial fishery that directly targets halibut, namely

the commercial setline IFQ fishery, which accounts for approximately 72% of the Area 2C

removals. Trawling, a commercial fishery that targets other groundfish species occurs is illegal

in Southeast. Trawl fisheries account for a large portion of the overall Alaska bycatch but do not

occur in Southeast, Area 2C, and therefore are not germane to this argument. The reported sport

catch accounts for 20% of the harvest and is sub-divided in two categories – guided (charter)

13% and non-guided 7% of the removals. Subsistence is the smallest of the three basic fisheries

and accounts for 4% of the removals. The other removals of halibut include wastage which

represents the mortality of legal sized halibut due to lost or abandoned gear and accounts for the

mortality of some sub-legal-sized halibut returned to the sea. Wastage in Area 2C has been at

300,000 or less over the last five years. Since the implementation of the IFQ fisheries in 1995,

the total mortality of legal sized halibut from lost gear has decreased. Bycatch mortality

accounts for halibut that die from being caught in other fisheries and has been estimated at about

160,000 pounds and relatively stable the last several years.[14]

---

[14] Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis, April 20, 2008, Table 19.

24.    In 2006, the Southeast halibut charter fleet had a self-reported halibut discard rate equal to 57% of their halibut catch.[15]  Applying the average weight estimated for charter-caught halibut of 18.98 pounds, the Southeast charter sector discarded 978,000 pounds of halibut in 2006.  Post release mortality (PRM) of halibut discarded in the charter fishery is likely increased by catch/recapture since the charter fleet tends to fish the same areas day after day and therefore is likely to discard the same fish more than once.  Bartholomew and Bohnsack (2005) found that at high angling encounter rates multiple recaptures could increase release mortality greatly.[16] Multiple catches of the same fish are particularly likely under the 32" maximum size limit restriction.  The 32" size limit was not supported by IPHC because of the unknown but likely increases in post-release mortality (PRM).

25.    The plaintiffs claim that their businesses have been irreparably harmed by the threat of the one halibut daily bag limit.  A recent search of the plaintiff's websites (June 16, 2008) indicated that most of their lodges are full or almost full for the 2008 season and are urging clients to book well in advance before spaces disappear.  One lodge is already accepting reservations for 2009, exhibiting little evidence of business failure. (See attachment).

26.    In sum, suspension of the one halibut daily limit in Southeast for 2008 will cause over harvest of the Southeast halibut resource, financial harm to the Southeast setline industry, including harvesters and processors, and irreparably harmed through reduced access for rural residents who depend on subsistence harvest.  Additionally, suspension of the one halibut daily limit will betray the commitment of setline fishermen to resource stewardship and the confidence they have placed in the public regulatory process.  Tensions in small communities are explosive;

---

[15] Meyer, S. 2007, Discussion Paper.  Halibut Discard Morality in Recreational Fisheries in IPHC Areas 2C and 3A, Table 3 on page 16.
[16] Bartholomew, A. and J.A. Bohnsack, 2005.  A review of catch-and-release angling mortality with implications for no-take reserves.  Reviews in Fish Biology and Fisheries 15:129-154.

granting immunity to the charter sector from conserving the resource during this time of low abundance and reduced catch limits inflames hostilities. Coastal Alaskan setline and subsistence fishermen heavily depend on the halibut resource and the integrity of the halibut management system for livelihood and sustenance. Each and every day that the charter sector is allowed to over fish will imposes irreparable harm on coastal fishermen and their families. For these reasons, the one halibut daily limit must be immediately reinstated for charter clients.

I hereby declare and certify, under penalty of perjury under laws of the United States of America, that the foregoing is true and correct. It is based upon my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as this Affidavit.


Dated: June 18, 2008

_____

Linda Behnken

**APPENDIX A**

COMMISSIONERS:
CLIFF ATLEO
PORT ALBERNI, B.C.
JAMES BALSIGER
JUNEAU, AK
RALPH G. HOARD
SEATTLE, WA
PHILLIP LESTENKOF
ST. PAUL, AK
LAURA RICHARDS
NANAIMO, B.C.
GARY ROBINSON
VANCOUVER, B.C.

INTERNATIONAL PACIFIC HALIBUT COMMISSION

ESTABLISHED BY A CONVENTION BETWEEN CANADA

AND THE UNITED STATES OF AMERICA

AGENDA C-1
Supplemental
DECEMBER 2006

TELEPHONE
(206) 634-1838

FAX:
(206) 632-2983

December 1, 2006



Ms. Stephanie Madsen, Chair
North Pacific Fishery Management Council
605 West 4th, Suite 306
Anchorage, AK  99501

DEC - 4 2006
N.P.F.M.C.

Dear Stephanie:

The recent publication of the recreational harvests of halibut in IPHC Regulatory Areas 2C and 3A in 2006 by the Alaska Department of Fish and Game has, with other removals, indicated that the Total Constant Exploitation Yield (CEY) established by the Commission for these areas has been exceeded. Exceeding the Total CEY for an IPHC regulatory area requires that the Commission undertake conservation actions to restrain the total removals within this Total CEY. The achievement of the Commission's conservation mandate is dependent on adherence to catch limits and total yield.

While the Commission regularly undertakes actions to restrain total removals within the Total CEY, the potential regulatory actions take on a different character if: a) there is a need for Commission conservation actions, and; b) domestic agencies have adopted targets or limits for recreational fisheries that have been exceeded. Under such conditions the Commission could adopt regulations that address both the need to restrain total removals and the needs of either contracting party to achieve domestic management targets for recreational fisheries, e.g. different seasons, bag limits, or different combinations of bag limits and seasons for each regulatory area, etc.

The IPHC staff notes the difficulty experienced by the Council in achieving its goal of adhering to the adopted GHL levels. The staff wishes to apprise the Council of the potential to use the Commission regulatory framework to supply the Council with tools that may either be incorporated in, or substitute for, domestic regulations until they are developed. This is not without precedent. For example, it would be similar to the IPHC actions concerning sublegal halibut retention in Areas 4D and 4E, or concerning interim regulation of the commercial fishery while the domestic Alaskan IFQ regulations were being developed. Both of these actions were implemented in furtherance of Council goals. The Commission and its staff understand clearly that any changes in IPHC regulations for recreational fisheries should be accomplished only through joint discussion with the NPFMC and National Marine Fisheries Service (NMFS), and not through unilateral action by the Commission. Further, in the absence of a specific request from the Council to the contrary, the Commission regulations would apply uniformly to all recreational fishery sectors.

At the 2006 IPHC Interim Meeting, the Commissioners directed the staff to undertake discussions with NPFMC and NMFS to determine if these agencies wish to explore the use of Commission recreational fisheries regulations to effect both the Commission's conservation mandate and the domestic allocation goals for Areas 2C and 3A. Should these agencies support such action, the Commission would consider a proposal to change its recreational fisheries regulations at the upcoming IPHC Annual Meeting on January 16-19, 2007 in Victoria, B.C.

The alternative to an action by the IPHC concerning recreational fishing regulations is to continue with the present Commission process of ensuring adherence to the Total CEY by subtracting the projected recreational harvest from the Total CEY for each regulatory area, and adopting catch limits for the commercial IFQ fishery based on the remaining CEY. In effect, if the recreational fishery exceeds domestic limits, there is a transfer of yield from the commercial fishery to the recreational fishery.

I and Gregg Williams of the IPHC staff will be attending your December meeting, and will be available to discuss this with the Council.

Sincerely yours,

Bruce M. Leaman
Executive Director


cc: Commissioners

**APPENDIX B**

COMMISSIONERS:
CLIFF ATLEO
PORT ALBERNI, B.C.
JAMES BALSIGER
JUNEAU, AK
RALPH G. HOARD
SEATTLE, WA
PHILLIP LESTENKOF
ST. PAUL, AK
LAURA RICHARDS
NANAIMO, B.C.
GARY ROBINSON
VANCOUVER, B.C.

DIRECTOR
BRUCE M. LEAMAN

P.O. BOX 95009
SEATTLE, WA 98145-2009

TELEPHONE
(206) 634-1838

FAX:
(206) 632-2983

# INTERNATIONAL PACIFIC HALIBUT COMMISSION

ESTABLISHED BY A CONVENTION BETWEEN CANADA

AND THE UNITED STATES OF AMERICA

January 23, 2007

Carlos M. Gutierrez
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Avenue N.W.
Washington, D.C. 20230

Dear Sir:

The International Pacific Halibut Commission completed its Eighty-third Annual Meeting in Victoria B.C., Canada, with Dr. Laura Richards of Nanaimo, B.C. presiding as Chair. The Commission is recommending to the governments of Canada and the United States, catch limits for 2007 totaling 65,170,000 pounds, a 6.7% decrease from the 2006 catch limit of 69,860,000 pounds. Highlights of the meeting are reviewed here and a news release with additional details is enclosed.

### *Stock assessment and harvest rate*
The Commission staff reported on the 2006 Pacific halibut stock assessment which implemented a coastwide estimation of biomass, compared with previous assessments which assessed stock biomass for each individual IPHC regulatory area. The total stock biomass identified by the coastwide assessment is approximately the same as the sum of that from the regulatory area assessments. However, the Commission believed that further examination of options for partitioning the coastwide biomass estimate into estimates of biomass for each regulatory area was required before it adopted the new approach. Accordingly, the Commission relied on the previous methodology of separate regulatory area assessments as the basis for determining catch limits. Lower catch rates in the eastern area of the halibut stock prompted the Commission to recommend more restrictive catch limits for this portion of the stock. Pending recruitment from the 1994 and 1995 year classes appears to be relatively strong in most areas, although Area 4B is showing a notably lower level of recruitment of these same year classes compared with other regulatory areas.

The Commission directed the staff to hold a workshop in 2007 that will allow agencies and the industry to better understand the coastwide assessment and apportioning process, and to explore alternative approaches. The staff will also develop a broader framework for the annual examination of the halibut stock assessment, in consultation with the respective agencies.

For 2007, the Commission continued with a 22.5% harvest rate for use in Areas 2A through 3A and a rate of 20% for Areas 3B through 4E. Low levels of recruitment and lower estimated levels of productivity in Areas 4B and 4CDE continued to support harvest rates lower than 20% for these areas. Accordingly, the Commission adopted catch limits based on a harvest rate of

- 2 -

15% for Areas 4B and 4CDE. The IPHC conducted additional research projects in Areas 4CDE during 2006 and the results provided an improved assessment base for these areas, however the biomass on the eastern Bering Sea shelf is still estimated to be low.

*Allocation agreements and fishing seasons*
The IPHC sets biologically-based catch limits for Areas 4A, 4B, and a combined Area 4CDE. The catch limits for Regulatory Areas 4C, 4D, and 4E reflect the North Pacific Fishery Management Council's (NPFMC) catch-sharing plan, which was adopted by the Commission. The Commission also adopted the catch-sharing plan for Area 2A (Washington-Oregon-California), authorized by the Pacific Fishery Management Council, and the allocation agreement for sport and commercial fisheries in Area 2B (British Columbia).

After reviewing staff information and proposals from the harvesting and processing sectors, the Commission voted on a season opening date of March 10 and a closing date of November 15, 2007, for the quota share fisheries. All Area 2A commercial and the treaty Indian commercial fisheries will fall within these dates, and the Area 2A directed fishery will be a series of 10-hr openings with fishing period limits.

*Other issues*
The Commission approved several changes to the regulations that will be sent for acceptance under separate cover. The catch limits by regulatory area will be sent as part of the regulation package.

The Commission noted that Guideline Harvest Levels (GHL) approved by the NPFMC for the charter/guided recreational halibut fishery in Areas 2C (southeast Alaska) and 3A (central Gulf of Alaska) were exceeded in recent years, substantially so in Area 2C (over 40% higher than the GHL in 2006). Commission staff initiated dialogue with the NPFMC to determine what control measures would be enacted by the Council to constrain harvest to the GHLs in 2007. The NPFMC indicated that, although it is committed to management of this fishery to the GHL limits, it would not be able to complete analyses and develop a regulatory framework to effect control of this fishery until 2008. The Commission, with the support of its advisory bodies, therefore recommends establishment of more restrictive daily bag limits for the charter/guided halibut fishery in Areas 2C and 3A during 2007, in order to constrain catch within the NPFMC GHL levels. These bag limit regulations would become null and void at such time as domestic regulations to achieve the same objectives are promulgated. The Commission takes this action with some reluctance but believes the action to be necessary, given the magnitude by which the charter/guided catches exceeded the GHL limits and the belief that such overharvesting puts at risk the achievement of IPHC management goals for the halibut stock.

The Commission approved, on a trial basis, a regulation to allow retention of halibut bycatch during fishing for sablefish with traps in Area 2B. Harvesters will have to acquire halibut quota shares to retain this bycatch and the Canadian Department of Fisheries and Oceans will develop a domestic regulatory framework to ensure that no targeting of halibut occurs. This regulation will be in effect during the period of the pilot program for integrated groundfish management in British Columbia, and will be reviewed at the end of 2008.

- 3 -

The Commission also noted that halibut bycatch mortality in non-target fisheries was reduced slightly in 2006 and was at the lowest level since 1987, continuing the trend initiated by the 1991 agreement between the U.S. and Canada to achieve lower bycatch mortality levels. However, the Commission agrees that further reductions are desirable and that current levels of mortality reduce yield to the directed halibut fisheries. The Commission will continue to work with agencies of the two governments to achieve reductions in halibut bycatch mortality.

The Commission wishes to acknowledge a debt of gratitude to the United States North Pacific and Pacific Fishery Management Councils, the National Marine Fisheries Service, the United States Coast Guard, the Canadian Department of Fisheries and Oceans, and the various state and provincial agencies for the assistance provided by their staff in Commission deliberations. The cooperation of all involved government agencies is excellent and assists in the development of proposed regulations.

The Commission also wishes to acknowledge the warm welcome it was afforded by the city of Victoria and our Canadian hosts. The 2008 Annual Meeting of the Commission will be held in or near Portland, Oregon, U.S., from January 22-25, 2008.

Sincerely yours,

James W. Balsiger
Chair

Encl.

**APPENDIX C**

COMMISSIONERS:

CLIFF ATLEO
PORT ALBERNI, B.C.
JAMES BALSIGER
JUNEAU, AK
RALPH G. HOARD
SEATTLE, WA
PHILLIP LESTENKOF
ST. PAUL, AK
LAURA RICHARDS
NANAIMO, B.C.
GARY ROBINSON
VANCOUVER, B.C.

# INTERNATIONAL PACIFIC HALIBUT COMMISSION

ESTABLISHED BY A CONVENTION BETWEEN CANADA

AND THE UNITED STATES OF AMERICA

DIRECTOR
BRUCE M. LEAMAN

P.O. BOX 95009
SEATTLE, WA 98145-2009

TELEPHONE
(206) 634-1838

FAX:
(206) 632-2983

January 30, 2008

Ms. Sue Salveson
Director, Sustainable Fisheries
NOAA Fisheries
P.O. Box 21668
Juneau, AK 99802

Dear Ms. Salveson: *Sue*

The staff of the International Pacific Halibut Commission (IPHC or Commission) has reviewed the Proposed Rule for limiting the sport charter harvest of halibut in IPHC Area 2C in 2008. We have the following comments for your consideration.

At its recent Annual Meeting in Portland, Oregon, the Commission reviewed the halibut coastwide assessment conducted by staff. Following discussion and with advice from its advisory bodies, the Commission adopted the Total Constant Exploitation Yields (CEYs) resulting from the assessment as the scientific basis for it's deliberations on catch limits. Importantly, the 2008 Total CEY for Area 2C is 6.50 Mlbs, which has implications for the corresponding Guideline Harvest Level (GHL) as defined in NMFS regulations.

The Commission noted that the CEY would result in a GHL of 0.931 Mlbs for the 2008 sport charter fishery, according to the GHL program adopted by the North Pacific Fishery Management Council (Council) and implemented in NMFS regulations (50 CFR 600.65(c). The Council has previously stated its intent to manage the sport charter fishery to the GHL, and has proposed management options if the GHL was reduced for 2008. The Commission took this commitment into account when setting the 2008 commercial fishery catch limit. Achievement of the Commission's harvest goals and management objectives is thus dependent on the proposed action.

We note that Option B was proposed by the Council in the event that the GHL was reduced to 1.217 Mlbs. As noted, the 2008 GHL as defined in regulations would be 0.931 Mlbs, lower than what was anticipated. This lower GHL makes Option B of the NMFS Proposed Rule (including a one-fish daily bag limit) the appropriate action for the 2008 fishery.

Sincerely yours,

Bruce M. Leaman
Executive Director

cc: IPHC Commissioners

# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | Civil Action No. 08-00941 |
| THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*, | |
| **Defendants.** | |

## AFFIDAVIT OF WILLIAM THOMAS, JR.

I, William Thomas, Jr., being duly sworn, depose and say as follows:

1.      My name is William (Bill) Thomas, Jr.  I am an Alaskan Native, born and raised in Klukwan, Alaska.  I am now a resident of the City of Haines, Alaska.  I am a subsistence fisherman and have been a commercial fisherman for over 35 years harvesting halibut.  I am also the State of Alaska Representative for District 5, covering rural Southeast Alaska, Yakutat, and Prince William Sound.  My mailing address is PO Box 942, Haines, AK 99827.

2.      I have watched the charter industry develop and grow over the years and consider this a new fishery trying to replace an existing industry.   The charter sector has exceeded its halibut allocation for four consecutive years, creating a conservation concern for all who depend on the halibut resource for subsistence and livelihood.  The charter industry operates near towns, allowing its non-resident clients to over harvest the same areas rural native subsistence fishermen have depended on for thousands of years.  Halibut is a traditional food for all Native people, having important cultural and nutritional significance.  Rural Alaska people, who live far from roads and urban grocery stores, depend on local subsistence resources to feed their families.  Subsistence foods are vitally important to rural Alaskans right now as fuel and food prices make

non-locally foods unaffordable. Depleting subsistence resources has harmed the subsistence lifestyle of native and non-native residents from the rural coastal Alaska communities that I represent. During this time of low abundance in Southeast, charter harvest must be limited with the one fish bag limit to take pressure off locally depleted areas and restore subsistence foods to rural Alaskans.

3.      Charter harvest in near town areas has also caused localized depletion of other important subsistence resources, including rockfish, which are taken and often discarded as bycatch by charter halibut fishermen.  Many subsistence fishermen fish out of small skiffs and can only safely access local resources.  Forcing subsistence harvesters to journey farther from town, into exposed and unprotected waters to find food, is unacceptably dangerous.  Allowing the charter sector to continue to exceed the GHL will exacerbate localized depletion of subsistence resources creating health and safety issues for my rural constituents who depend on subsistence.

4.      The halibut fishery provides a critical economic base for the people of my region. It is this essential base economic activity that keeps the villages of coastal Alaska viable as communities.  83% of the Area 2C halibut setline quota is held by Alaska residents, and 63% of those Alaskans are from rural communities.  Villages in my region depend on the halibut setline industry not only for the jobs and wealth it creates but also for the Fisheries Business Tax revenue the local governments receive.  The Fishery Business tax provides essential local government services for Alaskans.  The only comparable state tax in the tourism industry is the Commercial Passenger Vessel Excise tax that was recently enacted by a ballot initiative in 2006. This tax is not strictly germane to the charter sport fishing industry only but is a head tax on cruise ship passengers. I am providing as a part of this affidavit pages 32-35 of the State of

Alaska Department of Revenue Tax Division 2007 Annual Report that describes the fishery

business tax and pages 22-23 that describes the Commercial Passenger Vessel Excise Tax. In

addition, I have included pages 16-18 & page 24 of the State of Alaska Department of Revenue

Fiscal Year 2007 Shared Taxes and Fees Annual Report that shows a breakdown of the

communities in the State that receive these two taxes.  For example, within the District that I

represent and live in,  the City of Haines received $190,641 in fisheries business tax and only

$6,290 in Commercial Passenger Vessel Excise tax.  The City of Haines has learned to depend

upon the Fishery business tax for basic governmental services and the school system since it has

existed for so long.  The Fishery business tax is the oldest tax in the State and has been shared

with municipalities since 1961.

     5.     As a commercial fisherman, halibut is an important part of my fishing income. I

was issued a small amount of halibut quota share when the halibut individual fishing quota (IFQ)

program was implemented, and have since purchased additional IFQ to support my family.

Reductions in the commercial setline quota have created economic hardship for my family, but

we have accepted quota reductions to conserve the halibut resource.  Overages by the charter

sector have also been deducted from my quota and from the quota of other setline fishermen,

imposing an unacceptable economic burden on the coastal fishermen who target halibut.

     6.     Over my long career as a commercial fisherman I have gone through the painful

process of rationalizing our fishery to prevent over fishing and ensure resources are sustainably

managed.  My fellow setline fishermen with whom I grew up and who are the lifeblood of our

communities have gone through the same process.  Many have had to take on huge debts to

purchase setline halibut quota (at $20-25 per pound) in order to continue their participation in the

halibut fishery and to be able to remain in their home communities, where there are few

alternative employment opportunities to commercial and fishing. Indeed many others simply

have not been able to continue as halibut fishermen. Allowing the fishery that we have worked

and sacrificed for to be over fished by and reallocated to the charter sector is unjust. Many

commercial fishermen from small communities purchased halibut quota share because of their

belief in the stability of the rationalized program and to help minimize the fluctuations that are

inherent in other fisheries such as salmon.

7.      Collectively, we in the commercial setline sector recognized that we would have

to sacrifice open access to the resource in order to stabilize the industry, improve quality, and

ensure conservation of the resource. Since then, the growth of the charter sector has eaten away

at the commercial quotas, since charter halibut harvest is deducted from the total allowable

harvest before the setline quota is annually established. For those of us who have long since

taken the difficult steps necessary to mitigate our own growth, the unwillingness of the charter

sector to be managed to remain within their allocation seem immature and inexcusable. The

charter industry should have to purchase quota share from the commercial fishermen and convert

the quota share into charter allocation if this new fishery needs additional growth or the

opportunity to offer a client a second fish.

8.      The halibut quota allocated to Southeast setline fishermen, including residents of

the rural native communities that I represent, has been reduced by 43% over the past two years.

Equitable conservation management demands the charter sector allocation be constrained to its

GHL during this time of low abundance. Abundance based management is the hallmark of

fisheries management in the North Pacific and State of Alaska. All other species, such as king

and coho salmon, ling cod and rockfish are allocated based on abundance based management. I

strongly believe that all user groups should be held to the same standard: when stocks are high,

everyone benefits by higher catch allocations and, conversely, in times of lower abundance everyone suffers proportionally.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 12, 2008

William Thomas, Jr.

I, _Neta Jane Schoonover_, a Notary Public of the city and state aforesaid, hereby certify that _William A. Thomas Jr._ personally known to me to be the affiant in the foregoing affidavit, personally appeared before me this day and having been by me duly sworn deposes and says the facts set forth in the above affidavit are true and correct.

Witness my hand and official seal this the _12_ day of June, 2008.

Notary Public

My Commission Expires: _5/24/2011_

NETA JANE SCHOONOVER
My Commission Expires
★ NOTARY PUBLIC ★
With office
State of Alaska

# Fisheries Business Tax
# AS 43.75

## Description
Alaska levies a fisheries business tax (also known as the "raw fish tax") on fisheries businesses and persons who process fisheries resources in or export unprocessed fisheries resources from Alaska. The tax is based on the price paid to commercial fishermen for the raw resource or fair market value when there is no arms length transaction prior to processing or export. The division collects fisheries business taxes from processors and persons who export unprocessed fishery resources from Alaska.

## Rate
Fisheries business tax rates are based on the location and type of processing activity and whether a fishery resource is classified as "established" or "developing" by the Alaska Department of Fish and Game. Rates are as follows:

## Processing Activity

| Established | Rate |
|---|---|
| Floating | 5% |
| Salmon Cannery | 4.5% |
| Shore-based | 3% |

| Developing | Rate |
|---|---|
| Floating | 3% |
| Shore-based | 1% |

*The Fisheries Business Tax is Alaska's oldest tax, enacted in 1899.*

## Returns
Fisheries businesses file calendar year returns that are due with payment on March 31 of the following year.

After filing the calendar year return, taxpayers file returns to report post-season, bonus payments made to fishermen. Returns for these payments are due with additional taxes by the last day of the month following the month of bonus payments.

## Exemptions
Commercial fishermen who process and freeze fish on board to maintain its quality before sale to a licensed processor are exempt.

## Credits
**Education** – Taxpayers that contribute to accredited Alaska universities or colleges for educational purposes may claim a tax credit for 50 percent of the first $100,000 and 100 percent of the next $100,000 of contributions. The maximum credit is $150,000 for each tax year.

**Scholarship Contributions** - Tax-payers that contribute to the A.W. "Winn" Brindle memorial scholarship account may claim a tax credit for the amount of contribution not to exceed 5 percent of their tax liability.

**Salmon Product Development and Utilization Credit** - Taxpayers are allowed tax credits against the fisheries business tax on salmon for expenditures promoting the development of salmon products and the utilization of salmon waste. The credit on salmon for expenditures promoting the development of salmon products was extended to December 31, 2008. The credit on salmon for expenditures promoting the utilization of salmon waste expired on December 31, 2005.

## Disposition of Revenue
The division deposits all revenue derived from the fisheries business tax into the General Fund. The legislature may appropriate revenue from the tax for revenue sharing as follows:

| Program Detail | *Alaska Tax Division 2007 Annual Report* |

*The first fisheries business tax was enacted in 1899 by the U.S. Congress.*

## Processing Activity Inside Municipality

The division shares 50 percent of tax collected with the incorporated city or organized borough in which the processing took place. If an incorporated city is within an organized borough, the division divides the (50 percent) shareable amount equally between the incorporated city and the organized borough.

## Processing Activity Outside Municipality

The division shares 50 percent of tax collected from processing activities outside an incorporated city or an organized borough through an allocation program administered by the Department of Commerce, Community and Economic Development.

## History

**1899** – the U.S. Congress adopted a "salmon case" tax to fund fisheries-related activities in pre-territorial Alaska. The Organic Act passed in 1912 established an organized territorial government in Alaska. In 1913, the First Territorial Legislature adopted the "salmon pack" tax which applied to salmon canneries based on canned salmon (7¢ per case); and the "cold storage" tax which applied to other fisheries and was based on business receipts. Between 1913 and 1949, the legislature amended the tax several times by changing tax rates and expanding the tax base to include different fisheries.

**1949** – The territorial legislature restructured the fisheries business tax to be based on value of the fisheries rather than volumes (case or business receipts). The new "raw fish" tax applied to salmon (4 percent), crab and clams (2 percent), and other fishery products (1 percent) processed in canneries.

**1951** – The territorial legislature enacted a fishery business license requirement with a $25 license fee, a tax on floating processors at 4 percent of value and increased the tax rate for salmon canneries to 6 percent.

**1962** – The legislature adopted provisions for sharing taxes (10 percent) and requiring calendar year returns for all businesses.

**1967** – The tax rate on salmon canneries was amended to 3 percent and provisions were adopted requiring security for a fishery business license under certain conditions.

**1979** – The legislature adopted the modern tax structure with different tax rates for established and developing species, as well as increasing the shared tax percentage to 20 percent.

**1981** – The shared tax percentage was increased to 50 percent.

**1986** – The legislature authorized a fisheries business tax credit of up to 50 percent of fisheries business taxes for capital expenditures associated with constructing and improving shore-side processing operations. The tax credit program was effective for 1987 through 1989 with a carryforward provision through 1991. Taxpayers claimed approximately $47.5 million of credits under this program. The legislature also enacted the A.W. "Winn" Brindle scholarship credit allowing a credit of up to 5 percent of fisheries business taxes due.

**1987** – The legislature enacted the Alaska education tax credit program allowing a tax credit on educational contributions of up to $100,000 against fisheries business taxes due.

*The Alaska Legislature extended the Salmon Product Development credit in 2006.*

**1990** – The legislature enacted provisions for a civil penalty for processing without a license. The division may progressively assess penalties in increments of up to $5,000 for each infraction to a maximum of $25,000 for the fifth and subsequent assessments. The legislature also enacted a provision that authorized sharing of 50 percent of taxes sourced from processing activities in the unorganized borough, effective July 1992.

**1991** – The legislature restructured the Alaska education credit and increased the maximum amount to $150,000.

**1995** – The legislature reduced the amount of surety bonding for small processors from $10,000 to $2,000.

**2001** – The legislature modified the tax payment security requirements necessary to obtain a fisheries business tax license. The legislature expanded the existing requirement for a whole-salmon exporter to include any exporter of any unprocessed fisheries resource. Under the legislation, exporters of unprocessed fish can obtain a fisheries business license by posting a $50,000 surety bond and paying their taxes monthly.

**2002** – The legislature authorized credits of up to 50 percent for contributions of not more than $100,000 and 75 percent of the next $100,000 in contributions made to the Alaska Veterans' Memorial Endowment Fund. The tax credit expired July 1, 2003.

**2003** - The legislature authorized a Salmon Product Development/Utilization Credit that allows tax credits against fisheries business taxes for expenditures promoting the value added processing of salmon products and the utilization of salmon waste in Alaska. The amount

of the tax credit cannot exceed 50 percent of the taxpayer's fisheries business liability for processing of salmon during the tax year.

Effective June 11, 2003 and retroactive to January 1, 2003, the legislation sunsetted on December 31, 2005. Unused credits earned may be carried forward for three years.

**2003** – Legislation allowed for monthly payment of the fisheries taxes in lieu of existing forms of security or prepayment as a prerequisite to being licensed. Fisheries businesses that elect the monthly payment option must post a $50,000 bond or have $100,000 equity in real property in the state. The provisions of this legislation took effect September 8, 2003.

**2004** – Legislation authorized a new Direct Marketing Fisheries Business License and tax structure set at the shore based rate of 1 percent of the value of developing fish species and 3 percent of the value of established fish species. The provisions of this legislation took effect January 1, 2005.

**2005** – Effective May 18, 2005, the legislature modified the surety and tax payment requirements for obtaining a fisheries business license. The legislature reduced the amount of surety bonding for small primary fish buyers from $10,000 to $2,000. The legislation added as a condition for obtaining a fisheries business license full payment of delinquent: taxes under AS 43, seafood marketing assessments, employment security contributions, OSHA penalties, and local fishery sales taxes.

**2006** – The legislature extended the Salmon Product Development Credit for expenditures made through December 31, 2008. The Salmon Utilization Credit was not extended.

*Alaska Tax Division 2007 Annual Report*

## FY 2007 Statistics

### Fisheries Business Tax

License Fees and Tax Collections $35,589,331
*Including penalties, interest and credits.*

### Fisheries Business Licenses Issued

| | |
|---|---|
| Shore-based Licenses Issued | 199 |
| Floating Licenses Issued | 374 |
| Exporter Licenses Issued | 19 |
| **Total** | **592** |

| | |
|---|---|
| Number of Returns | 669 |
| Number of Taxpayers | 495 |

| | |
|---|---|
| Program Cost | $767,928 |
| Staffing (full time equivalent) | 9.1 |

Program Detail

*Alaska Tax Division 2007 Annual Report*

## Commercial Passenger Vessel (CPV) Excise Tax AS 43.52.200 – 295

### Description
Alaska imposes an excise tax on travel on commercial passenger vessels, typically cruise ships that have 250 or more berths and provide overnight accommodations in the state's marine waters. Passengers traveling on qualified commercial passenger vessels are liable for the tax.

### Rate
The commercial passenger vessel excise tax rate is $46 per passenger per voyage.

### Returns
Cruise ship companies and commercial passenger vessel owners file returns and pay taxes monthly. The due date is the last day of the month following the month in which voyages ended.

### Exemptions
The CPV excise tax does not apply to passengers on board a commercial passenger vessel that does not anchor or moor in state marine waters with the intent to allow passengers to disembark.

### Disposition of Revenue
The division deposits all proceeds from the CPV excise tax into the Commercial Vessel Passenger Tax (CVP) Account in the general fund. Subject to appropriation by the legislature from this account, the division distributes $5 per passenger to each of the first five ports of call in Alaska unless the port of call imposes a tax on travel on commercial passenger vessels engaged in activities involving overnight accommodations. If the port of call is a city located within a borough, the division distributes $2.50 to the city and $2.50 to the borough. Each port of call receiving funds shall use the funds in a manner calculated to improve port and harbor facilities and other services to properly provide for vessel or watercraft visits and to enhance the safety and efficiency of interstate and foreign commerce.

The division transfers 25% of the revenue deposited in the CVP Tax Account into a Regional Cruise Ship Impact (RCSI) Fund, a sub-account of the CVP Tax Account. Subject to appropriation and regulations adopted by the Department of Revenue, the division distributes funds from the RCSI Fund to municipalities and other governmental entities within the Prince William Sound Region, Southeast Alaska, or any other distinctive region impacted by cruise ship related tourism activities but not entitled to receive funds under port of call provisions above. Funds distributed from the RCSI Fund shall be used to provide services and infrastructure directly related to passenger vessel or watercraft visits or to enhance the safety and efficiency of interstate and foreign commerce related to vessel or watercraft activities.

### History
**2006** – The CPV excise tax was enacted by 2006 Primary Election Ballot Measure No. 2. The measure was approved by voters at the primary election of August 26, 2006. The results of the election were certified September 18, 2006 and the initiative's provisions became effective December 17, 2006.

*The CPV excise tax was first collected in FY 2007 for voyages in Alaska during May and June 2007.*

| | |
|---|---|
| Tax Collections | $15,981,734 |
| Number of Returns | 18 |
| Number of Taxpayers | 3 |
| Program Cost | $108,755 |
| Staffing (full time equivalent) | 1.2 |

*Reflects only one (monthly) filing because first returns were due June 30, 2007 (for voyages in May 2007).

Five-Year Comparison of Shared Taxes and Fees

## Table 5
## Fisheries Business Tax

| | FY 2007 | FY 2006 | FY 2005 | FY 2004 | FY 2003 | Total All Years |
|---|---|---|---|---|---|---|
| **Municipality** | | | | | | |
| Anchorage | $44,421 | $56,814 | $29,594 | $42,777 | $31,642 | $205,248 |
| Juneau | 334,326 | 340,230 | 298,218 | 221,435 | 218,549 | 1,412,758 |
| Sitka | 808,257 | 681,749 | 672,370 | 474,029 | 361,336 | 2,997,741 |
| **Total Municipalities** | 1,187,004 | 1,078,793 | 1,000,182 | 738,241 | 611,527 | 4,616,747 |
| | | | | | | |
| **Borough** | | | | | | |
| Aleutians East | 1,581,639 | 1,563,918 | 1,296,716 | 1,365,445 | 1,212,887 | 7,023,605 |
| Bristol Bay | 1,295,546 | 1,176,357 | 834,661 | 450,975 | 385,264 | 4,144,793 |
| Denali | 608 | 569 | 986 | 0 | 0 | 2,161 |
| Fairbanks North Star | 0 | 0 | 0 | 360 | 163 | 523 |
| Haines | 190,641 | 135,524 | 150,554 | 94,421 | 114,501 | 685,641 |
| Kenai Peninsula | 708,041 | 791,462 | 640,430 | 676,737 | 512,894 | 3,329,564 |
| Ketchikan Gateway | 302,485 | 303,361 | 278,473 | 327,692 | 234,339 | 1,446,350 |
| Kodiak Island | 1,031,498 | 942,310 | 802,313 | 718,877 | 573,595 | 4,068,391 |
| Lake and Peninsula | 133,792 | 98,911 | 71,206 | 113,059 | 87,995 | 504,963 |
| Matanuska-Susitna | 216 | 74 | 0 | 386 | 0 | 676 |
| Northwest Arctic | 0 | 0 | 475 | 0 | 0 | 475 |
| Yakutat | 200,086 | 152,860 | 35,973 | 47,862 | 91,550 | 528,321 |
| **Total Boroughs** | 5,444,648 | 5,167,336 | 4,114,787 | 3,793,814 | 3,213,178 | 21,733,463 |
| | | | | | | |
| **City** | | | | | | |
| Adak | 116,422 | 117,297 | 247,144 | 302,877 | 322,497 | 1,106,037 |
| Akhiok | 0 | 98 | 0 | 0 | 0 | 98 |
| Akutan | 751,346 | 740,716 | 828,852 | 832,084 | 580,806 | 3,333,804 |
| Atka | 20,235 | 19,155 | 24,446 | 24,402 | 19,337 | 107,575 |
| Chefornak | 573 | 196 | 107 | 19 | 40 | 935 |
| Chignik | 55,667 | 44,623 | 42,355 | 76,649 | 52,316 | 271,810 |
| Clark's Point | 134,662 | 29,231 | 1 | 0 | 0 | 164,126 |
| Coffman Cove | 1,223 | 143 | 1,256 | 4,222 | 1,099 | 7,943 |
| Cordova | 631,642 | 610,916 | 591,749 | 448,958 | 386,605 | 2,669,870 |
| Craig | 29,669 | 47,702 | 65,908 | 20,412 | 4,784 | 168,473 |
| Delta Junction | 0 | 0 | 1,610 | 0 | 0 | 1,610 |
| Dillingham | 183,743 | 147,986 | 154,274 | 99,889 | 78,807 | 664,699 |
| Egegik | 74,284 | 29,184 | 28,651 | 36,409 | 35,674 | 204,412 |
| Emmonak | 10,212 | 8,817 | 5,921 | 3,826 | 0 | 28,776 |
| Fairbanks | 0 | 0 | 0 | 279 | 163 | 442 |
| False Pass | 0 | 0 | 0 | 0 | 6,058 | 6,058 |

Shared Taxes and Fees FY 2007 Annual Report

*Five-Year Comparison of Shared Taxes and Fees*

**Table 5**
**Fisheries Business Tax**

| | FY 2007 | FY 2006 | FY 2005 | FY 2004 | FY 2003 | Total All Years |
|---|---|---|---|---|---|---|
| Gustavus | 563 | 278 | 0 | 0 | 0 | 841 |
| Homer | 90,092 | 88,734 | 67,100 | 156,890 | 88,038 | 491,854 |
| Hoonah | 139,048 | 130,252 | 192,396 | 133,052 | 94,741 | 689,489 |
| Hooper Bay | 14 | 49 | 1 | 32 | 0 | 96 |
| Houston | 89 | 26 | 0 | 0 | 0 | 115 |
| Hydaburg | 0 | 2,786 | 3,847 | 2,106 | 1,741 | 10,480 |
| Kachemak | 0 | 6,060 | 0 | 0 | 0 | 6,060 |
| Kake | 16,193 | 0 | 6,280 | 32,731 | 0 | 55,184 |
| Kasaan | 242 | 470 | 2,075 | 161 | 1,199 | 4,147 |
| Kenai | 129,443 | 138,088 | 126,701 | 77,026 | 53,561 | 524,819 |
| Ketchikan | 234,757 | 184,279 | 181,411 | 142,925 | 141,758 | 885,130 |
| King Cove | 438,722 | 463,050 | 385,638 | 326,453 | 211,092 | 1,804,955 |
| Klawock | 26,784 | 13,483 | 143 | 4,916 | 1,516 | 46,842 |
| Kodiak | 823,097 | 760,099 | 654,818 | 597,337 | 467,426 | 3,302,777 |
| Kotzebue | 0 | 0 | 475 | 0 | 0 | 475 |
| Kupreanof | 0 | 331 | 0 | 0 | 0 | 331 |
| Larsen Bay | 59,043 | 49,715 | 37,505 | 28,060 | 24,372 | 198,695 |
| Marshall | 2,897 | 984 | 1,047 | 0 | 0 | 4,738 |
| Mekoryuk | 3,845 | 3,979 | 1,903 | 1,625 | 2,571 | 13,923 |
| New Stuyahok | 0 | 0 | 0 | 30 | 0 | 30 |
| Nome | 17,276 | 16,976 | 13,901 | 10,034 | 8,988 | 69,177 |
| North Pole | 0 | 0 | 0 | 82 | 0 | 82 |
| Old Harbor | 18 | 0 | 0 | 0 | 0 | 18 |
| Pelican | 70,119 | 5,741 | 14,835 | 7,736 | 48,065 | 146,498 |
| Petersburg | 658,119 | 679,870 | 630,650 | 545,267 | 467,342 | 2,981,248 |
| Pilot Point | 0 | 101 | 0 | 0 | 4 | 105 |
| Port Alexander | 0 | 533 | 1,245 | 2 | 482 | 2,262 |
| Quinhagak | 16,471 | 14,196 | 17,807 | 7,483 | 3,862 | 59,819 |
| Saint Mary's | 3,229 | 0 | 0 | 0 | 467,342 | 1,646,488 |
| Saint Paul | 437,169 | 305,888 | 382,056 | 328,120 | 313,336 | 1,746,599 |
| Sand Point | 208,844 | 201,769 | 195,686 | 195,688 | 141,763 | 944,860 |
| Savoonga | 14 | 0 | 0 | 0 | 0 | 14 |
| Seldovia | 410 | 0 | 0 | 0 | 0 | 410 |
| Seward | 312,535 | 367,526 | 314,304 | 310,578 | 239,554 | 1,544,497 |
| Soldotna | 1,313 | 1,165 | 585 | 699 | 565 | 4,337 |
| Tenakee Springs | 22,211 | 27,565 | 16 | 224 | 0 | 50,016 |
| Togiak | 37,620 | 30,195 | 21,903 | 38,111 | 6,465 | 134,264 |
| Toksook Bay | 4,031 | 2,138 | 638 | 1,262 | 1,002 | 9,071 |
| Unalakleet | 7,158 | 5,431 | 2,091 | 972 | 45 | 15,697 |
| Unalaska | 3,178,334 | 3,321,455 | 3,014,039 | 3,228,807 | 2,913,343 | 15,653,978 |

Five-Year Comparison of Shared Taxes and Fees

Table 5
Fisheries Business Tax

| | FY 2007 | FY 2006 | FY 2005 | FY 2004 | FY 2003 | Total All Years |
|---|---|---|---|---|---|---|
| Valdez | 200,992 | 225,119 | 166,233 | 215,577 | 127,552 | 935,473 |
| Wasilla | 128 | 103 | 5 | 0 | 0 | 236 |
| Whittier | 56,940 | 46,286 | 35,556 | 38,420 | 57,262 | 234,474 |
| Wrangell | 240,175 | 119,704 | 144,589 | 60,856 | 74,860 | 640,184 |
| **Total Cities** | 9,447,813 | 9,022,518 | 8,370,875 | 8,141,086 | 6,981,721 | 41,964,013 |
| | | | | | | |
| **Grand Total** | **$16,079,365** | **$15,268,547** | **$13,485,844** | **$12,572,941** | **$10,906,426** | **$68,313,223** |
| | | | | | | |
| Number of Communities Shared With | 61 | 62 | 59 | 67 | 62 | 75 |
| | | | | | | |
| Additional Sharing with DCCED | $1,630,472 | $1,867,596 | $1,738,224 | $1,725,251 | $1,362,651 | $8,224,194 |

## Table 9
## Commercial Passenger Vessel Excise Tax

| | FY 2007 [1] | Total All Years |
|---|---|---|
| **Municipality** | | |
| Sitka | 103,325 | 103,325 |
| **Total Municipalities** | **103,325** | **103,325** |
| **Borough** | | |
| Haines | 6,290 | 6,290 |
| Kenai Peninsula | 16,223 | 16,223 |
| Ketchikan Gateway | 203,810 | 203,810 |
| **Total Boroughs** | **226,323** | **226,323** |
| **City** | | |
| Hoonah | 14,015 | 14,015 |
| Seward | 16,222 | 16,222 |
| Skagway | 339,855 | 339,855 |
| Whittier | 44,840 | 44,840 |
| **Total Cities** | **414,932** | **414,932** |
| **Grand Total** | **$744,580** | **$744,580** |
| | | |
| **Number of Communities Shared With** | **8** | **8** |

[1] First year of tax collected

**EXHIBIT 5**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| SCOTT VAN VALIN, *et al.*, | |
|---|---|
| Plaintiffs, | |
| v. | Civil Action No. 08-00941 |
| THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*, | |
| Defendants. | |

## AFFIDAVIT OF STEVE BOX

1.  My name is Steve Box and I live at 4401 Abby Way, Juneau, Alaska, 99801. I am married and have two young children. My wife Molly and our two kids have fished with me since 2003. Commercial fishing has always been my career choice. My first commercial fishing experience was gillnetting salmon out of Juneau when I was thirteen years old. I am now 41 years old and have just started my 27th year of commercial fishing. That career is now in jeopardy due in significant part to the lack of conservation by the commercial charter fishing sector of the industry.

2.  Longlining halibut is a large part of my fishing business. Over the years I have made substantial investments in the 2C halibut fishery. I started out as a crewman aboard many different vessels, halibut fishing in the 2C area. Once I saved enough money, I decided to take the next step, and I purchased a boat in 1990. I continued to longline halibut in area 2C on my own boat for five years. In 1995 measures were taken by the North Pacific Fisheries Management Council to control and properly manage the halibut commercial fishery by implementing the Individual Fishing Quota (IFQ) system.

1

Because I didn't own my boat until 1990, I did not qualify to receive any initial issuance quota shares. I was forced with the IFQ decision to either get out of the halibut fishery or to make a substantial investment by purchasing IFQ's in order to continue longlining halibut and make my living as a commercial fisherman.

3. In 1995, I chose to make the investment and bought approximately 10,000 pounds of quota at $7.50 a pound, going into debt to continue commercial fishing. In 2003 I purchased an additional 10,000 pounds of quota at $12.50 a pound; for a total expense of approximately $125,000. I currently have a loan out and am making payments on my second IFQ purchase. My first IFQ purchase and my Southeast Alaska gillnet permit are held as collateral. In 2006 my quota share was approximately 20,000 pounds. During the last two years that amount has decreased 43 percent for conservation reasons. The International Pacific Halibut Commission determined that these reductions were necessary in order to preserve a healthy halibut stock for years to come. Like virtually all other longline fishermen, I support these restrictions even though they make my business much more difficult financially. In years when the halibut population increases, so do our IFQ's. The same is true when the halibut population decreases; our IFQ's decrease as well. As a commercial fleet we have been strictly monitored since the inception of IFQ's, and we have stayed within our harvest limits. No matter how difficult, we understand that our future is based on protecting the productivity of the halibut resource through necessary conservation.

4. The charter industry has done nothing to take any responsibility in insuring that we have halibut left for the future. The charter fleet has grown by leaps and bounds since the early 1990's. Longline fishermen took measures to control and manage our industry. It is now the charter fleet's turn to do the same. The charter fleet has continued to go over their harvest limits for the past four years, and continues to take more halibut regardless of how healthy the socks are. These last two years especially have provided low and declining halibut stocks. Yet the charter sector resists any reduction in their harvest level. They have exceeded their harvest limits in every year beginning in 2004. With the large reduction in harvestable halibut in area 2C and in the charter GHL for 2008, the demand by charter fisherman to keep the two-fish daily bag limit shows absolutely no concern for the future since this will put them substantially over the GHL. If there are no real, effective, measures to reduce the charter catch in 2008, the amount by which they exceed their 2008 GHL will be even greater than that in recent years. The halibut resource is fully utilized. The charter excess is harvest that is beyond what is biologically sustainable. Experience has shown that in the next years those excess amounts will reduce the quota available to my longline fishery.

5. As the commercial charter sector continues to over-fish in years of low stock, their actions continue to jeopardize my business even further. My livelihood depends on sustainable harvest levels of halibut, and the over-harvesting by charter operators threatens the resource and my business. I continue to make large payments on my IFQ investments while watching the charter fleet grow, exceed their harvest limits, and ignore their responsibility to protect their own livelihoods by sharing the burden of conserving

the halibut resource.  Something needs to be done to limit short sighted behavior to take

more fish than allowed, behavior that puts the long term sustainability of the resource at

risk. We have a conservation problem in the halibut fishery and under the principles of

the Halibut Act those burdens should be shared fairly and equitably.

I hereby declare and certify, under penalty of perjury under the laws of the United

States of America, that the foregoing is true and correct.  It is based on my personal

knowledge, and if I were called to testify in this court proceeding, my testimony would

be the same as what is contained in this Affidavit.

Dated:  June 14, 2008

Steve Box

4

# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

      Plaintiffs,

v.

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

      Defendants.

Civil Action No. 08-00941

## AFFIDAVIT OF DAVID GIBSON

I, David Gibson, being duly sworn, depose and say as follows:

1.     My name is David Gibson and I am the owner and operator of the 40-foot fishing vessel, LAVERN LYNN, a commercial fishing business located in Juneau, Alaska. My address is: P.O. Box 21092, Juneau, Alaska 99802-1092.

2.     I am 32 years old and have been a commercial fisherman since 1995, engaged in both salmon and halibut fishing. In 2001, I bought my first boat and then bought the LAVERN LYNN in 2005. I also work as a deck hand on halibut boats fishing IPHC Area 2C and Area 3A. In 2001, I took out a loan from the State of Alaska Division of Invests for $50,000 at 6% to purchase the LAVERN LYNN with $20,000 as a down payment. My payments on the LAVERN LYNN are $4,920/year.

3.     In Fall 2005, I purchased 30,970 units of halibut Quota Share (QS) which resulted in 5684 pounds of halibut quota. In 2006, this QS resulted in 5,529 pounds. In 2007, this equated to 4,423 pounds. And this year, 2008, this equated to 3,230 pounds. From 2006 to 2008, this equated to a 43% reduction in the amount of fish I am allowed to catch. The reason my allowable catch was cut was because the IPHC had reduced the total amount of halibut which

could be harvested. The IPHC reduced the halibut harvest levels because of the need to implement conservation actions.

4.    In 2005, it cost me $103,336 at 7.5% interest to purchase my halibut QS. My down payment was $9,529 and I took out a loan from the State of Alaska in the amount of $93,807 and pledged the LAVERN LYNN as collateral. My QS loan payment is $9,964 per year. In 2006, I grossed $18,321.21 on halibut and netted approximately $2,000 after expenses and halibut QS loan payments.

5.    I have already fished my halibut QS this year and grossed $13,994.70. My expenses were $5,457.93 for shares paid to the skipper and crew of the boat that I caught the halibut on. This leaves a net $8,536.77 which is less than the QS loan payment due this year. As of now I still owe $80,797.41 on this loan.

6.    I am entirely dependent on commercial fishing for my livelihood. In a typical year, 30% of my income is from halibut and the remainder from salmon, although this can vary quite a bit due to variability in the strength and value of the salmon runs. In 2006, my net income was approximately $18,000 after all my fishing and loan expenses. This year will be especially difficult because of the loss on my halibut operation and the very high fuel costs associated with my salmon operation. If the halibut quota is cut any further, i.e. due to charter overages, I may lose my quota share, boat, and salmon permit; in other words I would lose my whole commercial fishing business.

7.    As an Alaskan fisherman, I completely understand the absolute necessity of sustainable fisheries management and have been willing to accept the reduced halibut quotas set by the International Pacific Halibut Commission. It is critical to my long time livelihood that the stocks be well managed and that all sectors stay within their allocation. It has been particularly

disturbing to me that the guided sport sector has exceeded their GHL allocation every year since 2004. This hurts me financially since charter overages result in overfishing of the stocks and a reduced quota for me over the long term. If I exceed my individual quota, I face confiscation of the fish I have caught and fines.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated:  June 13, 2008

David Gibson

# EXHIBIT 7

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTT VAN VALIN,** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 08-00941** |
| **THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce,** *et al.,* | |
| **Defendants.** | |

## AFFIDAVIT OF CHRISTOPHER KNIGHT

1.      My name is Christopher Knight and I am the owner-operator of the fishing vessel SWEETWATER, a small commercial fishing business located in Juneau, Alaska. My address is 623 10th St, Juneau, Alaska 99801.

2.      I started deckhanding on setline halibut boats in 1990 while working my way through college. During this period the North Pacific Fishery Management Council (NPFMC) instituted an Individual Fishing Quota (IFQ) system in order to improve conservation and management of the halibut resource and to improve a poor safety record of the setline fishery.

3.      Since 1995, setline fishermen have been required to possess Quota Shares (QS) in order to commercially setline fish for halibut. At the onset of the IFQ system, vessel owners and vessel lease holders were awarded QS in proportion to their individual histories of halibut landings during a specific base period. Subsequent entrants into the setline fishery have gained access only through the purchase of QS from individual fishermen or through transfer

1

within families via inheritance, etc. This significant cost is in addition to expenses for vessel purchase and maintenance, fishing gear, fuel, crew, and so on. At present in southeast Alaska, 67% of QS holders have purchased some if not all of their QS. Thirty-three percent of Southeast setline fishermen have purchased all of their QS. The selling price for QS in Area 2C has ranged in excess of $25 per pound. Many fishermen, including myself, carry extraordinary debt-service burdens and have mortgaged vessels, other fishing permits, and even homes in order to purchase QS in which to harvest halibut. This burden of debt is exacerbated whenever halibut abundance decreases through natural variability or over harvest. Charter fishery participants do not fish in the QS system and do not bear any comparable investment cost for gaining access to the halibut resource.

4.     Because I was a deckhand and not a vessel owner during the qualifying base years, I did not receive an initial allocation of halibut quota share (QS) but have invested heavily, beginning in 2002, in what I took to be a stabilized, well-managed fishery.  Actions by the NPFMC created a loan program, while also creating smaller blocks of quota called "sweep-ups" both of which provided access for new entrants such as myself.  I currently hold large loan debts, in the hundreds of thousands of dollars for the halibut QS that I have purchased.  Had I known that the quota I was purchasing would be re-allocated to another industry—the halibut charter industry--I never would have bought into the halibut QS fishery.

5.     The Southeast charter industry has over-harvested its allocation (established as the Guideline Harvest Level (GHL) by the NPFMC) for the past four years. Specifically, in 2004 the charter fishery exceeded the GHL by 22%, in 2005 by 36, in 2006 by 26.5, and with preliminary numbers in 2007 by 19%. During these four years, the charter GHL did not change. The upper bound of the intended charter harvest remained exactly the same. For 2008, due to

2

reduced abundance estimates by the IPHC (International Pacific Halibut Commission), the charter GHL is reduced by 35%. Despite this record of consistent over harvest, the charter fishery has yet to be forced in any year to reduce its harvest level to the GHL. If the same holds true in 2008 with further reduced abundance and a significantly reduced GHL, the negative effect on conservation of the halibut resource will be considerable.

6.      In the past, charter sector over harvest has been deducted from the setline QS in subsequent years, first compromising the resource and second punishing the sector that has remained under its allocation for over a decade. This is fundamentally unjust and sets a poor standard for sustainable management.

7.      The abundance of the Alaska halibut stock has declined in recent years, with stocks in Southeast declining sharply in the past two years. In order to conserve the resource, I have lost access to over 43% of the quota that I thought I had purchased. Unfortunately, 43% of my halibut IFQ loans have not disappeared. Additional deductions to protect the resource from charter over harvest could put me out of business.

8.      In 2001, I purchased a setline boat. Like the charter industry, I too have boat payments, a house mortgage, and I am struggling to start a family. Unlike the charter industry, I also have QS payments—charter operators do not have to purchase QS or any other access privileges to allow their clients to harvest halibut. My annual loan payments for quota share and my vessel exceeds $32,000 annually.

9.      Continued over-harvesting by the charter sector will force the IPHC and the North Pacific Fishery Management Council to reduce my access in order to maintain the sustainability of the halibut stock. The halibut resource in southeast Alaska is fully utilized. The IPHC estimates the size of the total harvestable halibut population annually and sets harvest

3

levels that are calculated to maintain the biological integrity of the halibut population and thus the sustainability of the fisheries. When the population naturally declines or when one fishing sector over-harvests its annual limits, the net result is a lowering of the annual total allowable harvest. The setline fishery has an exemplary record of harvesting within its established limits. In fourteen years of existence, the IFQ setline fishery has never exceeded its annual Total Allowable Catch (TAC).

10.     The QS reductions necessitated by reduced abundance and charter overages in the past have forced me to supplement my halibut loan payments with more than one other job. My halibut quota is collateralized by using my fishing vessel and my Alaska salmon permit. Further reductions in the quota will likely force my lender to demand immediate cash restitution as the quota loaned upon continues to lose its equity value. Requiring additional cash beyond the annual loan payments to secure the loans will likely lead me into bankruptcy. Many of my friends and cohorts are in similar situations, having taken out loans to purchase all of the halibut QS they currently hold.

11.     Current reductions in the commercial halibut fishery will also reduce revenues to local communities by eliminating the 3% raw fish tax levied on every setline halibut sold and processed in that community. No equivalent revenue generating measures are in effect on charter harvests. Coastal communities that rely on the raw fish tax to pay for local government services will be dramatically affected if current practices of over-harvesting by the charter industry deplete the resource or continue to cause a reallocation of halibut from setline to charter operators.

12.     In Area 2C (southeast Alaska), effective catch restrictions are particularly crucial because halibut abundance is at low levels. Only by limiting the catch in Area 2C to the

4

levels specified for the setline and charter fisheries is there assurance that the biological

sustainability of all halibut fisheries can be maintained.  Limiting harvests or reducing by-catch

in other regions off Alaska will have limited if any effect on the halibut population in this region.

13.    It is time the charter industry was stabilized and managed to its allocation

like every other commercial harvester of the halibut resource.  Without effective restrictions, the

halibut charter industry will continue to over harvest the resource and eat through the quota of

the setline fishery, ultimately destroying the framework of sustainability on which all harvesters

of the halibut resource depend upon which also includes non-commercial users.


I hereby declare and certify, under penalty of perjury under the laws of the United States

of America, that the foregoing is true and correct.  It is based on my personal knowledge, and if I

were called to testify in this court proceeding, my testimony would be the same as what is

contained in this Affidavit.


Dated:  June 15, 2008

Christopher Knight
06/15/2008

# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SCOTT VAN VALIN,** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 08-00941** |
| **THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce,** *et al.,* | |
| **Defendants.** | |

## AFFIDAVIT OF RYAN NICHOLS

1. I, Ryan Nichols, of 305 Islander Drive Sitka, Alaska was born and raised in Sitka, Alaska. I have been around the halibut fishery all of my life, and for the last ten years (since the age of twelve) I have been a deckhand on my father's setline fishing vessel. My father has setlined for halibut for the past twenty-five years.

2. The Alaska setline halibut fishery operates under a limited access privilege system called Individual Fishing Quotas, or IFQs. No one can harvest halibut for commercial sale unless that person holds Quota Share (QS). QS is issued in units, which translate to pounds of IFQ on an annual basis, fluctuating directly with abundance of the halibut resource in each area.

3. When I was a senior in high school, I purchased my first 2C halibut QS, which amounted to 1,634 pounds of halibut Individual Fishing Quota (IFQ) in that year of purchase 2005. I paid $25,470 for this QS. In 2006 , I purchased additional 2C

halibut QS spending a total of $91,383.50 to purchase 5,711 pound of 2C halibut IFQ based on the 2006 total quota. To do this I used money that I had saved from working as a deckhand and from a personal loan that I was granted. I am using my earnings from fishing my halibut QS to pay for my college education.

4. I currently owe $22,269 on my halibut QS and am having a harder time paying for this with the reductions in the Southeast halibut quota while also supporting myself through college. Of the 5,711 pounds that I originally bought, the 2007 reduction in the Southeast setline quota reduced my annual IFQ for the year to 4,546 pounds of harvestable halibut and in 2008 I have 3,311 pounds of IFQ halibut to harvest. Yet while this has happened I still have to pay off loans on the original 5,711 pounds of quota that I had originally purchased.

5. I depend upon sustainably managed, healthy populations of halibut for my livelihood and would like to make a career of trolling for salmon and setlining for halibut With the reductions in the overall halibut quota and the fact that only the setline halibut harvesters are closely monitored and constrained to harvest limits, the one halibut daily bag limits seems equitable and long overdue.

6. Over harvesting by any user group should be considered unacceptable. Everyone should have to share in conserving this valuable resource. Whether reductions in the amount of halibut are short term or long term the health and abundance of the halibut resource should be of the utmost importance. By having any user group

knowingly over harvesting threatens not only the halibut resource directly, but has and will have economically negative effects upon myself and all who depend on the Alaska halibut resource.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June ___, 2008

_____
Ryan Nichols

# EXHIBIT 9

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, *et al.*, | |
| **Plaintiffs,** | |
| v. | Civil Action No. 08-00941 |
| THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*, | |
| **Defendants.** | |

## AFFIDAVIT OF SHERI WOHLHUETER AND KURT WOHLHUETER

1. We, Sheri Wohlhueter and Kurt Wohlhueter, have made our home in Petersburg, Alaska raising our 5 daughters there since 1979. We are a fishing family. Kurt has commercial fished in Alaska since 1978, beginning halibut fishing in 1979, fishing continuously since. I joined him on our 2nd vessel in 1981 with our first 2 daughters when they were 3 years and 6 months of age.

2. We began with a 19 foot wooden dory. We began slowly building our fishing business to our present vessel the F/V Betty, a wooden vessel built in 1912 that we've had for the past 20 years.

3. When halibut became restricted access in 1995 we received an initial allocation of quota share (QS) that translated to just over 8,000 pounds of individual fishing quota (IFQ)in the first year of the program (QS is issued in units; IFQs are the annual harvestable pounds associated with the quota share units. As the total quota for a halibut changes the IFQ associated with QS fluctuates). Our initial allocation was 1/3rd of our recent annual harvest, since the initial allocation included more individuals and

1

organizations than had fished in any one year. This was also our first experience with halibut reduction, but a result of the criteria in place to manage and conserve the halibut stocks. Over time we positioned ourselves to afford QS loans using our boat as collateral. We have purchased over 40,000 lbs more with principal investment of nearly half a million dollars. Because we can only slowly pay back the loans hence are paying interest, our total payments will significantly exceed our initial investment. We have weathered the increase and decrease in our halibut IFQs. This is not easy in this business, with its inherent dangers, expenses, changing fish prices, and the demands of raising our 5 daughters, but we accepted the risks and understand conservation measures are needed and put in place to protect the halibut resource.

4. Our economic survival depends on proper, diligent management. It is crucial to be willing partners in conservation of the halibut species. We stand by this: a successful outcome will protect the resource from over harvest and allow future generations, be they setline fishermen earning their living, sport fishermen recreating, or subsistence harvesters feeding their families, to have the same choices and opportunities that we have had. We all affect the halibut resource and we all need to share in conserving it for future generations.

5. We have experienced well over $100,000 decrease in our income the last two seasons with the quota reductions. All our halibut shares are in 2C; we can not fish halibut in any other area. We still have large QS payments, rising fuel costs, and many other increases in the costs of running our business. Our family crew members have also experienced the reduction in income. This is their main income for living and education

2

costs, and we will not be able to afford to hire and pay them as crew if quota reductions continue.

6. This year we are fishing slightly less than 33,000 lbs of halibut IFQs. Two years ago our QS translated to approximately 55,000 lbs of halibut IFQ. We are managing to make our payments and expenses living with less then what we purchased. We have IFQs that are gone, but we still have to pay for them. Our business has devalued as the setline quota dropped and our IFQs decreased 43% accordingly. We have remained focused and are committed to maintaining the health of the halibut stocks at any cost. Our lifestyle and business depend on sound fisheries management. The halibut resource is only renewable if harvest levels are sustainable.

7. Conservation of the halibut resource should be the first priority for all harvesters. The commercial setline sector has not exceeded its yearly harvest limits set by the International Pacific Halibut Commission since the IFQ program was implemented in 1995. A Guideline Harvest Level (GHL) was established for the charter sector and published in the Federal Register as a Final Rule in August of 2003. The Federal Register states the following: *Guideline harvest level (GHL) means a level of allowable halibut harvest by the charter vessel fishery.* The charter fishery exceeded it GHL in 2004, 2005, 2006 and 2007. Charter halibut harvests that exceed the GHL impact the resource and in turn reduce the amount of halibut the commercial setline sector is allowed to fish in subsequent years.

8. Petersburg is a rural commercial fishing community. The roots of Petersburg and many other Southeast communities are steeped in a tradition of commercial fishing with many families having fished for generations. Commercial fishing forms the core of

these towns and economically supports community infrastructure.  Tourism is a relatively new industry in Alaska and depends on the disposable income of non-residents.  Many of the rural, and particularly Native, Southeast towns have minimal or no tourism industry, hence are almost entirely dependent on subsistence harvesting and commercial fishing.

We hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.  It is based on our personal knowledge, and if we were called to testify in this court proceeding, our testimony would be the same as what is contained in this Affidavit.

Dated:  June 14, 2008

Sheri Wohlhueter

Kurt Wohlhueter

# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**SCOTT VAN VALIN,** *et al.,*

        **Plaintiffs,**

**v.**

                                    **Civil Action No. 08-00941**

**THE HONORABLE CARLOS M.**
**GUTIERREZ,** in his official capacity as
Secretary of Commerce, *et al.,*

        **Defendants.**

---

**AFFIDAVIT OF ANNAH TAFT PERRY**

I, Annah Taft Perry, say as follows:

1.      My name is Annah Taft Perry and I am the co-owner and co-operator of the fishing vessel Pacific Flyer, a commercial fishing business operated out of Sitka, Alaska. My home and mailing address is 1406 34th St, Anacortes, Washington 98221.

2.      My husband's name is Dan Miner and we are in our mid-fifties. My husband started halibut fishing in 1978, and I started trolling for salmon at about the same time. In December 2006, after being out of the halibut fishery for some years, my husband and I decided to buy some halibut quota shares (QS) in Area 2C. We purchased 6,500 pounds of 2006 season Individual Fishing Quota (IFQ) at about $18.50/pound, for a total of $120,000 (6,500 pounds x $18.50). (QS is issued annually in allowable fishing pounds or IFQ). Half this money was from our retirement savings and we took out a loan for the other half using our house as collateral. Shortly following our purchase, the 2007 Southeast setline quota was reduced 20% in order to protect the halibut stocks. In 2008 there was a further reduction of 27% to protect the stocks, lowering our 2008 IFQs to 3,600 pounds. In other words, we are allowed to catch 43% less halibut in 2008 then we were allowed to catch, and actually paid to purchase, just 18 months earlier. Quota share is now selling for approximately $21/pound so with the drop in our quota to

3,600 pounds, in 18 months our $120,000 halibut investment dropped to $75,000 (3,600 pounds x $21).  So although the price per pound has increased, the poundage decrease of 43% has created a big loss for us.

3.      The details on our loans are as follows.  We borrowed $60,000 at 8.05% from Skagit State Bank using our Anacortes home as collateral.  Our annual loan payment is $9,000. We borrowed $60,000 from our retirement funds and intended to pay ourselves back on the same schedule.  Our assumption was that a share of 6,500 pounds would yield a gross of about $26,000 and a net of about $20,000.  Now that we only have 3,600 pounds, we anticipate a net of about $10,000.  This means we can just make our Skagit State loan payment but cannot make any progress paying back the retirement funds.  And this does not take into account the more than $15,000 that we have spent rigging our troller for setlining.  At this point, the $10,000 net barely allows us to service the debt incurred by purchase of the halibut quota share.  There is no profit at current harvest rates and further reduction in our catch as necessitated by continuing charter overages will leave us unable to make our annual payments.  If we cannot make our payments we will have to find a way to refinance or leave the fishery.

4.      As commercial fishermen, Dan and I are fully supportive of catch reductions triggered by declines in the fish stocks.  We believe the sustainability of the resource is more important than the economics of the fishermen.  We have suffered catastrophic losses in the form of the 43% reduction in the halibut harvests.  The income we had planned on from the $60,000 of retirement funds we put into the halibut shares is lost.  Although the commercial setline fleet has seen their halibut quotas reduced by 43% to conserve declining halibut stocks in Area 2C, the charter boat fleet has had only a minimal reduction in their catch from the implementation of one fish under 32" rule in 2007.  Continuing to allow the charter boat sector to increase its catch and to exceed the Guideline Harvest Level ("GHL") during this time of low abundance threatens the halibut resource in Area 2C.

2

5. Every year since the GHL was established, the Southeast charter sector has exceeded the GHL. Overfishing threatens the conservation of the halibut resource. Two years ago the IPHC forced the National Marine Fisheries Service to impose management restrictions on charter harvest in an effort to protect the resource from over harvest. Those measures have proven to be insufficient. In 2007, the North Pacific Fishery Management Council recommended additional restrictions. Unless the IPHC has confidence that charter harvest will be restricted to its GHL, the Commission will once again deduct charter overages from the quota of setline fishermen like my husband and me. The IPHC has stated they will go back to subtracting the estimated charter harvest rather than the GHL before determining the commercial catch limits in 2009 <u>if the one fish bag limit is not implemented in 2008</u>. Overturning the one halibut bag limit will unquestionably affect the poundage of all setline fishers. It is time to resolve this issue in a way that protects the stocks first and foremost while treating both sectors in an even handed way.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 14, 2008

Annah Taft Perry

# EXHIBIT 11

.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 08-00941 |
| THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*, | |
| Defendants. | |

## AFFIDAVIT OF NORTH PACIFIC SEAFOODS, INC.

1. North Pacific Seafoods, Inc. (NPS) buys and processes Alaskan Halibut at three (3) of our locations: Sitka, Kodiak and Togiak, Alaska. NPS has been processing halibut at these locations for over 30 years. At the peak of the season, NPS employees about 800 workers. Alaskan Halibut is one of the primary resources for our plants in 2C, 3A and 4E regulatory areas.

2. The sustainability of Alaskan Halibut is critical to our company's success. We have been closely and continuously involved in the management research, analyses, and decision-making process that protects this valuable resource. When the resource abundance is lower, we understand the catch limits must be reduced.

3. In area 2C, we have experienced lower catch limits due in part to the charter sector exceeding their catch limits for the past three years. This current season will be the fourth year in a row, if that sector exceeds their guideline harvest limit, which has been reduced from last year's limit due to lower overall abundance of the resource.

4. The one-fish rule, like any rule recommended by IPHC for conservation reasons and implemented by NMFS through direction of the NPFMC, is the result of thorough research, exhaustive analyses, and weeks of input from all sectors of the industry and public. It is a time-tested process that has resulted in the best managed sustainable fishery in the world.

5. Since 2004 when the charter fleet began exceeding their catch limit, Alaskan Halibut production at our plants in 2C has dropped by 25%. If the one-fish rule is blocked this year, we can expect a further drop in processing volume, likely to 30% of what we processed in 2004.

6. If the one-fish rule for sports fishing is over turned this year, NPS will experience about a 25% loss of revenue which results is less fish taxes for the State and the Alaskan cities NPS is located. In addition, NPS will reduce our number of employees by 10%.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 16, 2008

Robert D. Nickinovich, President
North Pacific Seafoods, Inc.

# EXHIBIT 12

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

     Plaintiffs,

v.

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

     Defendants.

Civil Action No. 08-00941

## <u>AFFIDAVIT OF ERIK BAHNSEN</u>

1. I, Erik Bahnsen, a charter boat operator from Sitka, Alaska, mailing address PO Box 6362, SUPPORT implementation of the one halibut daily limit for charter clients.

2. I have been charter fishing for five years, targeting salmon and halibut in the waters off southeast Alaska.  Charter fishing is my primary source of income and essential to the health and well-being of my family.

3. Protecting the long-term health of the resource is paramount.  Resource conservation is more important than economic gain or hardship by any one sector or individual.

4. In marine fisheries, all harvest must be tied to abundance and must be managed to remain within biological limits or the resource will suffer. The charter sector's repeated exceedance of established halibut limits compromises management objectives and resource

health. Compromising the health and abundance of the halibut resource will cause irrevocably harm to all setline and charter businesses, my own included.

5. Abundance of halibut in the southeast Alaska area had dropped, triggering a reduction in the setline quota (43%) and the charter Guideline Harvest Level (35%). The one halibut daily limit is necessary to manage charter harvest to the sector's Guideline Harvest Level (GHL). The one halibut limit has not harmed my business. Charter operators will need to adjust expectations and business plans during this time of low abundance to protect the long-term health of the halibut resource. I willingly make those adjustments to share in conserving the resource.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 15, 2008

Erik Bahnsen

**EXHIBIT 13**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

        **Plaintiffs,**

v.

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

        **Defendants.**

Civil Action No. 08-00941

      I, Wayne Brown of Sitka, Alaska, 203 Halibut Point Road, was one of the first persons to provide charter fishing opportunities to Sitka visitors. I have been operating Brownie's Charters, running the vessel *Vixen*, since 1978, and continue to derive a significant portion of my income from charter fishing.

      Between 1978 and 1992 I offered halibut and salmon fishing charters, targeting stocks in the Sitka local area. During this time I watched the charter fleet grow from four vessels to the hundreds that currently operate from Sitka's harbors and lodges. By 1992 halibut stocks were so depleted by charter fishing in the near town area that I focused my charters on salmon and have done so ever since.

      My clients primarily arrive in Sitka by cruise ship, and have a limited amount of time to fish before their ship leaves. The localized depletion of halibut near Sitka has made it infeasible and unsafe for me to transport clients to productive halibut grounds. This has harmed my business, limiting my charters to clients satisfied by strictly salmon fishing.

Halibut stocks are depleted in waters near every Southeast town that has a charter fleet Halibut stocks will not rebuild unless charter effort is limited. The one halibut daily bag limit is necessary to rebuild and conserve Southeast halibut stocks. Rebuilding stocks in near shore waters will enhance charter opportunities for operators of small vessels, such as me, who can not safely run to more distant and exposed fishing grounds. Failure to implement the one halibut daily limit on charter clients during this time of low halibut abundance in Southeast will further jeopardize stocks and further compromise my charter business. As one of the original charter operators fishing out of Southeast's busiest halibut charter port, I SUPPORT implementation of the one halibut daily limit for charter clients.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated:  June 13th 2008

Wayne Brown

# EXHIBIT 14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| SCOTT VAN VALIN, *et al.*, | |
|---|---|
| Plaintiffs, | |
| v. | Civil Action No. 08-00941 |
| THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*, | |
| Defendants. | |

## AFFIDAVIT OF SANDY CRAIG

1. I, Sandy Craig, am the owner-operator of Icy Strait Adventures, a small charter fishing business located in Elfin Cove, Alaska. My address is PO Box 13, Elfin Cove, AK 99825.

2. I began chartering in 1991 after the *Exxon Valdez* hit Bligh Reef in 1989 and destroyed Alaska's commercial fish prices. Operating a charter boat has been and remains a substantial part of my personal income. My small business is very busy; I have between 50% and 80% repeat customers each year. My clients target both halibut and salmon.

3. Most of my clients are conservation minded and repeatedly tell me how much they value the sustainability of Alaska's fish resources. I attribute that sustainability to good management and Alaska's pristine environment. The North Pacific Fishery Management

1

Council (NPFMC), the Alaska Department of Fish and Game (ADFG), and the International
Pacific Halibut Commission (IPHC) have done a very good job of protecting Alaska's fragile
resource during a time when many fish stocks in other parts of the world are diminishing.

4. The IPHC and NPFMC should be allowed to do their job to protect the resource.
Fishery management decisions should be made by scientists and managers through an open
public process. In 2008 the IPHC recommended a quota reduction for the Southeast setline
halibut fleet of 27% after reducing the quota 20% last year, equating to 43% reduction over two
years. The reductions are necessary because halibut abundance has decreased in Southeast. The
reduced abundance also triggered a 35% reduction in the Southeast halibut charter GHL. The
one halibut daily bag limit is necessary to constrain Southeast charter harvest to the sector's
GHL. In developing and implementing the one halibut daily limit, managers followed the
correct process and implemented a management action clearly supported by analysis,
deliberation, and public comment. This action is necessary to protect the health and
sustainability of the resource and my business, which depends on productive halibut stocks.

5. Many of my clients voluntarily stop retaining the halibut they hook about the third
day of their fishing trip. They like to take a nice box of fish home with them, but they have just
as much fun with catch and release. Although they were allowed two halibut per day last year,
very few people cared to keep a second halibut. One halibut a day was plenty.

6. The number of charter boats has and is increasing in the Southeast area. The pressure
on the resource is mounting and charter boats are running further to find productive fishing

grounds, but the increasing price of fuel will have an impact on how far boats go. In sum, the price of fuel, rising transportation costs, and local depletion will have a larger negative effect on my small business than the regulation restricting my clients to retention of one halibut per day.

7. The North Pacific Fishery Management Council has been trying to develop an effective management strategy for the halibut charter sector for 15 years. I am very surprised charter captains and crews were allowed to fish and retain halibut with paying clients on board until last year. Last season, after charter captains and crew were prohibited from fishing for halibut during a charter, I saw the practice continuing. That indicates to me a disregard for conservation.

8. I began commercial fishing for halibut in 1982. In 1995, an Individual Fishing Quota (IFQ) system was implemented in Alaska, with vessel owners and those holding a qualified vessel lease being granted an initial allocation of halibut quota share (QS) based on their halibut harvest during an historic base period. A person must hold QS in order to commercially setline for halibut off Alaska. QS holders are issued IFQs, expressed in pounds, on an annual basis. IFQs fluctuate as the halibut biomass in an area increases and decreases.

9. My husband, my son and I each invested in halibut QS after implementation of the IFQ program and it is a substantial portion of each of our incomes. My son was able to put himself through college by fishing his halibut shares. I am glad he has other skills as his annual halibut IFQs, along with ours, have dropped 43% over the past two years. That drop represents approximately an $180,000 reduction in assets and a $39,000 reduction in our families' annual

income. The reduction in annual income has been hard to take financially, amounting as it does to an approximate 25% reduction in our family's income.

9. We have observed a decrease in the available halibut biomass in the Southeast area. The biologists are correct in reducing harvest levels. Both charter and setline sectors need to share in conserving the resource. I can accept and support the reduction in our QS and the one halibut per day limit for charter clients. The health of the resource must come first.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 16, 2008

Sandy Craig

# EXHIBIT 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

      Plaintiffs,

v.

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

      Defendants.

Civil Action No. 08-00941

## AFFIDAVIT OF LUKE WIEDEL

    1. I, Luke Wiedel, am a charter boat captain operating out of Sitka, Alaska. My mailing address is PO Box 6362 Sitka, AK 99835. I have worked in the charter industry for seven years, transporting clients to the fishing grounds to target halibut and salmon. Charter fishing is my primary source of income.

    2. The abundance of halibut in the Southeast area has decreased in recent years. Although the halibut resource is healthy overall, it will not remain healthy unless all halibut harvesters take less during times of low abundance. The Southeast setline quota has been reduced by 43% over the past two years and the Southeast charter guideline harvest level (GHL) was reduced by 35% this year; these reductions are necessary to protect resource health. My business, and the businesses of all charter and setline fishermen, depends on a healthy resource. Everyone loses if short term economic gain is allowed to outweigh long-term resource health.

    3. The Southeast charter sector's halibut harvest has exceeded the sector's GHL for the past four years. Careful analysis has shown that either a one halibut daily bag limit or a shortened season is necessary to restrict charter harvest to the 2008 GHL. Through an open

public process that included substantial testimony from charter boat operators, the North Pacific Fishery Management Council selected the one halibut daily bag limit. I SUPPORT implementation of the one halibut daily bag limit for charter clients. The one halibut limit allows my clients the opportunity to fish, the opportunity to take home a halibut to eat, and the opportunity to participate in conserving the resource by releasing any halibut hooked after the bag limit is reached. My clients understand that sustainable resource management ties harvest to abundance and does not allow catch limits to be exceeded. Many of my clients intend to return to Alaska to halibut fish and, like me, want to make sure there is an abundant resource to enjoy in the future.

4. Charter sector's halibut GHL overages have created tensions in Southeast communities. These tensions are particularly intense in Sitka where relationships are openly hostile between charter and setline fishermen. These hostilities are pitting neighbor against neighbor and tearing apart the social fabric of Southeast's isolated rural communities. I am willing to do my part to conserve the resource and to end the hostilities.


I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.


Dated: June 16, 2008

_____
Luke Wiedel

# EXHIBIT 16

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTT VAN VALIN,** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 08-00941** |
| **THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce,** *et al.,* | |
| **Defendants.** | |

1. My name is Carolyn Heuer of PO Box 2281 Sitka, Alaska 99835. My family has subsistence fished out of Sitka for 8 years. We depend solely on wild fish and game for our family's protein source. Not only is it more nutritious, but it is economical as well. We live in an island community and all groceries are brought in by barge. This means that groceries are very expensive, even more so now with increasing fuel prices. We can not afford to feed our family without depending on subsistence harvests. In a given year we eat approximately 50-75 lbs of halibut. Over the past 4 years we have noticed a significant decline in the availability of halibut due to the depletion of halibut stocks in the waters around Sitka. Our usual locations for subsistence fishing are no longer reliable and we must travel farther and explore more areas to catch halibut. The added expense in time and gas is causing extra financial burden on us and as we fish out of a small boat this increases our risk. We are dependent on halibut and my ability to feed my family is threatened.

2. The Sitka LAMP (Local Area Management Plan) was established to reduce fishing pressure on Sitka Sound to allow access by personal use and subsistence fishers.

It was recognized that concentrated fishing effort was causing depletion in the local fish stocks. The commercial fleet now fishes efforts north and south of town. The charter fishing industry continues to concentrate fishing efforts just outside the restricted area. I have heard from one or more charter fishermen stating they must go farther each year to catch halibut.

3. Over the last 10 years the charter fleet and their effort has greatly expanded, placing increased pressure on a declining resource. For at least the last 3 years the charter fleet has gone over their halibut allocation. While charter industry continues to grow at an unlimited rate without any regulations holding them to their allocation the commercial fleet has reduced their fishable quota by 43% over the last 2 years acknowledging the decline in fish abundance. Abundance based management is the hallmark of fisheries management in the North Pacific. Sensible conservation management demands the charter sector allocation be constrained to its GHL especially during this time of low abundance. Other species, such as king and coho salmon, and rockfish are allocated based on abundance based management and regulations are in place to hold the charter sector to their allocation for these species. I strongly believe that all user groups should be held to the same standard: when stocks are high, everyone benefits by higher catch allocations and, conversely, in times of lower abundance everyone suffers proportionally.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated:  June  17th, 2008

Carolyn Heuer

# EXHIBIT 17

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTT VAN VALIN, *et al.*,** | |
| Plaintiffs, | |
| v. | **Civil Action No. 08-00941** |
| **THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*,** | |
| Defendants. | |

## AFFIDAVIT OF JERROD GALANIN

1. I, Jerrod Galanin, of 2309 Merganser Drive, Sitka, Alaska, depend on the halibut resource for subsistence. As a Tlingit, subsistence foods are important to me culturally, economically, and nutritionally. I harvest over 1,000 pounds of halibut per year that I share with family, elders and friends.

2. The reason I live in Southeast Alaska is my culture and its history, which I am tied to through subsistence hunting and fishing. The economics are less important to me than the connection.

3. The charter industry is focused on making money from the same resource that I value for my ties to the land. My ancestors have resided and subsisted on these islands for thousands of years. Priority should be given to subsistence lifestyle and harvest over tourists' vacation adventures.

4. Charter harvest is concentrated near towns and has caused local depletion of important subsistence resources, including halibut. In Alaska, subsistence has priority over all other uses. Allowing the charter sector to over harvest important subsistence areas reduces my access, as well as the access of all subsistence fishermen. Allowing the charter sector to exceed its allocation and harvest halibut disproportionate to abundance while halibut stocks are at low levels is unacceptable and may be unlawful.

5. The charter halibut harvest should be restricted and carefully managed to stop the over-harvest of the resource that our community depends on. Charter clients travel to Sitka for an Alaskan adventure. For them, halibut fishing is an expensive long weekend, something they do for the experience and not because they need or culturally depend on the resource.

6. The halibut harvest should be managed so it is sustainable for future generations.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 15, 2008

NAME

# EXHIBIT 18

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 08-00941** |
| **THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*,** | |
| **Defendants.** | |

## AFFIDAVIT OF PATRICIA PHILLIPS

## ON BEHALF OF THE CITY OF PELICAN

1. I, Patricia Phillips, representing the City of Pelican, a community of 106 residents in southeast Alaska, SUPPORT implementation of the one halibut daily bag limit for charter clients in the Southeast Alaska (Area 2C).

2. Pelican is an isolated fishing community, without road connections to any other town or city. Thirty-nine residents hold commercial fishing permits and twenty-five have crew member licenses. Commercial fishing and seafood processing are the mainstay of Pelican's economy. Most land-based employment occurs at the seafood processing plant, Pelican Seafoods, which also owns the grocery store. The population is approximately 30% Alaska Native or American Indian.

1

3. Fourteen Pelican residents hold halibut Quota Share (QS); ten residents hold halibut QS for Area 2C. QS are required in Alaska to commercially harvest halibut and can only be secured through initial allocation or purchase from a willing seller (Area 2C halibut QS is currently marketed at $20-25 per pound; Southeast commercial setline fishermen currently receive an average dock price of $4 per pound for halibut).

4. Pelican is a recognized landing port with the National Marine Fisheries Service. In past years, over one million pounds of halibut were landed in Pelican. Last year 434,000 pounds of halibut were landed in Pelican; generating $70,000 in Fisheries Business Tax (FBT). The State of Alaska collects the tax and 50% should be returned to the City. Pelican depends heavily on the FBT in its annual budget to help support operating costs for basic community services and infrastructure. The City's economy would suffer without the tax and it would cause undo hardship. Without the FBT, the City would experience a significant loss of revenue and have to cut its budget by 20% to make up for the loss. There are eight registered charter boat operators in Pelican; four of the eight also hold halibut QS. No tax comparable to the FBT exists on charter harvest; hence reductions in the commercial setline halibut quota are not offset by any tax contributions from the charter sector. Suspension of the one halibut daily catch limit on charter clients will result in the Southeast charter harvest exceeding the sector's halibut Guideline Harvest Level (GHL); to compensate, the amount of that exceedance will be deducted from individual Southeast commercial fishermen's quota in 2009, directly reducing the tax revenues accruing to the City of Pelican and other southeast Alaska coastal communities. More insidious is the cumulative effect on the resource and the communities that depend on that resource of five consecutive years of Southeast halibut charter GHL overages. Southeast fishery dependent communities can not afford to wait another year for relief.

2

5. The historic subsistence harvest and use of halibut is a traditional way of life in Pelican. To illustrate: in 2006, 5,925 pounds of halibut were harvested by local residents for subsistence needs. This subsistence harvest is shared among households, and is a recognized social pattern. Allowing charter halibut harvest, which is concentrated near towns in what have historically been subsistence use areas, disproportionate to abundance during this time of declining halibut stocks will directly and immediately harm subsistence harvesters. Halibut subsistence use meets both cultural and nutritional needs of Pelican residents.

6. Along with other rural southeast Alaska coastal communities, Pelican residents rely on healthy marine resources for subsistence, sport and commercial fishing livelihood. The survival of Pelican as a community depends on the long-term abundance of these marine resources. Without access to productive and viable marine fisheries, our community would cease to exist.

7. The cornerstone of sustainable management rests squarely on restricting harvest to science-based catch limits. In Alaska, catch limits are determined by long-established factual and unbiased scientific methods and conservative pre-season resource abundance assessments. Exceeding these catch limits compromise resource health and the socio-economic survival of fisheries-dependent communities such as Pelican.

8. The abundance of halibut in the Area 2C is approaching historic low levels. Setline halibut quotas in Area 2C have been reduced by 43% over the past two years in an effort to conserve halibut stocks. This quota reduction has caused significant economic harm to Pelican setline fishermen, the Pelican seafood processing plant, and the region as a whole. Despite the economic hardship, Pelican residents concur with the conservation mandates of the International Pacific Halibut Commission. We recognize that the decreased abundance of halibut demands more restrictive quotas in order to ensure the long-term viability of the halibut resource.

9. In the past, setline fishermen have had to sacrifice quota in order to compensate for the allocation overages of the halibut charter sector. The charter sector has exceeded its halibut Guideline Harvest Level (GHL), or catch limit, for the past four years. These overages have compromised the halibut resource, economically-harmed the setline halibut sector, and as a result, the region's economy. The one halibut daily bag limit for charter vessels in southeast Alaska, implemented by the Secretary of Commerce, followed federal rule-making procedures, and on June 1, 2008 was implemented to control guided sport charter vessel halibut harvest to the GHL. Given the reduced abundance of Area 2C halibut stocks, the heightened need for resource conservation, and the quota reductions imposed on the setline halibut industry, the necessity of the one halibut daily limit should be adhered to. The Area 2C Constant Exploitation Yield, or area harvest level, established to protect halibut stocks, will likely be exceeded if the one halibut daily limit is not applied. Pelican residents assert that all sectors need to share in conserving the resource; the health of the halibut resource and the socioeconomic and cultural fabric of southeast Alaska communities such as Pelican depend on it.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 16, 2008          *Patricia Phillips*

                              Patricia Phillips, Mayor – City of Pelican

**EXHIBIT 19**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTT VAN VALIN,** *et al.,* | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 08-00941** |
| **THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce,** *et al.,* | |
| **Defendants.** | |

## AFFIDAVIT OF WILLIAM LUEDKE, ON BEHALF OF
## THE CITY OF PORT ALEXANDER

1. We the City Council of the City of Port Alexander and on behalf of the City of Port Alexander, SUPPORT implementation of the one halibut daily bag limit for charter clients in the Southeast (2C) Alaska management area in 2008. The one halibut daily limit is necessary to constrain charter harvest to the sector's Guideline Harvest Level (GHL) thereby protecting Southeast halibut stocks from over harvest.

2. The survival of Port Alexander as a community depends on viable access to healthy and abundant marine fish stocks. Residents support sustainable management of marine fisheries, and believe harvesting allocations should be directly tied to resource abundance.

3. The Southeast halibut stock is estimated by the International Pacific Halibut Commission to be near historically low levels of abundance. Catch rates have dropped

for all sectors. The Southeast setline halibut quota has been reduced by 43% over the two years to conserve the resource and allow rebuilding.

4. In 2003 a guideline harvest level (GHL) was established for the halibut charter fishery in Southeast to place an upper bound on charter harvest. The GHL, as established stairsteps down as halibut abundance declines. Declines in halibut abundance did not trigger the stair step until 2008, when the charter GHL dropped from 1.4 million pounds to 0.931 million pounds.

5. The halibut charter sector has exceeded its GHL for the past four years. During the first two years of that overage, the halibut setline quota was reduced to compensate for the overages and prevent over harvesting the halibut resource. These reallocations impact Port Alexander fishermen and our community, since the economic survival of the community depends on the commercial halibut and salmon fleet. In 2006 the charter sector's GHL overage also caused an overage of the area Constant Exploitation Yield (CEY), or the amount of fish that can be annually harvested on a sustainable basis. In 2007 and 2008 charter halibut harvest control restrictions were recommended by the International Pacific Halibut Commission (IPHC) and North Pacific Fishery Management Council, respectively, to prevent CEY and GHL overages. Assuming that these controls would be effectively implemented by June 1st of the respective years, the IPHC set fishery catch limits after using the GHL as the proxy for harvest. If the one halibut daily limit is not implemented in June, the halibut charter GHL will once again exceed its GHL and will likely cause a CEY overage. Over harvesting the resource during this time of low abundance creates a serious resource concern; over harvesting catch limits four

years straight years when the resource is at low levels jeopardizes the future or our community and the future of all who depend on the halibut resource. ......

6. Port Alexander residents have participated in developing a management plan for the Southeast halibut charter sector through the North Pacific Fishery Management Council public process for the past 15 years. Hundreds of concerned fishermen have provided testimony urging the Council to establish a charter halibut GHL, and effectively manage the charter sector to that GHL. The one halibut daily bag limit is the first effective halibut charter management restriction implemented as a result of that process. Suspending implementation of this limit will decrease the public's confidence in the regulatory process.

7. Port Alexander supports sustainable harvest and conservative fishery management. Sharing the burden of conservation encourages conservation and good stewardship in fishery harvesters. Reduced quotas impose economic hardship on all who make their living from harvesting the resource, but are necessary to protect the long-term health of the halibut resource. Our community depends on the halibut resource for sustenance and livelihood. The one halibut daily limit is necessary to ensure charter harvest is restricted to the sector's GHL, the resource is not over harvested, and fishery dependent communities such as Port Alexander survive.

I, as mayor pro-tem, hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June _17_, 2008

_____

William Luedke, Mayor pro-tem

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**SCOTT VAN VALIN,** *et al.*,

        **Plaintiffs,**

v.

            **Civil Action No. 08-0941 (RMC)**
            **Category D**

**THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce,** *et al.*,

        **Defendants.**

## ORDER

Upon consideration of the Motion to Intervene as Defendants submitted by Linda Behnken, Christopher Knight, William Thomas, Jr., Steve Box, David Gibson, Sherri Wohlhueter and Kurt Wohlhueter, Annah Taft Perry, North Pacific Seafoods, Inc., Erik Bahnsen, Wayne Brown, Sandy Craig, Luke Wiedel, Carolyn Heuer, Jerrod Galanin, Seafood Producers Cooperative, Ryan Nichols, the City of Pelican, and the City of Port Alexander ("Proposed Intervenor-Defendants"), and this Court's finding that the proposed Intervenor-Defendants are entitled to intervene as a matter of right pursuant to Fed. R. Civ. P. 24(a)(2) or, in the alternative, should be permitted to intervene pursuant to Fed. R. Civ. P. 24(b), it is on this ____ day of _____, 2008, hereby

ORDERED that the Motion be, and hereby is, GRANTED; and it is

FURTHER ORDERED that Linda Behnken, Christopher Knight, William Thomas, Jr., Steve Box, David Gibson, Sherri Wohlhueter and Kurt Wohlhueter, Annah Taft Perry, North Pacific Seafoods, Inc., Erik Bahnsen, Wayne Brown, Sandy Craig, Luke Wiedel, Carolyn Heuer,

Jerrod Galanin, Seafood Producers Cooperative, Ryan Nichols, the City of Pelican, and the City of Port Alexander be, and hereby are, granted leave to intervene as Defendants; and it is

FURTHER ORDERED that the Answer accompanying the Motion shall be deemed to have been filed and served on the date this Order is entered.

_____
Rosemary M. Collyer
United States District Judge

Copies to:

John Winston Butler
SHER & BLACKWELL
1850 M Street, NW, Suite 900
Washington, DC 20036
Email:  jbutler@sherblackwell.com

Robert Pendleton Williams
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
601 D Street, NW
3rd Floor - Room 3033
Washington, DC 20530
Email: robert.p.williams@usdoj.gov

George J. Mannina, Jr., Esq.
Paul L. Knight, Esq.
O'Connor & Hannan, LLP
1666 K Street, N.W., Suite 500
Washington, DC  20006
Email:  gmannina@oconnorhannan.com
Email:  pknight@oconnorhannan.com