**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**SCOTT VAN VALIN**, *et al.*,

     **Plaintiffs,**

v.

                            **Civil Action No. 08-0941 (RMC)**
                            **Category D**

**THE HONORABLE CARLOS M.**
**GUTIERREZ, in his official capacity as**
**Secretary of Commerce,** *et al.*,

     **Defendants.**

## THE SITKA CONSERVATION SOCIETY'S
## MOTION FOR LEAVE TO FILE AN AMICUS CURIAE BRIEF

     The Sitka Conservation Society, through its undersigned counsel, hereby moves this Court for leave to file an amicus curiae brief and in support thereof states as follows:

     The Sitka Conservation Society's interest lies in the conservation and science-based management of sustainable halibut populations in Southeast Alaska and in particular the local subsistence and recreational use of this and other affected fish populations in marine areas near Sitka. Its members include commercial fishermen, adventure lodge owners, charter fishing guides, local recreational fishermen and non-Native and Alaska Native subsistence resource users, all of whom have an interest in the conservation of halibut populations.

     The Sitka Conservation Society can assist the Court by providing a unique perspective on the matters at issue in this case. Its proposed amicus curiae brief analyzes issues directly pertaining to the Court's assessment of Plaintiffs' likelihood of success on the merits and the burden on the public that would flow from the injunction requested by Plaintiffs. The Sitka Conservation Society's proposed amicus curiae brief is attached hereto at Attachment A.

     Pursuant to Local Rule 7(m), undersigned counsel discussed the Motion with counsel for Plaintiffs and Defendants. Plaintiffs' counsel opposes the Motion in that it relates to the

preliminary injunction, but will reconsider their position as to amicus briefing on the merits.

Defendants' counsel takes no position.

The Sitka Conservation Society invites the Court's attention to the Memorandum of

Points and Authorities filed in support hereof.

Dated:  June 19, 2008                                    Respectfully submitted,


                                                         /s/ Gary C. Adler
                                                         Gary C. Adler, Esquire
                                                         D.C. Bar No. 416640
                                                         ROETZEL & ANDRESS, LPA
                                                         1300 Eye Street, N.W., Suite 400 East
                                                         Washington, DC  20005
                                                         Telephone:  (202) 625-0600
                                                         Facsimile:  (202) 338-6340

                                                         Paul Olson, Esquire
                                                         Conservation Director
                                                         Sitka Conservation Society
                                                         Sitka Conservation Society Office
                                                         P.O. Box 6533
                                                         Sitka, AK 99835
                                                         Telephone:  (907) 747-7509
                                                         Facsimile:  (907) 747-6105

2

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2008, a copy of the foregoing *Motion for Leave to File an Amicus Curiae Brief, Memorandum of Points and Authorities* in support thereof, *and Proposed Amicus Curiae Brief* were served via email and first class mail, postage prepaid, upon the following counsel of record:

John Winston Butler, Esq.
SHER & BLACKWELL
1850 M Street, NW, Suite 900
Washington, DC 20036
Email: jbutler@sherblackwell.com

Robert Pendleton Williams, Esq.
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
601 D Street, NW
3rd Floor - Room 3033
Washington, DC 20530
Email: robert.p.williams@usdoj.gov

George J. Mannina, Jr., Esq.
Paul L. Knight, Esq.
O'Connor & Hannan, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803


/s/ Gary C. Adler
Gary C. Adler, Esquire

9087 v_04 \ 000000.1105

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

        Plaintiffs,

v.

        Civil Action No. 08-0941 (RMC)
        Category D

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

        Defendants.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
THE SITKA CONSERVATION SOCIETY'S
MOTION FOR LEAVE  TO FILE  AN AMICUS CURIAE BRIEF

## I.    INTRODUCTION

The Sitka Conservation Society moves the Court for leave to file an amicus curiae brief

regarding the issues in this case including those related to Plaintiffs' Motion for a Preliminary

Injunction.  The Sitka Conservation Society's interests lie in the conservation and science-based

management of sustainable halibut populations in Southeast Alaska and in particular the local

subsistence and recreational use of this and other affected fish populations in marine areas near

Sitka.

An amicus curiae brief is desirable in this case because the Sitka Conservation Society

can assist the Court by providing a unique perspective pertaining to the Court's assessment of

Plaintiffs' likelihood of success on the merits, the burden on the public interest that would flow

from an injunction, and the public interest in denying Plaintiffs' requested relief.

Specifically, the Sitka Conservation Society's brief will address the following

conservation concerns and the affected public interests:  (1) The reasons why the Secretary's rule

is a non-allocative conservation measure; (2) the presence of localized depletions of halibut and

the effects of those depletions on the public interest; (3) the public interest in sound, science-based data collection and resource management principles, including accurate guided charter fishery catch data and a growth management scheme for an industry that disproportionately impacts local resource uses; (4) the need to buffer halibut populations from Guideline Harvest Level ("GHL") exceedances in light of downward population trends and new scientific studies demonstrating deficiencies in previous population models; and (5) how all of these concerns justify the Secretary's decision to impose the one-bag limit in order to prevent further GHL exceedances in conformity with the conservation standard delineated in the Northern Pacific Halibut Act of 1982, 16 U.S.C. §§ 773-773k.

## II.    THE SITKA CONSERVATION SOCIETY'S INTEREST IN THIS CASE AND ITS UNIQUE PERSPECTIVE

The Sitka Conservation Society is Alaska's oldest conservation society and is a non-profit organization supported by its members and guided by a Board of Directors.[1]  Since 1967, the Sitka Conservation Society has worked to protect the Tongass National Forest and surrounding coastal waters.  Its members include commercial fishermen, adventure lodge owners, charter fishing guides, local recreational fishermen and non-Native and Alaska Native subsistence resource users, all of whom have an interest in the conservation of halibut populations.  The Sitka Conservation Society actively works to preserve freshwater salmon habitat for local fisheries, actively works to protect all subsistence resources for local communities, and has been active in specifically protecting halibut through public education and outreach pertaining to proposed offshore aquaculture legislation.  The Sitka Conservation Society has also worked with the Alaska Marine Conservation Council and the Alaska Longline

---

[1] The factual assertions about the Sitka Conservation Society are supported by the verification of Paul Olson, Esquire, its Conservation Director.  More information can also be found at the Sitka Conservation Society's website: www.sitkawild.org.

Fishermen's Association to educate the public about the impacts of climate change on fishery resources and in particular the risks posed by increases in ocean acidification.

## III.     LEAVE TO FILE AN AMICUS CURIAE BRIEF SHOULD BE GRANTED

This Court has the discretion to determine the fact, extent and manner of participation of the amicus. *Cobell v. Norton*, 246 F. Supp. 2d 59, 62 (D.D.C. 2003). This Court has held that "[a]n amicus brief should normally be allowed … when the amicus has unique information or perspective that can help the court beyond the help that the lawyers for the parties are able to provide." *Id.* (quoting *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1064 (7th Cir.1997)).

The Sitka Conservation Society is perfectly positioned to assist the Court and to raise public interest issues related to Plaintiffs' Motion for Preliminary Injunction. The Sitka Conservation Society's interest in this case is the need to conserve migratory halibut populations for their intrinsic value and for local use in light of a downward trend in abundance and a growing guided charter fishery that is not monitored as stringently as other fisheries and is likely to exceed its GHL for a fifth consecutive year. For those reasons, the Sitka Conservation Society is concerned that any reversal of the decision to impose a one fish bag limit could further exacerbate localized depletions and further jeopardize sustainable harvests of halibut over the long term for traditional and customary users, commercial, charter and local recreational harvesters and most importantly future generations in all of these capacities.

## IV.     CONCLUSION

The Sitka Conservation Society respectfully requests the Court consider the points raised in its amicus curiae brief.

I, Paul Olson, under the penalty of perjury declare that the foregoing factual description of the Sitka Conservation Society is true and correct to the best of my knowledge and belief.

Date: 6 - 19 - 2008

Paul C. Olson

Paul Olson

4

Dated:  June 19, 2008                          Respectfully submitted,


                                               /s/ Gary C. Adler

                                               Gary C. Adler, Esquire
                                               D.C. Bar No. 416640
                                               ROETZEL & ANDRESS, LPA
                                               1300 Eye Street, N.W., Suite 400 East
                                               Washington, DC  20005
                                               Telephone:  (202) 625-0600
                                               Facsimile:  (202) 338-6340

                                               Paul Olson, Esquire
                                               Conservation Director
                                               Sitka Conservation Society
                                               Sitka Conservation Society Office
                                               P.O. Box 6533
                                               Sitka, AK 99835
                                               Telephone:  (907) 747-7509
                                               Facsimile:  (907) 747-6105

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2008, a copy of the foregoing *Memorandum of Points and Authorities* in support thereof were served via email and first class mail, postage prepaid, upon the following counsel of record:

John Winston Butler, Esq.
SHER & BLACKWELL
1850 M Street, NW, Suite 900
Washington, DC 20036
Email:  jbutler@sherblackwell.com

Robert Pendleton Williams, Esq.
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
601 D Street, NW
3rd Floor - Room 3033
Washington, DC 20530
Email: robert.p.williams@usdoj.gov

George J. Mannina, Jr., Esq.
Paul L. Knight, Esq.
O'Connor & Hannan, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C.  20006-2803


/s/ Gary C. Adler
Gary C. Adler, Esquire

# ATTACHMENT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

      Plaintiffs,

v.

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

      Defendants.

Civil Action No. 08-0941 (RMC)
Category D

## AMICUS CURIAE BRIEF OF THE SITKA CONSERVATION SOCIETY

Gary C. Adler, Esquire
D.C. Bar No. 416640
ROETZEL & ANDRESS, LPA
1300 Eye Street, N.W., Suite 400 East
Washington, DC 20005
Telephone: (202) 625-0600
Facsimile: (202) 338-6340

Paul Olson, Esquire
Conservation Director
Sitka Conservation Society
Sitka Conservation Society Office
P.O. Box 6533
Sitka, AK 99835
Telephone: (907) 747-7509
Facsimile: (907) 747-6105

9091 v_05 \ 000000.1105

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SCOTT VAN VALIN, *et al.*,

        **Plaintiffs,**

v.

        **Civil Action No. 08-0941 (RMC)**
        **Category D**

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

        **Defendants.**

---

### AMICUS CURIAE BRIEF OF THE SITKA CONSERVATION SOCIETY

**I.**    **INTRODUCTION**

    The Sitka Conservation Society is a non-profit organization that is Alaska's oldest

conservation society. Its members have an interest in the conservation of halibut populations and

science-based management of sustainable halibut populations. Those interests compel the Sitka

Conservation Society to address certain matters in the pending action and this Court's

consideration of whether to enter a preliminary injunction against implementation of a final rule

issued by the Secretary of Commerce ("Secretary") and published in the Federal Register on

May 28, 2008 (the "Rule").[1] The Rule establishes a one halibut per calendar day catch limit for

guided sport charter vessel anglers in Southeast Alaska pursuant to the Secretary's authority

under the Northern Pacific Halibut Act of 1982 ("Halibut Act") and the recommendation of the

International Pacific Halibut Commission ("IPHC").

    The Sitka Conservation Society's amicus curiae brief analyzes two issues raised by

Plaintiffs in seeking a preliminary injunction. First, it addresses Plaintiffs' argument that the

---

[1] 73 Fed. Reg. 30504 (May 28, 2008).

Rule does not involve a conservation issue. This argument misconstrues the relationship between Guideline Harvest Level ("GHL") exceedances and conservation and ignores the most recent scientific research that supports the IPHC's rationale for recommending the contested catch limit.

Second, the Sitka Conservation Society respectfully submits that the Court consider the relationship between localized depletions, community stability, unrestricted charter fleet growth and sustainability in making the public interest determinations necessary to decide the pending issues before the Court. Contrary to Plaintiffs' arguments, the public interest compels sound, science-based resource management supported by accurate data, as well as local access to public resources. These interests face significant harm should the Court grant Plaintiffs' requested relief.

## II.    THE RULE CLEARLY INVOLVES A CONSERVATION MEASURE

### A.    Plaintiffs' Argument that GHL Exceedances are not a Conservation Issue Ignores the Purpose of the GHL and the Recent Findings of the IPHC

The Halibut Act provides:

> If it becomes necessary to allocate or assign halibut fishing privileges among various United States fishermen, such allocation shall be fair and equitable to all such fishermen, based on the rights and obligations in existing Federal law, reasonably calculated to promote conservation, and carried out in a manner that no particular individual, corporation or other entity acquires an excessive share of the halibut fishing privileges (emphasis added).[2]

Plaintiffs argue that the one halibut catch limit "is purely an allocation measure; there are no resource conservation issues involved."[3] Plaintiffs' position ignores the findings of the IPHC and disingenuously relies on piecemeal quotes from the Department of Commerce public

---

[2] 16 U.S.C. § 773c(c); *see also* Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order ("Plaintiffs' Memorandum") at 13 (omitting the emphasized language).
[3] Plaintiffs' Memorandum at 13.

2

notices. Plaintiffs selectively cite the following comments to support their contention that the
rule was not reasonably calculated to promote conservation:

- "This final rule is not expected to significantly impact the sustainability of the halibut stock."[4]

- "The exploitable biomass for the coastwide projection and Area 2C projection is expected to increase during the next ten years."[5]

- "The proposed alternatives address resource allocation issues. They would affect harvest levels and fishing practices of individuals participating in the charter halibut fishery, but not the health of the halibut stock."[6]

However, Plaintiffs failed to include portions of the record that place their citations in
proper context. For example, the EA/RIR/FRFA goes on to state "no adverse impacts to the
halibut resource would be expected because the IPHC factors most resource removals in the
halibut stock assessment when setting annual catch limits."[7] It also asserts: "The environmental
analysis (EA) concluded that none of the alternatives would affect the health of the halibut stock
since the IPHC sets limits on total halibut removals."[8]

In other words, the comments Plaintiffs rely on are dependent on the assumption that
there will be no GHL exceedances. The truth is the entire environmental analysis is predicated
on the conclusion that the health of the stock would not be impacted "since the IPHC sets limits

---

[4] 73 Fed. Reg. at 30507.
[5] Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis at 16 (hereinafter "EA/RIR/FRFA") at 14 attached as Exhibit 1 to Federal Defendants' Opposition to Motion for Temporary Restraining Order, Document 3-2 filed 06/02/2008.
[6] *Id.* at 23.
[7] *Id.* at xi. The page numbers are different from those cited in Plaintiffs' Memorandum. This footnote cites the April 20, 2008 version of the EA filed with the Court.
[8] *Id.*

3

on total halibut removals."[9]  This is exactly what the Rule accomplishes.  It assures that there

will be no adverse impacts because it prevents the charter industry from exceeding its GHL.

Moreover, the Court should consider that the best and most recent available science

clearly supports the Secretary's determination that the one halibut catch limit is reasonably

calculated to promote conservation.  Because the above discussion demonstrates that fishers

must remain within the GHL in order to avoid adverse impacts, the conservation component of

the rule is self-evident in the overall management scheme.  The GHL regulation is clearly linked

to the constant exploitation yield ("CEY") which is "[a] biological target level for total removals

from each regulatory area." [10]  The IPHC's CEY calculation is a determination of "the amount of

halibut that may be removed from the resource without causing biological conservation

problems."[11]  The IPHC expressed the relationship between CEY, GHLs and conservation

clearly in a letter to the North Pacific Fishery Management Council:

> The recent publication of the recreational harvests of halibut in
> IPHC Regulatory Areas 2C and 3A in 2006 by the Alaska
> Department of Fish and Game has, with other removals, indicated
> that the Total Constant Exploitation Yield (CEY) established by
> the Commission for these areas has been exceeded.  Exceeding the
> Total CEY for an IPHC regulatory area requires that the
> Commission undertake conservation actions to restrain the total
> removals within this total CEY.  The achievement of the
> Commission's conservation mandate is dependent on adherence to
> catch limits and total yield.[12]

---

[9] *Id.*; *see also* Exhibit 1, Bruce M. Leaman and Heather L. Gilroy. IPHC staff regulatory
proposals: 2008.  (Excerpted from International Pacific Halibut Commission Eighty-fourth
Annual Meeting, Portland, OR, January 2008 at 106 (reviewing recommendations by the IPHC
that the U.S. and Canada take action to restrict sport fisheries to domestic targets).
[10] 72 Fed. Reg. 74257, 74258 (Dec. 31, 2007).
[11] *Id.*
[12] Exhibit 2, Letter from IPHC to NPFMC, 12/1/06.

4

Based on these explanations of the management scheme, it is clear that the Rule was "reasonably calculated to promote conservation." Indeed, "(i)t is intended to further the management and conservation goals of the [Halibut Act]."[13]

Also, there are additional and compelling conservation justifications for the Rule based on the latest scientific research. The results of recent studies published and considered by the IPHC clearly demonstrate that GHL exceedances are a conservation concern for two reasons; (1) previous models have likely overestimated the amount of halibut in Area 2C for some time and, (2) the potential increase in the exploitable biomass is offset by a marked decline in halibut growth rates that may warrant a reevaluation of the harvest rate should the decline continue and the GHL "is linked to the overall management of the halibut fisheries by the IPHC."[14]

As to the first point, the Rule is an appropriate response to the finding that there is an exploitable biomass decline of 55% in Area 2C and to the following recommendation:

> Our present view of Area 2 is that harvest rates have been much higher than the target rate of 0.20 over the past decade (Fig. 6). Such a high target rate was sustainable over decades but was possible only because of the low exploitation rate to the west. As that situation has changed, it has become paramount that harvest rates be brought down to the target harvest rate in Area 2.[15]

Indeed, according to the most recent Pacific halibut stock assessment, new research indicates that abundances in Area 2 have been overestimated and therefore harvests have been excessive:

---

[13] 68 Fed. Reg. 47256 (August 8, 2003); *see also* EA/RIR/FIFR at 3 and 72 Fed. Reg. 30714, 30721 (June 4, 2007) (explaining the purpose of the IPHC-recommended one fish bag limit was to "achieve its conservation and management goals" and that implementation of a reduction in charter vessel harvest would protect against overfishing of the halibut resource).

[14] 73 Fed. Reg. at 30505.

[15] Exhibit 3, Steven R. Hare and William G. Clark 2007. IPHC harvest policy analysis: past, present and future considerations. (Excerpted from International Pacific Halibut Commission Eighty-fourth Annual Meeting, Portland, OR, January 2008) at 84.

9091 v_05 \ 000000.1105

A growing body of estimates from both the assessments (Clark and Hare 2007a) and the ongoing mark-recapture experiment (Webster and Clark 2007) shows there is probably a continuing eastward net migration of catchable fish from the western Gulf of Alaska (Areas 3B and 4) to the eastern side (Area 2). The effect of this migration on the closed-area stock assessments was to produce underestimates of abundance in the western areas and overestimates in the eastern areas. To some extent this was almost certainly been the case for some time, meaning that exploitation rates were well above the target level in Area 2 and a disproportionate share of the catches have been taken from there.[16]

In other words, the guided charter fishery's GHL exceedances must be viewed in light of the fact that the IPHC has overestimated the CEY in Area 2C. It is important to point out that these exceedances occur only in the guided charter fishery. The Individual Fishing Quota ("IFQ") program for the commercial setline fleet "has kept catches within harvest limits" and has an overage/underage provision that "results in a long-term balance of harvest at the catch limit."[17] Furthermore, recent harvest statistics indicate that the commercial setline fleet consistently harvests less than its catch limit.[18] Because catch limits are a critical component of the IPHC's conservation objectives, it is clear that the Rule is reasonably calculated to promote conservation because it imposes limits on the one harvest sector that does not remain within its catch limits.

GHL exceedances are also a conservation concern because there is a marked decline in halibut size at age. The average weight of 20 year old female halibut taken from the Kodiak area has declined from 150 pounds twenty years ago to 60 pounds ten years ago to 32 pounds at present.[19] In 2002, scientists correlated this change in part to the density of halibut over ten

---

[16] *Id.*
[17] EA//RIR/FIFR at 19.
[18] *Id.* at 18.
[19] Exhibit 3 at 86.

6

years old.[20]  But recent studies indicate that there has been a substantial increase in the biomass of arrowtooth flounder in the Gulf of Alaska, a species that competes with halibut for habitat and food which "grew – and may still be growing – at an unchecked exponential rate."[21]

Because of this "stark change" scientists now believe that "[i]t is reasonable to surmise that the current slow growth of halibut is due not only to the increased numbers of halibut in the ocean but also the greatly increased number of arrowtooth."[22]

B.    <u>Inadequate Monitoring and Data Collection Protocol for Guided Charter Fisheries Add to the Immediacy of the Conservation Concern</u>

The Sitka Conservation Society advocates science-based resource management and reliable and scientifically defensible data collection procedures.  Because of the heightened conservation concerns discussed above, there is an immediate need for reliable data about guided charter vessel halibut take levels.  The current methods for assessing guided charter vessel halibut take levels do not include strict enforcement and verification procedures that are necessary to ensure the reliability of the data.  This is a conservation concern because reliable baseline data is necessary for the purpose of informing in-season management measures and guiding future management decisions.

The National Research Council's Committee on the Review of Recreational Fisheries Survey Methods has concluded that "marine recreational fishing is a significant source of fishing mortality for many marine species and that adequate information on the nature of that mortality in time and space is required for successful management of those species."[23]  Because of the impacts of the guided charter fishery on the resource, there is a need to track "the effort and

---

[20] Exhibit 3 at 86.
[21] *Id.* at 86-87.
[22] *Id.* at 87.
[23] Exhibit 4, National Research Council, 2006. Review of Recreational Fisheries Survey Methods at 3.

7

harvest of individual charter operations ... and changes in business patterns."[24]  Further, in 2002

the Department of Commerce noted the North Pacific Fishery Management Council's

recommendation that "[t]he need for reliable harvest data will increase as the magnitude of

harvest expands in the charter sector."[25]  The agency has further recognized that "[a]dequate

recordkeeping and reporting requirements and monitoring are imperative to the enforceability

and, hence, the success of the proposed GHL program in managing harvests by the guided

recreational fishery,"[26] but there are "a number of recordkeeping and reporting issues."[27]

     The National Research Council made several specific recommendations to remediate the

issues associated with guided charter fishery monitoring and reporting;  (1) the guided charter

sector is more like a commercial sector and therefore requires different survey methods and

reporting requirements, and (2) there should be a mandatory logbook required that is verifiable

and available to the survey program.[28]

     Alaska has used three methods of estimating marine sport harvests of halibut, (1) an

annual Statewide Harvest Survey ("SWHS"), (2) on-site surveys (creel and catch sampling), and

(3) a logbook program.[29]  The SWHS results are "currently considered to be the official and final

estimates of halibut harvest and saltwater effort."[30]  These figures estimate harvest levels based

---

[24] 67 Fed. Reg. 3867 (January 28,2002).
[25] *Id.*
[26] 67 Fed. Reg. at 3871.
[27] 67 Fed. Reg. at 3870
[28] Exhibit 4 at 6, 8.
[29] Exhibit 5, Tersteeg, D.L. and M.J. Jaenicke, 2007, Summary Data From the Sport Fishery for Pacific Halibut in the IPHC Area 2C Portion of Southeast Alaska, 2007.  Alaska Department of Fish and Game, Division of Sport Fish, Juneau, Alaska at 1.
[30] *Id.* at 1.

9091 v_05 \ 000000.1105

on questionnaires "mailed to a random sample of households" containing at least one state licensed angler.[31]  It takes over a year before the results of this method are available.[32]

Similarly, creel surveys in three Southeast Alaska communities "were designed to enable managers to make inseason estimates" but sampling programs in six other communities "were designed in a way that did not allow for direct inseason estimates of harvests."[33]  In 2007, this method surveyed 424 active charter vessels, less than half of the total vessels registered with the Alaska Department of Fish and Game and slightly more than half of the 702 vessels registered to operate in IPHC Area 2C ports.[34]

Alaska resumed collection of halibut harvest data in 2006 through charter logbooks.[35]  But reliable data requires more than simple self-reporting.  There are "noted inconsistencies between charter boat logbook records and observed presence and absence information on vessels at their normal home port."[36]  Therefore, the data collected "will be reliable only if there are strict verification and enforcement components."[37]  This recommendation was made because of the fact that logbook information is owner supplied.[38]  In stark contrast, there are reliable tracking methods for other harvesters.  Commercial harvest is tracked using a catch accounting system at the time of delivery that is used to enforce the total annual quota.[39]

The Sitka Conservation Society submits that in light of the heightened conservation concern for halibut stocks, the absence of reliable data and strict enforcement and verification

---

[31] *Id.*
[32] *Id.* at 2.
[33] *Id.* at 2.
[34] *Id.* at 3.
[35] 72 Fed. Reg. 30719 (June 4, 2007).
[36] Exhibit 4 at 39.
[37] *Id.* at 75.
[38] *Id.* at 75.
[39] EA/RIR/FIFR at 46.

9

procedures is a conservation concern because there is simply no accurate baseline data available. For this reason, a rule that serves the purpose of bringing the charter fleet into compliance with GHL is imperative because there is no way to accurately measure exceedances when they occur.

C.    The Rule Appropriately Responds to Conservation-Based Issues

In 2007, the IPHC concluded that conservation measures were necessary because "given the magnitude by which the charter/guided catches exceeded the [GHL] limits and the belief that such over harvesting puts at risk the achievement of IPHC goals for the halibut stock."[40] The Secretary's rule responds to this conservation-based impetus.

Further exceedances of GHL would have been highly likely had the Secretary failed to adopt the one halibut catch limit. Immediately after the Department of Commerce implemented the GHL in 2004, "the charter harvest has exceeded the Area 2C GHL by increasing amounts."[41] In 2006, the guided sport charter fishery exceeded the GHL in Area 2C by over 27 percent and in 2007 the charter sector exceeded the GHL by over 20 percent.[42] There has been an average growth rate of 6.8 percent over the past decade and average numbers of clients and trips per boat are all at their highest levels.[43] The number of charter clients has increased from 55,922 in 1998 to 92,394 in 2006 and the number of trips conducted by active vessels has increased from 15,541 to 23,907 during the same period.[44] Unlike, the guided sport charter fishery, the commercial setline sector has consistently remained within its catch limits.[45]

Moreover, the increased growth of the guided charter vessel industry has occurred even as abundance has declined. The 2005 sport harvest reached record levels and the subsequent

---

[40] Exhibit 6, IPHC News Release, IPHC, January 22, 2007.
[41] EA/RIR/FIFR at 3.
[42] *Id.*
[43] *Id.*
[44] *Id.* at 35.
[45] Exhibit 1

10

harvest in 2006 was the second highest harvest during that period.[46]  These increases "can be attributed to increased effort by charter anglers."[47]  Sport halibut harvests increased from slightly over 20,000 fish in 1980 to over 160,000 fish in 2005.[48]  Notably, the steepest increase occurred between 2002 and 2005 when sport halibut harvests rose from slightly over 100,000 fish to more than 160,000 fish.[49]

In light of the fact that (i) conservation concerns are apparent from the IPHC's recent studies, (ii) the GHL is a key component of the conservation strategy for halibut, (iii) the guided charter fishery has always exceeded its GHL by significant amounts and (iv) there are no adequate mechanism for assessing the level or nature of the exceedances, the Rule is beyond doubt a conservation measure.

## III.   THE PUBLIC INTEREST REQUIRES CONSIDERATION OF THE EFFECTS OF LOCAL DEPLETIONS ON LOCAL ACCESS TO SUBSISTENCE AND NON-GUIDED RECREATIONAL FISHERIES

The Sitka Conservation Society promotes the conservation of resources for sustainable local uses.  Halibut is one of Alaska's most important subsistence food species.[50]  Subsistence fishing occurs in areas that are close to and accessible to the home community.[51]  The growth of the guided charter harvest has greatly increased competition in subsistence community use areas because it targets halibut in nearshore areas adjacent to these communities.  Sitka residents who use small boats to access these resources must now use more fuel and face increased safety risks

---

[46] Exhibit 5 at 3.
[47] *Id.* at 3.
[48] *Id.* at 12.
[49] *Id.*
[50] Exhibit 7, NMFS, Environmental Assessment and Regulatory Impact Review for a Regulatory Amendment to Define a Halibut Subsistence Fishery Category in Convention Waters (2003) at 99.
[51] *Id.* at 100.

11

as they are forced to fish further from Sitka in order to harvest halibut for personal, traditional and customary uses.[52]

The North Pacific Fishery Management Council recommended the implementation of the GHL in part to address this very concern in recognizing the following problems, "(1) [p]ressure by charter operations may be contributing to localized depletion in several areas [and] (2) [t]he recent growth of charter operations may be contributing to the overcrowding of productive grounds and declining harvests for historic sport and subsistence fishermen in some areas."[53] The Department of Commerce has acknowledged these concerns.[54] Because of these issues, "community stability may be affected as traditional sport, subsistence and commercial fishermen are displaced by charter operators."[55]

In making the decision whether to grant a preliminary injunction, the Court must consider any burden on others' interests from an injunction and the public interest in granting or denying relief.[56] Plaintiffs insist that an injunction would not substantially burden the interests of others and imply that there is no other relevant affected public interest.[57] The Sitka Conservation Society strongly disagrees and respectfully submits that the Court should accord great weight to the impacts of localized depletion associated with the concentration of charter harvest near coastal communities and the effects of that depletion on subsistence and non-guided recreational fishing.

---

[52] Exhibit 8, Affidavit of Jerrod Galanin at ¶2; Affidavit of Floyd Tomkins at ¶1 and Affidavit of Carolyn Heuer at ¶1.
[53] EA/RIR/FIFR at 5.
[54] 67 Fed. Reg. at 3867.
[55] *Id.*
[56] *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F.Supp.2d 30, 35-36 (D.D.C. 2006).
[57] Plaintiffs' Memorandum at 11-13.

12

A.    There is a Compelling Public Interest in Affirming the Secretary's Decision
      Because the GHL Exceedances Cause Areas of Local Depletion and Resulting
      Harm to Subsistence Users

Because the GHL applies on an area-wide basis, there are no region-wide management

measures in place that address the impacts of intensive charter fishing on local subsistence users

of the halibut resource.[58]  Subsistence fishing for halibut is the non-commercial, long-term,

customary, and traditional use of halibut.[59]  Area 2C provides the largest portion of the Alaska

subsistence halibut harvest – 580,117 pounds.[60]

In April of 2003, the National Marine Fisheries Service implemented a subsistence

halibut fishery in Alaska's coastal waters.[61]  Subsistence fishers must obtain a Subsistence

Halibut Registration Certificate ("SHARC") from the agency.[62]  Sitka has the second largest

number of actively fishing SHARC holders residing in eligible rural communities (759) and the

second largest number of Alaska Native SHARC holders (149).[63]  Altogether, there are 915

SHARC holders in Sitka that fished in 2006 – slightly more than 10% of the city's population.[64]

There were 1,895 SHARCs issued to Sitkans in 2006 and tribal members obtained 466 of those

SHARCS.[65]  Subsistence harvesters took 147,526 pounds from the Sitka Local Area

Management Plan (LAMP) area in 2006.[66]  Many SHARC holders also harvested halibut in sport

fisheries.  All total, SHARC holders took 186,404 pounds of halibut in 2006.[67]

---

[58] *See e.g.* 68 Fed. Reg. 47262 (August 8, 2003).
[59] Exhibit 7 at 14.
[60] Exhibit 9, J.A. Fall, et al., Subsistence Harvests of Pacific Halibut in Alaska, 2006, Alaska Department of Fish and Game, Division of Subsistence.  Juneau, Alaska:  December 2007.
[61] *Id.* at 1.
[62] *Id.*
[63] *Id.* at 13-14..
[64] *Id.* at 14.
[65] *Id.* at 24.
[66] *Id.* at 16.
[67] *Id.* at 1.

13

The economic value of these harvests to local communities is substantial. One method of quantifying the value of halibut subsistence is to estimate the replacement costs of substitute, imported products.[68] Had these Sitka residents purchased their fish at an Anchorage grocery store, the cost would have easily exceeded $1.5 million at current prices for halibut fillets. But because many non-guided sport and subsistence fishermen operate from small skiffs, they cannot safely access halibut far from town and accordingly they fish in near shore waters.[69] Commercial setline effort is distributed further from Sitka but the guided charter vessel fleet fishes as close to Sitka as possible.[70] Because of this increased effort near town, it has become increasingly difficult for many non-guided sport and subsistence fishermen to find halibut and ranging further from town is not feasible for these fishermen.[71]

It is notable that despite the cultural, recreational, and economic value of subsistence halibut fisheries, there has been a significant overall decrease in subsistence harvests in Area 2C. Subsistence harvests in the Sitka LAMP area have decreased 15% since 2003.[72] There have also been subsistence harvest decreases in other parts of Southeast Alaska and in parts of Area 3A where there is a large guided charter presence, near Yakutat, Cook Inlet and in Prince William Sound.[73] The Alaska Department of Fish and Game explains that "[t]he reasons for these changes in Area 2C are likely complex and beyond the scope of [its 2006 report on subsistence halibut harvests]."[74]

---

[68] Exhibit 7 at 61.
[69] Exhibit 8, Affidavit of Floyd Tomkins at ¶1 and Affidavit of Carolyn Heuer at ¶1-¶2.
[70] *Id.*
[71] *Id; see also* Exhibit 8, Affidavit of Jerrod Galanin at ¶2.
[72] Exhibit 9 at 25.
[73] *Id.* at 17.
[74] *Id.* at 18.

14

A decline in subsistence harvests has a substantial economic impact as residents must shift to purchasing more expensive products from grocery stores.[75] In addition, halibut has a high nutritional value and is the culturally significant in light of its traditional and customary use.[76] For many subsistence halibut harvesters, the ability to catch and to share this resource with community members is critical to cultural well-being and continuity.[77]

It is clear that local depletion of halibut populations has been and continues to be one of the complex reasons suggested by the Alaska Department of Fish and Game.[78] Even though the migratory nature of halibut stocks has the potential to fill in areas with low halibut density, "continued high exploitation may maintain or cause small, but temporary, local depletions."[79] These "temporary" and "small" local depletions occur in areas targeted by the charter fleet on an annual basis and force subsistence harvesters and non-guided anglers to consume more fuel and leave the safety of nearshore areas in order to access the resource. More importantly, there is insufficient data available to determine the impacts on the availability of resources to subsistence users.[80]

Many halibut harvesters have emphasized this concern. In 2007, commenters on a proposed rule to modify Area 2C size and bag limits chastised the National Marine Fisheries Service ("NMFS") for failing to include subsistence users and non-guided anglers in its problem statement because of local depletion, increased conservation concerns, and the negative impact

---

[75] Exhibit 8, Affidavit of Floyd Tomkins at ¶1 and Affidavit of Carolyn Heuer at ¶1-¶2.
[76] *Id.*, Affidavit of Jerrod Galanin at ¶1; Affidavit of Floyd Tomkins at ¶1 and Affidavit of Carolyn Heuer at ¶1.
[77] *Id.* Affidavit of Jerrod Galanin at ¶1-¶2.
[78] 67 Fed. Reg. at 3871; *see also* Exhibit 8 Affidavit of Jerrod Galanin at ¶2; Affidavit of Floyd Tomkins at ¶1 and Affidavit of Carolyn Heuer at ¶1.
[79] 72 Fed. Reg. at 30724.
[80] EA/RIR/FIFR at 14.

15

on subsistence users that results from halibut harvest above the GHL.[81] In 2003, resident sport anglers supported the initial implementation of the GHL "as a means to control effort in the fishery and ensure sport fishing opportunities for local residents."[82] NMFS is now considering additional gear and seasonal restrictions applicable to subsistence users specifically in Sitka Sound "to further address localized depletion concerns."[83]

Also, as shown by the attached chart, catch rates measured by Harvest Per Unit of Effort ("HPUE") support the Council's concerns about the need to address local depletions.[84] HPUE for charter halibut fisheries based out of Craig and Sitka have declined by 58 percent and 47 percent respectively from 2002 to 2007. This catch rate decline substantially exceeds the rate of decline for the less concentrated commercial fishery – 33 percent. The presence of a higher catch rate decline for the guided charter fishery that targets localized areas justifies the inference that catch rates are declining at a higher rate near communities than in the larger 2C area where the commercial fishery effort is dispersed. The tables also demonstrate that the catch rate for non-charter sport fishing near Ketchikan and Sitka has declined in the past two years.

The Secretary's one-fish bag limit rule promises to ameliorate the effects of local depletion on subsistence and non-guided anglers who often lack the resources to pursue halibut further from their communities. The Court should accord substantial weight to the public interest served by the proposed rule; the conservation of halibut resources for local and subsistence users and the substantial cultural, recreational, and economic value derived from

---

[81] 72 Fed. Reg. 30716 (June 4, 2007).
[82] 68 Fed. Reg. 47260 (August 8, 2003).
[83] 73 Fed. Reg. at 20009.
[84] Exhibit 10, O'Connell, V., 2007. Testimony to NPFMC, April 2008. Data compiled from IPHC 2008 Bluebook and Terseeg, D. and M. Jaenicke, 2006. Summary Data from the sport fishery for Pacific halibut in the IPHC area 2C portion of southeast Alaska, Alaska Department of Fish and Game, Douglas AK, at 35.

16

these harvests. Moreover, the Court should consider and accord substantial weight to the burden

that granting an injunction would impose on these interests.

**IV.     CONCLUSION**

       The Sitka Conservation Society submits Plaintiffs are incorrect when they assert the Rule

does not address conservation issues. Quite to the contrary, it promotes a conservation-based

management science. Additionally, the Sitka Conservation Society requests the Court consider

the interest of local subsistence resource harvesters served by the Rule.


Dated: June 19, 2008                         Respectfully submitted,

/s/ Gary C. Adler
Gary C. Adler, Esquire
D.C. Bar No. 416640
ROETZEL & ANDRESS, LPA
1300 Eye Street, N.W., Suite 400 East
Washington, DC 20005
Telephone: (202) 625-0600
Facsimile: (202) 338-6340

Paul Olson, Esquire
Conservation Director
Sitka Conservation Society
Sitka Conservation Society Office
P.O. Box 6533
Sitka, AK 99835
Telephone: (907) 747-7509
Facsimile: (907) 747-6105

9091 v_05 \ 000000.1105

# EXHIBIT 1

# IPHC staff regulatory proposals: 2008

**Bruce M. Leaman and Heather L. Gilroy**

In making catch limit recommendations for 2008, Staff has considered the results of the analytic assessment, changes in the commercial and survey indices used to monitor the stock, recruitment of incoming year classes, and a revised harvest policy that reflects coastwide policy goals. The staff also drew on the outcome of both the June 2007 Stock Assessment Workshop and the independent, external peer review of the stock assessment analysis. Detailed results of these additional investigations are reported in the 2007 Report of Assessment and Research Activity. Ongoing tag returns from the coastwide PIT tagging program continue to demonstrate that regulatory areas cannot be treated as closed management units and this has influenced our choice of assessment models and corresponding harvest policy. Changes in the stock biomass as indicated by our catch at age assessment as well as changes in relative abundance indices from our surveys and the commercial fishery were also influential in our recommendations for 2008.

With the exceptions of Areas 3A and 4B, commercial catch per unit effort (CPUE) in 2007 showed decreases from 2006 values. Notable declines occurred in Area 2A, 2B, 3B, 4A, and 4D. Commercial catch rate in Area 3A was unchanged, while that in Area 4B showed a notable increase. The 2007 IPHC setline survey CPUE values were largely stable or increasing in the central and eastern portions of the stock (Areas 2A-3B) but lower than in 2006 for Area 4. These fluctuations were generally in the ±10% range, although Area 4A showed a larger decline of over 20%.

The 1994-1998 year classes continue to recruit in relatively strong numbers in most areas, particularly in Areas 2B, 2C, and 3B. In addition, preliminary indications from survey data suggest that the 1999-2000 year classes are also strong relative to surrounding year classes. Only Area 4B is showing a notably low level of recruitment, in comparison with the same year classes in other regulatory areas.

The analysis of optimum harvest rates for a coastwide assessment conducted in 2006 resulted in a target coastwide harvest rate of 20% of coastwide exploitable biomass. However, the staff also required a framework to partition the coastwide estimate of exploitable biomass into regulatory areas. The staff examined several alternatives for partitioning the coastwide biomass and concluded that the use of the IPHC setline survey data offered the most standardized and consistent data source to achieve this partitioning. The staff also acted on a recommendation from the June Stock Assessment Workshop and used depth-stratified means of survey data for apportionment. Accordingly, the distribution of biomass, as determined by the three-year average CPUE of legal-sized fish obtained on the stock assessment survey, was used to partition the coastwide exploitable biomass estimate into regulatory area biomass totals. While the 20% harvest rate was determined to be optimal for the aggregated coastwide biomass, regulatory areas which have net immigration of fish, such as Area 2, have experienced substantially higher harvest rates, particularly in recent years. The yield from this area could be increased if these exploitation rates were reduced and biomass was allowed to increase. The staff therefore recommends that the 20% harvest rate be applied coastwide, with the exceptions of Areas 4B and 4CDE. For Area 4B, the staff continues to recommend a harvest rate of 15% as indicated by the analysis of productivity conducted in 2005 (Hare 2006). Similarly for Area 4CDE, the continued decline in survey and commercial catch rates supports the continued use of the 15% harvest rate for this area as well.

105

## Catch limit recommendations

The staff recommendations totaling 59.24 million pounds for 2008 are presented in Table 1. The Area 2A recommendation includes all removals (commercial, treaty Indian, sport) allocated by the Pacific Fishery Management Council's Catch Sharing Plan. Area 4CDE is treated as a single regulatory unit by the Commission, although the North Pacific Fishery Management Council's Catch Sharing Plan partitions the Commission catch limit into limits for the individual regulatory areas. The Area 2B catch limit recommendation includes totals for the commercial and sport fisheries. The Department of Fisheries and Oceans, Canada will allocate the adopted catch limit between the sport and commercial fisheries.

The catch limit recommendations make the assumption that both Canada and the U.S. will manage to their domestic agreements on targets for sport fish catch. At its 2007 Annual Meeting, the Commission adopted regulations for the sport fisheries in Areas 2B, 2C, and 3A. These regulations were adopted because actions to restrict sport fisheries to the domestic targets in these areas had not been taken by either country and the resulting sport catches, when combined with those of the commercial fisheries, exceeded the Commission's management targets. While the Commission's regulations were not adopted by either country, the U.S. did take action in June 2007 to restrict sport fisheries in Area 2C, with a goal of achieving similar levels of mortality reduction as that anticipated in the Commission regulations. No action to restrict sport fisheries was taken by Canada in 2007. In both Areas 2B and 2C, the domestic targets for sport fisheries are estimated to have been exceeded again in 2007. The estimated 2008 Total Constant Exploitation Yield (CEY) for Area 2C is at a level which, by NMFS regulations, triggers a downward stepping of the charter recreational halibut Guideline Harvest Level (GHL) from 1.432 Mlb to 0.931 Mlb. The GHL for Area 3A would remain at the existing level of 3.65 Mlb.

The use of a coastwide assessment with a single coastwide selectivity, differing harvest rates by regulatory area, and partitioning of coastwide biomass with survey estimates of distribution creates some substantial changes in CEY and recommended catch limits among areas. Lower recommended catch limits are identified for Area 2, while Areas 3 and 4 have higher recommended catch limits. A large component of these differences is associated with the different distribution of biomass associated with survey partitioning of a coastwide total biomass, compared with the traditional closed-area biomass distribution. As noted in the 2005 stock assessment, the survey distribution of biomass is more consistent with other estimates of biomass distribution that are not dependent on the stock assessment (Clark 2006).

The staff continues to recommend a slow rate of increase in catch limits when estimated CEY is increasing and a more rapid reduction of catch limits when CEY is decreasing. For Areas 2, 3A, and 4CDE the staff recommends catch limits that are lower by 50% of the difference between 2007 catch limits and the estimated fishery CEYs for 2008. For Areas 3B, 4A, and 4B, the staff recommends an increase over the 2007 catch limit equivalent to one-third of the difference between the 2007 catch limit and the estimated 2008 fishery CEY.

The staff has concerns about the status of halibut in Area 4A. There are signs that current yields may not be sustainable and the staff believes that a harvest rate of 20% may be too high for this area. Other regulatory areas in the Bering Sea are assigned a harvest rate of 15% based on analysis of life history parameters, productivity, and oceanographic characteristics. We have not yet conducted such an analysis for Area 4A. Further, we believe that an analysis of productivity

106

and harvest policy for the Bering Sea as a whole is necessary to determine if a modified harvest rate for Area 4A is appropriate. This analysis will be conducted in 2008.

The staff recognizes that adoption of the coastwide assessment and survey apportionment results in a significant shift in the estimated distribution of exploitable biomass. This analysis concludes that exploitation rates on the eastern portion of the stock have been too high in the past decade, resulting in lower biomass in Area 2, than would be realized if harvest rates had been near the target level. Ultimately, a lowered harvest rate will permit rebuilding of the exploitable biomass in Area 2 and an increase in available yield. The pace of that rebuilding will be affected by the strength of year classes recruiting to the fishery over the next several years. However, the staff recognizes that the Commission may wish to transition to these lower harvest rates over a period of time.

## Fishing periods

As in past years, the staff recommends March 15 to November 15 opening and closing dates for the quota share fishing season. This recommendation is a compromise between minimizing interceptions of migrating fish and providing opportunity for market presence of fresh wild halibut. The Area 2A fishery should also occur within this period.

For the Area 2A directed commercial fishery, the staff recommends fishing periods similar to those in effect in 2007: a series of 10-hour periods, with fishing period limits to ensure that the catch limit is not exceeded. The size of the fishing period limits will be determined when more information on fleet participation is available.

### Catch sharing plans: Area 2A and 4CDE

The Commission does not make allocative decisions within regulatory areas or among different user groups. However, for Areas 2A and 4CDE the staff recommends that the Commission endorse the catch sharing plans developed by the Pacific and North Pacific Fishery Management Councils for these areas, respectively.

## Proposed changes to the IPHC regulations

### Revise Area 2A vessel license application requirement

Area 2A vessels are required to obtain an IPHC license to fish in the halibut fishery. The current regulations require that the vessel owner sign the application form. In many cases the applications are signed by the skipper. IPHC staff recommends changing the requirement to allow the signature of the vessel owner or skipper on the application form.

### Further define net weight in IPHC regulations

IPHC regulations currently define net weight, as halibut that is gutted, head-off, and without ice and slime. We recommend defining in regulation the conversion factors required to be used if the halibut is weighed with the head-on and with ice and slime. The factors would be defined as a 10% deduction for head and 2% deduction for ice and slime. These conversion factors are in agreement with the Condition of License in B.C. and quota share regulations in Alaska. This would assist enforcement in Area 2A.

**Determining the minimum size of sport caught halibut in Alaska**

NOAA Enforcement requests a change in wording of the sport regulation that states that no person shall fillet, mutilate, or otherwise disfigure a halibut that prevents the determination of the minimum size or number of fish on board a catcher vessel (IPHC Regulations Section 25(7)). The intent will remain the same, referring to the fishing vessel, but the definition of vessel as "catcher" will change, as it is unenforceable.

**Defining the acceptable logbooks used by U.S. commercial fishing vessel operators**

IPHC regulations define acceptable logbooks that can be used in the U.S commercial halibut fisheries. The IPHC staff has been working with Washington Department of Fish and Wildlife (WDFW) to modify their voluntary sablefish logbook to incorporate all needed data elements. If the logbook is modified prior to the Annual Meeting, we recommend allowing the WDFW voluntary sablefish logbook as an option for the commercial halibut fisheries.

## References

Clark, W.G. 2006. Analysis of PIT tag recoveries through 2005. Int. Pac. Halibut Comm. Report of Assessment and Research Activities 2005:123-134.

Clark, W.G. and Hare, S.H. 2007. Assessment of the Pacific halibut stock at the end of 2006. Int. Pac. Halibut Comm. Report of Assessment and Research Activities 2006: 97-128.

Hare, S.R. 2006. Area 4B population decline – should yield be lowered? Int. Pac. Halibut Comm. Report of Assessment and Research Activities 2005: 145-149

Hare, S.H. and Clark, W.G. 2007. Harvest policy considerations. Int. Pac. Halibut Comm. Report of Assessment and Research Activities 2006: 145-160.

Hauser, L., Newton, L., and Loher, T. 2007. Microsatellite variation in spawning adults of Pacific halibut in the Gulf of Alaska and Bering Sea. Int. Pac. Halibut Comm. Report of Assessment and Research Activities 2006: 219-232.

**Table 1. Staff recommended catch limits for 2008 by IPHC regulatory area (million lbs, net weight). Recommendations based on coastwide assessment of exploitable biomass with survey apportionment to Regulatory Area exploitable biomass. Removal data are preliminary. Also shown are the 2007 catch limits for comparison.**

| Reg Area | Exploitable biomass | Harvest Rate | Total CEY | 2007 Other Removals | 2007 Catch Limit | 2008 Fishery CEY | 2008 Catch Limit Recommendation | |
|---|---|---|---|---|---|---|---|---|
| 2A | 4.70 | 20.0% | 0.94 | 0.29 | 1.34 | 0.65 | 1.00 | 1,4 |
| 2B | 25.60 | 20.0% | 5.12 | 0.47 | 11.47 | 4.65 | 8.06 | 2,4 |
| 2C | 32.50 | 20.0% | 6.50 | *2.59* | 8.51 | 3.92 | 6.21 | 4 |
| 3A | 144.80 | 20.0% | 28.96 | *6.71* | 26.20 | 22.25 | 24.22 | 4 |
| 3B | 74.00 | 20.0% | 14.80 | 0.53 | 9.22 | 14.27 | 10.90 | 3 |
| 4A | 21.30 | 20.0% | 4.26 | 0.75 | 2.89 | 3.51 | 3.10 | 3 |
| 4B | 20.20 | 15.0% | 3.03 | 0.33 | 1.44 | 2.70 | 1.86 | 3 |
| 4CDE | 37.90 | 15.0% | 5.69 | 2.01 | 4.10 | 3.68 | 3.89 | 4 |
| Total | 361.00 | 19.2% | 69.30 | 13.68 | 65.17 | 55.62 | 59.24 | |

Note:Exploitable biomass is coastwide assessment, survey partitioning; amended 2C sport.
[1] Catch limits and Fishery CEY for 2A includes commercial, sport, and treaty subsistence catches.
[2] Catch limits and Fishery CEY for 2B includes commercial and sport catch.
[3] Calculated as 2007 catch limit plus 1/3 of the difference between 2008 Fishery CEY and 2007 Catch Limit.
[4] Calculated as 2007 Catch Limit minus 1/2 of the difference between 2008 Fishery CEY and 2007 Catch Limit.

**Numbers in bold italics indicate assumed GHL of 0.931 Mlb in Area 2C, 3.65 Mlb in Area 3A under Other Removals; reduced GHL in Area 2C, based on NMFS-regulated GHL reduction associated with reduced Total CEY.**

**Table 2. Estimated fishery CEY, staff recommended catch limits, catch, percent of catch limits taken, survey and commercial CPUE of Pacific halibut by IPHC regulatory area (in thousands of pounds, net weight), 2003-2007.**

### ESTIMATED CEY

| Regulatory Area | 2003 | 2004 | 2005 | 2006 | 2007[1] |
|---|---|---|---|---|---|
| 2A[2] | 1,290 | 1,890 | 1,330 | 1,170 | 1,020 |
| 2B | 11,320 | 15,780[3] | 12,700[3] | 13,220[3] | 9,720[3] |
| 2C | 9,110 | 17,030 | 11,800 | 10,330 | 7,810 |
| 3A | 34,220 | 29,980 | 26,300 | 24,940 | 26,010 |
| 3B | 29,190 | 15,600 | 10,700 | 8,570 | 12,830 |
| 4A | 11,220 | 3,470 | 3,400 | 3,250 | 3,980 |
| 4B | 7,760 | 2,810 | 1,700 | 1,070 | 1,970 |
| 4CDE | 13,820 | 3,390 | 4,400 | 3,110 | 3,650 |
| Total | 117,930 | 89,880 | 72,170 | 65,950 | 66,990 |

### STAFF RECOMMENDATIONS

| Regulatory Area | 2003 | 2004 | 2005 | 2006 | 2007[1] |
|---|---|---|---|---|---|
| 2A[2] | 1,310 | 1,480 | 1,330 | 1,380 | 660 |
| 2B | 11,750 | 13,800[3] | 13,250[3] | 13,220[3] | 6,220[3] |
| 2C | 8,500 | 11,310 | 10,930 | 10,630 | 4,980 |
| 3A | 22,630 | 25,600 | 25,470 | 25,200 | 27,630 |
| 3B | 17,130 | 15,600 | 13,150 | 10,860 | 16,770 |
| 4A | 4,970 | 3,470 | 3,440 | 3,350 | 5,230 |
| 4B | 4,180 | 2,810 | 2,260 | 1,670 | 2,560 |
| 4CDE | 4,450 | 3,390 | 3,990 | 3,550 | 3,850 |
| Total | 74,920 | 76,910 | 73,820 | 69,860 | 67,900 |

### CATCH LIMITS[4]

| Regulatory Area | 2003 | 2004 | 2005 | 2006 | 2007[1] |
|---|---|---|---|---|---|
| 2A[2] | 1,310 | 1,480 | 1,330 | 1,380 | 1,340 |
| 2B | 11,750 | 13,800[3] | 13,250[3] | 13,220[3] | 11,470[3] |
| 2C | 8,500 | 11,310 | 10,500 | 10,630 | 8,510 |
| 3A | 22,630 | 25,060 | 25,470 | 25,200 | 26,200 |
| 3B | 17,130 | 15,600 | 13,150 | 10,860 | 9,220 |
| 4A | 4,970 | 3,470 | 3,470 | 3,440 | 2,890 |
| 4B | 4,180 | 2,810 | 2,260 | 1,670 | 1,440 |
| 4CDE | 4,450 | 3,785 | 3,989 | 3,550 | 4,100 |
| Total | 74,920 | 75,505 | 73,819 | 69,860 | 65,170 |

### CATCH[5]

| Regulatory Area | 2003 | 2004 | 2005 | 2006 | 2007[6] |
|---|---|---|---|---|---|
| 2A[2] | 1,232 | 1,395 | 1,309 | 1,369 | 1,320 |
| 2B | 11,724 | 13,700[3] | 14,089[3] | 13,723[3] | NA |
| 2C | 8,286 | 10,114 | 10,489 | 10,397 | 8,343 |
| 3A | 22,324 | 24,717 | 25,228 | 25,238 | 25,957 |
| 3B | 16,965 | 15,180 | 12,874 | 10,565 | 9,217 |
| 4A | 4,949 | 3,473 | 3,329 | 3,278 | 2,775 |
| 4B | 3,817 | 2,683 | 1,923 | 1,542 | 1,376 |
| 4CDE | 3,209 | 2,889 | 3,459 | 3,199 | 3,833 |
| Total | 72,506 | 73,910 | 72,700 | 69,311 | NA |

### PERCENT OF CATCH LIMIT TAKEN

| Regulatory Area | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|
| 2A[1] | 94 | 94 | 98 | 99 | 99 |
| 2B | 100 | 99 | 106 | 104 | NA |
| 2C | 97 | 96 | 96 | 98 | 98 |
| 3A | 99 | 99 | 98 | 98 | 99 |
| 3B | 99 | 98 | 98 | 97 | 100 |
| 4A | 100 | 97 | 97 | 98 | 96 |
| 4B | 91 | 95 | 85 | 92 | 96 |
| 4CDE | 72 | 76 | 87 | 90 | 93 |
| Total | 97 | 97 | 99 | 99 | NA |

### AVERAGE SURVEY (S) AND COMMERCIAL (C) CPUE[7]

| Regulatory Area | 2003 S | 2003 C | 2004 S | 2004 C | 2005 S | 2005 C | 2006 S | 2006 C | 2007 S | 2007 C |
|---|---|---|---|---|---|---|---|---|---|---|
| 2A[1] | 22 | 184 | 27 | 145 | 28 | 155 | 16 | 147 | 19 | 121 |
| 2B | 73 | 231 | 86 | 212 | 72 | 197 | 59 | 202 | 57 | 172 |
| 2C | 223 | 233 | 173 | 240 | 171 | 203 | 144 | 170 | 140 | 164 |
| 3A | 229 | 487 | 270 | 485 | 276 | 446 | 232 | 403 | 212 | 410 |
| 3B | 262 | 355 | 236 | 364 | 211 | 293 | 181 | 292 | 191 | 261 |
| 4A | 364 | 196 | 142 | 328 | 111 | 301 | 88 | 241 | 69 | 213 |
| 4B | 158 | – | 73 | 315 | 86 | 238 | 95 | 218 | 87 | 230 |
| 4CDE | 104 | – | – | 202 | – | – | – | – | – | – |
| Total | – | – | – | – | – | – | – | – | – | – |

[1] Estimated fishery CEY and staff recommendations from coastwide stock assessment with survey partitioning to area as presented in the 2007 Annual Meeting Handout. The closed area stock assessment produced staff recommendations by area in millions of pounds of: Area 2A = 1.34; Area 2B = 11.47; Area 2C = 8.51; Area 3A = 26.20; Area 3B = 9.22; Area 4A = 2.89; and 4B = 1.44 and Area 4CDE = 4.10. The Commission determined the 2007 catch limits using recommendations based on the closed area stock assessment.

[2] Area 2A includes sport catch and treaty Indian catch

[3] Area 2B includes sport catch

[4] Catch limits do not include additional pounds from underage/overage programs

[5] Catch does not include IPHC research catch

[6] 2007 data are preliminary

[7] lbs/skate: Area 2A CPUE based on small sample; refer to Clark and Hare (2007) for Areas 4C and 4D CPUEs

# EXHIBIT 2

DEC-05-2006 TUE 10:28 AM                    FAX NO.                                    P. 01

COMMISSIONERS:
CLIFF ATLEO
PORT ALBERNI, B.C.
JAMES BALSIGER
JUNEAU, AK
RALPH G. HOARD
SEATTLE, WA
PHILLIP LESTENKOF
ST. PAUL, AK
LAURA RICHARDS
NANAIMO, B.C.
GARY ROBINSON
VANCOUVER B.C.

# INTERNATIONAL PACIFIC HALIBUT COMMISSION

ESTABLISHED BY A CONVENTION BETWEEN CANADA

AND THE UNITED STATES OF AMERICA

AGENDA C-1
Supplemental
DECEMBER 2006

TELEPHONE
(206) 634-1838

FAX:
(206) 632-2983

December 1, 2006



Ms. Stephanie Madsen, Chair
North Pacific Fishery Management Council
605 West 4th, Suite 306
Anchorage, AK  99501

Dear Stephanie:

The recent publication of the recreational harvests of halibut in IPHC Regulatory Areas 2C and 3A in 2006 by the Alaska Department of Fish and Game has, with other removals, indicated that the Total Constant Exploitation Yield (CEY) established by the Commission for these areas has been exceeded.  Exceeding the Total CEY for an IPHC regulatory area requires that the Commission undertake conservation actions to restrain the total removals within this Total CEY. The achievement of the Commission's conservation mandate is dependent on adherence to catch limits and total yield.

While the Commission regularly undertakes actions to restrain total removals within the Total CEY, the potential regulatory actions take on a different character if: a) there is a need for Commission conservation actions, and; b) domestic agencies have adopted targets or limits for recreational fisheries that have been exceeded.  Under such conditions the Commission could adopt regulations that address both the need to restrain total removals and the needs of either contracting party to achieve domestic management targets for recreational fisheries, e.g. different seasons, bag limits, or different combinations of bag limits and seasons for each regulatory area, etc.

The IPHC staff notes the difficulty experienced by the Council in achieving its goal of adhering to the adopted GHL levels.  The staff wishes to apprise the Council of the potential to use the Commission regulatory framework to supply the Council with tools that may either be incorporated in, or substitute for, domestic regulations until they are developed.  This is not without precedent.  For example, it would be similar to the IPHC actions concerning sublegal halibut retention in Areas 4D and 4E, or concerning interim regulation of the commercial fishery while the domestic Alaskan IFQ regulations were being developed.  Both of these actions were implemented in furtherance of Council goals.  The Commission and its staff understand clearly that any changes in IPHC regulations for recreational fisheries should be accomplished only through joint discussion with the NPFMC and National Marine Fisheries Service (NMFS), and not through unilateral action by the Commission.  Further, in the absence of a specific request from the Council to the contrary, the Commission regulations would apply uniformly to all recreational fishery sectors.

At the 2006 IPHC Interim Meeting, the Commissioners directed the staff to undertake discussions with NPFMC and NMFS to determine if these agencies wish to explore the use of Commission recreational fisheries regulations to effect both the Commission's conservation mandate and the domestic allocation goals for Areas 2C and 3A. Should these agencies support such action, the Commission would consider a proposal to change its recreational fisheries regulations at the upcoming IPHC Annual Meeting on January 16-19, 2007 in Victoria, B.C.

The alternative to an action by the IPHC concerning recreational fishing regulations is to continue with the present Commission process of ensuring adherence to the Total CEY by subtracting the projected recreational harvest from the Total CEY for each regulatory area, and adopting catch limits for the commercial IFQ fishery based on the remaining CEY. In effect, if the recreational fishery exceeds domestic limits, there is a transfer of yield from the commercial fishery to the recreational fishery.

I and Gregg Williams of the IPHC staff will be attending your December meeting, and will be available to discuss this with the Council.

Sincerely yours,

Bruce M. Leaman
Executive Director


cc: Commissioners

# EXHIBIT 3

# 2007 IPHC harvest policy analysis: past, present, and future considerations

Steven R. Hare and William G. Clark

## Abstract

The IPHC harvest policy is updated to include the "slow up/fast down" fishery CEY adjustment and autocorrelated assessment error, and a range of spawning biomass thresholds is considered. We conclude that a harvest rate of 0.20 in combination with a threshold reference point equal to 1.5 times the limit reference point (i.e., the point at which fishing ceases) provides the optimal combination of yield and spawning biomass conservation, under conditions of either density dependent growth or continued slow growth. The halibut female spawning stock is determined to be well above the minimum reference points, however the harvest rate has been over target for the past few years. Exploitable biomass is declining in all areas. This is occurring in the western regions as the stock is fished down from a lightly exploited state and in the eastern regions because of the passage of two exceptional year classes (1987 and 1988), as well as the buildup of the western area fisheries. Projections indicate that spawning biomass and exploitable biomass will both increase sharply if the incoming 1999 and 2000 year classes remain as strong as the assessment currently estimates them. The current slow growth rate of halibut may not reverse as numbers are fished down due to the large increase in the biomass of arrowtooth flounder. The potential fishery impact of dropping the current 32-inch commercial minimum size limit is analyzed. We conclude that there is no long-term substantive gain from dropping the size limit.

## Introduction

Every year the International Pacific Halibut Commission (IPHC) harvest policy is reviewed and simulations conducted to determine an optimal harvest rate as well as the need for any additional conservation measures. The status of the halibut stock, relative to standard reference points, is now explicitly determined. A review of recent stock performance by major region is conducted and biomass projections are presented in response to industry requests. Further exploration of the growth rate of halibut in relation to other factors is also provided this year. Finally, we analyze the potential impact of dropping the current 32-inch commercial minimum size limit.

## Determination of stock status relative to reference points

Estimates of age-six recruits are obtained from closed area assessments and expanded to account for pre-recruit mortality in the commercial and bycatch fisheries (Clark and Hare 2006). The vast majority of pre-recruit mortality comes from the well-observed groundfish fisheries in the Bering Sea and Gulf of Alaska. Estimates of IPHC regulatory area pre-recruit mortality are derived using the "intermediate schedule" of the migration model developed by Clark and Hare (1998). For Areas 2B, 2C, and 3A combined, the average recruitment for year classes 1947-1976 is 4.13 million age-six halibut. For the year classes 1977-2001 the average is 13.00 million age-six halibut. These two different time periods reflect two phases of the Pacific Decadal Oscillation (Mantua et al. 1997) and correspond to different climate, and halibut productivity, regimes.

79

Thus, halibut recruitment in a low productivity regime is about 32% of recruitment during a high productivity regime.

The next step is to determine what spawning biomass (all references to spawning biomass are to the female component only) would be in the absence of fishing. There are different methods of doing this, but the method we use is to compute spawning biomass per recruit (SBR) in the absence of fishing and then multiply that number with average recruitment. The time period and size at age schedules used in these calculations are critical. One component of the IPHC harvest policy has been to maintain spawning biomass such that it does not drop below the observed historical minimum. It is also instructive to determine what fraction of unfished spawning biomass level that the historical minimum represents. That minimum occurred in the early 1970s, at the end of the low productivity period that began in the 1940s. This argues for using recruitment and SBR values from the low productivity period to establish historical, and contemporary, perspective.

Sex-specific size at age for halibut for both the low productivity (earlier) period and current high productivity period are illustrated in Figure 1a. The values are computed by averaging data from Areas 2B, 2C and 3A, weighted by abundance at age for each region. The earlier period values are computed from 1974-1977 length-at-age data, the later values from data for 2002-2005. The standard size selectivity curve (Fig. 1b) estimated in the coastwide assessment (Clark and Hare 2008) and used in the harvest policy simulations is used to compute SBR values. A single time-invariant maturity by age schedule is used to determine spawning biomass (Fig. 1c) The extremely divergent length at age schedules for the earlier and later periods give rise to very different SBR schedules (Fig. 1d). In the absence of fishing, SBR for the earlier/less productive period is around 118 lbs per recruit, compared to a value of around 50 lbs per recruit for the later period.

Two minimum spawning biomass limits are established, one for the long-term simulations and one for the coastwide stock. For the simulations, as has been custom in developing the harvest policy, areas 2B/2C/3A are combined. The purpose of establishing a coastwide limit is twofold: it establishes the level of the current biomass in relation to an unfished state and it establishes the point at which more conservative actions should be taken (i.e., lowering of the target harvest rate). Multiplying the low productivity period average recruitment value of 4.13 million age-six recruits by the SBR with no fishing gives an estimate, for areas 2B/2C/3A, of 489 million pounds for $B_{unfished}$.

The minimum spawning biomass limit for the coastwide stock is established in the following manner. For Areas 2B, 2C, and 3A the historical minimum observed spawning biomass (as estimated in the closed area assessments) is 63.7 million pounds. Based on the unfished biomass calculations described above (and summarized in Table 1), the historical minimum observed spawning biomass is 13% of unfished spawning biomass ($B_{13}$). As noted earlier, a cornerstone of the IPHC harvest policy has been to prevent spawning biomass from falling below the historical minimum and, in reality, to avoid even getting very close to that level. The reasoning for this has been that we can have some confidence that the stock can be (and has been) rebuilt from that level of spawning biomass but we have no experience with stock dynamics at a lower level. For the harvest rate simulations, we set the minimum biomass limit at 20% (rather than 13%) of $B_{unfished}$. This reflects both an extra layer of conservation and recognizes the recent finding that ongoing migration beyond age eight implies that the minimum observed biomass that produced the large recruitments of the 1970's was likely somewhat larger than 63.7 million pounds, due to immigration from outside the 2B/2C/3A areas. The biomass threshold reference point, i.e., the

80

point at which the harvest rate begins to be set lower than the target harvest rate, is set somewhere higher than $B_{20}$ and is discussed in the following section.

For the coastwide stock, we leverage data from 2B/2C/3A to compute $B_{unfished}$ and $B_{20}$ and then determine the current status of the coastwide spawning biomass. From the coastwide assessment, we have recruitment estimates for the period 1996-2007. Because there is substantial uncertainty in the most recent estimates, we use the 1996-2003 data which gives an average of 19.86 million age-six recruits. These recruits are from a productive regime. Using the ratio from areas 2B/2C/3A where recruitment in an unproductive regime is approximately 32% of the average in a productive regime, we estimate that average coastwide recruitment in an unproductive regime would be 6.31 million age-six recruits. Multiplying this number by the SBR (in the absence of fishing) value of 118.5 lbs results in a $B_{unfished}$ value of 748 million pounds. $B_{20}$ is 150 million pounds and the most recent assessment estimate of current spawning biomass ($B_{current}$) is 300 million pounds which translates to a value of $B_{40}$. This level of spawning biomass is very similar to target values set for many groundfish stocks in Alaska. The conclusion from this exercise is that the halibut stock, on a coastwide basis, is in good shape and not near a level that would trigger more conservative action. The time trajectory of the coastwide spawning biomass in relation to the reference points described above is illustrated in Figure 2.

The determination that $B_{current}$ is well above $B_{20}$ defines the halibut stock, on a coastwide basis, to be well above the minimum reference points, and therefore not in a region of added concern. It has also become common practice to determine whether actual removals are in line with the intent of the harvest policy. We do this by comparing actual harvest rates over time to the target harvest rate. The target harvest has ranged between 0.20 and 0.25 over the past decade. Figure 3 illustrates the currently estimated historical harvest rates compared to the range of target harvest rates. The realized harvest rate increased steadily from 1996 to 2006, rising to a maximum rate of 0.26. The rate has since declined to 0.24 for 2007. This is above target but is headed in the right direction. Incorporation of the "slow up/fast down" adjustment (described below) slows the transition from an above target harvest rate to the actual target rate. Additionally, ongoing retrospective behavior in the assessment has had the result of successively lowering estimates of earlier exploitable biomass thus retroactively raising the realized harvest rate.

## Harvest policy analysis

The simulation model used to analyze the IPHC harvest policy remains basically unchanged from the past few years and is fully described in Clark and Hare (2006). The analysis this year focused on three areas of refinement. First, in response to suggestions arising from the Center for Independent Experts (CIE) review (Clark et al. 2008), the analysis now incorporates assessment error (often termed observation error). Adding assessment error to the dynamic simulations should give a more realistic picture of how the harvest policy performs in the (real world) situation where assessments are uncertain and tend to evolve over time. The error was implemented by adding autocorrelated lognormal error to annual spawning biomass. Based on recent retrospective behavior of the halibut assessment model, a value of 0.25 was used for the lognormal standard deviation and lag-one autocorrelation was set at a moderately high value of 0.6. The CIE review also noted that the IPHC has routinely been applying a "Slow Up – Fast Down" (SUFD) adjustment to the Fishery CEY. This adjustment limits abrupt fishery CEY changes from one year to the next in the following manner. If a fishery CEY is greater than the previous year's catch limit, only 33.3%

81

of the increase is allowed. If a fishery CEY is lower than the previous year's catch limit, only 50% of the decrease is allowed. This adjustment was implemented in exactly this fashion for this year's harvest policy simulations. The effect of these two harvest policy simulation adjustments is discussed below.

The third area of refinement concerned the spawning biomass threshold, i.e., the biomass level at which the harvest rate begins to be set below the target rate in order to slow down the decline in biomass. The approach we took to analyze positioning of the spawning biomass threshold was to set it as a variable multiple of the minimum biomass limit (where the harvest rate set is set to zero). The range of values we analyzed was 1.0 (i.e., threshold equal to the limit) to 2.0 (i.e., threshold at $B_{40}$, double the limit). Analyses were conducted with and without incorporating the SUFD adjustment, and with and without inclusion of observation error. Simulations were conducted for two alternative states of nature ("scenarios"): Standard scenario which incorporates density dependent growth response and Slow Growth scenario which sets growth rate constant at the slow rate currently extant in the population. Thus, a total of eight different combinations were analyzed. It turned out that the effects of both the SUFD adjustment and the inclusion of assessment error were minor and of little influence on the results. Therefore, only two sets of results are illustrated – one for the Standard scenario and one for the Slow Growth scenario and both sets of results incorporate the two adjustments. The Slow Growth scenario is a conservative metric and serves as a "worst case" scenario for management of halibut. Performance of the harvest policy over a range of harvest rates was assessed in terms of impact on spawning biomass, frequency of triggering target harvest rate reduction, fraction of maximum yield taken, and average "realized" harvest rate.

Results for the Standard scenario are illustrated in Figure 4 and results for the Slow Growth scenario are illustrated in Figure 5. In all plots, harvest rate increases from left to right along the x-axis while the biomass threshold increases from bottom to top along the y-axis. Thus any combination of harvest rate and threshold can be considered. For 2006, the target harvest rate was recommended at 0.20 and the threshold at 1.5 times the limit. This combination is indicated by a large dot on all the plots. The four plots for both scenarios illustrate the tradeoff between higher harvest rate and protection to the spawning biomass as well as the impact of the growth rate. The upper left plot shows how often the spawning biomass drops to within 25% of $B_{20}$. While this is a somewhat arbitrary level of concern, it is a point at which serious concern about the spawning biomass would arise. For a given harvest rate and limit multiplier combination, the frequency of occurrence is substantially greater under the Slow Growth scenario. Under the recommended combination of a 0.20 harvest rate and limit multiplier of 1.5, the spawning biomass drops to within 25% of $B_{20}$ 10% of the time in the Standard scenario and 25% of the time under Slow Growth scenario. Setting a higher harvest rate or a lower threshold increases the frequency relatively sharply.

The upper right plots show how often the spawning biomass reaches the threshold, thereby triggering a reduction from the target harvest rate. Higher harvest rates as well as a larger limit multiplier both result in a more frequent occurrence of a harvest rate reduction. At a harvest rate of 0.20 and limit multiplier of 1.5, the harvest rate reduction would occur approximately 33% of the time under the Standard scenario and 45% of the time under the Slow Growth scenario. The lower right panels illustrate how the average harvest rate would be less than the target harvest rate because of the triggering. The bottom left panels show how much yield would be expected – compared to the maximum that would be obtained at a harvest rate of 0.30 and a limit multiplier

82

of 1.0 (termed $Y_{max}$) – for the various combinations of harvest rate and limit multipliers. For both scenarios, a target harvest rate of 0.20 and a limit multiplier of 1.5 would give about 85% of the $Y_{max}$. Of course the $Y_{max}$ is much lower under the Slow Growth scenario – the combination of harvest rate and limit multiplier results in the same Yield fraction relative to the respective $Y_{max}$'s.

We noted earlier that the simulations reported on above incorporated the IPHC SUFD adjustment to annual catch limits and that the effect was minor. For example, at the 0.20 harvest rate and limit multiplier of 1.5, there is a difference of less than 2% for each of the four measures of harvest policy performance. A small, but positive, benefit is that the spawning biomass threshold is reached less frequently, thus triggering a harvest rate reduction less often. The effect of adding assessment error to the simulations was also relatively minor, however its impact was to cause slightly more aggressive harvesting and a slightly more frequent triggering of the harvest rate reduction. Taking all the factors discussed above, we conclude that a target harvest rate of 0.20, in combination with a spawning biomass threshold of $B_{20}$ and a spawning biomass threshold of $B_{30}$ (i.e., a limit multiplier of 1.5) provides the optimum balance of yield and protection for the spawning biomass. While a slightly more aggressive harvest rate might be entertained under the Standard scenario, uncertainty about the future direction of growth rate (discussed further below) argues for equal, if not greater, attention to be paid to the Slow Growth scenario.

## Area by area summary of stock status and biomass indicators

The coastwide assessment indicates a declining spawning biomass but one that is still well above a level of concern or anything close to historic minimums. Survey CPUE indices indicate that catch rates are down in all IPHC regulatory areas over the past 5 to 10 years. The reasons for decline vary from area to area however. The western regions were relatively lightly fished until the mid 1990s while there has been a long history of full exploitation in the eastern regions. Mean size at age continues to decline as well. In this section, we examine indicators of abundance for each region as well as the history of removals, fishing effort, and catch rates and discuss the current biomass trends area by area. Recent trends in harvest rates are illustrated in Figure 6. This set of rates is derived using the coastwide population assessment (Clark and Hare 2008) in combination with a three year running mean of survey partitioning. For comparison, a summary of presumptive harvest rates based solely on the closed area assessments is also provided in Figure 6. There are no closed area assessments for Area 2A and 4CDE. A summary of decadal changes in CPUE, effort, and assessed biomass estimates for each of the regulatory areas is given in Table 2. These values reflect the 2006-2008 average values compared to the 1996-1998 average values; this averaging was done to minimize the influence of any single large deviant value.

### Area 2

Area 2A, 2B and 2C indices are illustrated in Figures 7, 8 and 9, respectively. Total removals have been very steady in all three areas for the past decade. In Area 2A, both commercial catch and sport catch increased by a factor of two between 1996 and 2007 while bycatch declined by more than 50% over the period. Commercial fishing effort tripled in 2A over the past decade, remained level in 2B and has increased substantially in 2C the past few years. All three areas show similar trends in the biomass indices. Commercial CPUE has declined 20-30% and survey CPUE has declined around 50% in all three areas since the mid 1990s. The coastwide assessment with survey partitioning estimates an exploitable biomass decline of 27% in 2A, 45% in 2B and 55%

83

in 2C. The closed area assessments in Areas 2B and 2C estimate an exploitable biomass decline of 26% and 17%, respectively.

All the indices are consistent with a picture of a steadily declining exploitable biomass in Area 2. The reasons for the decline are likely twofold. The first is the passing through of the two very large year classes of 1987 and 1988. Every assessment over the past decade has shown that those two year classes were very strong in comparison to the surrounding year classes. Now that those two year classes are 20 years old, their contribution to the exploitable biomass and catches has sharply declined and the drop in biomass is to be expected as they are replaced by year classes of lesser magnitude. A second factor relates to the relatively recent finding that eastward migration apparently continues beyond the age of recruitment to the fishery. Prior to the mid 1990s, the westward regions were relatively lightly fished. However, now that area 3B and westward are fully engaged, there is a decrease in the number of fish that migrate into Area 2. Taken together, the decline in exploitable biomass in Area 2 is understandable and is not cause for undue alarm. However, under a constant exploitation harvest strategy, removals by the fishery must come down as the biomass declines. Our present view of Area 2 is that harvest rates have been much higher than the target rate of 0.20 over the past decade (Fig. 6). Such a high target rate was sustainable over decades but was possible only because of the low exploitation rates to the west. As that situation has changed, it has become paramount that harvest rates be brought down to the target harvest rate in Area 2.

## Area 3

Area 3A and 3B indices are illustrated in Figures 10 and 11. While these two areas occupy the central area of distribution of the halibut stock, they have substantially different exploitation histories over the past 10-20 years. Area 3A removals, both the total as well as the individual components (commercial, sport, bycatch) have been very stable over the past 10 years. Commercial effort has also seen relatively little variation. The CPUE indices show a slow decline with a drop of 12% in the commercial and 28% in the survey between 1997 and 2007. The coastwide assessment estimates a decline of 11%, while the closed area assessment estimates a decline of 27% over the same time frame. Area 3B saw a large increase in removals beginning in 1996 which peaked in 2002 and has dropped sharply since. Commercial fishing effort more than tripled in the seven years after 1996 and then declined modestly over the past four years. Commercial and survey CPUE both dropped by a bit more than 50% between 1997 and 2007. Both assessments suggest biomass dropped by around 42% between 1997 and 2007.

Area 3A has the appearance of being the most stable of the IPHC regulatory areas. The area has been fully exploited for many decades and there is a wealth of data detailing the population dynamics. The area also sits at the center of halibut distribution and it appears that emigration is roughly equal to immigration resulting in an effectively closed population. Like Area 2, Area 3A benefited from the very large year classes of 1987 and 1988 and the slow decline in exploitable biomass is the result of those year classes dying off. The biomass remains in a healthy state and will continue to support removals of the size seen over the past 2-3 decades. The situation in Area 3B is different. Area 3B was relatively lightly fished until the mid 1990s. With the introduction of a regular survey, quotas were incrementally increased from 4 million pounds to a high of 17 million pounds. Predictably, catch rates declined steadily. Our view of Area 3B is that the area had an accumulated "surplus" biomass that could be (and was) taken but the level of catches was not sustainable. The area has now been fished down and the average annual yield will be somewhere

84

in between the low levels of the mid 1990s and the high levels of 5-6 years ago. As the area is also centrally located, we apply the dynamics of Areas 2 and 3A and believe that a constant harvest rate of 0.20 is appropriate for the region. The coastwide assessment suggests that harvests have been in the 0.15 to 0.19 range over the past six years while the closed area assessment suggests harvest rates have been between 0.23 and 0.33. However, the effect on ongoing eastward emigration out of 3B would cause a closed area assessment to underestimate contemporary biomass and thus overstate harvest rates.

## Area 4

Area 4A, 4B and 4CDE indices are illustrated in Figures 12, 13 and 14, respectively. The three areas have roughly similar commercial exploitation histories over the past decade and show similar trends. In all three areas, commercial catches increased from around 1.5 million pounds to around 4-5 million pounds between 1996 and 2001. Catches have since declined in all three areas, most strongly in Areas 4B and 4CDE where a lower target harvest rate of 0.15 was applied the past few years. Commercial effort mirrored the rise in removals from 1996-2001, however the drop in effort was not nearly as sharp as the drop in catches, and the drop in commercial CPUE is evident in the time series. Survey CPUE in Area 4A and 4B has declined around 70% over the past decade; the decline in Area 4D survey CPUE is around 46% (there is no survey index for 4C or 4E). Both the coastwide and closed area assessments indicate an exploitable biomass decline of 67% for 4A and 4B; the coastwide assessment suggests a decadal decline of 49% for Area 4CDE.

The situation in Area 4 is somewhat like Area 3B only more exaggerated. Area 4 was very lightly exploited up until the mid 1990s. With the onset of surveys, quotas were quickly increased and the accumulated surplus biomass quickly removed. Catches of 4-5 million pounds in each area are clearly not sustainable, as was stated by the IPHC staff when higher catch limits were recommended. In Area 4B, where catch limits were dropped most strongly, there is evidence of a reversal in the strong biomass decline. Over the past three years, the CPUE indices have actually increased slightly and the two assessments estimate a level time trend in exploitable biomass. Area 4A, which still has a target harvest rate of 0.20, has not yet shown signs of reversing its strong decline and has become an area of concern to the staff. Area 4CDE is also still declining though the biomass indices appear to be flattening out. Area 4CDE commercial removals may well be near an optimum level but bycatch in the groundfish fisheries is still very large (accounting for more than 50% of total 4CDE removals) thus any future increase in 4CDE will require a reduction in bycatch loss. Areas 4B and 4CDE have a lower target harvest rate due to ongoing concerns about the sustainable level of productivity in those regions. The target harvest rate of 0.20 for the central portion of the stock is based on analyses of decadal long stock dynamics and it is not necessarily appropriate that the same dynamics be assumed for the westward regions. The westward regions differ substantially form the central and eastern regions in that bycatch of juveniles (which strongly affects overall productivity of the stock) is much higher and there is net emigration from Area 4 of exploitable halibut. These concerns will be addressed in a, upcoming study focusing solely on Area 4 population dynamics to help determine whether a single harvest rate, possibly different form the central and eastern regions, should be applied for all of Area 4.

85

## Five-year exploitable and spawning biomass projections

The annual stock assessment produces an estimate of the total number of halibut, ages 6 and older, in the ocean (Fig. 15). With this set of numbers and assuming that life history parameters, such as size at age and maturity at age, remain close to what they are today, we can make biomass and yield projections for several years into the future. Because the age range of halibut in the catch is generally in the 10-20 year old range, estimates of recruitment – which are often imprecise – do not much influence the projections. The time series of abundance shown in Figure 15 illustrate the strength of the celebrated 1987, and to a lesser extent 1988, year classes. The current assessment suggests that two extremely large year classes – 1999 and 2000 – are poised to enter the exploitable biomass over the next few years. Presently, both year classes look to be larger – in terms of numbers – than the 1987 and 1988 year classes. However, it is important to note that size at age is much smaller now than it was 20 years ago. This has two important ramifications – first it means that the 1999 and 2000 year classes are only just beginning to reach the exploitable size range and, therefore, their true numbers in the population are still quite uncertain. Secondly, it also means that for a given number of halibut, their collective biomass will be lower. Currently, a large fraction of males never reach the minimum size limit and thus never enter the exploitable biomass. It remains to be seen just how these year classes will develop. If we assume that size at age remains at the values seen this year, then the projections for both the exploitable biomass and spawning biomass are very optimistic (Fig. 16) and indicate that the declines we have seen over the past decade are on the verge of reversing. It important to note that removals should still remain at around 20% of the exploitable biomass and not be kept high in anticipation of future increases. As happened in the mid 1990s, when the biomass rises, higher catch limits will follow.

## Update on halibut size-at-age

Halibut size at age continues to decline (Fig. 17). Mean size at age for older fish is lower than at any point since size data have been collected. For example, a 20 year old female halibut from the Kodiak Island area weighs, on average, about 32 pounds. Ten years ago, a 20 year old female from the same area averaged about 60 pounds; 20 years ago the average was over 150 pounds. Compared to 20 years ago, mean size at age has decreased at least 50% for all ages over 10. The decline has occurred in all areas though it is greatest for Area 3A. Clark and Hare (2002) compared the growth changes to trends in the environment and halibut stock size. They concluded that the change in growth rate was likely density dependent and related most strongly to the number of adult (age 10+) halibut in the population. Despite the steep decline in exploitable biomass, much of which is due to decreased size at age, the most recent stock assessment estimates there are more halibut in the ocean than ten years ago. The density dependence argument suggests that growth rates will remain very low until the halibut numbers are thinned.

There has been, however, a stark change in the large marine ecosystem in which halibut reside. While a number of commercially important species have fluctuated in abundance, there is one particular species that has increased exponentially over the past 20 years. The biomass of arrowtooth flounder (*Atheresthes stomias*) in the Gulf of Alaska is estimated to have increased from a level of 400,000 mt in 1970 to over 2.2 million mt in 2006 (Turnock and Wilderbuer 2007). A comparison of arrowtooth biomass, halibut biomass and size at age for three age classes of halibut over the past 40 years is presented in Fig. 18. Arrowtooth flounder, while smaller than halibut, likely exploit much of the same habitat and thus compete for available food. There is no

86

commercial fishery on arrowtooth, they are infrequently seen in the diets of marine mammals and are not know to be cannibalistic. The environmental conditions that accompanied the climatic regime shift of 1976-77 and favored increased productivity of halibut had the same effect on arrowtooth. However, the lack of predation on arrowtooth meant that the population grew – and may still be growing – at an unchecked exponential rate.

It is entirely reasonable to surmise that the current slow growth rate of halibut is due not only to the increased numbers of halibut in the ocean but also the greatly increased number of arrowtooth. It is then also reasonable to conclude that fishing down the number of halibut will not necessarily lead to an increase in halibut growth rates. If this "new world order" persists, then it becomes important to factor this into any analysis of the harvest rate. The performance of the halibut harvest policy under conditions of continued slow growth was presented in Figure 5. It can be anticipated that for any given harvest rate, there will be less yield and more occasions of low spawning biomass under slow growth conditions. This argues for a harvest rate no greater than 0.20 and possibly for something a bit lower. If growth rates continue to decline even further, reevaluation of the harvest rate will be undertaken.

## Long-term and short-term implications of dropping the 32-inch commerical minimum size limit

In 1974, the coastwide minimum size limit for the commercial halibut fishery was set at 32 in (81.3 cm), an increase of 6 in over the previous size limit of 26 in (66.0 cm). The change was made based on a yield per recruit analysis by Myhre (1974). Changes in the growth rates of halibut have prompted continued investigations into the appropriateness of the 32-inch size limit (Clark and Parma 1995, Parma 1998, Hare and Clark 2005). All of these studies supported maintaining the current size limit. With the continued decline in growth rates and the large biomass of halibut that are "unexploitable" due to the size limit and the commercial selectivity pattern, the 32-inch size limit is revisited once again.

The major difficulty in evaluating the effect of changing the size limit is estimating the change in commercial selectivity as well as the level of compliance with any change in the limit. The simplest alternative size limit to analyze is the case of no minimum size limit. In this situation, we can assume that the resultant selectivity would approximately resemble the IPHC setline survey selectivity (Fig. 19). This selectivity is estimated in the coastwide population assessment model and is based on coastwide survey catches for 1997-2007 using standard survey gear. As there is very little catch below 26 in (66.0 cm), having no size limit has roughly the same effect as having a 26-inch (66.0 cm) minimum size limit, as was the situation prior to 1974. A supporting reason for analyzing the no-minimum-limit alternative is that, practically speaking, it would be the easiest regulation to enforce, requiring retention of all caught halibut.

The IPHC bases its harvest policy, and recommended harvest rate of 0.20, on a dynamic simulation of time-varying halibut productivity regimes. The policy is intended to be robust across periods of lower productivity as well as for different regimes of growth rates. As noted above, it is uncertain whether growth rates will return to the rates of the 1960s and 1970s. Assuming that the current growth rates will not increase over the next decade or so, a "per recruit" analysis based on current growth rates, the female maturity schedule, and commercial and survey selectivity schedules can help establish the impact of dropping the size limit. One of the most common harvest strategies for Alaska groundfish, based purely on life history parameters, is a $F_{35}$ strategy

87

(Clark 1991). Under such a strategy, a target harvest rate is established such that spawning biomass per recruit (SBR) is reduced to 35% of its value in the absence of fishing.

The schedules of SBR in relation to harvest rate for commercial and survey selectivities are illustrated in Figure 19. It is important to note that the selectivity schedule is what determines exploitable biomass – for any given population, survey exploitable biomass will be greater than commercial exploitable biomass due to the higher rate of selectivity at all lengths. A given harvest rate therefore, results in larger removals for survey selectivity compared to commercial selectivity. At current growth rates, survey selectivity reduces spawning biomass per recruit to 35% of the unfished value at a harvest rate around 0.16, compared to a harvest rate around 0.21 for commercial selectivity. Thus, if the size limit was dropped and the resultant commercial fishery approximated the IPHC setline survey fishery, the target harvest rate would be set somewhere around 0.16.

Various other considerations come into play when comparing the current size limit with dropping the size limit (Fig. 20). Yield per recruit is very similar for both policies up to a harvest rate of 0.25. Exploitable biomass per recruit starts out higher with no size limit but drops more rapidly than the 32-inch (81.3 cm) size limit policy as harvest rates increase. The mean weight of fish in the catch is significantly lower when there is no size limit – since yields are roughly similar this means that the catch would be comprised of many more, smaller fish. A rough approximation of the financial impact of dropping the size limit is also provided in Figure 20. Using the IPHC setline survey prices for the different size categories, the dollar value per age-six recruit to the population can be computed. Halibut less than 32 in (81.3 cm) fall into the under-10 pound category, for which there is no established price. We utilized a range of prices, from $3/lb to $4/lb to estimate the financial impact of retaining smaller fish. It turns out that the difference in dollars per recruit is very minor at all harvest rates examined.

The "per recruit" analysis suggests that, at current growth rates, a harvest policy of no minimum size limit, combined with a smaller harvest rate, has approximately the same impact on the halibut population as a policy with a 32-inch (81.3 cm) size limit. The basic difference between the two is that a larger number of smaller fish would be taken for an equal (ex-vessel) fishery value. A bigger question concerns the implications of a lack of compliance with a removal of the size limit, particularly if the harvest rate is not revised downwards in tandem with the redefinition of the exploitable biomass that dropping the size limit would entail. Using the 2008 halibut population numbers as estimated in the assessment, we can examine the projected impacts for both policies. The commercial selectivity schedule yields an exploitable biomass of 361 million pounds. At a harvest rate of 0.20, the CEY would be 72.2 million pounds. A survey selectivity schedule yields an exploitable biomass of 482 millions pounds. A harvest rate of 0.16 would give a CEY of 77.0 million pounds while, coincidentally, a harvest rate of 0.15 would give a CEY of 72.2 million pounds. Thus, under current conditions a 32-inch (81.3 cm) size limit with a harvest rate of 0.20 and no size limit with a harvest rate of 0.15 result in the same CEY. Under both scenarios, the estimated 2009 coastwide spawning biomass would be more than 340 million pounds (and as high as 345 million pounds if all small fish were retained). We estimate that, with a lower harvest rate, there would be no deleterious effect to the stock if fish less than 32 in (81.3 cm) were not retained (i.e., if high grading occurred), but if smaller fish were retained, there would be the beneficial effect of leaving more large (and mostly female) fish in the water. If, however, the size limit were dropped but the harvest rate kept the same, the impact on the spawning biomass would be highly negative. A 20% harvest rate applied to the survey selectivity exploitable biomass results in a CEY of 96.2 million pounds. Depending on the degree of highgrading that took place, the estimated

88

2009 spawning biomass would be 2.5-3.5% lower than under the optimal level of harvesting. If such a practice continued over several years, the spawning biomass would quickly drop to near the levels of concern identified earlier.

Lastly, this analysis was conducted under an assumed fixed schedule of maturity and two different but fixed schedules of selectivity. The dynamics of the maturity schedule in particular, are not well determined. In addition, there is a growing body of evidence that suggests that greater attention to the age and size-specific contribution to the spawning biomass is required to understand their influence on stock dynamics. The staff has not yet conducted such analyses and it should do so before a major change in size or age-specific harvesting is contemplated.

## References

Clark, W. G. 1991. Groundfish exploitation rates based on life history parameters. Can. J. Fish. Aquat. Sci. 48: 734-750.

Clark, W. G. and Hare, S. R. 2006. Assessment and management of Pacific halibut: data, methods, and policy. Int. Pac. Halibut Comm. Sci. Rep. 83.

Clark, W. G. and Hare, S. R. 2008. Assessment of the Pacific halibut stock at the end of 2007. Int. Pac. Halibut Comm. Report of Assessment and Research Activities 2007:177-204.

Clark, W. G., Hare, S. R. and Webster, R.A. 2008. Staff response to peer review. Int. Pac. Halibut Comm. Report of Assessment and Research Activities 2007:167-176.

Clark, W. G. and Parma, A. M. 1995. Re-evaluation of the 32-inch Commercial Size Limit. Int. Pac. Halibut Comm. Tech. Rep. 33.

Hare, S.R. and Clark, W. G. 2005. Yield per recruit analysis for a sex specific halibut assessment model. Int. Pac. Halibut Comm. Report of Assessment and Research Activities 2004: 171-183.

Mantua, N. J., Hare, S. R., Zhang, Y., Wallace, J. M.and Francis, R. C.. 1997. A Pacific interdecadal climate oscillation with impacts on salmon production . Bull. Amer. Meteor. Soc. 78: 1069-1079.

Myhre, R. J. 1974. Minimum size and optimum age of entry for Pacific halibut. International Pacific Halibut Comm. Sci. Rep. 55.

Parma, A. M. 1998. Re-evaluation of the 32-inch Commercial Size Limit. Int. Pac. Halibut Comm. Report of Assessment and Research Activities 1997: 167-202.

Turnock, B. J. and Wilderbuer, T. K. 2007. Gulf of Alaska Arrowtooth Flounder Stock Assessment. In Stock Assessment and Fishery Evaluation Report for the 2007 Gulf of Alaska Groundfish Fishery. 54 p. Gulf of Alaska Groundfish Plan Team, North Pacific Fishery Management Council, P.O. Box 103136, Anchorage, AK 99510.

**Table 1. Parameter values used in calculation of Spawning Biomass reference points (see text for detail).**

|  | 2B/2C/3A | Coastwide | Units |
|---|---|---|---|
| Avg. Recruitment | 13.00 | 19.86 | Million age-six halibut |
| (High productivity) |  |  |  |
| Avg. Recruitment | 4.13 | 6.31 | Million age-six halibut |
| (Low productivity) | (32% of high) |  |  |
| SBR (at F=0) | 118.49 | 118.49 | Net lbs. per age-six recruit |
| (Low productivity) |  |  |  |
| $SBio_{unfished}$ | 489 | 709 | Million pounds (female) |
| $SBio_{20}$ | 98 | 150 | Million pounds (female) |
| $SBio_{30}$ | 147 | 224 | Million pounds (female) |
| $SBio_{min. obs.}$ | 64 |  | Million pounds (female) |
| $SBio_{current}$ |  | 300 | Million pounds (female) |

**Table 2. Decadal changes in several indices of abundance and effort. Values indicate change for 2006-2007 average from 1996-1998 average. CPUE is catch per unit effort, effort refers to standard 100 hook skates. CW assessment refers to estimates of exploitable biomass from the coastwide assessment with survey apportionment. CA assessment refers to estimates of exploitable biomass from the closed area assessments (there are no closed area assessments for Areas 2A and 4CDE).**

|  | 2A | 2B | 2C | 3A | 3B |
|---|---|---|---|---|---|
| Commercial CPUE | -31% | -20% | -30% | -12% | -52% |
| Survey CPUE | -49% | -54% | -55% | -28% | -56% |
| Commercial effort | +207% | +18% | +41% | +25% | +163% |
| CW assessment | -27% | -45% | -55% | -11% | -43% |
| CA assessment | NA | -26% | -17% | -27% | -42% |

|  | 4A | 4B | 4C | 4D | 4CDE |
|---|---|---|---|---|---|
| Commercial CPUE | -55% | -17% | -78% | -61% | NA |
| Survey CPUE | -71% | -65% | NA | -46% | NA |
| Commercial effort | +158% | -37% | NA | NA | +211% |
| CW assessment | -54% | -62% | NA | NA | -49% |
| CA assessment | -67% | -67% | NA | NA | NA |

90



**Figure 1. Parameter values used to determine unfished spawning biomass (B_unfished) and the relationship between harvest rate and spawning biomass per recruit (SBR). See text for details.**

91



**Figure 2. Historical level of spawning biomass in relation to various reference levels.**



**Figure 3. Plot illustrating the performance of the coastwide halibut stock in relation to conservation reference points. Along the x-axis, the annual spawning biomass level ($B_{annual}$) is shown relative to $B_{20}$, i.e., spawning biomass at 20% of its unfished value. Along the y-axis, the annual realized harvest rate ($HR_{annual}$) is shown relative to the target harvest rate ($HR_{target}$). The current target harvest rate of 0.20 corresponds to a value of 1.0. An earlier target harvest rate of 0.25 (used in 2004 and 2006 for some areas) corresponds to a value of 1.25. The sloped lines indicate the reduction in target harvest rate that would occur if $B_{annual}$ drops below the spawning biomass threshold (currently set at 1.5 times $B_{20}$).**

92



**Figure 4. Performance of the harvest policy across a range of target harvest rates and limit multipliers (i.e., setting of spawning biomass limit in relation to spawning biomass threshold) under conditions of density dependent growth. All simulations incorporate autocorrelated assessment error and annual removals are adjusted using the "slow up/fast down" procedure.**

93



**Figure 5. Performance of the harvest policy across a range of target harvest rates and limit multipliers (i.e., setting of spawning biomass limit in relation to spawning biomass threshold) under conditions of constant slow growth. All simulations incorporate autocorrelated assessment error and annual removals are adjusted using the "slow up/fast down" procedure.**

94





Figure 6. Summary of realized harvest rates from (top) the coastwide assessment (using survey partitioning) and (bottom) closed area assessments (there are no closed area assessments for Areas 2A and 4CDE.

95



**Figure 7. Summary of removals, effort and stock indicators for Area 2A. See text for details.**



**Figure 8. Summary of removals, effort and stock indicators for Area 2B See text for details.**

96



**Figure 9. Summary of removals, effort and stock indicators for Area 2C See text for details.**



**Figure 10. Summary of removals, effort and stock indicators for Area 3A. See text for details.**

97



**Figure 11. Summary of removals, effort and stock indicators for Area 3B See text for details.**



**Figure 12. Summary of removals, effort and stock indicators for Area 4A. See text for details.**

98



**Figure 13. Summary of removals, effort and stock indicators for Area 4B See text for details.**



**Figure 14. Summary of removals, effort and stock indicators for Area 4CDE. See text for details.**

99



**Figure 15. Coastwide population estimates of halibut in the most recent stock assessment (Clark and Hare 2008). Several very large year classes are noted.**



**Figure 16. Projected exploitable and spawning biomasses for the coastwide population of halibut.**

100



Figure 17. Mean weight at age of females in Area 3A from survey and research data collected back to 1926.

101



**Figure 18. Summary of arrowtooth flounder and Pacific halibut biomass trends along with trends in size at age for halibut.**

102



**Figure 19. Commercial and IPHC setline survey selectivity as estimated in the 2007 IPHC halibut assessment (left panel). Spawning biomass per recruit based on the two different selectivities is plotted in the right panel. The boxes indicate the location where spawning biomass per recruit drops to 35% of the respective rate at no fishing.**

103



Figure 20. Fishery performance data for a fishery following the current 32-inch (81.3 cm) size limit and for a fishery with no size limit that has a selectivity similar to the IPHC setline survey. See text for details.

104

# EXHIBIT 4



**Review of Recreational Fisheries Survey Methods**

Committee on the Review of Recreational Fisheries
Survey Methods, National Research Council
ISBN: 0-309-66075-0, 202 pages, 6 x 9, (2006)
**This free PDF was downloaded from:**
**http://www.nap.edu/catalog/11616.html**

Visit the National Academies Press online, the authoritative source for all books from the
National Academy of Sciences, the National Academy of Engineering, the Institute of
Medicine, and the National Research Council:
- Download hundreds of free books in PDF
- Read thousands of books online, free
- Sign up to be notified when new books are published
- Purchase printed books
- Purchase PDFs
- Explore with our innovative research tools

Thank you for downloading this free PDF. If you have comments, questions or just want
more information about the books published by the National Academies Press, you may
contact our customer service department toll-free at 888-624-8373, visit us online, or
send an email to comments@nap.edu.

This free book plus thousands more books are available at http://www.nap.edu.

Copyright © National Academy of Sciences. Permission is granted for this material to be
shared for noncommercial, educational purposes, provided that this notice appears on the
reproduced materials, the Web address of the online, full authoritative version is retained,
and copies are not altered. To disseminate otherwise or to republish requires written
permission from the National Academies Press.

**THE NATIONAL ACADEMIES**
*Advisers to the Nation on Science, Engineering, and Medicine*

R E V I E W   O F

# RECREATIONAL FISHERIES SURVEY METHODS

Committee on the Review of Recreational Fisheries Survey Methods

Ocean Studies Board

Division on Earth and Life Studies

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Copyright © National Academy of Sciences. All rights reserved.

**THE NATIONAL ACADEMIES PRESS**  500 Fifth Street, N.W.  Washington, DC 20001

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

This report is funded in part by a contract from the National Oceanic and Atmospheric Administration (NOAA). The views expressed herein are those of the author(s) and do not necessarily reflect the views of NOAA or any of its subagencies.

International Standard Book Number 0-309-10193-X

*Cover:* Image provided by the National Oceanic and Atmospheric Administration.

Additional copies of this report are available from the National Academies Press, 500 Fifth Street, N.W., Lockbox 285, Washington, DC 20055; (800) 624-6242 or (202) 334-3313 (in the Washington metropolitan area); Internet, http://www.nap.edu.

Copyright 2006 by the National Academy of Sciences. All rights reserved.

Printed in the United States of America

Copyright © National Academy of Sciences. All rights reserved.

# Summary

## INTRODUCTION

Recreational fishing in the United States is an important social and economic component of many marine fisheries. However, in some cases, recreational fishing takes more fish than commercial fishing, and in an increasing number of cases, recreational fishing is the main source of fishing mortality. In addition, current assessments indicate that some marine recreational fisheries have exceeded their quotas, raising concern because fishing effort in marine recreational fisheries is projected to increase. It is important that catch monitoring systems are adequate for timely management of these fisheries.

Marine recreational fisheries are not monitored with the same rigor as commercial fisheries. However, as concerns about the effects of all types of fishing have grown, more attention has been paid to the possible impacts of marine recreational fishing. The growing interest in the effects of recreational fishing on fish stock size and composition has led to increased demands for timely and accurate data. Although the National Marine Fisheries Service (NMFS) of the National Oceanic and Atmospheric Administration implemented the Marine Recreational Fisheries Statistics Survey (MRFSS) in 1979 to obtain statistics about marine recreational fisheries, management goals and objectives have changed since then, as has the complexity of the recreational fishing sector. The need for and use of marine recreational fishery statistics in science and management have changed as well. This committee has identified several areas in which designers of sampling programs, data collectors, and users of recreational fisheries data appear to have incomplete communication, mismatched criteria, or other obstacles.

The MRFSS has two major components: an onsite component, in which anglers are intercepted and interviewed on the water or at sites

1

Copyright © National Academy of Sciences. All rights reserved.

Review of Recreational Fisheries Survey Methods
http://www.nap.edu/catalog/11616.html

2          *REVIEW OF RECREATIONAL FISHERIES SURVEY METHODS*

such as marinas where they access the water; and an offsite component, in which anglers are contacted and surveyed by telephone after their trips are completed. There has been widespread criticism of the nature and use of the MRFSS information. The MRFSS was (and is) intended to be a national program, but not all coastal states participate. In some cases, states have their own surveys of recreational fish landings instead of the MRFSS; in other cases, states have surveys that complement the MRFSS. In addition to this lack of uniformity of coverage, the quality of the MRFSS data for management purposes has also been questioned.

Indeed, it is much more difficult to collect data on recreational saltwater anglers than on commercial fishing operations. There are far more saltwater anglers than commercial fishermen—approximately 14 million anglers fished annually in recent years—and they do not land their catches at specific points where there are dealers, as do commercial fishermen. In addition, there are many modes of fishing (e.g., anglers who fish from head boats or charter boats, with guides,[1] from shore, on private boats, from private property), and many anglers release fish they catch. Some anglers travel far to fish and often fish only a few times each year, which makes them difficult to encounter in surveys. Others, who live within 50 miles of the coast, are much more likely to be intercepted by the MRFSS. Finally, most surveys of anglers depend to some degree on the anglers' recall and willingness to volunteer valid information. As a result, designing a survey that will provide accurate and timely information, with good coverage and at acceptable cost, is a major challenge.

Despite the complexity of the challenge and its importance for fishery management, the MRFSS staff have been severely handicapped in their efforts to implement, operate, and improve the MRFSS, including implementing the recommendations of earlier reviews. It is not reasonable to expect such a small staff—and one that lacks a Ph.D.-level mathematical statistician—to operate a national survey of such complexity, despite the dedication of the small staff the MRFSS does have.

---

[1] Head boats, also called party boats, take large groups of anglers (sometimes as many as 100) on fishing trips; the groups usually are not pre-formed. Charter boats (also occasionally called party boats) take smaller groups of anglers, usually four to eight, most often in pre-formed groups. Guided trips are trips in which a guide takes one or two anglers in a smaller boat. These different categories operate under different U.S. Coast Guard and state license requirements. Throughout this report, these sectors are collectively referred to as the for-hire sector.

Copyright © National Academy of Sciences. All rights reserved.

Review of Recreational Fisheries Survey Methods
http://www.nap.edu/catalog/11616.html

In addition, the MRFSS is severely limited by the lack of a universal sampling frame for all saltwater anglers, a lack that is not of the MRFSS's own making. To make matters even more difficult, some of the data that the MRFSS depends on are collected by states, which use a variety of data-collection and sampling protocols. Finally, the financial resources allocated to the MRFSS are modest in comparison to the challenge. This committee's findings and recommendations should be viewed with this in mind.

## THE PRESENT STUDY

To help identify solutions to some of the above problems, NMFS asked the National Academies to assemble a committee to review current marine recreational fishing surveys and to make recommendations for improvements—especially to the MRFSS—and to recommend the implementation of possible alternative approaches. (See Box S.1 for the committee's statement of task.)

In response, the National Research Council (NRC) of the National Academies established the Committee on the Review of Recreational Fishing Survey Methods, composed of experts in survey design and statistics, biological statistics, fishery management, and the economics and sociology of recreational fishing. The background and support for the conclusions and recommendations presented below are found in subsequent chapters.

## CONCLUSIONS AND RECOMMENDATIONS

### General Conclusions

- The committee agrees with conclusions of previous NRC committees that marine recreational fishing is a significant source of fishing mortality for many marine species and that adequate scientific information on the nature of that mortality in time and space is required for successful management of those species.
- Marine fisheries management goals, objectives, and context have changed since the MRFSS was begun in 1979. Management

Copyright © National Academy of Sciences. All rights reserved.

4                REVIEW OF RECREATIONAL FISHERIES SURVEY METHODS

Box S.1
Statement of Task

This study will critically review the types of survey methods used to estimate catch per unit effort and effort in recreational fisheries, including state and federal cooperative programs. The committee will examine representative survey types but will not evaluate every regional or state survey method currently in use. The study will consider the match or mismatch between options for collecting recreational fisheries data and alternative approaches for managing recreational fisheries.

In particular, the committee will assess current types of survey methods giving consideration to:

- Their suitability for monitoring different types of fishing (e.g., charter boats versus private boats, offshore versus inshore, species, fisheries with temporally or spatially restricted fishing seasons).
- The adequacy of providing the quality of information needed to support various approaches for managing recreational fisheries, with reference to how the management approach might be restricted by the type of survey method, stratification scheme, and sample size required. For example, is the management unit, frame (in-season, annual, or multi-year), consistent with temporal design of the survey? Is the geographic scale of management (e.g., state versus regional) appropriate for the resolution provided by the survey? How would the survey design need to be modified to match the requirements of the management approach?
- Make recommendations regarding possible improvements to current surveys and/or possible implementation of alternative approaches, including setting priorities for reviewing monitoring methods that will yield the greatest improvements in effort and catch per unit effort estimates.

Current survey methods and recommended alternatives will be compared with relation to costs, sources of bias, precision, and timeliness.

decisions are often made at finer spatial and temporal scales than they were earlier, the mix of recreational and commercial fishing has changed for many areas and species, and stock-assessment models now make greater use of data from recreational fisheries.

- The MRFSS is in need of additional financial resources so that technical and practical expertise can be added to assist in a major overhaul of the design, implementation, and analysis of data from the MRFSS. Both the telephone and access components of the current approach have serious flaws in design or implemen-

Copyright © National Academy of Sciences. All rights reserved.

tation and use inadequate analysis methods that need to be addressed immediately.

- This committee's review has focused primarily on the MRFSS, but many of the component surveys of the MRFSS conducted by state agencies (with various degrees of federal funding) suffer from the same shortcomings as does the central MRFSS. As a result, many of this committee's recommendations apply to state surveys as well as to the MRFSS.

- Many of the independent surveys conducted by the states, as well as state-run surveys that are components of the MRFSS, are different from each other and from the central MRFSS in important ways, including sampling, data collection, and preparation of estimators.

- The committee concludes that users' concerns about the use of the MRFSS in fishery management are justified by the above-mentioned weaknesses, but they also result from inadequate communication and outreach on the part of the MRFSS managers at NMFS.

- The for-hire sector of marine recreational fisheries (i.e., charter, guide, and head boat operations) is more like a commercial sector than it is like the private-angler sector.

## General Recommendations

- The MRFSS (as well as many of its component or companion surveys conducted either indirectly or independently) should be completely redesigned to improve its effectiveness and appropri-ateness of sampling and estimation procedures, its applicability to various kinds of management decisions, and its usefulness for social and economic analyses. After the revision is complete, provision should be made for ongoing technical evaluation and modification, as needed, to meet emerging management needs. To improve the MRFSS, the committee further recommends that the existing MRFSS program be given a firm deadline linked to sufficient program funding for implementation of this report's recommendations.

- A much greater degree of standardization among state surveys, and between state surveys and the central MRFSS, should be

Copyright © National Academy of Sciences. All rights reserved.

6                    *REVIEW OF RECREATIONAL FISHERIES SURVEY METHODS*

achieved. This will require a much greater degree of cooperation and coordination among the managers of the various surveys.

- The for-hire sector of marine recreational fisheries should be considered a commercial sector, and survey methods and reporting requirements for that sector therefore should be different from those for private anglers.

### Sampling Issues Conclusions

- The committee concludes that the current methods used in the MRFSS for sampling the universe of anglers and for determining their catch and effort are inadequate. Sampling of each group of anglers (i.e., private, guided, head boat, charter boat) presents challenges that can differ across the groups. Two complementary methods of sampling are used in the MRFSS. One is onsite (i.e., intercepting anglers while they are fishing or at their access [landing] points). The other is offsite, which includes a variety of sampling techniques for contacting anglers after they have completed their trips. Both onsite and offsite methods suffer from weaknesses that may lead to biases in catch and effort estimation. Finally, the estimation procedure for information gathered onsite does not use the nominal or actual selection probabilities of the sample design and therefore has the potential to produce biased estimates for both the parameters of interest and their variances.

- Onsite methods fail to intercept anglers who have private access to fishing waters or intercept them only sporadically. It is impossible, using current methods, to obtain information on the target species of anglers who have private access. In addition, various physical, financial, and operational constraints often lead to spatial or temporal biases in onsite sampling coverage that are not adequately accounted for in the estimation equations.

- Offsite sampling methods that rely on telephone interviews are complicated by the increasing use of cellular telephones, especially in surveys of residents of coastal counties. This is because cellular telephones are not restricted to a geographic region as are landline telephones. If cellular telephones are excluded, then undercoverage of the survey will be increasingly problematic

Copyright © National Academy of Sciences. All rights reserved.

Review of Recreational Fisheries Survey Methods
http://www.nap.edu/catalog/11616.html

over time as the number of people who use only cellular telephones is growing.

- The existing random digit dialing (RDD) survey suffers in efficiency from the low proportion of fishing households among the general population and may allow bias in estimation from its restriction to coastal counties only.

- Reliance on fishing license-based lists of saltwater anglers is not yet feasible as a means of improving offsite sampling methods to avoid the inefficiency of RDD, undercoverage due to cellular telephone use, and restriction to coastal counties. Although many states collect angler information when a saltwater fishing license is purchased, there are license exemptions based on age, residence, access points, existence of a boat license, mode of fishing, and other factors. As a result, angler information for those states is incomplete. Some states have more complete information than others, and in the states that have no saltwater license, there is no list of saltwater anglers. The lack of a universal sampling frame (registry or license requirement) for all saltwater anglers is a major impediment to the development of a reliable and accurate survey program.

- Catch and release fishing (release of fish that survive capture) is increasingly common in many marine recreational fisheries. Although some fish survive capture and release, mortality may be high, in some cases exceeding 50 percent. The survey fails to provide a valid and reliable method of adequately accounting for fish caught and *not* brought to the dock (including fish released alive or dead, as well as fish caught for bait or given away before reaching the dock). This shortcoming affects estimates of catch and total removals.

- The correct identification of fish species, especially in places with diverse fish faunas, is a difficult challenge, both for many anglers and for those conducting surveys. Incorrect identification obviously has the potential to lead to incorrect conclusions from survey data.

**Sampling Issues Recommendations**

- A comprehensive, universal sampling frame with national coverage should be established. The most effective way to achieve this

Copyright © National Academy of Sciences. All rights reserved.

Review of Recreational Fisheries Survey Methods
http://www.nap.edu/catalog/11616.html

8                    *REVIEW OF RECREATIONAL FISHERIES SURVEY METHODS*

is through a national registration of all saltwater anglers or through new or existing state saltwater license programs that would allow no exemptions[2] and that would provide appropriate contact information from anglers fishing in all marine waters, both state and federal. Any gaps in such a program (e.g., a lack of registration in a particular region or mode, exemptions of various classes of anglers) would compromise the use of the sampling frame and, hence, the quality of the survey program. An updated, complete registration list would greatly improve sampling efficiency in terms of time and cost. Although these savings might not cover the entire cost of maintaining such a database, the benefit from the increased quantity and quality of the data would be worth the extra cost, especially if there is an associated increase in public confidence in the final estimates.

- Future telephone surveys should be based on the above universal sampling frame.
- Charter boat, head boat, and other for-hire recreational fishing operations should be required to maintain logbooks of fish landed and kept, as well as fish caught and released. Providing the information should be mandatory for continued operation in this sector, and all the information should be verifiable and made available to the survey program in a timely manner.
- Additional studies are needed to understand the extent to which fish are kept and inspected, as well as the extent of catch not available for inspection to improve the accuracy of catch estimates.
- Panel surveys, which contact individual anglers repeatedly over time, should be considered in recreational fishing surveys to gather angler trend data and to improve the efficiency of data collection.
- The onsite sampling frame for the MRFSS should be redesigned. The estimation procedure critically depends on the assumption that catch rate does not vary according to the nature of the access point. In particular, small or private access points that most likely are missed might have different catch rates than larger access points, which would lead to bias in the resulting estimators. In

---

[2] There is no scientific reason that a state should not continue to allow certain groups (e.g., seniors) to fish for free, as long as everyone is required to register in the universal sampling frame or have a state saltwater license.

Copyright © National Academy of Sciences. All rights reserved.

addition, the sampling process requires greater quality control (less latitude on the part of the samplers) than it has at present. (See the recommendation below for the establishment of an independent research group to investigate matters such as these.)

- Dual-frame procedures should be used wherever possible to reduce sample bias. For example, if a state has an incomplete list frame based on licenses, the use of an additional sampling frame of the state's residents (e.g., RDD) would reduce the bias. The existence of a universal frame described above would make this approach unnecessary for offsite sampling.

- Internet surveys should be considered for their potential use in recreational fishing surveys, especially in panel surveys, as a way for anglers to submit information.

## Statistical Estimation Issues Conclusions

- The designs, sampling strategies, and collection methods of recreational fishing surveys do not provide adequate data for management and policy decisions. Unknown biases in the estimators from these surveys arise from reliance on unverified assumptions. Unless these assumptions are tested and the degree and direction of bias reliably estimated, the extent to which the biases affect final estimates will remain unknown.

- The statistical properties associated with data collected through different survey techniques differ and often are unknown. The current estimators of error associated with various survey products are likely to be biased and too low. It is necessary, at a minimum, to determine how those differences affect survey results that use differing methods.

  Current analysis procedures used in the MRFSS do not exploit the current knowledge of finite population sampling theory. The current estimates are particularly deficient when applied to small areas because they do not use information in adjoining areas or time periods, nor do they consider relationships between species that occur together. Therefore, they are of lower precision than would be possible if this information were used. Improvements in these estimates would be of great use to managers who need to make quick decisions concerning spatial areas that are smaller than typical in the early years of the MRFSS.

Copyright © National Academy of Sciences. All rights reserved.

Review of Recreational Fisheries Survey Methods
http://www.nap.edu/catalog/11616.html

*REVIEW OF RECREATIONAL FISHERIES SURVEY METHODS*

### Statistical Estimation Issues Recommendations

- The statistical properties of various sampling, data-collection, and data-analysis methods should be determined. Assumptions should be examined and verified so that biases can be properly evaluated.

- A research group of statisticians should design new analyses based on current developments in sampling theory. These examinations should include experimentation, such as specific sampling of activities like nighttime fishing or fishing from private property, whose current underrepresentation in the MRFSS sampling has the potential to create bias.

### Human Dimensions Conclusions

- The MRFSS was not designed with human dimensions data (i.e., collection of social, behavioral, attitudinal, and economic data) in mind. The qualities of social, economic, and other human dimensions data have been compromised for many of the same reasons that the biological data have been compromised, including such issues as those related to coastal populations, telephone surveys, and sampling protocol. The human dimensions data have been further compromised by simply being added onto the biological data collection efforts that have different sampling requirements and survey design needs. Current surveys are largely focused on biological factors (e.g., numbers, sizes, and species of fish landed) and not on human dimensions factors. The statistical and sampling problems associated with social, behavioral, attitudinal, and economic data often can be considerably different from those associated with biological factors.

  If the number of marine fishing trips increases, it is likely that additional fishing access sites will be developed. In addition, social and environmental changes (e.g., changes in the distribution and numbers of people, a major hurricane) also can affect the availability and use of access sites. To ensure adequate coverage of the recreational fishery, a periodic updating of lists and descriptions of fishing locations and access sites is needed.

Copyright © National Academy of Sciences. All rights reserved.

**Human Dimensions Recommendations**

- An independent national trip and expenditure survey should be developed to support economic valuation studies, impact analyses, and other social and attitudinal studies. The sampling and survey procedures of the independent survey should be designed for the purpose of social and economic, not biological, analyses.
- Add-on surveys for human dimensions should be continued but in a more focused way than currently is done to target specific management needs and to supplement the national data as needed.
- The national database on marine recreational fishing sites and their characteristics should be enhanced to support social, economic, and other human dimensions analyses. Sites should be defined at levels as fine as possible. The data set should include site characteristics that matter to anglers in making fishing choices, such as boat ramps, facilities, natural amenities, parking, size, and type (e.g., beach, pier, launch point). To account for changes in the number and patterns of trips and the changing characteristics of sites, a periodic updating of the data should be conducted.

**Program Management and Support Conclusions**

- A large number of complex technical issues associated with surveys of marine recreational fishing remain unsolved, and a significant investment in intellectual and technical expertise is needed.
- A greater degree of coordination between federal, state, and other survey programs is necessary to achieve the national perspective on marine recreational fisheries that is needed.
- The recommended changes to the design and operation of the MRFSS and its continued development and operation will require additional funding above current levels.

Copyright © National Academy of Sciences. All rights reserved.

12                    *REVIEW OF RECREATIONAL FISHERIES SURVEY METHODS*

### Program Management and Support Recommendations

- A permanent and independent research group should be established and funded to continuously evaluate the statistical design and adequacy of recreational fishery surveys and to guide necessary modifications or new initiatives. Human dimensions expertise should be included as well.
- Additional funding is needed for a survey office devoted to the management and implementation of marine recreational surveys, including coordination between surveys conducted in various state and federal agencies.

### Communication and Outreach Conclusions

- It is difficult for individual anglers to see the effects of recreational fishing on their target species and to distinguish daily and seasonal fluctuations from trends. As a result, no matter how well designed and implemented a marine recreational survey is, it will not fully succeed without the cooperation of anglers. Unless anglers believe that the survey is well designed and implemented and that it is being used intelligently to address appropriate management issues, they are unlikely to participate.
- In particular, anglers need to have a basic understanding of the relationship between a statistically based sampling scheme and the frequency with which each of them is (or is not) contacted by a data collector.
- If anglers believe that their input is influencing the design and use of surveys, they are more likely to be satisfied with those surveys than otherwise.
- If anglers understand the basic purposes and decisions to which recreational fishing survey data are being applied and how those data are interpreted and used, they are more likely to feel confident that the approaches used are legitimate and are more likely to participate willingly and provide valid information.

### Communication and Outreach Recommendations

- Outreach and communication should be improved in several ways. The MRFSS managers should advise anglers and data

Copyright © National Academy of Sciences. All rights reserved.

Review of Recreational Fisheries Survey Methods
http://www.nap.edu/catalog/11616.html

users on the constraints that apply to the use of the data for various purposes. Managers and anglers also should be informed clearly about any limitations of the data.

- Outreach and communication should be institutionalized as part of an ongoing MRFSS program so their importance is acknowledged and appropriate expertise can be developed.
- Angler associations should be engaged as partners with survey managers through workshops, data collection, survey design, and participation in survey advisory groups. Many NRC and other reports stress the importance of using local and traditional knowledge, capacity building, and local communities in knowledge-gathering and dissemination activities. These recommendations apply, as well, to the recreational fishing community.

Copyright © National Academy of Sciences. All rights reserved.

# EXHIBIT 5

# SUMMARY DATA FROM THE SPORT FISHERY FOR PACIFIC HALIBUT IN THE IPHC AREA 2C PORTION OF SOUTHEAST ALASKA, 2007



by:

Diana L. Tersteeg
Michael J. Jaenicke
Alaska Department of Fish and Game
Division of Sport Fish
P.O. Box 11024
Juneau, AK  99811-0024

The Alaska Department of Fish and Game administers all programs and activities free from discrimination on the bases of race, color, national origin, age, sex, religion, marital status, pregnancy, parenthood, or disability. The department administers all programs and activities in compliance with Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act of 1990, the Age Discrimination Act of 1975, and Title IX of the Education Amendments of 1972.

*If you believe you have been discriminated against in any program, activity, or facility, or if you desire further information please write to ADF&G, P.O. Box 25526, Juneau, AK 99802-5526; U.S. Fish and Wildlife Service, 4040 N. Fairfield Drive, Suite 300, Arlington, VA 22203 or O.E.O., U.S. Department of the Interior, Washington DC 20240.*

*For information on alternative formats for this and other department publications, please contact the department ADA Coordinator at (voice) 907-465-4120, (TDD) 907-465-3646, or (FAX) 907-465-2440.*

# TABLE OF CONTENTS

                                                                                        **PAGE**

LIST OF FIGURES ...............................................................................................................ii

LIST OF TABLES ..............................................................................................................iii

INTRODUCTION ................................................................................................................1

METHODS ...........................................................................................................................1
Statewide Harvest Survey .................................................................................................1
On-Site Creel and Catch Sampling Surveys ....................................................................2
    Analysis of Historical Trends in HPUE, Harvest, and Effort .................................2
    Charter Vessel Licensing and Activity ...................................................................2
    Biological Data ........................................................................................................3

RESULTS ............................................................................................................................3
Regional SWHS Sport Harvests of Pacific Halibut, 1977-2006.......................................3
On-Site Survey Summaries of HPUE Trends, Harvest, and Effort for 2007 ....................4
    Ketchikan .................................................................................................................4
    Sitka .........................................................................................................................4
    Juneau......................................................................................................................4
    Craig and Klawock (west coast of Prince of Wales Island area) .............................5
    Petersburg and Wrangell ........................................................................................5
    Gustavus and Elfin Cove.........................................................................................6
Charter Vessel Activity......................................................................................................6
Biological Data ..................................................................................................................7

DISCUSSION.......................................................................................................................8

LITERATURE CITED ....................................................................................................... 10

i

# LIST OF FIGURES

**FIGURE**                                                                                                                                **PAGE**

1.    Map of Southeast Alaska showing boundaries of the International Pacific Halibut Commission
      (IPHC) regulatory areas, and the Statewide Harvest Mail Survey areas. ....................................................11

2.    Sport harvest totals of Pacific halibut in IPHC Area 2C by inner and outer coastal areas from
      1977 to 2003 as estimated by the Statewide Harvest Mail Survey (Howe et al. 2001 a-d, Walker
      et al. 2003; Jennings et al. 2004; Jennings et al. 2006 a, b; Jennings et al. 2007; Jennings et al.
      *in prep a, b*). ....................................................................................................................................12

3.    Historical halibut harvest per unit of effort (HPUE) and percent of catch retained by chartered
      and non-chartered anglers bottomfishing from the port of Ketchikan, Alaska from 1988 to 2007. .............13

4.    Semi-monthly chartered and non-chartered halibut harvest per angler-hour of bottomfishing
      effort (HPUE) in sampled ports of IPHC Area 2C during 2007. ..................................................................14

5.    Historical halibut harvest per unit of effort (HPUE) and percent of catch retained by chartered
      and non-chartered anglers bottomfishing from the port of Sitka, Alaska from 1988 to 2007.....................15

6.    Historical halibut harvest per unit of effort (HPUE) and percent of catch retained by chartered
      and non-chartered anglers bottomfishing from the port of Juneau, Alaska from 1988 to 2007..................16

7.    Historical halibut harvest per unit of effort (HPUE) and percent of catch retained by chartered
      and non-chartered anglers bottomfishing from the port of Craig, Alaska from 1988 to 2007.....................17

8.    Number of charter vessels registering with the Alaska Department of Fish and Game (ADF&G)
      from 1988 to 1997, the Commercial Fishery Entry Commission from 1998 to 2004, and
      ADF&G from 2005 to 2007 for use in Southeast Alaska waters (including Yakutat)................................18

9.    Chartered and non-charted historical trend of mean net weights (headed and eviscerated) of
      sport caught halibut in sampled IPHC Area 2C ports from 1998 to 2007. ..................................................19

10.   Chartered and non-chartered cumulative length-frequencies of sport caught halibut sampled in
      IPHC Area 2C ports during 2007..............................................................................................................20

11.   Comparison of cumulative length-frequencies of charter sport caught halibut sampled in IPHC
      Area 2C ports during 2003-2007...............................................................................................................21

12.   Summary of the percent of fish under 32 inches that were sampled from the charter angler
      harvest of halibut in IPHC Area 2C ports during 2003-2007. ....................................................................22

# LIST OF TABLES

**TABLE** **PAGE**

1.  Historical sport harvests of Pacific halibut in IPHC Area 2C (which excludes Yakutat) of Southeast Alaska from 1977 to 2006 as reported in the Statewide Harvest Mail Survey (modified from: Howe et al. 2002 a-d; Walker et al. 2003; Jennings et al. 2004; Jennings et al. 2006 a, b; Jennings et al. 2007; Jennings et al. *in prep a, b*)..................................................................23

2.  Total number of registered and active charter vessels by sampled ports as determined from on-site sampling in IPHC Area 2C from 2002 to 2007. ...................................................................24

3.  Number of surveyed trips (including salmon fishing trips) per charter vessel by port from on-site survey sampling in IPHC Area 2C from 2002 to 2007.........................................................25

4.  Number of charter vessel trips surveyed during on-site sampling in IPHC Area 2C reported to be targeting bottomfish only, salmon only, or both bottomfish and salmon from 2002 to 2007. .................26

5.  Estimated average length (cm) of Pacific halibut sampled during on-site surveys in IPHC Area 2C by non-chartered and chartered user groups from 2002 to 2007.........................................27

6.  Estimated average net weight (in pounds) for Pacific halibut sampled during on-site surveys in IPHC Area 2C by non-chartered and chartered user groups from 2002 to 2007. ..........................28

7.  Length frequency distributions of Pacific halibut sampled in IPHC Area 2C ports by on-site surveys for charter and non-charter user groups during 2007......................................................29

8.  Summary of harvested and sampled halibut, by whole or carcass ,brought back to port by charter and non-charter anglers as indicated by on-site the creel survey and catch sampling data at the various ports in IPHC Area 2C during 2007. ...................................................................30

iii

## INTRODUCTION

Sport fishing for Pacific halibut, *Hippoglossus stenolepis,* (herein referred to as halibut) in Southeast Alaska is an important recreational activity for resident and nonresident anglers alike. Sport harvests of halibut in the region rapidly increased in the late 1980s to mid-1990s as a result of continued increases in targeted effort. As the effort for this species continues to increase, an increasing demand is placed on managers to ensure the stocks can support exploitation by sport, subsistence, and commercial user groups. The Alaska Department of Fish and Game (ADF&G), Division of Sport Fish in Southeast Alaska collects some of the needed information from sport anglers returning from fishing trips. This information is compiled and presented to managers who monitor the status of these stocks. The surveys occur in the area defined by the International Pacific Halibut Commission (IPHC) as Regulatory Area 2C. This area excludes the Yakutat area of Southeast Alaska, which is included in IPHC Regulatory Area 3A (Figure 1). The following report provides a summary of the halibut data collected during the 2007 season by ADF&G creel survey staff, halibut estimates from the Statewide Harvest Survey (SWHS) through 2006, and historical trends from selected ports representative of Area 2C. Sport harvest summary information for the Yakutat area (IPHC Regulatory Area 3A) is compiled and presented by ADF&G Southcentral Region staff. All 2007 data summaries published in this report should be considered preliminary.

## METHODS

Two survey methodologies are employed by ADF&G to evaluate marine sport harvests of numerous fish species (including halibut) in Southeast Alaska: the annual SWHS and on-site (creel and catch sampling) surveys. Both survey types were vital to capturing the data presented in this report.

The ADF&G mandatory saltwater charter vessel logbook program initiated in 1998 discontinued the collection of halibut data in 2002. Dean and Howe (1999) and Dean (2001) presented brief summaries of preliminary results from the 1998 and 1999 logbook programs. In 2006, ADF&G reintroduced halibut into the logbook program and expanded the detail of reporting. Prior to 2006, charter operators recorded the total catch and releases for the boat party using one line per trip in the logbook. Beginning in 2006, operators were required to record the catch and releases of each angler as separate entries, as well as the sport fishing license number for anglers over 16 and 'youth' for anglers under 16. Logbook information is not included in this report, but during the on-site survey, staff recorded whether a trip was private or chartered, meaning the vessel was registered with ADF&G and was required to fill out a logbook.

Statewide Harvest Survey

The SWHS has occurred annually since 1977. Results from this survey are currently considered to be the official and final estimates of halibut harvest and saltwater effort. The survey uses a mail questionnaire to provide harvest, catch, and effort estimates for eight primary areas in Southeast Alaska: seven areas fall into IPHC Area 2C and one area falls into IPHC Area 3A (Yakutat; Figure 1). Much of SWHS area G, the outer coast of the Glacier Bay area is north of Cape Spencer and therefore also in IPHC Area 3A. Because very little sport harvest is taken in this area, all harvest in the Glacier Bay area is assigned to IPHC Area 2C. In 2000, SWHS area G was enlarged to include all of Icy Strait and Cross Sound, and thus the southern sections of these latter two water bodies are no longer included in SWHS area D (Sitka, Figure 1).

Questionnaires are mailed to a random sample of households containing at least one angler (both resident and nonresident) who purchased an Alaska sport fishing license in a given year, or who have either a permanent identification card for residents 60 years or older, or a Disabled Alaska Veteran card (both of which are permanent fishing licenses). The questionnaire is designed to obtain fishing activity by all household members. Individuals failing to respond to a first mailing are mailed a second form within a month of the first. Those individuals still not responding after two mailings are mailed a third and final form. Estimates of effort and harvest are determined from the responses, and final estimates are corrected to account for non-response

1

bias. The SWHS harvest estimates from 1996-1998 were revised in September 2000 (Howe et al. 2001 a-c). The SWHS harvest estimates for 2007 will not be available until mid to late 2008.

On-site Creel and Catch Sampling Surveys

On-site surveys occurred in nine primary communities in IPHC Area 2C, and varied in duration and type based on the data collection needs of managers. Creel surveys in Juneau, Ketchikan, and Sitka began in late April and continued through late September 2007. The surveys were designed to enable managers to make inseason estimates of the sport fish harvests in local areas. Additionally, catch sampling programs were in place in Craig, Klawock, Petersburg, Wrangell, Gustavus, and Elfin Cove from May to September. Similar types of data were collected from returning anglers in these areas, but were designed in a way that did not allow for direct inseason estimates of harvests. During the 2003 season, length and effort data were collected in Elfin Cove (Glacier Bay area) as part of a graduate student project. Sampling followed the guidelines established by ADF&G and were combined with data gathered in Gustavus. In 2004, the catch sampling program in Elfin Cove became an ADF&G funded, staffed, and managed project. At all sampled ports in 2007, returning anglers interviewed by ADF&G personnel were queried for the following information: type of trip (charter vs. non-charter); vessel license number and logbook number (if charter); species targeted (bottomfish, salmon, etc.); number of anglers fishing; number of rods fished; total time (hours) spent fishing; number of days fishing (if a multi-day trip); statistical area(s) fished; composition of the catch (by number of each species kept and released); and verification of the catch ("verified" if the sampler observed the catch or "not verified" if they took the angler's word).

Analysis of Historical Trends in HPUE, Harvest, and Effort

To compare present and historical levels of angler success, estimates of halibut harvest per angler-hour of effort (HPUE) were computed from on-site survey data collected from 1988-2007. Data from each port were separated into two classes: charter and non-charter. Start and ending times are not the same for all catch sampling ports over all years; therefore, only survey data from the beginning of June through the end of August were used for this computation. In addition, June through August is when the majority of the halibut fishery occurs in IPHC Area 2C. Average rates of retention by the two classes were computed by dividing the total number of halibut kept by the total halibut captured (the sum of the number kept and the number released) for the duration of the described period.

Charter Vessel Licensing and Activity

All charter vessel owners are required by state regulation to register their vessels annually and record the primary port where the vessel is based. From 1988-1997 owners registered with ADF&G, from 1998-2004 they licensed vessels with the Commercial Fisheries Entry Commission (CFEC), and beginning in 2005 owners registered their vessels with ADF&G through the charter logbook program. Because of the difference and changes in agency reporting requirements, the registration databases from these three time periods are not comparable. When a charter vessel was encountered during onsite interviews, the vessel license number and current logbook number was recorded. At the end of the season, the following charter information was compiled into a separate database: sampled port and date, vessel and logbook number, and the type of fishing conducted during that particular trip.

Biological Data

Length data were collected during on-site surveys when time and an accurate representation of the halibut catch allowed; the latter being of primary importance to avoid sample bias. Bias could occur within the charter fleet when smaller halibut were cleaned at sea (CAS) with the carcasses disposed of, and the larger "prize" halibut brought back to dock. Therefore, length data were collected only when all the halibut aboard the vessel were represented. Fork lengths (tip of snout to fork of tail) were recorded to the nearest 5 mm and the type of measurement (whole or carcass) and statistical area of harvest were recorded. Biological sampling

2

from 1998 to 2007 also captured the type of trip (charter versus private) to estimate class-specific statistics. All data sheets were digitized and edited, and net (headed and eviscerated) weights were estimated in pounds (lb) from the length-weight relationship published by Clark (1992). Because of the close proximity of Petersburg and Wrangell, length data collected from these two ports were combined prior to computing average weights. Similarly, length data from Craig were combined with Klawock, and Gustavus with Elfin Cove.

RESULTS

Regional SWHS Sport Harvests of Pacific Halibut from 1977 to 2006

The SWHS provides the official halibut harvest estimates (Howe et al. 2001 a-d; Walker et al. 2003; Jennings et al. 2004; Jennings et al. 2006 a, b; Jennings et al. 2007; Jennings et al. *in prep a, b*). The overall harvest in 2006 was 140,991 halibut, 13% below the 2005 harvest, but still the third highest harvest for the period 1977-2006 (Table 1). Area specific comparisons of harvests between 2005 and 2006 indicate decreased harvests in Juneau (43%), Glacier Bay (29%), Ketchikan (8%), Prince of Wales (7%) and Sitka (7%). The only increase was in the two areas, Petersburg/Wrangell and Haines/Skagway, which have the lowest estimated harvests of halibut. The Petersburg/Wrangell area harvest increased 19% from 2005 and was 156% of the historic average. The Haines/Skagway area increased by 19% from 2005, but was 26% below the historic average.

In 2005 and 2006, harvests from the three outer coast areas (Sitka, Prince of Wales Island, and Glacier Bay) accounted for 67% of the overall sport harvest in IPHC Area 2C (Figure 2). Since 1991, the combined halibut harvest has continued to be greater in the outer coast areas. Combined sport harvest totals from these outer coastal areas reached a record of 108,518 halibut in 2005. Although 12% below the 2005 harvest, the 2006 harvest of 95,104 in the outer coast areas was the second highest harvest from 1977-2006, remaining 10% above the recent 5-year average. From 1980-1987, outer coast harvests had remained at approximately 10,000 fish per year. The great increases in the harvest from the outer coastal areas since 1987 can be attributed to increased effort by charter anglers.

The inner coastal areas consist of Juneau, Ketchikan, Petersburg/Wrangell, and Haines/Skagway. Historically, the halibut harvests in the inner coastal area have increased only slightly since 1987, ranging from 30,700 to 46,400 halibut per year. However, in 2004 and 2005, the harvest increased 13% and 17%, respectively over the previous record harvest in 1997. In 2006, the inner coast harvest of 45,887 decreased by 15% from the 2005 harvest, but was 8% higher than the 2001-2005 average.

In 2000, the boundary in the SWHS between area G (Glacier Bay) and area D (Sitka) was modified resulting in the size of area D decreasing and area G increasing (Figure 1). The harvest levels of halibut in area D remained about the same during the first year after the modification. However, in the following years the harvest in area D increased to a record high of 33,104 halibut in 2001, decreased to 25,156 halibut in 2002, and then continued to increase to another record high of 42,185 in 2005. The annual halibut harvest in area G since the modification of the boundary jumped from below 9,300 fish prior to 2000 to between 13,639 and 27,389 fish during 2000-2006 (Jennings et al. 2004; Jennings et al. 2006 a, b; Jennings et al. 2007; Jennings et al. *in prep a, b*).

3

On-site (Creel & Catch Sampling) Survey Summaries of HPUE Trends, Harvest, and Effort for 2007

Ketchikan

The 2007 Ketchikan charter angler HPUE of 0.301 was up 15% from the 2006 rate of 0.262 and 7% above the recent 5-year average of 0.282 (Figure 3). Ketchikan's non-chartered angler HPUE hit a record high in 2007 of 0.176, which was 22% higher than both the 2006 HPUE (0.145) and recent 5-year average of 0.144. While the 2007 HPUE for the Ketchikan area was an increase from 2006, overall, Ketchikan chartered and non-chartered anglers ranked fourth and fifth respectively out of the six ports for HPUE. Charter anglers retained a higher proportion of halibut, 92% (an increase of 15% from 2006), while non-chartered anglers retained halibut at a similar rate to last year. Ketchikan's semi-monthly HPUE for charter anglers peaked in late July, fell in early August, then increased again in late August (Figure 4). Ketchikan's semi-monthly HPUE for non-chartered anglers was low in early June then increased slightly and remained steady for the season.

Preliminary creel survey data indicate that during 2007, the estimated total targeted effort (charter and non-charter) for halibut in the Ketchikan area was 15% above last year and 37% above the recent 5-year average. The total number of kept halibut increased 33% from 2006 and 52% from the recent 5- year average. The charter fleet accounted for 29% of the total bottomfishing effort and 35% of the sport harvest of halibut in 2007, while in 2006 the charter fleet accounted for 27% of the bottomfish effort and 38% of the halibut harvest.

Sitka

Consistent survey data in Sitka is only available from 1992-2007; therefore HPUE is not presented for the years from 1988-1991. Limited data are available from 1988-1989, but not presented. HPUE rates for chartered and non-chartered halibut anglers steadily increased reaching a peak in 2003 and 2004, respectively (Figure 5). After the charter HPUE peaked in 2003, it began declining while the non-charter HPUE remained steady.

Sitka's 2007 chartered HPUE of 0.302 ranked third regionally, behind Craig/Klawock and Juneau, and was similar to the 2006 rate. However, the 2007 HPUE was down 32% from the 2002-2006 average HPUE of 0.447. The charter angler HPUE remained relatively steady, with a slight peak in late July (Figure 4). The Sitka non-chartered HPUE of 0.231 also ranked third regionally, down 20% from 2006, and down 13% from the recent 5-year average. Sitka's non-charter HPUE peaked in late June then fell dramatically in early July, stabilizing through early August then increasing in late August. The retention rate for chartered anglers was 91%, up 3% from last year, and up 6% from the 5-year average of 86%. The retention rate for non-chartered anglers was 76%, a 10% decrease from 2006 and a 9% decrease from the 5-year average of 84%.

Preliminary creel survey estimates indicate that the total estimated bottomfishing effort in Sitka in 2007 decreased 9% and the harvest of halibut decreased 6% from 2006. Bottomfishing effort decreased negligibly (0.2%) from the recent 5-year average, but the harvest of halibut decreased by 25%. In 2007, the charter fleet accounted for 92% of the total bottomfishing effort, very similar to 2006 and 2005; and accounted for approximately 91% of the 2007 sport harvest of halibut in Sitka, which was identical to 2006.

Juneau

The HPUE for Juneau's non-chartered anglers was 0.174, an increase of 14% from 2006, and an increase of 5% from the recent 5-year average. Despite this increase, the non-chartered HPUE rate was the lowest regionally. Juneau area chartered anglers had an HPUE of 0.369, the second highest HPUE historically, after 2004. This ranked the Juneau chartered HPUE rate second regionally, behind Craig/Klawock and was an increase of 11% from 2006 and an increase of 22% from the recent 5-year average (Figure 6). The charter HPUE varied during the season, with a peak in early July and a larger peak during early August (Figure 4). In

4

contrast, Juneau's non-charter angler HPUE remained fairly constant throughout the year. The retention rates for non-chartered anglers decreased 17% from 2006, and decreased 15% from the recent 5-year average. Retention rates for chartered anglers decreased 8% from 2006, and 15% from the 5-year average.

Preliminary 2007 estimates for total effort and harvest indicate that, compared to 2006, the total targeted bottomfishing effort increased by only 9%, but the estimated total harvest increased by 31%. The 2007 estimated bottomfishing effort also increased over the recent 5-year average by 8% and the estimated total harvest of halibut increased by 22% over the 5-year average. In 2007, the Juneau charter fleet accounted for about 9% of the targeted effort and 16% of the sport harvest of halibut, while in 2006 the charter fleet represented 11% of the targeted effort and harvested 22% of the halibut.

### Craig and Klawock (West Coast of Prince of Wales Island Area)

Survey data were available to compare HPUE rates for the period 1992-2007 (excluding 1993). Also, in 1997, a number of charter vessels in Craig began landing clients and their harvest at private docking facilities not accessible by our survey staff. Therefore, estimates of HPUE for the charter fleet for 1997 and 1998 were not as well estimated as they had been in prior years. In 1999, sampling efforts were expanded to nearby Klawock in an effort to increase survey data for the expanding west coast of Prince of Wales Island sport fishery. In 2007, information collected during on-site creel surveys increased because of an increase in the number of full interviews versus collecting biological information.

During 2007, the non-charter HPUE of 0.292 increased 28% from 2006, and increased 7% from the 2002 high of 0.274. The charter HPUE rate of 0.423 was 11% higher than 2006, but 58% lower than the 2002 record high HPUE of 1.009 (Figure 7). During 2001 and 2002, the charter HPUE in the Craig/Klawock area peaked, and since then the charter HPUE has continued to decrease. Compared to the recent 5-year average (2002-2006), the chartered HPUE for 2007 decreased 28%, where the non-chartered HPUE increased 32%. Compared to last year, both chartered and non-chartered anglers from Craig/Klawock retained a lower percentage of their catch, 72% and 70%, respectively. In comparison to the other major ports, Craig charter anglers had the highest regional semi-monthly HPUE, and non-chartered anglers had the second highest. The HPUE for the charter fishery remained relatively consistent and peaked in early August (Figure 4). In contrast, the non-charter HPUE peaked in late June then declined throughout July and peaked again in late August.

### Petersburg and Wrangell

For the 2002-2007 seasons, the sampling period in Petersburg/Wrangell was extended from May to September, making comparisons with other ports possible for the entire season. Previously, Petersburg/Wrangell had abbreviated sampling seasons; usually ending in July, when monitoring the Chinook salmon fishery was completed. The non-charter HPUE for 2007 was 0.210, an increase of 9% from 2006, placing it fourth in the region. The semi-monthly HPUE for non-charter anglers increased into late July then remained relatively steady, decreasing slightly through August (Figure 4). The charter angler HPUE was 0.243, an increase of 29% from 2006. Even with this increase, the charter HPUE still remained sixth in the region. The chartered HPUE rate increased in early June and remained fairly constant throughout the season with a slight dip in late July. The retention rate for halibut in the Petersburg/Wrangell area was the lowest of the "inside" ports at 54% for non-chartered (a decrease of 3% from 2006) and 47% for chartered anglers (an increase of 20% from 2006). Despite this increase, the Petersburg/Wrangell charter retention rate was again the lowest in the region.

5

Gustavus and Elfin Cove

This was the sixth year of ADF&G creel sampling in Gustavus and the fifth at Elfin Cove. Since the two ports are close to each other, and both fall into SWHS area G, effort and length data gathered in Elfin Cove were combined with data gathered in Gustavus. Results show that the HPUE for non-chartered anglers of 0.251 was the highest in the region, an increase of 21% from last year. In contrast, the HPUE of 0.276 for chartered anglers was an increase of 28% from 2006, but continued to be lower than the other outside ports of Sitka and Craig/Klawock (Figure 4) and ranked fifth regionally. Non-charter anglers in Gustavus/Elfin Cove had the lowest retention rates in the region, retaining only 52% of their catch, even though this was an increase of 23% from 2006. Charter anglers retained 49%, a 14% increase from 2006, ranking a close second to lowest behind Petersburg/Wrangell. These low rates of retention indicate that anglers here and in Petersburg and Wrangell, are participating in more catch and release halibut fishing than other areas of IPHC Area 2C.

Charter Vessel Activity

In 2007, 928 charter vessels registered with ADF&G in Southeast Alaska (this includes 18 vessels in Yakutat, Figure 8). This is a decrease of 2% in the number of registered vessels from 2006. Due to registration changes in 2005, only vessels used in saltwater chartering are included in the total (similar to 1988-1997 reporting). From 1998-2004 vessels used in freshwater and for the transport of anglers to and from shore were also included in the total, explaining the increase in registered vessels during this period. The total number of charter vessels registering annually with ADF&G increased steadily from 1988-1997 in Southeast Alaska, more than tripling during that time period. From 1998-2004, the number of registered vessels increased mainly due to the changes in registration requirements. The number of registered vessels from 2005-2007 is similar to the number seen at the end of the 1988-1997 period. The new system should more accurately track the number of charter vessels but it will take a few years to see potential trends developing.

On-site survey data indicate that not all registered charter vessels at sampled ports were encountered by creel personnel for several possible reasons: some charter vessels used a dock or boat launch not surveyed by our samplers at a given port, some used a dock or boat launch that we did survey but they were never encountered during our sampling, or some never actively participated in charter fishing activities. Of the 702 vessels (does not include 11 vessels from Haines and Skagway) that registered to operate in the IPHC Area 2C ports sampled during 2007, only 424 (60%) of the vessels were verified as "actively" chartering during on-site surveys (Table 2). Gustavus and Elfin Cove had the highest percentage of active registered vessels at 90% and 93%, respectively, while the other ports ranged from 33% active in Petersburg/Wrangell to 69% active in Craig/Klawock. Overall, on-site data indicate an increase of 2% in the number of active charter vessels that targeted bottomfish during 2007. Of the 424 active charter vessels surveyed in the region during 2007, 315 (74%) targeted bottomfish or both salmon and bottomfish on at least one of the surveyed trips.

Interview frequency of individual charter vessels decreased in Sitka, Juneau, and Gustavus, and increased in Craig/Klawock, Petersburg, Wrangell, and Elfin Cove, and remained similar in Ketchikan (Table 3). The number of vessels surveyed by creel personnel on more than four occasions remained similar to last year except for in Craig/Klawock. In Craig, a major reduction in interview frequency per vessel occurred from 1996-1998 due to movement of some of the fleet to private docking facilities, rather than a decrease in vessel activity. Starting in 1999, supplemental data from charter trips surveyed in Klawock were pooled with the Craig data. In addition, in 2007, more creel interviews were completed from anglers in Craig/Klawock, as opposed to catch sampling interviews (which only record species composition, angler type and area fished).

Juneau, Ketchikan, Craig/Klawock, and Wrangell charter vessels were more likely to target "salmon only" in 82%, 57%, 48%, and 47% of the trips, respectively (Table 4). For Juneau and Ketchikan, this is likely due to the abundant supply of local hatchery-produced salmon. The percent of "salmon only" trips decreased in Ketchikan and Craig/Klawock from 2006, and the percent of "bottomfish only" trips decreased at each of these four ports except for Craig/Klawock which remained the same. In 2007, Petersburg and Gustavus charter operators continued to have an increased number of "bottomfish only" trips as opposed to "salmon

6

only" trips (54% to 20%, and 56% to 12%, respectively), and targeted both bottomfish and salmon in 26% and 31% of the trips. Sitka (62%) and Elfin Cove (66%) operators pursued both salmon and bottomfish on the same trip more often than operators in the rest of the region. Charter operators in Ketchikan and Juneau pursued both salmon and bottomfish on fewer than 15% of their trips. On a regional basis, the average relative percentage of charter trips by target based on the creel survey interview data during 2002-2007 has been 40% "salmon only" trips, 42% combination trips, and 17% "bottomfish only" trips.

Biological Data

Regionwide, 13,178 halibut measurements were taken in 2007, 25% more than last year (Table 5). Most of the additional halibut measurements were a result of increased sampling in Sitka due to the NMFS regulation. In 2007, Sitka collected 2,934 samples, 351% more than the prior year. There were an increased number of samples collected in Juneau (106%) and in Petersburg/Wrangell (42%). The numbers of Ketchikan and Craig/Klawock samples were down by 32% and 40% respectively, where samples in Gustavus/Elfin Cove remained relatively consistent to prior years. There were a lower number of biological samples from Craig/Klawock, but a higher number of full interviews due to the change in sampling protocol last year.

During 2007, the waters around the Gustavus/Elfin Cove area continued to produce the largest charter harvested halibut on average (31.6 lb net weight, Table 6), followed by Petersburg/Wrangell (22.0 lb), Sitka (18.5 lb), Ketchikan (15.5 lb), Juneau (12.1 lb), and Craig/Klawock (10.0 lb). The Gustavus/Elfin Cove area non-charter anglers in 2007 also harvested the largest halibut on average (25.6 lb, Table 6), followed by Petersburg/Wrangell (17.0 lb), Ketchikan (15.7 lb), Sitka (15.2 lb), Juneau (12.5 lb), and Craig (10.7 lb).

Precision goals (expressed as relative precision, RP) for the average net weight estimates in each angler class were ±10% for private anglers and ± 5% for charter anglers at the 90% level of confidence. This goal was achieved for the non-charter angler class at Ketchikan (RP=7%), Petersburg/Wrangell (RP=5%), Juneau (RP=5%), and Gustavus/Elfin Cove (RP=9%), while the goal was not achieved at Sitka (RP=18%) and Craig/Klawock (RP=11%). The estimated average net weights of halibut harvested by charter anglers at Petersburg/Wrangell (RP=5%), Sitka (RP=4%), and Gustavus/Elfin Cove (RP=4%) met the precision goal, while the estimated net weights in Ketchikan (RP=9%), Craig/Klawock (RP=6%), and Juneau (RP=8%) did not. Small sample sizes of halibut harvested may be the reason for not achieving the precision goals.

During 2007, the average net weight of halibut harvested by charter anglers decreased from the 2006 values at Sitka (-28%), Ketchikan (-18%), Petersburg/Wrangell (-17%), and Juneau (-16%), while in Craig and Glacier Bay there was a 3% and a 10% increase, respectively, in average net weight (Table 6). The average net weight of halibut harvested by non-charter anglers increased at Gustavus/Elfin Cove (46%), Ketchikan (17%), and Petersburg/Wrangell (11%), had no change in Craig (0%), and decreased in Juneau (-4%) and Sitka (-11%, Table 6). Long-term trend data for mean net weights indicate a larger difference in the average weights of halibut by port in the charter fishery versus non-charter (Figure 9).

Length frequency distributions of the halibut harvested during 2007 varied between fisheries (Table 7, Figure 10). The largest halibut harvested by non-charter anglers were from Gustavus/Elfin Cove with 42% sampled larger than 95 cm. Petersburg/Wrangell had 81% falling in the 65-104 cm range, and Ketchikan and Sitka had 72% and 77% of the sampled catch falling in the 65-94 cm range, respectively. In Juneau, 81% of the halibut harvested by non-charter anglers were in the 55-94 cm range, and 81% of the sampled halibut in Craig/Klawock were in the 55-84 cm range (Table 7).

Gustavus/Elfin Cove charter anglers also harvested the largest halibut, with 49% of the halibut sampled being larger than 95 cm. In the Petersburg/Wrangell area, 64% of the halibut harvested by charter anglers were in the 75-104 cm range. In Ketchikan, 85% of the charter halibut harvests were in the 65-104 cm range, while most of the halibut harvested by charter anglers in Sitka (67%) and Juneau (79%) were in the 65-94 cm range. Craig/Klawock area charter anglers harvested the smallest halibut, with 85% falling in the 55-84 cm range (Table 7).

7

Because of the growing importance of accurate and precise average weight estimates for use in the Guideline Harvest Level (GHL) program, there was concern regarding whether length data collected in IPHC Area 2C were from a representative sample of halibut discards. Collecting an adequate number of lengths was an issue in Sitka. From 2001-2006, 85%-90% of the charter halibut returning to port were CAS. In early June 2007, new regulations issued by NOAA Fisheries for guided (chartered) sport fishing anglers in IPHC Area 2C went into effect to reduce the number of pounds of halibut harvested by guided sport charter vessels (Federal Register 2007). Specifically, the daily bag limit remained at two halibut per day for guided anglers; however, at least one of the fish could be no more than 32 inches long. To allow for enforcement, the regulation required that all charter vessels at least retain the carcasses until the fillets were offloaded. This regulation gave the on-site survey crew the opportunity to collect more halibut measurements from guided angler harvests by having access to all halibut on board. In Sitka in 2007, 61% of the halibut sampled came from carcasses that would not have been sampled without the new landing requirements, allowing 34% of the halibut observed by on-site crew to be sampled (Table 8) compared with 4% last year.

The length data of sampled charter harvested halibut for the various IPHC Area 2C ports during 2003-2007 provides a means of assessing the impact of the 2007 NOAA Fisheries regulation for guided (chartered) sport fishing anglers in that area. The cumulative length frequency by ports in 2007 indicate that the length frequency of charter harvested fish shifted to smaller sizes at most ports, especially at Petersburg/Wrangell and Sitka (Figure 11). An examination of the percent of the halibut (number of fish) that have been harvested by charter anglers at the IPHC Area 2C ports during 2003-2007, as estimated by our onsite sampling programs, also indicates that fish under 32 inches in length made up a greater percent of harvested fish in 2007 at most ports (Figure 12), with the exception of Craig where fish under 32 inches had already made up the majority of the harvest in recent years.

## DISCUSSION

It is evident that sport fishing for halibut will continue to be an important activity for sport anglers and that continued demand will produce a relatively consistent annual harvest given no major change in stock status. The 2007 projected IPHC Area 2C regional halibut harvest is 151,704 fish, based on a new method of double exponential projections of Area 2C-wide charter harvests and single exponential projections of Area 2C-wide private harvests. This 2007 projection is 8% higher than last year's harvest of 140,991 halibut. This year, 13,178 halibut measurements were taken, the highest number of halibut ever measured during the creel survey. Fishing activity for both bottomfish and salmon by charter vessels remained high during 2007, with the number of surveyed trips (n= 4,779) being the highest on record, and a result of the increased sampling at Craig/Klawock. According to the most recent effort data available from the SWHS (2006), the combined number of resident and nonresident sport-fishing trips was up by 5% compared to the recent 10-year average (1996-2005). During this period, days fished by resident anglers decreased by 12%, while the number days fished by nonresident anglers increased by 23% (Howe et al. 2001 a-d; Walker et al. 2003; Jennings et al. 2004; Jennings et al. 2006 a, b; Jennings et al. 2007; Jennings et al. in prep a, b). Many nonresident anglers take a charter sport fishing trip while visiting Southeast Alaska. As projections for numbers of visitors to the region continue to increase annually, there is little reason to expect that nonresident angling pressure will drop off significantly in the future.

The growth in the size of the charter vessel fleet in Southeast Alaska appears to have stabilized. However, because of the new reporting process, it will take a few years to see the trends in number of registered vessels. Prior to this year, the number of registered charter vessels peaked in 2001 at 1,302 vessels, and then remained relatively consistent. As the number of charter trips continues to rise, halibut will continue to be harvested in large numbers. The charter fleet will no doubt continue to target halibut throughout much of the salmon fishing season (usually June through August). In areas where salmon are abundant, more effort will be redirected toward halibut after a daily limit of salmon has been taken. The outer coast ports of Elfin Cove and Sitka had the highest proportion of combination trips for the region at 66% and 62%, respectively, followed by

8

Craig/Klawock (32%) and Gustavus (31%). Where halibut were less abundant (traditionally the inside ports), the percentage of combination trips was much lower, with Wrangell at 24%, Petersburg at 26%, Ketchikan at 15%, and Juneau at 10%. Shifts in fishing effort are also more likely to occur with nonresident chartered anglers who are limited to lower daily bag limits and annual harvests of Chinook salmon, *Oncorhynchus tshawytscha,* in Southeast Alaska. After a daily or annual limit is attained, and when other salmon species are not available, the remainder of their charter fishing time will likely be spent pursuing halibut and other bottomfish such as lingcod, *Ophiodon elongatus,* and rockfish, *Sebastes* spp.. Note that in the 2007 season in IPHC Area 2C, lingcod had a nonresident annual limit of 1 lingcod, restricted season and slot size limit, and yelloweye rockfish, *S. ruberrimus,* had a nonresident annual limit of 2 fish and a nonresident daily bag limit of 1 fish per day. These restrictions on two highly prized bottomfish species are also focusing bottomfish effort on halibut and other rockfish species, especially for guided anglers who fish more than one day.

The 2007 NOAA Fisheries regulation for guided (chartered) sport fishing anglers in IPHC Area 2C (i.e., two fish per day, of which one had to be under 32 inches in length) had the desired effect of decreasing the average weight of charter harvested fish at most of the sampled ports. The one port where average weight actually increased for charter caught fish was Glacier Bay, where indications are that while the percent of fish under 32 inches increased from 2006, there may have been some high-grading of the one large halibut per client per day which resulted in an overall increase in the average weight.

# LITERATURE CITED

Clark, W. G. 1992. Validation of the IPHC length-weight relationship for halibut. Pages 113-116 in Report and Assessment of Research Activities, 1991. International Pacific Halibut Commission, Seattle, WA.

Dean, M. R. and A. L. Howe. 1999. Alaska Department of Fish and Game sportfishing guide and business registration and saltwater sportfishing charter vessel logbook program, 1998. Alaska Department of Fish and Game, Special Publication No. 99-1, Anchorage.

Dean, M. R. 2001. Alaska Department of Fish and Game sportfishing guide and business registration and saltwater sportfishing charter vessel logbook program, 1999. Alaska Department of Fish and Game, Special Publication No. 01-1, Anchorage.

Federal Register. 2007. Pacific Halibut fisheries; guided sport charter vessel fishery for halibut, Title 50 Code of Federal Register, Part 300. 2007 ed.

Howe, A. L., R. J. Walker, C. Olnes, K. Sundet, and A. E. Bingham. 2001a. Revised Edition: Harvest, catch, and participation in Alaska sport fisheries during 1996. Alaska Department of Fish and Game, Fishery Data Series No. 97-29 (Revised), Anchorage.

Howe, A. L., R. J. Walker, C. Olnes, K. Sundet, and A. E. Bingham. 2001b. Revised Edition: Harvest, catch, and participation in Alaska sport fisheries during 1997. Alaska Department of Fish and Game, Fishery Data Series No. 98-25 (Revised), Anchorage.

Howe, A. L., R. J. Walker, C. Olnes, K. Sundet, and A. E. Bingham. 2001c. Revised Edition: Participation, catch, and harvest in Alaska sport fisheries during 1998. Alaska Department of Fish and Game, Fishery Data Series No. 99-41 (Revised), Anchorage.

Howe, A. L., R. J. Walker, C. Olnes, K. Sundet, and A. E. Bingham. 2001d. Participation, catch, and harvest in Alaska sport fisheries during 1999. Alaska Department of Fish and Game, Fishery Data Series No. 01-08, Anchorage.

Jennings, G.B., K. Sundet, A. E. Bingham, and D. Sigurdsson. 2006a. Participation, catch, and harvest in Alaska sport fisheries during 2002. Alaska Department of Fish and Game, Fishery Data Series No. 06-34, Anchorage.

Jennings, G.B., K. Sundet, A. E. Bingham, and D. Sigurdsson. 2006b. Participation, catch, and harvest in Alaska sport fisheries during 2003. Alaska Department of Fish and Game, Fishery Data Series No. 06-44, Anchorage.

Jennings, G.B., K. Sundet, and A. E. Bingham. In prep a. Participation, catch, and harvest in Alaska sport fisheries during 2005. Alaska Department of Fish and Game, Fishery Data Series, Anchorage.

Jennings, G.B., K. Sundet, and A. E. Bingham. In prep b. Participation, catch, and harvest in Alaska sport fisheries during 2006. Alaska Department of Fish and Game, Fishery Data Series, Anchorage.

Jennings, G.B., K. Sundet, A. E. Bingham, and H. K. Sigurdsson. 2004. Participation, catch, and harvest in Alaska sport fisheries during 2001. Alaska Department of Fish and Game, Fishery Data Series No. 04-11, Anchorage.

Jennings, G.B., K. Sundet, and A. E. Bingham. 2007. Participation, catch, and harvest in Alaska sport fisheries during 2004. Alaska Department of Fish and Game, Fishery Data Series No. 07-40, Anchorage.

Walker, R. J., C. Olnes, K. Sundet, A. L. Howe, and A. E. Bingham. 2003. Participation, catch, and harvest in Alaska sport fisheries during 2000. Alaska Department of Fish and Game, Fishery Data Series No. 03-05, Anchorage.



Figure 1.–Map of Southeast Alaska showing boundaries of the International Pacific Halibut Commission (IPHC) regulatory areas, and the Statewide Harvest Mail Survey areas. Note the area labeled "Old D/New G", which prior to 2000 was part of SWHS area D but now is part of area G.

A = Ketchikan Area
B = Prince of Wales Is. Area
C = Petersburg/Wrangell Area
D = Sitka Area
E = Juneau Area
F = Haines/Skagway Area
G = Glacier Bay Area
H = Yakutat Area

11



**Year of Harvest**

Figure 2.-Sport harvest totals of Pacific halibut in IPHC Area 2C by inner and outer coastal areas from 1977 to 2006 as estimated by the Statewide Harvest Mail Survey (Howe et al. 2001 a-d; Walker et al. 2003; Jennings et al. 2004; Jennings et al. 2006 a, b; Jennings et al. 2007; Jennings et al. *in prep a, b*). The SWHS estimates for 1996-1998 were revised by ADF&G in September 2000.



**Figure 3.–Historical halibut harvest per unit of effort (HPUE) and percent of catch retained by chartered and non-chartered anglers bottomfishing from the port of Ketchikan, Alaska from 1988 to 2007. HPUE is measured as the number of fish kept per angler-hour of bottomfishing effort**

13





**Figure 4.–Semi-monthly chartered and non-chartered halibut harvest per angler-hour of bottomfishing effort (HPUE) in sampled ports of IPHC Area 2C during 2007.**

14



**Figure 5.–Historical halibut harvest per unit of effort (HPUE) and percent of catch retained by chartered and non-chartered anglers bottomfishing from the port of Sitka, Alaska from 1992 to 2007. HPUE is measured as the number of fish kept per angler-hour of bottomfishing effort.**

15



**Figure 6.–Historical halibut harvest per unit of effort (HPUE) and percent of catch retained by chartered and non-chartered anglers bottomfishing from the port of Juneau, Alaska from 1988 to 2007. HPUE is measured as the number of fish kept per angler-hour of bottomfishing effort.**

16



**Figure 7.–Historical halibut harvest per unit of effort (HPUE) and percent of catch retained by chartered and non-chartered anglers bottomfishing from the port of Craig, Alaska from 1992 to 2007.  HPUE is measured as the number of fish kept per angler-hour of bottomfishing effort.**

17



Figure 8. Number of charter vessels registering with the Alaska Department of Fish and Game (ADF&G) from 1988 to 1997, the Commercial Fishery Entry Commission from 1998 to 2004, and ADF&G in 2005 to 2007 for use in Southeast Alaska waters (including Yakutat).

18





Figure 9.-Chartered and non-chartered historical trend of mean net weights (headed and eviscerated) of sport caught halibut in sampled IPHC Area 2C ports from 1998 to 2007.

19



**Figure 10.-Chartered and non-chartered cumulative length-frequencies of sport caught halibut sampled in IPHC Area 2C ports during 2007.**

20



**Figure 11.** Comparison of cumulative length-frequencies of charter sport caught halibut sampled in IPHC Area 2C ports during 2003-2007.

21



Figure 12. Summary of the percent of fish under 32 inches that were sampled from the charter angler harvest of halibut in IPHC Area 2C ports during 2003-2007.

Table 1.-Historical sport harvests of Pacific halibut in IPHC Area 2C (which excludes Yakutat) of Southeast Alaska from 1977 to 2006 as reported in the Statewide Harvest Mail Survey (modified from: Howe et al. 2002 a-d; Walker et al. 2003; Jennings et al. 2004; Jennings et al. 2006 a, b; Jennings et al. 2007; Jennings et al. *in prep a, b*).

| Year | Ketchikan | Prince of Wales Island | Petersburg/ Wrangell | Sitka | Juneau | Haines/ Skagway | Glacier Bay | Total |
|---|---|---|---|---|---|---|---|---|
| | | | Area of Harvest | | | | | |
| 1977 | 1,360 | 277 | 447 | 992 | 1,976 | 81 | 271 | 5,404 |
| 1978 | 751 | 230 | 1,103 | 339 | 3,066 | 448 | 170 | 6,107 |
| 1979 | 1,359 | 593 | 1,380 | 3,179 | 5,832 | 49 | 632 | 13,024 |
| 1980 | 5,260 | 1,085 | 3,193 | 4,976 | 9,333 | 361 | 620 | 24,828 |
| 1981 | 4,634 | 1,321 | 2,299 | 4,288 | 8,122 | 670 | 443 | 21,777 |
| 1982 | 5,963 | 2,242 | 3,845 | 6,330 | 16,988 | 650 | 744 | 36,762 |
| 1983 | 6,760 | 1,849 | 4,147 | 7,945 | 18,651 | 1,426 | 535 | 41,313 |
| 1984 | 11,719 | 2,724 | 5,649 | 8,197 | 15,618 | 2,029 | 748 | 46,684 |
| 1985 | 12,600 | 3,073 | 4,757 | 6,091 | 16,695 | 1,023 | 1,355 | 45,594 |
| 1986 | 11,014 | 2,902 | 3,624 | 6,617 | 16,574 | 2,189 | 1,331 | 44,251 |
| 1987 | 9,676 | 2,760 | 3,039 | 7,545 | 14,382 | 3,567 | 2,184 | 43,153 |
| 1988 | 11,544 | 2,778 | 3,877 | 10,572 | 18,697 | 3,201 | 4,238 | 54,907 |
| 1989 | 13,699 | 9,213 | 5,548 | 17,727 | 20,273 | 2,588 | 4,484 | 73,532 |
| 1990 | 9,872 | 10,264 | 5,768 | 17,492 | 16,248 | 1,972 | 3,415 | 65,031 |
| 1991 | 9,733 | 11,875 | 6,433 | 20,283 | 13,637 | 1,199 | 8,766 | 71,926 |
| 1992 | 9,455 | 11,661 | 6,153 | 22,092 | 14,850 | 926 | 4,863 | 70,000 |
| 1993 | 12,763 | 22,501 | 5,984 | 19,366 | 16,340 | 2,195 | 5,878 | 85,027 |
| 1994 | 15,313 | 24,465 | 7,992 | 23,701 | 10,362 | 1,058 | 5,849 | 88,740 |
| 1995 | 14,483 | 20,808 | 9,488 | 21,452 | 15,145 | 856 | 7,090 | 89,322 |
| 1996[a] | 15,316 | 23,266 | 10,234 | 20,840 | 16,414 | 1,209 | 7,618 | 94,897 |
| 1997[a] | 13,685 | 21,201 | 10,417 | 27,552 | 21,282 | 1,007 | 9,242 | 104,386 |
| 1998[a] | 11,311 | 24,028 | 8,995 | 30,303 | 14,553 | 564 | 7,190 | 96,944 |
| 1999 | 10,989 | 25,739 | 8,133 | 28,222 | 15,522 | 879 | 7,552 | 97,036 |
| 2000[b] | 13,665 | 28,860 | 9,930 | 28,375 | 16,672 | 499 | 13,639 | 111,640 |
| 2001 | 10,106 | 28,210 | 8,345 | 33,104 | 14,213 | 864 | 15,112 | 109,954 |
| 2002 | 10,766 | 30,960 | 6,742 | 25,156 | 15,647 | 1,220 | 14,322 | 104,813 |
| 2003 | 8,810 | 29,307 | 7,569 | 32,362 | 20,530 | 1,136 | 19,767 | 119,481 |
| 2004 | 19,938 | 31,081 | 12,149 | 39,505 | 19,544 | 863 | 24,236 | 147,316 |
| 2005 | 15,751 | 38,944 | 11,876 | 42,185 | 25,662 | 763 | 27,389 | 162,570 |
| 2006 | 14,538 | 36,267 | 15,801 | 39,408 | 14,643 | 905 | 19,429 | 140,991 |
| **Percent within region** | | | | | | | | |
| 1977-2006 avg. | 10,428 | 15,016 | 6,497 | 18,540 | 14,916 | 1,213 | 7,304 | 73,914 |
| % 1977-2006 avg. | 14% | 20% | 9% | 25% | 20% | 2% | 10% | 100% |
| 2001-2006 avg. | 13,961 | 33,312 | 10,827 | 35,723 | 19,205 | 977 | 21,029 | 135,034 |
| % 2001-2006 avg. | 10% | 25% | 8% | 26% | 14% | 1% | 16% | 100% |
| **Percent difference between years** | | | | | | | | |
| 1977-2005 avg. | 10,286 | 14,283 | 6,176 | 17,820 | 14,925 | 1,224 | 6,886 | 71,601 |
| 2006 vs '77-'05 avg. | 41% | 154% | 156% | 121% | -2% | -26% | 182% | 97% |
| 2001-2005 avg. | 13,074 | 31,700 | 9,336 | 34,462 | 19,119 | 969 | 20,165 | 128,827 |
| 2006 vs '01-'05 avg. | 11% | 14% | 69% | 14% | -23% | -7% | -4% | 9% |

[a]-SWHS estimates for 1996-1998 were revised by ADF&G/Div. of Sport Fish/RTS in September 2000.
[b]-Glacier Bay boundary area enlarged to include all of Icy Strait and Cross Sound in 2000.

23

Table 2.-Total number of registered and active charter vessels by sampled ports as determined from on-site sampling in IPHC Area 2C from 2002 to 2007.

| Port | Year | Survey period | No. registered vessels | Minimum no. active vessels[b] | % active | No. fished for bottomfish | % fished for bottomfish |
|------|------|---------------|------------------------|-------------------------------|----------|---------------------------|-------------------------|
| Ketchikan | 2002 | 4/29-9/29 | 220 | 86 | 39% | 31 | 36% |
| | 2003 | 4/28-9/28 | 227 | 95 | 42% | 43 | 45% |
| | 2004 | 4/26-9/26 | 216 | 97 | 45% | 41 | 42% |
| | 2005 | 4/25-9/25 | 155 | 99 | 64% | 44 | 44% |
| | 2006[c] | 4/24-10/08 | 170 | 105 | 62% | 57 | 54% |
| | 2007 | 4/23-9/23 | 180 | 96 | 53% | 51 | 53% |
| Craig/ | 2002 | 5/06-9/15 | 105 | 28 | 27% | 25 | 89% |
| Klawock | 2003 | 5/05-9/14 | 106 | 24 | 23% | 20 | 83% |
| | 2004 | 5/03-9/12 | 115 | 43 | 37% | 28 | 65% |
| | 2005 | 5/02-9/11 | 93 | 25 | 27% | 23 | 92% |
| | 2006 | 5/01-9/10 | 100 | 33 | 33% | 26 | 79% |
| | 2007 | 4/30-9/09 | 101 | 70 | 69% | 56 | 80% |
| Sitka | 2002 | 4/29-9/29 | 279 | 136 | 49% | 118 | 87% |
| | 2003 | 4/28-9/28 | 277 | 128 | 46% | 109 | 85% |
| | 2004 | 4/26-9/26 | 288 | 127 | 44% | 104 | 82% |
| | 2005 | 4/25-9/25 | 209 | 136 | 65% | 123 | 90% |
| | 2006 | 4/24-9/24 | 224 | 163 | 73% | 130 | 80% |
| | 2007 | 4/23-9/23 | 214 | 143 | 67% | 117 | 82% |
| Petersburg | 2002 | 5/06-7/07 | 59 | 12 | 20% | 11 | 92% |
| | 2003[d] | 5/07-9/14 | 52 | 13 | 25% | 13 | 100% |
| | 2004 | 5/03-9/12 | 55 | 14 | 25% | 13 | 93% |
| | 2005 | 4/27-9/11 | 31 | 15 | 48% | 13 | 87% |
| | 2006 | 4/24-9/10 | 36 | 15 | 42% | 14 | 93% |
| | 2007 | 4/23-9/09 | 40 | 13 | 33% | 13 | 100% |
| Wrangell | 2002 | 5/06-7/07 | 49 | 7 | 14% | 3 | 43% |
| | 2003[d] | 5/07-9/14 | 45 | 7 | 16% | 5 | 71% |
| | 2004 | 5/03-9/12 | 36 | 4 | 11% | 2 | 50% |
| | 2005 | 4/27-9/11 | 16 | 5 | 31% | 4 | 80% |
| | 2006 | 4/24-9/10 | 17 | 10 | 59% | 9 | 90% |
| | 2007 | 4/23-9/09 | 13 | 6 | 46% | 6 | 100% |
| Juneau | 2002 | 4/29-9/29 | 160 | 41 | 26% | 20 | 49% |
| | 2003 | 4/28-9/28 | 154 | 35 | 23% | 16 | 46% |
| | 2004 | 4/26-9/26 | 153 | 33 | 22% | 16 | 48% |
| | 2005 | 4/25-9/25 | 96 | 45 | 47% | 27 | 60% |
| | 2006 | 4/24-9/24 | 94 | 40 | 43% | 23 | 58% |
| | 2007 | 4/23-9/23 | 95 | 42 | 44% | 20 | 48% |
| Gustavus | 2002 | 6/03-9/15 | 29 | 24 | 83% | 23 | 96% |
| | 2003 | 5/05-9/14 | 29 | 22 | 76% | 22 | 100% |
| | 2004 | 5/10-9/12 | 32 | 22 | 69% | 21 | 95% |
| | 2005[b] | 5/04-9/18 | 30 | 22 | 73% | 22 | 100% |
| | 2006[b] | 5/08-9/24 | 29 | 24 | 83% | 24 | 100% |
| | 2007 | 5/07-9/07 | 30 | 27 | 90% | 26 | 96% |
| Elfin Cove | 2003 | 6/01-9/06 | 38 | 27 | 71% | 26 | 96% |
| | 2004 | 5/10-9/12 | 39 | 24 | 62% | 24 | 100% |
| | 2005 | 5/09-9/11 | 31 | 28 | 90% | 28 | 100% |
| | 2006 | 5/08-9/10 | 28 | 27 | 96% | 26 | 96% |
| | 2007[c] | 5/07-9/16 | 29 | 27 | 93% | 26 | 96% |
| Totals | 2002 | | 901 | 334 | 37% | 231 | 69% |
| | 2003 | | 928 | 351 | 38% | 254 | 72% |
| | 2004 | | 934 | 364 | 39% | 249 | 68% |
| | 2005 | | 661 | 375 | 57% | 284 | 76% |
| | 2006 | | 698 | 417 | 60% | 309 | 74% |
| | 2007 | | 702 | 424 | 60% | 315 | 74% |

[a] Note changes in 1998-2004 and 2005-2007 registrations reflect changes in agency requirements and the resulting source database.
[b] Number of vessels sampled by creel personnel with known CFEC or logbook numbers.
[c] Sampling extended this year.
[d] Sampling extended in Petersburg and Wrangell beginning in 2003.

24

Table 3.-Number of surveyed trips (including salmon fishing trips) per charter vessel by port and year, collected from on-site creel survey sampling in IPHC Area 2C from 2002 to 2007.

| Port | Year | Survey period | Minimum no. active vessels[b] | No. of surveyed trips per vessel | | | |
|------|------|---------------|---------------|---|-----|-----|---------|
| | | | | 1 | 2-4 | >4 | Average |
| Ketchikan | 2002 | 4/29-9/29 | 86 | 14 | 18 | 55 | 7.8 |
| | 2003 | 4/28-9/28 | 95 | 18 | 18 | 59 | 6.9 |
| | 2004 | 4/26-9/26 | 97 | 20 | 30 | 47 | 5.7 |
| | 2005 | 4/25-9/25 | 99 | 18 | 15 | 66 | 7.7 |
| | 2006[c] | 4/24-10/08 | 105 | 25 | 24 | 56 | 5.8 |
| | 2007 | 4/23-9/23 | 96 | 24 | 22 | 50 | 5.7 |
| Craig/ | 2002 | 5/06-9/15 | 28 | 6 | 7 | 16 | 8.6 |
| Klawock | 2003 | 5/05-9/14 | 24 | 3 | 8 | 13 | 8.0 |
| | 2004 | 5/03-9/12 | 43 | 17 | 10 | 16 | 6.0 |
| | 2005 | 5/02-9/11 | 25 | 2 | 2 | 21 | 12.5 |
| | 2006 | 5/01-9/10 | 33 | 6 | 3 | 24 | 11.8 |
| | 2007 | 4/30-9/09 | 70 | 9 | 10 | 51 | 12.5 |
| Sitka | 2002 | 4/29-9/29 | 136 | 22 | 24 | 90 | 8.9 |
| | 2003 | 4/28-9/28 | 128 | 18 | 19 | 91 | 10.1 |
| | 2004 | 4/26-9/26 | 127 | 14 | 27 | 86 | 12.0 |
| | 2005 | 4/25-9/25 | 136 | 23 | 14 | 99 | 10.0 |
| | 2006 | 4/24-9/24 | 163 | 36 | 18 | 109 | 10.1 |
| | 2007 | 4/23-9/23 | 143 | 24 | 20 | 99 | 9.8 |
| Petersburg | 2002 | 5/06-7/07 | 12 | 4 | 2 | 6 | 6.2 |
| | 2003[d] | 5/07-9/14 | 13 | 2 | 2 | 9 | 13.5 |
| | 2004 | 5/03-9/12 | 14 | 2 | 3 | 9 | 13.9 |
| | 2005 | 4/27-9/11 | 15 | 4 | 1 | 11 | 9.5 |
| | 2006 | 4/24-9/10 | 15 | 4 | 4 | 7 | 8.3 |
| | 2007 | 4/23-9/09 | 13 | 3 | 1 | 9 | 16.0 |
| Wrangell | 2002 | 5/06-7/07 | 7 | 6 | 1 | 0 | 1.1 |
| | 2003[d] | 5/07-9/14 | 7 | 3 | 3 | 1 | 2.9 |
| | 2004 | 5/03-9/12 | 4 | 2 | 0 | 2 | 5.5 |
| | 2005 | 4/27-9/11 | 5 | 2 | 2 | 1 | 3.2 |
| | 2006 | 4/24-9/10 | 10 | 4 | 2 | 4 | 4.9 |
| | 2007 | 4/23-9/09 | 6 | 1 | 3 | 2 | 5.66 |
| Juneau | 2002 | 4/29-9/29 | 41 | 12 | 10 | 20 | 5.9 |
| | 2003 | 4/28-9/28 | 35 | 8 | 12 | 15 | 5.3 |
| | 2004 | 4/26-9/26 | 33 | 6 | 7 | 20 | 7.4 |
| | 2005 | 4/25-9/25 | 45 | 14 | 12 | 19 | 5.7 |
| | 2006 | 4/24-9/24 | 40 | 9 | 12 | 19 | 6.3 |
| | 2007 | 4/23-9/23 | 42 | 9 | 15 | 18 | 5.57 |
| Gustavus | 2002 | 6/03-9/15 | 24 | 3 | 3 | 19 | 22.4 |
| | 2003 | 5/05-9/14 | 22 | 3 | 1 | 19 | 34.4 |
| | 2004 | 5/10-9/12 | 22 | 2 | 2 | 18 | 30.6 |
| | 2005[b] | 5/04-9/18 | 22 | 2 | 1 | 19 | 31.3 |
| | 2006[b] | 5/08-9/24 | 24 | 2 | 2 | 20 | 31.1 |
| | 2007 | 5/07-9/07 | 27 | 3 | 2 | 22 | 29.17 |
| Elfin Cove | 2003 | 6/01-9/06 | 27 | 3 | 6 | 19 | 7.0 |
| | 2004 | 5/10-9/12 | 24 | 0 | 0 | 24 | 21.5 |
| | 2005 | 5/09-9/11 | 28 | 2 | 3 | 23 | 16.3 |
| | 2006 | 5/08-9/10 | 27 | 5 | 0 | 21 | 16.9 |
| | 2007[c] | 5/07-9/16 | 27 | 4 | 1 | 22 | 19.25 |
| Totals | 2002 | | 334 | 67 | 65 | 206 | 8.7 |
| | 2003 | | 351 | 58 | 69 | 226 | 10.0 |
| | 2004 | | 364 | 63 | 79 | 222 | 11.0 |
| | 2005 | | 375 | 67 | 50 | 259 | 10.7 |
| | 2006 | | 417 | 91 | 65 | 260 | 10.3 |
| | 2007 | | 424 | 77 | 74 | 273 | 11.0 |

[a] Note changes in 1998-2004 and 2005-2007 registrations reflect changes in agency requirements and the resulting source database.
[b] Number of vessels sampled by creel personnel with known CFEC or logbook numbers.
[c] Sampling extended this year.
[d] Sampling extended in Petersburg and Wrangell beginning in 2003.

Table 4.-Number of charter vessel trips surveyed during on-site sampling in IPHC Area 2C reported to be targeting bottomfish only, salmon only, or both bottomfish and salmon from 2002 to 2007.

| Port | Year | Survey period | Total trips[a] | Bottomfish only No. | Percent | Both targets No. | Percent | Salmon only No. | Percent |
|------|------|---------------|---------------|---------------------|---------|------------------|---------|-----------------|---------|
| Ketchikan | 2002 | 4/29-9/29 | 680[b] | 30 | 4% | 55 | 8% | 594 | 87% |
| | 2003 | 4/28-9/28 | 659 | 56 | 9% | 83 | 13% | 520 | 79% |
| | 2004 | 4/26-9/26 | 563[b] | 40 | 7% | 46 | 8% | 466 | 83% |
| | 2005 | 4/25-9/25 | 760[b] | 132 | 17% | 119 | 16% | 4'.2 | 64% |
| | 2006[c] | 4/24-10/08 | 665[b] | 159 | 24% | 70 | 11% | 396 | 60% |
| | 2007 | 4/23-9/23 | 646[b] | 151 | 23% | 97 | 15% | 369 | 57% |
| Craig/ | 2002 | 5/06-9/15 | 248 | 7 | 3% | 173 | 70% | 68 | 27% |
| Klawock | 2003 | 5/05-9/14 | 192[b] | 4 | 2% | 103 | 54% | 83 | 43% |
| | 2004 | 5/03-9/12 | 259[b] | 16 | 6% | 106 | 41% | 136 | 53% |
| | 2005 | 5/02-9/11 | 312[b] | 26 | 8% | 92 | 29% | 193 | 62% |
| | 2006 | 5/01-9/10 | 390[b] | 23 | 6% | 128 | 33% | 217 | 56% |
| | 2007 | 4/30-9/09 | 882[b] | 49 | 6% | 279 | 32% | 422 | 48% |
| Sitka | 2002 | 4/29-9/29 | 1,211[b] | 68 | 6% | 656 | 54% | 480 | 40% |
| | 2003 | 4/28-9/28 | 1,292[b] | 51 | 4% | 759 | 59% | 475 | 37% |
| | 2004 | 4/26-9/26 | 1,518 | 89 | 6% | 834 | 55% | 595 | 39% |
| | 2005 | 4/25-9/25 | 1,361[b] | 73 | 5% | 833 | 61% | 447 | 33% |
| | 2006 | 4/24-9/24 | 1,670[b] | 46 | 3% | 1051 | 63% | 547 | 33% |
| | 2007 | 4/23-9/23 | 1,402[b] | 50 | 4% | 873 | 62% | 478 | 34% |
| Petersburg | 2002 | 5/06-7/07 | 74 | 45 | 61% | 3 | 4% | 26 | 35% |
| | 2003[d] | 5/07-9/14 | 176 | 116 | 66% | 14 | 8% | 46 | 26% |
| | 2004 | 5/03-9/12 | 203 | 134 | 66% | 33 | 16% | 36 | 18% |
| | 2005 | 4/27-9/11 | 143 | 83 | 58% | 31 | 22% | 29 | 20% |
| | 2006 | 4/24-9/10 | 128 | 73 | 57% | 28 | 22% | 27 | 21% |
| | 2007 | 4/23-9/09 | 209 | 112 | 54% | 55 | 26% | 42 | 20% |
| Wrangell | 2002 | 5/06-7/07 | 8 | 3 | 38% | 0 | 0% | 5 | 63% |
| | 2003[d] | 5/07-9/14 | 20 | 3 | 15% | 11 | 55% | 6 | 30% |
| | 2004 | 5/03-9/12 | 22 | 7 | 32% | 7 | 32% | 8 | 36% |
| | 2005 | 4/27-9/11 | 16 | 3 | 19% | 2 | 13% | 11 | 69% |
| | 2006 | 4/24-9/10 | 52 | 17 | 33% | 12 | 23% | 23 | 44% |
| | 2007 | 4/23-9/09 | 38 | 11 | 29% | 9 | 24% | 18 | 47% |
| Juneau | 2002 | 4/29-9/29 | 248 | 17 | 7% | 15 | 6% | 216 | 87% |
| | 2003 | 4/28-9/28 | 184 | 22 | 12% | 11 | 6% | 151 | 82% |
| | 2004 | 4/26-9/26 | 243 | 19 | 8% | 18 | 7% | 206 | 85% |
| | 2005 | 4/25-9/25 | 258[b] | 15 | 6% | 26 | 10% | 211 | 82% |
| | 2006 | 4/24-9/24 | 258[b] | 34 | 13% | 22 | 9% | 197 | 76% |
| | 2007 | 4/23-9/23 | 237[b] | 19 | 8% | 23 | 10% | 194 | 82% |
| Gustavus | 2002 | 6/03-9/15 | 560[b] | 183 | 33% | 251 | 45% | 117 | 21% |
| | 2003 | 5/05-9/14 | 792[b] | 266 | 34% | 375 | 47% | 149 | 19% |
| | 2004 | 5/10-9/12 | 674[b] | 197 | 29% | 333 | 49% | 138 | 20% |
| | 2005[b] | 5/04-9/18 | 689[b] | 262 | 38% | 320 | 46% | 106 | 15% |
| | 2006[b] | 5/08-9/24 | 752[b] | 403 | 54% | 230 | 31% | 116 | 15% |
| | 2007 | 5/07-9/07 | 831[b] | 464 | 56% | 261 | 31% | 102 | 12% |
| Elfin Cove | 2003 | 6/01-9/06 | 195[b] | 35 | 18% | 141 | 72% | 18 | 9% |
| | 2004 | 5/10-9/12 | 516 | 84 | 16% | 372 | 72% | 60 | 12% |
| | 2005 | 5/09-9/11 | 457 | 92 | 20% | 320 | 70% | 45 | 10% |
| | 2006 | 5/08-9/10 | 468 | 87 | 19% | 329 | 70% | 52 | 11% |
| | 2007[c] | 5/07-9/16 | 534 | 130 | 24% | 354 | 66% | 50 | 9% |
| Totals | 2002 | | 3,029 | 353 | 12% | 1,153 | 38% | 1,506 | 50% |
| | 2003 | | 3,510 | 553 | 16% | 1,497 | 43% | 1,448 | 41% |
| | 2004 | | 3,998 | 586 | 15% | 1,749 | 44% | 1,645 | 41% |
| | 2005 | | 3,996 | 686 | 17% | 1,743 | 44% | 1,525 | 38% |
| | 2006 | | 4,383 | 842 | 19% | 1,870 | 43% | 1,575 | 36% |
| | 2007 | | 4,779 | 986 | 21% | 1,951 | 41% | 1,675 | 35% |

[a] Number of trips sampled by creel personnel from vessels with known CFEC or logbook numbers.
[b] Includes interviews where species target was not reported
[c] Sampling extended this year.
[d] Sampling extended in Petersburg and Wrangell beginning in 2003.

26

Table 5.-Estimated average length (cm) of Pacific halibut sampled during on-site surveys in IPHC Area 2C by non-chartered and chartered user groups from 2002 to 2007.

| Port | Year | Survey period | Non-chartered average length | | | Chartered average length | | | Total overall sample size |
| | | | n | (cm) | SE | n | (cm) | SE | |
|---|---|---|---|---|---|---|---|---|---|
| Ketchikan | 2002 | 4/29-9/29 | 411 | 88.8 | 1.4 | 1,428 | 95.1 | 0.6 | 1,839 |
| | 2003 | 4/28-9/28 | 264 | 85.3 | 1.1 | 169 | 89.6 | 1.3 | 433 |
| | 2004 | 4/26-9/26 | 466 | 87.1 | 1.0 | 489 | 94.2 | 0.9 | 955 |
| | 2005 | 4/25-9/25 | 388 | 82.4 | 1.0 | 355 | 90.8 | 1.0 | 743 |
| | 2006[a] | 4/24-10/08 | 919 | 82.3 | 0.6 | 736 | 90.6 | 0.8 | 1,655 |
| | 2007 | 4/23-9/23 | 757 | 85.2 | 0.8 | 364 | 85.9 | 1.0 | 1,121 |
| Craig/ | 2002 | 5/06-9/15 | 149 | 83.5 | 1.5 | 408 | 79.1 | 0.7 | 557 |
| Klawock | 2003 | 5/05-9/14 | 385 | 78.9 | 0.7 | 635 | 78.1 | 0.6 | 1,020 |
| | 2004 | 5/03-9/12 | 408 | 82.2 | 0.8 | 1,525 | 80.0 | 0.4 | 1,933 |
| | 2005 | 5/02-9/11 | 497 | 79.8 | 0.9 | 2,960 | 74.4 | 0.3 | 3,457 |
| | 2006 | 5/01-9/10 | 646 | 76.5 | 0.7 | 2,922 | 73.9 | 0.3 | 3,568 |
| | 2007 | 4/30-9/09 | 479 | 76.1 | 0.8 | 1,653 | 74.8 | 0.4 | 2,132 |
| Sitka | 2002 | 4/29-9/29 | 202 | 91.4 | 1.8 | 621 | 94.2 | 1.0 | 823 |
| | 2003 | 4/28-9/28 | 189 | 83.4 | 1.3 | 1,193 | 93.3 | 0.6 | 1,382 |
| | 2004 | 4/26-9/26 | 135 | 87.2 | 1.9 | 550 | 92.6 | 1.1 | 685 |
| | 2005 | 4/25-9/25 | 136 | 83.7 | 1.9 | 537 | 95.2 | 1.2 | 673 |
| | 2006 | 4/24-9/24 | 159 | 85.7 | 1.9 | 491 | 96.7 | 1.3 | 650 |
| | 2007 | 4/23-9/23 | 112 | 84.3 | 2.0 | 2,822 | 87.5 | 0.5 | 2,934 |
| Petersburg/ | 2002 | 5/06-7/07 | 132 | 96.9 | 2.0 | 196 | 110.8 | 1.9 | 328 |
| Wrangell | 2003[b] | 5/07-9/14 | 554 | 93.0 | 0.9 | 674 | 102.6 | 0.7 | 1,228 |
| | 2004 | 5/03-9/12 | 607 | 90.8 | 0.8 | 814 | 98.6 | 0.6 | 1,421 |
| | 2005 | 4/27-9/11 | 768 | 86.0 | 0.7 | 776 | 102.4 | 0.6 | 1,544 |
| | 2006 | 4/24-9/10 | 863 | 85.5 | 0.7 | 518 | 102.2 | 0.9 | 1,381 |
| | 2007 | 4/23-9/09 | 939 | 88.8 | 0.6 | 1,026 | 95.2 | 0.7 | 1,965 |
| Juneau | 2002 | 4/29-9/29 | 474 | 89.8 | 1.1 | 63 | 87.6 | 2.3 | 537 |
| | 2003 | 4/28-9/28 | 596 | 90.4 | 0.9 | 111 | 90.8 | 1.8 | 707 |
| | 2004 | 4/26-9/26 | 521 | 91.3 | 1.0 | 264 | 91.0 | 1.1 | 785 |
| | 2005 | 4/25-9/25 | 1,107 | 84.4 | 0.6 | 182 | 89.8 | 1.0 | 1,289 |
| | 2006 | 4/24-9/24 | 550 | 80.3 | 0.9 | 194 | 83.8 | 1.4 | 744 |
| | 2007 | 4/23-9/23 | 1,122 | 80.3 | 0.5 | 411 | 80.5 | 0.8 | 1,533 |
| Gustavus/ | 2002[c] | 6/03-9/15 | 281 | 101.7 | 1.5 | 1,043 | 115.2 | 0.8 | 1,324 |
| Elfin Cove | 2003 | 5/05-9/14 | 320 | 102.0 | 1.1 | 2,052 | 114.5 | 0.5 | 2,372 |
| | 2004 | 5/10-9/12 | 338 | 101.0 | 1.2 | 2,224 | 114.0 | 0.4 | 2,562 |
| | 2005[a] | 5/04-9/18 | 422 | 82.8 | 0.7 | 2,152 | 103.5 | 0.5 | 2,574 |
| | 2006[a] | 5/08-9/24 | 414 | 85.2 | 1.2 | 2,110 | 101.6 | 0.6 | 2,524 |
| | 2007 | 5/07-9/16 | 387 | 97.7 | 1.4 | 2,050 | 101.9 | 0.7 | 2,437 |
| Totals | 2002 | | 1,649 | | | 3,759 | | | 5,408 |
| | 2003 | | 2,308 | | | 4,834 | | | 7,142 |
| | 2004 | | 2,475 | | | 5,866 | | | 8,341 |
| | 2005 | | 3,318 | | | 6,962 | | | 10,280 |
| | 2006 | | 3,551 | | | 6,971 | | | 10,522 |
| | 2007 | | 3,901 | | | 9,277 | | | 13,178 |

[a] Sampling extended this year.
[b] Sampling extended in Petersburg and Wrangell beginning in 2003.
[c] Gustavus samples only, sampling began in Elfin Cove in 2003.

27

Table 6.-Estimated average net weight (lb) for Pacific halibut sampled during on-site surveys in IPHC Area 2C by non-chartered and chartered user groups from 2002 to 2007.

| Port | Year | Survey period | Non-chartered average net weight | | | Chartered average net weight | | | Total Overall Sample Size |
|------|------|---------------|------|------|------|------|------|------|------|
| | | | n | (lb) | SE | n | (lb) | SE | |
| Ketchikan | 2002 | 4/29-9/29 | 411 | 18.4 | 1.0 | 1,428 | 21.8 | 0.6 | 1,839 |
| | 2003 | 4/28-9/28 | 264 | 14.9 | 1.0 | 169 | 17.1 | 1.5 | 433 |
| | 2004 | 4/26-9/26 | 466 | 16.8 | 0.9 | 489 | 20.7 | 0.9 | 955 |
| | 2005 | 4/25-9/25 | 388 | 13.8 | 0.7 | 355 | 18.2 | 0.9 | 743 |
| | 2006[a] | 4/24-10/08 | 919 | 13.5 | 0.5 | 736 | 18.9 | 0.8 | 1,655 |
| | 2007 | 4/23-9/23 | 757 | 15.7 | 0.7 | 364 | 15.5 | 0.8 | 1,121 |
| | | | | | | | | | |
| Craig/ | 2002 | 5/06-9/15 | 149 | 14.0 | 1.3 | 408 | 11.2 | 0.6 | 557 |
| Klawock | 2003 | 5/05-9/14 | 385 | 10.9 | 0.5 | 635 | 10.9 | 0.5 | 1,020 |
| | 2004 | 5/03-9/12 | 408 | 13.1 | 0.7 | 1,525 | 11.8 | 0.3 | 1,933 |
| | 2005 | 5/02-9/11 | 497 | 12.7 | 0.7 | 2,960 | 9.9 | 0.2 | 3,457 |
| | 2006 | 5/01-9/10 | 646 | 10.7 | 0.4 | 2,922 | 9.7 | 0.3 | 3,568 |
| | 2007 | 4/30-9/09 | 479 | 10.7 | 0.7 | 1,653 | 10.0 | 0.3 | 2,132 |
| | | | | | | | | | |
| Sitka | 2002 | 4/29-9/29 | 202 | 20.7 | 1.7 | 621 | 22.2 | 1.1 | 823 |
| | 2003 | 4/28-9/28 | 189 | 14.0 | 1.0 | 1,193 | 20.3 | 0.6 | 1,382 |
| | 2004 | 4/26-9/26 | 135 | 17.3 | 2.1 | 550 | 21.9 | 1.2 | 695 |
| | 2005 | 4/25-9/25 | 136 | 15.1 | 1.5 | 537 | 24.4 | 1.3 | 673 |
| | 2006 | 4/24-9/24 | 159 | 17.0 | 1.6 | 491 | 25.6 | 1.4 | 650 |
| | 2007 | 4/23-9/23 | 112 | 15.2 | 1.6 | 2,822 | 18.5 | 0.4 | 2,934 |
| | | | | | | | | | |
| Petersburg | 2002 | 5/06-7/07 | 132 | 22.9 | 1.7 | 196 | 35.8 | 2.7 | 328 |
| / | 2003[b] | 5/07-9/14 | 554 | 20.3 | 0.9 | 674 | 25.8 | 0.7 | 1,228 |
| Wrangell | 2004 | 5/03-9/12 | 607 | 18.1 | 0.6 | 814 | 22.3 | 0.5 | 1,421 |
| | 2005 | 4/27-9/11 | 768 | 15.7 | 0.6 | 776 | 25.3 | 0.6 | 1,544 |
| | 2006 | 4/24-9/10 | 863 | 15.4 | 0.6 | 518 | 26.4 | 1.1 | 1,381 |
| | 2007 | 4/23-9/09 | 939 | 17.0 | 0.5 | 1,026 | 22.0 | 0.7 | 1,965 |
| | | | | | | | | | |
| Juneau | 2002 | 4/29-9/29 | 474 | 19.6 | 1.1 | 63 | 16.1 | 1.8 | 537 |
| | 2003 | 4/28-9/28 | 596 | 19.1 | 0.9 | 111 | 18.1 | 1.3 | 707 |
| | 2004 | 4/26-9/26 | 521 | 19.2 | 0.9 | 264 | 17.5 | 0.9 | 785 |
| | 2005 | 4/25-9/25 | 1,107 | 14.6 | 0.4 | 182 | 16.0 | 0.6 | 1,289 |
| | 2006 | 4/24-9/24 | 550 | 13.0 | 0.6 | 194 | 14.4 | 0.9 | 744 |
| | 2007 | 4/23-9/23 | 1,122 | 12.5 | 0.4 | 411 | 12.1 | 0.6 | 1,533 |
| | | | | | | | | | |
| Gustavus/ | 2002[c] | 6/03-9/15 | 281 | 27.1 | 1.5 | 1,043 | 38.7 | 0.9 | 1,324 |
| Elfin Cove | 2003 | 5/05-9/14 | 320 | 25.9 | 1.1 | 2,052 | 37.3 | 0.6 | 2,372 |
| | 2004 | 5/10-9/12 | 338 | 25.8 | 1.2 | 2,224 | 36.0 | 0.5 | 2,562 |
| | 2005[a] | 5/04-9/18 | 422 | 12.9 | 0.5 | 2,152 | 27.8 | 0.5 | 2,574 |
| | 2006[a] | 5/08-9/24 | 414 | 17.5 | 1.4 | 2,110 | 28.8 | 0.7 | 2,524 |
| | 2007 | 5/07-9/16 | 387 | 25.6 | 1.4 | 2,050 | 31.6 | 0.8 | 2,437 |
| Totals | 2002 | | 1,649 | | | 3,759 | | | 5,408 |
| | 2003 | | 2,308 | | | 4,834 | | | 7,142 |
| | 2004 | | 2,475 | | | 5,866 | | | 8,341 |
| | 2005 | | 3,318 | | | 6,962 | | | 10,280 |
| | 2006 | | 3,551 | | | 6,971 | | | 10,522 |
| | 2007 | | 3,901 | | | 9,277 | | | 13,178 |

[a] Sampling extended this year.
[b] Sampling extended in Petersburg and Wrangell beginning in 2003.
[c] Gustavus samples only, sampling began in Elfin Cove in 2003.

28

Table 7.– Length frequency distributions of Pacific halibut sampled in IPHC Area 2C ports by on-site surveys for charter and non-charter user groups during 2007.

| | Length Interval (cm)[a] | Ketchikan | | Craig/ Klawock | | Sitka | | Petersburg/ Wrangell | | Juneau | | Gustavus/ Elfin Cove | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | No. | (%) | No. | (%) | No. | (%) | No. | (%) | No. | (%) | No. | (%) |
| Charter | <55 | 1 | (0) | 3 | (0) | 9 | (0) | | (-) | 4 | (1) | 1 | (0) |
| | 60 | 17 | (5) | 400 | (24) | 207 | (7) | | (-) | 28 | (7) | 70 | (3) |
| | 70 | 90 | (25) | 650 | (39) | 829 | (29) | 86 | (8) | 133 | (32) | 377 | (18) |
| | 80 | 106 | (29) | 349 | (21) | 746 | (26) | 427 | (42) | 135 | (33) | 393 | (19) |
| | 90 | 56 | (15) | 129 | (8) | 314 | (11) | 114 | (11) | 55 | (13) | 214 | (10) |
| | 100 | 56 | (15) | 50 | (3) | 165 | (6) | 114 | (11) | 30 | (7) | 240 | (12) |
| | 110 | 10 | (3) | 22 | (1) | 135 | (5) | 81 | (8) | 10 | (2) | 143 | (7) |
| | 120 | 9 | (2) | 12 | (1) | 107 | (4) | 70 | (7) | 5 | (1) | 144 | (7) |
| | 130 | 6 | (2) | 8 | (0) | 102 | (4) | 55 | (5) | 5 | (1) | 102 | (5) |
| | 140 | 5 | (1) | 11 | (1) | 70 | (2) | 39 | (4) | | (-) | 90 | (4) |
| | 150 | 4 | (1) | 4 | (0) | 63 | (2) | 24 | (2) | 4 | (1) | 88 | (4) |
| | 160 | 3 | (1) | 6 | (0) | 34 | (1) | 5 | (0) | 2 | (0) | 75 | (4) |
| | >165 | 1 | (0) | 9 | (1) | 41 | (1) | 11 | (1) | | (-) | 113 | (6) |
| | Totals | 364 | (100) | 1,653 | (100) | 2,822 | (100) | 1,026 | (100) | 411 | (100) | 2,050 | (100) |
| Non- charter | <55 | 1 | (0) | 1 | (0) | 1 | (1) | 2 | (0) | 33 | (3) | 1 | (0) |
| | 60 | 49 | (6) | 104 | (22) | 6 | (5) | 26 | (3) | 140 | (12) | 16 | (4) |
| | 70 | 222 | (29) | 177 | (37) | 32 | (28) | 154 | (16) | 295 | (26) | 53 | (14) |
| | 80 | 209 | (28) | 105 | (22) | 33 | (29) | 314 | (33) | 311 | (28) | 69 | (18) |
| | 90 | 117 | (15) | 51 | (11) | 21 | (19) | 172 | (18) | 161 | (14) | 84 | (22) |
| | 100 | 62 | (8) | 13 | (3) | 5 | (4) | 125 | (13) | 93 | (8) | 51 | (13) |
| | 110 | 24 | (3) | 12 | (3) | 4 | (4) | 53 | (6) | 36 | (3) | 27 | (7) |
| | 120 | 22 | (3) | 5 | (1) | 1 | (1) | 35 | (4) | 19 | (2) | 22 | (6) |
| | 130 | 18 | (2) | 3 | (1) | 4 | (4) | 23 | (2) | 14 | (1) | 16 | (4) |
| | 140 | 18 | (2) | 2 | (0) | 2 | (2) | 15 | (2) | 8 | (1) | 17 | (4) |
| | 150 | 5 | (1) | 2 | (0) | 2 | (2) | 13 | (1) | 8 | (1) | 11 | (3) |
| | 160 | 5 | (1) | 1 | (0) | | (-) | 3 | (0) | 1 | (0) | 9 | (2) |
| | >165 | 5 | (1) | 3 | (1) | 1 | (1) | 4 | (0) | 3 | (0) | 11 | (3) |
| | Totals | 757 | (100) | 479 | (100) | 112 | (100) | 939 | (100) | 1,122 | (100) | 387 | (100) |

[a] Length intervals are the midpoints of ranges for example 60 implies a range of 55-64 cm and 70 implies 65-74 cm.

29

Table 8.—Summary of harvested and sampled halibut, by whole or carcass, brought back to port by charter and non-charter anglers as indicated by on-site creel survey and catch sampling data at the various ports in IPHC Area 2C during 2007.

| Port | Angler Type | Number of Halibut Observed On-site | | | Number Sampled On-site (creel and catch sampling) | | Breakdown by sample status (whole or carcass) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Creel | Biological Sampler[a] | Total | Total Number of Halibut Sampled | Percent | Number Sampled as a Whole Fish | Percent | Number Sampled as a Carcass | Percent |
| Ketchikan | Non-charter | 1,595 | | | 757 | | 730 | 96% | 27 | 4% |
| | Charter | 898 | 514[c] | | 364 | | 348 | 96% | 16 | 4% |
| | Combined | 2,511[b] | | 3,025 | 1,127 | 37% | 1,084 | 96% | 43 | 4% |
| Sitka | Non-charter | 430 | | | 112 | | 96 | 86% | 16 | 14% |
| | Charter | 4,180 | | | 2,822 | | 1,037 | 37% | 1,785 | 63% |
| | Combined | 4,610 | 4,144 | 8,754 | 2,934 | 34% | 1,133 | 39% | 1,801 | 61% |
| Juneau | Non-charter | 1,805 | | | 1,122 | | 1,081 | 96% | 10 | 1% |
| | Charter | 260 | | | 411 | | 411 | 100% | 0 | 0% |
| | Combined | 2,065 | 1,170 | 3,235 | 1,533[d] | 47% | 1,492 | 97% | 10 | 1% |
| Craig/ Klawock | Non-charter | 989 | | | 479 | | 471 | 98% | 8 | 2% |
| | Charter | 3,842 | | | 1,653 | | 1,641 | 99% | 11 | 1% |
| | Combined | 4,831 | | 4,831 | 2,132 | 44% | 2,113 | 99% | 19 | 1% |
| Petersburg/ Wrangell | Non-charter | 1,261 | | | 939 | | 923 | 98% | 16 | 2% |
| | Charter | 1,087 | | | 1,026 | | 1,010 | 98% | 16 | 2% |
| | Combined | 2,348 | | 2,348 | 1,965 | 84% | 1,933 | 98% | 32 | 2% |
| Gustavus/ Elfin Cove | Non-charter | 839 | | | 387 | | 385 | 99% | 2 | 1% |
| | Charter | 5,842 | | | 2,050 | | 1,936 | 94% | 114 | 6% |
| | Combined | 6,681 | | 6,681 | 2,437 | 36% | 2,321 | 95% | 116 | 5% |
| Total[e] | Non-charter | 6,919 | | | 3,796 | | 3,686 | 97% | 79 | 2% |
| | Charter | 16,109 | | | 8,326 | | 6,384 | 77% | 1,942 | 23% |
| | Combined | 23,046 | | 28,874 | 12,128 | 42% | 10,076 | 83% | 2,021 | 17% |

[a] The Biological Sampler only collects biological samples, and does not denote angler type.
[b] Eighteen halibut kept with unknown angler type.
[c] Number of halibut encountered by catch sampler not recorded, only number of halibut sampled, therefore the % sampled is overestimated for Ketchikan.
[d] Includes 31 (3%) halibut with unknown sample status (whole or carcass).
[e] Represents the regional totals and percentages based on the onsite interview data collected in Area 2C in 2007.

30

# EXHIBIT 6

**Washington Receptionist**

**From:**    Saved by Windows Internet Explorer 7
**Sent:**    Wednesday, June 18, 2008 7:26 PM
**Subject:** Results of the 2007 IPHC Annual Meeting

# INTERNATIONAL PACIFIC HALIBUT COMMISSION

### *News Release*



January 22, 2007

## HALIBUT COMMISSION COMPLETES 2007 ANNUAL MEETING

The International Pacific Halibut Commission completed its Eighty-third Annual Meeting in Victoria, B.C., with Dr. Laura J. Richards of Nanaimo, B.C. presiding as Chair. The Commission is recommending to the governments of Canada and the United States, catch limits for 2007 totaling 65,170,000 pounds, a 6.7% decrease from the 2006 catch limit of 69,860,000 pounds.

The Commission staff reported on the 2006 Pacific halibut stock assessment which implemented a coastwide estimation of biomass, compared with previous assessments which assessed stock biomass for each individual IPHC regulatory area. The total stock biomass identified by the coastwide assessment is approximately the same as the sum of that from the regulatory area assessments. However, the Commission believed that further examination of options for partitioning the coastwide biomass estimate into estimates of biomass for each regulatory area was required before it adopted the new approach. Accordingly, the Commission relied on the previous methodology of separate regulatory area assessments as the basis for determining catch limits. Lower catch rates in the eastern area of the halibut stock prompted the Commission to recommend more restrictive catch limits for this portion of the stock. Pending recruitment from the 1994 and 1995 year classes appears to be relatively strong in most areas, although Area 4B is showing a notably lower level of recruitment of these same year classes compared with other regulatory areas.

For 2007, the Commission continued with a 22.5% harvest rate for use in Areas 2A through 3A and a rate of 20% for Areas 3B through 4E. Low levels of recruitment and lower estimated levels of productivity in Areas 4B and 4CDE continued to support harvest rates lower than 20% for these areas. Accordingly, the Commission adopted catch limits based on a harvest rate of 15% for Areas 4B and 4CDE. The IPHC conducted additional research projects in Areas 4CDE during 2006 and the results provided an improved assessment base for these areas, however the survey catch rate on the eastern Bering Sea shelf is still estimated to be low, compared with other

commercial fishing areas.

**Seasons and Catch Limits**

The Commission received regulatory proposals for 2007 from the scientific staff, Canadian and United States harvesters and processors, and other fishery agencies. The Commission will recommend to the governments the following catch limits for 2007 in Area 2A (California, Oregon, and Washington), Area 2B (British Columbia), Area 2C (southeastern Alaska), Area 3A (central Gulf), Area 3B (western Gulf), Area 4A (eastern Aleutians), Area 4B (western Aleutians), Area 4C (Pribilof Islands), Area 4D (northwestern Bering Sea), and Area 4E (Bering Sea flats):

# 2007 Catch Limits

| Regulatory Area | Catch Limit (pounds) |
|---|---|
| Area 2A | 227,955 |
| Non-treaty directed commercial (south of Pt. Chehalis) | 40,227 |
| Non-treaty incidental catch in salmon troll fishery | 70,000 |
| Non-treaty incidental catch in sablefish longline fishery (north of Pt. Chehalis) | 461,000 |
| Treaty Indian commercial | 33,000 |
| Treaty Indian ceremonial and subsistence (year-round) | 239,636 |
| Sport – North of Columbia River | 268,182 |
| Sport – South of Columbia River | 1,340,000 |
| Area 2A total | 11,470,000 |
| Area 2B (includes sport catch allocation) | 8,510,000 |
| Area 2C | 26,200,000 |
| Area 3A | 9,220,000 |
| Area 3B | 2,890,000 |
| Area 4A | 1,440,000 |
| Area 4B | 1,866,500 |
| Area 4C | 1,866,500 |

| Area 4D | 367,000 |
|---|---|
| **Area 4E** | 8,430,000 |
| Area 4 total | |
| Total | **65,170,000** |

The Department of Fisheries and Oceans, Canada (DFO) will allocate the adopted Area 2B catch limit between sport and commercial fisheries.

The IPHC sets biologically-based catch limits for Areas 4A, 4B, and a combined Area 4CDE. The catch limits for Regulatory Areas 4C, 4D, and 4E reflect the catch-sharing plan implemented by the North Pacific Fishery Management Council (NPFMC). The catch-sharing plan allows Area 4D Community Development Quota (CDQ) harvest to be taken in Area 4E.

The catch-sharing plan implemented by the Pacific Fishery Management Council (PFMC) for Area 2A was adopted by the Commission and is reflected in the catch limits adopted for the Area 2A fisheries. In Area 2A, seven 10-hour fishing periods for the non-treaty directed commercial fishery are recommended: June 27, July 11, July 25, August 8, August 22, September 5, and September 19, 2007. All fishing periods will begin at 8:00 a.m. and end at 6:00 p.m. local time, and will be further restricted by fishing period limits announced at a later date.

Area 2A fishing dates for an incidental commercial halibut fishery concurrent with salmon troll fishing seasons, and the incidental commercial halibut fishery during the sablefish fishery north of Point Chehalis, will be established under United States domestic regulations by the National Marine Fisheries Service (NMFS). The remainder of the Area 2A catch-sharing plan, including sport fishing seasons and depth restrictions, will be determined under regulations promulgated by NMFS. For further information of the depth restrictions in the commercial directed halibut fishery, incidental halibut during the sablefish fishery, and the sport fisheries, call the NMFS hotline (1-800-662-9825).

After reviewing staff information and proposals from the harvesting and processing sector, the Commission approved a season opening date of March 10. The Saturday opening date is to facilitate marketing. Therefore, seasons will commence at 12 noon local time on March 10 and terminate at 12 noon local time on November 15, 2007 for the following fisheries and areas: the Canadian Individual Vessel Quota (IVQ) fishery in Area 2B, and the United States Individual Fishing Quota (IFQ) and CDQ fisheries in Areas 2C, 3A, 3B, 4A, 4B, 4C, 4D, and 4E. All Area 2A commercial fishing including the treaty Indian commercial fishery will fall within March 10 – November 15, 2007.

**Regulatory Changes and Issues**

The Commission approved regulations to change the California sport fishery possession limit as part of the catch sharing plan. The sport fishery possession limit on land and on the water in California will be one daily bag limit.

For Area 2B, the Commission adopted a regulation to allow the retention of halibut in

sablefish trap gear during the halibut IQ season, provided that harvesters had obtained halibut quota shares for the mortality and retention of halibut. This was passed to assist DFO with the Integrated Groundfish Fisheries Plan, which is a three-year pilot program. The regulation will be reviewed at the 2009 IPHC Annual Meeting to determine if retention of halibut in sablefish traps should continue to be allowed.

For Alaska, the Commission agreed to revise the regulation which prohibits the processing or mutilation of sport caught halibut that prevents the determination of the minimum size or number of fish. The regulation change limits the application to on board the catcher vessels only, so that halibut may be subsequently cut up as necessary off of the vessel.

The Commission agreed to change the recording date from December 1 to November 1 for the CDQ managers to report the amount of sublegal-sized halibut retained in Area 4E and 4D CDQ fisheries.

IPHC regulations require that halibut caught in the commercial fishery that are not retained shall be immediately released outboard of the roller and returned to the sea with minimum of injury. The Commission agreed to revise the regulation to allow halibut to be measured on board the vessel to determine if they meet the legal-size limit and to then be returned to the sea with minimal injury.

The Commission noted that Guideline Harvest Levels (GHL) approved by the NPFMC for the charter/guided recreational halibut fishery in Areas 2C (southeast Alaska) and 3A (central Gulf of Alaska) were exceeded in recent years, substantially so in Area 2C (over 40% higher than the GHL in 2006). Commission staff initiated dialogue with the NPFMC to determine what control measures would be enacted by the Council to constrain harvest to the GHLs in 2007. The NPFMC indicated that, although it is committed to management of this fishery to the GHL limits, it would not be able to complete analyses and develop a regulatory framework to effect control of this fishery until 2008. The Commission, with the support of its advisory bodies, therefore passed a regulation for a one-fish halibut bag limit for sport guided charter fishing in Area 2C from June 15 - July 31, 2007 and for Area 3A from June 15 - 30, 2007. These bag limit regulations will be effective until the implementation by the U.S. government of domestic regulations to achieve halibut mortality reductions consistent with those that would be achieved by the IPHC recommendations. The Commission takes this action with some reluctance but believes the action to be necessary, given the magnitude by which the charter/guided catches exceeded the GHL limits and the belief that such overharvesting puts at risk the achievement of IPHC management goals for the halibut stock.

**Other Actions**

The Commission spent considerable time discussing migration, coastwide stock assessment versus closed-area stock assessment, and apportionment among regulatory areas. The Conference Board and Commission staff recommended a workshop be held to allow the industry and agencies to better understand the coastwide stock assessment model. The Commission staff was tasked with determining the best method for the

workshop and review, in consultation with the respective agencies.

In addition, the Conference Board requested a report on the effects of hook straightening and careful release in relation to halibut viability. The Commission staff will complete a report prior to next year's Annual Meeting. The Commission will continue its research in Areas 4B and 4CDE, which was also highlighted by the Conference Board.

The Commission honoured Mr. Dylan Hardie of Courtenay, B.C. as the fifth recipient of the IPHC Merit Scholarship. Mr. Hardie was presented with a certificate and plaque, as well as the scholarship of $2,000 (U.S.). The Commissioners expressed their continued support for the scholarship program and commended the Scholarship Committee for their efforts in assessing the candidates.

The recommended regulations for the 2007 halibut fishery will become official as soon as they are approved by the Canadian and United States Governments. The Commission will publish and distribute regulation pamphlets.

The next Annual Meeting of the Commission is planned for Oregon, at or near Portland, from January 22 to 25, 2008. The United States Government Commissioner, Dr. James W. Balsiger of Juneau AK, was elected Chair for the coming year. The Canadian Government Commissioner, Dr. Laura J. Richards of Nanaimo B.C., was elected Vice-Chair. Other Canadian Commissioners are Clifford Atleo (Port Alberni, B.C.) and Gary Robinson (Vancouver, B.C.). The other United States Commissioners are Ralph Hoard (Seattle, WA) and Phillip Lestenkof (St. Paul, AK). Dr. Bruce M. Leaman is the Executive Director of the Commission.

- END -

Bruce M. Leaman, Executive Director
Phone: (206) 634-1838
FAX: (206) 632-2983
Web: www.iphc.washington.edu

[Printable PDF File] [Home] [News Releases]

6/19/2008

# EXHIBIT 7

## 1.0 ENVIRONMENTAL ASSESSMENT

This Environmental Assessment (EA) assesses the potential biological, social, and economic impacts of alternatives for implementing regulations to restrict charter harvest in Area 2C to its Guideline Harvest Level (GHL) of 1.432 Mlb and a reduced GHL of 1.217 Mlb. The National Environmental Policy Act (NEPA) requires a description of the purpose and need for the proposed action, as well as a description of alternative actions that may address the problem.

- The purpose and need is addressed in Section 1.2.
- Section 1.4 describes the alternatives considered for analysis.
- Section 1.8 describes the affected environment.
- Section 1.9 discusses the potential environmental impacts of the alternatives as required by NEPA, as well as impacts on endangered species and marine mammals.
- Section 2.0, the regulatory impact review (RIR), describes potential economic impacts from the alternatives.
- Section 3.0 presents the initial regulatory flexibility analysis (IRFA), which evaluates the impacts on directly regulated small entities.

## 1.1  Background

The International Pacific Halibut Commission promulgates regulations governing the Pacific halibut (*Hippoglossus stenolepis*) fishery in compliance with the terms of the Convention between the United States and Canada for the Preservation of the Halibut Fishery of the North Pacific Ocean and Bering Sea, signed at Washington, D.C., on March 29, 1979. The IPHC promulgates regulations on an annual basis that are approved by the United States Secretary of State under Section 4 of the Northern Pacific Halibut Act (Halibut Act, 16.U.S.C. 773 – 773k). Pursuant to regulations at 50 CFR 300.62, the approved IPHC regulations are published in the *Federal Register* to inform persons subject to the regulation.

Additional management regulations that are not in conflict with those adopted by the IPHC are implemented by the Secretary of Commerce and may be developed by the regional Fishery Management Council to allocate harvest privileges among U.S. fishermen. The halibut fishery in waters off Alaska (0-200 miles) is under the jurisdiction of the Secretary of Commerce, represented by the National Marine Fisheries Service (NMFS), and advised by the North Pacific Fishery Management Council (Council) These waters comprise IPHC regulatory Areas 2C (Southeast Alaska), 3 (Southcentral Alaska), and 4 (Bering Sea/Aleutian Islands).

Each year, using a combination of harvest data from the commercial, recreational, and subsistence fisheries and information collected during scientific surveys, the IPHC determines the abundance of halibut in each area (exploitable biomass). The biological target level for total removals in a regulatory area is the product of a fixed harvest rate and the estimate of exploitable biomass. This is called the "total constant exploitation yield" (Total CEY) and is the target level for total removals (in net lb) for an area in the coming year. The IPHC subtracts estimates of the total "non-commercial" removals for the upcoming year from the Total CEY. These removals include harvest from recreational anglers, subsistence users, wastage, and bycatch mortalities. The portion of the Total CEY remaining after the removals are subtracted is the CEY available for the commercial longline fishery, the "Fishery CEY."[8] The actual fishery harvest limit is set with reference to this Fishery CEY.

---

[8] The IPHC does not currently account for mortality resulting from the release of fish in the sport fishery.

---



**Figure 3    Coastwide CEY projection through 2012 (IPHC 2007)**

The IPHC did not adopt staff recommendations for the 2006 projections for Area 2C and, instead, adopted a CEY of 8.3 Mlb. The Commission believed that further examination of options for partitioning the coastwide biomass estimate for each area before it adopted the new approach. Thus, the IPHC relied on previous methodology of separate regulatory assessments as the basis for determining 2007 catch limits. Lower catch rates in the eastern portion of the stock prompted the IPHC to recommend more restrictive catch limits for Area 2C. A stakeholder committee will meet with staff to learn more about the coastwide model and make recommendations to the IPHC on adopting the new model for Area 2C in 2008. Using an area-wide approach, yields are projected to increase in Area 2C (after being adjusted downward as a result of the new migration model) over the next five years. While the area trends are probably accurate, the absolute biomass estimates are not (W.G. Clark, IPHC, pers. comm., Feb. 21, 2006).

For Area 2C, the coastwide model predicted a harvest limit of 7.81 Mlb whereas the closed area model predicted an allowable harvest level of 9.12 Mlb. The IPHC recommended a 2007 harvest level of 8.51 Mlb and discussed holding a workshop to discuss the modeling changes in 2008 and determine its application. The IPHC believed that further examination of options for partitioning the coastwide biomass estimate for each area was needed before it adopted the new modeling approach. Thus, the IPHC relied on previous methodology of separate regulatory assessments as the basis for determining 2007 catch limits.

The exploitable biomass for the coastwide projection and Area 2C projection is expected to increase during the next ten years. Note that the projections in Figure 4 assume the CEY in depicted in Figure 3 is harvested in the future and the IPHC authors report the following caution about the area-specific projection:

> *"At this juncture it is uncertain what future harvest rates will be applied to the different regulatory areas. Further, the closed areas assessments do not portray the same biomass distribution as the coastwide assessment. We do believe, however, that the closed area assessments provide a generally accurate portrayal of past trends and future projections. What is uncertain is the vertical scale for the different areas. We have included area-specific projections from the closed area assessments for illustrative purposes." (IPHC 2007).*

added operating cost and risk (e.g., fuel, wear and tear, at-sea risk, other consumables) so that their deck employees (perhaps seasonal and transient) could undertake "free" personal-use fishing trips to offset the foregone fish, now unavailable to them while crewing the charter cruises. The "likelihood" that owners would adopt this practice cannot be judged, *a priori.*

One possible benefit of a Federal ban on crew harvesting of halibut is that it would allow ADF&G to remove the emergency order that prevents skippers and crew from retaining <u>any</u> species of fish while on a saltwater charter trip. Thus, this option could improve the financial situation for crew, over the current emergency order. Although the State's 6-line limit for all saltwater charter fishing (implemented in Southeast Alaska in 1983), and the regulation capping the number of lines fished to the number of paying clients (implemented in 1997) would preclude any crew member from fishing while on a charter, a Federal line limit would not. Substituting a Federal regulation for the State emergency order would, in effect, allow skipper and crew to begin fishing for non-halibut species, as soon as one of their clients ceased fishing for the day. That is, if a client ceased fishing, a crew member could fish and catch up to the legal bag limit, assuming the sport fishing season for that species was open (e.g., any of the five species of Pacific salmon, rockfish, ling cod, other groundfish).

As described in more detail under Section 2.7.4, line limits in Federal regulations would be difficult to enforce.

### 2.7.3.3    Option 3 – Effect of an Annual Limit of Four, Five, or Six Fish per Charter Angler

Option 3 would limit clients to four, five, or six fish, annually. The annual limit is likely to economically affect many charter operators and could affect local economies. Key informant interviews revealed that lodge operators and charter boat operators offering packages of four or more consecutive fishing days are the most likely to be affected by this option because the limit makes longer experiences less marketable to potential clients. A four or five fish annual limit would likely affect the experience of charter anglers on a three-day or longer charter, because four fish equals two daily bag limits for halibut. Businesses likely to be affected by this change told us they would expect higher marketing costs, higher operating costs[30], lower demand, and lower margins associated with such a change. Interviewees also indicated that pressure could increase on other species, as operators work to retain clients interested in longer trips. These economic effects are likely to be experienced throughout Area 2C, as many individual charter boat operators offer these trips. Charter boat operators catering to people seeking only one trip per year or a single-day experiences are less likely to be affected by the measure than businesses focusing on multi-day experiences.

Sitka and Prince of Wales Island, which are home to several large lodges, could feel the effects of this option more acutely than other communities. As noted above, saltwater anglers spend a significant amount of money each day. While a change in annual limits may not affect the daily bag limit for most charter anglers, the study does show that anglers are sensitive to such changes. The economic effects of such changes are likely to be local. While anglers would experience a loss in welfare surpluses associated with catch reductions, they might also choose to redirect their angling dollars to other locations resulting in no changes in net benefits on a national level.

---

[30] Operators indicated that their current structure allows for one three-day excursion and one set of four-day fishing excursions in the same seven day period. An annual limit would likely reduce the desirability of a four-day experience. One response would be to offer more two-day or three-day packages. This change means more rapid guest turnover and higher operating costs associated with guest rotations. It also increases the average 'cost-per-day' for the consumer, since travel costs (often a significant portion of the total expenditure), to and from Alaska, is spread over a shorter number of days.

following the rules.[31] Effective enforcement of proposed management options can only be accomplished by enforcement personnel at-sea, and with effective after-the-fact auditing for a number of reasons. Competing charter operators are not likely to know any more details regarding potential violations than enforcement personnel, unless they are on the catching vessel witnessing and auditing the activities. The operator of one vessel that is observing the actions of the persons onboard another vessel, whether at-sea or dockside, will not know who harvested which fish, if that fish was properly documented in a logbook, if the fishermen had a valid fishing license, if the fishermen documented it on the back of the fishing license, the total number of halibut onboard, if the skipper or crew harvested any of the halibut, the total number of fish harvested by each individual for the year, the destination of the halibut, etc. The commercial fishery is equally highly competitive and many boats operate, offload, and tie up in close proximity to each other. In addition the commercial fleet has processing plant employees, fuel dock employees, harbor department employees and often ADF&G and IPHC samplers watching their daily activities. Yet, with all this competition and oversight, enforcement does not get many reports of violations from competing commercial fishermen.

Third, charter operators are required to have a current USCG license to operate. One of the conditions of the license requires the operator to comply with all Federal regulations. Charter operators potentially risk losing their USCG license if they violate Federal fisheries regulations. It is reasonable to conclude that because of the nature of the USCG license, inferring a trust and responsibility to the licensee, as well as the double jeopardy implications, charter operators would likely have a higher rate of compliance with GHL options than might otherwise be expected. However, the USCG has declined to investigate evidence from NOAA OLE that a vessel operator was in violation of one Federal regulation or another and, therefore, suspend or revoke the operator's USCG license.

Fourth, ADF&G currently regulates the recreational harvest of king salmon, rainbow trout, salmon sharks, and other species in certain areas by requiring anglers to record harvests of these species on the back of their fishing licenses immediately upon harvest. A similar system that utilizes the logbook or a system involving charter stamps could be used to regulate annual harvest limits in Area 2C. Having the angler record their halibut catches on the reverse side of a fishing license will be required. If an angler is required to record their Federal halibut catches on their sport fishing license, the license becomes a record. As such, Federal enforcement personnel will need access to that record to ensure that daily or annual bag/possession limits are not exceeded.

These attributes associated with a charter fishery, along with an enforcement priority for recreational fisheries and appropriate recordkeeping and reporting may provide a level of compliance sufficient to ensure that the alternatives have the desired effect in controlling charter halibut removals in Area 2C.

In 2007, the State legislature passed a bill that allowed State agencies to share confidential data with Federal agencies. This will enhance the ability of the NOAA to administer and enforce some of the options that would otherwise be more difficult to administer and enforce. Specifically, the ability to administer and enforce the preferred alternative has been enhanced as a result of State action.

### 2.7.4.1   Trip limit (Option 1)

The trip limit described in Alternative 2, Option 1 would require NOAA OLE to determine the number of trips taken by a charter vessel for a given day. The regulation for a trip limit would indicate that a charter halibut trip begins on a charter fishing vessel when a halibut is harvested and ends: (1) when any halibut is offloaded from that vessel; (2) when any person that was present on that vessel when a halibut was

---

[31] Charter operators cannot offer a "trip with higher bag or rod limits," as suggested in this excerpt. Those limits are set in regulation and operators would not advertise illegal activity.

**Table A4- 1 Estimated effect of analyzed management options**

| Management Option | Sub-Option | In Conjunction with, or Independent of, the Status Quo | Post-Option Harvest as a Portion of the GHL (%) | | Harvest with Option (Mlb) | |
|---|---|---|---|---|---|---|
| | | | Less Effective | More Effective | Less Effective | More Effective |
| Option 10. Combine Options 1, 2, 3, and 5. | 50" & 4 Fish | Independent | 76% | 74% | 1.089 | 1.064 |
| *Preferred Alternative Under Lowered GHL* | | *In Conjunction* | *76%* | *53%* | *1.089* | *0.762* |
| Option 10. Combine Options 1, 2, 3, and 5. | 50" & 5 Fish | Independent | 83% | 81% | 1.188 | 1.162 |
| Option 10. Combine Options 1, 2, 3, and 5. | 45" & 4 Fish | Independent | 83% | 83% | 1.193 | 1.185 |
| *Preferred Alternative Under the Current GHL* | | *In Conjunction* | *85%* | *78%* | *1.210* | *1.114* |
| Option 3. Annual Limit with NMFS 2007 | 4 Fish | In Conjunction | 85% | 78% | 1.210 | 1.114 |
| Option 10. Combine Options 1, 2, 3, and 5. | 50" & 6 Fish | Independent | 88% | 86% | 1.257 | 1.232 |
| Option 10. Combine Options 1, 2, 3, and 5. | 45" & 5 Fish | Independent | 91% | 90% | 1.299 | 1.290 |
| Option 3. Annual Limit with NMFS 2007 | 5 Fish | In Conjunction | 92% | 84% | 1.313 | 1.209 |
| Option 7. Combine Options 1, 2, and 5. | 50" | Independent | 95% | 90% | 1.362 | 1.282 |
| Option 10. Combine Options 1, 2, 3, and 5. | 45" & 6 Fish | Independent | 96% | 95% | 1.373 | 1.364 |
| Option 3. Annual Limit with NMFS 2007 | 6 Fish | In Conjunction | 97% | 89% | 1.386 | 1.276 |
| Option 5. Minimum Size on the Second Fish | 50" | Independent | 97% | 92% | 1.387 | 1.318 |
| Option 8. Combine Options 1 and 2. | None | In Conjunction | 99% | 91% | 1.422 | 1.301 |
| Option 1. One Trip per Day | None | In Conjunction | 99% | 91% | 1.422 | 1.301 |
| Option 7. Combine Options 1, 2, and 5. | 45" | Independent | 100% | 90% | 1.437 | 1.282 |
| *2007 NMFS Rule[37]* | *None* | *Status Quo* | *101%* | *93%* | *1.448* | *1.333* |
| Option 2. No Harvest by Skipper & Crew | None | In Conjunction | 101% | 93% | 1.448 | 1.333 |
| Option 5. Minimum Size on the Second Fish | 45" | Independent | 102% | 92% | 1.464 | 1.318 |
| Option 11. Combine Options 1, 2, 3, and 7. | 32"/45" & 4 Fish | Independent | 103% | 92% | 1.470 | 1.324 |
| Option 11. Combine Options 1, 2, 3, and 7. | 32"/45" & 4 Fish | Independent | 106% | 92% | 1.518 | 1.321 |
| Option 4. One Fish Bag Limit | July | Independent | 108% | 99% | 1.542 | 1.423 |
| Option 4. One Fish Bag Limit | August | Independent | 111% | 104% | 1.588 | 1.489 |
| Option 11. Combine Options 1, 2, 3, and 7. | 32"/50" & 5 Fish | Independent | 112% | 101% | 1.598 | 1.452 |
| Option 4. One Fish Bag Limit | June | Independent | 113% | 108% | 1.624 | 1.541 |
| Option 11. Combine Options 1, 2, 3, and 7. | 32"/45" & 5 Fish | Independent | 115% | 102% | 1.650 | 1.454 |
| Option 11. Combine Options 1, 2, 3, and 7. | 32"/50" & 6 Fish | Independent | 118% | 108% | 1.688 | 1.542 |
| Option 11. Combine Options 1, 2, 3, and 7. | 32"/45" & 6 Fish | Independent | 122% | 108% | 1.742 | 1.546 |
| Option 9. Combine Options 1, 2, and 7. | 32"/50" | Independent | 123% | 110% | 1.766 | 1.576 |
| Option 4. One Fish Bag Limit | May | Independent | 124% | 123% | 1.772 | 1.757 |
| Option 4. One Fish Bag Limit | September | Independent | 124% | 123% | 1.779 | 1.767 |
| Option 6. Reverse Slot Limit | 32"/50" | Independent | 126% | 113% | 1.800 | 1.620 |
| Option 9. Combine Options 1, 2, and 7. | 32"/45" | Independent | 127% | 114% | 1.824 | 1.628 |
| Option 6. Reverse Slot Limit | 32"/45" | Independent | 130% | 117% | 1.857 | 1.672 |

---

[37] The status quo includes a State of Alaska Emergency Order (EO) that bans skipper and crew harvest and line limits on all charter boats. In order for this ban to remain in effect, ADF&G must issue a new EO each year. The decision of whether to issue a new EO is internal to ADF&G. The harvest estimate for the 2007 NMFS Rule includes the effects of this EO. A Federal ban on skipper and crew harvest (along with the 2007 NMFS Rule) are included in the preferred alternative. This ban would be permanent until repealed by the Secretary.

---

# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 08-00941** |
| THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*, | |
| **Defendants.** | |

## AFFIDAVIT OF JERROD GALANIN

1. I, Jerrod Galanin, of 2309 Merganser Drive, Sitka, Alaska, depend on the halibut resource for subsistence. As a Tlingit, subsistence foods are important to me culturally, economically, and nutritionally. I harvest over 1,000 pounds of halibut per year that I share with family, elders and friends.

2. The reason I live in Southeast Alaska is my culture and its history, which I am tied to through subsistence hunting and fishing. The economics are less important to me than the connection.

3. The charter industry is focused on making money from the same resource that I value for my ties to the land. My ancestors have resided and subsisted on these islands for thousands of years. Priority should be given to subsistence lifestyle and harvest over tourists' vacation adventures.

4.  Charter harvest is concentrated near towns and has caused local depletion of important subsistence resources, including halibut.  In Alaska, subsistence has priority over all other uses.  Allowing the charter sector to over harvest important subsistence areas reduces my access, as well as the access of all subsistence fishermen.  Allowing the charter sector to exceed its allocation and harvest halibut disproportionate to abundance while halibut stocks are at low levels is unacceptable and may be unlawful.

5.  The charter halibut harvest should be restricted and carefully managed to stop the over-harvest of the resource that our community depends on.   Charter clients travel to Sitka for an Alaskan adventure.  For them, halibut fishing is an expensive long weekend, something they do for the experience and not because they need or culturally depend on the resource.

6.  The halibut harvest should be managed so it is sustainable for future generations.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.  It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated:  June 1 5 , 2008

_____
NAME

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| SCOTT VAN VALIN, *et al.*, | |
|---|---|
| Plaintiffs, | |
| v. | Civil Action No. 08-00941 |
| THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*, | |
| Defendants. | |

## AFFIDAVIT OF FLOYD TOMKINS.

1. My name is Floyd Tomkins. I have subsistence fished for halibut out of Sitka, Alaska the past twenty-one years. Our family will eat roughly 150 pounds of halibut a year. I have a small skiff and have landed this much halibut in only three years since 1995, despite intense effort, owing to local depletion of halibut stocks in the waters around Sitka. We used to rely on the full freezer each fall, filled by catch taken in reasonable trips. Now we buy other food that is expensive and getting more so but not as healthy and nutritious. Many other subsistence fishermen of my acquaintance suffered similar shortfalls over this period.

2. The year 1995 marks imposition of the Local Area Management Plan (LAMP) in Sitka, a collaborative restriction on halibut fishing by commercial fishermen and charter operators designed to remedy the collapse of accessible stocks of subsistence halibut in Sitka Sound. It was broadly recognized that overfishing and lack of dispersion of effort caused the collapse. This was and is a conservation matter. Since 1995, commercial effort has been distributed forty miles north and south of town while charter operators fish the line bounding the LAMP area, as near to town as possible. There are three times as many Sitka charter boats now as in 1995. Commercial effort is regulated and has decreased. Halibut remain extremely difficult to find in Sitka Sound.

3. The International Pacific Halibut Commission recognized that unlimited increase in halibut fishing by charter operators was causing a crisis in halibut stocks along the Southeast Alaska coast. Unlimited fishing (unlimited numbers of operators sending out unlimited numbers of clients) is repeatedly and vociferously asserted as a right by charter operators, usually on the basis of individual freedom—that of the operators to promise as much fish as they can and then to sell the trips. Unlimited access by one party to a regulated resource is not only unfair, but contrary to wise or effective management practice.

4. Although many charter operators are also fishermen, and some have a keen appreciation of the history and management of the halibut resource, for industrial-scale purposes halibut fishing is merely a charter marketing tool. So are salmon

fishing, bird watching, rockfish fishing, wildlife viewing, experiencing Alaska, water taxi service, and any other attraction that puts clients in boats. With no direct and responsible relationship to the halibut resource, charter operators can and often do ignore the conservation of that resource.

5. The charter operators claim that the Secretary's decision had no basis in conservation concerns. This flies in the face of evidence received and weighed through at least a year of hearings during which all parties were heard, including many charter operators and myself. I best recall two days of testimony at the NPHC meeting in Sitka during 2007 when I testified directly after two charter captains. The sole emphasis of these hearings was, as it has been for over a hundred years, conservation and the careful husbanding of halibut stocks. It is hard to believe that the charter operators' claim is being taken seriously.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 17, 2008

_____
Floyd Tomkins

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, *et al.,* | |
| Plaintiffs, | |
| v. | Civil Action No. 08-00941 |
| THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.,* | |
| Defendants. | |

1. My name is Carolyn Heuer of PO Box 2281 Sitka, Alaska 99835. My family has subsistence fished out of Sitka for 8 years. We depend solely on wild fish and game for our family's protein source. Not only is it more nutritious, but it is economical as well. We live in an island community and all groceries are brought in by barge. This means that groceries are very expensive, even more so now with increasing fuel prices. We can not afford to feed our family without depending on subsistence harvests. In a given year we eat approximately 50-75 lbs of halibut. Over the past 4 years we have noticed a significant decline in the availability of halibut due to the depletion of halibut stocks in the waters around Sitka. Our usual locations for subsistence fishing are no longer reliable and we must travel farther and explore more areas to catch halibut. The added expense in time and gas is causing extra financial burden on us and as we fish out of a small boat this increases our risk. We are dependent on halibut and my ability to feed my family is threatened.

2. The Sitka LAMP (Local Area Management Plan) was established to reduce fishing pressure on Sitka Sound to allow access by personal use and subsistence fishers.

It was recognized that concentrated fishing effort was causing depletion in the local fish stocks. The commercial fleet now fishes efforts north and south of town. The charter fishing industry continues to concentrate fishing efforts just outside the restricted area. I have heard from one or more charter fishermen stating they must go farther each year to catch halibut.

3. Over the last 10 years the charter fleet and their effort has greatly expanded, placing increased pressure on a declining resource. For at least the last 3 years the charter fleet has gone over their halibut allocation. While charter industry continues to grow at an unlimited rate without any regulations holding them to their allocation the commercial fleet has reduced their fishable quota by 43% over the last 2 years acknowledging the decline in fish abundance. Abundance based management is the hallmark of fisheries management in the North Pacific. Sensible conservation management demands the charter sector allocation be constrained to its GHL especially during this time of low abundance. Other species, such as king and coho salmon, and rockfish are allocated based on abundance based management and regulations are in place to hold the charter sector to their allocation for these species. I strongly believe that all user groups should be held to the same standard: when stocks are high, everyone benefits by higher catch allocations and, conversely, in times of lower abundance everyone suffers proportionally.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated:  June  17th, 2008

Carolyn Hoyer

# EXHIBIT 9

# CHAPTER 1: BACKGROUND AND METHODS

## BACKGROUND

The primary goal of this project was to estimate the subsistence harvest of Pacific halibut *Hippoglossus stenolepis* in Alaska in 2006 through a survey mailed to registered subsistence halibut fishers and supplemented by a limited number of face-to-face interviews in selected communities. This was the fourth year for which the research was conducted. (See Fall et al. 2004 for the results for 2003, Fall et al. 2005 for the results for 2004, and Fall et al. 2006 for the results for 2005.) The Division of Subsistence of the Alaska Department of Fish and Game (ADF&G) administered the project through a grant from the National Marine Fisheries Service (NMFS) (Award Number NA04NMF4370314).

In Alaska's coastal areas, subsistence halibut fisheries are local, noncommercial, customary and traditional food fisheries, as noted by Wolfe (2002) and described in *Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis for a Regulatory Amendment for Defining a Halibut Subsistence Fishery Category* (an "EA/RIR/IRFA.") by North Pacific Fishery Management Council (NPFMC), ADF&G, International Pacific Halibut Commission (IPHC), and NMFS, August 11, 2000 (NMFS 2000; see also NMFS 2003). The EA/RIR/IRFA summarizes information about the subsistence halibut fishery in Alaska. This background information is not repeated here but provided the basis for the NPFMC's recommendation for subsistence halibut fishing regulations in Alaska. Figure 1 illustrates halibut regulatory areas in Alaska.

In April 2003, the National Marine Fisheries Service, Alaska Region, published federal regulations implementing a subsistence halibut fishery for qualified individuals in the waters in and off Alaska (68 FR 18145, April 15, 2003) (see www.fakr.noaa.gov/frules/fr18145.pdf). In total, residents of 117 rural communities[1] and members of 123 Alaska Native tribes are eligible to participate in the fishery.[2] (See Appendix A for a list of eligible tribes and communities as they appear in the Federal Register.) Subsistence halibut fishers are required to obtain a Subsistence Halibut Registration Certificate (SHARC) from the Restricted Access Management Program (RAM) office of NMFS prior to fishing. These federal regulations (50 CFR Part 300.65(h)(4)) authorize periodic surveys of holders of SHARCs to estimate annual subsistence harvests and related catch and effort information. The regulation states that, "Responding to a subsistence halibut harvest survey will be voluntary." [3]

Table 1 provides population estimates for the eligible rural communities for 2000 based on the federal decennial census. The total population of these communities in 2000 was 82,572, of which 38,977 were Alaska Natives. In addition, the nonrural places of Juneau and Ketchikan in

---

[1] In December 2004, the NPFMC adopted a recommendation to the Secretary of Commerce to add Naukati Bay to the list of eligible rural communities. Regulations implementing this change had not been approved as of the preparation of this report.

[2] Note that the Northern Pacific Halibut Act of 1982, under which the Alaska subsistence halibut fishery regulations are authorized, provides for fair and equitable allocations of halibut among U.S. fishers, but does not establish priorities for those allocations (see www.fakr.noaa.gov/frules/70fr16742.pdf, page 16747).

[3] The subsistence rules were amended in 2005 by regulations published in the Federal Register at 70 FR 16742, April 1, 2005. Among other things, this amendment provides for obtaining Community Harvest Permits, Ceremonial Permits, and Educational Permits.

2000 had Alaska Native populations of 5,084 and 2,689, respectively (U.S. Census Bureau 2001), most of whom were eligible to participate in the subsistence halibut program through their tribal membership. Also, an unknown number of eligible tribal members lived in other nonrural places such as Anchorage and the Kenai Peninsula Borough. As also shown in Table 1, estimates published by the State of Alaska for 2006 report a total population of 80,516 for eligible rural communities. Updated population estimates by ethnicity are not available.

## PROJECT OBJECTIVES

The primary goal of the project was to estimate the subsistence harvest of halibut in Alaska in the calendar year 2006. Objectives included:

1. An estimate of the subsistence harvest of halibut in Alaska in 2006 by community, tribe, gear type, and IPHC regulatory area, along with an estimate of the number of individuals who subsistence fished for halibut in 2006.

2. An estimate of the harvest of halibut by SHARC holders while sport fishing in 2006.

3. An estimate of the number of lingcod *Ophiodon elongatus* and rockfish *Sebastes* spp. taken by subsistence fishers while subsistence fishing for halibut in 2006.

## DATA COLLECTION METHODS

### Public Outreach

In mid December 2006, the Division of Subsistence sent a letter to all eligible tribes informing them about the fourth year of the research. This communication also included a copy of the short summary of the findings for 2005. (Appendix B is a copy of the letter sent to all eligible tribes.) Each tribe also received a copy of the full final report for 2005. In January 2007, announcements were made through the media (local newspapers and radio stations) about the upcoming mailing of halibut survey forms to SHARC holders. Appendix C is a copy of an announcement that ran in the following Alaska newspapers in late January 2007: Kodiak Daily Mirror, Bristol Bay Times (Dillingham), the Dutch Harbor Fisherman, the Tundra Drums (Bethel), the Cordova Times, the Sitka Sentinel, the Ketchikan Daily News, the Petersburg Pilot, the Wrangell Sentinel, the Chilkat Valley News (Haines), the Juneau Empire, and the Capital City Weekly. Information was also available on the NMFS web site for subsistence halibut fishing in Alaska (http://www.fakr.noaa.gov/ram/subsistence/halibut.htm).

### Mailed Household Survey

As noted, this was the fourth year of a harvest assessment program for the subsistence halibut fishery in Alaska. Because the subsistence halibut regulations only came into effect in 2003, the first several years of collecting harvest data should be viewed as exploratory. Especially in the first study year, in which the new subsistence regulation only came into effect in May, it was expected that harvest estimates for some communities and tribes would be incomplete, based upon relatively low response rates or incomplete registration of halibut fishers with NMFS. Subsequent study years have built upon the lessons learned in the first years of the project and have benefited from outreach efforts to improve response rates. (See recommendations in Chapter 4.)

As recommended by Wolfe (2002), the methodology was based upon the registration system for all subsistence halibut fishers, which requires fishers to obtain a SHARC before fishing. Of the

2

14,206 individuals who held a valid SHARC for any portion of 2006 as of December 31, 2006, 13,372 were surveyed with a mailed, retrospective recall form covering a 12-month harvest period in calendar year 2006.[4]  Because an in-season harvest monitoring program took place in St. Paul, no surveys were mailed to residents of that community.  Also, SHARC holders who participated in an in-season harvest monitoring project in Kodiak and Sitka were not mailed surveys (see below).  Households in Nanwalek and Port Graham were interviewed as part of a rockfish project and no surveys were mailed to residents of these communities.

The survey instrument was virtually identical to the form used for the 2003, 2004, and 2005 study years.  It is based on recommendations by Wolfe (2002:Appendix A), with slight modifications such as study year and return address. (See Appendix D in this report for a copy of the 2006 survey instrument.)  Wolfe (2002:15-18) provided justification for the kinds of data to be collected, which included name and address of the fisher; halibut harvests in numbers and pounds round (whole) weight by gear type in 2006; number of hooks usually set; and harvests of lingcod and rockfish taken while subsistence fishing for halibut. In 2003, a question addressing the water body fished (primary location) while subsistence fishing was added at the recommendation of NMFS staff.  This question was retained for 2004, 2005, and 2006, and another was added in 2004 to record the location of sport halibut fishing by SHARC holders.  The form was designed to reduce the potential double counting of halibut taken with rod and reel gear in both the subsistence survey and the Statewide Harvest Survey conducted by the Department of Fish and Game, Division of Sport Fish (Wolfe 2002:19) by asking respondents to distinguish between their subsistence and sport harvests with this gear type.

A short explanatory letter with instructions on the back for completing the form was included in the mailings (Appendix E).  The form was designed so that it could be directly mailed to the Division of Subsistence, postage paid.

Presently, under IPHC regulations, Community Development Quota (CDQ) fishers may retain halibut under 32 inches ("shorts") while commercial CDQ fishing in Areas 4D and 4E only.  These regulations require the CDQ organization to report this harvest to the IPHC.  To avoid double counting, subsistence fishers were instructed not to include these fish on their subsistence halibut survey forms.

During a meeting of the Alaska Native Subsistence Halibut Working Group (ANSHWG) on October 9, 2003, before the mail-out survey for the first study year, community representatives expressed concern that not all fishers would know what fish are to be included under the category "rockfish" for the incidental harvest question on the survey form.  This could lead to an overestimation of this harvest if fishers reported fish such as Pacific cod or sculpins in response to this question.  The instructions mailed with the survey provided guidance on this question.[5]

---

[4] SHARCs issued to non-tribal residents of eligible rural communities are valid for two years. Therefore, SHARCs issued beginning in May 2003 began to expire starting in May 2005 and had to be renewed.  Some SHARC holders did not renew and therefore were not eligible to participate in the subsistence halibut fishery for all of 2006.  See also the section on data analysis, below.

[5] The principal investigators for this study are aware that more than 30 species of rockfish inhabit Alaska waters. (See Alaska Administrative Code 5 AAC 39.975 for definitions of management assemblages of rockfishes.)  The goal of this study was to keep the questions about incidental harvests simple.  As discussed in the recommendations section (see Chapter 4), if more precise harvest data for various rockfish are needed for particular areas, future research should be designed and funded to address these data needs.

3

Table 2 provides a chronology of key activities during the project. Table 3 provides a summary of response rates by mailing, SHARC type, and place of residence. The first mailing to 13,372 SHARC holders occurred on February 16, 2007. The second mailing to 8,179 SHARC holders occurred on March 19, 2007. The third mailing to 6,666 SHARC holders took place on April 18, 2007.

The Division of Subsistence set up a dedicated e-mail address that recipients of the mailed survey could use if they had questions about how to respond. Also, the RAM Program set up a toll-free number (1-800-304-4846) to provide information about the subsistence halibut program, including the harvest assessment program. Both the e-mail address and 1-800 phone number appeared on the survey form. A set of "frequently asked questions" and responses was developed by ADF&G and NMFS staff members to guide staff responses to phone calls and e-mail inquiries about how to fill out the survey form (Appendix F).

## Community Visits

Because the response rate to the mailed survey varied by community and tribe in the first three study years, the mailings were again supplemented in selected communities with face-to-face household surveys conducted by Division of Subsistence staff or local research assistants. The latter were hired through subcontracts with tribes or Alaska Native regional organizations. Because of the large number of eligible communities and tribes, it was not possible to conduct face-to-face surveys in most communities.

Through a contract with the Alaska Native Harbor Seal Commission (ANHSC), the Division of Subsistence and the ANHSC conduct annual household surveys in approximately 60 communities to collect harbor seal and sea lion harvest data from Alaska Native subsistence hunters. For the 2006 study year, most of these interviews took place in February, March, and April 2007. In many of the study communities (especially in Southeast Alaska), only known marine mammal hunters were interviewed, but in others (primarily the smaller communities), the goal was to interview all Alaska Native households.[6] In most communities, local assistants hired to conduct the marine mammal interviews were asked to remind people they were interviewing to return the halibut survey form. In most cases, these individuals had received the mailed forms before these community visits took place.

In 2007, Division of Subsistence researchers conducted systematic household interviews in Chenega Bay, Port Graham, Nanwalek, and Sitka to record traditional knowledge and subsistence harvest information about rockfish, through a project funded by the North Pacific Research Board. The subsistence halibut harvest form for 2006 was administered as part of these interviews. Division researcher Davin Holen conducted these interviews in Chenega Bay in March 2007. Division researcher Ron Stanek administered the halibut surveys in Nanwalek in mid March 2007, assisted by Nick Tanape Sr. Stanek also administered the surveys in Port Graham in March, assisted by Sabrina Malchoff. Cooperative agreements with the Nanwalek Tribal Council and the Port Graham Tribal Council supported this work. Division of Subsistence researchers who worked on the project in Sitka included Nancy Ratner, Mike Turek, and Mathew Brock (Turek 2007).

---

[6] For a description of this project, including a complete list of study communities and sampling goals, see Wolfe et al. 2005.

4

A continuing goal of the project was to contact subsistence halibut fishers in person in selected communities with relatively high numbers of SHARC holders for which good response rates were especially important. As in the 2005 study year, this included Toksook Bay, Sitka, Hydaburg, Ketchikan, and Saxman. For 2006, household surveys were also administered in Angoon, as recommended in the final report for 2005. Cooperative agreements with Sitka Tribe of Alaska, the Angoon Cooperative Association, and the Hydaburg Cooperative Association supported interviewing in Sitka, Angoon, and Hydaburg, respectively. Through another cooperative agreement, the Southeast Alaska Inter-Tribal Fish and Wildlife Commission conducted outreach and interviews in Ketchikan and Saxman. In each community, the surveys were administered face-to-face or by phone.

As noted in the final report for 2003 (Fall et al. 2004:8), in Toksook Bay, the number of SHARCs issued (532 were valid in 2006 [Table 3]) approximates the community's total population. Meetings with community leaders in early 2004 determined that there were at the time about 90 to 100 active halibut fishers in Toksook Bay, but only about a third to one-half fished in a particular year. Therefore, as for 2003, 2004, and 2005, a Division of Subsistence staff member, Sverre Pedersen, visited the community, in April 2007. With the assistance of local tribal officials and review of findings for 2005, Pedersen identified and interviewed most of the subsistence halibut fishers in Toksook Bay. He also called SHARC holders in Tununak and Hooper Bay to encourage returns of mailed surveys.

### In-season Harvest Monitoring in St. Paul

In January 2005, principal investigator James Fall met with several representatives of the St. Paul tribal government while attending the annual meeting of the International Pacific Halibut Commission in Victoria, British Columbia. These tribal representatives were very concerned about the very low response rate to the 2003 mail-out survey by SHARC holders from St. Paul (17%; see Figure 3 in Fall et al. 2004:61), and supported actions that would improve the response rate and result in a reliable estimate of the subsistence halibut harvest for 2004. Subsequently, in March 2005, Fall and division information management coordinator Bridget Easley developed an informal agreement with the Central Bering Sea Fishermen's Association (CBSFA) for outreach and evaluation of the survey results. This informal agreement was renewed for the 2005 study year. In March 2006, staff at the CBSFA reviewed the list of St. Paul SHARC holders. They identified individuals who had left the community. They then divided the remaining names on the list into two groups: those who are active subsistence or commercial halibut fishers, and those who do not actively participate in either fishery (131 SHARC holders for 2005). This list was used during analysis of the survey results for St. Paul. In addition, CBSFA staff posted flyers urging return of the mailed survey, ran an announcement about the survey on the local radio station, and were otherwise available to answer questions about the survey and the subsistence halibut program.

Later in 2006, the Division of Subsistence and the CBSFA entered into a formal agreement to conduct a pilot in-season harvest monitoring program for subsistence halibut fishing in St. Paul for 2006. The CBSFA developed a list of subsistence halibut fishers and hired a staff person to distribute and collect harvest calendars bi-weekly during June, July, and August 2006. An additional form was distributed and collected to record any late season harvests. Most subsistence fishers participated in the project, although collection of in-season harvest data in September was incomplete and had to be supplemented by recall. CBSFA reviewed sample achievement and preliminary results.

5

Because of the in-season project, no surveys were mailed to SHARC holders with St. Paul mailing addresses. St. Paul tribal SHARC holders living in other communities were mailed surveys. SHARC holders not identified by CBSFA staff as subsistence fishers were classified as returned surveys (staff administered) that did not fish.

### In-season Harvest Monitoring in Sitka and Kodiak

In October 2005, when the grant award between NMFS and the Division of Subsistence of ADF&G was amended, funding was included to plan and implement a pilot project to collect subsistence halibut harvest data in season in Kodiak and Sitka in 2006. In June 2006, random samples of SHARC holders in these two communities were contacted and asked to keep records of their subsistence and sport halibut harvests. In July and August, Division staff contacted project participants biweekly to collect the harvest data. In September, project participants received a calendar to record any harvest that took place through December. These were returned by mail. A separate report, projected to be completed in late 2007 or early 2008, will provide a full discussion of the in-season project methods and findings. In-season project results for participating SHARC holders were incorporated into the harvest estimates for Kodiak and Sitka presented in this report as "staff administered" surveys. No in-season project participants received the mailed survey.

## SAMPLE ACHIEVEMENT

Table 3 reports sample achievement by tribe, rural community, and community of residence. Overall, 8,426 surveys were returned by 14,206 SHARC holders, a response rate of 59% (Figure 2). For residents of the 117 eligible rural communities who did not register as tribal members, 5,127 of 7,083 surveys were returned (72%). As shown in Figure 3, in 2006 there were 12 communities with more than 100 nontribal SHARC holders, accounting in total for 85% of all nontribal SHARCs issued in rural communities. Return rates were 65% or more in all 12 of these communities, and were 70% or more in nine of them.

Of the 7,123 individual tribal members who held SHARCs in 2006, 3,299 (46%) returned surveys. As shown in Figure 3, there were 16 tribes with more than 100 members who obtained SHARCs. Return rates for these 16 tribes varied widely, from 95% in Hydaburg (where a contract between the Division of Subsistence and Hydaburg Cooperative Association [the tribal governing body] facilitated survey returns) to 26% in Toksook Bay. In total, these 16 tribes accounted for 72% of all tribal SHARCs.

Figure 4 illustrates survey response rates by place of residence of SHARC holders for the 23 communities with 100 or more SHARC holders in 2006. These communities accounted for 83% of all SHARCs and 86% of all returned surveys.

Figure 5 shows the survey return rate by response category (see also Table 3). After the first mailing, 4,909 surveys were returned, for a response rate of 35%. Responses to the second mailing added 1,305 surveys, a total response rate of 44% up to that point. Responses to the third and final mailing added 690 surveys, for a total response to the mail-out of 6,904 surveys, 49% of the 14,206 SHARC holders, and 52% of the 13,372 surveys initially mailed. In addition, surveys administered by staff, either ADF&G personnel or representatives of tribal organizations working with ADF&G, added 1,522 surveys. Most of these were in Angoon, Hydaburg, Ketchikan, Sitka, Nanwalek, Port Graham, St. Paul, and Toksook Bay. This brought the total response to 8,426 surveys, 59% of all individuals who held SHARCs in 2006.

The overall response rate for the survey for 2006 declined slightly compared to 2005, from 60% to 59%. The return rate for 2003, the first year of the survey, was 65%, and the return rate for 2004, the second year of the survey, was 62%. The number of returned surveys increased over the first three years of the project, from 7,593 in 2003, to 8,524 in 2004, and 8,565 in 2005, reflecting the larger number of SHARC holders in 2004 and 2005 and the larger number of staff administered surveys in 2005. The total number of surveys dropped slightly in 2006, to 8,426.[7] The response rate by mail declined from 62% in 2003 to 59% in 2004, 55% in 2005, and 52% in 2006. However, the number of surveys returned as "undeliverable" increased from 208 in 2003 (Fall et al. 2004:45), to 617 in 2004 (Fall et al. 2005:48), 613 in 2005 (Fall et al. 2006), and 1,194 in 2006 (Table 3). Subtracting "undeliverables" from the mail-out totals gives a response rate by mail of 57% in 2006, compared to 62% in 2004, 63% in 2003, and 57% in 2005. More surveys were administered in person or through phoning in 2006 (1,522) compared to 2005 (755 surveys), 2004 (355 surveys), or 2003 (392 surveys). The interviewing in Angoon, Nanwalek, and Port Graham, and the in-season monitoring projects in St. Paul, Sitka, and Kodiak, accounted for most of this increase.

## DATA ANALYSIS

### Data Entry

All returned survey forms were reviewed for completeness prior to data entry. Responses were coded following standardized codebook conventions used by Division of Subsistence. Staff within the Information Management Section of the division set up database structures within an MS SQL Server at ADF&G in Anchorage to hold the survey data. The database structures included rules, constraints, and referential integrity to insure that data were entered completely and accurately. Data entry screens were available on a secure Internet site. Daily incremental backups of the database occurred, and transaction logs were backed up hourly. Full backups of the database occurred twice weekly. This ensured that no more than one hour of data entry would be lost in the unlikely event of a catastrophic failure.

Survey responses were manually entered twice, and survey forms were electronically scanned. All data were compared programmatically for inconsistent data entry. Double data entry ensured a more accurate transfer of information from the coded survey forms into the database, and is a standard practice with data processing for the Division of Subsistence. Data did not pass to the processing phase until inconsistencies between the twice-entered data set were eliminated. The scanned survey forms also facilitated efficient data correction and editing.

Information was processed and analyzed using MS SQL programming. Initial processing included the performance of standardized logic checks of the data. Logic checks are often needed in complex data sets where rules, constraints, and referential integrity do not capture all of the possible inconsistencies that may appear.

### Analysis: Development of Harvest Estimates

Analysis included review of raw data frequencies, cross tabulations, table generation, and estimates of population parameters. Missing information was dealt with situationally. The Division of Subsistence has standard practices for dealing with missing information, such as minimal value substitution or use of an average response for similarly characterized households

---

[7] See Table 18 in Chapter 4 for sample sizes and fractions and selected study findings for the four study years.

or communities. Typically, missing data are an uncommon, randomly occurring phenomenon in household surveys conducted by the division, as was the case in this project.

In general, estimates of harvests, levels of participation, and other findings were calculated based upon the application of weighted means (Cochran 1977). These calculations are standard methods for extrapolating sampled data. In this study, each tribe and rural community was a separate stratum for purposes of estimating total harvests. In most cases, the mean for returned SHARC surveys was applied to the total number of SHARCs issued for the tribe or community to calculate the estimated harvest. (See Appendix Table 1 in Appendix G for the reported harvests for each tribe and community.) The formula for standard expansion of community harvests is:

$$H_t = \sum H_i$$

where $H_i = h_i W_i$

and $W_i = \dfrac{N_i}{n_i}$ (Harvest weight factor per strata i)

$H_t$ = the total harvest (numbers of fish or pounds),

$H_i$ = the total harvest for tribe or community i

$W_i$ = the weight factor for tribe or community i,

$h_i$ = the total harvest reported in returned surveys for tribe or community,

$n_i$ = the number of returned surveys in each tribe or community, and

$S_i$ = the number of SHARCs issued for tribe or community.

There were five exceptions. As discussed above, in 2006, 532 SHARCs were held by members of the Native Village of Toksook Bay, most of whom do not fish for halibut. Expanding the reported harvest based on in-person interviews and mailed survey returns (138 returns, or 26% of all SHARCs issued [Table 3]) would result in a large overestimate of the subsistence halibut harvest for the community. Therefore, the reported harvest is the estimated harvest for Toksook Bay.

Second, as discussed above, CBSFA staff in St. Paul divided the list of SHARC holders living in that community into two strata: potential subsistence halibut fishers (33 SHARC holders) and others (201 SHARC holders). All SHARC holders in the second category were classified as "staff administered surveys, did not fish." Of the potential fisher category, 27 of 33 participated in the in-season harvest monitoring project. Survey results for respondents in this stratum were used to estimate harvests for the six non-participants in this strata. One participant in the in-season project was a member of the Native Village of Atka. There were 12 other St. Paul tribal SHARC holders living outside the community of St. Paul. Attempts were made through the

8

mail-out survey to contact these SHARC holders, but none responded and all were treated as potential fishers.

Third, 177 SHARCs were held by eligible tribal members living outside of Alaska. Only 31% of the mailed surveys were returned from this group, and only four of these returned surveys indicated any subsistence fishing activity. Rather than assign the mean value for their tribe (which would likely result in an overestimate of the harvest), all non-returned surveys for SHARC holders with out-of-state addresses were coded as "did not fish."

Fourth, rural community SHARC holders were divided into two categories based upon the expiration date of their SHARC. SHARCs having an expiration date falling within the study period and that were not renewed were treated as separate strata from other SHARCs for the purpose of generating harvest estimates. This was done to account for potential bias and resulting overestimation of harvest for SHARCs that only fished for part of the year. During 2006, 626 rural community SHARCs expired; of those 263 (42%) participated in the survey.

Fifth, as in 2005, the response rate for tribal SHARC holders of the Village of Kanatak was very low (1 of 11; 9%). Therefore, an expanded harvest estimate was not calculated for this tribe; the reported harvest by the single respondent serves as the harvest estimate for the Village of Kanatak.

The RAM division issued six community harvest permits to tribes in Area 2C that were valid in 2006. Holders of these permits reported no subsistence halibut harvests to RAM. No educational or ceremonial permits were issued for 2006. If harvests under any of these permits had occurred, the totals would have been added to the estimates for the tribe of the permit holder because they are not reported by individuals in their response to the SHARC mailed survey.

It should also be noted that not every individual who obtained a SHARC as a tribal member resided in the community where his or her tribe's headquarters is located. Therefore, the sum of harvest estimates for tribal SHARC holders and rural resident SHARC holders does not necessarily equal the halibut harvest for particular communities. Rather, an additional analysis was necessary to estimate harvests by community of residence that assigned tribal SHARC holders to a community based on their mailing addresses. Appendix Tables 4, 5, and 6 report study results by place of residence of the SHARC holders.

The standard deviation (SD) (or Variance [V], which is the SD squared) of the harvest was calculated with the raw, unexpanded data. The Standard Error (SE), or SD of the mean, was also calculated for each community or tribe. This was used to calculate the *relative precision of the mean*, or the likelihood an unknown value falls within a certain distance from the mean. In this study, the relative precision of the mean is shown in the tables as a confidence interval (CI), expressed as a percent. Once the standard error was calculated, the CI was determined by multiplying the SE by a constant that reflected the level of significance desired, based on a normal distribution. The constant for 95% confidence intervals is 1.96. Though there are numerous ways to express the formula below, it contains the components of a SD, V, and SE.

9

Relative Precision of the Mean (CI%):

$$C.I.\%(\pm) = \frac{t_{\alpha/2} \times \frac{s}{\sqrt{n}} \times \sqrt{\frac{N-n}{N-1}}}{\overline{x}}$$

Where $s = \sqrt{\sum_{i=1}^{t} \frac{\sum(x-\overline{x}_i)^2}{n_i - 1}}$ (Sample standard deviation)

$s$ = sample standard deviation

$n$ = total sample size

$N$ = total population size

$n_i$ = tribal or community sample size

$N_i$ = tribal or community population size

$t_{\alpha/2}$ = Student's t statistic for alpha level ($\alpha$=.95) with n-1 degrees of freedom.

Project staff explored the possibility of non-response bias for returned mail out surveys and its effect on harvest estimates. However, it was determined that responses to the survey, including harvest levels and involvement in the fishery, were not significantly different between any of the response categories (responses to the first mail out, the second mailout, the third mailout, and staff administered surveys) (see Appendix Table 2).

As noted above, survey respondents provided harvest estimates in pounds round (whole, live) weight. For ease of comparison with estimates of halibut removals in other fisheries, we have converted these estimates to pounds net (dressed, head off) weight, where (0.75) (round weight) = net weight.[8]

## Supplemental Mailing and In-Season Study

In 2005, the grant agreement between ADF&G and NMFS was amended to add funds to support a supplemental survey mailing to 1,108 SHARC holders in Sitka and Kodiak who had responded to the mailed survey in 2005 and had reported fishing for halibut in 2004. The primary goal of the supplemental mailing was to collect additional background information about subsistence halibut fishing that was necessary to design an in-season harvest assessment program for 2006.

---

[8] The factor of 0.75 for converting halibut round weight to net weight is the standard used by the International Pacific Halibut Commission and the Division of Sport Fish of ADF&G. Division of Subsistence studies, as reported in the Technical Paper Series and the Community Subsistence Information System (ADF&G 2007) (formerly the Community Profile Database [Scott et al. 2001]), generally use a factor of 0.72 for converting halibut round weights to net weights, based on Crapo et al. (1993:7), who report that on average, the weight of a dressed halibut with the head removed is 72% of the round weight, with a range of 68% to 80%. In Division of Subsistence reports, "net" weight (dressed, head off) is usually referred to as "usable weight."

Respondents were asked to indicate the months in which they fished for halibut in 2004 and their harvests in each month; name the locations at which they landed (brought to shore) halibut in 2004; explain how they distinguished between sport fishing and subsistence fishing for halibut; and evaluate their understanding of the subsistence halibut regulations. Survey findings are reported in Appendix I of Fall et al. 2006. Chapter 2 includes a short discussion of reasons provided by supplemental survey respondents for distinguishing between subsistence and sport-caught halibut.

As noted earlier, the grant agreement between ADF&G and NMFS was also amended to fund an in-season harvest monitoring program for the subsistence halibut fisheries in Sitka and Kodiak in 2006. This study was implemented in May 2006. Findings will be reported in a separate report to be completed in early 2008.

**Products**

The public review draft of this final report was completed in November 2007 and circulated for review and comments. The draft report was also posted at the Division of Subsistence web site. A presentation of the study findings and recommendations took place at the December 2007 meetings of the ANSHWG and the NPFMC in Anchorage, Alaska. The final report was revised in consideration of comments and suggestions received from reviewers of the public review draft and those received during the NPFMC and ANSHWG meetings. In addition to the final report, a short findings summary was prepared (Appendix H). The summary was sent to tribal government representatives and other interested individuals and groups. This report and the project summary were posted on the Division of Subsistence web site and the RAM website in PDF format for downloading and printing by the public.

11

12

# CHAPTER 2: FINDINGS

## SUBSISTENCE HALIBUT HARVESTS IN 2006

### Estimated Number of Subsistence Halibut Fishers

Of the 14,206 individuals who were holders of SHARCs in 2006 (obtained in 2003, 2004, 2005, or 2006), an estimated 5,909 (42%) participated in the subsistence halibut fishery in 2006 (Table 4, Figure 6). Of the 7,123 individuals who had obtained SHARCs as members of an eligible tribe, an estimated 2,329 participated in the fishery (33%). Of the 7,083 individuals who had obtained SHARCs as residents of qualifying rural communities, an estimated 3,580 (51%) participated in the subsistence fishery for halibut in 2006. In 2005, 5,621 of 14,306 SHARC holders fished in the subsistence halibut fishery (39%) including 2,035 of 6,437 tribal SHARC holders (32%) and 3,349 of 7,869 non-tribal rural SHARC holders (43%). In 2004, 5,984 of 13,813 SHARC holders participated in the fishery (43%), including 2,157 of 6,533 tribal SHARC holders (33%) and 3,827 of 7,280 non-tribal rural SHARC holders (53%). In 2003, 4,924 of 11,635 SHARC holders participated in the subsistence fishery (42%), including 1,836 of 5,578 tribal SHARC holders (33%) and 3,106 of 6,057 non-tribal rural SHARC holders (51%) (Figure 6).

In 2006, as in 2003 through 2005, demography may account for the difference in the rate of participation in the subsistence halibut fishery between tribal SHARC holders and rural SHARC holders. As shown in Table 5 and illustrated in Figure 7, in 2006, 17% of tribal SHARC holders were younger than 20 years of age, compared to 7% of rural SHARC holders. This may reflect a policy on the part of some eligible tribes to register all or most tribal members, including younger people who were less likely to participate in the subsistence fishery than adults. For example, 532 members of the Native Village of Toksook Bay held SHARCs in 2006; of these, 40% were younger than 20 years of age (Table 5). Excluding Toksook Bay from the statewide tribal SHARC totals does not substantially alter the contrast in the younger age cohorts between tribal and rural resident SHARC holders (Table 5).

As illustrated in Figure 8 (see also Table 4), the largest number of Alaska subsistence halibut fishers in 2006 were from tribes and rural communities in Regulatory Area 2C (Southeast Alaska), 3,298 (56%). There were 1,729 subsistence halibut fishers (29%) from tribes and communities in Regulatory Area 3A (Southcentral Alaska), 371 (6%) from Regulatory Area 4E (East Bering Sea Coast) tribes and communities, and 306 (5%) from Area 3B (Alaska Peninsula) tribes and communities. Additionally, there were 205 (3%) halibut fishers who were members of tribes and residents of communities in the four other regulatory areas. As also shown in Figure 8, the distribution of subsistence fishers by regulatory area in 2006 was similar to that of 2003, 2004, and 2005. Compared to 2005, the estimated number of halibut fishers from tribes and rural communities in Areas 2C and 3A was about the same in 2006. The estimated number of fishers increased by 29% in Area 3B (from 237 to 306), primarily due to increases in participation at Sand Point. The estimated number of subsistence halibut fishers increased by 22% (from 305 to 371) in Area 4E, mostly due to increased participation at Toksook Bay.

Alaska Native tribes with the most subsistence halibut fishers in 2006 included the Central Council of Tlingit and Haida Indians (204 subsistence halibut fishers), the Sitka Tribe of Alaska (149), the Ketchikan Indian Corporation (145), the Native Village of Toksook Bay (112), the Shoonaq' Tribe of Kodiak (112), the Metlakatla Indian Community (105), the Qagan Tayagungin Tribe of Sand Point Village (96), the Hoonah Indian Association (85), the Native

13

Village of Kipnuk (68), the Klawock Cooperative Association (66), the Angoon Community Association (55), and the Hydaburg Cooperative Association (55). Of the SHARC holders who registered as residents of eligible rural communities, the most subsistence fishers lived in Kodiak (824), followed by Sitka (759), Petersburg (370), Cordova (216), Haines (203), Wrangell (188), and Craig (169). Appendix Table 3 provides details for each tribe and community regarding participation in the subsistence fishery and subsistence halibut harvests in 2006.

As noted above, not every tribal SHARC holder lives in his or her tribe's headquarters community. After assigning tribal members to a community based on their place of residence, an estimate of participation in the subsistence halibut fishery in 2006 by community can be obtained. Appendix Table 4 provides study findings based on place of residence. Communities with 100 or more resident SHARC holders who participated in the subsistence halibut fishery in 2006 were Kodiak (961), Sitka (915), Petersburg (426), Cordova (248), Craig (244), Wrangell (242), Haines (229), Ketchikan (208), Hoonah (139), Klawock (137), Sand Point (133), Metlakatla (118), and Toksook Bay (113). Of the 13 Alaska communities with 100 or more subsistence halibut fishers in 2006, most had about the same or slightly fewer fishers than in 2005. Participation by Kodiak residents increased each of the first four years of the fishery. Notable increases in participation from 2005 to 2006 occurred in Toksook Bay (61 subsistence halibut fishers in 2005, 113 in 2006; 85% increase) and Sand Point (100 fishers in 2005, 133 in 2006; 33% increase) (Figure 9). (See Chapter 3 for further discussion of Kodiak, Sand Point, and Toksook Bay as case study communities.) Seven non-Alaska resident tribal SHARC holders subsistence-fished for halibut in Alaska in 2006, compared to 0 in 2005, 24 in 2004, and 5 in 2003.

## Estimated Alaska Subsistence Halibut Harvests in 2006 by SHARC Type and Regulatory Area

Table 4 reports estimated Alaska subsistence halibut harvests for 2006 by SHARC type, regulatory area, and gear type. The total estimated subsistence halibut harvest in Alaska in 2006 was 54,089 fish (+/- 3%) for 1,125,312 pounds (+/- 3%) net weight.[9] As estimated in pounds net weight, 53% of the subsistence halibut harvest (591,786 pounds [+/- 4%]) was taken by fishers registered with tribes or rural communities in Regulatory Area 2C (Fig. 10). (Note that because some SHARC holders may fish in a regulatory area different from the location of their tribal headquarters or rural community of registration, the area totals in Table 4 do not precisely represent harvest locations. See the section on harvests by location, below.) Fishers from Area 3A tribes and rural communities harvested 361,731 pounds (+/- 4%) (32% of the state total). For Regulatory Area 4E,[10] the estimated harvest for tribal and rural SHARC holders was 71,219 pounds (+/- 20%) (6%). Harvests totaled 54,088 pounds (+/- 14%) (5%) for communities and

---

[9]  This approximates 1,500,416 pounds round (live or whole) weight. See footnote 7 in Chapter 1 for an explanation of the factor used to convert round weight to net weight (net weight = 75% of round weight).

[10]  Community Development Quota (CDQ) organizations operating exclusively in Areas 4D and 4E may retain sublegal halibut (less than 32 inches) from their commercial catches for home use. In 2006, a total of 19,710 pounds net weight of halibut was retained by 3 organizations: Coastal Villages Regional Fund (13,467 pounds), Bristol Bay Economic Development Corporation (2,836 pounds), and Norton Sound Economic Development Corporation (3,407 pounds) (Williams 2007). The IPHC includes these fish within the "personal use" removal category, a category that also includes subsistence harvests (Gilroy 2005:64). See also the section in Chapter 3, "Comparisons with Nonsubsistence Harvests."

tribes of Regulatory Area 3B. For tribal and rural SHARC holders in Area 4A, the estimated harvest was 27,562 pounds (+/- 19%) (2%). Tribes and communities in the remaining three regulatory areas (4B, 4C, and 4D) harvested 18,926 pounds (about 2%).

The estimated subsistence harvest of 1,125,312 pounds of halibut in 2006 represents a decrease of 4.5% compared the estimated harvest of 1,178,222 pounds in 2005 (Figure 11). Harvests by tribal SHARC holders increased by 2.8%, from 496,792 pounds in 2005 to 510,740 pounds in 2006. Tribal SHARC holders harvested 45% of the Alaska subsistence halibut harvest in 2006, compared to 42% in 2005. Subsistence halibut harvests by non-tribal, rural resident SHARC holders decreased by 9.8%, from 681,430 pounds in 2005 to 614,572 pounds in 2006. This group accounted for 55% of the statewide subsistence halibut harvests in 2006, compared to 58% in 2005.

Members of 74 Alaska tribes harvested subsistence halibut in 2006. In three others, SHARC holders fished but had no harvest. In 24 others, tribal members obtained SHARCs, but no one fished. No one in the remaining 22 eligible tribes held a valid SHARC in 2006. All of these tribes were in Regulatory Area 4E (East Bering Sea Coast). As shown in Figure 12, members of the 13 tribes with harvests of 10,000 pounds or more accounted for 62% of the total subsistence halibut harvest by tribal SHARC holders in 2006. These 13 tribes accounted for 58% of the tribal SHARCs (4,119 of 7,123). Members of the other 61 tribes with harvests accounted for about 38% of the total harvest by tribal members.

Residents of 58 eligible rural communities harvested subsistence halibut in 2005.[11] In four others, SHARC holders fished unsuccessfully. In 20 others, individuals obtained SHARCs but no one fished. No one in the remaining 35 eligible rural communities held a valid SHARC as a non-tribal member in 2006. Most of these communities (29) were in Regulatory Area 4E (East Bering Sea Coast).[12] As shown in Figure 13, 12 rural communities with harvests of over 10,000 pounds accounted for 83% of the subsistence halibut harvest by the holders of rural (non-tribal) SHARCs in 2006. These communities accounted for 84% of the rural SHARCs. Residents of the other 46 communities with harvests accounted for 17% of the total harvest by rural SHARC holders.

As also shown in Figure 13, rural SHARC holders from two communities accounted for 48% the total harvest by this group: Kodiak (28%) and Sitka (20%). Adding Petersburg, the next highest rural community harvest at 8%, the top three rural communities accounted for over half (55%) of the rural community (non-tribal) subsistence halibut harvest in Alaska in 2006.

**Estimated Alaska Subsistence Halibut Harvests in 2006 by Harvest Location**

Survey respondents were asked to report the "water body, bay, or sound [that they] usually fished" for subsistence halibut in 2006. Multiple responses were permitted. In Table 6, estimated subsistence halibut harvests are reported for the eight Alaska halibut regulatory areas and 21 subdivisions within these areas. It should be noted that regulatory area totals in Table 6 differ slightly from those reported in Table 4 because not all SHARC holders fished within the regulatory area in which their tribal headquarters or residence is located.

---

[11] In this tally, Chiniak, listed separately in tables in this report, is counted as part of Kodiak, as it is for eligibility.

[12] Note that residents of these communities may have obtained SHARCs as tribal members.

Subsistence halibut harvests in Regulatory Area 2C (Southeast Alaska) accounted for 52% of the Alaska subsistence halibut harvest in 2006 (580,117 pounds net weight) (Figure 14; Table 6). Also, three of the four geographic subareas with the largest subsistence halibut harvests in 2006 were in Area 2C: southern Southeast Alaska (307,921 pounds net weight; 27% of the state total); the Sitka Local Area Management Plan (LAMP) area (147,526 pounds; 13%), and northern Southeast Alaska other than the Sitka LAMP area (124,670 pounds; 11%), as shown in Figure 15 and Figure 16.[13] Regulatory Area 3A (Southcentral Alaska) ranked second, with 34% of the state's total subsistence halibut harvest (379,258 pounds net weight). Waters bordering the Kodiak Island road system (including Chiniak Bay) ranked third among subareas, with a subsistence halibut harvest of 140,388 pounds (12% of the state total), followed by the remainder of the Kodiak Island area, which ranked fifth (111,752 pounds; 10%). Harvests within Cook Inlet waters of Area 3A accounted for 5% of the state total (59,965 pounds), those within Prince William Sound added 47,965 pounds (4% of the statewide total), and the Yakutat Area added 19,187 pounds (2%). Among regulatory areas, Area 4E (Bering Sea Coast) ranked third with 6% (70,743 pounds). Combined, Bristol Bay and the Yukon/Kuskokwim Delta areas with Area 4E accounted for all of this area's harvest, with no reported harvests from Norton Sound. Area 3B (Alaska Peninsula including the Chignik Area) ranked fourth with 4% of the Alaska total (48,547 pounds). In descending order, subsistence halibut harvests in the other regulatory areas in 2006 were as follows: Area 4A (eastern Aleutian Islands), 27,062 pounds (2%); Area 4C (Pribilof Islands), 8,527 pounds (less than 1%); Area 4D (St. Lawrence Island), 8,297 pounds (less than 1%); and Area 4B the western Aleutian Islands, 2,761 pounds (less than 1%).

Figure 17 reports estimated harvests in pounds net weight by location fished at the regulatory area level in 2003, 2004, 2005, and 2006. Table 7 compares estimated subsistence halibut harvests by regulatory area and geographic area in 2006 with those estimated for 2005, 2004, and 2003. As noted previously, for the state overall, the estimated harvest in pounds decreased by about 4% in 2006 from 2005 (Figure 18). However, the estimated harvest in 2006 was about 8% higher than the estimate for 2003, the first year of the subsistence halibut harvest monitoring program (Figure 19).

Estimated subsistence halibut harvests increased in five regulatory areas in 2006 compared to 2005 (Figure 17; Figure 18; Table 7). The largest proportional increase was in Area 4B (Western Aleutian Islands), where estimated harvests increased 104%, from 1,351 pounds in 2005 to 2,761 pounds in 2006. The 2006 estimate was also notably higher than the 2004 estimate (916 pounds), but was very similar to the estimate of 2,582 pounds for 2003 (7% higher) (Figure 17; Figure 19; Table 7). Estimated harvests in Area 4C (Pribilof Islands) increased 11%, from 7,716 pounds in 2005 to 8,527 pounds in 2006. Estimated subsistence halibut harvests in the Pribilof Islands in 2006 were not markedly different from those of 2004 (9,734 pounds), but were 63% lower than the 22,881 pounds estimated for 2003 (Figure 19). However, as noted in the report for the 2004 study year (Fall et al. 2005:15), an improved response rate to the survey has likely resulted in better harvest estimates for St. Paul, the largest community in Area 4C. In

---

[13]  For this study, "northern Southeast Alaska" includes those waters of Regulatory Area 2C north of Frederick Sound, including waters surrounding Baranof Island and excluding the Sitka LAMP area. For a description of the Sitka LAMP area, see FR 68 18156, April 15, 2003, § 300.65(d)(1). The remaining waters of Area 2C are referred to as "southern Southeast Alaska" in this report.

retrospect, the harvest estimate for Area 3C for 2003 appears too high, the result of a small sample size with an overrepresentation of active fishers.

Estimated subsistence harvests of halibut increased by 42% in Area 4D (Central Bering Sea) (from 5,848 pounds in 2005 to 8,297 pounds in 2006). The 2006 estimate was lower than that for 2004 (10,923 pounds), but 89% higher than 2003 (4,380 pounds). In Area 4E (East Bering Sea Coast), the estimated harvest of 70,743 pounds was a 31% increase over the 54,119 pounds estimated for 2005 (Figure 17; Figure 18; Table 7). The 2005 harvest in this area was notably higher than the estimate for 2004 (28,501 pounds) but approximately the same as the estimate for 2003 (53,775 pounds). More thorough harvest reporting in several western Alaska communities may account for the change in harvest estimates from 2004 to 2005. The 2006 estimate was 32% above the 2003 estimate (Figure 17; Figure 19; Table 7). Increased harvest effort in Toksook Bay accounts for much of this increase (see Chapter 3).

There was a small increase of 5% in Area 3B (Alaska Peninsula) harvests from 2005 (46,225 pounds) to 2006 (48,547 pounds) (Figure 17; Figure 18; Table 7). In Area 3B, the 2006 estimated harvest was notably higher than that for 2004 (33,519 pounds) and 2003 (27,477 pounds) (Table 7; Figure 17; Figure 19). Improved participation in the SHARC program likely accounts for some of the increase in the estimated harvests in Area 3B (see discussion of Sand Point in Chapter 3).

Estimated subsistence halibut harvests in other three regulatory areas were lower in 2006 compared to 2005 (Table 7; Figure 17; Figure 18). Estimated harvests in Area 4A (Eastern Aleutian Islands) dropped by 24% in 2006 (27,062 pounds) from 2005 (35,615 pounds). However, the 2006 estimate was similar to that for 2004 (28,877 pounds) and was 28% above the estimate for 2003 (21,197 pounds) (Table 7; Figure 17; Figure 19).

In terms of total pounds, the largest increase in estimated harvests over the first three years of the project took place in Area 3A (Southcentral Alaska), where the 2005 harvest of 429,275 pounds was 6% higher than the estimate for 2004 (403,610 pounds) and 50% higher than the estimate for 2003 (285,500 pounds) (Table 7). The estimated harvest for 2006 (379,258 pounds) declined by 12% compared to 2005, but remained 33% higher than the estimate for 2003 (Figure 17; Figure 18). As a consequence, Area 3A accounted for 34% of the statewide subsistence halibut harvest in 2006, 36% in 2005, and 34% in 2004, compared to 27% in 2003 (Table 7). In Area 3A, subsistence halibut harvests increased in the Kodiak Island road system area (increase of 4%) and the remainder of Kodiak Island (increase of 1%) from 2005 to 2006. Decreases in harvests occurred in Cook Inlet (down 24%), Prince William Sound (down 30%), and the Yakutat area (down 48%) (Table 7).

As in the first three years of the project, Area 2C (Southeast Alaska) accounted for the most subsistence halibut harvests in 2006 (580,117 pounds), but this harvest represents a decrease of 3% compared to 2005 (Table 7; Figure 17; Figure 18) and 7% compared to 2003 (Figure 19). The percentage of the total statewide subsistence halibut harvest that took place in Area 2C in 2006 was 52%, similar to 2005 (51%), but a decline compared to 57% in 2004 and 60% in 2003. Harvests decreased in two subareas within Area 2C in 2006 compared to 2005, with an 8% decrease in northern Southeast Alaska subarea (excluding the Sitka LAMP) and a 6% decrease in the southern southeast subarea. Estimated subsistence halibut harvests in the Sitka LAMP area were 10% higher in 2006 compared to 2005, but 15% lower in 2006 compared to 2003 (Table 7).

The reasons for these changes in Area 2C are likely complex and beyond the scope of this report.[14]

Figure 20 illustrates the average subsistence halibut harvest in pounds net weight for those SHARC holders who subsistence fished in 2006. Figure 21 illustrates the average harvest per fisher in number of halibut. For the state overall, the average subsistence halibut fisher harvested 190 pounds net weight or about 9.2 halibut in 2006. Average harvests per fisher at the regulatory area level ranged from 170 pounds net weight in Area 3B to 377 pounds per fisher in Area 4D. In 2003, subsistence fishers on average harvested 8.9 halibut (211 pounds) (Fall et al. 2004:12-13): in 2004 the average harvests were 8.8 halibut and 199 pounds (Fall et al. 2005:15); and in 2005, the average harvests were 9.9 halibut and 210 pounds (Fall et al. 2006: 17).

**Subsistence Halibut Harvests by Place of Residence**

As shown in Figure 22, there were 31 Alaska communities whose residents had combined estimated subsistence halibut harvests of approximately 7,500 pounds or more net weight (over 10,000 pounds round weight) in 2006. In this figure, community totals include harvests of all SHARC holders living in the community, regardless of type of SHARC (tribal or rural) or tribal affiliation.[15] Residents of these communities accounted for 87% of the total Alaska subsistence halibut harvest in 2006. Residents of Kodiak (Kodiak includes Kodiak city and other portions of the Kodiak Island Borough connected to it by roads) ranked first with 18% of the total Alaska harvest, and Sitka ranked second with about 15%. With 12,003 and 8,833 residents, respectively, these two communities included about 27% of the population of rural communities eligible to participate in the subsistence fishery. There were 66 other Alaska communities with at least one resident who participated in the subsistence halibut fishery in 2006. The total harvest for these other communities represented 13% of the state total.

For 2006, 177 SHARC holders provided out of state addresses from 123 communities in 29 states and territories.[16] Seattle was the non-Alaska community with the most SHARC holders, with 13. Seven non-Alaska residents SHARC holders subsistence fished for halibut in 2006, reporting a harvest of 72 fish and 2,436 pounds net weight (0.2% of the state total) (see Appendix Table 4). No non-Alaska resident SHARC holders subsistence fished for halibut in 2005. In 2004, 24 non-Alaska residents reported subsistence fishing for halibut in Alaska, with an estimated total harvest of 169 fish and 4,845 pounds net weight (about 0.4% of state total). In 2003, five non-Alaska residents participated in the Alaska subsistence halibut fishery, harvesting five fish.

**Subsistence Harvests by Gear Type**

Table 6 and Figure 23 report the estimated subsistence harvests of halibut in Alaska in 2006 by gear type and regulatory area fished. In total, 782,532 pounds (70%) of halibut (net weight)

---

[14] Further discussion of differences between harvest estimates for 2003, 2004, 2005, and 2006 appears in Chapter 3 and Chapter 4. However, more thorough discussion of harvest trends in the Alaska subsistence halibut fishery should await availability of data for 2007, the fifth year of harvests under the new regulations.

[15] Note that nonrural places, such as Anchorage, Juneau, Ketchikan, and Valdez, appear in Figure 22 and in Appendix Tables A-4, A-5, and A-6, because members of eligible Alaska Native tribes may participate in the fishery regardless of where they live.

[16] Note that members of eligible tribes may obtain SHARCs regardless of their place of residence.

18

were harvested using setline (stationary) gear (longlines or skates) and 342,779 pounds (30%) were harvested using handlines or lines attached to a rod or pole (hand-operated gear). There were notable differences between regulatory areas (Table 6, Figure 23). Harvests using setline gear predominated in Area 4D (Central Bering Sea) (93% of the total subsistence harvest), 2C (Southeast Alaska) (83%), 3A (Southcentral Alaska) (65%), and 4B (Western Aleutian Islands) (79%). In contrast, hand-operated gear accounted for most of the subsistence halibut harvests in Area 4E (East Bering Sea Coast) (88%) and 4A (Eastern Aleutian Islands) (72%). Harvests were about equally divided across the two gear types in Area 3B (Alaska Peninsula) (48% setline gear and 52% hand operated gear) and in Area 4C (Pribilof Islands) (48% setline gear, 52% hand operated gear). In 2005 also, 70% of the total Alaska subsistence harvest was taken with setline gear and 30% with hand-operated gear (Fall et al. 2006: 18). In 2004, 74% of the Alaska subsistence halibut harvest was taken with setline gear and 26% with hand operated gear (Fall et al. 2005:16). In 2003, 72% was taken with setline gear and 28% with hand operated gear (Fall et al. 2004:13).

## Number of Hooks Fished with Setline Gear

Respondents who fished with setline (stationary) gear (longline or skate) were asked to report how many hooks they "usually set." The findings by regulatory area are reported in Table 8. For the fishery overall, most setline fishers (38%) used 30 hooks, the maximum number allowed by regulation in Areas 2C, 3A, 3B, 4A, and 4B (there is no hook limit in Areas 4C, 4D, and 4E) (Figure 24). The next most frequently reported number was 20 hooks, usually used by 20% of the fishers who used setline gear. Twenty-five hooks (8%) ranked third, followed by 10 hooks (8%) and 15 hooks (8%). This pattern is similar to that recorded for 2005, when 42% of setline fishers used 30 or more hooks and 20% used 20 hooks (Fall et al. 2006:18-19); 2004, when 44% of setline fishers used 30 hooks and 19% used 20 hooks (Fall et al. 2005:16), and 2003, when 43% of setline fishers used 30 hooks and 20% used 20 hooks (Fall et al. 2004:13).

Thirty was the most frequently used number of hooks with setline gear in six of the eight regulatory areas (Table 8): 2C (Southeast Alaska), 38%; 3A (Southcentral Alaska), 40%; 3B (Alaska Peninsula), 43%; 4A (Eastern Aleutian Islands), 55%; Area 4C (Pribilof Islands), 50%; and 4E (East Bering Sea Coast), 33%. In Area 4B (Western Aleutians), 42% of fishers who used set hook gear used one hook and 20% used 20 hooks. In Area 4D (Central Bering Sea), 71% used 20 hooks, followed by 14% using 30 hooks.

## Sport Harvests of Halibut by SHARC Holders

Survey respondents were asked to report the number of halibut and pounds of halibut they harvested "while sport fishing during 2006." They were instructed not to include fish they included as part of their subsistence harvests as sport caught. The goal of this question was to avoid double-counting harvested halibut in this survey and in the statewide survey of sport fishers administered by ADF&G's Division of Sport Fish. Answering this question required respondents to classify their hand-operated gear (hook and line, and rod and reel) harvests as either subsistence or sport; these gear types are legal gear for both sport fishing and subsistence fishing. Fish reported in the survey as "sport harvests" are not included in the estimated subsistence harvests discussed above. If SHARC holders also received the sport fish survey for 2006, they would be expected to report the same number of halibut as sport-caught as in their response in the SHARC survey and not include any halibut they reported as subsistence harvests, even if taken with rod and reel or handheld line with two or less hooks. Note that the study

19

findings do not represent the total recreational halibut harvest by residents of eligible communities and tribes in 2006, because individuals from these tribes and communities who did not obtain SHARCs could have sport fished.

As shown in Table 4 and Table 6, the estimated total sport halibut harvest by holders of SHARCs in 2006 was 11,219 fish and 223,639 pounds net weight. Of the total harvest, most was taken by SHARC holders from Area 2C (Southeast Alaska) (112,907 pounds; 50%) and Area 3A (southcentral Alaska) (93,685 pounds; 42%) (Table 4). By area fished, most of the sport halibut harvest by SHARC holders occurred in Area 2C (109,649 pounds; 49%) and Area 3A (99,602 pounds; 45%) (Table 6). In total, an estimated 2,894 SHARC holders (20%) reported that they sport fished for halibut in 2006. A very large majority of these fishers fished in either Area 2C (1,731; 60%) or Area 3A (1,025; 35%) (Table 6). (See Appendix Table 7 for estimated sport halibut harvests by tribe and non-tribal rural community SHARC holders.)[17]

### Estimated Average Net Weights of Subsistence and Sport-Caught Halibut

Table 9 reports the average net weight of subsistence and sport-caught halibut by SHARC holders in 2006, based upon estimates provided by survey respondents. For the state, the estimated average net weight of subsistence caught halibut was 20.8 pounds and the average net weight of sport-harvested halibut by SHARC holders was 19.9 pounds. For all halibut harvested by SHARC holders in 2006, the average net weight per harvested halibut was 20.7 pounds. Between regulatory areas, there was a range of average weights per halibut. The halibut harvested by the communities of Area 4D (Saint Lawrence Island), averaged 35.7 pounds net weight per fish, almost double the statewide average. In Area 4E, halibut averaged 10.8 pounds net weight, about half of the statewide average. In 2005, the estimated average weight of halibut harvested in the subsistence fishery was 21.1 pounds, the average halibut taken by SHARC holders while sport fishing weighed 20.8 pounds, and the average of all halibut was 21.0 pounds (Fall et al. 2006:20). In 2004, the statewide average for subsistence-harvested halibut was estimated at 22.8 pounds, the average sport-harvested halibut by SHARC holders was 20.0 pounds, and the average for all halibut was 22.2 pounds (Fall et al. 2005:17). In 2003, the statewide average for subsistence-harvested halibut was 23.7 pounds, the average sport-harvested halibut by SHARC holders was 22.8 pounds, and the average for all halibut was 23.5 pounds (Fall et al. 2004:14).

---

[17] The mail-out survey did not investigate the criteria by which survey respondents classified their rod and reel (hook and line attached to a rod or pole) halibut harvests as subsistence or sport. However, a supplemental mailing to 1,098 SHARC holders from Kodiak and Sitka who fished for halibut in 2004 asked respondents to provide reasons for classifying their halibut harvests as sport or subsistence. For a discussion of the findings, see Fall et al. 2006:19-20, 123-138. In short, the primary factor (for 69% of respondents) was the gear used to harvest the fish: respondents viewed rod and reel as "sport gear" and setline gear as "subsistence gear." Another factor, reported by 12%, concerned the composition of the fishing group. If the SHARC holders had fished with relatives or friends who did not possess a SHARC, they classified their fishing as recreational. Harvest amounts were also a consideration: harvests or one or two halibut with a rod and reel were considered "sport" by some respondents, but if they harvested more than two fish with rod and reel in one day, they classified the harvest as subsistence. Finally, about 19% of the respondents gave reasons related to the use of the fish or cultural and lifestyle explanations.

## ROCKFISH HARVESTS

Survey respondents were asked to estimate the number of rockfish they harvested while subsistence fishing for halibut in 2006. Harvest data at the species level were not collected as part of this survey.

Note that these survey results do not represent an estimate for the total subsistence rockfish harvest by SHARC holders in 2006 because they might have harvested rockfish while fishing for species other than halibut, and other fishers in the communities who did not obtain SHARCs might have harvested rockfish. The Division of Subsistence Community Subsistence Information System (CSIS) (ADF&G 2006)[18] includes estimates of rockfish harvests for communities in which comprehensive household surveys have been administered.

It should also be noted that the label "bycatch" for these harvests is misleading.[19] Rockfish are used for subsistence purposes in rural communities throughout their range in Alaska (ADF&G 2006). It is highly likely that rockfish harvested incidentally in the subsistence halibut fishery are utilized as a subsistence food. It is highly unlikely that many incidentally caught rockfish are discarded in this subsistence fishery.

As shown in Table 10, the statewide estimated rockfish incidental harvest in the subsistence halibut fishery in 2006 was 16,945 fish by 1,529 fishers (11% of all SHARC holders, and 26% of all SHARC holders who subsistence fished for halibut in 2006). This is an average of about 2.9 rockfish per fisher for all subsistence halibut fishers and about 11.1 rockfish per fisher for those who had a rockfish harvest. Most of the subsistence halibut fishers who caught rockfish fished in Area 2C (Southeast Alaska) (1,069 fishers; 70%) and Area 3A (376 fishers; 25%). In Area 2C, about 32% of subsistence halibut fishers incidentally harvested rockfish, as did 21% in Area 3A (Southcentral Alaska). (See Appendix Table 7 for estimated rockfish harvests by tribe and by non-tribal rural community SHARC holders.)

As illustrated in Figure 25 and Figure 26, most of the incidental rockfish harvest in 2006 was harvested in Area 2C: 11,486 rockfish, 68% of the statewide total. Area 3A accounted for the second-highest total: 3,977 rockfish, 24% of the total. Harvests were relatively small by SHARC holders fishing in other regulatory areas, who combined harvested 1,482 rockfish, about 9% of the statewide total. Compared to 2005, when 12,395 rockfish were harvested, the incidental rockfish harvest in the subsistence halibut fishery in 2006 was up by 37%. The 2006 estimated rockfish harvest was lower than the estimate for 2004 (19,001 rockfish) but higher than 2003, when 14,870 rockfish were harvested in the subsistence halibut fishery.

---

[18] This was formerly the Community Profile Database (Scott et al. 2001).

[19] The Magnuson-Stevens Fishery Conservation and Management Act (Section 3) defines "bycatch" as "fish harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards. Such term does not include fish released alive under a recreational catch and release fishery management program." Federal regulations (50 CFR 679.2) define bycatch or bycatch species as fish caught and released while targeting another species or caught and released while targeting the same species; under 50 CFR 600.10 discard means to release or return fish to the sea, whether or not such fish are brought fully on board a fishing vessel. In all cases, bycatch means to discard fish and excludes retaining fish for use. The federal definition of "incidental catch" or "incidental species" is "fish caught and retained while targeting on some other species, but does not include discard of fish that were returned to the sea" (50 CFR 679.2).

Table 10 also reports the estimated incidental rockfish harvest in 2006 by SHARC holders by location of harvests within geographic subareas. Most of the harvest occurred in southern Southeast Alaska (5,517 fish), the Sitka LAMP area (4,038 rockfish), northern Southeast Alaska (1,927 rockfish), the Kodiak Island Road System (1,826 rockfish), and other Kodiak Island (826 rockfish). Incidental rockfish harvests totaled 719 fish in Prince William Sound and 330 rockfish in Cook Inlet. In Lower Alaska Peninsula waters, there was an incidental harvest of 669 rockfish.

## LINGCOD HARVESTS

Survey respondents were asked to estimate the number of lingcod they harvested while subsistence fishing for halibut in 2006. Note that these survey results do not provide an estimate of the total subsistence lingcod harvest by SHARC holders in 2006 because they might have harvested lingcod while fishing for species other than halibut. Also, other fishers in the communities who did not hold SHARCs might have fished for or harvested lingcod, so that these incidental harvests represent only a portion of the total 2006 subsistence harvest. The Division of Subsistence Community Subsistence Information System (ADF&G 2006) includes estimates of lingcod harvests for communities in which comprehensive household surveys have been administered.

It should also be noted that the label "bycatch" for these harvests might be misleading.[20] Lingcod are used for subsistence purposes throughout their range in rural Alaska (ADF&G 2006). It is highly likely that lingcod harvested incidentally in the subsistence halibut fishery are utilized as a subsistence food. It is very unlikely that many lingcod caught in this subsistence fishery are discarded.

The statewide estimated incidental lingcod harvest in the subsistence halibut fishery in 2006 was 3,486 fish by 927 fishers (Table 10). This is an average of about 0.6 lingcod per fisher for all subsistence halibut fishers and 3.8 lingcod per fisher for those who had a lingcod harvest. Of all SHARC holders who subsistence fished for halibut in 2006, 16% harvested at least one lingcod while halibut fishing. Most of the subsistence halibut fishers who harvested lingcod fished in Area 2C (Southeast Alaska) (626; 68%) and Area 3A (Southcentral Alaska) (240; 26%). (See Appendix Table 7 for estimated lingcod harvests by tribe and by non-tribal rural community SHARC holders.)

As illustrated in Figure 27 and Figure 28, most of the incidental lingcod were harvested in Area 2C: 2,057 lingcod, 59%. Area 3A fishing locations accounted for the second-highest total: 949 lingcod, 27%. In 2005, 2004, and 2003, an estimated 2,355, 4,407 and 3,298 lingcod, respectively, were harvested in the subsistence halibut fishery. The 2006 estimated harvest represents an increase of 48% in the incidental lingcod harvest compared to 2005, a decrease of 21% compared to 2004, and a 6% increase compared to 2003.

Table 10 also reports the incidental harvest of lingcod in 2006 by SHARC holders while they were subsistence fishing for halibut by geographic subarea. Most of this harvest occurred in Area 2C (southeast Alaska): the Sitka LAMP area (998 lingcod), southern Southeast Alaska (849 lingcod), and the Kodiak Island road system (265 lingcod). Incidental lingcod harvests totaled 229 lingcod in the Yakutat Area, 228 in Cook Inlet, and 210 lingcod in northern Southeast Alaska waters outside the Sitka LAMP. Harvests totaled less than 200 lingcod in each of the other geographic subareas.

---

[20] See footnote 19 for definitions of bycatch and incidental catch.

22

# CHAPTER 3: DISCUSSION

## COMPARISONS WITH OTHER HARVEST ESTIMATES

As discussed in the report for the first year of the SHARC survey pertaining to fishing in 2003 (Fall et al. 2004:19-22), comparing the statewide harvest estimate for the Alaska subsistence halibut fishery based on the SHARC survey with estimates for previous years is difficult for several reasons. As noted in Chapter One, regulations that allow subsistence halibut fishing in Alaska waters using traditional gear such as longlines with more than two hooks, and that removed the restrictive daily harvest limit of two fish, have only been in place since May 2003. Also, 2003 through 2006 were the first four years for which a study was implemented to develop a comprehensive estimate of subsistence halibut harvests in Alaska.

Although the Division of Subsistence of ADF&G has conducted systematic household surveys in many of the rural Alaska communities with traditional uses of halibut, these studies pertain to different harvest years. There are many communities, especially in western Alaska, where such surveys have not been conducted. Division of Subsistence studies have attempted to estimate the total halibut harvest for home use in communities, including harvests conducted under sport fishing rules and harvests removed from commercial fisheries for home use. Typically, these studies collected harvests by gear type, such as rod and reel or "other gear." Therefore, it is not possible to separate the "sport harvest" from the "subsistence harvest" for past harvest years, especially in the larger rural communities with a diverse population.

In contrast, the statewide estimates of subsistence halibut harvests for 2003, 2004, 2005, and 2006 based on the SHARC mailout survey include only subsistence harvests by individuals who obtained SHARCs. The estimates do not include total harvests accomplished under sport fishing regulations or halibut removed by commercial fishers for their households' use or for noncommercial sharing. Thus they are only partial estimates of the total harvest of halibut for home use by rural Alaska residents and are not directly comparable to previous estimates from Division of Subsistence studies.

The report for the first year of this study included a detailed discussion of previous efforts to develop an estimate of subsistence halibut harvests at the regional and statewide level. The report suggested that the 2003 SHARC survey estimates were not markedly different from estimates based on Division of Subsistence household survey data as reported in the Community Subsistence Information System (ADF&G 2006). We will not repeat that full discussion here.[21]

---

[21] For example for 2000, the IPHC estimated 439,000 pounds net weight for Alaska "personal use" (noncommercial, non-recreational) harvests (*in* Wolfe 2001). The IPHC estimate is based upon a methodology described by Trumble (1999). The IPHC method assumed that 50% of Alaska Native rod and reel halibut harvests as reported in ADF&G household surveys are "sport" and 50% "personal use," and that 75% of the non-Native rod and reel harvests are "sport" and 25% "personal use" (Trumble 1999:62). No justification for these assumptions is provided, and changing these sport to personal use ratios can result in a very different estimate for the "personal use" halibut harvest. In a report to the Alaska Board of Fisheries in May 2001, using the same data source as the IPHC, Wolfe (2001) estimated that the subsistence halibut harvest in Alaska "probably ranges between 400,000 and 1,000,000 pounds (round weight) annually," based on harvest data in the Division of Subsistence Community Profile Database (Scott et al. 2001). This is an estimated harvest of 300,000 to 750,000 pounds net weight. See Fall et al. 2004: 19-21 for discussion of Wolfe's methods. In the original analysis for the subsistence halibut

However the report also concluded that because of the limitations associated with the previous subsistence harvest estimates at the statewide level, until a time series is developed based upon the SHARC survey results, discussion of harvest trends in the subsistence halibut fishery will remain speculative. A brief discussion comparing the study findings for 2006 with those for 2005, 2004, and 2003 appears in Chapter 4. More detailed comparisons of the findings will appear in the report planned for the fifth year of this study.

## COMMUNITY CASE STUDIES

To evaluate the subsistence halibut harvest estimate for 2006, comparisons can be made with previous harvest estimates for particular communities where Division of Subsistence household harvest surveys have been administered. These comparisons are subject to several limitations, including different sampling methods, uncertainty in the separation of subsistence and recreational harvests, and the potential effects of the subsistence regulatory changes beginning in 2003. The following communities were selected as case studies to represent communities of similar size and geographic location. In this evaluation, an emphasis is placed on larger communities, since, as discussed in Chapter 2, a small number of large communities accounted for most of the statewide subsistence halibut harvest in 2003, 2004, 2005, and 2006. The quality of the harvest estimates for these places largely determines the reliability of the statewide estimate and the performance of the harvest assessment program. Also, as noted in Chapter 1, not all tribal SHARC holders live in the community where their tribal headquarters is located. The following comparisons are based upon place of residence of the SHARC holder to be consistent with earlier division studies. Table 11 reports selected study findings for the case study communities discussed below for 2003, 2004, 2005, and 2006. Appendix Tables 4, 5, and 6 report study results for 2006 for all communities based upon residence of SHARC holders.

### Sitka (Regulatory Area 2C)

Sitka had a population of 8,835 people in 2000, 2,178 of whom were Alaska Native (U.S. Census Bureau 2001). In 2006, the estimated population of Sitka was 8,833 (ADLWD 2007). Sitka was the second largest rural community eligible to participate in the subsistence halibut fishery in 2006, and had the most SHARCs issued, 1,895 (Table 11) (about 13% of the Alaska total). Of these, 1,429 were issued to non-tribal residents of Sitka, and 466 to tribal members. Members of the Sitka Tribe of Alaska (STA) obtained 460 SHARCs; some STA members live in communities other than Sitka. Members of other Alaska tribes also live in Sitka. Developing a reliable subsistence halibut harvest estimate for Sitka is essential for the success of the subsistence harvest assessment program. It is important to note that Sitka residents' response rates to the survey have been high in the 4 years of the project: 75% in 2003, 72% in 2004, 68% in 2005, and 69% in 2006.

Based on Division of Subsistence research, there are two estimates of halibut harvests for home use for Sitka prior to the authorization of subsistence halibut fishing by the NPFMC in May 2003 (Table 12). For 1987, the estimated total halibut harvest was 193,335 pounds (+/- 22%) (net weight); or 180,982 pounds if fish removed from commercial harvests are deleted. This noncommercial total only includes harvests reported by surveyed persons as taken with rod and reel; data on any harvests using "other methods" such as longlines (not then allowed in the

---

program, the NPFMC estimated the Alaska subsistence halibut harvest at 1.5 million pounds net weight (68 FR 18145, April 15, 2003, EA/RIR (NMFS 2003).

subsistence fishery) were not collected. An estimated 1,252 Sitka households had at least one member who fished for halibut in 1987. For 1996, the total estimated harvest was 165,772 pounds net weight (+/- 28%), 149,244 pounds with commercial removals deleted. In 1996, an estimated 943 Sitka households had at least one member who fished for halibut.

For 2006, the estimated subsistence harvest of halibut by tribal SHARC holders who live in Sitka (most, but not all, of whom are members of the STA) and other residents of Sitka (1,895 SHARC holders) was 163,372 pounds net weight (6,691 fish). This was the second highest of any community (Kodiak ranked first), and accounted for 15% of the statewide total subsistence halibut harvest. Of Sitka's total subsistence halibut harvest, 145,542 pounds (89%) was taken with setline gear, and 17,830 pounds (11%) was taken with hand-operated gear. Adding sport harvests by Sitka SHARC holders (23,032 pounds) increases the estimate to 186,404 pounds net weight. Nine hundred fifteen SHARC holders from Sitka subsistence fished for halibut in 2006. Of these, 809 used setline gear and 297 used hand-operated gear. Also, 395 SHARC holders from Sitka sport-fished for halibut in 2006. The total number of SHARC holders living in Sitka who fished for halibut in either the subsistence or recreational fishery in 2006 was 1,036 (Table 11).

Estimated subsistence and sport halibut harvests by Sitka SHARC holders in 2006 were similar to estimates for 2003, 2004, and 2005 (Table 11). A total of 1,639 Sitka residents had SHARCs in 2003 and as did 1,871 in 2004 and 1,974 in 2005. Subsistence harvests were 174.880 pounds net weight in 2003 compared to 166,474 pounds in 2004 (a decline of 5%), 146,319 pounds in 2005 (a decline of 16%), and 163,372 pounds in 2006 (7% lower than 2003). The change was less in terms of number of halibut harvested: 6,621 in 2003, 6,583 in 2004, 6,062 in 2005, and 6,691 in 2006. Adding sport harvests of halibut by SHARC holders to subsistence harvest totals results in similar harvest estimates for Sitka for the four years of the study: 207,288 pounds for 2003, 192,303 pounds in 2004, 202,232 pounds for 2005, and 186,404 pounds in 2006. More Sitka residents participated in the subsistence halibut fishery in 2006 (915) compared to 2003 (821 SHARC holders) or 2005 (814 SHARC holders), and about the same number participated in 2004 (904 SHARC holders); 1,036 participated in either subsistence or sport fishing for halibut in 2006 compared to 956 SHARC holders in 2003 and 1,026 SHARC holders in 2004, and 987 SHARC holders in 2005.[22]

In summary, this comparison of harvest estimates from face-to-face comprehensive household surveys and the SHARC survey, although it has limitations because of the different survey and sampling methods used, suggests that the 2003, 2004, 2005, and 2006 subsistence halibut harvest estimates for Sitka based on the SHARC survey returns appear reasonable. They are generally in line with the anonymous, face-to-face household surveys results from 1987 and 1996.

**Petersburg (Regulatory Area 2C)**

In 2000, Petersburg had a population of 3,224, including 388 Alaska Natives (U.S. Census Bureau 2001). In 2006, the estimated population had dropped to 3,129 (ADLWD 2007). Before

---

[22] Following a recommendation from the first study year (Fall et al. 2004:31), data from the Division of Sport Fish, ADF&G, Sport Fishing Statewide Harvest Survey (SWHS) about sport halibut harvests by Sitka residents were analyzed for additional background on halibut fishing in the community and discussed in the report for the 2004 study year (Fall et al. 2005:23-24). An updated analysis was not prepared for this report, but will appear in the report planned for the 2007 study year.

the authorization of subsistence halibut fishing under federal regulations in May 2003, there were two estimates for halibut harvests by Petersburg residents based on household surveys conducted by the Division of Subsistence of ADF&G, pertaining to 1987 and 2000 (Table 13). In the 1987 study, a random sample of 49 of the 1,123 households in Petersburg were interviewed (4%). In that year, Petersburg residents harvested an estimated 119,176 pounds of halibut (net weight) (+/-51%); of this, 11,728 pounds were removed from commercial harvests, giving a noncommercial harvest of 107,448 pounds. As with Sitka, the 1987 study in Petersburg only collected noncommercial harvest data for halibut taken with rod and reel. Of the 1,123 households in Petersburg, 54% had at least one member that fished for halibut noncommercially, for a minimum of 604 halibut fishers in the community in 1987 (Scott et al. 2001). In 2000, Petersburg residents harvested an estimated 55,974 pounds net weight of halibut (+/-39%). Of this, 6,951 pounds were removed from commercial harvests, for a noncommercial harvest of 49,023 pounds, all of which was taken with rod and reel. In 2000, 468 Petersburg households had at least one member who fished for halibut for home use.

For 2006, the estimated subsistence harvest of halibut by Petersburg residents with SHARCs (1,082 SHARC holders) was 53,682 pounds net weight (Table 11). In 2005, 1,197 SHARC holders in Petersburg harvested 61,372 pounds of halibut in the subsistence fishery; in 2004, 1,187 SHARC holders harvested 71,784 pounds of halibut in the subsistence fishery; and in 2003, 1,047 Petersburg SHARC holders harvested 55,718 pounds. Of the total 2006 subsistence halibut harvest, 35,608 pounds (66%) was harvested with setline gear and 18,075 pounds (34%) was harvested with hand operated gear. In 2005, 72% of the subsistence halibut harvest by Petersburg SHARC holders was harvested with setline gear and 28% with hand operated gear. In both 2003 and 2004, about 75% of Petersburg's subsistence halibut harvest was taken with setline gear and 25% with hand operated gear.

In 2006, Petersburg SHARC holders also harvested 17,351 pounds of halibut they classified as sport harvested. This gives a total halibut harvest by Petersburg SHARC holders of 71,033 pounds in 2006. In 2005, the sport harvest of halibut by Petersburg SHARC holders was 23,289 pounds for a total harvest of 84,661 pounds of halibut. In 2004, the sport harvest of halibut by Petersburg SHARC holders was 26,408 pounds for a total harvest of 98,192 pounds of halibut. In 2003, the sport harvest was 19,611 pounds, giving a total halibut harvest of 75,329 pounds (Table 11).

In 2006, 426 Petersburg SHARC holders harvested halibut in the subsistence fishery (300 used setline gear and 222 used hand operated gear). This compares to 436 fishers in 2005 (338 used setline gear and 175 used hand operated gear); 482 fishers in 2004 (322 used set line gear, 206 used hand operated gear); and 415 subsistence halibut fishers in 2003 (330 used setline gear, 138 used hand operated gear). In 2006, 246 Petersburg SHARC holders sport fished for halibut, as did 312 in 2005, 351 in 2004, and 268 in 2003. A total of 529 Petersburg SHARC holders either subsistence or sport fished for halibut in 2006; the estimated total halibut fishers among Petersburg SHARC holders was 569 in 2005, 617 in 2004, and 523 in 2003 (Table 11).

Given that some Petersburg residents without SHARC cards likely sport fished for halibut, the 2003, 2004, 2005, and 2006 estimates of noncommercial halibut harvests in the community based on the SHARC survey appear consistent with the 1987 estimate based on household interviews, but are slightly higher than the estimate for 2000. Note that in 2000, when regulations restricted subsistence fishing to handlines or rod and reel using no more than two hooks, no Petersburg households reported taking halibut for home use with any gear other than rod and

reel, while 330 used setline gear in 2003, 322 did so in 2004, 338 did so in 2005, and 300 did so in 2006 (Table 11, Table 13).

## Cordova (Regulatory Area 3A)

In 2000, Cordova had a population of 2,454 people, including 368 Alaska Natives (U.S. Census Bureau 2001). Cordova's estimated population in 2006 was 2,211 (ADLWD 2007). Before 2003, there were six Division of Subsistence household surveys that estimated home-use halibut harvests for previous years (Table 14). After subtracting fish removed from commercial harvests for home use, estimated noncommercial halibut harvests by Cordova residents ranged from 25,609 pounds (+/-33%) net weight in 1991 to 120,221 pounds (+/- 62%) in 1988, with an average over the six study years of 57,285 pounds. The estimated number of Cordova households with at least one member fishing noncommercially for halibut ranged from 228 in 1985 to 401 in 1992, with a mean of 325 households (ADF&G 2006).

Subsistence halibut harvest estimates and participation estimates for Cordova residents for 2003 were lower than might be expected from previous research (Fall et al. 2004:24-25). In 2003, 358 residents of Cordova obtained SHARCs (Table 11). Of these, 102 subsistence-fished (68 with setline gear, 40 with hand operated gear), 144 reported that they sport fished for halibut, and 194 fished for halibut either under the new subsistence provisions or in the sport fishery. The estimated subsistence harvest was 15,498 pounds net weight (7,613 pounds [49%] with setline gear, 7,885 pounds [51%] with hand operated gear), with an additional 11,534 pounds taken by SHARC holders while sport fishing. The total of 27,032 pounds was about 47% of the average for previous study years.

Based on these comparisons, the final report for 2003 suggested that the SHARC survey had underestimated the amount of halibut harvested by Cordova residents for home use, perhaps because not all subsistence fishers in Cordova obtained SHARCs in 2003. The results of the survey for 2004 supported this conclusion (Fall et al. 2005:25-26). A total of 526 Cordova residents had obtained SHARCs by the end of 2004 (an increase of 47%) (Table 11). An estimated 262 Cordova SHARC holders subsistence fished for halibut in 2004, up 157% from 2003. Of these, 174 fished with setline gear (up 156%) and 97 used hand-operated gear. The estimated subsistence halibut harvest by Cordova residents in 2004 was 40,640 pounds net weight, an increase of 163% over 2003. Sport harvests by Cordova SHARC holders (174 of whom sport fished for halibut in 2004) added 12,149 pounds to the community harvest for 2004, for a total of 52,789 pounds of halibut by 325 fishers. This total was an increase of 95% over 2003, and was about 92% of the average for the six survey years prior to 2003 (and exceeded the total for three of those six years). Given that some Cordova residents likely obtained halibut for home use exclusively in the sport fishery without obtaining SHARCs, the SHARC survey estimate for 2004 appeared consistent with earlier estimates of subsistence halibut harvests in Cordova.

Findings for Cordova for 2005 were much like those for 2004 and supported the conclusions of the 2004 final report. As shown in Table 11, 602 Cordova residents held SHARCs in 2005, continuing the growth for halibut in 2004, but at a slower pace. Subsistence halibut harvests totaled 47,141 pounds, up about 16% from 40,640 pounds in 2004. In 2004, 73% of the total was harvested with setline gear, as was 74% in 2005. In 2005, 281 Cordova residents participated in the subsistence halibut fishery, compared to 262 in 2004. Cordova SHARC holders harvested 10,519 pounds of halibut while sport fishing in 2005, for a total harvest for

# EXHIBIT 10

01/07/1994  05:49    9077473462    ALFA/STELLER/WBLOCK    PAGE   01





Halibut Conservation

Concerns regardless of model used in assessments; recent catch unit effort is down significantly in all sectors in 2C and also Coastwide for survey and setline:

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**SCOTT VAN VALIN,** *et al.,*

      **Plaintiffs,**

v.

**THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce,** *et al.,*

      **Defendants.**

**Civil Action No. 08-0941 (RMC)
Category D**

## ORDER

Upon consideration of the Motion for Leave to File Amicus Curiae Brief submitted by

the Sitka Conservation Society, and all the facts and circumstances of this matter, and the Court

being fully aware of the premises therein, it is on this _____ day of June, 2008, hereby

ORDERED that the Motion be, and hereby is, GRANTED; and it is

FURTHER ORDERED that the Amicus Curiae Brief accompanying the Motion shall be

deemed to have been filed and served on the date this Order is entered.

 

Honorable Rosemary M. Collyer
United States District Judge

Copies to:

John Winston Butler
SHER & BLACKWELL
1850 M Street, NW, Suite 900
Washington, DC 20036

9103 v_01 \ 000000.1105

Robert Pendleton Williams
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
601 D Street, NW
3rd Floor - Room 3033
Washington, DC 20530

George J. Mannina, Jr.
Paul L. Knight
O'Connor & Hannan, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C.  20006-2803

Gary C. Adler, Esquire
ROETZEL & ANDRESS, LPA
1300 Eye Street, N.W., Suite 400 East
Washington, DC  20005
Telephone:  (202) 625-0600
Facsimile:  (202) 338-6340

9103 v_01 \ 000000.1105