.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

   Plaintiffs,

v.

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

   Defendants.

Civil Action No. 08-0941 (RMC)
Category D

## MOTION TO INTERVENE AS DEFENDANTS

  Pursuant to Fed. R. Civ. P. 24 and for the reasons set forth in their accompanying

Memorandum of Points and Authorities attached hereto, Linda Behnken, David Gibson,

Sherri Wohlhueter and Kurt Wohlhueter, North Pacific Seafoods, Inc., Sandy Craig,

Luke Wiedel, Carolyn Heuer, Seafood Producers Cooperative, the City of Pelican, the City of

Port Alexander, and the Halibut Association of North America respectfully move to intervene as

defendants in the case as of right pursuant to Fed. R. Civ. P. 24(a)(2) or, in the alternative,

permissively under Fed. R. Civ. P. 24(b).  The Proposed Answer is attached hereto as Exhibit 1.

  Counsel for Proposed Intervenor-Defendants has conferred with counsel for Plaintiffs and

Defendants in this action.  Defendants have represented that they have no position regarding the

Motion to Intervene.  Plaintiffs have represented that they have no opposition to this Motion as it

relates to the merits of the case but oppose the Motion to Intervene to the extent it would give

proposed Intervenor-Defendants the right to appeal the Preliminary Injunction.  Proposed

Intervenor-Defendants submit they meet the standards for intervention and should be permitted

to intervene for all purposes.  Given the immediacy of the issues in this case, proposed

Intervenor-Defendants respectfully request expedited consideration of this Motion to Intervene.

Proposed Intervenor-Defendants have attached a proposed Order for the consideration of this

Court.

Dated:  June 23, 2008                             Respectfully submitted,

_____
George J. Mannina, Jr. (D.C. Bar No. 316943)
Paul L. Knight (D.C. Bar No. 911594)
O'Connor & Hannan, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C.  20006-2803
Telephone:     (202) 887-1400
Facsimile:      (202) 466-3215
*Counsel for Proposed Intervenor-Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2008, a copy of the foregoing *Motion to Intervene,*

*Memorandum of Points and Authorities* in support thereof, *and Proposed Order* were served via

email and first class mail, postage prepaid, upon the following counsel of record:

John Winston Butler, Esq.
SHER & BLACKWELL
1850 M Street, NW, Suite 900
Washington, DC 20036
Email: jbutler@sherblackwell.com

Robert Pendleton Williams, Esq.
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
601 D Street, NW
3rd Floor - Room 3033
Washington, DC 20530
Email: robert.p.williams@usdoj.gov

Christopher T. Koegel, Esq.
Manatt, Phelps & Phillips, LLP
700 12th Street, N.W., Suite 1100
Washington, DC 20005-4075
Email: CKoegel@manatt.com

Gary C. Adler, Esq.
Roetzel and Andress
1300 Eye Street, NW
Suite 400 East
Washington D.C. 20005

_____
George J. Mannina, Jr.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

        Plaintiffs,

v.

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

        Defendants.

Civil Action No. 08-0941 (RMC)
Category D

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
INTERVENE AS DEFENDANTS SUBMITTED BY LINDA BEHNKEN, DAVID
GIBSON, SHERRI WOHLHUETER AND KURT WOHLHUETER, NORTH PACIFIC
SEAFOODS, INC., SANDY CRAIG, LUKE WIEDEL, CAROLYN HEUER, SEAFOOD
PRODUCERS COOPERATIVE, THE CITY OF PELICAN, THE CITY OF PORT
ALEXANDER, AND THE HALIBUT ASSOCIATION OF NORTH AMERICA**

**I.    INTRODUCTION**

    Plaintiffs, the charter halibut fishing industry operating in International Pacific Halibut

Commission ("IPHC") Area 2C, seek to overturn a final rule issued under the Northern Pacific

Halibut Act ("Halibut Act") – a rule specifically designed to prevent continued overfishing by

Plaintiffs in Area 2C. The proposed Intervenor-Defendants ("Intervenor" or "Intervenors"),

described in more detail below, will be substantially affected should this final rule be struck

down by the Court.

    Intervenors have three specific interests. First, they have a strong interest in the

conservation of the halibut stocks. Allowing charter fishermen to continue to overfish their

quota in Area 2C, as they have every year since 2003, will significantly affect halibut fishing in

future years. Second, Intervenors have an interest in proper regulation of the industry. Lastly,

Intervenors wish to correct factual inaccuracies and omissions presented to the Court by the charter industry. The Court should make its final decision on accurate and complete facts.

It is significant that the charter industry has never claimed that its allotment of halibut in Area 2C is unfair or incorrect. They do not deny that the harvest amount they are allocated, called the Guideline Harvest Level ("GHL"), is a conservation-based determination. What Plaintiffs are seeking in this action is to prevent the National Marine Fisheries Service ("NMFS") from implementing the conservation-based harvest levels set for the charter industry. Exceeding the GHL is first and foremost a conservation issue. It is not a simple allocation issue as Plaintiffs repeatedly claim. Plaintiffs have been allocated 931,000 pounds of halibut, but they do not want to be held to that level.

The Intervenors fall into five categories: (i) commercial setline halibut fishermen, (ii) halibut processors, (iii) halibut subsistence users, (iv) charter boat operators, and (v) local communities. Below is a factual description of each of the Intervenors by category. The application of the facts to the legal standards for standing can be found in Section III of this Memorandum.

A.     Intervenors Who Are Commercial Setline Halibut Fishermen

1.     Intervenor Linda Behnken is a commercial halibut setline fisherman fishing in International Pacific Halibut Coalition ("IPHC") Area 2C. Affidavit of Linda Behnken ("Behnken Aff."), ¶¶ 1, 2, attached as Exhibit 2 of Memorandum of Points and Authorities in support of Motion to Intervene as Defendants, ("Intervenors' Memorandum").

Ms. Behnken purchased all of the halibut quota share ("QS") she holds. In 2008, she will be allowed to fish approximately 5,000 pounds. *Id.,* ¶ 4. Ms. Behnken depends on the halibut resource. *Id.,* ¶ 1. Approximately 50% of her family's income is earned from halibut fishing. *Id.,* ¶ 5. The 43% reduction in the setline commercial quota over the past two years "has caused

substantial economic harm to our family" and deductions from her quota caused by the guided

sport industry exceeding its guideline harvest level ("GHL") imposes a "harmful burden...." *Id.*,

¶¶ 4, 5.  If the guided sport industry fishes pursuant to the same regulatory regime as allowed in

2007, they will be harvesting approximately twice as much fish as provided for in the 2008 GHL.

That will mean a further 15% reduction in Ms. Behnken's halibut allocation since overharvests

by the guided sport industry have been, and will be, deducted from the setline quota. *Id.,* ¶¶ 6, 7,

18.  Thus, each day the 2008 regulations are suspended and charter boat fishermen operate under

the 2007 rules results in a reallocation of commercial halibut QS from Ms. Behnken and other

setline fishermen because each pound of fish harvested in 2008 by the guided sport industry

above the 931,000 pound GHL will be a direct deduction from the 2009 commercial setline

fisheries. *Id.,* ¶¶ 6, 7, 18.  Ms. Behnken served as a member of the North Pacific Fishery

Management Council ("Council") at the time the Council helped to frame and develop the GHL

program. *Id.,* ¶¶ 9, 12, 16.

      2.       Intervenor David Gibson owns a 40-foot commercial halibut setline fishing vessel

in Area 2C.  Affidavit of David Gibson ("Gibson Aff."), ¶ 1, attached as Exhibit 3 to

Intervenors' Memorandum.  Mr. Gibson borrowed money to purchase his vessel and halibut QS.

*Id.,* ¶¶ 3, 4.  To purchase QS, Mr. Gibson pledged his fishing vessel as collateral. *Id.,* ¶ 4.  In

2006, Mr. Gibson grossed $18,321.  Subtracting his QS loan payments and expenses, Mr. Gibson

netted about $2,000. *Id.,* ¶ 4.  Due to reductions in the amount of fish Mr. Gibson was allowed

to harvest in 2008, his gross income of almost $14,000 is insufficient to pay expenses and debt

service on his QS loan payment. *Id.,* ¶ 5.  Mr. Gibson is "entirely dependent on commercial

fishing for my livelihood....  If the halibut quota is cut any further, *i.e.,* due to charter overages, I

may lose my quota share, boat, salmon permit; in other words, I would lose my whole commercial fishing business." *Id.,* ¶ 6.

3.     Intervenors Sherri Wohlhueter and Kurt Wohlhueter "are a fishing family." Affidavit of Sherri Wohlhueter and Kurt Wohlhueter ("Wohlhueter Aff."), ¶ 1, attached as Exhibit 4 of Intervenors' Memorandum. The Wohlhueters received an initial halibut QS when the individual fishermen's quota ("IFQ") program was implemented in 1995. They have purchased additional QS. *Id.,* ¶ 3. Their halibut QS are in Area 2C and they cannot fish halibut in any other area. *Id.,* ¶ 5. Mr. and Mrs. Wohlhueter will not be able to pay their crew "if quota share reductions continue." *Id.* Charter harvests exceeding the GHL impact the resource and reduce the amount of halibut Mr. and Mrs. Wohlhueter can harvest, economically impacting them. *Id.,* ¶ 7.

B.     <u>Intervenors Who Are Halibut Processors</u>

1.     Intervenor North Pacific Seafoods, Inc. processes halibut in Area 2C. Affidavit of North Pacific Seafoods, Inc. ("North Pacific Seafoods Aff."), ¶ 1, attached as Exhibit 5 to Intervenors' Memorandum. In Area 2C, North Pacific Seafoods has experienced a reduction in business due to the reduced commercial setline harvest caused in part by the charter sector exceeding its GHL. *Id.,* ¶ 3. Since 2004 when the guided sport industry began exceeding their GHL, halibut production in North Pacific Seafoods' Area 2C processing plant has dropped 25%. *Id.,* ¶ 5. If the 2008 conservation measures are not enforced, North Pacific Seafoods expects "a further drop in processing volume, likely to be 30% of what we processed in 2004." *Id.* If the 2008 NMFS rule is overturned, North Pacific Seafoods "will experience about a 25% loss of revenue" and will reduce its 800 employees by 10%. *Id.,* ¶¶ 1, 6.

2.     Seafood Producers Cooperative founded in 1944 is the largest fishermen owned cooperative in the United States. It has a halibut processing facility in Sitka, Alaska in IPHC

4

Area 2C.  Affidavit of Seafood Producers Cooperative ("Seafood Producers Cooperative Aff."),

¶ 1, attached as Exhibit 6 to Intervenors' Memorandum.  Twenty-five percent of the

Cooperative's revenue is derived from halibut.  The commercial halibut quota has been reduced

by 43% in the past two years and the latest reduction will reduce the Cooperative's revenue by

$2 million, also reducing incomes for 140 plant employees.  *Id.,* ¶ 2.  Allowing the charter GHL

overages to continue will have "the immediate effect" of reducing setline fishing success,

thereby impacting the Cooperative's operations and members.  *Id.,* ¶ 3.  The Cooperative has

participated in the Council's deliberations on halibut management for 15 years and has

representatives on both of the IPHC advisory boards.  *Id.,* ¶ 5.

       3.      Intervenors Halibut Association of North America ("HANA") represents 70% of

the Pacific halibut processed annually, 46% of which operate processing plants in Area 2C.

Affidavit of the Halibut Association of North America ("HANA Aff."), ¶ 1, attached as Exhibit 7

to Intervenor's Memorandum.  Since 2006, halibut deliveries to HANA members Area 2C plants

have dropped 10-30% depending on the plant.  *Id.,* ¶ 7.  Lay-offs have resulted.  If the 2008

regulations are not enforced, HANA members anticipate a 25-30% drop in product availability, a

20-25% drop in revenue, and total losses of $5-10 million.  *Id.,* ¶ 8.  HANA's charter provides

for representation of its members on economic and regulatory issues of concern.  *Id.,* ¶ 2.

HANA has been involved with efforts by the Council to manage the halibut fishery for 15 years

and has actively participated in IPHC matters for nearly 50 years, including currently serving on

advisory committees established by the IPHC.  *Id.,* ¶¶ 2-5.

      C.      <u>Intervenors Who Are Subsistence Users</u>

      1.      Intervenor Carolyn Heuer is a subsistence fisherman in Area 2C.  Her family

depends solely on wild fish and game for the family's protein.  Affidavit of Carolyn Heuer

("Heuer Aff."), ¶ 1, attached as Exhibit 8 to Intervenors' Memorandum.  According to Ms.

Heuer: "We can not afford to feed our family without depending on subsistence harvest. In a given year, we eat approximately 50-75 lbs of halibut. Over the past 4 years, we have noticed a significant decline in the availability of halibut due to the depletion of halibut stocks in the waters around Sitka.... We are dependent on halibut and my ability to feed my family is threatened." *Id., ¶ 1.* The charter fishing industry continues to concentrate its fishing efforts in and around Sitka and "our usual locations for subsistence fishing are no longer reliable...." *Id., ¶¶ 1, 2.*

D.    Intervenors Who Are Local Communities

1.    Intervenor City of Pelican is a community of 106 residents, 30% of whom are Alaskan natives or American Indian in Area 2C. Affidavit of Patricia Phillips on behalf of the City of Pelican ("City of Pelican Aff."), ¶¶ 1, 2, attached as Exhibit 9 to Intervenors' Memorandum. Pelican has no road connections with any other town and the commercial halibut fishery is the mainstay of Pelican's economy. *Id.*, ¶ 2. "Pelican depends heavily" on commercial fisheries' taxes to provide essential revenue for community services and infrastructure. *Id.*, ¶ 4. Without that tax revenue, Pelican would experience a significant loss of revenue and be forced to reduce its budget by 20%. *Id.* Reductions in the setline halibut fishery reduce taxes available to Pelican. *Id.*, ¶ 6. The GHL exceedances by the charter boat sector which has contributed to the commercial setline quota reduction "has caused significant economic harm" to Pelican. *Id.*, ¶¶ 8, 9.

2.    Intervenor City of Port Alexander in Area 2C is a community that "depends on viable access to healthy and abundant marine fish stocks." Affidavit of William Luedke on behalf of the City of Port Alexander ("City of Port Alexander Aff."), ¶¶ 1, 2, attached as Exhibit 10 to Intervenors' Memorandum. The reallocation of halibut from the commercial setline sector to the charter sector "impact Port Alexander fishermen and our community, since the economic

6

survival of the community depends on the commercial halibut and salmon fleet." *Id.,* ¶ 5. The

Port also receives taxes from the fisheries' tax on setline halibut landings. If the 2008 NMFS

rule is not implemented in June, the halibut charter fleet will once again exceed its GHL and the

impact on Port Alexander will be serious. *Id.,* ¶ 5. Port Alexander participated in Council

deliberations for the past 15 years regarding halibut management. *Id.,* ¶ 6. "Our community

depends on the halibut resource for sustenance and livelihood. The one halibut daily limit is

necessary to ensure charter harvest is restricted to the sector's GHL, the resource is not over

harvested, and fishery dependent communities such as Port Alexander survive." *Id.,* ¶ 7.

      E.    <u>Intervenors Who Are Charter Boat Operators</u>

      1.    Intervenor Sandy Craig is the owner and operator of a small charter fishing

business. Affidavit of Sandy Craig ("Craig Aff."), ¶ 1, attached as Exhibit 11 to Intervenors'

Memorandum. Her clients target halibut and salmon. *Id.,* ¶ 2. Ms. Craig's business depends on

a healthy halibut resource. *Id.,* ¶ 4. The number of Area 2C charter boats is increasing with

mounting pressure on the resource and that is having a "negative effect on my small business...."

*Id.,* ¶ 6. Ms. Craig and her family have also invested in halibut QS and, therefore, are also

commercial setline fishermen. *Id.,* ¶¶ 8-9. Because of the reduction in her halibut quota

amounting to 43% over the past two years, her family has suffered significant financial harm

given that commercial halibut fishing accounts for approximately 25% of her family's income.

*Id.,* ¶ 9.

      2.    Intervenor Luke Wiedel is a charter boat captain in Area 2C. Charter fishing is

his primary source of income and his clients target halibut and salmon. Affidavit of Luke

Wiedel ("Wiedel Aff."), ¶ 1, attached as Exhibit 12 to Intervenors' Memorandum. "My

business, and the business of all charter and setline fishermen, depends on a healthy resource."

*Id.,* ¶ 2. The southeast charter sector's halibut harvest has exceeded its GHL for the past four

years and it is important to have regulations enforcing the GHL in order to protect the resource

on which Mr. Wiedel depends. *Id.*, ¶¶ 2, 3.

Intervenors are entitled to intervene as a matter of right pursuant to Fed. R. Civ. P.

24(a)(2). Alternatively, Intervenors respectfully request that they be permitted to intervene

pursuant to Fed. R. Civ. P. 24(b).

## II.    STATEMENT OF FACTS

Plaintiffs challenge a rule issued pursuant to authority granted under the Northern Pacific

Halibut Act of 1982, 16 U.S.C. § 773-773k. *See* 73 Fed. Reg. 30504, 30523 (May 28, 2008) (the

"Rule") ("The authority citation for 50 C.F.R. Part 300, Subpart E continues to read as follows:

Authority: 16 U.S.C. 773-773k.") The Rule limits the 2008 commercial guided sport halibut

harvest to the 931,000 pound conservation limit set forth at 50 C.F.R. 300.65(c).

Part II of this Memorandum overviews the facts relevant to the interests of Intervenors

and the harm to them that will occur if Plaintiffs prevail. Before doing so, it may be helpful to

place the Rule in its regulatory context.

The existing regulations specifying the appropriate GHL for the halibut guided sport

industry are found at 50 C.F.R. 300.65. The regulations provide that if the IPHC determines the

biologically acceptable harvest of halibut is "x" then the allowable harvest by the guided sport

industry, the GHL, will be "y." There are five different GHLs based on five different halibut

population sizes. 50 C.F.R. 300.65(c). No one, including Plaintiffs, has ever argued the GHL

limits are not the correct harvest levels based on the health of the halibut resource. The

regulations also provide a procedure for dealing with circumstances in which the guided sport

industry exceeds the appropriate GHL in a given year. *Id.*

Plaintiffs argue that even though the halibut population has declined such that the

appropriate GHL is now set at 931,000 pounds in accordance with 50 C.F.R. 300.65(c), NMFS

cannot require the guided sport industry to adhere to that GHL, even though there is no dispute

that this is the correct, conservation-based GHL. Allowing the resource to be overfished by

allowing the guided sport industry to exceed the conservation-based GHL harms the resource

and causes direct, immediate, and irreparable harm to Intervenors.

A.    Conservation Issues

1.    The Halibut Resource Is Declining

The Pacific halibut fishery is cyclical and is currently experiencing a decline in

abundance. Indeed, the exploitable biomass in IPHC Area 2C has declined 55%. IPHC Eighty-

fourth Annual Meeting Handout, Jan. 2008 at 83-84, which can be found at http://www.iphc.

washington.edu/HALCOM/pubs/annmeet/2008/bluebook/bluebook08.pdf; Ex. 6, Seafood

Producers Aff., ¶ 7 ("In written materials provided at the annual meeting, IPHC staff stated the

halibut resource is at the lowest level in a decade"); Ex. 2, Behnken Aff., Ex., ¶ 13. When a

resource is in decline, it is especially important to prevent overfishing. Commercial setline

halibut fishermen such as Intervenors who have permitted halibut harvesting rights[1] have a direct

and tangible interest in conserving the resource and preventing its overharvest, as do halibut

processors. Individuals such as Intervenors who depend on the resource for their subsistence

---

[1] In 1995, an Individual Fishermen's Quota ("IFQ") permit program was initiated for the commercial setline halibut fleet. Fishermen were allocated Quota Shares ("QS") based on their past level of fishing. QS is translated annually into pounds of halibut, the amount fluctuating directly with the total setline catch limit for a management area. Without a QS setline, halibut fishing is prohibited. QS were issued for IPHC management areas. Thus, commercial fishermen with QS for management Area 2C (southeast Alaska) cannot fish in management Area 3A (central Gulf of Alaska) without a QS for that area. Pursuant to the IFQ Program, there is an excessive share cap such that the amount of QS any person may own or control is 1% of the total quota, or 599,799 QS units. Those QS units are translated into pounds of halibut based on the allowable harvest limit. Thus, if the allowable harvest based on biomass increases, the amount of pounds represented by QS units increases. If the allowable harvest number decreases, then the allocation from each unit of QS also decreases. In 2008, the maximum QS units of 599,799 translated into fixed cap of 62,100 pounds. Fishermen can buy and sell QS. Ex. 2, Behnken Aff., ¶ 3.

needs have the same interest. Similarly, local governments that depend on revenue generated from the commercial setline halibut fishery have a significant interest in preserving and protecting the halibut resource.

    2.    <u>Allowable Catch Limits Are Being Exceeded</u>

The IPHC sets fishing conservation targets to protect the resource from overfishing. These targets are based on an assessment of the biological status of the halibut resource called the Constant Exploitation Yield ("CEY"). A separate CEY is established for each IPHC management area. There are ten IPHC areas, including Area 2C in southeast Alaska. 72 Fed. Reg. 74257, 74258 (Dec. 31, 2007). Since 1995, when the IFQ Program was established, commercial setline fishermen have never exceeded their allocation and conservation targets. Ex. 6, Seafood Cooperative Aff., ¶ 10; Federal Defendants' Opposition to Motion for Temporary Restraining Order, Exhibit 1, Environmental Assessment/Regulatory Impact Review/Final Regulatory Flexibility Analysis dated April 20, 2008, at p. 18, Table 19; IPHC Eighty-third Annual Meeting Handout, at 93, found at http://www.iphc.washington.edu/halcom/pubs/annmeet/2007/bluebook/iphcbb07.pdf.

In contrast, the commercial guided sport industry in Area 2C has exceeded its allocation and conservation target, the GHL, every year since the GHL was established. The commercial guided sport industry exceeded its GHL by 22% in 2004, 36% in 2005, and 26.5% in 2006. 72 Fed. Reg. 74257, 74259 (Dec. 31, 2007). In 2007, the GHL was overharvested by 20%. IPHC Eighty-fourth Annual Meeting Handout, Jan. 2008, at 11, found at http://www.iphc.washington.edu/HALCOM/pubs/annmeet/2008/bluebook/bluebook08.pdf.

Intervenors whose commercial fishing, subsistence, and other interests depend on the continued viability of the halibut resource have a significant interest in preventing that resource from being overfished.

3.    The Exceedance Of Allowable Catch Limits Is Causing Overfishing
Of Allowable Harvest Levels And Is A Threat To The Resource

Common sense tells you that there is a conservation problem when fishing limits are set and then regularly exceeded.  More importantly, the IPHC, the entity charged with managing and conserving the halibut resource, has stated that fishing above assigned conservation targets by any sector poses serious conservation problems.  As NMFS stated in the preamble to the proposed Rule:

> The IPHC annually determines the amount of halibut that may be removed from the resource without causing biological conservation problems on an area-by-area basis....

72 Fed. Reg. 74257, 74258 (Dec. 31, 2007).  Thus, these conservation targets represent the harvest level that can occur in an IPHC management area "without causing conservation problems."  Fishing beyond these allocations presents conservation problems.

The IPHC has expressed continuing concerns about the conservation threat posed by the commercial guided sport industry exceeding its conservation allocation, particularly in Area 2C.  As early as December 1, 2006, the IPHC wrote the Council, the entity established pursuant to the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801, to manage domestic fisheries, stating:

> The recent publication of the recreational harvests of halibut in IPHC Regulatory Areas 2C and 3A in 2006 by the Alaska Department of Fish and Game has, with other removals, indicated that the [CEY] established by the Commission for these areas has been exceeded... The achievement of the Commission's conservation mandate is dependent on adherence to catch limits and total yield.

*See* Ex. 2, Behnken Aff., Appendix B, Letter from Bruce Leaman, Executive Director, IPHC, to Stephanie Madsen, Chair, North Pacific Fishery Management Council, December 1, 2006.  As noted above, only the guided sport sector is exceeding its harvest allocation.

11

On January 23, 2007, the IPHC wrote the U.S. Secretary of Commerce again protesting the conservation threat caused by overfishing by the commercial guided sport industry. That letter stated:

> The Commission noted that the [GHL] approved by the [Council] for the charter/guided recreational halibut fishery in Areas 2C (southeast Alaska) and 3A (central Gulf of Alaska) were exceeded in recent years, substantially so in Area 2C (over 40% higher than the GHL in 2006).... The Commission, with the support of its advisory bodies, therefore recommends establishment of more restrictive daily bag limits for the charter/guided halibut fishery in Areas 2C and 3A during 2007, in order to constrain catch within the [Council's] GHL levels.... The Commission ... believes the action to be necessary given the magnitude by which the charter/guided catches exceeded the GHL limits and the belief that such overharvesting puts at risk the achievement of IPHC management goals for the halibut stock.

*See* Ex. 2, Behnken Aff., Appendix B, Letter from Jim Balsiger, Chairman, IPHC, to Secretary Gutierrez, January 23, 2007.

On January 30, 2008, the IPHC wrote NMFS, again expressing its concerns about the conservation threat caused by overfishing by the commercial guided sport industry.

> The Council has previously stated its intent to manage the sport charter fishery to the GHL, and has proposed management options if the GHL was reduced for 2008. The Commission took this into account when setting the 2008 commercial fishery catch limit. Achievement of the Commission's harvest goals and management objectives is thus dependent on the proposed action.

*See* Ex. 2, Behnken Aff., Appendix B, Letter from Bruce Leaman, Executive Director, IPHC, to Sue Salveson, January 30, 2008.

In sum, the agency charged with responsibility for conserving the halibut resource and protecting it for present and future generations identifies overfishing by the commercial guided sport industry as a threat to the conservation of the resource. As NMFS stated in the preamble to the proposed Rule, "conservation of the halibut resource is the overarching goal of the IPHC...."

12

72 Fed. Reg. 74257, 74258 (Dec. 31, 2007). NMFS has acknowledged this concern about the

effects of charter boat overfishing stating:

> The IPHC recommended [limits on the guided sport halibut catch]
> because it believed its management goals were at risk by the
> magnitude of the charter halibut harvest in excess of the GHL,
> especially in Area 2C.

72 Fed. Reg. 74257, 74259 (Dec. 31, 2007).

In other words, and as confirmed by the January 30, 2008 IPHC letter cited in this

section, statements that there is no conservation issue are based on the assumption that all sectors

live within their allocation. The facts are that the IPHC establishes its halibut conservation

program area by area and the IPHC is concerned about the conservation of halibut in Area 2C,

the area governed by the regulations at issue. In fact, the IPHC stated in their 2008 annual report

that "it has become paramount that harvest rates be brought down to the target harvest rate in

Area 2." IPHC, Eighty-fourth Annual Meeting Handout, Jan. 2008, at 84, found at

http://www.iphc.washington.edu/HALCOM/pubs/annmeet/2008/bluebook/bluebook08.pdf.

Intervenors whose subsistence needs, livelihood, and other interests depend on a healthy

halibut resource, have a direct and substantial interest in the conservation of that resource.

> 4.    Overfishing By The Commercial Guided Sport
>        Industry Is Causing Localized Depletion

Alaska Department of Fish and Game ("ADFG") data shows that the charter halibut catch

per rod hour has declined in many areas and by more than 50% around Sitka, Alaska, where

approximately 40% of the Area 2C charter halibut harvest occurs. Ex. 2, Behnken Aff., ¶¶ 20,

21; Ex. 6, Seafood Cooperative Aff., ¶ 3. Declines in catch per unit of effort are a classic sign of

diminished resource abundance and localized depletion. Ex. 2, Behnken Aff., ¶ 20. The fact that

the charter fleet now travels farther to catch the same fish also indicates localized depletion. *Id.*

at ¶ 21.

As NMFS has stated:

> The Council has discussed the expansion of the halibut guided
> recreational fleet since 1993, when the rapid increase in guided
> recreational vessel effort in some small Alaskan communities, such
> as Sitka, gave rise to concerns about localized depletion of the
> halibut resource....

67 Fed. Reg. 3867 (Jan. 28, 2002).

Indeed, as early as 1995, the Council recognized this issue finding:

> Pressure by charter operations may be contributing to localized
> depletion in several areas.

*Id.*

Subsistence fishermen are inshore fishermen and Intervenors who depend on the halibut

resource for their subsistence needs are immediately impacted by localized depletion.

B.    Allocation Impact On Intervenors Caused By Overfishing By The Commercial
      Guided Sport Industry

1.    Overfishing By The Commercial Guided Sport Industry Results In A
      Direct Reduction Of The Allocation To The Commercial Setline Sector

In addition to the impact on Intervenors caused by conservation threats to the resource,

overfishing by the guided sport industry has a second direct adverse impact on Intervenors. Each

year, the IPHC determines "the amount of halibut that may be removed from the resource

without causing biological conservation problems on an area-by-area basis...." 72 Fed. Reg.

74257, 74258 (Dec. 31, 2007). The IPHC then estimates the catch by the guided sport sector and

other users, not including commercial setline fishermen. That total is subtracted from the CEY

based conservation target for each area and the remaining amount of fish is the catch quota for

the commercial setline fleet for that area. 68 Fed. Reg. 47256, 47257 (Aug. 8, 2003). As the

guided sport fishery increases its catch, the setline harvest is reduced. As NMFS has stated:

> This represents an open-ended allocation to the guided recreational
> fishery from the quota available to the commercial halibut fishery.

> Hence, as the guided recreational fishery expands, its harvests
> reduce the pounds available to be fished in the commercial halibut
> fishery and, subsequently, the value of quota shares (QS) in the
> IFQ Program.

*Id.*

Exacerbating the impact of this system on the setline fleet is the fact that the IPHC has

deducted from the setline quota the amount of over harvest by the commercial guided sport

fishery in the previous year. 72 Fed. Reg. 74257, 74258 (Dec. 31, 2008); 73 Fed. Reg. 30504,

30505 (May 28, 2008).

This open-ended reallocation of fish from commercial setline fishermen to the

commercial guided sport sector causes severe economic harm to individual setline fishermen,

forcing many to consider leaving the halibut fishery and forcing many to confront the loss of

their homes and vessels pledged as collateral for loans to purchase QS. This is a direct,

immediate, and irreparable injury to Intervenors.

        2.      <u>It Is Neither Fair Nor Equitable For Setline Fishermen To
               Bear All Of The Quota Reduction Needed For Conservation</u>

Because GHL exceedances are deducted from the setline quota, and because of

overfishing by the commercial guided sport industry, the setline quota was reduced by 20% in

2007 and another 27% in 2008. 73 Fed. Reg. 30504, 30507 (Response to comment 6)(May 28,

2008). The GHL for the guided sport sector was never reduced until this year. 72 Fed. Reg.

74257, 74259 (Dec. 31, 2007). The purpose of the Rule is to implement a regulatory program

that will keep the guided sport harvest in Area 2C within its GHL established at 50 C.F.R.

300.65(c). 72 Fed. Reg. 74257 (Dec. 31, 2007). This will prevent overfishing of the resource by

this sector. Plaintiffs filed this action to overturn the Rule so they will not be compelled to stay

within their GHL and may continue overfishing.

It is neither fair nor equitable for one group of fishermen to have their quota reduced for conservation purposes and for another group to say they should not have their quota reduced, particularly when the second group is overfishing and creating a conservation problem. Intervenors will be directly, immediately, and irreparably harmed if Plaintiffs prevail in overturning the Rule because Intervenors will bear all of the conservation and allocation burdens.

3.    Overharvests By The Guided Sport Industry Threatens Subsistence Fishermen And Local Communities

Halibut is one of Alaska's most important subsistence fish species. Environmental Assessment and Regulatory Impact Review for a Regulatory Amendment to Define a Halibut Subsistence Fishery Category in Convention Waters, NMFS, 2003, at 100, found at http://www.fakr.noaa.gov/analyses/subsistence/halibut0403.pdf. Subsistence fishing occurs in near shore areas which are readily accessible to subsistence users. *Id.* at 99-100. The commercial guided sport fishery operates in near shore areas, competing with local anglers and subsistence users. Localized depletion caused by the guided sport industry poses an immediate, direct, and irreparable threat to subsistence fishermen, and coastal communities. Ex. 2, Behnken Aff., ¶¶ 20, 21.

Indeed, the Alaska Department of Fish and Game has found that subsistence harvests have declined in Area 2C and in other areas where the guided sport industry operates inshore in waters on which subsistence fishermen depend. Hall, J.A., Koster, D., and Turek, M., Subsistence Harvests of Pacific Halibut in Alaska, 2006, Alaska Dept. of Fish and Game, Division of Subsistence, Dec. 2007, at 17-18, found at http://www.subsistence.adfg.state.ak.us/TechPap/TP333.pdf.

Charter boat harvests in near shore areas have also caused localized depletion of other important subsistence resources such as rockfish. Ex. 2, Behnken Aff., ¶ 22.

16

C.    The Legal and Regulatory Regime

1.    The GHL Is A Defined And Fixed Allocation

The GHL is the halibut quota established for the commercial guided sport fishery. As NMFS has stated: "The GHLs are established as a total maximum poundage." 68 Fed. Reg. 47257, 47258 (Aug. 8, 2003). "[T]he GHL was to provide a limit on the total amount of harvests in the guided fishery...." 68 Fed. Reg. 47259. The preamble to the Rule recognizes "it is the Council's policy that the charter vessel fishery should not exceed the GHL." 73 Fed. Reg. 30504, 30505 (May 28, 2008). This was clearly the intent of the Council members who debated and voted for this policy. Ex. 2, Behnken Aff., ¶¶ 24, 25, 27.

Intervenors have a direct and immediate interest in assuring that this policy is followed, an interest directly opposed and prevented by the relief sought by Plaintiffs.

2.    The Area 2C GHL Was Reduced In 2008 In Accordance With 50 C.F.R. 300.65(c)

When the GHLs were established, they were linked to the overall CEY for each IPHC management area. Thus, 50 C.F.R. 300.65(c) provides that if the Area 2C CEY is more than 9,027,000 pounds, the GHL will be 1,432,000 pounds. The regulations then provide four more GHL categories or levels, each expressed such that if the CEY is reduced to "X" pounds, then the GHL shall be "Y" pounds. The Category (iv) level is that if the Area 2C CEY is 5,841,000 pounds or more, then the GHL shall be 931,000 pounds. 50 C.F.R. 300.65(c).

Since the GHLs were first established, the CEY has been reduced. However, it has never been reduced in an amount sufficient to trigger a step down reduction in GHL from the highest GHL level of 1,432,000 pounds, identified as Category (i) in the regulations. 2008 is the first year the Area 2C CEY has been decreased sufficiently to trigger a GHL reduction from Category (i). The 2008 Area 2C CEY reduction was of such a magnitude that the Area 2C GHL was

dropped from the maximum Category (i) level to the fourth of the five possible levels. As the preamble to the Rule states:

> Since 2003, when the GHLs became effective, they have never been reduced below their maximum level because declines in the total CEY have not been sufficient to trigger the first step reduction in GHLs.

72 Fed. Reg. 74257, 74259 (Dec. 31, 2007).

No one has ever challenged as improper the regulation providing a step down decrease in Area 2C GHLs based on Area 2C CEY levels. There is also no dispute that the Area 2C CEY has now been reduced such that the 2008 Area 2C GHL is 931,000 pounds. For both conservation and allocation reasons, Intervenors have a direct interest in effectuating the existing regulation and implementing the GHL appropriate to the CEY for the resource, an interest opposed by Plaintiffs.

> D.    The Purpose Of The Rule

In describing the purpose of the Rule, NMFS stated:

> NMFS proposes regulations that would limit the harvest of Pacific halibut by guided sport charter vessel anglers in [IPHC] Area 2C of Southeast Alaska to the [GHL] for that area....

72 Fed. Reg. 74257 (Dec. 31, 2007). NMFS continued:

> This proposed regulatory change is necessary to reduce the halibut harvest in the charter vessel sector to the GHL for Area 2C.

*Id.*

The final Rule reflects that intent. The preamble to the Rule states its purpose is to restrict the guided sport halibut fishery in Area 2C "to the [GHL] of 931,000 lb (422.3 mt)." 73 Fed. Reg. 30504, 30505 (May 28, 2008). *See also id.* at 30506 (Response to Comment 2) (the Rule is "intended to reduce the Area 2C charter halibut harvest amount to the 2008 GHL."); and at 30509 (Response to Comment 23).

18

Thus, the Rule is not intended to retrospectively deal with an overage in a prior year's GHL. Its purpose is to implement 50 C.F.R. 300.65(c) which provides for a lower GHL when the CEY is reduced. The issue is not addressing a GHL exceedance in the circumstance when the base GHL remained unchanged. The issue is implementing a conservation program based on the fact that the CEY and, therefore, the GHL has changed. This dichotomy, regulation to address GHL exceedances versus regulations to address a lower GHL based on a lower CEY, was reflected in the Council debate. As NMFS explained in the preamble to the proposed Rule:

> The Council also was considering management alternatives for the charter vessel halibut fishery in Area 2C during the first half of 2007.... Not knowing in June 2007 how the GHL may be affected by IPHC action in January 2008, the Council recommended a suite of charter vessel fishing restrictions if the GHL remains the same in 2008 (Option A) and a different, more restrictive, suite of restrictions if the GHL decreases in 2008 (Option B).

72 Fed. Reg. 74257, 74260 (Dec. 31, 2007). The Council was dealing with two possible circumstances: (1) a lower GHL based on reduced halibut abundance, or (2) an overage of the 2007 GHL, assuming no change in the CEY and, therefore, the base GHL. Once the IPHC determined in January 2008 that the Area 2C CEY needed to be reduced for conservation reasons, the issue became how to manage to the GHL required by the lower CEY. As NMFS noted:

> This Council recommendation is the basis for this proposed regulatory action.

*Id.*

In short, there are two stages of GHL management: management to achieve the GHL based on the CEY based conservation targets and then management of any exceedances of that GHL. Ample quotations can be found to show that for GHL exceedances, the existing policy is to not disrupt charter fishing by making in-season adjustments, a policy reflected in the

procedure for dealing with GHL exceedances retrospectively. However, in 2008, because of the reduced CEY, the issue was implementing 50 C.F.R. 300.65(c) which pegs the Area 2C GHL to changes in the Area 2C CEY. As noted above, Plaintiffs do not challenge that this is the correct conservation-based GHL. The Rule implements this GHL under the Halibut Act.

In sum, the Rule was adopted under the Halibut Act, *infra.* at p. 8, to achieve the conservation goals of the IPHC when the Area 2C CEY was reduced, this triggering the lower GHL already established in regulation – a regulation and GHL never challenged by Plaintiffs. Intervenors have a direct and immediate interest in NMFS implementing the regulations setting lower GHLs when CEY is reduced. Plaintiffs seek to prevent the lower, conservation based GHLs from being implemented.

It should be noted that NMFS estimates that even with implementation of the Rule, the guided sport fishery could exceed the 2008 GHL by up to 58,000 pounds. 72 Fed. Reg. 74257, 74263 (Dec. 31, 2007). If that occurs, then the regulatory processes set forth in 50 C.F.R. 300.65(c) for addressing GHL exceedances will be triggered.

E.    Conclusion

As discussed in more detail below, there can be no question that (1) the interests of Intervenors are directly and immediately implicated by the subject of this action, *i.e.,* the Rule and its halibut management program, (2) those interests could be seriously and adversely affected by the disposition of this action, and (3) the interests and perspectives of the Intervenors are different from those of the government.

## III.    INTERVENORS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT

Qualification for intervention as of right pursuant to Fed. R. Civ. P. 24(a)(2), depends on the following four factors:

> (1) the timeliness of the motion; (2) whether the applicant "claims an interest relating to the property or transaction which is the subject of the action"; (3) whether "the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest"; and (4) whether "the applicant's interest is adequately represented by existing parties."

*Fund for Animals, Inc. v. Norton,* 322 F.3d 728, 731 (D.C. Cir. 2003); *Nuesse v. Camp,* 385 F.2d 694, 699 (D.C. Cir. 1967). These standards must be interpreted flexibly. *Nuesse,* 385 F.2d at 700. The requirements of Rule 24(a) are to be broadly construed in favor of applicants for intervention. 7C C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure,* §§ 1904 (2d ed. 1986); *See also Nuesse v. Camp,* 385 F.2d at 700; *States Marine Intern., Inc. v. Peterson,* 518 F.2d 1070, 1080 n.25 (D.C. Cir. 1975), *cert. denied,* 424 U.S. 912 (1976); *South Dakota ex rel. Barnett v. U.S. Dept. of Interior,* 317 F.3d 783 (8th Cir. 2003); *Lipsett v. United States,* 37 F.R.D. 549 (S.D.N.Y. 1965), *appeal dismissed,* 359 F.2d 956 (2d Cir. 1966); *United States v. Oregon,* 913 F.2d 576, 587 (9th Cir. 1990), *cert. denied,* 501 U.S. 1250 (1991); *United States v. Stringfellow,* 783 F.2d 821, 826 (9th Cir. 1986), *cert. dismissed,* 478 U.S. 1030 (1986); *Westlands Water Dist. v. United States,* 700 F.2d 561, 563 (9th Cir. 1983); *Washington State Bldg. & Constr. Trades Council v. Spellman,* 684 F.2d 627, 630 (9th Cir. 1982), *cert. denied,* 461 U.S. 913 (1983).

In addition to the qualifications for intervention under Rule 24(a)(2), a party seeking to intervene as of right in this Circuit must demonstrate that it has standing under Article III of the Constitution. *Fund for Animals,* 322 F.3d at 731. Intervenors satisfy all of the requirements for intervention as a matter of right. In light of the opposition filed by Plaintiffs to the initial Motion to Intervene based on timeliness and interest in the subject matter, and in light of the Court's concern regarding standing, this Memorandum will expand on these points.

A.    <u>Intervenors Have Standing</u>

Standing, being jurisdictional, must be addressed prior to determining whether the four factors under Rule 24(a)(2) are met. *Id.* at 732.

1.    <u>Intervenors Have Constitutional Standing</u>

Constitutional standing derives from the requirement that federal courts can act only upon a justiciable case or controversy. U.S. Const. Art. III. If a party lacks Article III standing, the court lacks subject matter jurisdiction to hear the case. To satisfy the case or controversy requirement of Article III, a plaintiff must, generally speaking, demonstrate that he has suffered "injury in fact," that the injury is "fairly traceable" to the actions of the defendant, and that the injury will likely be redressed by a favorable decision. *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997); *Fund for Animals*, 322 F.3d at 732-733.

a.    <u>Standing Based on Economic Harm</u>

Both the United States Court of Appeals for the District of Columbia Circuit and the United States Court of Appeals for the Eleventh Circuit have specifically found that harm to economic interests constitutes injury-in-fact sufficient to confer Article III standing. *Fund for Animals*, 322 F.3d at 733; *Alabama-Tombigbee Rivers Coalition v. Norton*, 338 F.3d 1244, 1252 (11th Cir. 2003), *citing Bennett v. Spear*, 520 U.S. at 167-68. Indeed, in a case in which the issue was regulations affecting the amount of fish which could be harvested, this Court held:

> Economic harm of this sort is a canonical example of injury in fact sufficient to establish standing. *E.g., National Wildlife Fed'n v. Hodel*, 839 F. 2d 695, 704 (D.C. Cir. 1988)(recognizing that injury to "traditional economic interests [ ] will support standing."

*North Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F.Supp.2d 62, 82 (D.D.C. 2007).

In *North Carolina Fisheries Ass'n*, the issue was implementation of a fishery management plan setting management restrictions to meet target harvest levels. *Id.* at 69-70.

The Court found that by affecting the amount of fish that could be caught, the agency had created

a situation in which some fishermen would suffer economic harm satisfying the requirements for

standing. *Id.* at 83. That is precisely the circumstance confronted by Intervenors. Plaintiffs

want to implement a fisheries management program allowing them to overfish their halibut

allocation. Such a management program affects Intervenors by reducing the availability of fish

because of conservation and allocation reasons.

    *Fund for Animals* involved an attempt by the Natural Resources Department of the

government of Mongolia, referred to as the "NRD," to intervene in a case brought by a wildlife

conservation organization challenging the Department of the Interior's decision to list the argali

sheep as threatened, instead of endangered, under the Endangered Species Act within certain

countries including Mongolia. The Court found that the NRD had Article III standing with

respect to any decision to list the argali sheep under the ESA. It found that the placement of the

argali sheep on the endangered list would result in the cancellation of import permits for

American hunters to bring trophies home, thereby causing a loss of tourist dollars, some of

which were spent on conservation programs for the argali. This was found to be a concrete and

imminent injury fairly traceable to the regulatory action that the Plaintiffs sought in the lawsuit.

> Mongolia's sheep are the subject of the disputed regulations, the
> country benefits from the [Department's] current regulations, and
> Mongolia would suffer concrete injury if the court were to grant
> the relief the plaintiffs seek.

*Fund for Animals,* 322 F.3d at 733.

    When, as here, the Intervenor is "an object of the action (or forgone action) at issue,"

there can be "little question that the action or inaction has caused him injury, and that a judgment

preventing or requiring the action will redress it." *Fund for Animals,* 322 F.3d at 734, *quoting*

*Sierra Club v. EPA,* 292 F.3d 895, 900 (D.C. Cir. 2002); *Lujan v. Defenders of Wildlife,* 504 U.S.

555, 561-62 (1992). In such cases, it is not even required that parties file evidentiary submissions to support standing – to the contrary, in many, if not most, cases the petitioner's standing is self-evident. *Fund for Animals*, 322 F.3d at 733.

> In this case, while the NRD is not itself the object of the challenged agency action, sheep that Mongolia regards as its national property and natural resource plainly are its subject. And for the purpose of determining whether standing is self-evident, we see no meaningful distinction between a regulation that directly regulates a party and one that directly regulates the disposition of a party's property.

*Id.* at 734.

Similarly, in *Alabama-Tombigbee Rivers Coalition, supra*, businesses that operate under federal permits have standing to challenge federal action that may affect their rights pursuant to those permits. In addition, permits have been held to convey property rights traditionally protected by law, and, therefore, are sufficient to confer standing under these circumstances. *Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810, 818-819 (9th Cir. 2001); *Sierra Club v. U.S. EPA*, 995 F.2d 1478, 1482 (9th Cir. 1993); *Foss v. National Marine Fisheries Service*, 161 F.3d. 584, 586, 588 (9th Cir. 1998).

In *Fund for Animals*, as in the instant case, the plaintiffs' own complaint, in and of itself, established the proposed Intervenor's standing.

> But even if we were to harbor any doubts about the NRD's standing, they would be dissipated by evidence in the district court record. First, there are the [plaintiff's] own pleadings, which are admissible as evidence in support of its opponent's cause.

*Fund for Animals*, 322 F.3d at 734. Based on the plaintiffs' complaint, the Court in *Fund for Animals* found that Mongolia was itself "an object of the action . . . at issue." Likewise, based on the allegations of the Complaint in the instant case, commercial setline fishermen are an object of the action at issue. *See* Complaint at ¶¶ 8, 43, 44, 53, and 62.

Here, individual commercial setline halibut fishermen have permits issued under the IFQ Program to fish for halibut. Ex. 2, Behnken Aff., ¶ 3. Their economic livelihood depends on their ability to fish for halibut. Plaintiffs' objective is to reduce the amount of halibut available for harvest by fishermen who are not part of the guided sport industry. Plaintiffs' Complaint makes that clear. As explained in the Introduction section of this memorandum, Intervenors Behnken, Gibson, and Wohlhueter are commercial setline fishermen who depend on the Area 2C, southeast Alaska commercial halibut fishery for their livelihood and are severely harmed economically when the commercial setline harvest allocation is reduced to compensate for overfishing by the guided sport industry and when the health of the resource is adversely affected by charter boat overfishing, causing further quota reductions. Ex. 2, Behnken Aff., ¶¶ 1, 4-8, 18; Ex. 3, Gibson Aff., ¶¶ 1, 3-6; Ex. 4, Wohlhueter Aff., ¶¶ 1, 4-7. Indeed, Intervenor Linda Behnken notes that if the guided sport industry is allowed to fish in 2008 pursuant to the 2007 regulations, it is likely to harvest the same amount of halibut in 2008 as 2007 and that amount will be almost double the 2008 GHL. This will result in a 2009 reduction of the allowable harvest for the setline fleet of about 15%. That reduction will have a severe economic impact on all setline fishermen, including Behnken. Ex. 2, Behnken Aff., ¶ 7. The reduction in the setline halibut quota resulting from deducting the GHL exceedances of the guided sport industry from the setline fleet could result in a loss of $7.2 -16.9 million to the commercial setline fishery. *Id.,* ¶ 8. The economic loss in 2009 to the setline fleet caused by overfishing in 2008 by the guided sport industry if they are allowed to use the 2007 regulations will likely equal $3.3 million. *Id.,* ¶ 7. When 57% of the commercial setline fleet has only 3,000 pounds of halibut allocation, 79% with less than 10,000 pounds, *id.,* ¶ 4; when the income earned by commercial setline fishermen averages $13,500-$45,000, *id.,* ¶ 12; and when the maximum amount of halibut that can be

harvested by setline fishermen is 62,100 pounds (assuming a setline fisherman owns the absolute maximum amount of halibut quota shares), *id.,* ¶ 3, these allocation reductions are especially onerous particularly when two of the Plaintiff charter boat operators are on record stating that the income from their charter boat operations is approximately $12 million in one case and $7.8 million in another, and when these same Plaintiffs indicate they are taking over 80,000 pounds of halibut annually, *id.,* ¶ 12.

Seafood processors who depend on halibut are also adversely impacted by reductions in the setline allocation. Thus, Intervenor North Pacific Seafoods, Inc., which processes halibut harvested in Area 2C, has seen the halibut production in its plants dip 25% since 2004 when the guided sport industry began exceeding its GHL. Ex. 5, North Pacific Seafoods Aff., ¶¶ 1, 5. If the 2008 regulations at issue are invalidated and the guided sport industry is allowed to fish under the 2007 regulations, North Pacific Seafoods "can expect a further drop in processing volume, likely to 30% of what we processed in 2004." *Id.,* ¶ 5. This would mean a 25% loss of revenue and firing 80 employees. *Id.,* ¶¶ 1, 6.

Intervenor Seafood Processors Cooperative operates a halibut processing plant in Area 2C. Ex. 6, Seafood Producers Cooperative Aff., ¶ 1. If the Rule is not implemented, the Cooperative will lose approximately $2 million in revenue. *Id.,* ¶ 2. The Seafood Producers Cooperative's 140 employees will also suffer reduced income. *Id.*

Members of the Halibut Association of North American ("HANA") will also be further impacted if the Rule is invalidated. HANA's members represent 70% of the Pacific halibut processed each year and 46% of members operate in Area 2C. Ex. 7, HANA Aff., ¶ 1. "The four years of excessive harvest by the charter boat sector has negatively impacted each HANA member with processing plants or buying stations in Area 2C." *Id.,* ¶ 7. Since 2006, these plants

26

have experienced a 10-30% drop in product availability depending on the plant. *Id.* This has caused employee lay-offs. *Id.* The reduced availability of halibut for Area 2C halibut processors has caused an inability to meet customers' orders which has meant reduced revenue and lost customers. *Id.*, ¶ 8. If the Rule is not implemented, HANA members will likely "lose more than a million pounds of halibut" they would otherwise have received for processing. *Id.* Already in 2008 because of charter boats fishing under the 2007 rules instead of the 2008 rules, HANA's members are anticipating a 25-30% drop in deliveries and a corresponding 20-25% decrease in revenues. *Id.* The total loss by the end of the season is estimated at $5-10 million. *Id.*

Even more than economic harm, standing is justified if one's very survival depends on the halibut fishery. Intervenor Carolyn Heuer is a subsistence halibut fishermen in Area 2C. Ex. 8, Heuer Aff., ¶ 1. Ms. Heuer exhibits the ultimate economic interest when she states "we can not afford to feed our family without depending on subsistence harvests. In a given year, we eat approximately 50-75 lbs of halibut.... We are dependent on halibut and my ability to feed my family is threatened." *Id.*

Community governments in Area 2C such as Intervenor City of Pelican will suffer economic loss from reductions in the commercial setline quota because of lost tax revenue generated by the tax on the commercial halibut setline catch. Ex. 9, City of Pelican Aff., ¶¶ 1, 4, 9. Without these revenues, revenues which will be reduced if the Rule is not implemented, the city budget will be cut and governmental services to the community cut. *Id.*, ¶ 4. Similarly, the City of Port Alexander, located in Area 2C and, which like all communities receives revenue from the commercial fish tax, is economically dependent on the commercial halibut fishermen. Ex. 10, City of Port Alexander Aff., ¶¶ 1, 2, 5, 7; Ex. 2, Behnken Aff., ¶ 31. The issue for the

City of Port Alexander is made more difficult by the fact that 23% of its residents live below the poverty level. Ex. 2, Behnken Aff., ¶ 20.

Intervenors who are charter boat operators depend on a healthy halibut resource for their income. Intervenor Sandy Craig, an Area 2C charter boat operator fishing for halibut derives a substantial part of her income from her charter boat operation. Ex. 11, Craig Aff., ¶¶ 1, 2. Her business depends on sustainable, healthy halibut stocks. *Id.,* ¶ 4. Overfishing those stocks such that conservation targets are exceeded harms those stocks and Ms. Craig's business. Intervenor Luke Wiedel is also an Area 2C charter boat captain fishing for halibut. Ex. 12, Wiedel Aff., ¶¶ 1, 2. Like Ms. Craig, charter fishing is Mr. Wiedel's primary source of income and his business "depends on a healthy resource." *Id.*

In a context similar to the instant situation, the United States Court of Appeals for the First Circuit explained:

> . . . [T]he adverse effect is certain. The fishing groups seeking intervention are the real targets of the suit and are the subjects of the regulatory plan. Changes in the rules will affect the proposed intervenors' business, both immediately and in the future.

*Conservation Law Foundation v. Mosbacher,* 966 F.2d 39, 43 (1st Cir. 1992). Even associations of commercial fishermen and those representing them have been held to have Article III standing with respect to regulations implementing fishery conservation and management measures. *Parravano v. Babbitt*, 861 F. Supp. 914, 928 (N.D. Cal. 1994), *aff'd.,* 70 F.3d 539 (9th Cir. 1995), *cert. denied,* 518 U.S. 1016 (1996).

The threat of more severe reductions in the commercial halibut harvest constitutes injury sufficient to confer Article III standing. Given the facts of this case, it is not possible to argue that the concrete economic and other injuries Intervenors will suffer would not be traceable to the instant case and to the relief sought by Plaintiffs.

b.     Standing Based On Loss Of Tax Revenue

It is well established that a municipal government has standing to protect the interests of its residents particularly when the municipality's ability to enforce the collection of tax revenues or to receive such revenues is threatened. *City of South Lake Tahoe v. California Tahoe Regional Planning Agency*, 449 U.S. 1039, 1041 (1980); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1189 (9th Cir. 2004); *City of Albuquerque v. Dept. of the Interior*, 379 F.3d 901 912-913 (10th Cir. 2004); *City of Sault St. Marie, Michigan v. Andrus*, 458 F. Supp. 465, 468 (D.D.C. 1978); *City of Tacoma v. Andrus*, 457 F. Supp. 342 (D.D.C. 1978).

Pursuant to Alaska's Fisheries business Tax (FBT"), local communities receive 50% of the revenue collected by the state of Alaska from taxes on commercial halibut landings. Ex. 2, Behnken Aff., ¶ 31; Ex. 6, Seafood Producers Cooperative, ¶ 12. As discussed above, both the City of Pelican and the City of Port Alexander receive tax revenue based on halibut landings by the setline fleet. Without this tax income, the City of Pelican would experience a significant revenue loss and would have to cut its budget by 20%. *Id.,* ¶ 4. Failure to implement the Rule "will result in the Southeast charter harvest exceeding its [GHL]; to compensate, the amount of that exceedance will be deducted from individual Southeast commercial fishermen's quota in 2009, directly reducing the tax revenues accruing to the City of Pelican and other southeast Alaska coastal communities." *Id.* The City of Port Alexander, 23% of whose residents are below the poverty line, also receives tax revenue from the tax on halibut setline landings and depends on the activity of this fleet for its survival. Ex. 10, City of Port Alexander Aff., ¶ 5; Ex. 2, Behnken Aff., ¶¶ 20, 31. Reductions in the commercial setline allocation caused when the guided sport sector exceeds the GHL and "jeopardizes the future of our community." Ex. 10, City of Port Alexander Aff., ¶ 5.

The governmental functions and economic foundation of these two municipalities is threatened by past, present, and future reductions in the commercial setline halibut catch caused by the guided sport industry exceeding its GHL.  Loss of tax revenue is sufficient for standing.

c.     <u>Standing Based On Resource Conservation</u>

Standing has been found based simply on a decline in a resource when persons will be affected by resource declines.  In *American Oceans Campaign v. Daley,* 183 F.Supp.2d 1, 9-10 (D.D.C. 2000), the Court found that the injury prong of the standing test could even be satisfied by harm to aesthetic interests.  *See, e.g., Animal Legal Defense Fund v. Glickman,* 154 F.3d 426, 432 (D.C. Cir. 1998), *cert. denied.* 526 U.S. 1064 (1999).  These rulings are grounded in the Supreme Court's holding that "the desire to use or observe an animal species, even for purely aesthetic purposes, is undeniably a cognizable interest for purpose of standing."  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562-563 (1992).  If viewing a species when the number of such species is or may be declining is adequate for standing, then the desire to use the species for other purposes or to derive benefit from the resource is also sufficient for standing.  In *American Oceans Campaign,* the issue was whether plaintiffs had standing to challenge fishing practices that reduced the number of fish for use by people seeking to use the resource for recreational purposes such as scuba diving and photography.  Here, the ability of Intervenors to use the resource will be seriously reduced if the Rule is invalidated.

Intervenors who are charter boat operators depend on and use the halibut resource.  The health and viability of that resource is necessary for their business.  Ex. 12, Wiedel Aff., ¶¶ 1, 2 ("My business ... depends on a healthy resource"); Ex. 1, Craig Aff., ¶ 4 ("My business...depends on productive halibut stocks").  Similarly, the City of Pelican states "[t]he survival of Pelican as a community depends on the long-term abundance" of halibut and other fish.  Ex. 9, City of Pelican Aff., ¶ 6.  The City of Port Alexander also states "[t]he survival of Port Alexander as a

30

community depends on viable access to healthy and abundant fish stocks." Ex. 10, City of Port Alexander Aff., ¶ 2. There can also be no doubt that each of the Intervenors who are commercial setline halibut fishermen and processors in Area 2C depend on and need a healthy halibut resource for survival. Ex. 2, Behnken Aff., ¶ 1; Ex. 3, Gibson Aff., ¶¶ 6, 7; Ex. 4, Wohlhueter Aff., ¶¶ 3, 4, 7; Ex. 5, North Pacific Seafoods Aff., ¶ 2; Ex. 6, Seafood Producers Cooperative Aff., ¶¶ 2, 3, 11. Finally, halibut subsistence fishermen who depend on a healthy resource for their very survival in life depend on a healthy resource. As Ms. Heuer states "we can not afford to feed our family without depending on subsistence harvest." Ex. 8, Heuer Aff., ¶ 1. Citing a decline in the availability of halibut, Ms. Heuer states: "We are dependent on halibut and my ability to feed my family is threatened." *Id.* The health and abundance of the halibut stock is a matter of more than economic importance – it is a matter of survival. *Id.,* ¶¶ 1, 3.

Each of the Intervenors has an interest in the health of a resource they use, an interest sufficient for standing.

d.    Standing Based On Subsistence

Subsistence use of a resource is also an basis for standing. In *Karuk Tribe of California v. U.S. Forest Service,* 379 F.Supp.2d 1071, 1091 (N.D. Cal. 2005), the Court found that an Indian tribe using a resource for subsistence and other purposes had standing to protect its subsistence uses of the resource, as well as its cultural and religious uses of thee resource. Here, Intervenor Carolyn Heuer is a subsistence user of the halibut resource who cannot afford to feed her family without depending on subsistence resources and whose ability to feed her family is threatened by any activity, such as overfishing by the guided sport industry which threatens the health and availability of the halibut resource. Ex. 8, Heuer Aff., ¶ 1. If the guided sport industry continues to fish in accordance with the 2007 regulatory regime, they will continue exceed their harvest limits and reduce the availability of halibut for subsistence. *Id.,* ¶¶ 2, 3.

2.    Intervenors Have Prudential Standing

Prudential standing refers to judicially self-imposed limits on the exercise of federal jurisdiction. Generally, prudential standing requires that the plaintiff's grievance fall within the zone of interests protected or regulated by the statutory provision invoked in the suit. *Bennett v. Spear,* 520 U.S. at 162.

In an analogous case, the United States Court of Appeals for the District of Columbia Circuit held that a trade association representing industry members had standing to challenge federal actions which affected their economic interests and fell within the "zone of interests" contemplated by the controlling law. *National Coal Ass'n v. Hodel,* 825 F.2d 523, 526-27 (D.C. Cir. 1987) (trade association of coal producers had standing under a Mineral Leasing Act to challenge a decision by the Secretary of the Interior when the association alleged competitive injury and fell within the Act's "zone of interests").

Even if it were not clear that Intervenors meet the test of prudential standing under the Halibut Act, a decision of this Circuit has held that a proposed intervenor need not show they have a cause of action in order to intervene. *Jones v. Prince George's County, Maryland,* 348 F.3d 1014, 1017-1018 (D.C. Cir. 2003).

In the instant case, Intervenors clearly fall within the zone of interests regulated by the Halibut Act. Pursuant to that statute, the amount of fish available for use by Intervenors for subsistence or for economic benefit is regulated by the Halibut Act. 16 U.S.C. §§ 773b, 773c, 773e. Further, allocations between sectors are regulated under Halibut Act. 16 U.S.C. § 773c.

B.    Intervenors' Motion Is Timely

Under Fed. R. Civ. P. 24, any claim for intervention must be timely filed. Evaluation of the timeliness of a motion to intervene lies within the sound discretion of the District Court. *Mass. Sch. of Law at Andover, Inc. v. United States,* 118 F.3d 776, 779 (D.C. Cir. 1997). It is

well settled in this Circuit particularly where intervention is sought as of right that the amount of time which has elapsed since the litigation began is not in itself the determinative test of timeliness. *Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C. Cir. 1972).

Whether a motion to intervene is timely "is to be determined from all the circumstances" of the case.

> (T)he amount of time which has elapsed since the litigation began is not in itself the determinative test of timeliness. Rather, the court should also look to the related circumstances, including the purpose for which intervention is sought . . . and the improbability of prejudice to those already in the case.

*Natural Resources Defense Council v. Costle*, 561 F.2d 904, 907, (D.C. Cir. 1977), *quoting Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C. Cir. 1972) and *NAACP v. New York*, 413 U.S. 345, 366 (1973). A court should be more reluctant to deny an intervention motion on grounds of timeliness if it is intervention as of right than if it is permissive intervention. *U.S. v. American Tel. and Tel. Co.,* 642 F.2d 1285, 1294-1295(D.C. Cir. 1980).

In *NAACP, supra*, it was found that the District Court abused the "sound discretion" it is accorded to assess timeliness when it relied solely upon the age of the case and its closeness to settlement in denying a motion to intervene, while failing to take into account the purpose for which intervention was sought. In *Hodgson, supra*, looking at the purpose for which the intervention was sought, the court allowed an application for intervention seven years after the case was filed.

Even if there was a delay in seeking intervention, a determination of timeliness would also have to weigh, as *Hodgson* instructs, on whether that delay would unfairly disadvantage the original parties. *Natural Resources Defense Council v. Costle,* 561 F.2d 904, 907-908 (D.C. Cir. 1977).

Plaintiffs filed their Complaint on June 2, 2008. Intervenors have acted diligently in bringing this motion to intervene. The less than three week interval between the filing of the Complaint and the bringing of this motion was necessitated by obtaining the necessary declarations filed herewith – a process made difficult and time consuming by the fact that the proposed intervenors are primarily fishermen whose fishing season has begun and who are therefore not readily accessible. The motion to intervene is being filed before Defendants' answer is filed. A temporary restraining order was entered on June 11, 2008, and a hearing on Plaintiffs' Motion for Preliminary Injunction is set for June 20, 2008. The motion to intervene is being filed at a time when no dispositive motion has been filed. Intervention will not prejudice any party or delay the proper resolution of this action. No separate briefing has been scheduled on the requested preliminary injunction. The parties can certainly prepare for oral argument based on issues raised by intervenors, and if they do need more time, this Court can extend the temporary restraining order currently in place for an additional 10 days. Fed. R. Civ. P. 65(b).

We have found no case where a motion to intervene, filed prior to a hearing on a preliminary injunction, was denied on the basis of timeliness. In *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998), the Court of Appeals for this Circuit stated:

> As to timeliness, Upjohn sought to intervene a few weeks after Mova initiated its action, and before the district court ruled on the preliminary injunction; this cannot be regarded as untimely.

Other circuits are in accord. In *Geiger v. Foley Hoag LLP Retirement Plan*, 521 F.3d 60 (1st Cir. 2008), the court granted a motion to intervene filed nine months after the intervenor became aware of the lawsuit, where the court found the case had not progressed beyond the initial stages when the motion was filed, no action beyond the filing of the Amended Complaint had occurred, and the only pending item was a scheduled hearing in which the court would consider the two competing injunction proposals.

34

> In the absence of any discovery or substantive legal progress, we
> cannot say the litigation was in any way at an "advanced stage."

*Geiger*, 521 F.3d at 65. *See also Association of Connecticut Lobbyists LLC v. Garfield*, 241

F.R.D. 100, 102 -103 (D. Conn. 2007)(motion to intervene filed just after a motion for

preliminary injunction was filed and before the filing of any significant substantive motions was

timely); *Jones v. Blinziner*, 536 F. Supp. 1181, 1188-1189 (N.D. Ind. 1982)(amended motion to

intervene, which raises an issue not raised in the complaint, granted although filed after hearing

on preliminary injunction where it would not unduly delay or prejudice original parties). Given

the serious impact the Preliminary Injunction on Intervenors, this Memorandum will respond to a

portion of Plaintiffs' Opposition to Motion to Intervene as Defendants ("Plaintiffs' Opp.") filed

in response to the initial Motion to Intervene. Specifically, Plaintiffs asserted the intervention

motion is not timely as to issues involving the Preliminary Injunction. Plaintiffs cited seven

cases for support. Plaintiffs' Opp., pp. 3-5. The first four cases on page 3 are post-judgment

cases which are so factually distinct from the instant case as to not bear further comment.

In their first filed Motion to Intervene, Intervenors asserted they had found no case where

a Motion to Intervene, filed prior to a hearing on a preliminary injunction, was denied on the

basis of timeliness. Plaintiffs' Opp. stated "Plaintiffs, however, are aware of some." Plaintiffs'

Opp., p. 5. Plaintiffs cited two cases. The first, *South Dakota v. U.S. Army Corps of Engrs.*, 330

F.3d 1014, 1021 (8th Cir. 2003), is described by Plaintiffs as "denying motion for intervention

after a TRO was issued, but before preliminary injunction hearing due to lack of timeliness."

Plaintiffs' Opp., p. 5. Unfortunately, that explanation provided by Plaintiffs is a description of

the District Court decision that was overruled. Equally important, the case has nothing to do

with timeliness. 330 F.3d at 1021. The Appeals Court characterized the District Court's holding

as finding that the proposed intervenors lacked standing and failed to meet the requirements of

Rule 24(a)(2). *Id.* at 1023. The Appeals Court explained the District Court had found the proposed intervenors lacked subject matter interest in the litigation. The Appeals Court disagreed. *Id.* at 1025. The Appeals Court noted the District Court had found proposed intervenors were adequately represented by other parties. Again, the Appeals Court disagreed. *Id.* The Appeals Court noted the District Court had denied intervention for fear it would strip the District Court of jurisdiction. The Appeals Court disagreed. *Id.* Thus ends the Appeals Court discussion of the issues associated with the intervention motion. Timeliness is never mentioned, except in Plaintiffs' brief.

Plaintiffs' second case is *Doe v. Duncanville Independent School Dist.*, 994 F.2d 160, 167 (5th Cir. 1993), Plaintiff's Opp., p. 5. Again, the case does not support Plaintiffs' position. The intervention motion was filed two days before the preliminary injunction hearing but, significantly, four months after the complaint. The District Court denied intervention in part because of timeliness. 994 F.2d at 167. However, the Appeals Court noted that while the intervention motion was filed four months after the complaint and two days before the preliminary injunction hearing, "thus threatening prejudice" to plaintiffs from possible delay, these considerations "are not dispositive." *Id.* at 168. The dispositive factor was that the proposed intervenors were adequately represented. Thus, the Appeals Court did not consider timeliness by itself as the dispositive factor. It was timeliness linked to prejudice and the adequacy representation of intervenor's interests. Here, Plaintiffs never asserted they would be prejudiced by intervention. They never asserted there was inadequate representation of Intervenors.

The third case cited by Plaintiffs is one also cited by the Intervenors, *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998). Plaintiffs cited this case as

proving that intervention should be allowed only "after the entry of the preliminary injunction." Plaintiffs' Opp., p. 5. Setting aside that that is precisely the factual situation in which we now find ourselves, Plaintiffs' discussion of the case as a timeliness case is not accurate. In *Mova*, the motion to intervene was filed before the preliminary injunction hearing. After granting the injunction, the district court denied the motion to intervene concluding it was moot and the proposed intervenor did not have a legally protected interest in the subject matter. 140 F.3d at 1063. The Appeals Court reversed, but that reversal had nothing to do with the timeliness. That the holding of the case has nothing to do with timeliness was clarified when the Appeals Court stated "the District Court never reached" the issue of timeliness. *Id.* at 1076. Intervenors cited *Mova* only for the dicta in which the Appeals Court stated:

> As to timeliness, [intervenor] sought to intervene a few weeks after
> *Mova* initiated its action, and before the District Court ruled on the
> preliminary injunction; this cannot be regarded as untimely.

*Id.* at 1076. In short, if timeliness had been raised as an issue, the Appeals Court did not think it would have been an obstacle to intervention.

C.    <u>Intervenors Assert An Interest Relating To The Subject Of The Action</u>

In the intervention area, the "interest" test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process. *Nuesse v. Camp*, 385 F.2d at 700. A greater impetus to intervention inheres in administrative cases. *States Marine Intern., Inc. v. Peterson*, 518 F.2d 1070, 1080 n.25 (D.C. Cir. 1975), *cert. denied,* 424 U.S. 912 (1976).

In *Fund for Animals*, the Court held that once it is established the proposed intervenor has constitutional standing – that alone is sufficient to establish it has an interest relating to the property or transaction which is the subject of the action. *Fund for Animals*, 322 F.3d at 735. *See also Yniguez v. Arizona*, 939 F.2d 727, 735 (9th Cir. 1991) (because Article III standing

requirements are more stringent than those for intervention, a determination that a party would have standing under Article III compels the conclusion that it has an adequate interest under Rule 24(a)(2)); *Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Department of the Interior*, 100 F.3d 837, 842 (10th Cir. 1996).

Intervenors, therefore, need show nothing further than they already have by demonstrating Article III standing. Nevertheless, Intervenors independently meet the interest requirements of intervention. As shown above, Intervenors have a direct and substantial economic and subsistence interest in the challenge lodged by Plaintiffs. Plaintiffs' direct objective is to prevent Intervenors from fishing or to severely restrict such fishing. The challenge brought by Plaintiffs seeks to alter existing fishery management programs to the consequent economic disadvantage of Intervenors. Plaintiffs' action also will diminish the availability of halibut for people who depend on the resource, including subsistence users. Intervenors have a direct, clear, and identifiable interest in this action.

In *Coalition of Arizona/New Mexico Counties*, the United States Court of Appeals for the Tenth Circuit, citing the D.C. Circuit decision in *Nuesse*, found that a wildlife photographer had the requisite interest to intervene in a case challenging the listing of the spotted owl as endangered under the ESA. After stating that a person with an economic interest in the species at issue would clearly have the requisite interest to intervene, the court went on to say that mere "involvement with the Owl in the wild" and a "persistent record of advocacy for its protection" amounted to "a direct and substantial interest in the listing of the Owl for the purpose of intervention as of right" even though the proposed intervenor had "little economic interest in the Owl itself." *Coalition of Arizona/New Mexico Counties*, 100 F.3d at 841.

In cases challenging administrative regulations, the interest of those who are governed by the regulations are sufficient to support intervention. 7C C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 1921 at 492 (2d ed. 1986). Indeed, ownership of a permit the use of which is at issue in a case, such as the fishing rights held by Intervenors represent a protectable interest. *See Sierra Club v. United States Env. Protection Agency*, 995 F.2d 1478, 1485 (9th Cir. 1993) (finding a sufficient interest relating to the subject matter by "permit-holding property owners . . . where the statute directly regulates their conduct").

No doubt can exist that Plaintiffs' motive in this action is to force Defendants to allow Plaintiffs to proceed in a way that significantly restricts Intervenors' access to the resource. When the "relief sought by plaintiffs will have direct, immediate, and harmful effects upon a third party's legally protectable interests, that party satisfies the 'interest' test of [Rule] 24(a)(2) . . . ." *Forest Conservation Council v. U.S. Forest Service*, 66 F.3d 1489, 1494 (9th Cir. 1995) (permitting community organizations deriving an economic return from logging activities to intervene as of right in an environmental organization's suit to limit and enjoin these logging activities); *see also Nuesse v. Camp*, 385 F.2d at 699. Nor is there any reasonable doubt that the relief sought by Plaintiffs will have a dramatic negative economic effect on Intervenors.

Interests identical to those of Intervenors were found to be sufficient to support intervention when fishermen and processors were permitted to intervene in a challenge to an amendment to the Management Plan for the groundfish fishery of the Gulf of Alaska. *Alaska Factory Trawler Association v. Baldridge*, 831 F.2d 1456 (9th Cir. 1987). Other similarly situated parties have also been held to meet the requirements for intervention. In *Center for Marine Conservation v. Brown*, 917 F. Supp. 1128 (S.D. Tex. 1996), groups representing the shrimping industry were allowed to intervene in a challenge to Defendants' management of the

Gulf of Mexico commercial shrimp fishery. There, an environmental group asserted that additional fishery management measures were needed.

Similarly, in *Conservation Law Foundation v. Mosbacher*, the Court allowed industry trade associations and industry participants to intervene. There, a conservation group sought to compel the Secretary of Commerce to develop fishery management measures that it claimed were necessary to prevent overfishing. The Court allowed fishing groups participating in the fishery to intervene. The Court found that "[c]hanges in the rules will affect the proposed intervenors' business, both immediately and in the future." 966 F.2d at 43. The Court noted that the plaintiff was seeking "more extensive regulation by a federal agency" of these industries' productive use of natural resources. *Id.* at 40; *see also Kleissler v. United States Forest Service*, 157 F.3d 964 (3rd Cir. 1998) (permitting industry and community groups with a financial stake in logging operations in national forests to intervene as of right in a suit by an environmental group to enjoin logging activity pending compliance with the National Environmental Policy Act); *Sierra Club v. Glickman*, 82 F.3d 106 (5th Cir. 1996) (permitting a trade association representing farmers to intervene as of right in a suit to restrict pumping of water from an aquifer for, among other things, these farmers' use); *Sierra Club v. Espy*, 18 F.3d 1202 (5th Cir. 1994) (permitting timber purchasers to intervene in an action challenging U.S. Forest Service logging regulations).

Although it is not required to demonstrate that the harm to Intervenors is irreparable, the facts are that it is. As shown above, overfishing by the guided sport industry threatens the continued viability of the resource in Area 2C and leads to a direct allocation of fish away from commercial setline fishermen. In Plaintiffs' Opp., Plaintiffs suggested that Intervenors had no interest at this time because the Preliminary Injunction will have no effect on the 2008 commercial setline allocation. Plaintiffs' Opp., p. 7. Sadly, Plaintiffs' omitted a few relevant

facts. Plaintiffs are now fishing under the 2007 regulations pursuant to which they harvested 1.7 million pounds of halibut, 20% over the 1.4 million pound GHL. The 2008 GHL was reduced to 931,000 pounds. As shown above, GHL exceedances are deducted from the setline quota in the following year. Thus, fishing right now under the 2007 rules, as allowed by the Preliminary Injunction, will result in corresponding reductions in the setline quota. The cause of the harm is immediate. The effect may occur later. But if Intervenors cannot challenge what is happening right now, the die will have been cast, the harm done, and the Intervenors left with no recourse. That is immediate harm. Further, the health of the resource is at issue when harvest targets are exceeded. Every Intervenor who depends on a healthy halibut resource is threatened by overfishing by the charter boat industry exceeding their GHL. Each day the guided sport industry fishes at a rate that will exceed its GHL guarantees the CEY based conservation targets will be exceeded and guarantees a reduction in the setline quota. Commercial setline fishermen, processors, subsistence users, other charter boat operators, and coastal communities suffer. That the actual quota reductions will occur next year in the case of the setline commercial sector is irrelevant because the cause of those reductions, overfishing by the guided sport industry, is occurring at this very moment. And there is no question that GHL exceedances by the guided sport industry in 2008 will be deducted from the setline quota next year. Ex. 2, Behnken Aff., ¶¶ 6, 7, 14, 18.

The threat to the resource and to Intervenors is occurring at this very moment because of fishing practices and patterns employed right now by the guided sport industry.

> D.    <u>Intervenors' Ability To Protect Their Interests May Be Impaired Or Impeded If The Motion To Intervene Is Denied</u>

Plaintiffs contend that management of the halibut fishery must be such as to allow them to increase their halibut harvest at the expense of others and of the resource. If Plaintiffs prevail,

the livelihood of Intervenors and the other interests of Intervenors will be greatly affected.

Denial of the motion to intervene will seriously impair the interests of Intervenors.

In *Georgia v. United States Army Corps of Engineers*, 302 F.3d 1242 (11th Cir. 2002),

the United States Court of Appeals for the Eleventh Circuit found that the State of Florida was

entitled to intervene as of right in a suit by the State of Georgia to compel the Army Corps of

Engineers to increase the water supply available to the City of Atlanta from a source under the

control of the Corps.  Florida argued that Georgia was seeking a de facto partial apportionment

of the water in the basin at issue, in violation of a compact between the states.  The Court found

that Florida's interest could be impaired by the disposition of the suit, even though Georgia did

not seek to enjoin or interfere with the prior compact process, and even though Florida might be

able to file a separate action with respect to its rights.  *Georgia v. United States Army Corps of*

*Engineers*, 302 F.3d at 1253-55.  In the instant case, Plaintiffs are specifically seeking to

overturn management measure to protect the resource on which Intervenors depend and use.

Any judgment in this case will be binding on NMFS, and no independent action by Intervenors

could alter that result.

> Where a party seeking to intervene in an action claims an interest
> in the very property and very transaction that is the subject of the
> main action, the potential *stare decisis* effect may supply that
> practical disadvantage which warrants intervention as of right.

*Chiles v. Thornburgh*, 865 F.2d 1197, 1214 (11th Cir. 1989).

E.      Intervenors' Interests Are Not Adequately Represented By Any Other Party

To satisfy this requirement, an applicant for intervention need only show "that

representation of [its] interest [by existing parties] 'may be' inadequate; and the burden of

making that showing should be treated as minimal." *Trbovich v. The United Mine Workers*, 404

U.S. 528, 538 n.10 (1972), *Appleton v. F.D.A.,* 310 F. Supp. 2d 194, 197 (D.D.C. 2004).

While Intervenors oppose Plaintiffs' challenge, as do the Defendants, Intervenors have direct economic, subsistence, and governmental interests that the Defendants lack. Where a private party may make a more vigorous presentation of the arguments than a government party, its representation by the government may be inadequate. *United States v. American Tel. & Tel. Co.*, 642 F.2d. 1285, 1293 (D.C. Cir. 1980); *National Farm Lines v. Interstate Commerce Comm'n*, 564 F.2d. 381, 383 (10th Cir. 1977); *Natural Resources Defense Council v. Costle*, 561 F.2d. 904 (D.C. Cir. 1977). Moreover, at least one court has held that "[t]he burden of persuasion that representation is adequate appears to rest on the party *opposing* intervention." *Caterino v. Barry*, 922 F.2d 37, 42 n.4 (1st Cir. 1990) (emphasis in original).

In *Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Department of the Interior*, the United States Court of Appeals for the Tenth Circuit reversed the District Court and allowed intervention as of right by a wildlife photographer in a case challenging a decision to list the spotted owl as endangered under the ESA. The court found that the minimal burden of showing that representation by existing parties may be inadequate was satisfied, even though the proposed intervenor and the government would both be attempting to defend the decision to list the owl:

> We have here . . . the familiar situation in which the governmental agency is seeking to protect not only the interest of the public but also the private interest of the petitioners in intervention, a task which is on its face impossible. The cases correctly hold that this kind of a conflict satisfies the minimal burden of showing inadequacy of representation.

*Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Department of the Interior*, 100 F.3d 837, 845 (10th Cir. 1996), *quoting National Farm Lines v. Interstate Commerce Comm'n*, 564 F.2d 381, 384 (10th Cir. 1977).

Where a proposed intervenor is a private party that seeks to advance its own interests, whereas a public defendant is required to balance a range of interests likely to diverge from those of intervenors, there can be no adequate representation of the intervenor's interest by that public body. *Meek v. Metropolitan Dade County, Florida*, 985 F.2d 1471, 1478 (11th Cir. 1993). Where a government agency seeks to protect its decision making process, as opposed to a proposed intervenor which seeks to protect the economic and statutory interests of its members, there is no adequate representation by the government agency of the proposed intervenor's interest. *Georgia v. United States Army Corps of Engineers*, 302 F.3d at 1259. A federal defendant, with a primary interest in the management of a resource, does not have interests identical to those of an entity with economic interests in the use of that resource. *Id.* Not only do Intervenors have direct economic, subsistence, and management interests which the government lacks, but Intervenors and the government have divergent views on the conservation status of the halibut resource and on the impact of the Rule on Intervenors. Thus, Intervenors will make arguments the government will not present.

Intervenors satisfy the minimal burden of showing that representation by the government may be inadequate. The interests of the government and Intervenors are not the same. The government is interested in establishing and implementing a regulatory system. Intervenors are interested in their livelihood and the long-term viability of the resource. In addition, Intervenors may have a different view as to some of the issues included in this case.

## IV.    PERMISSIVE INTERVENTION IS APPROPRIATE

Anyone may be permitted to intervene in an action, upon timely motion, when that intervenor's "claim or defense that shares with the main action a common question of law or fact" and the intervention will not "unduly delay or prejudice the adjudication of the original

parties' rights." Fed. R. Civ. P. 24(b); *Acree v. Republic of Iraq*, 370 F.3d 41, 49 (D.C. Cir. 2004), *cert. denied,* 544 U.S. 1010 (2005).

Intervenors seek to oppose Plaintiffs' efforts to restrict the halibut fishery. Intervenors' defenses involve questions of fact and law that are in common with the government's defenses. Moreover, this Motion is timely and intervention will not delay or prejudice adjudication of the rights of the original parties. Accordingly, Intervenors should be permitted to intervene as a defendant.

## V.    CONCLUSION

For the reasons stated above, Intervenors respectfully requests that the Court grant their motion to intervene in this case and to file their Answer.

Dated:  June 23, 2008                                Respectfully submitted,

George J. Mannina, Jr. (D.C. Bar No. 316943)
Paul L. Knight (D.C. Bar No. 911594)
O'Connor & Hannan, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C. 20006-2803
Telephone:     (202) 887-1400
Facsimile:     (202) 466-3215
*Counsel for Proposed Intervenor-Defendants*

**EXHIBIT 1**

**ANSWER OF INTERVENOR-DEFENDANTS**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

      Plaintiffs,

v.

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

      Defendants.

Civil Action No. 08-0941 (RMC)
Category D

## ANSWER OF INTERVENOR-DEFENDANTS

Intervenor-Defendants, Linda Behnken, Christopher Knight, William Thomas, Jr.,

Steve Box, David Gibson, Sherri Wohlhueter and Kurt Wohlhueter, Annah Taft Perry, North

Pacific Seafoods, Inc., Erik Bahnsen , Wayne Brown , Sandy Craig , Luke Wiedel,

Carolyn Heuer, Jerrod Galanin, Seafood Producers Cooperative, Ryan Nichols, the City of

Pelican, and the City of Port Alexander ("Intervenor-Defendants"), by and through counsel,

answer the Complaint ("Complaint") filed by Plaintiffs as follows:

1.     Paragraph 1 sets forth legal conclusions to which no response is required.

2.     Paragraph 2 sets forth legal conclusions to which no response is required.

3.     Paragraph 3 sets forth legal conclusions to which no response is required.

4.     Paragraph 4 sets forth legal conclusions to which no response is required.

5.     Paragraph 5 sets forth legal conclusions to which no response is required.

6.     In response to the allegations contained in Paragraph 6 of the Complaint,

Intervenor-Defendants admit that the Plaintiffs challenge a final rule issued by the Secretary of

Commerce. In response to the remaining allegations of Paragraph 6, the document referred to best speaks for itself.

7.      In response to the allegations contained in the first sentence of Paragraph 7, Intervenor-Defendants state that the document referred to best speaks for itself. The allegations of the second sentence of Paragraph 7 set forth legal conclusions to which no response is required. Intervenor-Defendants deny the allegation contained in the third sentence of Paragraph 7 because the rule at issue was based on far more than the document referenced.

8.      Intervenor-Defendants deny the allegations contained in Paragraph 8.

9.      In response to the allegations contained in Paragraph 9, Intervenor-Defendants state that the referenced document best speaks for itself.

10.     In response to the allegations contained in Paragraph 10, Intervenor-Defendants state that the referenced document best speaks for itself.

11.     In response to the allegations contained in Paragraph 11, Intervenor-Defendants state that the referenced document best speaks for itself.

12.     In response to the allegations contained in Paragraph 12, Intervenor-Defendants state that the referenced document best speaks for itself.

13.     In response to the allegations contained in Paragraph 13, Intervenor-Defendants state that the referenced document best speaks for itself.

14.     In response to the allegations contained in Paragraph 14, Intervenor-Defendants state that the referenced document best speaks for itself.

15.     Intervenor-Defendants deny the allegations contained in Paragraph 15, except that the references to statutory provisions set forth legal conclusions to which no response is required.

16.     Intervenor-Defendants deny the allegations contained in Paragraph 16.

17.     Intervenor-Defendants deny the allegations contained in Paragraph 17.

18.     Intervenor-Defendants deny the allegations contained in Paragraph 18.

19.     Intervenor-Defendants deny the allegations contained in Paragraph 19.

20.     In response to the allegations contained in Paragraph 20, Intervenor-Defendants state that the referenced document best speaks for itself.

21.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 21.

22.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 22.

23.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 23.

24.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 24.

25.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 25.

26.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 26.

27.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 27.

28.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 28.

29.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 29.

30.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 30.

31.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 31.

32.     Intervenor-Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 32.

33.     Intervenor-Defendants admit the allegations contained in Paragraph 33.

34.     Intervenor-Defendants admit the allegations contained in Paragraph 34.

35.     Intervenor-Defendants admit the allegations contained in Paragraph 35.

36.     Intervenor-Defendants admit the allegations contained in Paragraph 36.

37.     Intervenor-Defendants admit the allegations contained in Paragraph 37.

38.     Intervenor-Defendants admit the allegations contained in Paragraph 38.

39.     Paragraph 39 contains legal conclusions to which no response is required.

40.     Paragraph 40 contains legal conclusions to which no response is required

41.     Paragraph 41 contains legal conclusions to which no response is required

42.     Paragraph 42 contains legal conclusions to which no response is required

43.     Intervenor-Defendants deny the allegations contained in Paragraph 43.

44.     In response to the allegations contained in Paragraph 44, Intervenor-Defendants state that the document referred to best speaks for itself, that the International Pacific Halibut Commission has established a procedure for determining the Constant Exploitation Yield from a fishery, and deny the remaining allegations.

45. In response to the allegations contained in Paragraph 45, Intervenor-Defendants state that the documents referred to best speak for themselves and deny the remaining allegations contained in Paragraph 45.

46. Intervenor-Defendants admit the allegations contained in first sentence of Paragraph 46 and deny the allegation contained in the second sentence of Paragraph 46 as an incomplete statement.

47. In response to the allegations contained in Paragraph 47, Intervenor-Defendants state that the document referred to best speaks for itself.

48. In response to the allegations contained in Paragraph 48, Intervenor-Defendants state that the document referred to best speaks for itself.

49. Intervenor-Defendants admit the allegations contained in the first and third sentences of Paragraph 49 and deny the allegations contained in the second sentence in that the formula for establishing a GHL had already been established.

50. In response to the allegations contained in Paragraph 50, Intervenor-Defendants state that the document referred to best speaks for itself.

51. Intervenor-Defendants admit the allegations contained in Paragraph 51.

52. Paragraph 52 sets forth legal conclusions to which no response is required.

53. In response to the allegations contained in Paragraph 53, Intervenor-Defendants state that the document referred to best speaks for itself.

54. In response to the allegations contained in Paragraph 54, Intervenor-Defendants state that the document referred to best speaks for itself and deny the remaining allegations in Paragraph 54.

55. Paragraph 55 sets forth legal conclusions to which no response is required.

56.     In response to the allegations contained in Paragraph 56, Intervenor-Defendants state that the document referred to best speaks for itself and deny the remaining allegations in Paragraph 56.

57.     Paragraph 57 sets forth legal conclusions to which no response is required.

58.     Intervenor-Defendants deny the allegations contained in Paragraph 58.

59.     Paragraph 59 sets forth legal conclusions to which no response is required.

60.     In response to the allegations contained in Paragraph 60, Intervenor-Defendants state that the document referred to best speaks for itself and deny the remaining allegations in Paragraph 60.

61.     In response to the allegations contained in Paragraph 61, Intervenor-Defendants reallege and incorporate by reference their response to the referenced paragraphs.

62.     Intervenor-Defendants deny the allegations contained in Paragraph 62.

63.     In response to the allegations contained in Paragraph 63, Intervenor-Defendants reallege and incorporate by reference their response to the referenced paragraphs.

64.     Intervenor-Defendants deny the allegations contained in Paragraph 64.

65.     In response to the allegations contained in Paragraph 65, Intervenor-Defendants reallege and incorporate by reference their response to the referenced paragraphs.

66.     Intervenor-Defendants deny the allegations contained in Paragraph 66.

67.     In response to the allegations contained in Paragraph 67, Intervenor-Defendants reallege and incorporate by reference their response to the referenced paragraphs.

68.     Intervenor-Defendants deny the allegations contained in Paragraph 68.

69.     In response to the allegations contained in Paragraph 69, Intervenor-Defendants reallege and incorporate by reference their response to the referenced paragraphs.

70.    Intervenor-Defendants deny the allegations contained in Paragraph 70.

### **Affirmative Defenses**

1.    Plaintiffs' Complaint fails to state a claim upon which relief may be granted.

2.    Plaintiffs' claims are barred because Defendants acted lawfully and properly at all times relevant to the Complaint.

WHEREFORE, Intervenor-Defendants respectfully request that this Court dismiss Plaintiffs' Complaint with prejudice and grant such other relief as the Court deems proper and just.


Dated:  June 18, 2008                                   Respectfully submitted,

                                                                    _____
                                                                    George J. Mannina, Jr. (D.C. Bar No. 316943)
                                                                    Paul L. Knight (D.C. Bar No. 911594)
                                                                    O'Connor & Hannan, L.L.P.
                                                                    1666 K Street, N.W., Suite 500
                                                                    Washington, D.C.  20006-2803
                                                                    Telephone:     (202) 887-1400
                                                                    Facsimile:      (202) 466-3215
                                                                    *Counsel for Proposed Intervenor-Defendant*

# EXHIBIT 2

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

     Plaintiffs,

v.

     Civil Action No. 08-0941 (RMC)
     Category D

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

     Defendants.

## AFFIDAVIT OF LINDA BEHNKEN

1.    I, Linda Behnken, of 123 Riggs Road, Sitka Alaska 99835, have a long-term interest in effective management of the Alaska halibut resource. I am a commercial setline halibut fisherman, conservationist, and fishery consultant. I hold a master's degree in Environmental Science from the Yale School of Forestry and Environmental Science, and am the director of the Alaska Longline Fishermen's Association (ALFA), a Sitka-based non-profit. I had the privilege of serving on the North Pacific Fishery Management Council (Council) from 1992-2001, which were the years when the halibut charter Guideline Harvest Level (GHL) was developed and adopted by the Council. I depend on, and have worked to protect the halibut resource throughout the 15 year process of developing the halibut charter management plan and the eight year process to develop the charter harvest restrictions currently challenged by the Plaintiffs.

2.    I have commercially setlined for halibut since 1982, as a deckhand and, since 1991, as the owner/operator of the 32 foot hook and line fishing vessel MORGAN. Because my participation in the halibut fishery during the qualifying years for the halibut Individual Fishing

Quota (IFQ) program was as a deckhand and Quota Share (QS) was only issued to vessel owners

or holders of a qualified vessel leases, I did not receive an initial allocation of halibut QS when

the IFQ program was implemented in 1995.  After the IFQ program was implemented I married

a fisherman, Kent Barkhau, who had received a small initial QS allocation in Southeast, or

management Area 2C, that translated to approximately 2,500 pounds of IFQ in the year of initial

issuance.

        3.      The IFQ program provides setline fishermen with a federal fisheries permit to

fish.  The initial issuance of QS was issued based on historic participation in the halibut fishery

during an established base period and is specified in units; pounds of IFQ are annually issued to

QS holders and directly fluctuate as the total setline halibut catch limit in an area fluctuates.  To

commercially harvest halibut in Alaska a person must hold halibut IFQ specified for the area of

harvest.  When the IFQ program was developed in 1995 Southeast fishermen, led by ALFA,

successfully sought low individual QS ownership caps to limit consolidation of access privileges;

owner-on board requirements to prevent absentee-ownership and to protect the working

waterfront; and vessel size classes that prevent QS initially issued to the small community-based

setline boats from being fished from larger boats or processed off-shore.  The Southeast

excessive share cap, or limit on amount of QS any person may own or control, is set at 1% of the

Southeast quota, or 599,799 QS units.  In 2008, those units translate to 62,100 pounds of

harvestable Southeast halibut IFQ.[1]  Currently only one Southeast QS holder owns QS equal to

the 1% ownership cap.

---

[1]  http://www.fakr.noaa.gov/ram/08caps.pdf

4.      I have purchased all the halibut QS I hold, as have 33% of the halibut QS holders in Southeast Alaska.[2] Sixty-seven percent of the Southeast QS (which includes the 33% referenced above) is held by persons who purchased some or all of their QS. In 2008, I have approximately 5,000 pounds of Southeast halibut IFQ, and 324 pounds of South central (management Area 3A) IFQ, making me an average Southeast halibut QS holder where, in 2008, 79% of the 1,339 QS holders own 10,000 pounds or less of Southeast halibut IFQ and 57% hold less than 3,000 pounds of Southeast halibut IFQ.[3] My husband has also purchased additional halibut QS, and has in total 6,100 pounds of Southeast halibut IFQ in 2008 and 7,300 pounds of South central (3A) halibut IFQ in 2008. All the halibut we harvest is delivered to Southeast communities, as is 90% of the entire Southeast harvest. Ninety-three percent of the Southeast halibut QS holders have QS designated for vessels less than 60 feet, which characterize the Southeast fleet.[4] I am also representative of the Southeast fleet in that I live in a southeast Alaska coastal community (74% of the Southeast QS is held by residents of Alaska's coastal communities and 83% is held by Alaskans) and fish halibut with my family. Each of my boys, now ages 6 and 4, first "deckhanded" on MORGAN at six months of age.

5.      Approximately fifty percent of my family's income is earned halibut fishing. Both my husband and I deckhand on setline line boats as well as fish MORGAN, and have used our earnings from deckhand work to purchase QS. We live in a log home my husband built and have stayed generally free of debt by working hard, saving what we earn and living simply. Our investment in halibut QS is the largest single investment my husband and I have made, either

---

[2] McDowell Group, April 2007. Economic impact of the commercial halibut fisheries in Areas 2C and 3A. 33% of 2C (Southeast) QS holders are new entrants, having purchased or received by gift all the QS they hold.
[3] NMFS/RAM Division data base
[4] http://www.fakr.noaa.gov/ram/ifqreports.htm

singly or as a couple. The 43% quota reduction over the past two years has caused substantial economic harm to our family. We are committed to protecting the resource to ensure that our boys and other young coastal residents have access to the same abundant halibut resource that has sustained us, and economize where we can. Deductions necessitated by Charter GHL overages impose a more harmful burden, particularly when we have taken great care to remain below our personal quotas. Every dollar counts in the economy of our family; what counts even more is a measure of confidence that the regulatory process will function as intended to protect our investments and the interests and investments of all halibut harvesters: setline, subsistence, sport, and charter.

6.    The Southeast halibut resource was fully utilized in 1995 when the Alaska halibut IFQ program was implemented. Charter harvest at that time was .986 million pounds.[5] While other resource removals (non-guided sport, subsistence, bycatch, wastage) have remained relatively stable, the charter harvest has increased to the 2005 high of 1.95 million pounds. All of that increase has been deducted on an annual basis from the Southeast setline sector to prevent resource over harvest, despite the fact that setline fishermen were collectively investing millions each year in the purchase of QS that was being annually eroded. In 2003 the Secretary established the Southeast halibut charter GHL as an upper bound on charter harvest, a "total maximum" to be harvested by the halibut charter fleet. 68 Fed. Reg. 47258. GHL overages since 2004 total 1.98 million pounds (using the 1.7 million pound preliminary numbers for 2007).[6] Overages were deducted from the setline harvest in 2004, 2005, and 2006. Overage deductions total 1.2 million pounds. Applying a conservative ex-vessel price (the price paid to

---

[5] http://www.iphc.washington.edu/halcom/pubs/annmeet/2008/bluebook/bluebook08.pdf, page 19
[6] http://www.fakr.noaa.gov/npfmc/current_issues/halibut_issues/halibut2Charvests_907.pdf.

fishermen at the dock) of $3 per pound, the three year loss to Southeast setline halibut fishermen of the overages is $3.6 million (prices have risen over this time from $3 per pound to over $4 per pound). Penalizing the setline sector, which has remained below established catch levels, for charter GHL overages sets a dangerous management precedent; allowing additional losses to be imposed on the Southeast setline fleet in 2009 to compensate for 2008 charter GHL overages will impose unacceptable harm to my fishing operation and to the fishing operations of the 1,338 other Southeast halibut QS holders.

7.    The IPHC has indicated that charter GHL overages may be deducted from the setline catch again in the future if effective harvest controls are not in place to prevent charter GHL. In the absence of the one halibut daily limit, the Southeast charter fleet can be expected to harvest approximately as much halibut as the fleet harvested in 2007, exceeding the fleet's .931 million pound GHL by 770,000 pounds, and taking 1.7 million pounds in total. If current stock projections are correct, it is reasonable to assume that the Southeast setline catch limit will likely be set in the 5 million pound range in 2009. As a result, and by my most recent calculations, the Southeast setline catch limit, and hence the IFQ of each Southeast halibut QS holder, will likely be reduced by 15% in 2009 to account for charter GHL overages. A 15% IFQ reduction will reduce my family's Southeast halibut gross income by approximately $6,000, (assuming a 20% catch limit reduction from 2008 and $4.50 ex-vessel price) and the gross income to the Southeast halibut setline fleet by $3.3 million. The economic impact of this loss to my family and other Southeast fishing families like mine will be severe. Coupled with quota reductions necessitated by low halibut abundance, the impacts could be devastating.

8.    The Southeast charter fleet has testified to the Council that their recent harvests, including their GHL overages, should be used as the basis for a long-term reallocation of halibut quota.  To quote one Southeast charter association:

> "We believe the initial allocation should include an option that reflects a healthy charter industry as represented on the control year of the moratorium.  Option 2:c. fixed ponds. 1.9 Mlbs for 2C is closest to the actual catch on that date (Dec 9, 2005).[7]

As stated, southeast halibut charter GHL overages in 2005 were significant.  In October, the North Pacific Fishery Management Council will consider establishing a higher GHL that uses charter harvests, including GHL overages, as the basis for the reallocation of quota from the setline to the charter sector.  The asset value of QS in Southeast ranges from $18-25 per pound, averaging $22 per pound.  If past overages and the inability of management agencies to control charter harvest to established catch limits becomes the basis for a reallocation, the 300,000 to 770,000 pound past overages could result in a reallocation that transfers $7.2 to $16.9 million dollars worth of QS assets from Southeast setline fishermen, many of whom are still paying on QS loans and have used their homes or boats as collateral, to charter operators such as the Plaintiffs.  Without question, these losses to my family, the Southeast setline halibut fleet, and the rural communities that depend on that fleet will be devastating and the harm irreparable.

9.    Coastal fishing families, including mine, have made considerable investments in halibut QS, believing as I did that they were investing in a healthy, well managed resource.  I have committed my time to the North Pacific Fishery Management Council process, both as a Council member and as a fishery spokesperson, and have the highest regard for the science that informs management of North Pacific fisheries.  For years I have encouraged coastal fishermen to invest the time and funds to travel from remote communities to participate in the Council

---

[7] Juneau Charter Boat Operators Association, Letter to Council Chairman Olson.  March 26, 2008.

process, assuring them public testimony did make a difference. For the past 15 years, hundreds

of fishermen have made those investments and forfeited fishing time to attend Council meetings

to testify on the halibut charter issue. For thirteen years, fishing families have invested in QS

and as a fleet have restrained harvest to the setline fishery catch limits (i.e., the Southeast setline

quota has not been exceeded since implementation of the IFQ program)—and waited for the

federal government to impose effective harvest restrictions on the rapidly growing halibut charter

sector. The legal challenge that has suspended implementation of effective harvest controls has

severely undermined the public's confidence in the Council process and the federal system. It

has also undermined the confidence of commercial QS lenders, who have raised the possibility

of loans being called if reallocation is allowed to erode the IFQ program.

10.     Commercial fishing is one of few sources of employment in rural Alaska

communities, supporting a uniquely independent way of life. The economic insecurity inflicted

by the combination of reduced quotas, reduced access to subsistence resources due to charter

driven local depletion, and the federal government's stalled effort to restrict charter harvest to

established catch limits, after 13 years of policy reversals and ineffective actions, has intensified

conflicts in small coastal communities. These tensions are manifesting as stress, hostility, and

other socially destructive responses. There has been immediate and growing harm from

suspension of the one halibut daily limit in Southeast communities.

11.     There is a misperception regarding the scale and impact of guided recreational

fisheries that has allowed this over harvest to occur Nation-wide and in Alaska. To quote

statements describing the results of a National Research Council study on the impact of

recreational fishing:

> "In some ways, recreational fishing is where commercial fishing
> was 20 years ago with very weak controls and rapidly increasing

numbers of fishermen," says Federal Ocean Commissioner
Andrew Rosenberg, of the University of New Hampshire and
former Deputy Director of NMFS.[8]

The NRC "review of Recreational Fisheries Survey Methods" concludes:

"...the for-hire sector of marine recreational fisheries should be
considered a commercial sector, and survey methods and reporting
requirements for that sector therefore should be different from
those of private anglers."[9]

In Southeast Alaska, the "very weak controls" have allowed a 70% increase in Southeast halibut

charter harvest between 2002 and 2006, despite the halibut resource being fully utilized.[10]

Southeast charter fishing lodges operate a fleet of high powered, highly efficient boats serving

non-resident anglers and have resource impacts that remain underestimated.  To illustrate: a 2008

report prepared by the Alaska Department of Fish and Game states that existing catch accounting

systems for halibut charter harvest in Southeast may under-estimate that harvest by 20%.[11]

12.    During development of the Southeast halibut GHL, and while I was a member of

the Council, one of the current Plaintiffs provided harvest data during public testimony

indicating that clients operating from his lodge harvested approximately 80,000 pounds of

Southeast halibut per year.  During the April, 2008 Council meeting, the same plaintiff testified

that the annual gross income of his lodge is approximately $12 million; another plaintiff claimed

his lodge grosses $7-8 million annually (Council record).  Contrast this to the average

community based family fishing businesses of the Southeast setline halibut fleet, whose

---

[8] Study in Science Reveals Recreational Fishing Takes Big Bite of Ocean Catch, *ScienceDaily*.
August 2004.
[9] Review of Recreational Fisheries Survey Methods, 2006, Committee on the Review of
Recreational Fisheries Survey Methods, Ocean Studies Board, National Research Council of the
National Academies.
[10] North Pacific Fishery Management Council 2007, Environmental Assessment/Regulatory
Impact Review/Initial Regulatory Flexibility Analysis for a Regulatory Amendment to
Implement Guideline Harvest Level Measures in the Halibut Charter Fisheries.
[11] Meyers, et al., March 24, 2008, Evaluation of the 2006 ADF&G Charter Logbook Scott
Meyer, Alaska Department of Fish and Game, Division of Sport Fish, Anchorage, AK.

estimated annual gross earnings from halibut fishing, using the 2008 figures quoted above and 2008 halibut prices of $4.50 per pound, ranges from $13,500-45,000. Most Southeast commercial fishing families have diversified their fishing businesses and depend on income from salmon as well as halibut, but incomes are modest in comparison. Certainly not all charter boat operators have either the substantial income or resource effect of the current Plaintiffs; however, the cumulative effect is significant, insufficiently monitored or measured, and contributing to resource decline.

13.    The Southeast halibut exploitable biomass has declined by 55% over the past two years and is near historical low levels.[12] Halibut catch rates in all sectors have declined, including the catch rates of charter halibut clients (see attached Appendix A). While the halibut stock overall may be healthy, the IPHC believes that assessment models used prior to 2008 overestimated abundance in IPHC Area 2, which includes Southeast, and that a "disproportionate share of the catches have been taken from there."[13] Other resource considerations, including slowed growth rates, also indicate the need for caution, conservative management, and reduced harvest. To accomplish the necessary reduction in harvest, Southeast setline IFQs and the annual poundage specified for the charter GHL have been reduced over the past two years by 43% and 35%, respectively.

14.    The Plaintiffs assert that the one halibut daily limit is an allocation, not a conservation measure. That assertion is based on the assumption that: "the IPHC sets limits on

---

[12] IPHC Eighty-Fourth Annual Meeting, Jan. 2008, p.65
[13] Clark, W.G. and Hare, S.R., Summary of the 2007 Pacific halibut stock assessment. Excerpted from International Pacific Halibut Commission Eighty-fourth Annual Meeting, Portland, OR, January 2008, p. 65

halibut removals" and that those limits will be adhered to.[14]  Conservation concerns are

indisputable given that the choice is between a management measure that can be reasonably

expected to constrain charter harvest to the sector's annual catch limit and management measures

that will allow charter halibut harvest to nearly double the Southeast GHL (preliminary numbers

indicate that under the 2007 two halibut limit with one fish required to be less than 32 inches the

Southeast halibut charter harvest was 1.7 million pounds, close to double the .931 million pound

2008 GHL).  This would mark the fifth consecutive year in which Southeast halibut charter

harvest exceeded the conservation target established for the sector by the IPHC.  Through the

Halibut Convention, the IPHC has an international responsibility to maintain the health and

abundance of North Pacific halibut stocks to ensure optimal yield.  The IPHC depends on the

United States and Canada to restrict catch to conservation targets established by the Commission,

including any more restrictive measures adopted by either country.  There are conservation

concerns, as well as both domestic and international implications associated with the long-

standing failure of the United States government to control charter harvest.  Additionally,

because the IPHC set 2008 catch limits based on the assumption that charter halibut harvests

would be held to the GHL, suspension of the one halibut daily limit will result in a significant

overage of the Southeast Constant Exploitation Yield (CEY), defined by the IPHC as the

biological target level for total removals from each regulatory area.  While it is true that CEY

overages are expected in Southeast even in the absence of a GHL exceedance, this overage is a

result of the IPHC "slow up fast down" (SUFD) policy and is accounted for in IPHC stock

assessment modeling.  This conservative policy ensures that upward setline catch limit

adjustments happen more slowly than downward adjustments, leaving more halibut in the water

---

[14] North Pacific Fishery Management Council 2008, Environmental Assessment/Regulatory
Impact Review/Initial Regulatory Flexibility Analysis, April 20, 2008,. p. xi.

over the long-term. The SUFD policy also allows the IPHC to act more responsively in applying new understandings of stock dynamics while acting more cautiously when increased biomass is indicated by the stock assessment. Such increases are often triggered by incoming recruitment (young fish that will sustain the stock in the future) to the stock but the strength of this recruitment must be verified over several years. Finally, the SUFD policy provides a measure of stability to the setline fishery that is comparable to the stabilizing effect provided to the charter sector by the GHL stair step formula. By way of example, the Southeast setline catch limit drop 20% in 2007 while the charter GHL remained unchanged; in 2008, the drop in the Southeast CEY was sufficient to trigger an additional 27% reduction in the setline catch limit (43% over two years) and a 35% stair step reduction in the charter GHL. Current projections indicate that the Southeast catch limit will likely decrease again next year, while the Southeast charter GHL will likely remain the same. Compensation for the CEY overages or underages that occur as a result of the SUFD policy has been thoroughly evaluated in the IPHC stock assessment and evaluations have confirmed that the SUFD policy contributes to precautionary stock management.[15] However, the chronic overages accruing from a half-decade of charter over harvest are not accounted for in the IPHC harvest policy. These overages pose a management and conservation concern because they compromise the effectiveness of the harvest policy. To quote the IPHC: "The achievement of the Commission's conservation mandate is dependent on adherence to catch limits and total yield."[16]

     15.     While past GHL overages were a detriment to the resource, continued GHL overages in 2008 overage is unacceptable. As described above, the resource is close to historic

---

[15] http://www.iphc.washington.edu/halcom/pubs/annmeet/2008/bluebook/bluebook08.pdf, p. 62; pp. 81-83.

low levels, questions regarding declining growth rates remain unanswered, and future projections indicate additional decline even in the absence of charter over fishing. In the absence of the one halibut daily limit, 2008 will mark the fifth consecutive year of Southeast halibut charter GHL overages. Plaintiffs allege that the Southeast stock will rebound in the next few years; clearly that recovery depends on reducing harvest and remaining within conservation limits.

16.     Effects of the rapidly increasing halibut charter harvest in Southeast were first brought to the Council attention in 1993 by the Alaska Longline Fishermen's Association (ALFA). Again, I was a member of the Council at that time, and helped to frame the problem statement as it was expressed in public testimony. These concerns included: local depletion, declining harvests for historic sport and subsistence fishermen, an open-ended reallocation from the commercial fishery to the charter industry, tensions between sectors and impacts on communities, and the need for more reliable data on charter harvest. Despite a tremendous amount of time and effort by the Council and the public, little tangible success in addressing these problems has been achieved. All has led to the management measure implemented on June 1, 2008, and later suspended by the court, to restrict charter halibut harvest to the sector's GHL. Every day that harvest is allowed in the absence of the one halibut limit exacerbates the problems that have now been festering for 15 years. Each day with the one halibut limit suspended worsens local depletion in important subsistence areas; each day charter harvests accrue toward an overage that undermines IPHC conservation and management objectives and results in a reallocation of QS from coastal fishing families who simply can not afford to lose another pound.

17.     The timeline of the halibut charter management actions stretching from 1993 to the present. The timeline bears evidence of the Council's efforts to accommodate the perspectives of charter boat and lodge owners through multiple task forces and committees; it

12

also gives evidence of the multiple failed attempts by the Council to create an effective halibut charter management plan. These problems have only intensified with time, government inaction and, particularly, with charter GHL overages.

18.    Until 2007, increased charter harvest resulted in a direct reallocation of halibut from the setline to the charter sector. This occurred as a result of the IPHC quota setting process, which subtracts from the total area CEY the estimated sport, subsistence, charter, bycatch and wastage removals of halibut, then establishes the remainder as the fishery CEY, or setline catch limit. Because harvest control measures were not in place in 2005 and 2006 the IPHC used projected catch, instead of the GHL, to estimate harvest, hence charter GHL overages were deducted from the setline quota in an effort to constrain total harvest to the area CEY. In other words, the charter sector's overages were directly deducted from the IFQs of setline fishermen, most of whom have purchased at great cost some or all of the QS they currently hold. When the Southeast charter harvest exceeded even the IPHC's harvest projections in 2006 and caused the area CEY to be exceeded, the IPHC recommended corrective action to control charter harvest to the GHL and, assuming effective harvest controls would be implemented, did not subtract charter halibut overages from the setline catch limit for 2007. In 2008 the IPHC again assumed the one halibut daily bag limit would be in place to prevent GHL overages, and established the setline catch limit accordingly. For this reason, suspension of the one halibut bag limit will result in an unaccounted for Southeast CEY overage in 2008, which "requires that the Commission undertake conservation actions to restrain the total removals within this Total CEY." [17] In the absence of charter harvest control measures, the IPHC will either revert to deducting charter GHL overages from the setline IFQ fleet, which has remained below catch

---

[17] IPHC letter to Council Chair Madsen, Dec.1, 2006 (attached at Appendix B).

limits for over a decade, or recommend charter harvest control measures as it did in 2007 (see attached IPHC letters; Appendix B).

19.    In 2007, the charter industry objected to IPHC action to restrict charter harvest, claiming management measures should be developed through the Council process. After being assured that the National Marine Fisheries Service (NMFS) would implement Southeast halibut charter management measures of comparable effectiveness, the acting Assistant Secretary of State for Oceans and International Environmental and Scientific Affairs did not approve the one halibut daily limit recommended by the IPHC, but noted:

> "with disappointment that the IPHC recommendation in question arose in part due to the inability of domestic processes in the United States to resolve this matter [of GHL overages] previously. We therefore strongly encourage[d] the North Pacific Council, the State of Alaska, and all affected agencies and stakeholders to develop comprehensive measures to resolve this issue **for 2008 and beyond.** The long-term interests of the resource demand such a result.[18]

(Letter attached as Appendix B) (*Emphasis added.*)  The one halibut daily limit currently challenged by the Plaintiffs is the first critical step by managing agencies to implement effective and comprehensive measures in 2008.

20.    Localized depletion has been highlighted by the Council in response to public testimony for decades.  Local depletion was also the theme of charter operators testifying before the Council in March 2007 on the halibut charter moratorium with operators describing the ever increasing distances they were forced to travel in order to access productive halibut fishing grounds.  Effort data from the Alaska Department and Game indicates that charter halibut catch per rod hour has declined near two Southeast communities, Sitka by approximately 50%, and

---

[18] Dept. of State Harnish letter to Chairman James Balsiger, IPHC, March 1, 2007.

14

Craig by 58%.[19] This is a clear indication of localized depletion. Local sport fishermen and subsistence harvesters have seen increasing fishing grounds preemption from charter vessels and have suffered declining catch as well. Many coastal Southeast residents depend on subsistence to meet cultural and nutritional needs. In the Southeast coastal community of Port Alexander, for example, 23% of residents live below the poverty level.[20] Subsistence harvest ensures that there will be enough food for the long Alaska winter. The critical importance of locally abundant and accessible subsistence foods is currently heightened by rapidly rising fuel costs, which have hit isolated communities with high transportation costs particularly hard. Because charter harvest is concentrated in near town areas to accommodate day clients, allowing charter harvest that is disproportionate to halibut abundance is directly and immediately causing irreparable harm to subsistence residents of rural communities throughout Southeast.

21.    Approximately 40% of the Southeast halibut charter harvest is taken in the Sitka area. Although sport and commercial management and reporting areas do not match exactly, the closest comparison of catch rates in the Sitka Management Area indicates that between 1995 (the year the halibut IFQ program was implemented) and 2006 setline halibut harvest **decreased** by 42% and charter halibut harvest **increased** by 55%.[21] As is the case many Southeast towns, local depletion has been driven by charter harvest and is extending from towns in an ever increasing radius as charter businesses upgrade to larger and faster boats to access more remote and still productive fishing areas. Setline fishermen have been forced to run further, increasing overhead

---

[19] *See* Tersteeg, Diane L. and Jaenicke, Michael J., Alaska Department of Fish and Game Summary Data from the Sport Fishery for Pacific Halibut in the IPHC Area 2C portion of Southeast Alaska, 2007.

[20] Effort data from the Alaska Department and Game indicates that charter halibut catch per rod hour has declined near two Southeast communities, Sitka by approximately 50%, and Craig by 58%.

[21] http://www.iphc.washington.edu/HALCOM/commerc/tables/1998nation&stat.html.

costs, to find healthy concentrations of halibut, and the harm to subsistence and personal use fishermen will be dramatic and irreparable if the Southeast charter fleet is again allowed to over harvest local halibut resources in 2008.

22.     Over harvest of demersal shelf rockfish (DSR), taken as bycatch in the halibut fisheries, both setline and charter, also pose a conservation concern. DSR are long-lived (80 years) and slow to reproduce. Mortality of DSR brought to the surface is assumed to be at or very close to 100%. DSR exhibit high site fidelity, hence are vulnerable to both over fishing and local depletion. DSR bycatch in the halibut setline fishery is limited to 10% measured against halibut catch on board; in addition, all DSR harvested by the setline halibut fleet must be retained, delivered and weighed to ensure adequate accounting. Charter and sport DSR harvest in the Southeast area are managed under one allocation, and harvest has increased with increased charter halibut harvest. The 2006 Southeast sport fishery allocation of DSR was exceeded by at least 10% with at least 50% of the catch coming from the Sitka area (Mike Jaenicke, ADF&G 1/26/2007).

23.     That localized depletion is a serious conservation problem is documented in Heino and Godo (2002), who conclude that recreational angling may have great potential to alter evolutionary trajectories of fish populations because the fisheries are usually concentrated more on coastal and smaller, more insular defined regions.[22] Charter catch accounts for more than 85% of total recreational halibut taken in Southeast Alaska.

24.     Plaintiffs have not contested the .931 million pound Southeast GHL; instead they have argued that management measures may not be implemented until charter harvest exceeds

---

[22] Heino, M. and O.R. Godo, 2002, Fisheries-induced selection pressures in the context of sustainable fisheries. Bull of Mar Sci. 70:639-656.

this year's GHL. This is a deliberate misinterpretation of Council intent, as expressed and published in the Federal Register, relative to GHL management.

25.     In 2003, on the third attempt, the Council's GHL policy was published in the Federal Register providing the following definitions:

> "...the GHLs are established as a maximum poundage....to be harvested by the guided sport fishery" 68 Fed. Reg. 47258 (April 3, 2008)

> "...it is the [North Pacific] Council's policy that the charter vessel fisheries should not exceed the GHLs..." Id.

The GHL was published in the Federal Register as a formula, tied to abundance in stair steps, with the clear intent of the Council, of which I was a then a member, that the GHL was defined by that formula, not by any one particular number. From the Council minutes:

> Dave Benton moved the following amendment for Issue 1–Basis for the GHL: To establish a proportional GHL consisting of a set of stair step guideline harvest levels based on pounds. The GHL would be reduced proportional to the reduction in abundance for halibut. (Council minutes, February 2000).

In 2004 the GHL formula resulted in a 1.4 million pound limit; in 2008 the GHL formula factored in exploitable biomass declines and established a .931 million pound limit—all stair steps and limits that were published in the Federal Register on August 8, 2003 page 47264. The 2008 limit of .931 million pounds is not a "new" GHL any more than the annual individual poundage limit issued to a setline halibut quota share holder represents a "new" QS. IFQs are the annual expression of the QS just as 1.4 and .931 are the annual expression of the GHL formula. This interpretation is consistent with Council intent as I understood that intent when I voted on the motion.

26.     The Southeast halibut charter GHL was implemented in 2004 and has been exceeded every year since. In 2006, Southeast charter GHL overages were sufficient to cause

exceedance of the Southeast Constant Exploitation Yield (CEY), defined by the IPHC as "the amount of halibut that may be removed from the resource without causing biological conservation problems." 72 Fed. Reg. at 74258 (Dec. 31, 2007). The problem before the Council already included issues of local depletion of halibut and rockfish, inability to account for halibut charter harvest on a timely or accurate basis, and inability to prevent sector over harvest; the 2006 CEY overages triggered corrective action from the IPHC to "undertake conservation actions to restrain the total removals within this total CEY. The achievement of this conservation mandate is dependent on adherence to catch limits and total yield." (Letter from IPHC to Chair Stephanie Madsen, Council, Dec. 1, 2006). Again, corrective action is demanded; chronic over harvest of sector catch limits by the Southeast charter sector has compromised IPHC conservation mandates.

27.    Both the IPHC and the Council struggled to identify effective management measures that would be deemed enforceable and affordable by NMFS while meeting the charter sector's repeatedly stated request for a continuous season of historic length. As the attached timeline illustrates, the Council recommended various management tools from the toolbox specified and re-specified by multiple halibut charter committees, including prohibitions on halibut retention by charter skippers and crew, two attempts at annual limits and, reaching back to 2001, halibut charter IFQs. The Council could have effectively controlled charter harvest by requiring the fleet to comply with and help pay for in-season catch accounting, as the setline industry does, then prohibiting retention of halibut once the GHL was reached. Instead, the Council, and the IPHC in 2007, sought to accommodate the charter fleet's protests that accurate in-season catch accounting would be too onerous, that in-season closures would be too economically burdensome, and instead recommended a one halibut daily retention limit for

charter clients, announced pre-season to manage charter halibut harvest to the "level of allowable

halibut harvest by the charter vessel fishery." 50 CFR 300.61 GHL Definitions. Council intent,

as reflected in the GHL final rule regulations, is for management measures to be noticed pre-

season and implemented to restrain charter harvest to that year's charter limit, as dictated by

IPHC CEY calculations, with overages addressed after the season and prior to establishing the

following year's management measures. Plaintiffs have deliberately misconstrued the intent of

both the Council and the Secretary by asserting that the 2008 GHL is "new" and that the Council

can not impose management measures to restrict harvest that annual limit until it has been

exceeded.

28.     Plaintiffs also incorrectly allege in paragraph 43 that "the harvest of halibut off

Alaska generally occurs in **four basic fisheries** – commercial, guided sport (charter), unguided

sport, and subsistence fisheries." In truth, in 72 Fed. Reg. 74258 the Federal Register actually

states:

> *"The harvest of halibut occurs in **three basic fisheries** – the*
> *commercial, sport, and subsistence fisheries. Additional fishing*
> *mortality occurs as bycatch or incidental catch while targeting*
> *other species and wastage of halibut that are caught but cannot be*
> *used for human food." (Emphasis added.)*

In Southeast Alaska, there is only one commercial fishery that directly targets halibut, namely

the commercial setline IFQ fishery, which accounts for approximately 72% of the Area 2C

removals. Trawling, a commercial fishery that targets other groundfish species occurs is illegal

in Southeast. Trawl fisheries account for a large portion of the overall Alaska bycatch but do not

occur in Southeast, Area 2C, and therefore are not germane to this argument. The reported sport

catch accounts for 20% of the harvest and is sub-divided in two categories: guided (charter) 13%

and non-guided 7% of the removals. Subsistence is the smallest of the three basic fisheries and

accounts for 4% of the removals. The other removals of halibut include wastage which

19

represents the mortality of legal sized halibut due to lost or abandoned gear and accounts for the

mortality of some sub-legal-sized halibut returned to the sea. Wastage in Area 2C has been at

300,000 or less over the last five years. Since the implementation of the IFQ fisheries in 1995,

the total mortality of legal sized halibut from lost gear has decreased. Bycatch mortality

accounts for halibut that die from being caught in other fisheries and has been estimated at about

160,000 pounds and relatively stable the last several years.[23]

29.     In 2006, the Southeast halibut charter fleet had a self-reported halibut discard rate

equal to 57% of their halibut catch.[24]  Applying the average weight estimated for charter-caught

halibut of 18.98 pounds, the Southeast charter sector discarded 978,000 pounds of halibut in

2006. Discard mortality of halibut released by halibut charter clients is not counted against the

charter GHL. Post release mortality (PRM) of halibut discarded in the charter fishery is likely

increased by catch/recapture since the charter fleet tends to fish the same areas day after day and

therefore is likely to discard the same fish more than once. Bartholomew and Bohnsack (2005)

found that at high angling encounter rates multiple recaptures could increase release mortality

greatly.[25]  Multiple catches of the same fish are particularly likely under the 32" maximum size

limit restriction. The 32" size limit was not supported by IPHC because of the unknown but

likely increases in post-release mortality (PRM).

30.     The plaintiffs claim that their businesses have been irreparably harmed by the

threat of the one halibut daily bag limit. A recent search of the Plaintiffs' websites (June 16,

---

[23] North Pacific Fishery Management Council, 2008. Environmental Assessment/Regulatory
Impact Review/Initial Regulatory Flexibility Analysis, April 20, 2008. Table 19.
[24] Meyer, S. 2007. Discussion Paper. Halibut Discard Morality in Recreational Fisheries in IPHC
Areas 2C and 3A. Table 3 on page 16
[25] Bartholomew, A. and J.A. Bohnsack, 2005. A review of catch-and-release angling mortality
with implications for no-take reserves. Reviews in Fish Biology and Fisheries 15:129-154.

2008) indicated that most of their lodges are full or almost full for the 2008 season and are

urging clients to book well in advance before spaces disappear.  One lodge is already accepting

reservations for 2009, exhibiting little evidence of business failure. (See attachment).  Plaintiffs

also allege concern for the economies of southeast coastal communities.  Two southeast coastal

communities and State of Alaska Representative William Thomas, Jr., who represents over 35

rural southeast coastal communities, have filed affidavits in support of the one halibut daily limit.

Another submitted a letter to the Council on March 24, 2008 highlighting the essential

contribution of the setline, or longline fisheries to his community's economy and the need to

share the burden of conservation:

> "My municipality does count on raw fish tax which totals well
> over a hundred thousand dollars on an annual basis.  The lion's
> share of that total comes directly from the longline fisheries.  I
> would urge that the council support a provision for the charter fleet
> based on a floating allocation that mirrors the quota system.  If
> there are conservation needs then all gear types need to support
> that initiative.  We cannot ask the commercial fisherman to carry
> all the load for conservation.  If the charter fleet wishes to become
> a player they need to be asked to take conservation measures when
> the need arises, **such as this year.**"[26]

31.     All Southeast coastal communities receive revenue from the Fisheries Business

Tax (FBT) based on commercial setline halibut landings.  Most communities, including Pelican,

Hoonah and Sitka, receive 50% of the revenue generated by the FBT; Port Alexander receives a

smaller, but still significant portion of the FBT.  This revenue is used to support essential local

government services.

32.     In sum, suspension of the one halibut daily limit in Southeast for 2008 will cause

over harvest of the Southeast halibut resource, financial harm to the Southeast setline industry,

including harvesters and processors, and irreparably harm through reduced access for rural

---

[26] Mayor of Hoonah, Dennis H. Gray, Letter to North Pacific Fishery Management Council
Chairman Olson, March 24, 2008.  (*Emphasis added.*)

residents who depend on subsistence harvest. Additionally, suspension of the one halibut daily limit will betray the commitment of setline fishermen to resource stewardship and the confidence they have placed in the public regulatory process. Tensions in small communities are explosive; granting immunity to the charter sector from conserving the resource during this time of low abundance and reduced catch limits inflames hostilities. Coastal Alaskan setline and subsistence fishermen heavily depend on the halibut resource and the integrity of the halibut management system for livelihood and sustenance. Each and every day that the charter sector is allowed to over fish will imposes irreparable harm on coastal fishermen and their families. For these reasons, the one halibut daily limit must be immediately reinstated for charter clients.

I hereby declare and certify, under penalty of perjury under laws of the United States of America, that the foregoing is true and correct. It is based upon my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as this Affidavit.

Dated: June 22, 2008

_____
Linda Behnken

**<u>APPENDIX A</u>**

Halibut Conservation Concerns regardless of model used in assessments:











recent catch per unit effort is down significantly in all sectors in 2C and also Coastwide for survey and setline Data from 2008 IPHC Bluebook and ADF&G Teerseg and Jaenicke Summary Data from the Sport Fishery for Pacific Halibut in the IPHC Area 2C Portion of southeast Alaska, 2007 (compiled by Victoria O'Connell)

COMMISSIONERS:
CLIFF ATLEO
PORT ALBERNI, B.C.
JAMES BALSIGER
JUNEAU, AK
RALPH G. HOARD
SEATTLE, WA
PHILLIP LESTENKOF
ST. PAUL, AK
LAURA RICHARDS
NANAIMO, B.C.
GARY ROBINSON
VANCOUVER, B.C.

AGENDA C-1
Supplemental
DECEMBER 2006

# INTERNATIONAL PACIFIC HALIBUT COMMISSION

ESTABLISHED BY A CONVENTION BETWEEN CANADA

AND THE UNITED STATES OF AMERICA

TELEPHONE
(208) 634-1838

FAX:
(206) 632-2983

December 1, 2006



Ms. Stephanie Madsen, Chair
North Pacific Fishery Management Council
605 West 4th, Suite 306
Anchorage, AK  99501

Dear Stephanie:

The recent publication of the recreational harvests of halibut in IPHC Regulatory Areas 2C and 3A in 2006 by the Alaska Department of Fish and Game has, with other removals, indicated that the Total Constant Exploitation Yield (CEY) established by the Commission for these areas has been exceeded. Exceeding the Total CEY for an IPHC regulatory area requires that the Commission undertake conservation actions to restrain the total removals within this Total CEY. The achievement of the Commission's conservation mandate is dependent on adherence to catch limits and total yield.

While the Commission regularly undertakes actions to restrain total removals within the Total CEY, the potential regulatory actions take on a different character if: a) there is a need for Commission conservation actions, and; b) domestic agencies have adopted targets or limits for recreational fisheries that have been exceeded. Under such conditions the Commission could adopt regulations that address both the need to restrain total removals and the needs of either contracting party to achieve domestic management targets for recreational fisheries, e.g. different seasons, bag limits, or different combinations of bag limits and seasons for each regulatory area, etc.

The IPHC staff notes the difficulty experienced by the Council in achieving its goal of adhering to the adopted GHL levels. The staff wishes to apprise the Council of the potential to use the Commission regulatory framework to supply the Council with tools that may either be incorporated in, or substitute for, domestic regulations until they are developed. This is not without precedent. For example, it would be similar to the IPHC actions concerning sublegal halibut retention in Areas 4D and 4E, or concerning interim regulation of the commercial fishery while the domestic Alaskan IFQ regulations were being developed. Both of these actions were implemented in furtherance of Council goals. The Commission and its staff understand clearly that any changes in IPHC regulations for recreational fisheries should be accomplished only through joint discussion with the NPFMC and National Marine Fisheries Service (NMFS), and not through unilateral action by the Commission. Further, in the absence of a specific request from the Council to the contrary, the Commission regulations would apply uniformly to all recreational fishery sectors.

At the 2006 IPHC Interim Meeting, the Commissioners directed the staff to undertake discussions with NPFMC and NMFS to determine if these agencies wish to explore the use of Commission recreational fisheries regulations to effect both the Commission's conservation mandate and the domestic allocation goals for Areas 2C and 3A. Should these agencies support such action, the Commission would consider a proposal to change its recreational fisheries regulations at the upcoming IPHC Annual Meeting on January 16-19, 2007 in Victoria, B.C.

The alternative to an action by the IPHC concerning recreational fishing regulations is to continue with the present Commission process of ensuring adherence to the Total CEY by subtracting the projected recreational harvest from the Total CEY for each regulatory area, and adopting catch limits for the commercial IFQ fishery based on the remaining CEY. In effect, if the recreational fishery exceeds domestic limits, there is a transfer of yield from the commercial fishery to the recreational fishery.

I and Gregg Williams of the IPHC staff will be attending your December meeting, and will be available to discuss this with the Council.

Sincerely yours,

Bruce M. Leaman
Executive Director


cc: Commissioners

COMMISSIONERS:
CLIFF ATLEO
PORT ALBERNI, B.C.
JAMES BALSIGER
JUNEAU, AK
RALPH G. HOARD
SEATTLE, WA
PHILLIP LESTENKOF
ST. PAUL, AK
LAURA RICHARDS
NANAIMO, B.C.
GARY ROBINSON
VANCOUVER, B.C.

# INTERNATIONAL PACIFIC HALIBUT COMMISSION

ESTABLISHED BY A CONVENTION BETWEEN CANADA

AND THE UNITED STATES OF AMERICA

DIRECTOR
BRUCE M. LEAMAN

P.O. BOX 95009
SEATTLE, WA 98145-2009

TELEPHONE
(206) 634-1838

FAX:
(206) 632-2983

January 23, 2007

Carlos M. Gutierrez
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Avenue N.W.
Washington, D.C. 20230

Dear Sir:

The International Pacific Halibut Commission completed its Eighty-third Annual Meeting in Victoria B.C., Canada, with Dr. Laura Richards of Nanaimo, B.C. presiding as Chair. The Commission is recommending to the governments of Canada and the United States, catch limits for 2007 totaling 65,170,000 pounds, a 6.7% decrease from the 2006 catch limit of 69,860,000 pounds. Highlights of the meeting are reviewed here and a news release with additional details is enclosed.

## Stock assessment and harvest rate

The Commission staff reported on the 2006 Pacific halibut stock assessment which implemented a coastwide estimation of biomass, compared with previous assessments which assessed stock biomass for each individual IPHC regulatory area. The total stock biomass identified by the coastwide assessment is approximately the same as the sum of that from the regulatory area assessments. However, the Commission believed that further examination of options for partitioning the coastwide biomass estimate into estimates of biomass for each regulatory area was required before it adopted the new approach. Accordingly, the Commission relied on the previous methodology of separate regulatory area assessments as the basis for determining catch limits. Lower catch rates in the eastern area of the halibut stock prompted the Commission to recommend more restrictive catch limits for this portion of the stock. Pending recruitment from the 1994 and 1995 year classes appears to be relatively strong in most areas, although Area 4B is showing a notably lower level of recruitment of these same year classes compared with other regulatory areas.

The Commission directed the staff to hold a workshop in 2007 that will allow agencies and the industry to better understand the coastwide assessment and apportioning process, and to explore alternative approaches. The staff will also develop a broader framework for the annual examination of the halibut stock assessment, in consultation with the respective agencies.

For 2007, the Commission continued with a 22.5% harvest rate for use in Areas 2A through 3A and a rate of 20% for Areas 3B through 4E. Low levels of recruitment and lower estimated levels of productivity in Areas 4B and 4CDE continued to support harvest rates lower than 20% for these areas. Accordingly, the Commission adopted catch limits based on a harvest rate of

- 2 -

15% for Areas 4B and 4CDE. The IPHC conducted additional research projects in Areas 4CDE during 2006 and the results provided an improved assessment base for these areas, however the biomass on the eastern Bering Sea shelf is still estimated to be low.

*Allocation agreements and fishing seasons*
The IPHC sets biologically-based catch limits for Areas 4A, 4B, and a combined Area 4CDE. The catch limits for Regulatory Areas 4C, 4D, and 4E reflect the North Pacific Fishery Management Council's (NPFMC) catch-sharing plan, which was adopted by the Commission. The Commission also adopted the catch-sharing plan for Area 2A (Washington-Oregon-California), authorized by the Pacific Fishery Management Council, and the allocation agreement for sport and commercial fisheries in Area 2B (British Columbia).

After reviewing staff information and proposals from the harvesting and processing sectors, the Commission voted on a season opening date of March 10 and a closing date of November 15, 2007, for the quota share fisheries. All Area 2A commercial and the treaty Indian commercial fisheries will fall within these dates, and the Area 2A directed fishery will be a series of 10-hr openings with fishing period limits.

*Other issues*
The Commission approved several changes to the regulations that will be sent for acceptance under separate cover. The catch limits by regulatory area will be sent as part of the regulation package.

The Commission noted that Guideline Harvest Levels (GHL) approved by the NPFMC for the charter/guided recreational halibut fishery in Areas 2C (southeast Alaska) and 3A (central Gulf of Alaska) were exceeded in recent years, substantially so in Area 2C (over 40% higher than the GHL in 2006). Commission staff initiated dialogue with the NPFMC to determine what control measures would be enacted by the Council to constrain harvest to the GHLs in 2007. The NPFMC indicated that, although it is committed to management of this fishery to the GHL limits, it would not be able to complete analyses and develop a regulatory framework to effect control of this fishery until 2008. The Commission, with the support of its advisory bodies, therefore recommends establishment of more restrictive daily bag limits for the charter/guided halibut fishery in Areas 2C and 3A during 2007, in order to constrain catch within the NPFMC GHL levels. These bag limit regulations would become null and void at such time as domestic regulations to achieve the same objectives are promulgated. The Commission takes this action with some reluctance but believes the action to be necessary, given the magnitude by which the charter/guided catches exceeded the GHL limits and the belief that such overharvesting puts at risk the achievement of IPHC management goals for the halibut stock.

The Commission approved, on a trial basis, a regulation to allow retention of halibut bycatch during fishing for sablefish with traps in Area 2B. Harvesters will have to acquire halibut quota shares to retain this bycatch and the Canadian Department of Fisheries and Oceans will develop a domestic regulatory framework to ensure that no targeting of halibut occurs. This regulation will be in effect during the period of the pilot program for integrated groundfish management in British Columbia, and will be reviewed at the end of 2008.

- 3 -

The Commission also noted that halibut bycatch mortality in non-target fisheries was reduced slightly in 2006 and was at the lowest level since 1987, continuing the trend initiated by the 1991 agreement between the U.S. and Canada to achieve lower bycatch mortality levels. However, the Commission agrees that further reductions are desirable and that current levels of mortality reduce yield to the directed halibut fisheries. The Commission will continue to work with agencies of the two governments to achieve reductions in halibut bycatch mortality.

The Commission wishes to acknowledge a debt of gratitude to the United States North Pacific and Pacific Fishery Management Councils, the National Marine Fisheries Service, the United States Coast Guard, the Canadian Department of Fisheries and Oceans, and the various state and provincial agencies for the assistance provided by their staff in Commission deliberations. The cooperation of all involved government agencies is excellent and assists in the development of proposed regulations.

The Commission also wishes to acknowledge the warm welcome it was afforded by the city of Victoria and our Canadian hosts. The 2008 Annual Meeting of the Commission will be held in or near Portland, Oregon, U.S., from January 22-25, 2008.

Sincerely yours,

James W. Balsiger
Chair

Encl.

COMMISSIONERS:
CLIFF ATLEO
PORT ALBERNI, B.C.
JAMES BALSIGER
JUNEAU, AK
RALPH G. HOARD
SEATTLE, WA
PHILLIP LESTENKOF
ST. PAUL, AK
LAURA RICHARDS
NANAIMO, B.C.
GARY ROBINSON
VANCOUVER, B.C.

# INTERNATIONAL PACIFIC HALIBUT COMMISSION

ESTABLISHED BY A CONVENTION BETWEEN CANADA

AND THE UNITED STATES OF AMERICA

DIRECTOR
BRUCE M. LEAMAN
——-
P.O. BOX 95009
SEATTLE, WA 98145-2009
— - —
TELEPHONE
(206) 634-1838
—— — —
FAX:
(206) 632-2983

January 30, 2008

Ms. Sue Salveson
Director, Sustainable Fisheries
NOAA Fisheries
P.O. Box 21668
Juneau, AK 99802

Dear Ms. Salveson:    *Sue*

The staff of the International Pacific Halibut Commission (IPHC or Commission) has reviewed the Proposed Rule for limiting the sport charter harvest of halibut in IPHC Area 2C in 2008. We have the following comments for your consideration.

At its recent Annual Meeting in Portland, Oregon, the Commission reviewed the halibut coastwide assessment conducted by staff. Following discussion and with advice from its advisory bodies, the Commission adopted the Total Constant Exploitation Yields (CEYs) resulting from the assessment as the scientific basis for it's deliberations on catch limits. Importantly, the 2008 Total CEY for Area 2C is 6.50 Mlbs, which has implications for the corresponding Guideline Harvest Level (GHL) as defined in NMFS regulations.

The Commission noted that the CEY would result in a GHL of 0.931 Mlbs for the 2008 sport charter fishery, according to the GHL program adopted by the North Pacific Fishery Management Council (Council) and implemented in NMFS regulations (50 CFR 600.65(c). The Council has previously stated its intent to manage the sport charter fishery to the GHL, and has proposed management options if the GHL was reduced for 2008. The Commission took this commitment into account when setting the 2008 commercial fishery catch limit. Achievement of the Commission's harvest goals and management objectives is thus dependent on the proposed action.

We note that Option B was proposed by the Council in the event that the GHL was reduced to 1.217 Mlbs. As noted, the 2008 GHL as defined in regulations would be 0.931 Mlbs, lower than what was anticipated. This lower GHL makes Option B of the NMFS Proposed Rule (including a one-fish daily bag limit) the appropriate action for the 2008 fishery.

Sincerely yours,

Bruce M. Leaman
Executive Director

cc: IPHC Commissioners

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

      Plaintiffs,

v.

      Civil Action No. 08-00941

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

      Defendants.

## AFFIDAVIT OF DAVID GIBSON

I, David Gibson, being duly sworn, depose and say as follows:

1.      My name is David Gibson and I am the owner and operator of the 40-foot fishing vessel, LAVERN LYNN, a commercial fishing business located in Juneau, Alaska. My address is: P.O. Box 21092, Juneau, Alaska 99802-1092.

2.      I am 32 years old and have been a commercial fisherman since 1995, engaged in both salmon and halibut fishing. In 2001, I bought my first boat and then bought the LAVERN LYNN in 2005. I also work as a deck hand on halibut boats fishing IPHC Area 2C and Area 3A. In 2001, I took out a loan from the State of Alaska Division of Invests for $50,000 at 6% to purchase the LAVERN LYNN with $20,000 as a down payment. My payments on the LAVERN LYNN are $4,920/year.

3.      In Fall 2005, I purchased 30,970 units of halibut Quota Share (QS) which resulted in 5684 pounds of halibut quota. In 2006, this QS resulted in 5,529 pounds. In 2007, this equated to 4,423 pounds. And this year, 2008, this equated to 3,230 pounds. From 2006 to 2008, this equated to a 43% reduction in the amount of fish I am allowed to catch. The reason my allowable catch was cut was because the IPHC had reduced the total amount of halibut which

could be harvested. The IPHC reduced the halibut harvest levels because of the need to implement conservation actions.

4.      In 2005, it cost me $103,336 at 7.5% interest to purchase my halibut QS. My down payment was $9,529 and I took out a loan from the State of Alaska in the amount of $93,807 and pledged the LAVERN LYNN as collateral. My QS loan payment is $9,964 per year. In 2006, I grossed $18,321.21 on halibut and netted approximately $2,000 after expenses and halibut QS loan payments.

5.      I have already fished my halibut QS this year and grossed $13,994.70. My expenses were $5,457.93 for shares paid to the skipper and crew of the boat that I caught the halibut on. This leaves a net $8,536.77 which is less than the QS loan payment due this year. As of now I still owe $80,797.41 on this loan.

6.      I am entirely dependent on commercial fishing for my livelihood. In a typical year, 30% of my income is from halibut and the remainder from salmon, although this can vary quite a bit due to variability in the strength and value of the salmon runs. In 2006, my net income was approximately $18,000 after all my fishing and loan expenses. This year will be especially difficult because of the loss on my halibut operation and the very high fuel costs associated with my salmon operation. If the halibut quota is cut any further, i.e. due to charter overages, I may lose my quota share, boat, and salmon permit; in other words I would lose my whole commercial fishing business.

7.      As an Alaskan fisherman, I completely understand the absolute necessity of sustainable fisheries management and have been willing to accept the reduced halibut quotas set by the International Pacific Halibut Commission. It is critical to my long time livelihood that the stocks be well managed and that all sectors stay within their allocation. It has been particularly

disturbing to me that the guided sport sector has exceeded their GHL allocation every year since 2004. This hurts me financially since charter overages result in overfishing of the stocks and a reduced quota for me over the long term. If I exceed my individual quota, I face confiscation of the fish I have caught and fines.

The foregoing affidavit is true and complete to the best of my knowledge, information, and belief.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated:  June 13, 2008

David Gibson

**EXHIBIT 4**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, *et al.*, | |
| **Plaintiffs,** | |
| v. | Civil Action No. 08-00941 |
| THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*, | |
| **Defendants.** | |

## AFFIDAVIT OF SHERI WOHLHUETER AND KURT WOHLHUETER

1. We, Sheri Wohlhueter and Kurt Wohlhueter, have made our home in Petersburg, Alaska raising our 5 daughters there since 1979. We are a fishing family. Kurt has commercial fished in Alaska since 1978, beginning halibut fishing in 1979, fishing continuously since. I joined him on our 2nd vessel in 1981 with our first 2 daughters when they were 3 years and 6 months of age.

2. We began with a 19 foot wooden dory. We began slowly building our fishing business to our present vessel the F/V Betty, a wooden vessel built in 1912 that we've had for the past 20 years.

3. When halibut became restricted access in 1995 we received an initial allocation of quota share (QS) that translated to just over 8,000 pounds of individual fishing quota (IFQ)in the first year of the program (QS is issued in units; IFQs are the annual harvestable pounds associated with the quota share units. As the total quota for a halibut changes the IFQ associated with QS fluctuates). Our initial allocation was 1/3rd of our recent annual harvest, since the initial allocation included more individuals and

1

organizations than had fished in any one year. This was also our first experience with halibut reduction, but a result of the criteria in place to manage and conserve the halibut stocks. Over time we positioned ourselves to afford QS loans using our boat as collateral. We have purchased over 40,000 lbs more with principal investment of nearly half a million dollars. Because we can only slowly pay back the loans hence are paying interest, our total payments will significantly exceed our initial investment. We have weathered the increase and decrease in our halibut IFQs. This is not easy in this business, with its inherent dangers, expenses, changing fish prices, and the demands of raising our 5 daughters, but we accepted the risks and understand conservation measures are needed and put in place to protect the halibut resource.

    4. Our economic survival depends on proper, diligent management. It is crucial to be willing partners in conservation of the halibut species. We stand by this: a successful outcome will protect the resource from over harvest and allow future generations, be they setline fishermen earning their living, sport fishermen recreating, or subsistence harvesters feeding their families, to have the same choices and opportunities that we have had. We all affect the halibut resource and we all need to share in conserving it for future generations.

    5. We have experienced well over $100,000 decrease in our income the last two seasons with the quota reductions. All our halibut shares are in 2C; we can not fish halibut in any other area. We still have large QS payments, rising fuel costs, and many other increases in the costs of running our business. Our family crew members have also experienced the reduction in income. This is their main income for living and education

costs, and we will not be able to afford to hire and pay them as crew if quota reductions continue.

6. This year we are fishing slightly less than 33,000 lbs of halibut IFQs. Two years ago our QS translated to approximately 55,000 lbs of halibut IFQ. We are managing to make our payments and expenses living with less then what we purchased. We have IFQs that are gone, but we still have to pay for them. Our business has devalued as the setline quota dropped and our IFQs decreased 43% accordingly. We have remained focused and are committed to maintaining the health of the halibut stocks at any cost. Our lifestyle and business depend on sound fisheries management. The halibut resource is only renewable if harvest levels are sustainable.

7. Conservation of the halibut resource should be the first priority for all harvesters. The commercial setline sector has not exceeded its yearly harvest limits set by the International Pacific Halibut Commission since the IFQ program was implemented in 1995. A Guideline Harvest Level (GHL) was established for the charter sector and published in the Federal Register as a Final Rule in August of 2003. The Federal Register states the following: *Guideline harvest level (GHL) means a level of allowable halibut harvest by the charter vessel fishery.* The charter fishery exceeded it GHL in 2004, 2005, 2006 and 2007. Charter halibut harvests that exceed the GHL impact the resource and in turn reduce the amount of halibut the commercial setline sector is allowed to fish in subsequent years.

8. Petersburg is a rural commercial fishing community. The roots of Petersburg and many other Southeast communities are steeped in a tradition of commercial fishing with many families having fished for generations. Commercial fishing forms the core of

these towns and economically supports community infrastructure. Tourism is a relatively new industry in Alaska and depends on the disposable income of non-residents. Many of the rural, and particularly Native, Southeast towns have minimal or no tourism industry, hence are almost entirely dependent on subsistence harvesting and commercial fishing.

We hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on our personal knowledge, and if we were called to testify in this court proceeding, our testimony would be the same as what is contained in this Affidavit.


Dated: June 14, 2008

Sheri Wohlhueter

Kurt Wohlhueter

# EXHIBIT 5

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTT VAN VALIN,** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 08-00941** |
| **THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce,** *et al.,* | |
| **Defendants.** | |

## AFFIDAVIT OF NORTH PACIFIC SEAFOODS, INC.

1. North Pacific Seafoods, Inc. (NPS) buys and processes Alaskan Halibut at three (3) of our locations: Sitka, Kodiak and Togiak, Alaska. NPS has been processing halibut at these locations for over 30 years. At the peak of the season, NPS employees about 800 workers. Alaskan Halibut is one of the primary resources for our plants in 2C, 3A and 4E regulatory areas.

2. The sustainability of Alaskan Halibut is critical to our company's success. We have been closely and continuously involved in the management research, analyses, and decision-making process that protects this valuable resource. When the resource abundance is lower, we understand the catch limits must be reduced.

3. In area 2C, we have experienced lower catch limits due in part to the charter sector exceeding their catch limits for the past three years. This current season will be the fourth year in a row, if that sector exceeds their guideline harvest limit, which has been reduced from last year's limit due to lower overall abundance of the resource.

4. The one-fish rule, like any rule recommended by IPHC for conservation reasons and implemented by NMFS through direction of the NPFMC, is the result of thorough research, exhaustive analyses, and weeks of input from all sectors of the industry and public. It is a time-tested process that has resulted in the best managed sustainable fishery in the world.

5. Since 2004 when the charter fleet began exceeding their catch limit, Alaskan Halibut production at our plants in 2C has dropped by 25%. If the one-fish rule is blocked this year, we can expect a further drop in processing volume, likely to 30% of what we processed in 2004.

6. If the one-fish rule for sports fishing is over turned this year, NPS will experience about a 25% loss of revenue which results is less fish taxes for the State and the Alaskan cities NPS is located. In addition, NPS will reduce our number of employees by 10%.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 16, 2008

Robert D. Nickinovich, President
North Pacific Seafoods, Inc.

# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTT VAN VALIN,** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 08-00941** |
| **THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce,** *et al.,* | |
| **Defendants.** | |

# AFFIDAVIT OF THE
# SEAFOOD PRODUCERS COOPERATIVE

    1. I, Thomas McLaughlin am submitting this affidavit as President and CEO and on behalf of Seafood Producers Cooperative. Seafood Producers Cooperative (SPC) is the largest fishermen owned cooperative in the United States. SPC was incorporated in 1944 as Halibut Producers Cooperative. In 1982, the name of the company was changed to Seafood Producers Cooperative, upon completion of our production facility in Sitka, Alaska. Sitka is in Southeast Alaska, area 2C, the International Pacific Halibut Commission (IPHC) regulatory management area affected by the temporary restraining order.

    2. SPC has been involved in the halibut fishery since 1944. Currently, 25% of our revenue is derived from the halibut fishery. The commercial quota has been reduced 43% over the last two years. The latest reduction will reduce our revenues by $2 million and production throughout by 15%, increasing costs and reducing incomes for our 140

plant employees. Since incorporation, SPC has supported the IPHC management and conservation measures. SPC recognizes that even when the conservation management regime will have a negative impact upon the business, a healthy sustainable resource will provide the best long-term potential for all stakeholders in the halibut fishery.

3. The Southeast charter fleet has exceeded the sector's Guideline Harvest Level (GHL) for four consecutive years, causing an overage of the area's biological limit in 2007 and, if plaintiff's were to prevail, almost certainly again in 2008. The half decade of charter over harvest has taken a toll on the resource, particularly in the Sitka area where 40% of the Southeast charter halibut harvest occurs and our Sitka SPC plan is located. Allowing the charter GHL overages to continue will have the immediate effect of reducing fishing success and efficiency for SPC owner/members and further undermining resource health during a time when stock declines demand conservation.

4. The SPC business model is the same model as the major agricultural cooperatives. Each of our 512 owner/members has a capital investment in Seafood Producers Cooperative. Two hundred seventy-five of our owner/members hold longline individual fishing quota privileges. (Halibut may only be harvested commercially in Alaska by persons holding halibut fishing quota privileges.) The vast majority of this quota is for area 2C. All of our owner/members holding area 2C quota have seen their quota decline by 43% over the last two years. SPC and its owners have long supported the halibut conservation measures of the IPHC and North Pacific Fishery Management Council (NPFMC).

5. SPC is very pro- active in regulatory issues that affect our owner/members. We participate at the NPFMC, the Alaska Board of Fisheries on salmon and groundfish issues, and IPHC. We are a member of United Fishermen of Alaska (UFA) the statewide umbrella organization and have had our representatives many times hold officer positions within this organization.   We have participated in the public process of the NPFMC throughout the 15 year history since 1993 on the halibut charter issue.  SPC provided written testimony and had representatives testify at the June 2007 NPFMC meeting when final action was taken on 2C GHL Management Measures and also provided written comments on this issue in support of a one fish bag limit during the proposed rule public comment period.  SPC has representatives on both advisory boards at IPHC; these consist of the Processor Advisory Group (PAG) and the Conference Board (CB). The CB is a panel representing Canadian and American commercial and sport halibut fishers.  Created in 1931 by the Commission, the CB gives the IPHC the fishers' perspective on Commission proposals presented at annual meetings.  The  PAG, as the name suggests, represents halibut processors and was formed in 1996.  Like the CB, PAG lends its opinion regarding Commission proposals and offers recommendations at IPHC Annual Meetings.

6. At the 2008 annual IPHC meeting, the IPHC Commissioners adopted a staff recommendation to change the model used to determine the halibut exploitable biomass. This model change was recommended because of new information on halibut migration patterns.  The new modeling method is called the "coast-wide" assessment model. The

coast-wide assessment model was first recommended by IPHC staff at the 2007 annual meeting.  At that time, the CB, PAG and the IPHC Commissioners all agreed that more time was needed to test model assumptions.  Between the 2007 and 2008 annual meetings,, the model was scientifically peer reviewed, a workshop was held to explain and discuss the new model and all questions asked of the IPHC staff were answered.  In 2008, all CB representatives, including the charter associations represented, unanimously supported the coast-wide model. The science supporting the model, as presented in published IPHC documents, indicates that previous models have likely overestimated halibut abundance in the Southeast area and that: "exploitation rates were well above the target level in Area 2 and a disproportionate share of the catches have been taken from there." (Clark and O'Hare, 2007).  To prevent continued over exploitation, the 2008 Southeast setline quota was reduced by 27% and the charter GHL reduced by 35%.

7. In written materials provided at the annual meeting, IPHC staff stated that the halibut resource is at the lowest level in a decade.  IPHC data indicate that the decline in Southeast Alaska is serious and driven by many factors, including the continual charter GHL overages. The charter fleet exceeded its GHL by 22% in 2004; 36% in 2005; 26% in 2006; and an estimated 20% in 2007.  In August of 2008 the GHL was defined in the Federal Register as: "a level of allowable halibut harvest by the charter vessel fishery." Clearly halibut charter management restrictions have failed to achieve stated GHL objectives.

8. Since implementation of the Individual Fishing Quota (IFQ) system in1995, only persons holding halibut Quota Share (QS) may commercially harvest halibut in Alaska.   QS is issued in number of units, assigned by IPHC area, and establish the QS holder's annual portion of the area catch limit. Individual Fishing Quota (IFQ) is the yearly amount you are allowed to harvest and are expressed in pounds.  At the inception of the program participants were issued initial QS based on their historic portion of the catch during an established base period.  For most participants, the original issuance was approximately 80% of the recipients catch levels prior to implementation of the program.

9.  Thirty-three percent (33%) of the participants in the 2C halibut setline fishery have purchased all the quota they currently hold, 67% of the participants have purchased all or a portion of their quota share, and 73% of the quota share has changed hands at least once.  Fifty-seven percent (57%) of commercial setline fishermen in Southeast holds less than 3,000 pounds of halibut QS, which results in an annual gross of $12,000-15,000 at current prices.  Two years with 43% more quota these fishermen's poundage would have been as high as 4,300 pounds an annual gross of $15,000-17,000  Up until the last couple of years, the halibut IFQ fishery appeared to be stable, a safe investment and viewed as one of the most sustainable fisheries in the world.

10.  Through improved resource management, investment in processing equipment, investment in marketing development and value added product focus and investment in quality improvements, halibut has gained excellent acceptance by American consumers.  Reduction of catch due to continued disregard by the charter

sector for management measures will reduce the viability of any commercial fishing. The commercial sector has not exceeded its harvest level since implementation of the individual fishing quota system in 1995.

11. The Marine Stewardship Council (MSC) evaluates fisheries against strict criteria for sustainable management. The Alaska commercial halibut setline fishery received certification in 2006. The inability to constrain charter harvest to the sector's GHL causes over fishing of the halibut resource and jeopardizes the important MSC certification. Sustainability has become a very important marketing tool in the seafood industry and the MSC label is one that is sought by consumers.

12. SPC and its owner/members are responsible for payment of the fishery business tax (FBT) also known as the "raw fish" tax. This is the oldest tax in the State of Alaska and is paid on the ex-vessel value of fish processed in the state. SPC is a shore-based facility and therefore pays 3% of the ex-vessel value of products that are purchased for processing. The fishery business tax is paid into the general fund and 50% is annually appropriated by the Alaska State Legislature to the municipality where the processing took place. Many of the small rural communities heavily rely on the fishery business tax for essential local services. In Sitka, where the SPC shore-side processing plant is located, the Municipality received $808,257 of the fiscal year 2007 (ends June 30th) fishery business tax from all seafood plants located in Sitka and for all species. There is no equivalent tax paid by the charter fleet for the actual cost of the sport fishing charter experience.

13. The commercial setline sector pays the Federal Government through the National Marine Fisheries Service (NMFS) a yearly cost recovery fee. This fee covers the cost of the administration, management and enforcement of the Alaska Halibut and Sablefish Individual Fishing Quota Program. The Magnuson-Stevens Fishery Management and Conservation Act provides for a maximum of 3% of the ex-vessel value of fish harvested under an IFQ program. NMFS annually sets a fee percentage for the sablefish and halibut IFQ program in Alaska based on the actual annual costs and the standard ex-vessel value of the harvest. For 2007, the cost recovery fee was set at 1.2% covering actual costs of $2,739,602. The charter industry does not pay any equivalent fee for the use of, or the costs associated with managing and enforcing the halibut charter fishery. SPC is very concerned that agencies charged with management and conservation of the halibut resource will find management conservation efforts negated by a harvesting sector that has exceeded GHLs for four consecutive years, demonstrated disdain for conservation measures, and relied on the commercial sector to cover management costs.

14. Many of our members are extremely concerned by the instability the halibut charter issue has created. These concerns include: the ability to stay in business under existing QS purchase debt loads, the ability to have future as a commercial fishermen, the ability to depend upon the public process and the regulatory schemes that are implemented, the ability to sell quota share when the owner/members are ready to retire, and the ability to maintain a lending program for willing quota share purchasers. At the April 2008 NPFMC meeting, the Commercial Fishing and Agriculture Bank and signed

by two other commercial lending institutions provided written testimony stating that the lending institutions are concerned about the stability and the future of the Alaska QS and rationalization programs and that further concern will limit lending opportunities for both sectors. For some Southeast halibut fishermen, future QS decreases will create the untenable position of owing more on QS loans then the underlying value of the QS, yet unable to generate sufficient income from fishing the shares to cover expenses and meet loan payments. With Southeast king salmon stocks also on the decline, even diversified fishing operations will find it economically impossible to subsidize their halibut QS fishery. These fishermen will be forced to make tough choices, with all choices causing harm to the QS holder and in turn imposing economic harm on SPC.

15. The charter industry has cited the lack of advance notice in this process as one of their complaints. SPC member/owners maintain that the charter sector had plenty of time to change their business model and educate their customers. This action was first proposed in October of 2005 when the NPFMC was notified that the 2004 GHL was exceeded. In response to the notice, the NPFMC developed an analysis for implementing management measures to reduce harvests below the GHL. The Council picked a five-fish annual limit as the preferred alternative in April of 2006. Upon request by NMFS, the Council rescinded its preferred alternative in December of 2006, due to the high implementation costs and enforcement issues. At the same meeting, NMFS advised the NPFMC that the 2005 charter harvest had exceeded the GHL and that the 2006 preliminary estimates indicated that the GHL had been exceeded. The NPFMC requested a revised analysis and in a public process in April of 2007 added additional alternatives

and in June, 2007 took final action. A smart business owner would have understood with the first motion in October, 2005 that the charter fleet was facing management restrictions and would have started educating clients that in a fully utilized resource each sector has to face harvest restrictions or risk depleting the resource. Finally, the IPHC recommendations in January 2007 for the one halibut daily limit should have served notice to all charter businesses. The resource is limited and all harvesters need to learn to live within those limits.

16. In personal communications, the IPHC has stated that in the absence of effective GHL management restrictions actual estimated charter halibut harvest, including GHL overages, will be deducted as the best estimate of actual harvest before the commercial setline limit is established. This will cause a very direct effect and relationship between the charter exceedance of the GHL and reduced commercial setline harvest limits. This is the very essence of the NPFMC problem statement to "address the open-ended reallocation of halibut from the commercial to the guided sport sector." Suspension of the one halibut daily limit will directly harm the resource in 2008 and directly harm all QS holders in 2009 and subsequent years.

17. SPC has always supported the principles of resource protection, even when it has hurt our business, above individual company gain. The decision to submit this affidavit is based on concern that the charter sector's over harvest and disregard for effective resource management will jeopardize the future of the halibut resource and the fishing businesses of our owner/members.

I hereby declare and certify, under penalty of perjury under laws of the United States of America, that the foregoing is true and correct.  It is based upon my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as this Affidavit.

Dated: June 17, 2008

Thomas McLaughlin

President/CEO

Seafood Producers Cooperative

**EXHIBIT 7**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SCOTT VAN VALIN**, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 08-00941** |
| **THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce,** *et al.*, | |
| **Defendants.** | |

**AFFIDAVIT OF**

**THE HALIBUT ASSOCIATION OF NORTH AMERICA**

1. This affidavit is being submitted by Joe M. Kyle, President, on behalf of the Halibut Association of North America (HANA or the Association), P.O. Box 872, Deming, WA 98244. HANA is a trade association representing halibut processors in Canada and the United States. HANA's members represent approximately 70% of the Pacific halibut processed each year. Forty-six percent of HANA's members operate plants in Area 2C, the regulatory area hardest hit by the charter sector's over harvest of halibut.

2. HANA has been dedicated to the responsible management of the Pacific halibut fishery for 47 years. HANA's Articles of Incorporation state the purpose of the association is to "participate in the ... processes that affect regulation of the halibut resource...including...regulatory issues significantly affecting the business condition of Association members." When member companies' economic viability is jeopardized by regulations or legislation that do not further the goals of conservation, HANA steps in. Issues of allocation, for the most part, do not engender action on the part of HANA, but issues of resource management, halibut research, and the process by which catch limits are established are of utmost importance to member companies year after year. Indeed, HANA's involvement in these vital processes inform members' business plans and models.

3. HANA has been involved in the efforts of the North Pacific Fisheries Management Council (Council) to put the charter halibut industry under a regulatory management plan for the past 15 years. HANA members and staff

1

presented testimony, participated in Council subcommittees, sent recommendations to the Council, began and encouraged cross-sector dialogs to reach agreements on management plan details with charter industry groups and individuals, and helped guide many charter operators new to the Council process through the sometimes arcane public process and decision-making.

4. For nearly five decades, HANA has been closely involved in the management and conservation process of the International Pacific Halibut Commission (IPHC). Because HANA members represent both countries of the Convention that established the IPHC in 1923, it is uniquely positioned to provide relevant input to the Commission regarding their research, analyses, and management decision-making.

5. Twelve years ago, HANA established the Processor Advisory Group (PAG) of the IPHC. The PAG is made up of processors from the U.S. and Canada (including non-HANA members) who convene at the IPHC's annual meeting to review regulatory recommendations from all sectors of the halibut industry, subsistence and recreational users, consumers, and IPHC staff for implementation in the coming season. The PAG's recommendations are presented to the six-member Commission for consideration before final decisions are announced.

6. In matters of fishery management, HANA's priority has always put conservation first, acknowledging that for businesses to thrive, all users of a public resource must share in the burden of good stewardship.

7. The four years of excessive harvest by the charter sector has negatively impacted each HANA member with processing plants or buying stations in Area 2C. Each year since 2003, charter operators took more halibut than they were allowed, often from near-shore areas where setline harvesters had traditionally fished. That means the setline fishermen had to go further out into the ocean, expending more time, effort, and operational cost for each halibut they delivered to the shore-based plant. The fish they delivered were more expensive because of these added costs. This would not have happened if the growth of the charter fleet had been checked in some way. After two years of excessive harvest by the charter operators, the setline quota was cut to accommodate the charter sector's overage. This resulted in less halibut being harvested by the setline halibut fleet and less halibut being delivered to HANA-member plants. Deliveries of halibut to the processing plants in Hoonah, Sitka, Pelican, Petersburg, Ketchikan, and other coastal communities in area 2C have dropped at least 10% and as much as 30% since 2006. Even a 10% drop in inventory (pounds processed and ready to sell) cannot be recaptured in sales price, much less a 30% drop in product inventory. Overhead for all plants has increased during that two-year period, due to rising fuel costs, increased airfreight tariffs, and a rise in materials and labor costs, so

margins have necessarily been sliced thinner. Higher overhead coupled with lower deliveries (less pounds of halibut into the plant) has resulted in lay-offs during the processing season, lost wages for plant workers, and higher unemployment in coastal communities.

8.  Forty percent of HANA-member companies have lost sales due to the unexpected downturn in catch limits. If the one-fish rule is blocked, it is expected that HANA-members will lose more than a million pounds of halibut that they would otherwise process for sales to retail and foodservice customers. Already this year, with a month of unrestricted harvest by the charter operators, HANA-member companies are anticipating a 25-30% drop in deliveries and a corresponding 20-25% drop in revenue. The forecasted total revenue loss for all HANA-member companies by the end of the season is estimated to be $5,000,000 to $10,000,000.

9.  It is important to note that setline fishery catches are accounted for electronically as soon as they are delivered to the plant. HANA-member companies, as well as other processing plants, instantly send delivery data to the agency in charge of managing the harvest. Just before the catch limit is reached, the season is shut down. No more halibut are caught, because the plants won't accept them, knowing the quota has been reached. This is not the case for charter harvests. Charter operators are not required to report their landings until months later, which makes over harvesting far more likely.

10. HANA members are seafood processors with decades of operating experience in Alaska and understand the vagaries of processing a wild resource. That's why they pay close attention to season forecasts and catch limits that are issued by IPHC and implemented by the National Marine Fisheries Service. These figures are the basis for each plant's forecasted budget. In the half-century that most of HANA's members have been in operation, sector exceedence of catch limits has not been an issue, until recently.

11. HANA members are from all ten of the IPHC-designated regulatory areas. To protect the halibut stocks in times of low regional abundance, some regulatory areas have endured lower catch limits over a period of years. The Association supported a more than 60% drop in Area 4B catch limit several years ago that is still in effect, while other halibut management areas (2C, 3A, and 3B for example) remained constant or enjoyed catch limit increases at that time. The principles of resource conservation and protection above the gain of any regional group or individual company have always prevailed. HANA's decision to submit an intervening affidavit in this matter is based on the informed concern that the charter sector's unauthorized and on-going overharvest impacts a resource that, in Area 2C, is already seriously compromised.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 17, 2008

JOE KYLE, President
HALIBUT ASSOCIATION OF NORTH AMERICA

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTT VAN VALIN,** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 08-00941** |
| **THE HONORABLE CARLOS M. GUTIERREZ,** in his official capacity as Secretary of Commerce, *et al.,* | |
| **Defendants.** | |

1. My name is Carolyn Heuer of PO Box 2281 Sitka, Alaska 99835. My family has subsistence fished out of Sitka for 8 years. We depend solely on wild fish and game for our family's protein source. Not only is it more nutritious, but it is economical as well. We live in an island community and all groceries are brought in by barge. This means that groceries are very expensive, even more so now with increasing fuel prices. We can not afford to feed our family without depending on subsistence harvests. In a given year we eat approximately 50-75 lbs of halibut. Over the past 4 years we have noticed a significant decline in the availability of halibut due to the depletion of halibut stocks in the waters around Sitka. Our usual locations for subsistence fishing are no longer reliable and we must travel farther and explore more areas to catch halibut. The added expense in time and gas is causing extra financial burden on us and as we fish out of a small boat this increases our risk. We are dependent on halibut and my ability to feed my family is threatened.

2. The Sitka LAMP (Local Area Management Plan) was established to reduce fishing pressure on Sitka Sound to allow access by personal use and subsistence fishers.

It was recognized that concentrated fishing effort was causing depletion in the local fish stocks. The commercial fleet now fishes efforts north and south of town. The charter fishing industry continues to concentrate fishing efforts just outside the restricted area. I have heard from one or more charter fishermen stating they must go farther each year to catch halibut.

3. Over the last 10 years the charter fleet and their effort has greatly expanded, placing increased pressure on a declining resource. For at least the last 3 years the charter fleet has gone over their halibut allocation. While charter industry continues to grow at an unlimited rate without any regulations holding them to their allocation the commercial fleet has reduced their fishable quota by 43% over the last 2 years acknowledging the decline in fish abundance. Abundance based management is the hallmark of fisheries management in the North Pacific. Sensible conservation management demands the charter sector allocation be constrained to its GHL especially during this time of low abundance. Other species, such as king and coho salmon, and rockfish are allocated based on abundance based management and regulations are in place to hold the charter sector to their allocation for these species. I strongly believe that all user groups should be held to the same standard: when stocks are high, everyone benefits by higher catch allocations and, conversely, in times of lower abundance everyone suffers proportionally.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 17th, 2008

Carolyn Heuer

**EXHIBIT 9**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SCOTT VAN VALIN, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 08-00941 |
| THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*, | |
| Defendants. | |

**AFFIDAVIT OF PATRICIA PHILLIPS**

**ON BEHALF OF THE CITY OF PELICAN**


1. I, Patricia Phillips, representing the City of Pelican, a community of 106 residents in southeast Alaska, SUPPORT implementation of the one halibut daily bag limit for charter clients in the Southeast Alaska (Area 2C).

2. Pelican is an isolated fishing community, without road connections to any other town or city. Thirty-nine residents hold commercial fishing permits and twenty-five have crew member licenses. Commercial fishing and seafood processing are the mainstay of Pelican's economy. Most land-based employment occurs at the seafood processing plant, Pelican Seafoods, which also owns the grocery store. The population is approximately 30% Alaska Native or American Indian.

1

3. Fourteen Pelican residents hold halibut Quota Share (QS); ten residents hold halibut QS for Area 2C. QS are required in Alaska to commercially harvest halibut and can only be secured through initial allocation or purchase from a willing seller (Area 2C halibut QS is currently marketed at $20-25 per pound; Southeast commercial setline fishermen currently receive an average dock price of $4 per pound for halibut).

4. Pelican is a recognized landing port with the National Marine Fisheries Service. In past years, over one million pounds of halibut were landed in Pelican. Last year 434,000 pounds of halibut were landed in Pelican; generating $70,000 in Fisheries Business Tax (FBT). The State of Alaska collects the tax and 50% should be returned to the City. Pelican depends heavily on the FBT in its annual budget to help support operating costs for basic community services and infrastructure. The City's economy would suffer without the tax and it would cause undo hardship. Without the FBT, the City would experience a significant loss of revenue and have to cut its budget by 20% to make up for the loss. There are eight registered charter boat operators in Pelican; four of the eight also hold halibut QS. No tax comparable to the FBT exists on charter harvest; hence reductions in the commercial setline halibut quota are not offset by any tax contributions from the charter sector. Suspension of the one halibut daily catch limit on charter clients will result in the Southeast charter harvest exceeding the sector's halibut Guideline Harvest Level (GHL); to compensate, the amount of that exceedance will be deducted from individual Southeast commercial fishermen's quota in 2009, directly reducing the tax revenues accruing to the City of Pelican and other southeast Alaska coastal communities. More insidious is the cumulative effect on the resource and the communities that depend on that resource of five consecutive years of Southeast halibut charter GHL overages. Southeast fishery dependent communities can not afford to wait another year for relief.

5. The historic subsistence harvest and use of halibut is a traditional way of life in Pelican. To illustrate: in 2006, 5,925 pounds of halibut were harvested by local residents for subsistence needs. This subsistence harvest is shared among households, and is a recognized social pattern. Allowing charter halibut harvest, which is concentrated near towns in what have historically been subsistence use areas, disproportionate to abundance during this time of declining halibut stocks will directly and immediately harm subsistence harvesters. Halibut subsistence use meets both cultural and nutritional needs of Pelican residents.

6. Along with other rural southeast Alaska coastal communities, Pelican residents rely on healthy marine resources for subsistence, sport and commercial fishing livelihood. The survival of Pelican as a community depends on the long-term abundance of these marine resources. Without access to productive and viable marine fisheries, our community would cease to exist.

7. The cornerstone of sustainable management rests squarely on restricting harvest to science-based catch limits. In Alaska, catch limits are determined by long-established factual and unbiased scientific methods and conservative pre-season resource abundance assessments. Exceeding these catch limits compromise resource health and the socio-economic survival of fisheries-dependent communities such as Pelican.

8. The abundance of halibut in the Area 2C is approaching historic low levels. Setline halibut quotas in Area 2C have been reduced by 43% over the past two years in an effort to conserve halibut stocks. This quota reduction has caused significant economic harm to Pelican setline fishermen, the Pelican seafood processing plant, and the region as a whole. Despite the economic hardship, Pelican residents concur with the conservation mandates of the International Pacific Halibut Commission. We recognize that the decreased abundance of halibut demands more restrictive quotas in order to ensure the long-term viability of the halibut resource.

3

9. In the past, setline fishermen have had to sacrifice quota in order to compensate for the allocation overages of the halibut charter sector. The charter sector has exceeded its halibut Guideline Harvest Level (GHL), or catch limit, for the past four years. These overages have compromised the halibut resource, economically-harmed the setline halibut sector, and as a result, the region's economy. The one halibut daily bag limit for charter vessels in southeast Alaska, implemented by the Secretary of Commerce, followed federal rule-making procedures, and on June 1, 2008 was implemented to control guided sport charter vessel halibut harvest to the GHL. Given the reduced abundance of Area 2C halibut stocks, the heightened need for resource conservation, and the quota reductions imposed on the setline halibut industry, the necessity of the one halibut daily limit should be adhered to. The Area 2C Constant Exploitation Yield, or area harvest level, established to protect halibut stocks, will likely be exceeded if the one halibut daily limit is not applied. Pelican residents assert that all sectors need to share in conserving the resource; the health of the halibut resource and the socioeconomic and cultural fabric of southeast Alaska communities such as Pelican depend on it.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 16, 2008                    *Patricia Phillips*

                                        Patricia Phillips, Mayor – City of Pelican

**EXHIBIT 10**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTT VAN VALIN**, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 08-00941 |
| **THE HONORABLE CARLOS M. GUTIERREZ**, in his official capacity as Secretary of Commerce, *et al.*, | |
| Defendants. | |

## AFFIDAVIT OF WILLIAM LUEDKE, ON BEHALF OF
## THE CITY OF PORT ALEXANDER

1. We the City Council of the City of Port Alexander and on behalf of the City of Port Alexander, SUPPORT implementation of the one halibut daily bag limit for charter clients in the Southeast (2C) Alaska management area in 2008. The one halibut daily limit is necessary to constrain charter harvest to the sector's Guideline Harvest Level (GHL) thereby protecting Southeast halibut stocks from over harvest.

2. The survival of Port Alexander as a community depends on viable access to healthy and abundant marine fish stocks. Residents support sustainable management of marine fisheries, and believe harvesting allocations should be directly tied to resource abundance.

3. The Southeast halibut stock is estimated by the International Pacific Halibut Commission to be near historically low levels of abundance. Catch rates have dropped

for all sectors. The Southeast setline halibut quota has been reduced by 43% over the two years to conserve the resource and allow rebuilding.

4. In 2003 a guideline harvest level (GHL) was established for the halibut charter fishery in Southeast to place an upper bound on charter harvest. The GHL, as established stairsteps down as halibut abundance declines. Declines in halibut abundance did not trigger the stair step until 2008, when the charter GHL dropped from 1.4 million pounds to 0.931 million pounds.

5. The halibut charter sector has exceeded its GHL for the past four years. During the first two years of that overage, the halibut setline quota was reduced to compensate for the overages and prevent over harvesting the halibut resource. These reallocations impact Port Alexander fishermen and our community, since the economic survival of the community depends on the commercial halibut and salmon fleet. In 2006 the charter sector's GHL overage also caused an overage of the area Constant Exploitation Yield (CEY), or the amount of fish that can be annually harvested on a sustainable basis. In 2007 and 2008 charter halibut harvest control restrictions were recommended by the International Pacific Halibut Commission (IPHC) and North Pacific Fishery Management Council, respectively, to prevent CEY and GHL overages. Assuming that these controls would be effectively implemented by June 1st of the respective years, the IPHC set fishery catch limits after using the GHL as the proxy for harvest. If the one halibut daily limit is not implemented in June, the halibut charter GHL will once again exceed its GHL and will likely cause a CEY overage. Over harvesting the resource during this time of low abundance creates a serious resource concern; over harvesting catch limits four

years straight years when the resource is at low levels jeopardizes the future or our community and the future of all who depend on the halibut resource.........

6. Port Alexander residents have participated in developing a management plan for the Southeast halibut charter sector through the North Pacific Fishery Management Council public process for the past 15 years. Hundreds of concerned fishermen have provided testimony urging the Council to establish a charter halibut GHL, and effectively manage the charter sector to that GHL. The one halibut daily bag limit is the first effective halibut charter management restriction implemented as a result of that process. Suspending implementation of this limit will decrease the public's confidence in the regulatory process.

7. Port Alexander supports sustainable harvest and conservative fishery management. Sharing the burden of conservation encourages conservation and good stewardship in fishery harvesters. Reduced quotas impose economic hardship on all who make their living from harvesting the resource, but are necessary to protect the long-term health of the halibut resource. Our community depends on the halibut resource for sustenance and livelihood. The one halibut daily limit is necessary to ensure charter harvest is restricted to the sector's GHL, the resource is not over harvested, and fishery dependent communities such as Port Alexander survive.

I, as mayor pro-tem, hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June _17_, 2008

William Luedke, Mayor pro-tem

**EXHIBIT 11**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTT VAN VALIN, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 08-00941 |
| THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*, | |
| Defendants. | |

## AFFIDAVIT OF SANDY CRAIG

1. I, Sandy Craig, am the owner-operator of Icy Strait Adventures, a small charter fishing business located in Elfin Cove, Alaska. My address is PO Box 13, Elfin Cove, AK 99825.

2. I began chartering in 1991 after the *Exxon Valdez* hit Bligh Reef in 1989 and destroyed Alaska's commercial fish prices. Operating a charter boat has been and remains a substantial part of my personal income. My small business is very busy; I have between 50% and 80% repeat customers each year. My clients target both halibut and salmon.

3. Most of my clients are conservation minded and repeatedly tell me how much they value the sustainability of Alaska's fish resources. I attribute that sustainability to good management and Alaska's pristine environment. The North Pacific Fishery Management

1

Council (NPFMC), the Alaska Department of Fish and Game (ADFG), and the International

Pacific Halibut Commission (IPHC) have done a very good job of protecting Alaska's fragile

resource during a time when many fish stocks in other parts of the world are diminishing.


    4. The IPHC and NPFMC should be allowed to do their job to protect the resource.

Fishery management decisions should be made by scientists and managers through an open

public process. In 2008 the IPHC recommended a quota reduction for the Southeast setline

halibut fleet of 27% after reducing the quota 20% last year, equating to 43% reduction over two

years. The reductions are necessary because halibut abundance has decreased in Southeast. The

reduced abundance also triggered a 35% reduction in the Southeast halibut charter GHL. The

one halibut daily bag limit is necessary to constrain Southeast charter harvest to the sector's

GHL. In developing and implementing the one halibut daily limit, managers followed the

correct process and implemented a management action clearly supported by analysis,

deliberation, and public comment. This action is necessary to protect the health and

sustainability of the resource and my business, which depends on productive halibut stocks.


    5. Many of my clients voluntarily stop retaining the halibut they hook about the third

day of their fishing trip. They like to take a nice box of fish home with them, but they have just

as much fun with catch and release. Although they were allowed two halibut per day last year,

very few people cared to keep a second halibut. One halibut a day was plenty.


    6. The number of charter boats has and is increasing in the Southeast area. The pressure

on the resource is mounting and charter boats are running further to find productive fishing

grounds, but the increasing price of fuel will have an impact on how far boats go. In sum, the price of fuel, rising transportation costs, and local depletion will have a larger negative effect on my small business than the regulation restricting my clients to retention of one halibut per day.

7. The North Pacific Fishery Management Council has been trying to develop an effective management strategy for the halibut charter sector for 15 years. I am very surprised charter captains and crews were allowed to fish and retain halibut with paying clients on board until last year. Last season, after charter captains and crew were prohibited from fishing for halibut during a charter, I saw the practice continuing. That indicates to me a disregard for conservation.

8. I began commercial fishing for halibut in 1982. In 1995, an Individual Fishing Quota (IFQ) system was implemented in Alaska, with vessel owners and those holding a qualified vessel lease being granted an initial allocation of halibut quota share (QS) based on their halibut harvest during an historic base period. A person must hold QS in order to commercially setline for halibut off Alaska. QS holders are issued IFQs, expressed in pounds, on an annual basis. IFQs fluctuate as the halibut biomass in an area increases and decreases.

9. My husband, my son and I each invested in halibut QS after implementation of the IFQ program and it is a substantial portion of each of our incomes. My son was able to put himself through college by fishing his halibut shares. I am glad he has other skills as his annual halibut IFQs, along with ours, have dropped 43% over the past two years. That drop represents approximately an $180,000 reduction in assets and a $39,000 reduction in our families' annual

income. The reduction in annual income has been hard to take financially, amounting as it does to an approximate 25% reduction in our family's income.

9. We have observed a decrease in the available halibut biomass in the Southeast area. The biologists are correct in reducing harvest levels. Both charter and setline sectors need to share in conserving the resource. I can accept and support the reduction in our QS and the one halibut per day limit for charter clients. The health of the resource must come first.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 16, 2008

Sandy Craig

4

# EXHIBIT 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

        Plaintiffs,

v.

THE HONORABLE CARLOS M.
GUTIERREZ, in his official capacity as
Secretary of Commerce, *et al.*,

        Defendants.

Civil Action No. 08-00941

## AFFIDAVIT OF LUKE WIEDEL

1. I, Luke Wiedel, am a charter boat captain operating out of Sitka, Alaska. My mailing address is PO Box 6362 Sitka, AK 99835. I have worked in the charter industry for seven years, transporting clients to the fishing grounds to target halibut and salmon. Charter fishing is my primary source of income.

2. The abundance of halibut in the Southeast area has decreased in recent years. Although the halibut resource is healthy overall, it will not remain healthy unless all halibut harvesters take less during times of low abundance. The Southeast setline quota has been reduced by 43% over the past two years and the Southeast charter guideline harvest level (GHL) was reduced by 35% this year; these reductions are necessary to protect resource health. My business, and the businesses of all charter and setline fishermen, depends on a healthy resource. Everyone loses if short term economic gain is allowed to outweigh long-term resource health.

3. The Southeast charter sector's halibut harvest has exceeded the sector's GHL for the past four years. Careful analysis has shown that either a one halibut daily bag limit or a shortened season is necessary to restrict charter harvest to the 2008 GHL. Through an open

public process that included substantial testimony from charter boat operators, the North Pacific Fishery Management Council selected the one halibut daily bag limit. I SUPPORT implementation of the one halibut daily bag limit for charter clients. The one halibut limit allows my clients the opportunity to fish, the opportunity to take home a halibut to eat, and the opportunity to participate in conserving the resource by releasing any halibut hooked after the bag limit is reached. My clients understand that sustainable resource management ties harvest to abundance and does not allow catch limits to be exceeded. Many of my clients intend to return to Alaska to halibut fish and, like me, want to make sure there is an abundant resource to enjoy in the future.

4. Charter sector's halibut GHL overages have created tensions in Southeast communities. These tensions are particularly intense in Sitka where relationships are openly hostile between charter and setline fishermen. These hostilities are pitting neighbor against neighbor and tearing apart the social fabric of Southeast's isolated rural communities. I am willing to do my part to conserve the resource and to end the hostilities.

I hereby declare and certify, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. It is based on my personal knowledge, and if I were called to testify in this court proceeding, my testimony would be the same as what is contained in this Affidavit.

Dated: June 16, 2008

Luke Wiedel

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTT VAN VALIN,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 08-0941 (RMC)** |
| | **Category D** |
| **THE HONORABLE CARLOS M.** | |
| **GUTIERREZ, in his official capacity as** | |
| **Secretary of Commerce,** *et al.,* | |
| **Defendants.** | |

## <u>ORDER</u>

Upon consideration of the Motion to Intervene and the Memorandum of Points and

Authorities in support thereof, as Defendants submitted by Linda Behnken, David Gibson,

Sherri Wohlhueter and Kurt Wohlhueter, North Pacific Seafoods, Inc., Sandy Craig,

Luke Wiedel, Carolyn Heuer, Seafood Producers Cooperative, the City of Pelican, the City of

Port Alexander, and the Halibut Association of North America ("Proposed Intervenor-

Defendants"), and any opposition thereto, and this Court's finding that the proposed Intervenor-

Defendants are entitled to intervene as a matter of right pursuant to Fed. R. Civ. P. 24(a)(2) or, in

the alternative, should be permitted to intervene pursuant to Fed. R. Civ. P. 24(b), and this Court

being fully advised of the premises therein, it is on this _____ day of _____, 2008, hereby

ORDERED that the Motion be, and hereby is, GRANTED; and it is

FURTHER ORDERED that Linda Behnken, David Gibson, Sherri Wohlhueter and

Kurt Wohlhueter, North Pacific Seafoods, Inc., Sandy Craig, Luke Wiedel, Carolyn Heuer,

Seafood Producers Cooperative, the City of Pelican, the City of Port Alexander, and the Halibut

Association of North America be, and hereby are, granted leave to intervene as Defendants; and

it is

155293_1.doc

FURTHER ORDERED that the Answer accompanying the Motion shall be deemed to have been filed and served on the date this Order is entered.


_____
Rosemary M. Collyer
United States District Judge

Copies to:

John Winston Butler
SHER & BLACKWELL
1850 M Street, NW, Suite 900
Washington, DC 20036
Email:  jbutler@sherblackwell.com

Robert Pendleton Williams
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
601 D Street, NW
3rd Floor - Room 3033
Washington, DC 20530
Email: robert.p.williams@usdoj.gov

George J. Mannina, Jr., Esq.
Paul L. Knight, Esq.
O'Connor & Hannan, LLP
1666 K Street, N.W., Suite 500
Washington, DC  20006
Email:  gmannina@oconnorhannan.com
Email:  pknight@oconnorhannan.com

Christopher T. Koegel
Manatt, Phelps & Phillips, LLP
700 12th Street, N.W., Suite 1100
Washington, DC 20005-4075
Email:  CKoegel@manatt.com