UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SCOTT VAN VALIN, *et al.*,

      **Plaintiffs,**

v.

THE HONORABLE CARLOS M. GUTIERREZ, in his official capacity as Secretary of Commerce, *et al.*,

      **Defendants.**

Civil Action No. 08-0941 (RMC)
Category D

**PROPOSED INTERVENOR-DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO INTERVENE AS DEFENDANTS**

Proposed Intervenor-Defendants ("Intervenors") reply to Plaintiffs' Opposition to Motion to Intervene as Defendants ("Plaintiffs' Opp.") to correct the statements of law and fact contained therein.

**I.**    **Intervenors Have Demonstrated Injury Sufficient To Justify Intervention**

Plaintiffs "do not object to intervention for the purpose of addressing the merits...." Plaintiffs' Opp. at 3. In short, Plaintiffs admit Intervenors have standing and meet the requirements for intervention. However, Plaintiffs object to intervention for purposes of addressing any issue associated with the preliminary injunction. *Id.* If Plaintiffs admit Intervenors have standing regarding the merits, Plaintiffs cannot simultaneously assert the absence of standing regarding preliminary injunction issues.

Applying Plaintiffs' argument to the facts of this case, Plaintiffs' position is that if this Court addresses the proper regulation of the 2008 halibut fishery by issuing a decision on the merits prior to the end of the 2008 fishing season, Intervenors have standing and otherwise meet the intervention standards. However, if the 2008 fishing season is addressed instead through a

155349_1.doc

preliminary injunction, Intervenors somehow no longer have standing. Plaintiffs' argument is without merit.

    A.    <u>When Does Harm Arise?</u>

Plaintiffs' assert the 2008 commercial setline quota is fixed and, therefore, no harm can befall Intervenors if Plaintiffs are allowed to exceed their quota. Plaintiffs' Opp. at 4.[1] Unfortunately, Plaintiffs have elected to tell the Court only half the story. Plaintiffs neglect to mention that when the International Pacific Halibut Commission ("IPHC") establishes the 2009 setline quota, the IPHC will reduce the commercial setline quota because of overharvesting caused by the guided sport industry exceeding its 2008 Guideline Harvest Level ("GHL").

The IPHC has an established history of deducting GHL exceedances from the amount of fish available for harvest by the setline sector. Thus, the harm to the commercial setline sector is occurring right now because Plaintiffs are being allowed to fish at a rate allowing them to catch almost twice as much fish permitted by the 2008 GHL of 931,000 pounds. *See* Intervenor-Defendants' Memorandum of Points and Authorities in Support of Motion to Intervene ("Intervenors' Mem."), at 40-41.[2]

Plaintiffs' position is that even though the cause of the harm is occurring now, Intervenors must wait until after the harm is completed before they can seek redress. Of course, at that point, it is too late. At that point, the GHL will already have been exceeded and nothing

---

[1] In considering whether Intervenors are harmed, Plaintiffs appear to be arguing for an irreparable harm standard. To prevail on a motion for preliminary injunction, Plaintiffs must satisfy a four-part test, one of which is that the injunction must not substantially injure other parties. *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). There is no doubt that Intervenors are substantially injured by the preliminary injunction.

[2] Plaintiffs also forget to mention, as discussed below, that the 2008 halibut conservation program and the setline quota were established based on the assumption that the guided sport industry would not exceed its GHL. Now that the regulations enforcing the GHL have been enjoined, there can be no guarantee that the National Marine Fisheries Service ("NMFS") will not issue emergency conservation regulations affecting the setline sector.

can be done to change that fact. Plaintiffs will have overfished the resource, the setline quota will be cut to make up for what the Plaintiffs did in 2008, and Intervenors will have no recourse. As the Court said in *McGlothlin v. Connors,* 142 F.R.D. 626, 642 (W.D. Va. 1992), it is not required that the harm be realized in the present if the cause of the future harm is occurring in the present.

> Although Plaintiffs have shown no present harm, as the benefits have not yet been suspended, the threat of future denial of health benefits represents a "sufficient direct threat of personal detriment." *See Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973) (proclaiming that plaintiffs "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief"). Plaintiffs should not be required to suffer through the hardship of losing health care benefits prior to pursuing redress. Moreover, the Fourth Circuit has acknowledged that a showing of likelihood of *future* injury in the absence of a preliminary injunction was sufficient evidence of irreparable harm. [Citation omitted.]

Plaintiffs do not deny that being allowed to fish pursuant to the terms of the preliminary injunction, *i.e.,* under the 2007 regulations, will result in the guided sport industry exceeding the 2008 GHL. As the IPHC's Executive Director stated in his declaration attached to the IPHC's Motion for Leave to Appear as *Amicus Curiae* ("IPHC Motion"), absent implementation of the Rule at issue, it is "reasonably expected" that the guided sport industry will exceed the 931,000 pound GHL "as has been amply demonstrated over previous years." Declaration of Bruce M. Leaman, Ph.D. as *Amicus Curiae* on behalf of Defendants ("Leaman Aff."), ¶ 8. Plaintiffs' only response to the IPHC brief was to object to having the IPHC present these facts to the Court.

Fishing by the guided sport industry at the 2007 fishing level, when the guided sport industry caught 1.7 million pounds of halibut, will result in deductions from the commercial setline quota of approximately 15%. Affidavit of Linda Behnken ("Behnken Aff.") attached as

3

Exhibit 2 to Intervenors' Mem., ¶¶ 6, 7, 18. That affects Intervenor Linda Behnken as well as all other setline fishermen, processors, and towns who comprise the Intervenors.

In considering the harm to Intervenors, Plaintiffs ignore the rulings of this Court that economic harm resulting from regulations affecting the amount of fish which can be harvested is a "canonical example of injury in fact sufficient to establish standing." *North Carolina Fisheries Association, Inc. v. Gutierrez,* 518 F.Supp.2d 62, 82 (D.D.C. 2007), cited in Intervenor's Mem. at 22. Thus, Plaintiffs ignore the statement by Intervenor David Gibson that he is "entirely dependent on commercial fishing for my livelihood" and "if the halibut quota is cut any further, *i.e.,* due to charter overages, I may lose my quota share, boat, salmon permit; in other words, I would lose my whole commercial business." Affidavit of David Gibson, attached as Exhibit 3 to Intervenors' Mem., ¶ 6. Plaintiffs ignore statements of Intervenors Sherri and Kurt Wohlhueter that they will suffer direct economic harm if quota reductions continue and may not even be able to pay for the crew necessary to operate their fishing vessel. Affidavit of Sherri and Kurt Wohlhueter attached as Exhibit 4 of Intervenors' Mem., ¶¶ 5, 7. Plaintiffs ignore the statement of Intervenor North Pacific Seafoods that if the 2008 Rule is overturned for the entire fishing season which generally ends in August, North Pacific Seafoods "will experience about a 25% loss of revenue" and will be forced to fire 80 employees. Affidavit of North Pacific Seafoods, attached as Exhibit 5 to Intervenors' Mem., ¶¶ 1, 6. Intervenors will generally not repeat all of the allegations and harms set forth in Intervenors' Memorandum at pages 2-8, 25-31 except to note that the harm suffered by Intervenors from continued overfishing by the guided sport industry is real and immediate.

That said, Plaintiffs' cavalier dismissal of harm to subsistence fishermen is particularly troubling. Plaintiffs assert that since the amount of fish set aside for subsistence users in 2008 is

not changed by the preliminary injunction, there is no problem. Plaintiffs' Opp. at 5. Plaintiffs ignore two important facts. First, subsistence fishermen like Intervenor Carolyn Heuer "can not" feed their families without the subsistence halibut harvest. Second, because the guided sport industry concentrates its fishing in near shore areas, subsistence users who fish in those same inshore waters find the resource fished out. Affidavit of Carolyn Heuer, attached as Exhibit 8 to Intervenors' Mem., ¶¶ 1, 2. Plaintiffs miss the point that the issue is not the total amount of fish but whether the fish are there for harvest. One is reminded of the oft quoted statement used to demonstrate the insensitivity of a rich person who is reported to have said in the midst of a summer heat wave that both the rich and the poor get ice, the poor get theirs in the winter. It does not matter how much fish might be set aside for subsistence if the subsistence fishermen cannot get it. *See also* Ex. 2 to Intervenors' Mem., Behnken Aff., ¶ 20.

  B. <u>Plaintiffs' Other Legal Arguments</u>

Plaintiffs also repeat the objections raised in their Opposition to Intervenors' initially filed Motion to Intervene stating that Intervenors do not have sufficient interest warranting protection and that the Motion to Intervene is not timely. Plaintiffs' Opp. at 3, note 6. Plaintiffs do not elaborate on either point. As to having an interest, Intervenors submit that their interest is fully articulated and established in Intervenors' Memorandum at 2-8, 22-31, as well as by Plaintiffs' admission that Intervenors should be allowed to intervene on the merits.

Plaintiffs' restated objection on timeliness also rings hollow. Recall that in the memorandum in support of Intervenors' initial Motion to Intervene, Intervenors stated they had found no case in which timeliness by itself was a basis for denial of intervention, even when a preliminary injunction motion was pending. That part of Intervenors' argument is repeated in Intervenors' Memorandum at 32-35. Plaintiffs responded that even though Intervenors were

5

unable to find such cases, Plaintiffs had found such cases. Intervenors' Memorandum reviewed each of the cases cited by Plaintiffs, noting that those cases had nothing to do with timeliness, or Plaintiffs were relying on district court judgments that were overruled, or Plaintiffs were relying on timeliness decisions when the motion to intervene was filed after judgment was entered, hardly apposite. Intervenors' Mem. at 35-37. The response in Plaintiffs' Opposition – silence. The absence of any response to the analysis of the cases on which Plaintiffs relied would seem to be an admission of error.

    C.    <u>Conclusion</u>

For the reasons above and for the reasons stated in Intervenors' Memorandum, Intervenors have a present, concrete, and particular interest in the 2008 Rule which has been held in abeyance by the preliminary injunction. Intervenors are and will be harmed if that Rule is not enforced. Intervenors meet the requisite standards for intervention in this case.

**II.**    **Plaintiffs' Factual Arguments**

    A.    <u>The Conservation Issue</u>

As with Plaintiffs' presentation of the timeliness issue and Plaintiffs' presentation about the 2008 commercial setline quota being set, Plaintiffs' argument on the conservation issue presents only half of the facts to this Court. Plaintiffs cite an NMFS statement in the Final Rule as supporting Plaintiffs' position that exceeding the GHL presents no conservation issue. Plaintiffs' Opp. at 2, *citing* 73 Fed. Reg. 30504, 30517-18 (May 28, 2008). Plaintiffs' presentation to this Court is accurate only if one ignores the remaining text Plaintiffs elected to not quote and only if one ignores the entire context. Before proceeding to examine the text Plaintiffs' forgot to mention, a few contextual facts are in order.

6

First, Plaintiffs do not deny they have exceeded their GHL by 20-36% in every year since the GHL was established. Intervenors' Mem. at 10. Second, Plaintiffs do not dispute repeated statements by the IPHC that "the achievement of the Commission's conservation mandate is dependent on adherence to catch limits and total yield." *Id*. at 11. The record is replete with similar statements by the IPHC. *Id.* at 11-13. The IPHC believes its conservation program for halibut is threatened when quotas are exceeded.[3] As the IPHC stated in its amicus brief, "[e]xceeding the GHL specified for 2008 in Area 2C" means that total removals in 2008 "will exceed the Commission's conservation targets ... to the detriment of the halibut stock in this area." Leaman Aff., ¶ 9.

Plaintiffs would have this Court ignore the IPHC's repeated statements and would have this Court believe that NMFS disagrees with the IPHC. The NMFS position and the IPHC position are entirely consistent. NMFS' assertion that it does not anticipate conservation problems in 2008 is predicated on the assumption that the Rule will take effect and, therefore, the GHL will not be exceeded. As explained in the IPHC amicus brief, the catch limits established for the commercial setline sector in 2008 "explicitly presumed effective management of charter vessel fisheries to levels specified in United States fishery regulations." IPHC Motion at 2. The Leaman Affidavit attached to the IPHC Motion states that the 2008 catch limits recommended by the Commission "were based on an understanding that the U.S. government would be enacting regulations for 2008 to limit the charter vessel harvest of halibut to the Guideline Harvest Levels...." Leaman Aff., ¶ 7. In sum, the 2008 conservation program and harvest targets set by the IPHC were predicated on the now enjoined Rule being in place so that everyone would live within their allocations.

---

[3] The commercial setline fleet has never exceeded its quota. Intervenors' Mem. at 10.

It is within this context that NMFS' statement about conservation issues, oft repeated by Plaintiffs, is to be understood. There is not a conservation problem if everyone lives within their limits. There is a conservation problem when the guided sport industry does not. In fact, reading beyond those few words of NMFS that Plaintiffs elected to present to this Court, one finds the following:

> NMFS agrees that fishing limits need to be adhered to in order to maintain the long term health of the halibut stock, and has therefore proposed this rule to reduce the charter fleet harvest to the GHL.

73 Fed. Reg. 30504, 30518 (Response to Comment 81)(May 28, 2008). In other words, NMFS agrees the IPHC has set conservation targets which assume that everyone lives within their quotas and, as long as the Rule is in place, the conservation of the resource is not at risk.

NMFS goes on to state:

> NMFS agrees that if the guided charter fishery grows in any single year, halibut removals will exceed planned IPHC removals in the short run and the actual harvest rate may be greater than the rate on which the [constant exploitation yield] for a year is based. However, in the medium and long term, the IPHC will adjust its harvest allowances for the commercial setline fishery to take account of changes in guided charter harvests.

*Id.,* (Response to Comment 82). In other words, the IPHC protects the resource from the conservation problem caused by charter boat overfishing by deducting that overharvest from the setline quota in order to keep harvest levels within accepted biological targets. *See* Intervenors' Mem. at 14-15. From Plaintiffs' perspective, of course there is no conservation issue. When the guided sport industry exceeds its GHL, the conservation burden falls on the small family businessmen and women who comprise the setline fishermen.

B.   Factual Errors?

Plaintiffs state they wish to correct "factual misstatements" by Intervenors regarding Plaintiffs' position. Plaintiffs' Opp. at 2. Plaintiffs contest Intervenors' statement that the charter industry has not challenged the validity of the 931,000 pound GHL. *Id.* Again, Plaintiffs present only part of the story.

Here are the facts. 50 C.F.R. 300.65(c)(1) provides that if the Constant Exploitation Yield ("CEY") is established at "x," then the GHL shall be "y." There are five GHL categories based on different CEY levels. One category is that if the Area 2C CEY is determined to be between 5.841 million pounds and 6.903 million pounds, then the GHL shall be 931,000 pounds. In the five years this provision has existed in the Code of Federal Regulations, Plaintiffs have never argued that if the CEY is between 5.841 and 6.903 million pounds then the proper GHL is not 931,000 pounds. This was the point made in Intervenors' Memorandum at 8-9.

Nowhere in any paper filed by Plaintiffs in the instant case do they argue that the 931,000 GHL is incorrect based on a CEY of 5.841 million pounds. It is not a factual misstatement that Plaintiffs have not challenged that this is the correct GHL based on the size of the halibut resource. Plaintiffs' position is not that the 931,000 pound GHL is incorrect based on the current CEY. Plaintiffs' position is that they do not want not to have regulations requiring them to adhere to the 2008 GHL until two or three years from now when they have exceeded the GHL, and the IPHC conservation targets, for several years.

Plaintiffs' tepid and misleading response is to cite Exhibit 1 of the IPHC Amicus Brief and to argue that the IPHC simply does not care if the CEY is exceeded. Plaintiffs' Opp. at 5-6. The implication that the IPHC does not care about conservation is patently unfair, particularly coming from people who do not want to adhere to their conservation quota. Equally important,

9

Plaintiffs are again taking things out of context. Exhibit 1 is a one-year snapshot. But the IPHC conservation program is a multi-year continuum which adjusts harvest rates over the medium and long term. 73 Fed. Reg. 30504, 30518 (May 28, 2008). When there is a significant decline in the CEY, the reductions in the commercial setline quota are stepped down in a phased-in program so that the commercial setline fishermen do not absorb 100% of the decline in one year. In the same manner, when the halibut resource increases, the commercial setline quota does not increase at the same rate but is phased in slowly. The percentage by which the setline quota decreases when the halibut stock is in decline (50%) is much greater than the rate a which the setline quota increases (33%) when the halibut resource increases *See* Behnken Aff., ¶ 14; Leaman Aff., attachment 1, notes 3, 4. This is a multi-year process. A one-year snapshot does not reflect the continuum of IPHC conservation management. Curiously, while Plaintiffs want to find fault with that phasing system, they show no concern about a similar but more generous phasing system that applies in determining the GHL. As 50 C.F.R. 300.65(c)(2) shows, the GHL is reduced in steps. However, the CEY must decline to a specific number before there is any GHL reduction. While the commercial setline sector has its quota adjusted annually to reflect any reductions in the CEY, 50 C.F.R. 300.65(c)(1) shows there are no reductions of the GHL until the total CEY reductions are fairly large.

     Since Plaintiffs raise the issue of factual accuracy, Intervenors would like to briefly address the perception that the commercial setline sector is comprised of large corporate enterprises instead of small family-owned businesses. Fifty-seven percent of the commercial setline fleet has only 3,000 pounds of halibut allocation and 79% have less than 10,000 pounds. Existing regulations limit the setline fleet to 62,100 pounds. Intervenors' Mem. at 25-26. Contrast that with the fact that some of the individual Plaintiffs have operations approximating

$12 million, taking 80,000 pounds or more of halibut annually. *Id.* at 26.  During the oral argument on the preliminary injunction motion, counsel for Intervenors recited those facts.  Thereafter, counsel for Plaintiffs asserted there was no 62,100 pound cap on commercial landings and that the cap is 300,000 pounds exacerbating any impression that the setline fishermen are large corporate entities.  Unfortunately, that statement is incorrect.  Plaintiffs confuse quota shares with pounds of fish.  Setline fishermen have a number of quota shares that represent the holder's percentage of the commercial setline quota.  A commercial fisherman can hold hundreds of thousands of quota share units but that is not the same thing as pounds of fish.  If a fisherman held the maximum amount of quota shares, it would translate to only 62,100 pounds of fish.  Intervenors' Mem. at 9, note 1.

### III. Conclusion

For reasons cited above and in Intervenors' Memorandum, Intervenors' respectfully request that their Motion to Intervene be granted.

Dated: June 26, 2008                    Respectfully submitted,


/s/ George J. Mannina
George J. Mannina, Jr. (D.C. Bar No. 316943)
Paul L. Knight (D.C. Bar No. 911594)
O'Connor & Hannan, L.L.P.
1666 K Street, N.W., Suite 500
Washington, D.C.  20006-2803
Telephone:    (202) 887-1400
Facsimile:    (202) 466-3215
*Counsel for Proposed Intervenor-Defendant*